Clerk of Court                                            July 29, 2013
Judge Isgur
United States Bankruptcy Court
Southern District of Texas, Houston Division
515 Rusk Avenue
Houston, TX 77002
ATP Oil & Gas Corporation                                          12-36187

United States District Court
Southern District of Texas
FILED

AUG 0 7 2013

David J. Bradley, Clerk of Court

You Honor,

Calvin Coolidge once said, "Nothing in the world can take the place of Persistence. Talent will not; nothing is more common than unsuccessful men with talent. Genius will not; unrewarded genius is almost a proverb. Education will not; the world is full of educated derelicts.

Persistence and determination alone are omnipotent. The slogan 'Press On' has solved and always will solve the problems of the human race."

The key of persistence opens all door closed by resistance.

As an owner of ATP I do value the courts hard work in this case and with all due respect, the courts comment regarding "not putting humpty dumpty (ATP) back together again" is concerning to me.

To date the "rushed" asset sale to the dip lenders has not been approved and we see continuing improvements in the price of oil which has reached $105 a barrel. "Rigzone" reported recently of the "continued strong permitting environment in the U.S. Gulf of Mexico" and "U.S. Gulf of Mexico drilling activity will continue to rise". Hardly diminishing market conditions!

ATP's oil and gas assets continue to increase in value based on accepted industry standards and the courts comment appears to favor only one "creditor" group and the process of liquidation over reorganization, regardless of the increasing value of ATP's assets and the increased market value of oil, if produced.

As you have found no issues with ATP managements "Sound Business Judgment", others including myself have major issues with that judgment. As an ATP equity holder, an owner of the company if you will, I have serious concerns regarding my management not fulfilling their fiduciary responsibilities to me as required by state and federal laws and their actions during this case related to "best value of the estate".

1

The rushed asset sale failed to deliver results of "Value". Even with this fact, my management has recommended this path of liquidation and abandonment over reorganization leaving my company insolvent. As I find this very puzzling and I ask why this path!

As disclosure issues appear to be of concern in most bankruptcy courts, we as equity holders, owners of the company, have learned in the court hearings, the **dip lenders would not allow the use of funding for any reorganization effort by ATP management including revenues generated by ATP**. The court will recall a press release at the start of this case issued by the company in August 2012, in that release ATP management declares;

*ATP has obtained a commitment for $617.6 million of debtor-in-possession (DIP) financing from members of its existing senior lender group, which will provide $250 million of additional funds and refinance into the DIP facility the amounts owed to those existing first lien lenders that participate in providing additional funds. Upon approval by the Bankruptcy Court, the **new financing and cash generated from ATP's ongoing operations will be used to support the business and ATP's efforts to negotiate and implement a reorganization plan** acceptable to its stakeholders.*

What we have now learned in the court hearings is very concerning. How could a reorganization plan be developed if funding for this activity was never provided for? This important disclosure was never made public to equity holders and if the ad hoc committee members were aware of this condition they were restricted from disclosure as they could tell me "nothing" that wasn't released by the court. Without this fundamental disclosure; this chapter 11 case has been cloaked as total asset liquidation, liquidation that would be easier achieved through a 363 sale.

One would think "Sound Business Judgment" would include management fulfilling their fiduciary responsibility to the company owners with public disclosure of this condition of the dip loan. We have now learned that liquidation and abandonment was the order of the day, cloaked in nondisclosure and leaving the company insolvent.

It is surprising to me that the court found no issues with ATP managements "Sound Business Judgment" as this analysis should be objective and not subjective. With all due respect, I ask the court; in using Sound Business Judgment "objective analysis", is there an acceptable level of

incompetence, a free pass so to speak, because of management's choice in not disclosing all of the facts? I ask the court, using sound business judgment, how could one find replacement DIP financing if a reorganization plan was not developed because of funding we have learned. Is it sound business judgment to expect lenders to give "anyone" a billion dollars without a plan?

ATP management in court documents state they could not find replacement funding, in fact they could not find any funding except the DIP lenders. How could any business find such funding without a plan? This is hardly sound business judgment when you learn the facts.

Does management get a free pass by the court in their "late" disclosure to the court that the dip lenders would not fund any reorganization effort, therefore no public disclosure that a reorganization plan was not going to be developed? Sound business judgment or deliberate intent cloaked by nondisclosure, but failure to disclose to the owners of the company these facts is not Sound Business Judgment when public statements document; *ATP's efforts to negotiate and implement a reorganization plan* acceptable to its stakeholders . This is the total disregard of management's fiduciary responsibilities to the owners of the company. This court may feel these issues are not the responsibility of the Bankruptcy court, but sir, these issues are related to Sound Business Judgment and one's objective analysis of that judgment.

ATP management should have disclosed that the DIP loan would not provide funding for any reorganization effort and liquidation of the company's assets was the only option. Instead ATP's management reported  "*Upon approval by the Bankruptcy Court, the new financing and cash generated from ATP's ongoing operations will be used to support the business and ATP's efforts to negotiate and implement a reorganization plan* acceptable to its stakeholders. "

Objective analysis of sound business judgment has to remove the cloak of nondisclosure. We discover by reading court documents, "after the fact" of managements issues in making sound business decisions. We now understand why Gomez failed, the ownership structure of the Gomez oil and gas production.  Of course history shows us ATP's current management has used questionable business judgment in the past, proven "Bad" business decisions. They have blamed the Gomez failure on the "greed" of the folks who purchased the production interest they in fact sold to them. So now, without the Gomez production everyone who owns an interest in that production has lost. Hundreds of millions of dollars lost in the cloak of nondisclosure. ATP management declares

they tried to negotiate a deal with production owners. How could anyone agree to a restructure their ownership, if a reorganization plan was never done? Is it sound business judgment to expect the other production owners just to give back their interest? We have learned in court documents ATP's ownership in Gomez production was merely 20% as they sold off the balance. Gomez production owners will receive nothing after Gomez has been abandoned; they knew that and still no deal. How does one objectively evaluate sound business judgment without knowledge of all the facts? I would hope that the court has not used subjective analysis, as salesmanship plays a big part in that analysis.

As investors in publicly held companies we trust those folks managing our companies and they are paid quite well for that responsibility. We also trust the courts to insure our rights as "owners" are protected from the "professional managers". Therefore, in this case, are their actions in the best interest of the estate. As an owner of ATP and with more information being disclosed, I question ATP's management in using sound business judgment and making business decisions based on that judgment.

How does any competent management explain SEC filings that state the "Gross Value of Assets" at billions of dollars and then history of their "Sound Business Judgment" decisions allow those assets to be liquidated for substantially less? How does any competent management explain SEC filings that show hundreds of millions of dollars of asset value being abandoned? If ATP management has used sound business judgment in there liquidation plan vs. a reorganization plan, they have singlehandedly proven oil and gas assets really are not worth what they are advertised in SEC filings. This in itself defies all objective logic, if one path does not deliver value is it sound business judgment to continue down that path? Or does sound business judgment suggest a different path, a path of reorganization.

Sound business logic would suggest that the 80% ownership interest in the Gomez production (non ATP interest), might have had an interest in signing over that ownership interest to APT if they were to receive an ownership position in the reorganized company. Of course there would need to be a reorganized company for this to happen and as we now know the DIP lenders will not allow funds for this activity, but will allow $15 million to get their purchase of valuable ATP assets closed, as these assets are increasing in value daily.

Sound business judgment, has the court been fooled by the act of "salesmanship" where only half of the story has been told? Or has the court known from the beginning that asset liquidation and the abandonment of assets was going to be the only action ATP's management was going to pursue and then deemed that course of action from the beginning as sound business judgment?

With current oil prices at $105 a barrel and the increased value of ATP oil and gas assets, it is difficult to understand the logic in the courts comment regarding "not putting humpty dumpty (ATP) back together again. We have two path's, the one we are traveling has now reached a very deep canyon and we are standing at the edge of the cliff, as the court has said we are not going back, some suggest we just jump off into the canyon. Sound logic would suggest this path doesn't work and we turn around and travel the second path. Sure it may require more time and energy, but what would be in our collective best interest, to jump or travel the other path. Then we are reminded by those that want us to jump, they never provided funding to travel that other path, so now everyone just line up and jump, as the Dip Lenders have reached the end of their path, with more value than they had four months ago.

In closing I would ask the court to reconsider as sound business judgment is a very objective analysis and disclosing only half the facts to support ones salesmanship skills to the court becomes very subjective. Hopefully the court will not be fooled.

With all due respect, someone has let the cows out of the barn; and as an owner of those cows, I believe it is not too late to get these cows back into the barn. If anyone were to suggest that reorganization plans have not been submitted to the court they would be factually wrong, as I have submitted a plan that could see a successful reorganization if one were just to commit the time and energy to make the plan work.

I ask, is it in the best interest of the court or the best interest of the estate to approve the liquidation and abandonment of valuable ATP assets when those assets have been proven to be more value today. I hope the court is not asking us to jump off the cliff, only because of the time and energy that has been put into this case. I have again attached a copy of my reorganization plan.

Best regards,

Douglas A. Meyer
429 Suncrest Loop W.
Slidell, Louisiana 70458

## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

In re:

ATP Oil & Gas Corporation, Debtor
Chapter 11
Case No.: 12-36187
Hon. Marvin Isgur

In reference;

## STRATEGIC REORGANIZATION PLAN
## FOR ATP OIL AND GAS CORPORATION the DEBTOR,

### DATED AS OF June 17, 2013.

*Submitted by Douglas A. Meyer, Prefferred Shareholder and 2nd Lien Holder.*
*429 Suncrest Loop West*
*Slidell, Louisiana 70458*

Executive Summary:

This plan has been developed by a Non-Legal Professional who is an interested party in the proceedings. It is in the best interest of the Debtor's estate, equity holders and creditors alike to reorganize the company vs. a plan for liquidation.

The debtor's estate can be reorganization based on improvements in the debtors operations and revenues. Since filing, the debtor's revenues were reported to be $303 million dollars. The debtor estate needs to substantially reduce its debt and this Strategic Reorganization Plan will accomplish that objective, turning debt into equity of the reorganized company with a means to pay all creditors 100% of their claims and creating a means to raise a minimum of $100 million dollars for the restructured company's operations without diluting the new equity positions and no creditor debt.

This Strategic Reorganization Plan, Chapter 11 Reorganization, is expected to be further amended and or modified by the legal professionals to insure all legal elements of a successful reorganization are include in the reorganization of the company. Having said that, this plan demonstrates that there is a means to successful reorganize the company.

On numerous occasions the court has asked "What would you want me to do?" I would ask the court to "Not" approve the 363 sale of ATP assets to the Dip Lenders and give this "Plan of Reorganization" an opportunity to develop. This plan can develop quickly and upon confirmation, the debtor would have "Limited Cash" in operating income until the effective date.

I present this plan to the court and other interested parties as a means to "preserve the value of the debtor's estate" and successfully reorganize the Debtor estate.


Douglas A. Meyer
429 Suncrest Loop West
Slidell, Louisiana 70458

# TABLE OF CONTENTS

ARTICLE I
INTRODUCTION AND STRATEGIC REORGANIZATION PLAN SUMMARY
Section 1.00. Introduction and Strategic Reorganization Plan Summary ..................... 5
Section 1.01. Strategic Reorganization Plan............................................................. 5
Section 1.02. Negotiation with Creditors.............................................................. 6
Section 1.03. Financing Options ......................................................................... 7
Section 1.04. Revenue Generation ...................................................................... 7
Section 1.05. Debtor's Equity in the Reorganized Company ................................... 7
Section 1.06. Equity and Creditor Debt Restructuring ........................................... 8
Section 1.07. Equity Restructuring ...................................................................... 8
Section 1.08. Creditor Restructuring ................................................................... 9
Section 1.09. Equity and Creditor Debt Restructuring Postmortem ........................... 9

ARTICLE II
CLASSIFICATION OF CLAIMS AND INTERESTS
Section 2.01. Generally........................................................................ ......... 10
Section 2.02. Unclassified Claims ..................................................................... 10
Section 2.03. Unimpaired Classes ...................................................................... 10
Section 2.04. Impaired Class Entitled to Vote...................................................... 10
Section 2.05. Impaired Classes Deemed to Reject ................................................ 10
Section 2.06. Classes Deemed to Become Unimpaired Upon Plan Acceptance ............... 10

ARTICLE III
PROVISIONS FOR TREATMENT OF CLASSES OF CLAIMS AND INTERESTS
Section 3.01. Satisfaction of Claims and Interests................................................ 11
Section 3.02. Unclassified Claims ...................................................................... 11
Section 3.03. Administrative Expense Claims...................................................... 11
Section 3.04. Priority Tax Claims....................................................................... 11
Section 3.05. Class 1: Secured First Lien Holders Claims, Creditors Group ................ 11
Section 3.06. Class 2: Secured Second Lien Holders Claims, Creditors Group.............. 12
Section 3.07. Class 3: Other Secure Lien Holders Claims, Creditors Group ................ 12
Section 3.08. Class 4: NPI and ORRI Holders Claims, Equity Group ........................ 12
Section 3.09. Class 5: Preferred Share Holders Claims, Equity Group ....................... 13
Section 3.10. Class 6: Unsecured Creditor Claim, Debtor Group ............................. 13
Section 3.11. Class 7: Common Stockholder Claims, Equity Group.......................... 13
Section 3.12. Restrictions Of The Sale Of New "Common Stock" Securities Issued
             By ATP The Reorganized Company................................................ 14
Section 3.13. Time and Quantity Restrictions ...................................................... 14
Section 3.14. Approved  Sale of New Issued "Common Stock" Securities ................... 14
Section 3.15. Class 7: Expiration of Restrictions.................................................. 14

ARTICLE IV
ACCEPTANCE OR REJECTION OF THE PLAN
Section 4.01. Acceptance by Impaired Classes of Claims.......................... ......... 15
Section 4.02. Voting Classes ............................................................................ 15
Section 4.03. Ballot Instructions....................................................................... 15

ARTICLE V
PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE PLAN
Section 5.01. Timing of Distributions.................................................................... 15
Section 5.02. Distributions to Holders of Allowed Claims ............................... 15
Section 5.03. Delivery of Distributions .............................................................. 16
Section 5.04. Method of Cash Distributions....................................................... 16
Section 5.05. Failure to Negotiate Checks.......................................................... 16
Section 5.06. Unclaimed Distributions .............................................................. 16
Section 5.07. Limitation on Distribution Rights................................................. 17
Section 5.08. Fractional Dollars.......................................................................... 17
Section 5.09. Compliance With Tax Requirements............................................. 17

ARTICLE VI
EXECUTORY CONTRACTS AND UNEXPIRED LEASES; INDEMNIFICATION
OBLIGATIONS; BENEFIT PROGRAMS
Section 6.01. Treatment of Executory Contracts and Unexpired Leases. ........... 17
Section 6.02. Cure of Defaults for Assumed Contracts and Leases ................... 18
Section 6.03. Bar Date for Claims for Rejection Damages ................................ 18
Section 6.04. Treatment of Rejection Claims ..................................................... 18
Section 6.05. Executory Contracts and Unexpired Leases Entered Into and Other
Obligations Incurred After the Petition Date....................................................... 19

ARTICLE VII
MEANS FOR IMPLEMENTATION OF THE PLAN
Section 7.01. Corporate Action........................................................................... 19
Section 7.02. Articles of Organization................................................................ 19
Section 7.03. Issuance of New Securities in Reorganized ATP.......................... 19
Section 7.04. Operations Between Confirmation Date and Effective Date......... 20
Section 7.05. Additional Funding Requirements................................................. 20
Section 7.06. Revesting of Assets........................................................................ 20
Section 7.07. Approval of Agreements................................................................ 20
Section 7.08. Change of Control.......................................................................... 20
Section 7.09. Post Effective Date Management................................................... 20
Section 7.10. Corporate Structure Changes ........................................................ 21

ARTICLE VIII
PRESERVATION OF CAUSES OF ACTION AND RIGHT TO DEFEND AND
CONTEST
Section 8.01. Preservation of Rights.................................................................... 21
Section 8.02. Setoffs ........................................................................................... 21
Section 8.03. No Payment or Distribution Pending Allowance........................... 21
Section 8.04. Resolution of Disputed Claims ..................................................... 21

ARTICLE IX
CONDITIONS TO CONSUMMATION OF THE PLAN
Section 9.01. Conditions to Effective Date.......................................................... 22
Section 9.02. Waiver of Conditions to Consummation ....................................... 22
Section 9.03. Effect of Failure or Absence of Waiver of Conditions
Precedent to the Effective Date of the Expiration of Restrictions Plan .............. 22

## ARTICLE X
## EFFECTS OF CONFIRMATION

Section 10.01. Discharge ...................................................................................... 23
Section 10.02. Injunction. .................................................................................... 23
Section 10.03. Exculpation .................................................................................. 24
Section 10.04. Releases........................................................................................ 24
Section 10.05. Other Documents and Actions...................................................... 25
Section 10.06. Term of Injunctions or Stays........................................................ 25
Section 10.07. Preservation of Insurance............................................................. 25
Section 10.08. Guaranties ................................................................................... 25
Section 10.09. Subordination Rights ................................................................... 25
Section 10.10. No Successor Liability.................................................................. 25

## ARTICLE XI
## RETENTION OF JURISDICTION

Section 11.01. Exclusive Jurisdiction of Bankruptcy Court ................................ 26
Section 11.02. Failure of Bankruptcy Court to Exercise Jurisdiction.................. 27

## ARTICLE XII
## MISCELLANEOUS PROVISIONS

Section 12.01. Binding Effect of Plan.................................................................. 28
Section 12.02. Withdrawal of the Plan ................................................................ 28
Section 12.03. Final Order................................................................................... 28
Section 12.04. Modification of the Plan .............................................................. 28
Section 12.05. Business Days .............................................................................. 28
Section 12.06. Severability .................................................................................. 28
Section 12.07. Governing Law ............................................................................ 29
Section 12.08. Dissolution of Committee ............................................................ 29
Section 12.09. Payment of Statutory Fees .......................................................... 29
Section 12.10. Post-Confirmation Operating Reports ......................................... 29
Section 12.11. Notices ........................................................................................ 29
Section 12.12. Filing of Additional Documents .................................................. 29
Section 12.13. Section 1125 of the Bankruptcy Code ......................................... 29
Section 12.14. Section 1146 Exemption .............................................................. 30
Section 12.15. Section 1145 Exemption .............................................................. 30
Section 12.16. Time ............................................................................................ 30
Section 12.17. No Attorneys' Fees ...................................................................... 30
Section 12.18. No Injunctive Relief..................................................................... 30
Section 12.19. Continued Confidentiality Obligations ........................................ 30
Section 12.20. No Admissions or Waivers .......................................................... 30
Section 12.21. Entire Agreement ......................................................................... 30
Section 12.22. Waiver.......................................................................................... 31
Section 12.23. Bar Date for Holders of Administrative Expense Claims.............. 31
Section 12.24. Bar Date for Professionals ........................................................... 31

## ARTICLE XIII
## DEFINITIONS, INTERPRETATION AND EXHIBITS

Section 13.01 Defined Terms............................................................................... 32
Section 13.02 Rules of Interpretation................................................................... 32
Section 13.03 Interpretation ................................................................................ 32

# ARTICLE I
# INTRODUCTION and STRATEGIC REORGANIZATION PLAN SUMMARY

## 1.00 Introduction
This chapter 11 plan (as further amended or modified hereafter, the "Plan") dated as of June 17, 2013
is proposed by Douglas A Meyer, a interested party.

Reference is made that the Author's has not signed a Nondisclosure and or a Confidentially agreement
with the Debtor. Discussion of the Debtors' history, business, results of operations, historical financial
information, properties, projections for future operations and risk factors, plus any summary and
analysis of the Plan and certain related matters are done by the author is based on released public
information. The Debtor and other committees have been given a copy of the plan as solicitation for
proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL CREDITORS OF THE DEBTORS ARE ENCOURAGED TO READ THE PLAN. SUBJECT
TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE
BANKRUPTCY CODE, BANKRUPTCY RULE 3019; THE AUTHOR OFFER'S THIS PLAN TO
THE COURT AS AN ALTERNATIVE TO THE DEBTORS PLAN OF LIQUIDATION. AS THE
AUTHOR OFFERS THIS PLAN TO THE COURT AND IT MAY BE ALTER, AMEND, MODIFY
BY THE PATIES.

## 1.01 Strategic Reorganization Plan
It is in the best interest of the Debtor's estate, equity holders and creditors alike to reorganize the
company vs. the debtor's plans for liquidation. The debtor's plan of liquidation serves only a few
creditors while the balance of creditors will be subject to the results of insolvency of the debtor's
estate.

The debtor's estate can be reorganization based on improvements in the debtors operations and
revenues. As reported in the May 2013 monthly operating report the debtor's revenues were reported at
$50 million dollar. Since filing, the debtor's revenues were reported to be $303 million dollars. The
debtor estate needs to substantially reduce its debt and this Strategic Reorganization Plan will
accomplish that objective, turning debt into equity of the reorganized company with a <u>means to pay all
creditors 100% of their claims</u> and creating a <u>means to raise a minimum of $100 million dollars</u> for the
restructured company's operations <u>without diluting the new equity positions and no creditor debt</u>.

This plan structures the reorganized debtor's estate where all creditors will be paid 100% of their
claims in the equity of the new reorganized company. The dip lenders shall have an opportunity to
receive 125% of their claim in the form of equity into the new reorganized company and or a "Cash
Out Option" at 100% of the value of their claim. This plan offers a means to pay that "Cash Out
Option", with an opportunity for the reorganized debtor to receive additional operating capital with
excess funds this means will produce.

This plan offers a means to stabilize the market capitalization of the new company by restrictions
placed on the sale of securities by the initial holders of the reorganized company, while providing a
reasonable market "Float" to sustain capitalization.

The authorized shares of the new company will be one billion with 612.5 million shares to be issued
and or to be "pledged" to issue. The company shall be debt free and total equity should be
approximately $4.9 billion dollars. The "book" value of each share would be $8.00 a share.

The company's total assets are approximately $2.9 billion dollars in "book value". The company has $1.8 billion in accumulated DD&A; some portion may be required to be recaptured. The company has assets that have "unknown" value and "goodwill" estimates need to be applied to these assets. The company has estimated oil and gas reserve values for its holding in ATP Med and other oil and gas assets, these estimates need to be confirmed and brought to the balance sheet and or "goodwill" value needs to establish. The company has claims against BP for $3.1 billion dollars and "goodwill" value for these claims, that caused the bankruptcy, needs to be established. It is in the best interest of the debtor's estate and the reorganized debtor's estate to capture all asset value going forward. This plan accepts the debtor's asset to have an asset value of at least $4.9 billion dollars.

The best time for reorganization is when everyone is unhappy. Right now only a few creditors are happy, the debtor's management and board of directors should become proponents of this plan by changing its recommendation to the court; from approval to rejection of the 363 "sale" and work towards the reorganize of the estate as described in this plan.

With that the debtor's management should make a statement by cutting expenses related to the liquidation of assets and focused on reorganization vs. liquidations. Eliminate all services that are not focus on the reorganization of the company.

**1.02 Negotiation with Creditors**
The debtor needs to start a dialog immediately with Creditors. Post-Petition Liabilities are approximately $767 million dollars. Pre-Petition Liabilities are approximately $2.257 billion dollars. Secured obligations hold $1.68 billion Pre-Petition debt; the second lien holders hold most of this debt. Principals of agreement on restructuring this debt into equity of the reorganized company need to be established. This Class holds 55.5% of the outstanding debt. The Plan offers this Class 100% of the value of their claims and they need to become proponents of the Plan. Agreements on worse case, to best case scenarios in principal need to be established!

The debtor also needs to start a serious dialog with the Other Obligations; NPI and ORRI holders which hold interest in the operating income of ATP's oil and gas assets. This class holds 14.3 % of the debt. The Plan offers this Class 100% of the value of their claims and they need to become proponents of the Plan. Principals of agreement on restructuring this interest into equity of the reorganized company need to be established. Agreement on worse case, to best case scenarios in principal need to be established!

The debtor needs to start a serious dialog with the Priority Unsecured and Unsecured holders. These two classes hold 4.7 % of the debt. The Plan offers these two Classes 100% of the value of their claims and they need to be proponents of the Plan. Principals of agreement on restructuring this debt into equity of the reorganized company need to be established. Agreement on worse case, to best case scenarios in principal need to be established!

These Classes above represent 75% of the outstanding debt.

The last group to be addressed is Post-Petition Debt. This Class includes the Dip Lender Group. This Plan offers a "Cash-Out" and or a Non-Cash-Out option. The "Cash-Out Option gives this Class 100% value of their claim and the "Non-Cash-Out Option gives this Class 125% of their claims value. Each member should be asked personally if they want to be part of the reorganized company or simply paid off. This Class should be proponents of the Plan. If any member wants to be part of the organized company, principals of agreement on restructuring their debt into equity of the reorganized company need to be established. If they prefer to be paid off, agreements of understanding need to be secured as

the Plan provides for a means for these payments to be made. As are a means for the reorganized company's future financing needs.

## 1.03 Financing Options

With substantially all of the debtor's debt reduced, the debtor would find a path to the financing of the debtor's current and future operations. However, the Plan provides a means for the reorganized debtor to raise $100 million dollars without diluting the equity holder's positions for working capital needs. With monthly revenues exceeding $50 million a month the reorganized company will be able to meet its "Cash" requirements going forward.

If the Class 1 holders elect to receive the "Cash-Out" option, the Plan provides a means, again without diluting the equity holder's positions, by offering securities allocated for the Class 1 holders to the public. Those shares have an equity value of $8.00 a share. Because the allocation value is higher than the "cash-out" value, the net benefit to the reorganized company would be $192 million dollars. The debtor should find brokers willing to negotiate the sale of these, and those other securities the Plan provides, to the investment community. The debtor and brokers selected should establish a plan that would maximize the value for these securities.

The debtor should start serious negotiations with BP with the minimal goal of receiving $1.5 billion in cash and $1.5 billion in loan guarantees. BP will be very unhappy if the court rules shortly that gross negligence or willful misconduct was found. That minimal goal needs to be established and communicated to BP before the June / July ruling.  With a ruling of gross negligence or willful misconduct, that minimal goal needs to be increased to $3 billion cash and $3 billion in loan guarantees if a settlement had not been reached. BP has a history of receiving and giving loan guarantees. ATP needs loan guarantees to re-establish financial creditably. Those attorneys handling the BP case today may not be the same attorneys handling the case if the Class 1 holders are awarded their credit bid.

## 1.04 Revenue Generation

The debtor has made substantial improvements to its operational revenues with more projected increases weeks away. The debtor should develop Revenue Generating Opportunities Plans to increasing revenues with minimal cost. If "Shut In" assets can produce positive revenue with little cost, produce a business model and budget for these assets to bring them to profitability. If the debtor's management has not "Shut In" all gas and oil assets that are not producing positive revenues, they should do so immediately, for the preservation of asset value.

The debtor should look for ATP IP licensing opportunities to generate positive revenue. Include engineering services to support licensing opportunities. Produce a business model and budget of opportunities found. Instruct all ATP subsidiaries to look for revenue generating opportunities to maximize the return on asset value. If opportunities are found produce a business model and budget for each opportunity. Instruct ATP UK and ATP MED to look for oil and gas revenue generating opportunities that require minimal investments but offer a high return on investment dollars. If these above activities have been tried and failed, offered those human assets doing the work an incentive for success based on return of value generated. See section 7.04 and 7.05 for funding.

## 1.05 Debtor's Equity in the Reorganized Company

The Debtors equity in the reorganized company will be $4.9 billion dollars. Currently total assets are approximately $2.9 billion dollars in "book value". The company has $1.8 billion in accumulated DD&A; the debtor should recapture that value by every "legal" means.

The debtors estate has assets that have "unknown" value, that value needs to be captured. The company has estimated oil and gas reserve values for its holding in ATP Med and these estimates need to be confirmed and brought to the balance sheet.

"Goodwill" value also needs to establish. The company has claims against BP for $3.1 billion dollars and "goodwill" value for these claims needs to be established. It is in the best interest of the debtor's estate and the reorganized debtor's estate to capture all asset value going forward. The "tax credits" should have value and the debtor's estate should receive credit for this value in the reorganized company.

All oil and gas assets have value and the all activity to relinquishment and abandonment assets should be suspended for the preservation of value. The Gomez assets should be recaptured as they have value, with the NPI and ORRI holders claims against these assets resolved, these assets should produce positive revenues. The reorganized company will have a means to invest in this asset to increase value. The reorganized company would them decide to relinquish and abandon these assets in the future.

This plan "accepts" the debtor's asset to have an asset value of at least $4.9 billion dollars.

## 1.06 Equity and Creditor Debt Restructuring

The Equity Holders and Debt Holders will be the "new owners" of the reorganized company. Their interest in the new company was calculated by the value of the assets and or value of the claims they hold. Each group's interest was calculated using total equity and debt figures. Equity figures are as described in section 1.05. Total equity value given to the Equity holders is $4.9 billion dollars. Equity holders will see a substantial diluted "ownership" position in the reorganized debtor's estate as all Class Holders claims will be paid from the Equity holder's value.

Total debt figures were calculated by the "allowed" claim value assigned to each debtor class. Debt holders "**Will Not**" see a diluted value in the final equity share structure of the reorganized company. Because of the hierarchy structure in bankruptcy each of these two Groups, Equity and Debt has the interests of the parties, in the restructured company, defined below in sections 1.07 and 1.08.

## 1.07 Equity Restructuring

Equity holders make up the Common; Class 7 and Preferred; Class 5 stock holders. This group will put all ATP assets including "goodwill value" into the reorganized company. Goodwill value is for additional asset value not represented in the "book value" of the company. This value will represent approximately $4.9 billion dollars.

Of this group's value, within the hierarchy structures, the preferred holders will receive 125% of the face value of their shares, plus interest due. These shares will be allocated from the common stock holder's equity position in the reorganized company.

The Equity group, common holders will provide from their equity position allocations to pay "outstanding legal and professional services fees owed by the creditors, but limited to 2% of the value of each creditors claim.

The Equity group, common stockholders, will provide from their equity position allocations to provide new securities, that will be pledged or offered "for sale" to raise $100 million dollars in funding for the reorganized company as described in section 3.14.

The common shareholders, after all Class Holders are paid, will receive the balance of this group's value in the reorganized company. This Equity group's value will be paid in the form of common shares. This group's expenses, in the form of outstanding legal fees and professional services owed,

will also be paid from the common shareholders equity interest, limited to .05% of the remaining value. These fees will be paid in "common shares" of the reorganized company.

## 1.08 Creditor Restructuring

Creditor Debt is made up of the first lien holders; Class 1, second lien holders; Class 2 , other secure lien holders; Class 3 , Priority unsecured and unsecured creditors, Class 6 and other obligations including NPI and ORRI interest; Class 4. This group will receive "one point" for each dollar of Debt.

Class 1, the first lien holders will have the option to be paid in "cash" at 100% of value and or equity at 125% of value in the form of common shares. This Class of creditor group is the only creditor group that has an option for cash or equity. With hierarchy structures, the first lien holders will receive 100% value in cash or they can chose 125% value in common shares. Outstanding legal and professional services fees will be paid from the common stockholder's equity position, but limited to 2% of the value of the first lien holder's claim.

The second lien holder's will be paid 100% of their value, plus interest in the form of common shares in the reorganized company. With hierarchy structures, this group will be paid 100% of value in common shares in the reorganized company. Outstanding legal and professional services fees will be paid from the common stockholder's equity position, but limited to 2% of the value of the second lien holder's claim.

The other secured creditors will be paid 100% of their value in the form of common shares in the reorganized company. Outstanding legal and professional services fees will be paid from the common stockholder's equity position, but limited to 2% of the value of the secured creditor claim.

The unsecured creditors will be paid 100% of their value in the form of common shares in the reorganized company. Outstanding legal and professional services fees will be paid from the common stockholder's equity position, but limited to 2% of the value of the unsecured claim.

Other Obligations including NPI and ORRI interest will receive 100% of the value of their claims in the form of common shares in the reorganized company. Outstanding legal and professional services fees will be paid from the common stockholder's equity position, but limited to 2% of the value of the other obligations.

## 1.09 Equity and Creditor Debt Restructuring Postmortem

With the equity and debt restructuring, the reorganized company will become basically debt free. All equity and creditors would receive common shares that they could sell at a future date to "cash out" their positions in the reorganized company. Both equity and creditors would win and the surviving company would be stronger.

## ARTICLE II
## CLASSIFICATION OF CLAIMS AND INTERESTS

### Section 2.01. Generally.

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of the Class and is classified in a different Class to the extent the Claim or Interest qualifies within the description of that different Class. A Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Reorganization only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class

and such Claim or Interest has not been paid, released, settled or otherwise satisfied prior to the Effective Date.

**Section 2.02. Unclassified Claims.**
In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified and are excluded from the Classes designated in this Article II of the Plan. The treatment accorded Administrative Expense Claims and Priority Tax Claims is set forth in Article III of the Plan.

**Section 2.03. Unimpaired Classes.**
The Plan classifies the following Unimpaired Claims and Interests as Unimpaired Classes that are not entitled to vote to accept or reject the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, each Holder of a Claim or Interest in the following Classes is conclusively presumed to have accepted the Plan in respect of such Claims or Interests and is not entitled to vote to accept or reject the Plan:

None

**Section 2.04. Impaired Class Entitled to Vote.**
The Plan classifies that all Classes of claims are Impaired Classes that may receive a distribution under the Plan and are entitled to vote to accept or reject the Plan:

> Class 1 Secured First Lien Holders.
> Class 2 Secured Second Lien Holders
> Class 3 Other Secure Lien Holders
> Class 4 Other Obligation; NPI and ORRI Holders
> Class 5 Equity Interest, Preferred Share Holders
> Class 6 Unsecured creditors including Priority
> Class 7 Common Stockholders

**Section 2.05. Impaired Classes Deemed to Reject.**
The Plan classifies the following Impaired Claims and Interests as Impaired Classes that are not entitled to vote to accept or reject the Plan. Pursuant to section 1126(g) of the Bankruptcy Code, each Holder of a Claim or Interest in such Classes is conclusively presumed to have rejected the Plan in respect of such Claims or Interests because the Plan does not entitle the Holders of such Claims or Interests to receive or retain any Property under the Plan on account of such Claims or Interests. Accordingly, each Holder of a Claim or Interest in the following Classes is not entitled to vote to accept or reject the Plan:

None

**Section 2.06  Classes Deemed to Become Unimpaired Upon Plan Acceptance**
Notwithstanding the foregoing, in the event that the Holders of Allowed Class 2 Claims vote as a class to accept the plan. Class 3, 4, 5, 6 and 7 will be Unimpaired and, accordingly, conclusively presumed to have accepted the Plan in respect of such Claims and not entitled to vote to accept or reject the Plan.

## ARTICLE III
## PROVISIONS FOR TREATMENT OF CLASSES OF
## CLAIMS AND INTERESTS AND RESTRICTIONS OF THE SALE OF NEW "COMMON STOCK" SECURITIES ISSUED BY ATP THE REORGANIZED COMPANY

**Section 3.01. Satisfaction of Claims and Interests**.
The treatment of and consideration to be received by Holders of Allowed Claims or Allowed Interests pursuant to this Article III and the Plan shall be in full satisfaction, settlement, release, extinguishment and discharge of their respective Claims against and Interests in the Reorganizing Debtors Estates, except as otherwise provided in the plan or the Confirmation Order. The equity and debt holders will be the "new owners" of the reorganized company. Their interest in the new company will be calculated by the value of the assets and or value of the claims they hold. Each group's interest will be calculated using total equity and debt figures.

**Section 3.02. Unclassified Claims**.
Administrative Claims and Priority Tax Claims are treated in accordance with section 1129(a)(9)(A) and section 1129(a)(9)(C) of the Bankruptcy Code, respectively. Such Claims are Unimpaired under the Plan and, in accordance with section 1123(a)(1) of the Bankruptcy Code, are not designated as Classes of Claims for purposes of this Plan and for purposes of sections 1123, 1124, 1126 and 1129 of the Bankruptcy Code.

**Section 3.03. Administrative Expense Claims**.
Administrative Expense Claims are Unimpaired. Each Allowed Administrative Expense Claim shall, in full and final satisfaction of such Allowed Administrative Expense Claim, be paid by the Reorganized Debtors, in full, in Cash and or in newly issued shares of the reorganized company for this purpose, in such amounts as are incurred in the ordinary course of business by the Reorganized Debtors, or in such amounts as such Administrative Expense Claim is Allowed by the Bankruptcy Court upon: (a) the later of: (i) the Effective Date; and (ii) if such Claim is Allowed after the Effective Date, the date upon which there is a Final Order allowing such Administrative Expense Claim; (b) such other terms as may exist in the ordinary course of the Reorganizing Debtors' business and in accordance with the terms and conditions of any agreement governing or document evidencing such Administrative Expense Claim; or (c) such terms and conditions as may be agreed upon between the Holder of such Allowed Administrative Expense Claim and the Reorganized Debtors.

**Section 3.04. Priority Tax Claims**.
Priority Tax Claims are Unimpaired. Each Holder of an Allowed Priority Tax Claim shall, in full and final satisfaction of such Holder's Allowed Priority Tax Claim, be paid either: (a) in Cash, in full, on the later of the: (i) Effective Date; and (ii) date such Priority Tax Claim becomes due and payable in the ordinary course of business; (b) in equal annual Cash payments aggregating the amount of such Allowed Priority Tax Claim together with interest at the applicable non-bankruptcy rate over a period not exceeding five (5) years from the Petition Date; or (c) on such other terms and conditions as may be agreed upon between the Holder of such Allowed Priority Tax Claim and the Reorganized Debtors.

**Section 3.05. Class 1: Secured First Lien Holders Claims, Creditors Group**.
Class 1 Secured First Lien Holders Claims are Impaired. Each individual Holder of an Allowed Secured First Lien Claim shall, in full and final satisfaction of each such Holder's Secured First Lien claim, receive (i) with respect to such Holder's Cash-Out Claim (if any), its Cash-Out Payment of 100% of such claim, and or (ii) with respect to such Holder's Non-Cash-Out Claim (if any), (a) its Pro Rata Share at 125% (1.25X) of such claim in New "Common Stock" Securities issued by ATP, which would represents, estimated, 19.586% of the outstanding common shares on the Effective Date.

Furthermore, the Reorganized Debtors, through allocations made by Class 7 holders, shall pay in full, in Cash and or New "Common Stock" Securities , any and all outstanding and unpaid fees and expenses incurred by the Secured First Lien Holders  professionals through the Confirmation Order effective date without further motion, fee application or order of the Bankruptcy Court, which terms and conditions are agreed upon between the Holder of such and the Reorganized Debtor, but limited to 2% of the value of the first lien holder's claim.

(a) For clarity, the Cash-Out Option is intended to give Secured First Lien Holders the option to receive, in full and final satisfaction of such Claims, a payment in Cash of 100% of the amount of such Claims, in lieu of receiving New Securities. In the event that the Cash-Out Option is subscribed, the reorganized debtor will offer the holders allocation of Pro Rata New "Common Stock" Securities to other investor groups for a period of three months after the effective date at which time the holders "cash-out option" is due and payable. The reorganized debtor agrees to pay a 2% premium for each month as interest on the unpaid claim, until paid and the holder agrees to accept these terms. The holder retains the right to convert the "remaining balance of their unpaid claim", into the "remaining balance the unsubscribed portion of their allocation" of Pro Rata New "Common Stock" that are offered "For Sale", during this three month period.

**Section 3.06. Class 2: Secured Second Lien Holders Claims, Creditors Group.**
Class 2 Secured Second Lien Holders Secured Obligation Claims are Impaired. Each Holder of an Secured Second Lien Secured Obligation Claim shall, in full and final satisfaction of each such Holder's Secured Second Lien receive its Pro Rata Share of a Non-Cash-Out settlement of its Claim at 100% (1.00X) of such claim in New "Common Stock" Securities issued by ATP, which would represents, estimated, 34.275 % of the outstanding common shares on the Effective Date. This percent also includes Class 3 holders.

Furthermore, the Reorganized Debtors, through allocations made by Class 7 holders, shall pay in full, in Cash and or New "Common Stock" Securities , any and all outstanding and unpaid fees and expenses incurred by the Secured Second Lien Holders  professionals through the Confirmation Order effective date without further motion, fee application or order of the Bankruptcy Court, which terms and conditions are agreed upon between the Holder of such and the Reorganized Debtor, but limited to 2% of the value of the second lien holder's claim.

**Section 3.07. Class 3: Other Secure Lien Holders Claims, Creditors Group**.
The Class 3 Other Secure Lien Holders Claims are Impaired. The Holder of Other Secure Lien Claims shall, in full and final satisfaction of the Secure Lien, receive its Pro Rata Share of a Non-Cash-Out settlement of its Claim at 100% (1X) of such claim in New "Common Stock" Securities issued by ATP, which would represents part of the 34.427 percent estimate that Class 2 holders would receive of the outstanding common shares on the Effective Date.

Furthermore, the Reorganized Debtors, through allocations made by Class 7 holders, shall pay in full, in Cash and or New "Common Stock" Securities , any and all outstanding and unpaid fees and expenses incurred by the Other Secure Lien Holders professionals through the Confirmation Order effective date without further motion, fee application or order of the Bankruptcy Court, which terms and conditions are agreed upon between the Holder of such and the Reorganized Debtor, but limited to 2% of the value of the secured creditor claim.

**Section 3.08. Class 4: Other Obligations, NPI and ORRI Holders Claims, Creditors Group**.
Class 4 Other Obligations; NPI and ORRI Holders Claims are impaired. Each Holder of the class shall, in full and final satisfaction of the claim, receive its Pro Rata Share of a Non-Cash-Out settlement of

its Claim at 100% (1X) of such claim in New "Common Stock" Securities issued by ATP, which would represents, estimated, 8.828% of the outstanding common shares on the Effective Date.

Furthermore, the Reorganized Debtors, through allocations made by Class 7 holders, shall pay in full, in Cash and or New "Common Stock" Securities , any and all outstanding and unpaid fees and expenses incurred by the NPI and ORRI Holders professionals through the Confirmation Order effective date without further motion, fee application or order of the Bankruptcy Court, which terms and conditions are agreed upon between the Holder of such and the Reorganized Debtor, but limited to 2% of the value of the Other Obligations and NPI and ORRI holders claims.

### Section 3.09. Class 5: Preferred Share Holders Claims, Equity Group.

Class 5 Preferred Share Holders Claims are impaired. Each Holder of a Preferred Shares claim shall, in full and final satisfaction of the claim, receive its Pro Rata Share of a Non-Cash-Out settlement of its Claim at 125% (1.25X) of such claim in value of their claim, plus interest.

The Preferred Share Holders claim with be paid out the equity groups allocation of Pro Rata New "Common Stock" Securities issued by ATP, which would represents, estimated, 3.481% of the outstanding common shares on the Effective Date.

Furthermore, the Reorganized Debtors,  through allocations made by Class 7 holders, shall pay in full, in Cash and or New "Common Stock" Securities , any and all outstanding and unpaid fees and expenses incurred by the Preferred Share Holders professionals through the Confirmation Order effective date without further motion, fee application or order of the Bankruptcy Court, which terms and conditions are agreed upon between the Holder of such and the Reorganized Debtor, but limited to 2% of the value of the Preferred Share Holders claims.

### Section 3.10. Class 6: Priority Unsecured and Unsecured Creditor Claim, Creditors Group.

Class 6 Unsecured Creditor's Claims are Impaired. Each Holder of Unsecured Creditor Claims shall, in full and final satisfaction of the Creditor's Claim, receive its Pro Rata Share of a Non-Cash-Out settlement of its Claim at 100% (1X) of such claim in New "Common Stock" Securities issued by ATP, which would represents, estimated, 2.963% of the outstanding common shares on the Effective Date.

Furthermore, the Reorganized Debtors, through allocations made by Class 7 holders, shall pay in full, in Cash and or New "Common Stock" Securities , any and all outstanding and unpaid fees and expenses incurred by the Unsecured Creditor's Claim Holders professionals through the Confirmation Order effective date without further motion, fee application or order of the Bankruptcy Court, which terms and conditions are agreed upon between the Holder of such and the Reorganized Debtor, but limited to 2% of the value of the Unsecured Creditors Holders claims.

### Section 3.11. Class 7: Common Stockholder Claims, Equity Group.

Class 7 Common Share Holders Claims are impaired. Each Holder of a Common Share claim shall, in full and final satisfaction of the claim, receive its Pro Rata Share of a Non-Cash-Out settlement of it Claim from the balance of the equity groups value in the reorganized company, less all outstanding and unpaid fees and expenses incurred by all other Class Holders professionals through the Effective Date without further motion, fee application or order of the Bankruptcy Court, which terms and conditions are agreed upon between the Holder of such and the Reorganized Debtor.

The Common Share Holders claim with be paid out the "balance" of the equity groups allocation of Pro Rata New "Common Stock" Securities issued by ATP, which would represents, estimated, 30.867 % of the outstanding common shares on the Effective Date.

Of that 30.867%; 1.29 % has been allocated to pay all outstanding and unpaid fees and expenses incurred by the all other Class Holders professionals through the Confirmation Order effective date without further motion, fee application or order of the Bankruptcy Court, which terms and conditions are agreed upon between the Holder of such and the Reorganized Debtor, but limited to 2% of the value of the Unsecured Creditors Holders claims.

In addition 2.05% of the common holders position has been allocated to provide new securities, that will be offered "for sale" to raise $100 million dollars in funding for the reorganized company.

Furthermore, the Reorganized Debtors, through allocations by this Class 7 holders, shall pay in full, in Cash and or New "Common Stock" Securities , any and all outstanding and unpaid fees and expenses incurred the Common Share Holders professionals through the Confirmation Order effective date without further motion, fee application or order of the Bankruptcy Court, which terms and conditions are agreed upon between the Holder of such and the Reorganized Debtor, but limited to 0.05% of the value of the Common Shareholder's remaining interest.

After all allocations, the balance would represent estimated 27.482% of the outstanding common shares on the Effective date.

### Section 3.12 Restrictions Of The Sale Of New "Common Stock" Securities Issued By ATP The Reorganized Company.
The sale of the Reorganized Debtors New "Common Stock" Securities issued by the reorganized debtor are governed by rules established by the SEC and are further restricted by the terms and conditions herein, for periods described in Section 3.13 and or rules established by the SEC, which ever many be for longer periods. It is in the best interest of the reorganized company, for a limited time, to restrict the sale of new "Common Stock" securities issued with this plan. Holders are restricted and there should be no sale of securities other than those listed in section 3.14

### Section 3.13 Time and Quantity Restrictions
Holders described in section 3.04 are restricted from selling New Issued "Common Stock" Securities for a period of 3 months after issuance and may sale only 20% of their holdings per quarter, for five quarters. Other SEC restrictions may apply.

### Section 3.14 Approved Sale of New Issued "Common Stock" Securities
The reorganized company may sale a limited number of New Issued "Common Stock" securities with no restrictions. These securities may be made available on the Effective Date.
(a)Those securities shall be the allocation of Pro Rata New "Common Stock" Securities that are not subscribed in the "non-cash out" option offered to the Class 1 holders. The offer price is restricted to the minimum value of $8.00 per share. These shares were to be received by Class 1 holders, but rejected for the "Cash-Out option. Monies received will first be paid to the Class 1 holders, with monies received in excess of the value will be used to pay down monies owed the Class 1 holders. Once all Class 1 holders are paid, the monies receive shall be the property of the reorganized company. All unsubscribed "Common Shares" allocated for Class 1 holders will be sold. The per share value to paid to Class 1 holders is $6.40 per share.
(b) Those securities described in section 3.11 and 7.05 maybe be pledged and or sold based on the minimum value; price per share described in (a) above, and the proceeds to be used as described in section 7.05.
(c) The reorganized company may offer New Issued "Common Stock" Securities after all of (a) and (b) above have been sold and or pledged. The number of securities offered is limited to 15% of the total number of outstanding shares and may not be discounted, they shall be sold at market price on the day

sold and may be sold over a period of time. Proceeds will be used for the operations of the company and or for the purchase of income producing oil and gas properties.

## Section 3.15 Expiration of Restrictions
All restrictions described in section 3.13 and 3.14, excluding SEC restrictions, will expire two years from the Effective Date.

## ARTICLE IV
## ACCEPTANCE OR REJECTION OF THE PLAN

### Section 4.01. Acceptance by Impaired Classes of Claims.
The Holders of Claims in all Classes are Impaired, entitled to vote on the Plan and shall be provided with a Ballot pursuant to which they may vote to accept or reject the Plan, and, with respect to Holders of Class 1 Claims, to elect to treat their Claims as Cash-Out Claims. Pursuant to section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if: (a) the Holders of at least two-thirds (2/3) in dollar amount of the Allowed Claims actually voting in such Class (other than Claims held by any Holder designated pursuant to section 1126(e) of the Bankruptcy Code) have timely and properly voted to accept the Plan; and (b) more than one-half (1/2) in number of the Holders of such Allowed Claims actually voting in such Class (other than Claims held by any Holder designated pursuant to section 1126(e) of the Bankruptcy Code) have timely and properly voted to accept the Plan. No Class of Interests is entitled to vote on the First
Plan pursuant to section 1126 of the Bankruptcy Code.

### Section 4.02. Voting Classes.
Except as otherwise required by the Bankruptcy Code or the Bankruptcy Rules or as otherwise provided in this Section 4.02, the Holders of Claims in all Classes shall be entitled to vote to accept or reject the Plan in accordance with Section 4.01 of the Plan. Classes of Claims or Interests Deemed to be Unimpaired under the Plan in Section 2.06, Notwithstanding the foregoing, in the event that the Holders of Allowed Class 2 Claims vote as a class to accept the plan. Class 3, 4, 5, 6 and 7 will be Unimpaired and, accordingly, conclusively presumed to have accepted the Plan in respect of such Claims and not entitled to vote to accept or reject the Plan.

### Section 4.03. Ballot Instructions.
Each Holder of a Claim entitled to vote on the Plan will be asked to complete and return a Ballot to the Voting Agent, which will compile the votes so received. Any questions as to the validity, form and eligibility (including time of receipt) of Ballots will be resolved by the Bankruptcy Court upon application or at the Confirmation Hearing.

## ARTICLE V
## PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE PLAN

### Section 5.01. Timing of Distributions.
Except as specifically set forth in the Plan, distributions of Property will be made to Holders of Allowed Claims in accordance with Article III hereof. If a Claim is not an Allowed Claim as of the applicable distribution date, distributions will be made only if and when the Claim is Allowed, and then in accordance with Article III hereof and, with respect to the cure of defaults for assumed executor contracts and unexpired leases, Section 6.02 hereof, and in each case, subject to Article VIII hereof. Distributions to be made as of the Effective Date on account of Claims that are Allowed as of the Effective Date, and are entitled to receive distributions under the Plan, shall be made on the Effective Date or as soon as reasonably practicable thereafter.

**Section 5.02. Distributions to Holders of Allowed Claims.**
Except as otherwise provided herein, the Disbursing Agent or the Reorganized Debtors (as applicable) shall make all distributions required under the in a manner consistent with the Plan. Distributions to Holders of Allowed Claims will be made in accordance with Article III hereof. Payments and other distributions to be made pursuant to the Plan will be made by the Disbursing Agent or the Reorganized Debtors, and will be available from assets and pledged funds transferred to or otherwise held by the Disbursing Agent or the Reorganized Debtors as of and after the Effective Date. If any dispute arises as to the identity of a Holder of an Allowed Claim who is to receive any distribution, the Disbursing Agent, the Reorganizing Debtors or the Reorganized Debtors (as applicable) shall, as appropriate and in lieu of making such distribution to such Holder, delay such distribution until the disposition thereof shall be determined by Final Order of the Bankruptcy Court or by written agreement among the interested parties to such dispute.

**Section 5.03. Delivery of Distributions.**
Distributions to Holders of Allowed Claims shall be made by the Disbursing Agent: (a) at the last known addresses of such Holders; or (b) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the Disbursing Agent. If any Holder's distribution is returned as undeliverable, no further distributions to such Holder shall be made unless and until the Disbursing Agent is notified of such Holder's then current address, at which time all missed distributions shall be made to such Holder without interest.

**Section 5.04. Method of Cash Distributions.**
Any Cash payment to be made pursuant to the Plan may be made by Cash, draft, check, wire transfer or as otherwise required or provided in any relevant agreement or applicable law at the option of the Disbursing Agent or the Reorganized Debtors.

**Section 5.05. Failure to Negotiate Checks.**
Checks issued in respect of distributions under the Plan shall be null and void if not negotiated within sixty (60) days after the date of issuance. Any amounts returned to the Disbursing Agent or Reorganized Debtors (as applicable) in respect of such non-negotiated checks shall be forwarded to (if necessary) and held by the Disbursing Agent. Requests for reissuance for any such check shall be made directly to the issuer of the check by the Holder of the Allowed Claim with respect to which such check originally was issued. All amounts represented by any voided check will be held until the earlier of: (a) one (1) month after the date on which the check is voided; or (b) the date on which the Bankruptcy Court enters the Final Decree, and all requests for reissuance by the Holder of the Allowed Claim in respect of a voided check are required to be made prior to such date. Thereafter, all such amounts shall be deemed to be Unclaimed Property, in accordance with Section 5.06 hereof, and all Holders of Claims in respect of void checks shall be forever barred, estopped and enjoined from asserting a claim to such funds in any manner against the Reorganizing Debtors or their respective assets, the Disbursing Agent or Reorganized Debtors (as applicable).

**Section 5.06. Unclaimed Distributions.**
All Property distributed on account of Claims must be claimed prior to the date on which the Bankruptcy Court enters the Final Decree, or, in the case of a distribution made in the form of a check, must be negotiated and a request for reissuance be made as provided for in Section 5.05 hereof. All Unclaimed Property will be retained by and will vest in the Reorganized Debtors. All full or partial payments made by the Reorganizing Debtors and received by the Holder of a Claim prior to the Effective Date will be deemed to be payments under the Plan for purposes of satisfying the obligations of the Reorganizing Debtors or the Disbursing Agent pursuant to the Plan.

Nothing contained in the Plan shall require the Reorganizing Debtors, the Disbursing Agent or Reorganized Debtors (as applicable) to attempt to locate any Holder of an Allowed Claim other than by reviewing the records of the Reorganizing Debtors and any Claims filed in the Chapter 11 Cases. Pursuant to section 1143 of the Bankruptcy Code, all claims in respect of Unclaimed Property shall be deemed Disallowed and the Holder of any Claim Disallowed in accordance with this Section 5.06 will be forever barred, expunged, estopped and enjoined from asserting such Claim in any manner against the Reorganizing Debtors or their respective assets, the Disbursing Agent or the Reorganized Debtors (as applicable).

### Section 5.07. Limitation on Distribution Rights.

If a claimant holds more than one Claim in any Class, all Claims of the claimant in all Class will be aggregated into one distribution made with respect to the aggregated Claims.

### Section 5.08. Fractional Dollars.

Distributions of fractions of dollars will not be made; rather, whenever any payment of a fraction of a dollar would be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash remains undistributed as a result of the rounding of such fraction to the nearest whole dollar, such Cash shall be treated as Unclaimed Property pursuant to Section 5.06 hereof.

### Section 5.09. Compliance with Tax Requirements.

In connection with each distribution with respect to which the filing of an information return (such as an Internal Revenue Service Form 1099 or 1042) or withholding is required, the Reorganizing Debtors, the Disbursing Agent or the Reorganized Debtors, as appropriate, shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution or effect any such withholding and deposit all moneys so withheld as required by law. With respect to any Person from whom a tax identification number, certified tax identification number or other tax information required by law to avoid withholding has not been received by the Reorganizing Debtors, the Disbursing Agent or the Reorganized Debtors (as applicable) within thirty (30) days from the date of such request, the Reorganizing Debtors, the Disbursing Agent or Reorganized Debtors (as applicable) may, at their or its option, withhold the amount required and distribute the balance to such Person or decline to make such distribution until the information is received.

## ARTICLE VI
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES; INDEMNIFICATION OBLIGATIONS; BENEFIT PROGRAMS

### Section 6.01. Treatment of Executory Contracts and Unexpired Leases.

(a) All executory contracts and unexpired leases of ATP shall be deemed to be assumed by the Reorganizing Debtors and assigned to the Reorganized Debtors as of the Effective Date, except for any executory contract or unexpired lease that: (a) has previously been assumed and assigned or rejected pursuant to an order of the Bankruptcy Court on or prior to the Confirmation Date; or (b) is listed on the Schedule of Rejected Contracts; provided, however, that the Plan Proponents shall have the right, at any time prior to the Confirmation Date, to amend the Schedule of Rejected Contracts by filing an amended version of such schedule to provide for the assumption and assignment or rejection of an executory contract or unexpired lease pursuant to this Section 6.01.

(b) All executory contracts and unexpired leases of ATP shall be deemed to be rejected by the Reorganizing Debtors, except for any executory contract or unexpired lease that: (a) has previously been assumed and assigned or rejected pursuant to an order of the Bankruptcy Court on or prior to the

Confirmation Date; or (b) is listed on the Schedule of Assumed Contracts; provided, however, that the Plan Proponents shall have the right, at any time prior to the Confirmation Date, to amend the Schedule of Assumed Contracts by filing an amended version of such schedule to provide for the assumption and assignment or rejection of an executory contract or unexpired lease pursuant to this Section 6.01.

(c) The Confirmation Order (except as otherwise provided therein) shall constitute an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code, effective as of the Effective Date, approving the assumptions, assignments and rejections hereunder. Each contract and lease assumed pursuant to this Section 6.01 shall be assumed only to the extent that any such contract or lease constitutes an executory contract or unexpired lease.

Assumption of a contract or lease pursuant to this Section 6.01 shall not constitute an admission by the Reorganizing Debtors or the Reorganized Debtors (as applicable) that such contract or lease is an executory contract or unexpired lease or that the Reorganizing Debtors have any liability thereunder. All executory contracts and unexpired leases that are assumed will be assumed under their present terms or upon such terms as are agreed to in writing between the applicable Reorganizing Debtor and the counterparty to such contract or lease.

**Section 6.02. Cure of Defaults for Assumed Contracts and Leases.**
The Schedule of Assumed Contracts will identify, with respect to each executory contract and unexpired lease to be assumed and assigned, the relevant Cure Amount for each executory contract or unexpired lease. The Plan Proponents will serve the Schedule of Assumed Contracts on the non-Debtor counterparties to each such executory contract or unexpired lease prior to the Confirmation Hearing. Each such counterparty shall have until the later of: (a) the date that is five (5) Business Days prior to the Confirmation Hearing; or (b) thirty (30) days from the date of service of the Schedule of Assumed Contracts to File an objection to the assumption and assignment of their executory contract or unexpired lease (whether the objection relates to the Cure Amount or otherwise). If any objections are filed and cannot be resolved by agreement, the Bankruptcy Court shall hold a hearing to determine the Cure Amount with respect to such executory contract or unexpired lease or to otherwise resolve the objection. Any party failing to object to the assumption of their executory contract or unexpired lease as set forth above shall be forever barred from asserting, collecting or seeking to collect from the Reorganized Debtors any amounts in excess of the Cure Amount or from otherwise objecting to the assumption or assignment of such executory contract or unexpired lease. Notwithstanding the foregoing, or anything else in this Article VI, with respect to any executory contract or unexpired lease which is the subject of an objection, the Reorganized Debtors shall retain the right, until five (5) Business Days following any order resolving such objection having become a Final Order, to reject such executory contract or unexpired lease. Within fifteen (15) days of the Effective Date, or as otherwise agreed with the counterparty to each executory contract or unexpired lease, the Reorganized Debtors shall pay the Cure Amounts to the non-Debtor parties to such executory contracts and unexpired leases being assumed.

**Section 6.03. Bar Date for Claims for Rejection Damages.**
Claims arising out of the rejection of any executory contract or unexpired lease pursuant to Article VI of the Plan must be Filed with the Bankruptcy Court no later than the later of: (a) twenty (20) days after the Effective Date; or (b) thirty (30) days after the entry of an order rejecting such executory contract or unexpired lease. Any Claim not Filed within such time period shall be forever barred. The Reorganizing Debtors, the Reorganized Debtors and the Disbursing Agent shall have the right to object to any Claim arising out of the rejection of an executory contract or unexpired lease pursuant to the terms of Section 8.04 hereof.

**Section 6.04. Treatment of Rejection Claims.**

The Bankruptcy Court shall determine any objections Filed in accordance with Section 8.04 hereof at a hearing to be held on a date to be determined by the Bankruptcy Court. Subject to any statutory limitation, including, but not limited to the limitations contained in sections 502(b)(6) and 502(b)(7) of the Bankruptcy Code, any Claims arising out of the rejection of executory contracts and unexpired leases shall, pursuant to section 502(g) of the Bankruptcy Code, be Unimpaired and treated as Unclassified Claims in accordance with Section 3.02 hereof.

**Section 6.05. Executory Contracts and Unexpired Leases Entered Into and Other Obligations Incurred After the Petition Date.**

On the Effective Date, all contracts, leases, and other agreements entered into by any or all of the Reorganizing Debtors on or after the Petition Date, which agreements have not been terminated in accordance with their terms on or before the Effective Date, shall be deemed assumed and assigned to the Reorganized Debtors.

## ARTICLE VII
## MEANS FOR IMPLEMENTATION OF THE PLAN

**Section 7.01. Corporate Action.**

The entry of the Confirmation Order shall constitute authorization for the Reorganizing Debtor to take or to cause to be taken all corporate actions necessary to reorganize the company as a "public company" or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court, including, without limitation: (a) the cancellation of all of the issued and outstanding Equity Interests in ATP; (b) the issuance of the New Securities of the reorganized company; (c) the full use of revenues generated by the ATP operations (d) the election of directors, managers and officers in accordance with the Plan; and (e) the adoption of the Reorganized Debtors' Organizational Documents, which shall supersede the prior certificates of incorporation, articles of organization, by-laws or other organizational documents, as appropriate, of each of the Reorganizing Debtors subsidiaries. All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the members, stockholders, directors or managers of the Reorganizing Debtors, the Reorganized Debtors or their Affiliates. On the Effective Date, the appropriate officers, directors, members and managers of the Reorganizing Debtors and the Reorganized Debtors subsidiaries are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan and in the name and on behalf of the Reorganizing Debtors.

**Section 7.02. Articles of Organization.**

The Reorganized Debtors' Organizational Documents shall contain such provisions as are required to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things: (a) authorization for Reorganized ATP to issue the New Securities; (b) a prohibition on the issuance of nonvoting equity securities to the extent, and only to the extent, required by section 1123(a)(6) of the Bankruptcy Code; (c) that the board of the Reorganized Debtor shall be comprised of seven (7) voting directors, one shall be appointed from each class as described in Section 2.04., for a period of 24 months and then thereafter voted by the common shareholders; (d) one (1) non-voting member to represent the Class 1 "cash out" holders until all "cash out" holders have been paid;(e) other provisions ordinary and customary in such situations so long as they are not inconsistent with any of the provisions to contained in the foregoing.

**Section 7.03. Issuance of New Securities in Reorganized ATP.**
On the Effective Date: (a) all of the issued and outstanding Equity Interests in ATP shall be cancelled and replaced with New Securities of the reorganized public company; (b) and the Reorganized ATP shall issue New Securities to the Holders of the Non-Cash-Out Claims.

> Class 1 Secured First Lien Holders.
> Class 2 Secured Second Lien Holders
> Class 3 Other Secure Lien Holders
> Class 4 NPI and ORRI Holders
> Class 5 Equity Interest, Preferred Share Holders
> Class 6 Unsecured creditors
> Class 7 Common Stockholders

**Section 7.04. Operations Between Confirmation Date and Effective Date.**
The Reorganizing Debtors shall continue to operate as debtors in possession, subject to the supervision of the Bankruptcy Court, during the period from the Confirmation Date through and until the Effective Date. With the courts authority to use revenues generated by the debtors operations to fund operational expenses.

**Section 7.05. Additional Funding Requirements.**
On the Confirmation Date, the Reorganized Debtor, subject to the supervision of the Bankruptcy court, is authorized to secure additional funding not to exceed $100,000,000 to support the reorganized debtor's current operation needs and Revenue Generation activities as described in section 1.04. These funds are to be used exclusively for operational and revenue generation activities to preserve the value of the debtor's estate. All expenditures must be approved by the court. Additional funding shall be secured first by Class 7 Common Shareholder's equity interest in the reorganized company and or second, by the pledge of New Securities from the allocation to Class 7 Common Shareholders.

**Section 7.06. Revesting of Assets.**
Except as otherwise expressly provided in the Plan, pursuant to sections 1123(a)(5), 1123(b)(3) and 1141(b) of the Bankruptcy Code, all Property comprising the Estates of the Reorganizing Debtor, be retained and revested in the Reorganized Debtor. Free and clear of all Claims, Liens, contractually-imposed restrictions, charges, encumbrances and Interests of Creditors and equity security holders on the Effective Date, with all such Claims, Liens, contractually-imposed restrictions, charges, encumbrances and Interests being extinguished except as otherwise provided in the Plan. As of the Effective Date, the Reorganized Debtor may operate its business and use, acquire and dispose of Property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and Confirmation Order. Without limiting the foregoing, the Reorganized Debtor may pay the charges it incurs for professional fees, disbursements, expenses or related support services after the Effective Date without any application to the Bankruptcy Court.

**Section 7.07. Approval of Agreements.**
The solicitation of votes on the Plan shall be deemed a solicitation of the Holders of Claims for the approval of all other agreements and transactions contemplated by the Plan, including, without limitation, the New Securities. Entry of the Confirmation Order shall constitute approval of such agreements and transactions and the Confirmation Order shall so provide.

**Section 7.08. Change of Control.**
The transactions contemplated under the Plan shall not be deemed or considered a change of control that would result in any acceleration, vesting or similar change of control rights under any agreements

or arrangements triggered by the consummation of the Plan shall be waived or otherwise cancelled under the Plan.

**Section 7.09. Post Effective Date Management.**
On the Effective Date, the management, control and operation of the Reorganized Debtor shall become the general responsibility of its respective board of directors or board of members in accordance with applicable non-bankruptcy law. On the Effective Date, each member of the existing board of directors of the Reorganizing Debtors shall be deemed to have resigned. The initial new board of each Reorganized Debtor shall be comprised of seven (7) voting directors and one (1) non-voting director, which shall include individuals as otherwise disclosed in the Plan Supplement. The initial new board members will serve from the Effective Date until their successors are duly elected or qualified or until earlier removed or replaced as in accordance with the plan.

**Section 7.10. Corporate Structure Changes.**
Corporate structure changes, if necessary, will be set forth in the Plan Supplement.

# ARTICLE VIII
## PRESERVATION OF CAUSES OF ACTION AND RIGHT TO DEFEND AND CONTEST

**Section 8.01. Preservation of Rights.**
Except to the extent that any Claim is Allowed during the Chapter 11 Cases or expressly by this Plan or the Confirmation Order, nothing, including, but not limited to, the failure of the Reorganizing Debtor to object to a Claim or Interest for any reason during the pendency of the Chapter 11 Cases, shall affect, prejudice, diminish or impair the rights and legal and equitable defenses of the Reorganizing Debtor with respect to any Claim or Interest, including, but not limited to, all rights of the Reorganizing Debtor to contest or defend themselves against such Claims or Interests in any lawful manner or forum when and if such Claim or Interest is sought to be enforced by the Holder thereof.

**Section 8.02. Setoffs.**
Except to the extent that any Claim is Allowed, the Reorganized Debtor, the Disbursing Agent may, but shall not be required to, set off against any Claims and the payments or distributions to be made pursuant to the Plan in respect of such Claims, any and all debts, liabilities, Causes of Action and claims of every type and nature whatsoever which the Estates, the Reorganized Debtor, the Disbursing Agent may have against such Creditors, but neither the failure to do so nor the allowance of any such Claims, whether pursuant to the Plan or otherwise, shall constitute a waiver or release by the Reorganized Debtor, the Disbursing Agent of any such claims or Causes of Action the Reorganized Debtor, the Disbursing Agent may have against such Creditors.

**Section 8.03. No Payment or Distribution Pending Allowance.**
All references to Claims and amounts of Claims refer to the amount of the Claim Allowed by agreement of the Reorganized Debtor, the Disbursing Agent and the Holder of such Claim, by operation of law, by Final Order or by this Plan. Notwithstanding any other provision in the Plan, no payment or distribution shall be made on account of or with respect to any Claim to the extent it is a Disputed Claim unless and until the Disputed Claim becomes an Allowed Claim.

**Section 8.04. Resolution of Disputed Claims.**
Unless otherwise ordered by the Court after notice and a hearing, the Reorganized Debtor shall have the right, on and after the Effective Date, to File objections to Claims (except those specifically Allowed by this Plan) and shall serve a copy of each such objection upon the Holder of the Claim to

which the objection is made as soon as practicable, but in no event later than the applicable Claims Objection Deadline. The foregoing deadlines may be extended by order of the Bankruptcy Court. An objection to any Claim shall be deemed properly served on the Holder thereof if the Disbursing Agent or the Reorganized Debtor effects service in any of the following manners: (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (b) by first class mail, postage prepaid, on the signatory and at the address set forth on the proof of claim or other representative identified in the proof of claim or any attachment thereto; or (c) by first class mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Cases.

## ARTICLE IX
## CONDITIONS TO CONSUMMATION OF THE PLAN

### Section 9.01. Conditions to Effective Date.
The Plan shall not be consummated, and the Effective Date shall not occur, unless and until the following conditions have occurred or have been duly waived (if waivable) pursuant to Section 9.02 below:
(a) the Bankruptcy Court shall have approved the information contained in the **Disclosure Statement** as adequate;
(b) the Confirmation Order, in a form acceptable in all respects to the Plan Proponents, shall have been entered and shall not be stayed by order of a court of competent jurisdiction and the Confirmation Order shall have become a Final Order;
(c) the Confirmation Order shall contain a finding by the Bankruptcy Court that the aggregate amount of: (i) Creditor Allowed Claims shall not exceed $ TBD million / billion; and (ii) Allowed Equity Holders Allowed claims shall not exceed $TBD million / billion;
(d) the Bankruptcy Court shall have entered an order (contemplated to be part of the Confirmation Order) authorizing and directing the Plan Proponents to take all actions necessary or appropriate to enter into, implement and consummate the documents created, amended, supplemented, modified or adopted in connection with Plan;
e) all authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness shall have been obtained; and
(f) no order of a court shall have been entered and shall remain in effect restraining the Reorganized Debtor from consummating the Plan.
(g) the reorganized debtors shall secure additional funding not to exceed $100,000,000 for the continued operations of the reorganized estate.

### Section 9.02. Waiver of Conditions to Consummation.
The conditions to consummation in Section 9.01 (other than Sections 9.01(a), (b) and (f)) may be waived at any time by a writing signed by an authorized representative of the Plan Proponents without notice or order of the Bankruptcy Court or any further action other than proceeding to consummation of the Plan.

### Section 9.03. Effect of Failure or Absence of Waiver of Conditions Precedent to the Effective Date of the Plan.
In the event that one or more of the conditions specified in Section 9.01 hereof have not occurred (or been waived), upon notification submitted by the Plan Proponents to the Bankruptcy Court: (a) the Confirmation Order, automatically and without further order of the Bankruptcy Court, shall be deemed, vacated, null and void and with no force or legal effect whatsoever; (b) no distributions under the Plan shall be made; (c) all Property of the Estates shall remain in the Reorganized Debtors' Estates; (d) all Holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Order had never been

entered and Confirmation had not occurred; and (e) the Reorganized Debtors' obligations with respect to the Claims and Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Interests by or against the Reorganized Debtors or any other Person or Entity or to prejudice in any manner the rights of the Reorganized Debtors or any Person or Entity in any further proceedings involving the Reorganized Debtors.

# ARTICLE X
# EFFECTS OF CONFIRMATION

**Section 10.01. Discharge.**

To the fullest extent permitted by applicable law (including, without limitation, section 105 of the Bankruptcy Code), and except as otherwise provided in the Plan or in the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims of any nature whatsoever against the Reorganized Debtor or any of their assets or properties, regardless of whether any Property shall have been distributed or retained pursuant to the Plan on account of such Claims. To the fullest extent permitted by applicable law (including, without limitation, section 105 of the Bankruptcy Code), upon the Effective Date, and except as expressly contemplated in this Plan, the Reorganized Debtor shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, debts (as such term is defined in section 101(12) of the Bankruptcy Code), Liens, security interests and encumbrances of and against all Property of the respective Estates or the Reorganizing Debtors that arose prior to the Effective Date, including, without limitation, all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (a) such Claim has been Allowed pursuant to section 502 of the Bankruptcy Code; or (b) the Holder of such Claim has voted to accept the Plan. Further, to the fullest extent under applicable law (including, without limitation, section 105 of the Bankruptcy Code), as of the Effective Date, all entities, including, without limitation, all Holders of Claims or Interests, shall be barred and enjoined from asserting against the Reorganized Debtor, the Disbursing Agent  their Property or their successors or assigns any other or further Claims, debts, rights, Causes of Action, liabilities or Interests relating to the Reorganized Debtor based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date, except for those obligations expressly created by, or reserved in, this Plan. In accordance with the foregoing, to the fullest extent permitted by applicable law (including, without limitation, section 105 of the Bankruptcy Code), except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Reorganized Debtor and termination of all Interests, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge and termination shall void any judgment obtained against the Reorganized Debtor, the Disbursing Agent at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

**Section 10.02. Injunction.**

(a) *Discharged Claims and Terminated Interests.* Except as otherwise expressly provided for in the Plan or the Confirmation Order, and to the fullest extent authorized or provided by the Bankruptcy Code, including sections 524 and 1141 thereof, the entry of the Confirmation Order shall, provided that the Effective Date occurs, permanently enjoin all Persons that have held, currently hold or may hold a Claim or other debt or liability that is discharged or an Interest or other right of an equity security holder that is Impaired or terminated pursuant to the terms of the Plan from taking any of the following actions against the Reorganized Debtor, the Disbursing Agent or the Property of any of the foregoing on account of any such discharged Claims, debts or liabilities or such terminated Interests or rights: (i)

commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind; (iv) asserting any setoff, offset, right of subrogation or recoupment of any kind, directly or indirectly, against any debt, liability or obligation due to the Reorganized Debtor; and (v) proceeding in any manner in any place whatsoever, including employing any process, that does not conform to or comply with or is inconsistent with the provisions of the Plan.

(b) *Released Claims.* As of the Effective Date, the Confirmation Order shall constitute an injunction permanently enjoining any Person that has held, currently holds or may hold a Claim, demand, debt, right, Cause of Action or liability that is released pursuant to Section 10.04 hereof from enforcing or attempting to enforce any such Claim, demand, debt, right, Cause of Action or liability against any Releasee, the Disbursing Agent or any of their respective Property, based on, arising from or relating to, in whole or in part, any act, omission or other occurrence taking place on or prior to the Effective Date with respect to or in any way relating to the Chapter 11 Cases, all of which claims, demands, debts, rights, Causes of Action or liabilities shall be deemed released on and as of the Effective Date; provided, however, that this injunction shall not apply to: (i) any Claims that Creditors may assert under the Plan to enforce their rights thereunder, to the extent permitted by the Bankruptcy Code; or (ii) any claims Creditors or other third parties may have against each other, which Claims are not related to the Reorganized Debtor, it being understood, however, that any defenses, offsets or counterclaims of any kind or nature whatsoever that the Reorganized Debtor may have or assert in respect of any of the claims of the type described in (i) or (ii) of this proviso are fully preserved.

**Section 10.03. Exculpation.**
Neither the Disbursing Agent nor any Releasee shall have or incur any liability to any Person, including, without limitation, any Holder of a Claim or Interest or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or Affiliates or any of their successors or assigns, for any act taken or omission made in connection with, relating to, or arising out of, the Chapter 11 Cases, Filing, negotiating, prosecuting, administering, formulating, implementing, confirming or consummating this Plan, or the Property to be distributed under this Plan, including all activities leading to the promulgation and confirmation of the Plan, the **[Disclosure Statement]** (including any information provided or statement made in the **[Disclosure Statement]** or omitted therefrom), or any contract, instrument, release or other agreement or document created in connection with or related to the Plan or the administration of the Reorganized Debtor or this Chapter 11 Case; provided, however, that the foregoing exculpation shall not apply to any act of gross negligence or willful misconduct.

**Section 10.04. Releases.**
(a) *Releases by Reorganized Debtor.* Effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, the Reorganized Debtor, in their capacities and as debtor in possession, will be deemed to have forever released, waived and discharged the Releasees, from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Reorganized Debtor or the Disbursing Agent to enforce the  Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder), whether for tort, contract, violations of federal or state securities laws or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, including actions in connection with