1

```
1              IN THE UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF TEXAS
2                      CORPUS CHRISTI DIVISION

3                   United States Courts
                    Southern District of Texas
         IN RE:            FILED         *     BANKRUPTCY
4                                        *
         ASARCO, LLC,    OCT 2 2 2007    *     NO. 05-21207-C-11
5                                        *
            DEBTOR,   Michael N. Milby, Clerk of Court*
6                                        *     CORPUS CHRISTI, TEXAS
                                         *     OCTOBER 9, 2007
7        * * * * * * * * * * * * * * * * *     8:30 A.M.

8

9        TRANSCRIPT OF COEUR D'ALENE ESTIMATION HEARING - DAY 1

10             BEFORE THE HONORABLE RICHARD S. SCHMIDT
                   UNITED STATES BANKRUPTCY JUDGE
11
         APPEARANCES:
12
         FOR THE DEBTOR:            MR. SHELBY A. JORDAN
13                                  JORDAN, HYDEN, WOMBLE, CULBRETH &
                                    HOLZER
14                                  500 NORTH SHORELINE, SUITE 900
                                    CORPUS CHRISTI, TEXAS 78471
15
                                    MR. DANIEL M. STEINWAY
16                                  MR. J. BARTON SEITZ
                                    MR. CHRISTOPHER DANLEY
17                                  MR. MICHAEL HEISTER
                                    BAKER BOTTS
18                                  THE WARNER
                                    1299 PENNSYLVANIA AVENUE, NW
19                                  WASHINGTON, DC 20004-2400

20              (APPEARANCES CONTINUED ON PAGE 2)

21
         COURT RECORDER:           MS. JANET EZZELL
22

23
              PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
24            TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
                     MOLLY CARTER, P.O. BOX 270203
25            CORPUS CHRISTI, TEXAS 78427 (361) 994-7596
```

2

```
 1    APPEARANCES:   (Continued)

 2

 3    FOR THE DEBTOR:              MR. TONY M. DAVIS
                                   MS. MARY GREGORY
                                   BAKER BOTTS
 4                                 910 LOUISIANA STREET
                                   HOUSTON, TEXAS 77002-4995
 5
      FOR ASARCO,                  MR. GREGORY EVANS
 6    INCORPORATED:                MR. WILLIAM R. PLETCHER
                                   MR. JASON B. BAIM
 7                                 MS. ALISA SCHLESINGER
                                   MILBANK, TWEED, HADLEY & MCCLOY LLP
 8                                 601 SOUTH FIGUEROA STREET, 30TH FLOOR
                                   LOS ANGELES, CALIFORNIA 90017-5735
 9
                                   MR. JEFF CIVINS
10                                 HAYNES & BOONE, LLP
                                   600 CONGRESS AVENUE, SUITE 1300
11                                 AUSTIN, TEXAS 78701

12    FOR EPA:                     MR. ALAN S. TENENBAUM
                                   MS. KATHRYN C. MACDONALD
13                                 MR. DAVID ASKMAN
                                   MR. DAVID L. DAIN
14                                 MR. PATRICK M. CASEY
                                   MR. ROBERT E. MAHER, JR.
15                                 DEPARTMENT OF JUSTICE
                                   ENVIRONMENTAL ENFORCEMENT SECTION
16                                 ROOM 2121, 601 D STREET, N.W.
                                   WASHINGTON, DC 20004
17
                                   MR. TED YACKULIC
18                                 MS. CARA STEINER-RILEY (ORC-158)
                                   ASSISTANT REGIONAL COUNSEL
19                                 U.S. ENVIRONMENTAL PROTECTION AGENCY
                                   REGION X
20                                 1200 SIXTH AVENUE
                                   SEATTLE, WASHINGTON 98101
21
      FOR DEPARTMENT OF THE        MR. BARRY STEIN
22    INTERIOR:                    U.S. DEPARTMENT OF THE INTERIOR
                                   500 NORTHEAST MULTNOMAH, SUITE 607
23                                 PORTLAND, OREGON 97232

24

25
```

3

```
 1    APPEARANCES:   (Continued)

 2

      FOR MITSUI & CO. (USA)     MR. STEPHEN A. GOODWIN
 3    INC.:                      CARRINGTON, COLEMAN, SLOMAN &
                                 BLUMENTHAL, LLP
 4                               200 CRESCENT COURT, SUITE 1500
                                 DALLAS, TEXAS 75201

 5

      FOR FIREMAN'S FUND         MR. DAVID R. BEANE
 6    INSURANCE:                 STEVENS & LEE
                                 111 NORTH SIXTH STREET
 7                               READING, PENNSYLVANIA 19603-0679

 8    FOR HARBINGER CAPITAL      MS. SARA K. ORR
      PARTNERS MASTER FUND       LATHAM & WATKINS, LLP
 9    AND CITIGROUP:             555 ELEVENTH STREET, NW, SUITE 1000
                                 WASHINGTON, DC 20004-1304
10

      FOR FCR ROBERT PATE:       MR. ROBERT K. SUGG
11                               OPPENHEIMER, BLEND, HARRISON & TATE
                                 711 NAVARRO, SIXTH FLOOR
12                               SAN ANTONIO, TEXAS 78205

13    FOR MURRAY CAPITAL         MS. MARTI MURRAY
      MANAGEMENT:                MURRAY CAPITAL MANAGEMENT
14                               680 5TH AVENUE, SUITE 2602
                                 NEW YORK, NEW YORK 10019

15

      FOR UNSECURED CREDITORS    MR. DAVID A. KLINGLER
16    OF CAPCO & LAQ:            STUTZMAN, BROMBERG, ESSERMAN & PLIFKA
                                 2323 BRYAN STREET, SUITE 2200
17                               DALLAS, TEXAS 75201-2689

18    FOR THE UNSECURED          MR. HARLEY N. TRICE
      CREDITORS:                 REED SMITH, LLP
19                               435 SIXTH AVENUE
                                 PITTSBURGH, PENNSYLVANIA 15219

20
                                 MR. EDWARD J. ESTRADA
21                               REED SMITH, LLP
                                 599 LEXINGTON AVENUE, 29TH FLOOR
22                               NEW YORK, NEW YORK 10022

23

24

25
```

1          (The proceedings began at 8:30 a.m.)

2          (Call to Order of the Court.)

3                THE COURT:  Send in the call.  All right, let's see.

4   David Beane?

5                MR. BEANE:  Present, Your Honor.

6                THE COURT:  Mike Heister?  Is it Heister?  Michael?

7   Baker Botts.

8                MR. HEISTER:  Present, Your Honor.

9                THE COURT:  Okay.  Sara Orr?

10               MS. ORR:  Present, Your Honor.

11               THE COURT:  Barry Stein?

12               MR. STEIN:  Present, Your Honor.

13               THE COURT:  Stephen Goodwin?

14               MR. GOODWIN:  Present, Your Honor.

15               THE COURT:  Marti Murray?

16               MS. MURRAY:  Present, Your Honor.

17               THE COURT:  Alisa Schlesinger?

18               MS. SCHLESINGER:  Present, Your Honor.

19               THE COURT:  Mary Gregory?

20               MS. GREGORY:  Present, Your Honor.

21               THE COURT:  Anyone else on the telephone call?  All

22   right.  Then in the courtroom, I see Mr. Jordan at the mike and

23   Mr. Tenenbaum coming up behind him.

24               MR. JORDAN:  Your Honor, Shelby Jordan, co-counsel

25   for the Debtor, ASARCO, counsel for the subsidiary debtors.

1     Also in the courtroom with Baker Botts on behalf of the

2     Debtors, as co-counsel, Tony Davis, Dan Steinway, Bart Seitz

3     and Chris Danley.

4            Your Honor, with respect to Dan Steinway, Bart Seitz

5     and Chris Danley, they are pending pro hac vice admission, and

6     we'd move to, for the purposes of these hearings, to have them

7     admitted.

8            THE COURT:  All right.  Is anyone objecting?

9        (No response.)

10           THE COURT:  All right.  They're in.

11           MR. JORDAN:  Your Honor, one other request.  With

12    respect to Mr. Steinway, who will be doing the bulk of the

13    examinations or cross, he's had recent back surgery, and he's

14    not capable of standing long periods of time, and we ask

15    permission that he be allowed to remain at counsel table.  He's

16    in the front, will be right by the microphone, so that he has

17    the ability to do the cross, if that's --

18           THE COURT:  All right.  Any objection to that?

19    Nobody?

20        (No response.)

21           THE COURT:  All right.  That's fine.

22           MR. TENENBAUM:  Good morning, Your Honor.  Alan

23    Tenenbaum for the United States.  Also present in the

24    courtroom, we have our co-leads for this site at the hearing

25    this week, Ms. Kathryn MacDonald and Mr. David Askman are our

1    co-leads on for this week.

2         THE COURT:  All right.

3         MR. TENENBAUM:  Also present in the courtroom, we

4    have David Dain, Pat Casey and Bob Maher.

5         THE COURT:  All right.

6         MR. TENENBAUM:  And we have two attorneys from EPA,

7    Ted Yackulic and Cara Steiner-Riley.

8         THE COURT:  Thank you.  All right.  Yes, sir?

9         MR. TRICE:  Your Honor, Harley Trice with Reed Smith

10   on behalf of the Committee for Unsecured Creditors.

11        THE COURT:  All right.

12        MR. EVANS:  Good morning, Your Honor.  Gregory Evans

13   on behalf of ASARCO, Incorporated.  Together with me in the

14   courtroom are Jason Baim, William Pletcher, also of Milbank

15   Tweed on behalf of ASARCO, Incorporated.  Also on behalf of

16   ASARCO, Incorporated, is Jeff Civins of Haynes Boone.

17        THE COURT:  All right.  Thank you.

18        MR. EVANS:  Thank you, Your Honor.

19        MR. KLINGLER:  Your Honor, David Klingler on behalf

20   of the Committee for the Unsecured Creditors for the Subsidiary

21   Debtors.

22        THE COURT:  Thank you.  Yes, sir.

23        MR. SUGG:  Your Honor, Robert Sugg for the Future

24   Claims Representative.

25        THE COURT:  Thank you, sir.  Anyone else want to make

1    an appearance on the record?  Yes, sir.

2            MR. ESTRADA:  Good morning, Your Honor.  Edward

3    Estrada of Reed Smith for the Official Committee of Unsecured

4    Creditors, ASARCO, LLC.

5            THE COURT:  All right.  We have an ERO.  This is,

6    this is, we've got more lawyers, more new lawyers in this

7    particular one, and we've got a new court reporter for daily

8    report.  So I would ask that everyone, since Janet knows most

9    of the people, but not all of the new people, but she doesn't

10   know anybody.  So if everyone would try to state their name

11   quickly whenever they rise to speak, that would be helpful for

12   her dailies.  And especially that's true of those who are on

13   the phone, since there will be no way for her to even see who

14   is talking.  So we'll do the best we can.

15           But the most important thing, I think, is to get

16   through the hearing in a meaningful way and not let the

17   electronics or the court reporting or anything else get in the

18   way of a fair hearing.  But I'd like to give you, since you

19   feel it necessary to have dailies, you think it's that

20   important, then I think it's important that we at least try to

21   make certain she can do a good job of it.  So --

22           MR. JORDAN:  Thank you, Your Honor.

23           THE COURT:  Be mindful of that, and let's go ahead.

24           MR. JORDAN:  All right.  Your Honor, Shelby Jordan.

25   If I can sort of, I guess, bring the Court up to speed on this

1  particular estimation hearing, first of all, it's scheduled for

2  28 hours, which would be 8:30 to 5:30 for four days.

3  Theoretically, Your Honor, since we've taken a little less each

4  time, that we ought to be able to finish on the Court's

5  calendar by at least Friday.

6      We have, if I can mention the participants to you,

7  the Debtor; the Parent of the Debtor, as the Court's aware,

8  will participate in certain limited respects; the EPA for the

9  DOJ; and then Hecla is the other PRP that you'll hear about

10  during trial but has not participated by expert reports and

11  will not participate directly in the trial.  We have actually

12  settled our disputes with Hecla in what you will hear is called

13  "the Box," and we have partial settlements for past costs that

14  we've reached with Hecla in the basin area, which you'll also

15  hear all about.  So they may be here in representation, but not

16  in participation.

17      There's a couple of housekeeping matters.  In respect

18  to evidence, there is some interest rate exhibits which were

19  furnished for one of the EPA witnesses, Mr. Wright.  I think

20  his name is Wiley Wright.  And in order for us to agree not to

21  have him here to testify or to cross, so that he wasn't

22  required to travel, we received some interest rate calculations

23  that he made, and we will probably be putting that in some form

24  of submission approved by DOJ and the Debtor, so that we don't,

25  so we resolve that particular issue.

1          There is also an issue of the proffer and the ongoing

2    issue of discount rate.  Mr. Maniatis has submitted a proffer,

3    as he has in the last two of the estimation hearings,

4    notwithstanding the fact that they sort of begin to change and

5    evolve as each one of us tries to respond to the other's

6    position.  He will not be here to testify.  We've agreed to

7    that.  We might be submitting a response to it, but we will not

8    be submitting any cross or any testimony in that respect, other

9    than the existing testimony of Mr., of Mr. White, who is Rick

10   White of LECG, and you've heard the bulk of that before.

11         And I want to tell the Court that we are not going to

12   continue to reinvent the wheel for each hearing.  If you

13   remember at the Washington hearing, we simply resubmitted the

14   direct and cross of Mr. Maniatis, in order to not have him

15   appear again.  We haven't decided how we're going to do that,

16   but we will in some fashion be able to respond to that, if

17   nothing else, in closing arguments.

18         I've also discussed with the DOJ the idea of

19   potentially filing a omnibus motion with respect to discount

20   rate.  We haven't decided to do that or not do that.  In fact,

21   I just talked to Mr. Tenenbaum this morning about the idea, so

22   that we can join all this stuff into one hearing, get one

23   ruling on what discount rate applies to the unsecured class of

24   creditors or doesn't apply to the unsecured class of creditors,

25   as the Court may rule.  And so we are discussing if we want to

```
 1    proceed in that fashion, so that you don't have to rehear at
 2    every hearing the same testimony or reread the same proffers.
 3            That also may involve -- we also have a stipulation
 4    that was circulated, I don't think it's been signed yet, but
 5    simply because it just hasn't been signed.  We'll take care of
 6    that, as to the asbestos discount rate, since the asbestos
 7    estimations are going forward, and there are expert reports in
 8    that area of personal injury claims, and the Government wanted
 9    to have us to either agree to it or submit that expert report.
10    It, at this point, is not for public consumption, so we've
11    agreed to a stipulation of the language in that specific part
12    of it, of the reports in the asbestos side of the litigation,
13    and we'll have that stipulation at some time during the week.
14            You also requested, if the Court recalls at the last
15    pretrial hearing --
16            THE COURT:  Okay.  That asbestos you're talking about
17    has to do with these environmental asbestos claims, not the
18    mass tort asbestos litigation.
19            MR. JORDAN:  No.  It's the mass tort.
20            THE COURT:  Oh.
21            MR. JORDAN:  The Government wanted -- for some
22    reason, they think that rate may apply, so we've agreed to put
23    the stipulation in, then we'll address whatever it is in
24    arguments.
25            THE COURT:  Mr. Tenenbaum.
```

1    MR. TENENBAUM:  What we, what that involves is the

2  Debtor submitted an expert report as part of the asbestos

3  estimation proceedings --

4    THE COURT:  Yes.

5    MR. TENENBAUM:  -- and it's confidential.  So we

6  needed to do -- the Debtor recommended, the Debtor's expert

7  recommended using a certain discount rate --

8    THE COURT:  Okay.

9    MR. TENENBAUM:  -- for that.  So we thought that was,

10  could be relevant to Your Honor's --

11    THE COURT:  Okay.

12    MR. TENENBAUM:  -- deliberation of discount rate

13  here.  But of course, it was produced to us under a

14  confidentiality agreement.  We have to do the stipulation.

15    THE COURT:  Okay.  Gotcha.

16    MR. JORDAN:  All right.  And by the same token, we're

17  going to argue and point to the authorities --

18    THE COURT:  But the asbestos litigation is currently,

19  been submitted for mediation.

20    MR. JORDAN:  That's correct.  Right.

21    THE COURT:  Okay.

22    MR. JORDAN:  So there's been actually --

23    THE COURT:  I entered a second order in that

24  appointing a mediator, I think, with the proper language

25  yesterday.  So I would hope that that's now smoothly moving on

1    towards mediation and resolution.

2            MR. JORDAN:  All right, Your Honor.  I'm not aware of

3    that, but I'll be certain it's passed along.  I'm sure the

4    parties are getting that.

5            MR. TENENBAUM:  I think there's a session scheduled

6    for end of October.

7            THE COURT:  Okay.  Good.

8            MR. JORDAN:  Your Honor, at the last pretrial

9    conference, you tried to get Court Call not to hang up, in a

10   request that you were making, and you made the request then in

11   open court for the parties to furnish to you a schedule of the

12   outstanding -- well, you asked for a schedule which would

13   include the environmental estimation hearing original demands,

14   demands at trial, and then the 9019 hearings that are scheduled

15   for settlements.  We've prepared that and just furnished that

16   just this morning because it took some time to put together.

17           THE COURT:  Okay.  And you all go over that before

18   you hand it to me.

19           MR. JORDAN:  Well --

20           THE COURT:  Make sure there's nothing in there that

21   you have a problem with.

22           MR. TENENBAUM:  Yeah, I had a question about that.

23           THE COURT:  Yes.

24           MR. TENENBAUM:  We were -- Court Call had ended when

25   you made that request.

```
 1            THE COURT:  Okay.
 2            MR. TENENBAUM:  But we have a little bit of an
 3   awkward problem with that, because some of the recent
 4   settlements have not been approved yet.  The amounts have not
 5   been approved by the person with authority.  So I guess, is
 6   it --
 7            THE COURT:  Well, then leave those out.
 8            MR. TENENBAUM:  Leave the amounts out?
 9            THE COURT:  Leave them out.  Unless you --
10            MR. TENENBAUM:  Just leave --
11            THE COURT:  Unless you think they're going to be
12   approved.  I mean, this is not evidence.
13            MR. TENENBAUM:  Okay.
14            THE COURT:  I'd just like to kind of see where we're
15   going.
16            MR. TENENBAUM:  Yeah, we can keep them on the list.
17   We'll just, won't put in the amount, and we'll say "not yet
18   approved."
19            THE COURT:  That will be fine.
20            MR. TENENBAUM:  Okay.  Thank you.
21            MR. JORDAN:  Your Honor -- well, Your Honor, if they
22   weren't recommended for approval, then we would have never
23   gotten to that stage.  I think it's critical for the Court to
24   know where the 9019s are coming from and the process that's
25   involved.
```

1          THE COURT:  Well --

2          MR. JORDAN:  And it doesn't make any sense to leave

3    out --

4          THE COURT:  I don't want to get into any kind of a --

5    I mean, if anybody has a problem with any of it, I mean, that's

6    fine.  Then just don't submit it.

7          MR. TENENBAUM:  Yeah, just --

8          THE COURT:  But if you want to asterisk and say "this

9    is under approval," you can do it that way, or if you want to

10   just leave it off, that's fine, too.

11         MR. TENENBAUM:  The problem is that, you know, the

12   designated high official has to approve it.  If he hasn't

13   approved it, he might -- if we make this filing, then it will

14   appear in the newspaper before he approves it, which is --

15         THE COURT:  Well, and I agree.  So if it hasn't been

16   approved, I mean, if it's been recommended for approval and

17   been approved, then obviously you could put it down even if it

18   hasn't been approved by the Court yet.  I think that if it's

19   been approved by your agencies or the whatever agency, you

20   could put it down.

21         MR. TENENBAUM:  Right.  We don't have a problem

22   putting it down even if it hasn't been approved, that there is

23   a recommended settlement.  We just don't want to put the amount

24   down.

25         THE COURT:  Okay.

1           MR. TENENBAUM:  Thank you.

2           THE COURT:  That's fine.

3           MR. JORDAN:  Your Honor, I assume that since you

4    haven't approved most of the 9019s, I mean, we're going to end

5    up giving you a blank report under that theory, so --

6           THE COURT:  Well, that's fine.  Let's see what it

7    looks like.

8           MR. JORDAN:  All right.

9           THE COURT:  That's fine.

10           MR. JORDAN:  All right.  We'll propose something, if

11    Mr. Tenenbaum objects to --

12           THE COURT:  And I don't want to see anything that you

13    both haven't agreed to.

14           MR. JORDAN:  All right, Your Honor.  I think then we

15    will work with Mr. Tenenbaum to try to get that report tweaked.

16           THE COURT:  All right.

17           MR. JORDAN:  And Your Honor, so the rest, I believe,

18    is the same drill.  The DOJ has the burden of proof, and

19    they're going to go first, and I believe that's all the

20    housekeeping matters I have.

21           THE COURT:  All right.

22           MR. TENENBAUM:  Yeah, the burden of proof, of course,

23    varies depending on the issue.

24           THE COURT:  On the issue, exactly.

25           MR. TENENBAUM:  And I just did want to respond on the

1   Box settlements that were mentioned.  The Debtor has also --

2   there's a recommended settlement for the Box, subject to the

3   approval of the person with authority for, with the Government,

4   as well as with Hecla.

5           THE COURT:  Okay.

6           MR. TENENBAUM:  And we do not know, as far as -- I

7   don't know anything about a settlement with Hecla for the

8   basin, but maybe we haven't been told.  I don't know.  Not

9   true?

10          MR. SEITZ:  It was through the -- Your Honor, the

11  settlement with Hecla was through the court-ordered mediation,

12  and I believe the parties that were at the mediation were aware

13  of, that we had worked something out.  I thought that was

14  communicated in context of that mediation.  We have not

15  exchanged papers or anything like that yet.

16          MR. TENENBAUM:  For the basin?  You settled with

17  Hecla for the basin?

18          MR. SEITZ:  Just for the, only for their -- to the

19  extent they had a claim on the basin.  They had a very limited

20  claim.  To the extent that was --

21          MR. TENENBAUM:  We're just not, we're not aware,

22  don't know the terms of that.

23          THE COURT:  Okay.  All right.  Go right ahead.

24          MS. MACDONALD:  Good morning, Your Honor.  My name is

25  Kathryn MacDonald, and I'm an attorney with the United States

1   of America.

2           MR. JORDAN:  Your Honor, I'm sorry.  Before

3   beginning, let me just make one other -- I believe you should

4   have all of the exhibits then before the Court in a DVD.  And I

5   think they're all, as to each side, everyone has agreed to the

6   admission of the exhibits.

7           THE COURT:  Okay.  So the Government has a certain

8   number of exhibits -- or are they all joint exhibits?

9           MR. JORDAN:  No, they're not joint exhibits this

10  time.

11          THE COURT:  Okay.  So the Debtor has some exhibits,

12  and the Government has exhibits, and you've all agreed to the

13  admission of all of the exhibits.  Is that correct?

14          MS. MACDONALD:  Yes, Your Honor.

15          THE COURT:  All right.  They're all admitted.

16          MR. JORDAN:  And actually --

17          THE COURT:  Did the Parent have any exhibits?

18          MR. EVANS:  Yes, Your Honor.

19          MR. JORDAN:  The Parent, we have a joint list with

20  the Parent.

21          THE COURT:  All right.  And what about, the committee

22  seems to be participating, or you just happen to be sitting

23  inside the Box?

24          MR. TRICE:  Yes, Your Honor.  We don't have any

25  exhibits that were proffering at this time.

1      THE COURT:  All right.  So the exhibits are all

2  admitted.  Go ahead.

3      MS. MACDONALD:  Okay.  The goal of the United States'

4  opening statement is to give the Court a road map of what

5  you're going to hear in the next day or so by the United States

6  and the witnesses that you'll hear for the two components of

7  our claim.  The first component deals with EPA's response costs

8  at this action, which I'll be discussing.  And then the second

9  component is natural resource damages, which my colleague,

10  David Askman, will be discussing briefly, as well as the issue

11  of divisibility.  The United States would like to reserve a few

12  minutes at the end for a reply.

13      I'm first going to introduce the witnesses that

14  you're going to be hearing over the next few days and what

15  their testimony is.  And then in order to give the Court some

16  context of what you're going to hear, I'm going to answer two

17  fundamental questions that make this case unique from the other

18  cases that you have heard.  One is where we have been in this

19  case, and the second is where we need to go in this case.

20      Now, with regard to the witnesses that you'll hear,

21  the first witness will be Cami Grandinetti.  And she is a

22  professional civil engineer.  She is the manager of the EPA

23  basin cleanup.  And she has been at EPA and working at this

24  site since 1996, when she was an RPM, which is a program

25  manager, doing basically in-the-field work.

1    She is going to, we are not going to be repeating

2    what she said in her proffer.  What we hope to do, with a slide

3    presentation, is to give you an overview of the basin, to give

4    you, to the best that we can, a tour of the basin and what it

5    looks like, what its mining history is, what the contamination

6    is, and what EPA's done in response to that, and what it needs

7    to do in order to be in compliance with CERCLA and be

8    protective of human health and the environment.

9    After Cami is done speaking, Tom DeHoff, who is a

10   certified public accountant from EPA, is going to briefly

11   discuss about EPA's indirect costs.  EPA's indirect costs are

12   basically the administrative and programmatic costs that EPA

13   incurs in running the Superfund program.

14   After Thomas DeHoff, we will hear from Paul Ammann.

15   Paul Ammann is a professional certified civil engineer, and he

16   has over 25 years of experience in a variety of engineering and

17   management positions at a mining company and other industrial

18   corporations.  The purpose of his testimony is to provide the

19   basis or provide the amount and reasonableness of EPA's future

20   cost estimate in accordance with the ASTM standard for

21   environmental claims.  And at the same time, he'll also be

22   refuting ASARCO's expert regarding their probabilistic analysis

23   in this case.

24   After that, that will conclude the EPA portion of the

25   case and the EPA cost claims.  After that, the witnesses will

1    be dealing primarily with natural resource damages.  The first

2    witness that we'll hear from is Dr. Joshua Lipton.  He is a

3    Ph.D. in natural resources.  He has been involved with the site

4    and the natural resources there for over 15 years.  He is going

5    to be discussing the United States' claims for NRDs, natural

6    resource damages.  He will explain how the federal trustees at

7    this site have gone about calculating the damages and the

8    methodologies that were employed in the basin and why those are

9    the appropriate and in fact the ones that need to be taken.

10            The next witness that we'll hear from is Kathleen

11   Moynan.  She is a project manager for the Department of

12   Interior's Fish and Wildlife Service.  This is one of the

13   trustees of the natural resources.  And she is briefly going to

14   be discussing some current restoration plans that are going on

15   and talking about the costs of those and how using those costs

16   in, to cost out future restoration actions is inappropriate.

17            The final witness that you'll hear from is Dr. Robert

18   Trost.  He is a Ph.D. in wildlife ecology and zoology.  He has

19   been with the Department of Interior for over 20 years in the

20   Fish and Wildlife Service.  He is currently serving as the

21   Pacific Flyway Representative for the Fish and Wildlife

22   Service.  He, in essence, oversees and manages the population

23   monitoring and assessment of migratory birds in, through the

24   *Pacific Flyway, which includes the Coeur d'Alene Basin.*  He

25   will testify about the procedures used to assess damages for

1    injuries to tundra swans in the basin and their habitat.

2            The other thing I'd like to bring attention to the

3    Court is we have a past cost component to our case.  And as

4    Mr. Jordan mentioned earlier, those are presented for you in

5    written direct testimony of both Wiley Wright and William Kime.

6    They're both certified public accountants.  And in Mr. Wright's

7    proffer, it lays out the past costs that have been incurred by

8    all the federal agencies at this site.  That will include EPA's

9    response costs, as well as the trustee's costs in doing the

10   assessment study work for the natural resource damages.  And

11   that amount is largely, this past cost is not in dispute in

12   this case right now.

13           Mr. Kime's proffer, again he is also a certified

14   public accountant, and he just lays out DOJ's, the Department

15   of Justice's enforcement costs in that case, in this case.  And

16   those are also recoverable response costs and are not being

17   disputed.

18           We have also submitted the direct written testimony,

19   for the Court's review, of Alexis Maniatis, regarding the

20   discount rate to be applied, and it responds to some of the

21   Debtor's contentions.

22           So my first question that I said I would address is

23   where we have been.  It is this question and the answer to this

24   that makes this very unique from any other case that you have,

25   any other case or claim that you have heard to date or that you

1   may hear in future estimation hearings.  And why that is is

2   because, one, liability is not an issue at this case.  It has

3   already been established.

4          We, after years of discovery, we had a trial in the

5   District Court of Idaho that lasted over six months, and there

6   was a finding there that ASARCO owned and operated a variety of

7   mines and mills throughout the basin, and they disposed

8   tailings into the waterways, which has led to the widespread

9   contamination throughout the basin.

10         The second thing that makes this case very unique and

11   that has already happened is unlike all the other environmental

12   claims that you have heard about in this bankruptcy, the EPA

13   has been investigating, studying, and actually cleaning up this

14   basin for over two decades.  EPA has spent, just with regard to

15   the basin, has spent four years, between 1998 and 2002,

16   conducting a rigorous and thorough investigation of the basin,

17   and then evaluating a range of cleanup alternatives in order to

18   develop a remedial approach.  This is referred to, as you'll

19   hear from Ms. Grandinetti, as a remedial investigation and

20   feasibility study, also known as an RI/FS.

21         More, and during this RI/FS process, EPA has analyzed

22   and collected more than 17,000 samples of soil, ground water,

23   sediment, surface water, and other media, like paint samples

24   and house dust.  And they were used to evaluate to assist in

25   understanding the widespread contamination of the basin and the

1    impacts that it has on human health and the environment.

2              As a result of all these years of study and

3    investigation and actual cleaning up, EPA is in the best

4    position to know what it's going to do, what it is going to

5    take to clean up the basin, so as to be protective of the human

6    health and the environment, and how much it will cost.

7              The second question I'd like to address is where we

8    need to go.  It is the Debtor who has filed this, who has filed

9    for bankruptcy and has necessarily required the United States

10   at this point to estimate this future work.  EPA has a

11   comprehensive remedy, and that is EPA's long-term cleanup plan

12   for the basin, the basis of which has been identified back in

13   2001 as a preferred alternative representing the best balance

14   of trade-offs of the CERCLA cleanup criteria.

15             An interim remedy has been selected by EPA in 2002,

16   and that was the first step towards this cleanup plan and

17   represents a prioritized subset of cleanup actions from this

18   comprehensive plan or this comprehensive remedy.  However, this

19   interim remedy was never meant to be final.  And in fact,

20   everyone agrees it will not meet the necessary requirements

21   under CERCLA, which are known -- you'll hear a lot of acronyms

22   today, unfortunately -- known as ARARs.  And that stands for

23   applicable or relevant and appropriate standards.

24             The comprehensive remedy does satisfy these cleanup

25   requirements.  Thus, it's the United States' position that the

1   comprehensive remedy is the appropriate basis for evaluating

2   the costs of long-term cleanup in the basin.  This

3   comprehensive remedy will be expensive.  It's going to cost

4   over $2 billion to be implemented over a 40-year time frame.

5           In direct contrast to this, ASARCO's expert, LECG,

6   has developed an estimated expected value for cleanup of the

7   basin.  It is derived from assumptions made without any

8   engineering, scientific or legal analysis whatsoever.  They

9   only serve to drive the cost downwards.  Specifically, all of

10  LECG's scenarios and alternatives wait 30 years before doing

11  any additional cleanup, thereby greatly reducing the value of

12  the estimated costs.

13          Second, LECG expected value gives the greatest

14  weight, 70 percent, that the Interim ROD will in fact be the

15  final remedy, which is contrary to EPA's findings and the

16  National Academy of Science, who reviewed this site, that it

17  will not be protective of the environment nor meet the

18  requirements of cleanup actions under CERCLA.

19          The United States is requesting that the liability be

20  calculated based on an overall cleanup plan identified long

21  before this bankruptcy was filed by -- was filed.  And this is

22  a cleanup plan that EPA, the decision maker at the site, who

23  has a first-hand knowledge and experience in the basin, has

24  selected.  The cleanup plan is reasonable in its goals and

25  expectations and is what is in fact needed in order to be

1   protective of human health and the environment.

2           Thank you, Your Honor.  And I'll turn it over to my

3   colleague, Mr. Askman.

4           MR. ASKMAN:  Good morning, Your Honor.  David Askman

5   on behalf of the United States.  As Ms. MacDonald just pointed

6   out, in addition to the United States' action or claim for

7   response costs in this case, there is an additional claim for

8   natural resource damages.  I know that in the California Gulch

9   site, the Leadville case that you had heard, held a hearing on

10  a few months ago, you heard something about natural resource

11  damages.  But in essence, they are an additional claim that are

12  based on injuries to natural resources which are within the

13  trusteeship of the United States.

14          The cause of action is available when natural

15  resources which belong to or are managed by the United States,

16  an Indian tribe, or a particular state, have been injured as a

17  result of releases of hazardous substances.  And typically,

18  they are determined by a regulatory action called a Natural

19  Resource Damage Assessment, which is ordinarily conducted by

20  the trustees for those natural resources and will determine

21  both what the extent of the injury is to the natural resource,

22  and then ultimately the amount of compensation that will be

23  required in order to fully compensate the trustees or the

24  public for that loss.

25          In this case, it's difficult to avoid hyperbole, but

1    the United States and the Coeur d'Alene Tribe have conducted

2    the most extensive Natural Resource Damage Assessment in the

3    history of CERCLA.  There have been dozens of studies conducted

4    of the Coeur d'Alene Basin by the Fish and Wildlife Service, by

5    the Bureau of Land Management, the United States Forest

6    Service, the Coeur d'Alene Tribe, United States Geological

7    Survey, the National Biological Services, when they existed,

8    the State of Idaho, evening the mining companies and various

9    other entities, and they have consistently found that there is

10   severe and persistent effects to all the natural resources in

11   the Coeur d'Alene Basin.

12          Those resources include miles of streams and rivers,

13   a vast wetlands complex, one of the largest contiguous wetlands

14   complexes in the United States, that is a home to hundreds of

15   species of birds and animals.

16          The Natural Resource Damage Assessment culminated in

17   a report by the trustees, which we will talk quite a bit about

18   later on during the week, a trial in the District Court, in the

19   District of Idaho, which you have heard about, and a finding

20   that natural resources were in fact injured and that ASARCO,

21   amongst other parties, was liable for those injuries.

22          One of the roles of the Court in this action is going

23   to be to determine the amount of damages that are due to the

24   United States because of its loss of natural resources.  Under

25   the law, natural resource trustees are entitled to the amount

1   of damages that would be required to restore natural resources

2   to their baseline conditions, to rehabilitate those resources,

3   to replace those resources, or to acquire the equivalent of the

4   natural resources.

5          How does that happen?  There will be testimony

6   presented by the United States this week about how the trustees

7   have gone about calculating the damages.  But essentially we've

8   employed an approach which determines, an approach which

9   determines the amount of money that it will cost to replace the

10  services that have been lost as a result of the natural

11  resources which have been injured.

12         Damages were calculated for three resources,

13  consistent with the District Court's opinion in the District of

14  Idaho, and the amount of the claim which we have set forth in

15  this case is, or we will prove in this case is $333.2 million.

16  Our witnesses will tell you precisely how we got to that

17  number, and they will testify that that number represents the

18  least amount.  It is a conservative amount, but it's the least

19  amount of money that can be justified, given the extent of the

20  natural resource damages in this case.

21         As you are already aware and have been made aware a

22  number of times, there is no dispute as to liability in this

23  case.  ASARCO is in fact liable, not just for the costs of EPA

24  cleanup, but also for the damages to natural resources.  But

25  there are other issues which are also not in dispute in this

1  case.

2          There is no dispute over the methods that have been

3  employed by the trustees to calculate damages.  And you will

4  hear no disputes over that.  There is no dispute for a variety

5  of injuries to natural resources.  For example, there's no

6  dispute over the number of migratory tundra swans that have

7  been killed in the basin nor the number of acres of wetland

8  habitat which have been contaminated.  There is no dispute over

9  the amounts, the acreage of federal land which has been

10  contaminated and for which the United States is due

11  compensation.

12          What is at issue in this case, and despite the

13  somewhat voluminous expert reports and the variety of issues

14  which have been highlighted in those, are just a few issues.

15  First, the Debtors will, the Debtor will contend that the

16  United States has inappropriately chosen restoration

17  alternatives in this case.  And you will hear testimony from

18  two witnesses who you've heard already in different estimation

19  hearings in this case, Mr. Richard White and Dr. William

20  Desvousges.  These are witnesses who will testify that the

21  United States failed to pick the appropriate restoration

22  options from amongst the suite of restoration alternatives

23  which were considered to restore natural resources.

24          They will testify to this, notwithstanding the fact

25  that neither of these gentlemen has any background at all in

1    the underlying scientific disciplines that are required to

2    evaluate these processes.  They have no expertise in the

3    development of restoration actions.  They don't know whether

4    the alternatives that they are recommending will compensate the

5    United States for its loss.  In fact, they won't even know

6    whether or not the alternatives that they are suggesting will

7    work.  Instead, they looked through the suite of alternatives

8    and simply chose the cheapest one, the easiest way to reduce

9    the bottom line number.

10           A second issue which will be addressed during this

11   estimation hearing is the issue of the United States

12   determination of baseline.  In determining how many natural

13   resources should be in a certain area, scientists will look at

14   areas that have not been affected by releases of hazardous

15   substances, and then they will compare the two areas.  The

16   condition of the natural resource were it not for the release

17   of a hazardous substance is a concept that we call baseline.

18           The determination of baseline is necessarily a

19   difficult and tricky one.  And in this case, it is no

20   different.  But in this case, uniquely, the trustees have

21   determined their baseline by conducting years of investigations

22   and studies.  They have compared various different sites within

23   the Coeur d'Alene Basin and outside the Coeur d'Alene Basin,

24   and they have determined, they have based their decision on

25   hundreds and hundreds of pages of supporting documents, as you

1   will hear testimony.

2        Nonetheless, the Debtors say that that is not enough.

3   They will contend that there has been data developed that was

4   excluded from the trustees' consideration and should not have

5   been excluded.  But the witnesses that testify for the United

6   States who have actually developed this baseline calculation

7   will tell you that it doesn't matter what evidence you use,

8   even if you use the evidence on which they rely, the results

9   are consistent.

10        In fact, the one set of data which will be championed

11   by both witnesses for the Debtor and for the Parent corporation

12   will, if you apply that data, will increase, not decrease, will

13   increase the amount of injuries suffered to the natural

14   resources in the Coeur d'Alene Basin by about three times.

15        The third issue that you will hear about regarding

16   natural resources is a debate over whether or not water quality

17   in the Coeur d'Alene Basin is getting better than the United

18   States claims that it is, and whether or not fish resources are

19   in fact growing at a rate higher than the United States has

20   predicted.

21        The Debtor has argued in its briefs and proffers that

22   the United States has been applying the wrong water quality

23   standard when it's determining its natural resource damages.

24   And they will argue that the United States has underestimated

25   the number of fish that are currently in the river systems in

1     the Coeur d'Alene River Basin.

2              It is important to note that neither of these

3     assumptions will change the United States' damage calculations

4     at all.  Even if the Court agrees, even if at the end of the

5     day the Debtor is successful in both of these arguments, there

6     will be no quantification provided and no basis to reduce the

7     United States' claim.

8              Regardless, the Debtor has failed to produce any

9     evidence that water quality is getting better at any rate which

10    is going to meet the applicable water quality criteria that

11    they suggest any time in the next several decades.

12             The last issue that will be discussed regarding

13    natural resource damages is an issue which is, I believe, only

14    brought up in the papers of the Parent corporation, and that

15    regards the costs of the restoration actions that the United

16    States has chosen as alternatives to restore these natural

17    resources.  They make the contention that the cost the United

18    States has used, the costing mechanisms that they have used

19    exaggerate, grossly exaggerate the costs of restoring the

20    wetlands, wetland and riparian habitat in the basin.  Again, in

21    this case, the witnesses who you will hear have no experience

22    in costing out restoration actions, have never chosen a

23    restoration alternative nor implemented, nor have they ever

24    evaluated whether or not a natural, a restoration action

25    actually works to recover natural resources.

1          One issue which we are not going to present evidence

2  on, Your Honor, is the issue of divisibility.  We have set

3  forth in the record both the testimony and deposition

4  transcripts of the experts for the United States and for the

5  mining companies in the District Court in the District of Idaho

6  regarding the Court's 22 percent allocation in its September

7  2003 order, and we are not going to put evidence, any

8  additional evidence on regarding that.

9          THE COURT:  So a Court has found what?  Found what

10  about -- what is 22 percent?

11          MR. ASKMAN:  The Court found that the mining

12  companies were liable to the United States in certain

13  percentages, based on mine production records.  The percentage

14  which was assigned to ASARCO was 22 percent.

15          THE COURT:  Okay.  So there's been a court

16  determination that ASARCO is liable for 22 percent of the

17  damages?

18          MR. ASKMAN:  That's correct, Your Honor.  In the

19  first phase of the District Court --

20          THE COURT:  And you're not challenging that.

21          MR. ASKMAN:  We are not, we are not putting evidence

22  on it, but, Your Honor, we vehemently disagree with the Court's

23  order, and we believe that new law in the Ninth Circuit, which

24  has come down recently, would require the Ninth Circuit, upon

25  review of that evidence, to overturn the finding of

1  divisibility.

2          We think the Court, in looking at, or in estimating

3  this hearing, needs to assign some probability to the chance

4  that if this issue were fully litigated and went through the

5  second phase of trial, and the United States were to appeal

6  this to the Ninth Circuit, that it would be overturned.  I know

7  that there will be a contention on behalf of the Debtor that we

8  should look, instead, to what the Fifth Circuit law is on

9  divisibility in the Bell Petroleum case, and we see no

10 substantive difference between the law.  In fact, the latest

11 case which came down in the Ninth Circuit relied explicitly on

12 that Bell opinion.

13         THE COURT:  Okay.

14         MR. ASKMAN:  At the end of the day, Your Honor, the

15 evidence will demonstrate that the Debtor's exercise in trying

16 to reduce the claims of the United States is not an exercise in

17 science at all, but simply an exercise in accounting.  If the

18 Debtor's experts and arguments win the day, the United States

19 is going to own easements on lands that the public can never

20 use, and, because restoration isn't a part of any of their

21 calculations, actual restoration work, those lands aren't going

22 to be used, worth using anyway.  The wetlands in the Coeur

23 d'Alene Basin will continue to poison their inhabitants, and

24 the damage suffered by the public will not be redressed.

25         THE COURT:  All right.  Thank you.

1      All right.  Are we going to -- go ahead.  Are you

2  going to reply now?  Or do you want to wait until you're

3  beginning your case?

4      MR. DAVIS:  Your Honor, I'm going to briefly provide

5  the Court with a couple of slides that explain what the claims

6  are, and in doing so, explain what some of the issues are in

7  the case.

8      THE COURT:  Okay.

9      MR. DAVIS:  And then I'm going to turn it over to

10  Mr. Steinway, who will respond more substantively to the

11  environmental arguments that the United States has put forth.

12      THE COURT:  All right.  Do we have -- we don't have

13  the State of Idaho in this?

14      UNIDENTIFIED SPEAKER:  No, Your Honor.

15      THE COURT:  It's just EPA.  Okay.

16      MR. DAVIS:  This chart, Your Honor, contains the

17  analyses that the parties have engaged in thus far.  The first

18  column is the Debtor's Initial Expert Report, which was

19  submitted on June 15th of '07 and has a total at the bottom of

20  $89 million.  And I want to quickly point out that these

21  numbers are all based on the District Court, Judge Lodge's, 22

22  percent divisibility ruling.

23      The second column is the Original Proof of Claim

24  filed by the Government, which has a number at the bottom of

25  approximately $174 million.  If you look at the -- well, I'll

1    get to that in a moment.

2          The third column, second to last column, is the

3    revised Government claim which came in with their expert report

4    about a year later, this past June.  That has a number at the

5    bottom of $568 million.  And again, that's the 22 percent

6    number of the United States.

7          The last column is the Debtor's revised numbers,

8    where the Debtor stands today, where our experts stand today,

9    and that number is $122 million.

10          Taking the lines here, the first item is past costs.

11   As Ms. MacDonald indicated, where we stand today is in

12   agreement, $36 million.  The second series of lines, human

13   health, Upper Basin environmental, monitoring, these are the

14   response costs that will be incurred in the future.  And if you

15   see, the original claim of the Government had an item for OU3

16   final remedy.  That was unspecified.  Actually, I think the

17   proof of claim said it was undetermined at the time.  That has

18   now been determined and it's been filled in to a substantial

19   increase in the human health, Upper Basin environmental and

20   Lower Basin environmental remedy numbers.  And that's where the

21   large increase is coming in the United States' claim.

22          The total future response costs, as you can see,

23   there's a large difference, $321 million versus $76 million.

24   The parties disagree on agency oversight costs, $17 million

25   versus $2.4 million.  And there's one point that you just made,

1   which is that the Government includes oversight costs for the

2   State of Idaho and the Coeur d'Alene Tribe, which I don't quite

3   understand.  They didn't file a claim on the basin, so I don't

4   think those costs are properly includable on the Government's

5   claim.

6          Next we come to the portion that Mr. Askman talked

7   about which is natural resource damages.  We are in agreement

8   on past costs for natural resource damages.  We are in

9   substantial disagreement on future natural resource damages.

10   The difference there at the end of the day being 80 million

11   versus 7 million.

12          So those are the differences between the parties.

13   Those are the elements of the claim that will be discussed

14   during the next few days.

15          Now, if we could go to the next chart.  This chart is

16   really my attempt to try to understand how, how we can come up

17   with different numbers by deciding three critical issues in

18   different combinations.  The first thing I want to point out

19   is, as you'll see underneath the parenthetical, or the

20   parenthetical phrase there, again, these numbers are based on

21   Judge Lodge's 22 percent ruling.

22          The second thing I would point out, that the --

23          THE COURT:  Was your chart of the Government's claim

24   based on a 22 percent ruling also?

25          MR. DAVIS:  Yes.  The top line, if you will, is the

1    Government's Response Cost Claim, basically divided by five, I

2    mean, applying the 22 percent divisibility ruling, and

3    including all --

4            THE COURT:  And that's what their claim is today?

5    They have not accepted the 22 percent.  Isn't that correct?

6            MR. DAVIS:  They are asking the Court, as I

7    understand it, to imagine that there is some prospect that

8    Judge Lodge's ruling would ultimately be reversed by the Ninth

9    Circuit.  I think, just the bankruptcy point of that, Your

10   Honor, is that we are in the Fifth Circuit.  This is an

11   estimation proceeding for all times and all purposes.  Whatever

12   happens to that ruling on ultimate appeal to the Ninth Circuit

13   is not going to affect ASARCO.  It will affect Hecla, the other

14   PRP.

15           The consideration here for this Court is whether to

16   accept Judge Lodge's ruling as a proxy for a fair result, or to

17   what extent to accept that ruling.  This Court's ruling will

18   then be reviewed by the Fifth Circuit, under the standards

19   applicable to decisions by the -- well, by the District Court

20   and then the Fifth Circuit.

21           THE COURT:  But why wouldn't, if there were some

22   probability, I mean, if I were looking at -- of course, you

23   know, if you look at the law review articles on estimation,

24   there are any number of ways that you can do estimations, you

25   know, and some of them are almost bizarre, but have been

1   accepted.

2            But assuming that the appropriate thing to do is to

3   rationally look at all of the facts that are available at the

4   time and try to come up with a figure that represents what

5   ultimately would be the actual, actual costs, the actual

6   damages, whatever it would be, then to the extent that if there

7   were a judgment that was on appeal and it was a high one, you

8   might want me to discount it by the fact that it might be

9   appealed, and they might, you might win.

10           But to the extent that it might be on appeal and it's

11  a low one, they might want me to increase by some percentage

12  the award, by virtue of what it might, you know, what the

13  probabilities or, you know, some analysis of the thinking

14  there.

15           Now, right off the bat, you could also take the

16  position, well no, those are matters of law, and I should make

17  a decision about that, one way or the other, and then it would

18  be appealable.  If it's not, you know, you would appeal the

19  issue, I guess, have to go up appealing.  If I were to decide

20  this isn't going to be overturned, then, and then you could, I

21  guess you would have to appeal the estimation in order to hold

22  off to make certain that that decision -- and so I don't know

23  that, as a practical matter, that I should be making findings

24  of law of matters that are contested, because if I do so, then

25  it really puts the parties in a position of we've got to appeal

```
 1    all of that sort of stuff, over those issues.  I think probably
 2    the better analysis is to look at what the probabilities are,
 3    what the possibilities are, and get some understanding what
 4    might go.  But I haven't, you know, I'm still working that
 5    issue on the first one.  So I haven't really made my decision.
 6    I may decide differently for each one, but who knows.  But I
 7    doubt that.
 8          But I guess what I'm saying is I think it makes
 9    sense, though, that they're probably correct, if this is a
10    decision that's on appeal, I could certainly look at the issue
11    of its appealability and whether they might win.  And it, I
12    mean, on the other hand, if they do win, that doesn't
13    necessarily mean that the Ninth Circuit's going to render
14    25 percent or 30 percent.  The odds are real good they'd send
15    it back.  Isn't that true?
16          MR. DAVIS:  I would think so, Your Honor.
17          THE COURT:  So they might render 100 percent.  They
18    might say, no, as a matter of law, it's 100 percent.  I don't
19    know that.  But I guess I have to look at all of those things.
20          MR. DAVIS:  I mean, I think the Court has broad
21    discretion, obviously --
22          THE COURT:  Right.
23          MR. DAVIS:  -- in conducting estimation proceedings.
24    And the parties are certainly prepared to discuss the
25    Bell Petroleum and Ninth Circuit decisions --
```

```
 1              THE COURT:  Right.

 2              MR. DAVIS:  -- as it relates to that case.

 3              THE COURT:  But there's no question that, as to this

 4    case, there's no chance that the Ninth Circuit is going to

 5    review my opinions.

 6              MR. DAVIS:  Correct, Your Honor.

 7              THE COURT:  Okay.  So go ahead.

 8              MR. DAVIS:  Okay.  In any event, this chart, again,

 9    it's based on the 22 percent numbers.  If you were inclined to

10    believe that there was some percentage of reversal, however you

11    work that issue out --

12              THE COURT:  Well, did the -- let me ask this

13    question.  When the Government filed its claim, did it file it

14    on the basis of the 22 percent, or did it file it on the basis

15    of 100 percent?

16              MR. DAVIS:  I believe it's 100 percent.

17              THE COURT:  Is that correct?

18              MS. MACDONALD:  Yes.

19              MR. TENENBAUM:  What did you say?

20              THE COURT:  You filed 100 percent of the liability --

21              MR. TENENBAUM:  Yes.

22              THE COURT:  -- is what you filed your claim.  Okay.

23              MR. DAVIS:  And that's why --

24              THE COURT:  So when you put up your chart, that was

25    your allocation of their percents.
```