1          MR. DAVIS:  Exactly, which is why we felt --

2          THE COURT:  Okay.

3          MR. DAVIS:  -- actually Mr. Jordan felt it necessary

4    to put the parenthetical in to make sure that we understood

5    that that was our interpretation of what those numbers are.

6          THE COURT:  Okay.

7          MR. DAVIS:  The other thing I want to point out is

8    that this does not include natural resource damages.  And the

9    reason it doesn't include that is natural resource damages are

10   not affected by the net present value and indirect issue in the

11   way the response costs are.  So if you're inclined to award

12   them the full amount of $80 million that they're looking for,

13   if you used one of these numbers, you'd need to add $80 million

14   to that number to correct, come up with a correct number for

15   the estimated amount.

16          I'd also, there's a footnote at the bottom that notes

17   that we have converted the numbers to a 2006 base year, which

18   we've used as a proxy for the filing of the petition date.  We

19   have not included oversight for the State and Tribe, for the

20   reasons that I mentioned a minute ago, and we have not included

21   post-petition interest on past costs.

22          Now, to understand how this chart works and the way

23   these numbers work, you really, you first have to choose the

24   remedy, then you need to apply the discount.  And of course,

25   there's an issue as to the discount rate.  But the first four

1    scenarios, of course, are the U.S. remedy, the comprehensive

2    remedy that Ms. MacDonald talked about.  The next four are the

3    Debtor remedy, which is really the EPA's remedy as proposed in

4    the Interim Record of Decision.

5         Then the next column illustrates what happens when

6    you take that remedy and either discount it according to the

7    United States discount rate, the low two, three percent rate,

8    or the Debtor's discount rate of about seven percent.

9         The final column is the application of either adding

10   indirects or not adding indirects.  As you recall, indirects is

11   like 33 percent that simply gets added to the total response

12   cost figure.  So after you take the remedy, you bring it back

13   to net present value, you add a percentage for indirect, and

14   you come up with the final number.

15        And if you look at the first two scenarios, what

16   we've done is we've used the United States' remedy, United

17   States' discount rate.  In scenario number two, we've not added

18   indirects, and scenario number one, we have added indirects.

19   And as you see, that would appear to suggest that the indirect

20   cost issue is a $100 million issue.

21        The problem with that analysis is if you look at Item

22   Number 7, or Scenario Number 7, we have the Debtor remedy,

23   Debtor net present value, and we add indirects.  Compare that

24   to Number 8, which is the Debtor's remedy, the Debtor's net

25   present value, and no indirects.  You see there's only about a

```
1   $26 million difference in between those two scenarios,

2   illustrating the point that until you apply the remedy and

3   determine the net present value, you don't really know how much

4   of an issue or how large a dollar issue indirect costs really

5   represent.  And so what --

6           THE COURT:  And tell me again what you think -- what

7   are indirect costs.

8           MR. DAVIS:  Indirect costs are basically EPA

9   overhead.  Mr. Steinway will address that at great length.

10          THE COURT:  Okay.  These are the costs, I mean,

11  this -- so the Number 7, that's your view of the indirects that

12  the EPA has?  I mean, aren't the indirect costs the same,

13  regardless of how much their damages are?

14          MR. DAVIS:  No.  Indirect costs vary as a direct

15  percentage of the amount of response costs.

16          THE COURT:  Okay.  So there is a, there is some legal

17  principle somewhere in environmental law that says that they're

18  entitled to indirect costs of a certain percentage.

19          MR. DAVIS:  Under certain circumstances.

20          THE COURT:  Okay, good.

21          MR. DAVIS:  And it is a percentage, so it varies,

22  again, with the amount of the remedy that you find.  And then

23  again, depending on how you discount that remedy over time --

24          THE COURT:  Right.

25          MR. DAVIS:  -- that also affects the percentage.
```

| | |
|---|---|
| 1 | THE COURT:  Okay.  I understand. |
| 2 | MR. DAVIS:  And that's all I'm trying to accomplish |
| 3 | with the chart.  You know, if you have questions about that |
| 4 | later, I can answer them.  But that's all I have right now. |
| 5 | I'd like to turn it over to Mr. Steinway. |
| 6 | THE COURT:  All right.  And you're going to sit -- go |
| 7 | right ahead.  You can sit. |
| 8 | MR. STEINWAY:  Yes.  Dan Steinway.  Yes, sir. |
| 9 | MR. DAVIS:  Would it help the two of you for me to |
| 10 | move this? |
| 11 | THE COURT:  No, I can see him fine. |
| 12 | MR. DAVIS:  Okay. |
| 13 | THE COURT:  But you can sit.  You don't have to |
| 14 | stand.  This is not a test. |
| 15 | MR. STEINWAY:  Thank you, Your Honor.  Good morning, |
| 16 | Your Honor.  Dan Steinway for Debtor, ASARCO, LLC. |
| 17 | THE COURT:  All right.  So are you a piano player |
| 18 | also?  Or is that just the name? |
| 19 | MR. STEINWAY:  Just the name, Your Honor. |
| 20 | THE COURT:  Okay. |
| 21 | MR. STEINWAY:  Your Honor, the Coeur d'Alene site is |
| 22 | indeed very large and an extremely complex site.  It includes |
| 23 | 1500 square miles of mountainous terrain and numerous rivers |
| 24 | and streams throughout.  The site is basically divided into two |
| 25 | specific components.  You will hear this morning, Your Honor, |

1    about an area called "the Box," and that's this 21-mile square

2    area that has been addressed starting in 1983 as the initial

3    action by EPA in the cleanup under the Superfund program.

4           Inside the Box, Your Honor, you will hear about two

5    different types of cleanups.  One is called Operable Unit

6    Number 1, which generally dealt with the populated area inside

7    the Box, and then Operable Unit Number 2, which is generally

8    referred to as the nonpopulated area of the Box.

9           Inside the Box was a smelter which was not owned by

10   ASARCO and is generally being addressed under Operable Unit

11   Number 2.  Outside the Box is the area we generally refer to as

12   the 1500 square-mile basin area.  And it is basically composed

13   of four different components, the Upper Basin, where the mining

14   activity began, and it's a heavily mountainous terrain area,

15   and the Coeur d'Alene River runs through the area down to Lake

16   Coeur d'Alene, to the main stem of the Coeur d'Alene River,

17   down to this area called the Lower Basin, which is the second

18   component of the overall basin area.  The third component is

19   Lake Coeur d'Alene, which is over here, and the fourth

20   component is the Spokane River.  And the whole basin area, Your

21   Honor, is referred to as Operable Unit Number 3, which is the

22   subject of this proceeding.

23          We, as the Government has noted, we have recently

24   settled with the Government with respect to the claims inside

25   the 21-square-mile Box area, and that is no longer an issue in

1    this matter.

2         The history of the Coeur d'Alene site is very

3    relevant in this case.  And I would like to briefly walk you

4    through that.  The Coeur d'Alene site dates back to the late

5    1800s, when mining began in an area generally referred to as

6    Silver Valley.  Throughout the years, there was a substantial

7    amount of mining, milling and smelting activity conducted in

8    various portions of the basin area.  And in fact, the Coeur

9    d'Alene area has produced through the years a substantial

10   amount of the zinc, lead and silver ores that provided basic

11   raw materials for our nation.  The area is a very heavily

12   mineralized area.  And indeed, today, mining activity still

13   continues in the Coeur d'Alene area, albeit to a smaller extent

14   than was the case in the past.

15        I think it would be helpful to go through a couple of

16   the key milestones in the history of the site.  As I mentioned,

17   in 1983 the Box, the 21-square-mile area, was initially listed

18   on EPA's National Priorities List.  And through the years, in

19   the OU1 and OU2 cleanup, activity has gone forward on that

20   portion of the project.

21        In 1998 EPA began to expand its investigation of the

22   Coeur d'Alene area outside the Box and began, as Counsel for

23   the Government said, to conduct the RI/FS, the remedial

24   investigation/feasibility study for the area.  The RI is

25   generally the work that is done to characterize the site and do

1    the actual investigatory work, and the FS, the feasibility

2    study, is generally a report that lays out potential options

3    for cleanup based on the study work that is done in the RI.

4         And in 2001 EPA completed the RI/FS for the basin.

5    And indeed, as Counsel for the Government has noted, as part of

6    the feasibility study, one of these six options, which is

7    option number three, was an option called the ecological

8    alternative number three, which is the comprehensive remedy

9    option for the site.  And indeed, the Government did express

10   and has expressed throughout the FS process its preference for

11   feasibility study alternative number three, albeit indeed the

12   comprehensive remedy.

13        However, a key action occurred prior to the formal

14   adoption of the feasibility study at the site.  In fact, we

15   believe it was an extremely unusual action.  In 2001, before

16   the option or the cleanup decision was made, a group called the

17   National Remedy Review Board undertook a review of the RI/FS.

18   And I will talk about the impact of the National Remedy Review

19   Board later on in my remarks.  But suffice it to say, Your

20   Honor, the Remedy Review Board is a high level management group

21   at EPA that undertakes reviews of only the most complicated

22   cleanup sites that the agency estimates decisions on.

23        Based on their action, there was an abrupt about-face

24   in what happened in the cleanup.  And in 2002, the Interim ROD,

25   which is the agency's Record of Decision, was issued, which was

1   different than the comprehensive cleanup.  In summary, because

2   of the Remedy Review Board, EPA decided to instead proceed

3   forward and formally adopted only a specified subset of the

4   cleanup activities that were originally included within the

5   scope of the comprehensive remedy and moved forward under the

6   Interim ROD for 30 years of selected actions.

7          And in fact, in another extremely noteworthy action,

8   in my view, Your Honor, one of the only times in the history of

9   the Superfund program that Congress has gotten involved in a

10  cleanup action in a Superfund program, in 2005, the National

11  Research Council, which is an arm of the National Academy of

12  Sciences, undertook a review and issued a report evaluating the

13  remedies that were being implemented at the Coeur d'Alene site.

14         The National Research Council was directed by

15  Congress to undertake this review basically at the behest of

16  the Idaho congressional delegation, and Congress earmarked

17  approximately $850,000 to have the National Research Council

18  take a specific study of the mega mining site Coeur d'Alene

19  cleanup decisions and provide very high level scientific advice

20  and recommendations.

21         Going to the bankruptcy proceeding, in July of 2006,

22  the Government initially filed a proof of claim.  And the proof

23  of claim included three basic components.  The first component

24  was a component for past costs, and indeed, $326 million for

25  the Interim Record of Decision, or the IROD, as we call it.

1   The second component of the proof of claim was a claim for
2   natural resource damages.  And the third component of the proof
3   of claim was a claim for the OU3, the basin cleanup, an
4   undetermined final remedy amount, which was included in the
5   Government's original proof of claim.
6           And after the estimation process moved forward, and
7   the Government filed, in June of 2007, their first expert
8   report, the affirmative report from the Government included,
9   for the very first time, a revised claim of $2.1 billion for
10  the basin.
11          Additional factual information, Your Honor, has been
12  provided by the Government throughout the course of reviewing
13  and rebutting expert reports, which led the Debtor, in
14  September of 2007, to issue its supplemental report.  We have
15  still gotten new additional information being made available to
16  us, as the process has continued.
17          Your Honor, there indeed has been metal contamination
18  from the mining of zinc, lead, and silver ores in the basin.
19  And ASARCO, as has been mentioned this morning, accepts
20  liability for the contamination at the site and recognizes full
21  well the injury that has occurred in the Basin Coeur d'Alene.
22  The key question, though, is how best to address the
23  environmental conditions that now exist in this area in the
24  most effective manner possible, in accordance with the law.
25          A number of key decisions, or a number of key issues

1   have been extensively litigated in the Coeur d'Alene situation

2   throughout many years, and there have been at least five key

3   major decisions.  As you've noted, Your Honor, one of the key

4   issues has already been addressed.  After a 78-day trial in

5   2003, Judge Lodge, of the Federal District Court for the

6   District of Idaho, issued a very noteworthy decision.  And in

7   that decision, Judge Lodge ruled that 22 percent of the costs

8   of the cleanup should be attributable to ASARCO.

9           In his decision, Judge Lodge specifically addressed

10  the key divisibility factors at the site, and we believe he

11  issued a very well-reasoned decision.  There was significant

12  testimony from both the Government's experts, as well as

13  ASARCO's experts.  And interestingly enough, both experts,

14  using allocation methodologies quite similar in nature, came up

15  with the same number, 22.07 percent versus 22.37 percent.  And

16  in fact, in his decision, Judge Lodge specifically referenced

17  the key Fifth Circuit divisibility case, which has been

18  mentioned here, In Re:  Bell Petroleum.

19          Having now addressed that factor, we believe there

20  are basically five principal issues remaining for resolution at

21  the Coeur d'Alene site.  First and foremost, the key issue is

22  what remedy should be used for the basis for cost estimation in

23  this proceeding?  As we noted earlier, EPA has adopted an

24  Interim ROD which specifies 30 years of ongoing work in this

25  area.  We accept the Interim ROD as a basis for the estimation,

1    recognizing the fact there are indeed substantial technical

2    problems associated with the implementation of that ROD.

3         We are asking the Court to estimate this claim in

4    accordance with that Interim ROD, which has been adopted by the

5    agency, after full and complete administrative process.  We are

6    only asking you to do what the National Gypsum Court did in

7    accepting EPA decisions after a full and complete

8    administrative decision.

9         We very much disagree, however, with the accelerated

10   nature of the implementation of the ROD, of the comprehensive

11   remedy, as proposed by the Government.  We do not believe this

12   Court, Your Honor, should place much emphasis at all or weigh

13   the decision of the Government in an advocacy proceeding in

14   this bankruptcy matter, given the fact that the comprehensive

15   remedy has not been finally adopted by EPA through a full and

16   complete administrative process.

17        The Government is asking you to do something very

18   different.  They are asking you to estimate a claim that has

19   not been adopted as a formal ROD, Record of Decision, by the

20   EPA.  They are asking you to implement a comprehensive remedy

21   in 2008, something now which has never been approved before.

22   This is a complete about-face from what has already been agreed

23   to.  Nothing has happened in the basin to justify such an

24   abrupt switch and change in approach.

25        And in fact, in their new proposed comprehensive

1    remedy, this cost, the cost of this remedy is estimated to be

2    approximately $3.8 billion, and according to EPA's recent

3    calculations, almost $2.1 billion, a number which we strongly

4    dispute.

5          We think, Your Honor, there are several basic

6    problems with EPA's newfound comprehensive approach.  First,

7    that comprehensive remedy, as I mentioned, has not been adopted

8    as a formal Record of Decision.

9          Second, the comprehensive remedy flies specifically

10   in the face of the requirements of the Interim ROD, which

11   requires the carrying out of a specified subset of actions over

12   a 30-year period.

13         Third, the comprehensive remedy flies, is directly at

14   odds with the adaptive management philosophy that has been

15   adopted for this site, which again anticipates a phased-in

16   approach of a cleanup remedy over a 30-year period of time.

17         In fact, Your Honor, this, the Government's proposed

18   comprehensive remedy is clearly at odds with the

19   recommendations of two distinguished audit bodies who have had

20   an opportunity to review the site.  First, as I mentioned

21   earlier, the National Remedy Review Board, which is a high

22   level management group at EPA, has, after careful review,

23   recommended to the agency that the phased approach be used to

24   periodic cleanup in the Coeur d'Alene Basin.

25         The National Remedy Review Board, Your Honor,

1    basically said there were three fundamental issues at the site:

2    One, there was an extensive amount of contamination at the

3    site; two, there were very significant technical uncertainties

4    associated with the site; and three, there were very

5    significant cost implications at the site.  And based on those

6    three fundamental factors, the National Remedy Review Board

7    recommended back to EPA that instead of implementing a

8    comprehensive remedy, the agency instead should go forward with

9    a phased approach.

10           In addition to the recommendations of the National

11   Remedy Review Board, the National Research Council, the arm of

12   the National Academy of Sciences, has also opined on the site

13   and expressed serious concerns about the feasibility and

14   effectiveness of implementing a long-term remedy, or even

15   components of the interim remedy that have been proposed by EPA

16   for the site.

17           And finally, as the whole body of technical evidence

18   visibly, vividly shows, there are huge and very significant

19   technical absurdities associated with proceeding forward with a

20   either interim or comprehensive remedy at the Coeur d'Alene

21   site.  Many key technical problems confront a remedy of the

22   scope asserted by the Government, and these issues have not

23   been anywhere near yet resolved.

24           For example, while we know what kind of cleanup

25   standards, or as the Government referred to, the ARAR standards

1   need to be used there.  The EPA itself has shown in their

2   documents that it will take at least 250 to 800 years to

3   achieve compliance with these cleanup goals.  These issues

4   themselves present substantial uncertainties.  And in fact, in

5   a real, in a real world, these ARAR standards are often waived

6   at various points as the cleanup projects go forward.

7           So it's unclear yet what will happen with these

8   cleanup standards.  Will they indeed be waived, or will they

9   not indeed be waived?  No one really knows actually what to do.

10  And we will have to wait many years, 30 years, or perhaps even

11  longer, to see what should be done next.

12          The EPA's proposed cleanup remedy also raises a

13  number of important technical issues that the NRC specifically

14  highlighted, the National Research Council.  For example, we

15  can conservatively say that the type or volume of material that

16  EPA would want excavated under the comprehensive remedy would

17  require 2.2 million truck loads of trips to accomplish and

18  would fill this courthouse completely 100 times over.

19          Even the State of Idaho, in reviewing the original

20  EPA cleanup remedy, expressed significant concerns about how

21  the interim remedy would disrupt and affect the local community

22  there.  And while they concurred in the remedy, they did have

23  reservations about how that remedy will be implemented.

24          You will hear testimony in this case finally about

25  repositories.  Your Honor, one of the key technical issues is

1    if this material is excavated and removed, where will we put

2    the millions of cubic yards of material that needs to be hauled

3    off the site?  And the agency's plan is to put it into

4    repositories down in the Coeur d'Alene area.

5          During our discovery period, we learned that there

6    will be a need for many repositories to handle the millions of

7    cubic yards of material to be dredged, yet no sites have been

8    selected.  And the agency has said there will no doubt be many

9    difficulties, whether because of what we call NIMBY concerns,

10   not-in-my-backyard concerns, or just plain feasibility concerns

11   in getting satisfactory locations to put the materials.

12         For the two components of the remedy, there is a need

13   to, when the human health remedy is implemented, there will be

14   a need to dispose of the contaminated material in various

15   repositories.  Right now, as this document, as this figure

16   shows, approximately six additional repositories are going to

17   be needed to handle the human health material.  Yet right now

18   there's only one repository in place.  That is the Big Creek

19   repository.  The second repository, East Mission Flats, is only

20   in the 30 percent design phase.  And in fact, the agency, in

21   issuing a report on the 30 percent design phase, has

22   specifically itself noted, there are going to be very

23   substantial problems in siting and building these repositories.

24   For the ecological remedy, the actual cleanup of the

25   contaminated sediments in the basin per se, no repository sites

1    have yet been identified, and none has been selected.

2         As to the other key issues in the case, the second

3    key issue remaining is the natural resource damages.  And the

4    Counsel for the Government has laid out the predicate for the

5    natural resource damage claim.  ASARCO has already paid to the

6    State of Idaho and the Tribe $4.8 million to settle already

7    existing natural resource damage claims.  And in fact, ASARCO

8    is planning to make one, an additional $1 million payment to

9    the Tribe in the near future.

10         As the Government has noted, there are three basic

11   injury claims that have made, have been made for natural

12   resource damages, aquatic resources, injured federal lands and

13   tundra swans.  We basically believe that the Government's claim

14   is faulty, for three fundamental reasons.  We disagree with the

15   Government on the calculation of the baseline conditions

16   against which injuries have to be measured.  We also disagree

17   with the Government that they have overstated the amount of

18   injuries that actually have been incurred in the basin.  And

19   finally, Your Honor, we disagree with the Government on the

20   damages.  We believe the Government, under the law, is required

21   to choose the most cost effective approach, and they have

22   failed to do so in this case.

23         In fact, as we've reviewed the Government's

24   affirmative reports, we have witnessed constant changes up in

25   their claim as they've modified their position.  For example,

1    as the Government has submitted affirmative and rebuttal

2    reports, we are now seeing new claims for natural resource

3    damages that were not in the original Government's claim filed

4    with their proof of claim.  There are two notable examples of

5    this.  One is a claim for a $40.7 million repository cell that

6    was never originally included in any of the Government's

7    initial proof of claim.  This cell is going to be constructed

8    to handle the materials that are generated from the excavation,

9    yet the Government now is insisting that there is a natural

10   resource damage claim associated with building the cell that's

11   going to handle the waste in the first place.

12          Second, just recently, in the Government's recent

13   papers, we have found just new data within the last couple of

14   weeks that show there's been an improvement in the fish

15   conditions in Canyon Creek, in the basin.  We have seen, Your

16   Honor, increases in fish resources in Canyon Creek.  Yet the

17   Government has now said, because we have more fish resources in

18   Canyon Creek, we have a worse problem than we had before.  The

19   more we get data, Your Honor, that shows improvement, the more

20   the Government is telling us we have more damages.

21          The third key issue remaining is the indirect cost

22   issue.  And as has been discussed already this morning, Your

23   Honor, the Government's claim is for $515 million.  And as

24   Mr. Davis has pointed out, this is a claim for overhead costs,

25   includes computer services, utilities, et cetera.  We believe

1   that the Government's claim is faulty, for two fundamental

2   reasons.  First, when there is a PRP available to do the work,

3   we believe, Your Honor, under the law, that the Government

4   cannot impose an indirect cost on us.  And the second key

5   reason we think that this claim is faulty is because of the

6   fact that the claim for indirect costs is estimated to

7   extrapolate out for the next 40 years.  We do not believe that

8   the Superfund program will remain at the same level of funding,

9   or same level of support 40 years out in the future as it is

10  today; and therefore, the Government does not have the

11  authority to impose the same kind of indirect costs on the site

12  in the future as they do today.

13          A couple of the other key remaining issues are the

14  discount rates, and this issue has been substantially litigated

15  before you, Your Honor.  And essentially, the EPA/OMB guidance

16  provides 7 percent real discount rate.  These are the rates

17  that are generally used in EPA's records of decisions.  And in

18  fact, the 7 percent rate is specifically included in the

19  Interim ROD for this site as well.

20          And the fifth and final issue is the base year issue.

21  As has been addressed at other sites, Your Honor, we believe

22  that the proposed base year of 2006 is the correct base year,

23  and the Government has proposed the year 2008.

24          So in sum, until this bankruptcy proceeding, there

25  had been no indication at all by the agency of any change in

1   course, from the prudent direction that had been set forth

2   previously in the Interim ROD decision.  That has changed.  In

3   fact, we have not seen, even in the agency's most recent

4   five-year review report, any indication at all that the agency

5   was proposing a comprehensive remedy.  We believe, Your Honor,

6   the prudent course is to continue on with the current study

7   state the agency has proposed and continue to clean up the site

8   for 30 years, as recommended under the Interim ROD.

9           Your Honor, in closing, we plan to call four

10  witnesses during this hearing.  They are Mr. Chris Pfahl, who

11  will give instruction to site and the historical mining and

12  milling operations in the basin, and ASARCO's prior involvement

13  at the site.  We also plan to call Mr. James Chadwick, who will

14  testify to the aquatic injuries and the appropriate baseline

15  conditions at the site; Mr. Rick White, who will opine on

16  natural resource damages, discount rates and inflation rates.

17  And finally, Mr. Jeff Zelikson will testify on the cleanup

18  issues and associated costs.  Thank you, Your Honor.

19          THE COURT:  Okay.

20          MR. JORDAN:  Your Honor, I have only a few comments

21  to address that were related to but distinct from what I

22  believe has been addressed already.  It deals, first of all,

23  with the proof of claim that's filed -- for the first time, I

24  think, today we hear the Government is backing off of its proof

25  of claim.  But I would like to point out for the Court what we

1   have been faced with in dealing with the Government's claim

2   that's on file.

3         First of all, I've handed the Court a copy of the

4   Coeur d'Alene versus ASARCO opinion of Judge Lodge.  For the

5   benefit of Counsel, there are highlighted portions.  Everyone

6   has colored copies, so everyone has the highlighted portions.

7         What's important to note, Your Honor, is that when we

8   were faced initially with this estimation proceeding, if you

9   look at the demonstrative that's attached, the reddish version

10  is Judge Lodge's opinion that really gives us 22 percent of

11  100 percent of the liability, which of course, if you'll

12  notice, the Government's, both Counsel said we have no issue of

13  liability.  They like the Judge Lodge opinion when it comes to

14  liability, but they back away, and apparently they're going to

15  try and convince you that on appeal Judge Lodge is going to be

16  reversed.  So they don't like his opinion when it comes to the

17  22 percent divisibility.

18        If you'll notice, if you follow the green

19  re-inclusions into the Box for ASARCO, where we were, based on

20  an opinion of a 78-day trial, 6,000 exhibits, 18,000 pages of

21  transcript, and 45-page opinion, which I've furnished the

22  Court, we were 22 percent divisible.  We are now, have been

23  given, under the proof of claim filed by the DOJ, all of

24  Hecla's portions, everybody else's portions, the orphan's share

25  portions, and indirect costs, as well as, if it's, if the claim

1    is, if I read the claim correctly, a supervisory charge.  So we

2    are back to funding the entire cleanup for the entire basin.

3              I want to address one other issue, which is, I guess,

4    closest to my participation in these proceedings, and that's

5    been the discount rate, Your Honor.

6              THE COURT:  Well, you would agree that there is the

7    possibility, absent this bankruptcy, that you would be charged

8    with 100 percent of the cleanup.

9              MR. JORDAN:  Well, I agree with your analysis that

10   you have -- Judge Lodge's opinion is not final law.

11             THE COURT:  Right.

12             MR. JORDAN:  You're not bound by it.  You're going to

13   have to weigh your own thoughts and --

14             THE COURT:  Right.

15             MR. JORDAN:  So I certainly don't object to the

16   Government telling us why Judge Lodge was wrong, and I assume

17   you'll hear us when we tell you why he was right.  But you do

18   have to make that decision.

19             THE COURT:  Right.

20             MR. JORDAN:  That is part of the estimation process,

21   and actually I've heard you address it in that fashion before

22   in respect to Tacoma.

23             Your Honor, let me address, though, the single issue

24   that's I think most dramatically evident in Coeur d'Alene, and

25   that is this change that Mr. Steinway walked you through from

1    the handling of this claim, up through the filing of the proof

2    of claim, other than the liability, because the proof of claim

3    that we had dealt with had the actual remedy as an unestimated.

4         And for the purpose of this, when the Academy and the

5    Review Board and the EPA all were in sync, it was a 35-year

6    study, still a very expensive study, but a 35-year study, and

7    then a decision in the future as to whether or not there could

8    be any such recovery, such as the $2 billion suggestion that is

9    before the Court today, 100 percent of that number.

10        And what has happened to us is this.  After the

11   estimation proceeding was filed, after all of the positions

12   that we ever understood were, was fairly certain, a process

13   that would require, as opposed to dredging the entire basin and

14   displacing all of the, all of the ecology and replacing it and

15   watching it grow, that there would be a process of 35 years to

16   study especially the impact of what was being done, what was

17   thought would be right, and then what did technology do in the

18   35 years that would help us do something other than dredge the

19   basin and displace the entire process for years and years.

20        And I suggest this, is that there is a factor, and

21   that this is purely a mathematical factor.  If the original

22   claim, if the Academy is right, if the Review Board is right,

23   that we should do 35 years worth of expensive study, but not

24   billions, and then decide at that point what to do, which could

25   be billions, you could find that then it's owed, that then you

```
 1   net present value that, you reach a substantially different
 2   number than if the position now taken, which only came after
 3   estimation, that let's start tomorrow, let's ignore what we
 4   have been told by the Academy, what we have suggested, what we
 5   have dealt with in dealing with the State of Idaho -- which you
 6   notice, you said they weren't here.  They do have a distinct
 7   position on whether they want the entire basin dredged and
 8   everyone displaced for years and years and years, in order to
 9   ultimately come up with a solution that will be final and
10   complete 250 years from now.  And that process, Your Honor, the
11   discount rate is a driver in this case.
12            If we start tomorrow, they eliminate the discount
13   rate.  Judge, we're going to start tomorrow, and it will take
14   the next 35 years, but we're going to have the big bulk of the
15   claim allowed at this point.  If we do what we said before we
16   came into bankruptcy and before we decided the estimation
17   proceeding would have a discount rate applied to it, it is
18   substantially different.  If we wait 35 years, if we then put
19   the funds, whatever you determine the claim actually is, into
20   play at that point in time, but we bring it back to current
21   dollars, the difference is dramatic, and the difference would
22   be dramatic in current dollars.
23            And for this reason, is to me most important.  When
24   you approve a claim, however you decide, however you weight the
25   relative importance of their remedies versus the remedies that
```

1   we believe are so much more practical, usable, when you do

2   that, you don't allow a proof of claim and restrict them to,

3   "Now, you said you were going to start tomorrow.  You start

4   tomorrow."  You don't say, "You have to spend this money."

5   Because what happens is they get a claim, then they process

6   this in the future, and they may decide the very next day after

7   the claim is allowed to start 35 years in the future.  Were

8   that true, if that were to occur, 35 years in the future this

9   fund would be four or five times larger and would effect, would

10  be in effect an allowance of a claim which would be far greater

11  than is even required to do the cleanup.

12          So I think it's important when you analyze what has

13  happened since the filing of the claim, today is the remarks

14  that they'll try to convince you on appeal, but they're not

15  arguing about the 22 percent.

16          THE COURT:  Okay.  What about the possibility that, I

17  mean, this is such a difference in approach that, I mean, the

18  concept of estimation is not supposed to have anything to do

19  with bankruptcy.  And I say that, understanding that that

20  doesn't make any sense, except for the fact that -- in other

21  words, I am not supposed to estimate this on what's a

22  reasonable amount that they can pay and still reorganize.

23  We're not -- that's not in the picture.

24          MR. JORDAN:  Of course.  That's right.

25          THE COURT:  However, in bankruptcy, you could propose

1  a possibility whereby you pay for the 35 years of studying, and

2  then when it comes in 35 years from now, you're responsible for

3  100 percent of whatever the ultimate thing comes out.  And down

4  the road, I mean, it may well be -- in other words, this is one

5  of those areas where if the possibility -- I mean, I think the

6  Code requires that I just charge you for your reasonable claim

7  today, as of the date of filing.  And, but on the other hand,

8  it may well be that an approach that provides a more

9  practical -- but that's all a part of the plan process.  And I

10 don't know that I can look at any of that to look at evaluating

11 this claim.

12        MR. JORDAN:  And the answer is, from our perspective,

13 and I think from DOJ's perspective, because we could both make

14 some pretty unique arguments, if it were, you were allowed to

15 do that, is 502 tells you that you have to liquidate claims

16 which cannot be liquidated within a reasonable time to avoid

17 confirmation as of the petition date.  You've got to come up

18 with a number --

19        THE COURT:  Okay.

20        MR. JORDAN:  -- then we get to manipulate the plan,

21 they get to manipulate the request, we negotiate how it's going

22 to be paid.

23        THE COURT:  Well, I mean, they have -- I mean

24 ultimately, they have the right to object to plan, and they

25 have the right --

1          MR. JORDAN:  Sure.

2          THE COURT:  -- to object to their treatment, too.

3          MR. JORDAN:  Yes.

4          THE COURT:  Once this is all done.  So, okay.  Go

5    ahead.

6          MR. JORDAN:  Yeah, but you're sort of stuck, Your

7    Honor, with having to come to the conclusion of what's the

8    claim worth on the petition date.

9          THE COURT:  Okay.

10         MR. JORDAN:  And I only suggest this, that it's

11   worth -- there are two things that are important.  One is that

12   it is worth what the merits say it's worth, and that's going to

13   be your call.

14         THE COURT:  Okay.                    .

15         MR. JORDAN:  The second is it's worth what it's worth

16   over the right time.  And that is strongly driven by the

17   discount rate, not just the distinctions between the ones we've

18   made, the 7 percent versus the 2½ percent, which is the range

19   in which you're arguing, you're working with in this particular

20   case, or whatever range you come up with, but it's the fact

21   that it is time driven, such that to make a distinction or to

22   make a decision in a bankruptcy case to accelerate your claim,

23   distinct from what we believe is reasonable, is a very

24   important ingredient to what we're asking the Court to consider

25   in this particular case.  Thank you.

1          THE COURT:   Okay.   Oh, the Parent wanted to say

2     something.

3          MR. EVANS:   Yes, Your Honor.   Good morning.   Gregory

4     Evans on behalf of ASARCO, Incorporated.   A few quick points.

5     Our role in this proceeding will be to assist the Court,

6     although it's an adversarial proceeding, but to provide an

7     expert witness, Dr. William Desvousges, who is a Ph.D.

8     economist, who has always specialized in natural resource

9     damage assessments and has in fact assisted the EPA and written

10    materials for training with EPA regarding the proper way to

11    assess natural resource damages.

12          To orient the Court to the evidence that will be

13    coming before it regarding the NRD claim, I think it's been

14    said, but not perhaps in this way, that there are three

15    elements that the Court will need to kind of review in

16    determining the merits of the NRD claim:   The terrestrial, the

17    aquatic, and one, one bird that has been determined to have

18    been harmed by the District Court.   So you have land, you have

19    water, and you have the tundra swan.

20          The evidence that will, I think, come before the

21    Court, Your Honor, the unequivocal position taken, I think, by

22    the Government in the District Court proceeding before Judge

23    Lodge regarding water is that they selected a control, and the

24    control they selected was consistent with the Code of Federal

25    Regulations.   You will hear Dr. Desvousges explain, and he'll

1    be available to answer questions regarding how the Code of

2    Federal Regulations dealing with NRD assessment apply.

3           In selecting a control for the water assessment in

4    the District Court action, the United States Trustee selected

5    the St. Regis River.  Now they select an upper portion of the

6    river that's affected because that has the effect of driving up

7    the damages, the baseline, and therefore the damages in this

8    case.

9           You will hear evidence that the best control is the

10   St. Regis, the same control the Government used in the District

11   Court.  And that, and we would urge the Court to reject any

12   effort to try and move that around or move that target during

13   this proceeding for purposes of increasing the amount that the

14   Court is asked to estimate.

15          You heard a little bit about trout.  You'll hear more

16   about trout by Dr. Chadwick and both by Dr. Desvousges.  The

17   issue there, Your Honor, that you're going to hear about is

18   that just in the last week, they went out and they found more

19   trout in a river that they have asserted is barren and would

20   remain barren for a long period of time.  This improvement

21   results in evidence to show that there has been improvement

22   occurring, and that should be taken into account in this

23   estimation.  Instead, again, moving the target and much like

24   the St. Regis River, which they reject, they now reject their

25   previous baseline.  And you'll hear evidence that the baseline

1    should be changed in accord with the newly found trout.

2         Regarding the swan, you'll hear evidence that the

3    Government, through its process, came up with some

4    alternatives.  And one of the alternatives that the Government

5    now rejects is conservation easements with some revegetation.

6    They're rejecting that as not feasible at the moment, even

7    though in the previous proceedings that was deemed something

8    appropriate by the EPA.  Look closely at that, Your Honor.

9    Consider whether or not this position has changed, like the

10   trout, like the St. Regis River, for purposes of increasing the

11   claim.

12        And finally, the terrestrial issue, that is the land,

13   the federal lands.  You'll hear that term used interchangeably,

14   terrestrial and federal lands.  Dr. Desvousges will testify as

15   an NRD economist as to how the cost benefit analysis that is

16   required by the Code of Federal Regulations applies here to

17   result in a more fair and a more appropriate estimation as to

18   the damages to the land.

19        Finally, I think a lot of attention has been devoted

20   this morning, Your Honor, to the Burlington Northern case, the

21   Ninth Circuit case, the finding of Judge Lodge, and the issue

22   of 22 percent allocation.  Two quick points on that.  I think

23   it's very telling that the Government has not indicated to the

24   Court that it is going to bring evidence before it to establish

25   that this is not a claim that should be apportioned consistent

1    with either the holding in Bell Petroleum or the holding in the

2    Burlington Northern case, which they claim will cause the Ninth

3    Circuit, they speculate will cause the Ninth Circuit to

4    overturn the case.

5            I want to just -- this will all be briefed, I'm sure,

6    and the Court has already been briefed on this issue, but I do

7    want to point out to the Court that the case that the

8    Government is relying on now trying to get you to assign some

9    probability of success to their claim that an appeal which

10   doesn't exist now may be filed and may end up overturning the

11   District Court's decision, reported decision, which finds the

12   22 percent in this case, the language from the case that they

13   rely upon, the Burlington Northern case, says, and I quote, "In

14   line with every Circuit that has addressed this issue, we hold

15   that apportionment is available."  That apportionment is

16   available.  They go on to hold, "We agree that apportionment

17   can be appropriate under CERCLA."

18           And no one's focusing you really on the underlying

19   case that they claim is going to vanquish Judge Lodge's

20   decision.  Your Honor, I was the lawyer in the underlying case,

21   the Brown & Bryant case, that has resulted in the Burlington

22   Northern reported decision by the Ninth Circuit.  I was the

23   lawyer who went onto the property and understood the

24   differences that led the District Court and led the Ninth

25   Circuit to decide as it has.

 1          And the reason that the Court says in its case, in

 2   its reported decision, the Ninth Circuit says that it cannot

 3   apportion in that case is because you had a lessor, a lessee, a

 4   partial lessee.  You had a generator and you had a transporter,

 5   all dealing with chemicals that ended up causing contamination

 6   on the land.  And under CERCLA, all of those parties were

 7   treated as if they had caused the harm.  And that's why it was

 8   so difficult for the Court to apply the concept of several

 9   liability in that case.

10          And that is not at all the case we have here.  We

11   have mining companies using the same materials to generate the

12   same ore, to generate the same minerals that are used and the

13   same metals that are used.  And for that reason, this case is

14   eminently, eminently a great candidate for apportionment, just

15   as Judge Lodge decided it was.

16          So, Your Honor, don't be distracted by the

17   Government's claim that this 22 percent finding is something

18   that this Court should not rely upon.  It is the law of the

19   case.  It is the finding of the District Court.  And it should

20   be the finding of this Court.  Thank you, Your Honor.

21          THE COURT:  All right.  Could we have a picture, that

22   picture of the basins, just to kind of orient me?  As I recall,

23   when I was in the Air Force, I drove over from Spokane to

24   Coeur d'Alene.  So where would I have gone?  If I went straight

25   over to the -- isn't there a park or, you know, the lake, or

1    where -- is there a town?  Or where is that on --

2         UNIDENTIFIED SPEAKER:  You would have been just east

3    of the dotted line, dashed line.

4         THE COURT:  It would have been --

5         UNIDENTIFIED SPEAKER:  On the very left-hand side.

6         THE COURT:  Can you point to where it would be?  Is

7    it on this chart?

8         UNIDENTIFIED SPEAKER:  Yeah.  Well, it's --

9         THE COURT:  Somewhere in there, along the lake?

10        UNIDENTIFIED SPEAKER:  Very left-hand side of that,

11   there's a small dash line.

12        THE COURT:  Right in there is where the town of

13   Coeur d'Alene is?

14        UNIDENTIFIED SPEAKER:  Yes.

15        THE COURT:  Okay.  Thank you.

16        MR. TENENBAUM:  Briefly, Your Honor, by way of reply

17   very briefly.

18        THE COURT:  Oh, sure.

19        MR. TENENBAUM:  Thank you.  I just wanted to clarify

20   the record with respect to one of Mr. Davis's exhibits.  He had

21   a column on there for the United States proof of claim and an

22   amount on there.  I'm not sure it was clear, though.  But

23   Mr. Steinway later did clarify that in fact the United States'

24   proof of claim does have and fully asserts a claim for future

25   comprehensive remedy.  It was just filed as an unliquidated

1    amount.  So that's why it didn't appear in those numbers.

2              THE COURT:  Correct.

3              MR. TENENBAUM:  Same thing for the indirect cost

4    figures.  That was asserted in our proof of claim, but as a

5    unliquidated number.  In accordance with the Case Management

6    Order here, we liquidated those for purposes of the estimation

7    hearing.

8              With respect to Mr. Steinway's contention that we're

9    seeking a claim for a remedy that's not yet been selected,

10   well, you know, this is an estimation hearing, so we are, the

11   whole point of it is to estimate what's going to happen in the

12   future.

13             With respect to Mr. Jordan's comments on discount

14   rate, well, first of all, I would point out that technically

15   it's our view that there really shouldn't be any discount rate

16   at all because the Debtor was liable as of the petition date to

17   do the full cleanup.  So there really shouldn't be any discount

18   rate at all.

19             As a matter of compromise and trying to hopefully

20   reach a settlement, which didn't happen here, we did do and did

21   take the position that we're willing to have a discount rate in

22   accordance with the rate that the Government earns on

23   Government securities, based on when the payment would be

24   expected to be made in 2008, but that's very much a compromise

25   position.  If we're going to have to disagree on this issue,

```
 1    then you know, then I think that we have to consider whether
 2    there should be any discount rate at all.
 3              And I would agree with Your Honor that this may well
 4    be a plan issue, because we have asbestos creditors in this
 5    case.  The Debtor's expert for the asbestos, in the asbestos
 6    creditors' matter takes a totally inconsistent position with
 7    their position here.  They argue for a discount rate much
 8    closer to what we were suggesting in our compromise approach.
 9    So you can't have it both ways.  I don't know why, you know, I
10    don't know what their explanation is.  I didn't hear any
11    response from Mr. Jordan on that point.
12              You know, it really would be truly unfair to discount
13    the value of the claim based on an interest rate, presumed
14    interest rate that the Government by law cannot earn, because
15    it's put into the Treasury.
16              And we also have in this case, not just the asbestos
17    creditors, you also have bondholders.  Now, I have not examined
18    the terms of the various bonds in this case, but it is common
19    in some bankruptcy cases that there are bonds that would, in
20    the ordinary course of things, if there hadn't been a
21    bankruptcy, they would have been paid out over 20, 30 years
22    into the future.  However, there's a term in the bonds that
23    accelerates the debt in the event of either default or maybe
24    even bankruptcy.  I don't know what they might say.  Well, you
25    know, there's a fairness and a consistency issue there.  I
```

1    mean, if those claims would have been paid out over 30 years,

2    and the Bankruptcy Court is going to value them without any

3    discount for that, then maybe again we should have the same

4    treatment, especially since the Debtor was liable, as of the

5    petition date, for the full cleanup.

6         Lastly, with respect to Mr. Evans' point about

7    allocation, he said that we're not submitting any evidence.

8    I'd like to correct that.  We do have in the record exhibits

9    that were testimony from the Idaho trial.  That is being

10   admitted into evidence as an exhibit here.  And so there is

11   evidence on that in the record.

12        THE COURT:  Okay.  Thank you.

13        MR. TENENBAUM:  Thank you.

14        THE COURT:  All right.  Are we ready to proceed?

15   Ready to call your first witness?  I have a book of all of the

16   proffers, and I don't really have it updated, but we'll do it

17   as we go long.  So if we can make sure we know who's being

18   called and what their current, I have their current proffer, it

19   would be a good idea.

20        MS. MACDONALD:  The first witness, Your Honor, will

21   be Cami Grandinetti.  And --

22        THE COURT:  Cami Grandinetti, which is Proffer

23   Number 12.

24        MS. MACDONALD:  Proffer Number 12, correct.

25        CAMI GRANDINETTI, GOVERNMENT'S WITNESS NO. 1, SWORN

1              DIRECT EXAMINATION

2    BY MS. MACDONALD:

3    Q.   Ms. Grandinetti, could you state and spell your name for

4    the record.

5    A.   My name is Cami Grandinetti.  C-A-M-I,

6    G-R-A-N-D-I-N-E-T-T-I.

7    Q.   And could you just describe your background, your

8    education, professional experience?

9    A.   Yes.  I have a bachelor of science in civil engineering.

10   I have a master of science in civil engineering.  I am a

11   Registered Professional Civil Engineer in the State of

12   Washington.  And I currently work for the Environmental

13   Protection Agency.

14        I started working for EPA in 1993 as a remedial project

15   manager in the Superfund program.  A remedial project manager

16   has the direct line technical responsibility for overseeing

17   investigation and cleanup of hazardous waste sites.

18        In 1996 I began working on the Bunker Hill site in the

19   Box, which Mr. Steinway talked about earlier.  And I have been

20   involved in the Coeur d'Alene project since that time.

21        Currently, I manage a unit of people who, a unit of

22   remedial project managers, a group of whom in that unit work on

23   the Coeur d'Alene Basin.  There are six full-time remedial

24   project managers working on the project right now, two

25   part-time remedial project managers, two part-time community

Grandinetti - Direct                            77

1   liaison professionals, one part-time risk assessor, and one

2   part-time chemical lab analysis professional.

3   Q.   And have you spent a lot of time in the Coeur d'Alene

4   region?

5   A.   Yes.  Originally, I was born and raised in Spokane,

6   Washington, which is about 30 miles west of the city of

7   Coeur d'Alene.  My grandmother is originally from the city of

8   Kellogg, which is where the smelter was.  She was born and

9   raised there.  And then when I was working on this project from

10  2001 to 2003, I lived in Spokane.  I was working on this

11  project and then another one in Central Washington.

12  Q.   Now I'd like to direct the Court's attention and you --

13          THE COURT:  Okay.  Let me just ask, when you said

14  they were part time, they have full-time jobs, they just --

15          THE WITNESS:  They do.

16          THE COURT:  -- this is part of what they do?

17          THE WITNESS:  This is just part of what they do.

18          THE COURT:  Okay.  I didn't know whether they had

19  some sort of -- go ahead.

20  BY MS. MACDONALD:

21  Q.   And now what I would like to do is just walk through a

22  slide presentation that we have to orient the Court.

23          THE COURT:  Can you see it?  You can see it right

24  there in front of you, can't you?

25          THE WITNESS:  I can see it here, yes.

Grandinetti - Direct                                       78

 1              THE COURT:  Okay, good.

 2   BY MS. MACDONALD:

 3   Q.   If we could go to the first slide.  This is another map of

 4   the basin.  And if you could just kind of describe where the

 5   site is.  And as a point of reference, if you could show where

 6   Spokane is, since --

 7   A.   Yes.  I'll try and --

 8   Q.   -- Honorable Judge Schmidt is aware of where that is.

 9              THE COURT:  If I had just waited, I wouldn't need to

10   have asked the question.

11              MS. MACDONALD:  That's fine.

12              THE WITNESS:  It's hard for me to do this from here.

13   Okay.  So the city of Spokane is right there.  The

14   Coeur d'Alene Basin, as Mr. Steinway also discussed -- I think

15   I've messed this up now.  What I want to point out here is the

16   State of Montana is on the right-hand side.  This, the

17   Bitterroot Mountains separate Idaho from Montana.  The

18   Coeur d'Alene Basin watershed runs from -- this is the South

19   Fork Coeur d'Alene River.  This area right here is what I'll

20   refer to as the Upper Basin.  This gray area right here is what

21   we call the Bunker Hill Box.  The Lower Basin starts on the

22   left-hand side of the Box.  The main stem Coeur d'Alene River

23   flows through here.  Coeur d'Alene Lake area is right here.

24   The city of Coeur d'Alene is right at the top of the lake, and

25   then the Spokane River flows out of the lake and into the city

1   of Spokane, and then ultimately to the Coeur d'Alene, or the

2   Columbia River rather.

3   Q.    And where did the contamination come from?

4   A.    The Mining District is what is located in the Upper Basin

5   area.  So all of the mining took place in this location up

6   here.

7   Q.    Could we go to the next slide?

8   A.    So as we've talked about, the Coeur d'Alene Mining

9   District was a rich Mining District.  There were several

10  operating mines over the years, and the basin was impacted by

11  more than 100 years of mining.  Historically, mine waste, mine

12  tailings, the by-product of separating the precious ore from

13  the waste, all of that mine waste was discharged to the river

14  and the creeks and the tributaries.

15       The Upper Basin is a pretty mountainous region.  There's

16  not a lot of flat land.  And so it was pretty convenient to

17  discharge to the creeks and the rivers.  And the creeks and the

18  rivers took the material away.

19       In 1968 the mining companies began impounding the mine

20  waste, and so there are several large impoundments located in

21  the Upper Basin that now contain historic mine waste.  And most

22  of those piles are also located very near the creeks and

23  streams, because there isn't a lot of flat land up there.

24       Over time it's estimated that more than 100 million tons

25  of mine waste has been discharged to the whole watershed,

1   including a lot of lead.  2.4 billion pounds of lead is

2   estimated, and it's covered thousands of acres.

3   Q.   And, if you go to the next slide, if you could describe

4   the types of contaminants that you find in this contamination

5   that you've been describing.

6   A.   The hard rock mining in this area was for precious metals,

7   lead cadmium, or lead, zinc, silver primarily.  But by-products

8   of those are in the earth.  And so you have a suite of metals

9   that are listed here in soil, sediment, ground water and

10  surface water throughout the basin.  What I will focus on

11  primarily today are lead and zinc.

12  Q.   And can you describe for the Court how the contamination

13  moves around?

14  A.   Yes.

15  Q.   Next slide.

16  A.   So the, what we call the fate and transport of

17  contaminants.  Once the tailings and mine waste was discharged

18  into the creeks and streams, it was readily transported

19  downstream.  The Upper Basin is a pretty steep gradient, fast

20  flowing river environment, and so the mine waste was readily

21  carried.  As it was carried down over, down through the Upper

22  Basin and then into the Lower Basin, it became deposited as

23  layers and sediment mixtures in the beds, banks, and flood

24  plain areas of the entire watershed.

25       Finer grain materials can move more readily than heavier