# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In re: | § | Case No.  05-21207 |
| | § | |
| ASARCO LLC, *et al.*, | § | Chapter 11 |
| | § | |
| Debtors. | § | Jointly Administered |
| | § | |

## POST-HEARING BRIEF OF ASARCO LLC AND ASARCO, INC.
## WITH RESPECT TO THE COEUR D'ALENE BASIN

DC01:486229.2

# TABLE OF CONTENTS

I.   THE COURT SHOULD ADOPT JUDGE LODGE'S DIVISIBILITY RULING ...........................................................................................1

    A.   The Court Has Ample Discretion to Adopt Judge Lodge's Ruling............................1

    B.   The Idaho Court's Ruling on Divisibility Is Sound....................................................3

    C.   The Idaho Court's Decision Would Not Likely Be Reversed On Appeal....................................................................................................................9

II.  THE TRUSTEES HAVE OVER-ESTIMATED THEIR CLAIM FOR NATURAL RESOURCE DAMAGES ...................................................................11

    A.   Natural Resource Trustees Must Select Cost-Effective Alternatives, Which Are Feasible In This Case .............................................................................11

    B.   The United States Incorrectly Asserts That It May Select Any NRD Restoration Option It Desires ...............................................................................13

    C.   The United States' Damage Assessment For Tundra Swans Is Excessive ...................................................................................................................14

    D.   The United States Seeks an Excessive Award For Damages To Injured Federal Lands .............................................................................................18

    E.   The Trustees' Claim for Aquatic Damages Is Overstated .........................................20

    F.   The Record Shows That ASARCO's Share of Total NRD Damages Is at Most $7.52 Million ...........................................................................................22

III. ASARCO'S APPORTIONED SHARE OF THE GOVERNMENT'S TOTAL RESPONSE COST CLAIM IS $113.12 MILLION .............................................23

    A.   Proper Estimates Are Based on the Timing and Scope of the Selected Remedy Under the Interim ROD .................................................................24

    B.   The Government's Proposed Comprehensive Remedy Will Not Be Implemented Until 2032, If Ever...........................................................................26

    C.   The U.S. Seeks Excessive Indirect Costs .................................................................31

    D.   Response Cost Scenarios .........................................................................................32

IV.  CONCLUSION...................................................................................................34

# TABLE OF AUTHORITIES

## CASES

*Addison v. Langston (In re Brints Cotton Mktg., Inc.),*
    737 F.2d 1338 (5th Cir. 1984) ...................................................................1, 2, 8, 23

*Bittner v. Borne Chem. Co.,*
    691 F.2d 134 (3rd Cir. 1982) .............................................................................1, 2

*Coeur d'Alene Tribe v. ASARCO, Inc.,*
    280 F. Supp. 2d 1094 (D. Idaho 2003) ...............................................1, 5, 6, 7, 8

*In re Baldwin-United Corp.,*
    55 B.R. 885 (Bankr. S.D. Ohio 1985)....................................................................2

*In re FV Steel & Wire Co.,*
    372 B.R. 446 (Bankr. E.D. Wis. 2007) ..................................................................1

*In re G-I Holdings, Inc.,*
    323 B.R. 583 (Bankr. D.N.J. 2005) ........................................................................2

*In re National Gypsum,*
    1992 WL 426464 (Bankr. N.D. Tex.)............................................................24, 26

*Montgomery County, Md. v. Metromedia Fiber Network, Inc.,*
    326 B.R. 483 (S.D.N.Y. 2005)................................................................................3

*New Mexico v. General Elec. Co.,*
    467 F.3d 1223 (10th Cir. 2006) ...........................................................................14

*Ohio v. Dep't of Interior,*
    880 F.2d 432 (D.C. Cir. 1989) .......................................................................13, 14

*U.S. Envt'.l Prot. Agency v. Sequa Corp. (In re Bell Petroleum Serv., Inc.),*
    3 F.3d 889 (5th Cir. 1993) ...........................................................................3, 4, 8

*United Savings Ass'n v. Timbers of Inwood Forest Assocs., Ltd.,*
    484 U.S. 365 (1988).............................................................................................23

*United States v. Burlington Northern & Santa Fe Ry. Co.,*
    2007 WL 2473236 (9th Cir. 2007) ................................................................5, 9, 10

## STATUTES

11 U.S.C. § 502(b)(2) .................................................................................................23

42 U.S.C. § 9607(f)(2)(C) ...........................................................................................14

## REGULATIONS

40 C.F.R. Part 300.......................................................................................................24

40 C.F.R. § 300.435(c)(2)(ii) .....................................................................................25

43 C.F.R. § 11.10 .......................................................................................................14

43 C.F.R. § 11.14(j) .............................................................................................12, 20

43 C.F.R. § 11.82(d) ...................................................................................................12

43 C.F.R. § 11.82(d)(2) ...............................................................................................12

43 C.F.R. § 11.83(d)(3) .........................................................................................12, 20

58 Fed. Reg. 39328 (July 22, 1993).............................................................................12

59 Fed. Reg. 14262 (March 25, 1994) ...........................................................12, 13, 16, 19

Pursuant to the direction of the Court, ASARCO LLC ("ASARCO" or the "Debtor") and Asarco, Inc. (the "Parent") (collectively, "ASARCO") hereby submit this post-hearing brief in connection with the environmental estimation hearing for the Coeur d'Alene Basin ("Basin" or "Site") held on October 9-12, 2007.

## I.     THE COURT SHOULD ADOPT JUDGE LODGE'S DIVISIBILITY RULING

### A.     <u>The Court Has Ample Discretion to Adopt Judge Lodge's Ruling</u>

The Government's claim that ASARCO should be jointly and severally liable for all costs incurred and to be incurred in connection with the cleanup of the Basin and for all natural resource damages associated with releases of hazardous substances from mining operations at the Site was fully litigated in the cost recovery action filed in the U.S. District Court for the District of Idaho by the U.S.  "[A]fter listening to approximately 100 witnesses, 78 days of trial and having reviewed 8,695 exhibits," Judge Lodge issued a lengthy opinion that among other things found that the harm at the Site is divisible and that ASARCO's share of the apportioned damages is 22%.  *Coeur d'Alene Tribe v. ASARCO, Inc.*, 280 F. Supp. 2d 1094, 1101, 1121 (D. Idaho 2003) ("*Coeur d'Alene*").

This Court would be acting well within its discretion to adopt Judge Lodge's ruling on divisibility.  Bankruptcy courts may estimate claims using "whatever method is best suited to the circumstances."  *Addison v. Langston (In re Brints Cotton Mktg., Inc.)*, 737 F.2d 1338, 1341 (5th Cir. 1984) ("*Brints Cotton*"); *see also Bittner v. Borne Chem. Co.*, 691 F.2d 134, 135 (3rd Cir. 1982); *In re FV Steel & Wire Co.*, 372 B.R. 446, 453 (Bankr. E.D. Wis. 2007) ("courts are given a great deal of judicial discretion in designing the procedures for a claim estimation proceeding, such that a judge can use 'whatever method is best suited to the circumstances'").  Moreover, this Court's estimation of the value of the Government's claims may be "disturbed on appellate

review only in the event of an abuse of discretion." *Brints Cotton*, 737 F.3d at 1341. For example, in *Bittner*, the appellants argued that the bankruptcy court had incorrectly "estimate[d] their claims according to their ultimate merits rather than the present value of the probability that they would succeed in their state court action." 691 F.2d at 136. Rejecting this claim, the U.S. Court of Appeals for the Third Circuit ruled that the use of an ultimate merits analysis as a valuation method did not represent "an abuse of the discretion conferred by section 502(c)(1)" on the bankruptcy court. *Id.* Indeed, the Third Circuit found that an ultimate merits analysis would be consistent with the goals of Chapter 11 to accomplish a reorganization quickly and efficiently. *Id.* at 137; *see also In re G-I Holdings, Inc.*, 323 B.R. 583, 599 (Bankr. D.N.J. 2005) ("to the greatest extent possible, a selected estimation procedure should not run counter to the efficient and expeditious administration of the bankruptcy estate").

Other courts have similarly affirmed the broad discretion of the bankruptcy court when performing estimations. For example, in *In re Baldwin-United Corp.*, 55 B.R. 885, 898 (Bankr. S.D. Ohio 1985) ("*Baldwin-United*"), the bankruptcy court had to estimate the claims of certain brokers, who were also named as defendants in numerous federal lawsuits filed in connection with the marketing of annuities. A number of these lawsuits had been consolidated before the Honorable Charles Brieant, District Judge for the Southern District of New York, who had approved settlements with brokers other than those who had asserted claims in the bankruptcy. In estimating the nonsettling brokers' claims, the bankruptcy court concluded that Judge Brieant's opinion approving the settlements "was certainly sufficient to provide a reasonable basis for estimating the Brokers' claims." *Id.* at 899.

This Court is in an even more fortunate position than the court in *Baldwin-United*. Instead of having merely a federal district court's approval of a settlement that was issued after a

one-day hearing, this Court has the benefit of the Idaho district court's determination on divisibility and apportionment after lengthy fact-finding and testimony involving the very same parties involved in the current Basin estimation hearing.   While the Idaho court's ruling is not final and therefore is not necessarily preclusive, this Court, in the exercise of its broad discretion in this estimation proceeding, may adopt the prior divisibility ruling.   Indeed, there are sound reasons to do so.   Unlike Judge Lodge, this Court does not have the luxury of conducting a nearly three-month trial on liability issues relating to this Site, but must instead employ streamlined procedures.

> **B.**     **The Idaho Court's Ruling on Divisibility Is Sound**
>
> > 1.     The Fifth Circuit standard in *Bell Petroleum* applies in this estimation proceeding

The U.S. has invited this Court to go beyond the Idaho court's decision and examine whether it is susceptible to reversal.   The U.S. advances this argument even though the Government separately extols the sound reasoning applied by the Idaho court to establish ASARCO's liability for Site response costs and natural resource damages ("NRD").   While ASARCO believes that Judge Lodge's decision stands on its own, it is highly likely that Judge Lodge's ruling would be upheld on appeal.   In this estimation proceeding the applicable precedent is the decision of the U.S. Court of Appeals for the Fifth Circuit in *U.S. Envt'l. Prot. Agency v. Sequa Corp. (In re Bell Petroleum Serv., Inc.*), 3 F.3d 889, 895 (5th Cir. 1993) ("*Bell Petroleum*").   *See Montgomery County, Md. v. Metromedia Fiber Network, Inc.*, 326 B.R. 483, 489 (S.D.N.Y. 2005) ("A federal bankruptcy court, like a federal district court, is bound to apply federal laws as they have been interpreted by the Court of Appeals in the circuit where it sits").

In *Bell Petroleum*, the Fifth Circuit held that the decision whether to impose joint and several liability turns on whether there is a reasonable and just method for determining the

amount of harm that was caused by each defendant. *See Bell Petroleum*, 3 F.3d at 896. The court stressed that certainty is not required in order to apportion liability, holding that "the fact that apportionment may be difficult, because each defendant's exact contribution to the harm cannot be proved to an absolute certainty, or the fact that it will require weighing of the evidence and making credibility determinations are inadequate grounds on which to impose joint and several liability." *Id.* at 903.

Applying these principles, the *Bell Petroleum* court held that the harm in that case – contamination of groundwater – was a single harm that could be reasonably apportioned based on the volume of chromium waste introduced into the environment by each defendant. The court noted that the harmful contaminants at issue entered the groundwater as a result of similar operations by three parties and held that it was reasonable to apportion the harm because Sequa was able to meet its burden of proof to show that there was a reasonable basis to do so. *Id.* at 904. The burden of proof was met through evidence regarding the amount of chrome-plating done by various defendants and the waste disposal practices of each defendant, as well as expert reports that provided estimates of the amount of waste that would have been released into the environment by each operator. *Id.* Even though the wastes disposed of by various parties were commingled, the court found that the nature of the waste from each defendant was basically similar and that the contribution of each defendant could therefore be reasonably approximated. *Id.* As a result, the court held that the respective contribution of the potentially responsible parties to the total volume of chromium waste was a reasonable basis for apportionment of liability and that the defendants should therefore not be held jointly and severally liable. *Id.*

2.    <u>Judge Lodge's decision meets all criteria for finding a reasonable basis for apportionment under *Bell Petroleum*</u>

Applying the *Bell Petroleum* standard to the facts that were presented to Judge Lodge in the *Coeur d'Alene* decision and that are now before this Court, it is clear that there is a reasonable basis for apportionment of the harm. For this Site the harm is the contamination found in various portions of the Basin, which consists of elevated levels of certain metals, particularly lead, zinc and cadmium.[1] *See Record of Decision, The Bunker Hill Mining and Metallurgical Complex Operable Unit 3* (Ex. D-64 at D-064.0033) (Sept. 2002) ("*IROD*") ("The site contaminants are primarily metals, and the metals considered of principal concern include lead and arsenic for protection of human health and lead, cadmium and zinc for protection of ecological receptors").

Judge Lodge specifically found that releases of hazardous substances in the Basin were causing injury to the natural resources in the Basin and that the "primary cause" of such injury was "the co-mingled mining waste," including "mixed tailings and alluvium in the beds and banks of the rivers and streams in the Basin." *Coeur d'Alene,* 280 F. Supp. 2d at 1106. There was substantial evidence in the record before Judge Lodge to support these conclusions. For example, the parties agreed that "[t]ailings contribute about 80% of the dissolved metals load in the South Fork of the Coeur d'Alene River." Joint Submission Concerning Legal and Factual

---

[1]   The Government has argued that Judge Lodge was wrong in concluding that this is a case in which there is a reasonable basis for determining the contribution of each defendant to a single harm because, the U.S. asserts, there were multiple harms in the Basin, not a single harm. The U.S. argues, for example, that there were harms to different species of migratory birds. Tr. Vol. IV at 93:20-25 (Askman). However, the Government misperceives the nature of the relevant inquiry. Because there are injuries in various areas of the Basin and because these injuries all stem from the same type of contamination associated with similar types of waste (*i.e.*, tailings) produced by similar activities of the defendants, it is reasonable and appropriate to view the injuries throughout the Basin as a single harm. *Cf. United States v. Burlington Northern & Santa Fe Railway Co.,* 2007 WL 2473236, 7-8 (9th Cir. 2007) (treating the "harm" as the contamination traceable to each defendant where there was both soil and groundwater contamination). The Government's approach of viewing injuries to specific resources as separate harms would make it virtually impossible for any defendant to establish a basis for divisibility, an outcome at odds with the standards set forth by the Fifth Circuit in *Bell Petroleum*.

Issues at 24 (Ex. D-188 at D-188.0151, which was a post-trial submission to Judge Lodge).   The

IROD subsequently confirmed these conclusions.  *See, e.g.*, *IROD* (Ex. D-64 at D-064.0063 to

D-064.0065 and Ex. D-064.0082) (tailings and tailings-impacted sediments account for over

80% of the dissolved zinc in the Upper Basin); *see also Feasibility Study Report, Part 3,*

*Ecological Alternatives*, Vol. I at 1-77 (Ex. D-70 at D-70.0099) ("the contamination primarily

resulted from the discharge or erosion of mill tailings and other mine-generated waste into the

rivers and streams").   Indeed, EPA stated in the IROD that "EPA's analyses and the historic

record make clear that mining-related practices in general and tailings-impacted sediment in

particular are the dominant sources of metals in the Basin." *IROD* (Ex. D-64 at D-064.0456).[2]

Moreover, despite the government's efforts to differentiate the waste, it was recognized

by experts on both sides that the ores mined by the various operators within the Basin were

generally similar and that the processing of those ores resulted in the generation of waste

materials – tailings – that were similar in relevant respects, containing lead, cadmium, zinc and

other metals.  *See, e.g.*, 2001 *Coeur d'Alene* Trial Testimony, Vol. LV at 11583:24-25 and

11584:1-6 (Stott) (Ex. USCdA112) ("Although the Coeur d'Alene ore bodies were not exactly

the same, they were all fairly similar"); *BH&S Report* at 10 (Ex. D-311) (report from U.S. expert

Rex Bull stating that "[a]ll of the tailings produced by the Bunker Hill mills would have

contained the same materials, namely, galena, sphalerite, siderite, quartz, pyrite and other minor

constituents").   In addition, the evidence before Judge Lodge indicated that the milling

technologies used throughout the Basin were generally similar at any given point in time.  *See,*

---

[2]  The U.S. has argued that one element of uncertainty regarding Judge Lodge's ruling on divisibility relates to the fact that Judge Lodge had reserved for Phase II of the district court proceedings a determination of the exact amount of injury resulting from sources other than tailings, such as discharges from mine adits.  *See* Tr. Vol. IV at 98:1-8 (Askman); *Coeur d'Alene*, 280 F. Supp. 2d at 1106.   Thus, Judge Lodge intended to take additional evidence concerning divisibility.  However, as noted above, there is ample evidence in the record to support Judge Lodge's determination that tailings are the primary source of injury.  Under the circumstances, it is entirely reasonable to accept Judge Lodge's decision as being applicable to the Basin generally.

*e.g.*, 2001 *Coeur d'Alene* Trial Testimony, Vol. XV at 2991:17 – 2992:14 (Bull) (Ex. USCdA105); 2001 *Coeur d'Alene* Trial Testimony, Vol. LV at 11584:1-6 (Stott) (Ex. USCdA112).    Even the Government's expert in this estimation, Ms. Cami Grandinetti, recognized that the tailings and method of contamination are similar:

> Q:  Isn't it true that you've testified that the contamination throughout the Basin is generally similar in nature in your depositions?
>
> A:  That the contamination in the Basin is generally similar in nature?
>
> Q:  Yes.
>
> A:  Mine waste. Mine tailings throughout the system.  Yes.

Tr. Vol. I at 135:8-18 (Grandinetti).

Based on the evidence, Judge Lodge held that the defendants had met their burden of proof where:

> sufficient evidence was presented by the Plaintiffs that establishes each generator was contributing tailings and all of the tailings released contained lead, cadmium and zinc.  Even though the exact percentages of lead, cadmium and zinc in the tailings from each mill is unknown and differed slightly based on the type of metal being extracted in the milling process, the Court finds the milling methodologies used in the Basin did not differ significantly from mill to mill to preclude divisibility based on the volume of tailings generated.

*Coeur d'Alene*, 280 F. Supp. 2d at 1120.  Based on this evidence, Judge Lodge found that "[t]he experts on both sides of this case agree that a 'reasonable basis' for apportioning is to consider the amount of mining waste discharged into the waterways."  *Id.* at 1121.  Judge Lodge further found that "clearly, there is a reasonable relationship between the waste volume, the release of hazardous substances and the harm at the site."  *Id.* at 1120.  Under these circumstances, Judge Lodge determined that "[d]ivisibility of the common harm to the Basin based on causation using

volumetric calculation may not be the 'perfect' method of divisibility, but it certainly is reasonable based on the historical facts available in this particular case." *Id.*[3]

Thus, like the defendants in *Bell Petroleum*, ASARCO has met its burden of proof to establish that there is a reasonable basis for apportionment of the harm through evidence regarding the nature and extent of waste-producing activities at the Site, the similarity of activities undertaken by various defendants and expert reports that provided estimates of the volume of tailings introduced by each operator.  While the Government pulls a few snippets out of context from 78 days of trial testimony and over 8600 exhibits, Judge Lodge in fact had a wealth of evidence before him and based his well-reasoned decision on the record as a whole.  There is no reason to believe that his legal ruling that there is a reasonable basis for apportionment would be overturned on appeal.  Moreover, while Judge Lodge's ruling normally would be subject to *de novo* review on appeal, this Court's act of discretion in deciding whether to adopt Judge Lodge's ruling in whole or in part may only be disturbed on appellate review in the event of an abuse of discretion.  *See Brints Cotton*, 737 F.3d at 1341.

With respect to the determination of what ASARCO's share of liability should be, Judge Lodge's determination of a 22% share for ASARCO is a question of fact that would only be overturned if clearly erroneous.  In any event, as Judge Lodge recognized, the approaches taken by the U.S. and ASARCO to determining ASARCO's share yield essentially the same result. *See Coeur d'Alene*, 280 F. Supp. 2d at 1121 n.20.  ASARCO's expert determined that the

---

[3] The U.S. has argued that Judge Lodge had no basis for establishing a nexus between the amount of waste disposed of by the defendants (principally tailings) and the amount of contamination at the Site because ASARCO allegedly did not establish the amount of metals contained in various types of tailings. Tr. Vol. IV at 94:1-97:16 (Askman). However, Judge Lodge found - based on the extensive record before him - that all tailings contained the principal contaminants of concern, *i.e.*, lead, cadmium and zinc, such that tailings volume provided a reasonable basis for apportionment. *Cf. Bell Petroleum*, 3 F.3d at 903 ("Even though it is not possible to determine the exact amount of chromium each defendant introduced into the groundwater, there is sufficient evidence from which a reasonable and rational approximation of each defendant's individual contribution to the contamination can be made.").

Debtor's share of liability based on ore production in the Coeur d'Alene mining district was 22.36% whereas its share of tailings produced – the Government's preferred method – was 22.07%. 2001 *Coeur d'Alene* Trial Testimony, Vol. LV at 11559:14, 11564:25 – 11565:3 (Stott) (Ex. USCdA112); *see also Coeur d'Alene Mining District Estimated Tailings Production* (Ex. D-50 at D-050.0003). Thus, it is highly unlikely that Judge Lodge's 22% determination would be overturned on appeal under any scenario.

### C.      The Idaho Court's Decision Would Not Likely Be Reversed On Appeal

#### 1.      The Idaho court's ruling is consistent with *Burlington Northern*

The U.S. has argued that Judge Lodge's decision would be subject to review on appeal in light of the standards set forth by the U.S. Court of Appeals for the Ninth Circuit in *United States v. Burlington Northern & Santa Fe Ry. Co.*, 2007 WL 2473236, *6 (9th Cir. 2007) ("*Burlington Northern*"). However, as noted above, the U.S. misperceives the relevant precedent that would be applied for this estimation proceeding; the standards set forth in *Bell Petroleum* would govern any appeal. Nevertheless, even if *Burlington Northern* represented the law of divisibility that governs here, Judge Lodge's decision is consistent with that precedent and would still be upheld on appeal. In *Burlington Northern*, the Ninth Circuit recognized that volume can be a reasonable basis for apportioning harm. Noting that "[i]n a situation in which the several defendants are all polluters themselves, divisibility under the Restatement approach is a fairly straight-forward analysis," the Ninth Circuit held that if a court is able to "estimate with some confidence the amount of waste that each defendant disposed of and has a basis for determining that the extent of contamination of the site is proportional to the amount of waste disposed of, then the Restatement approach to apportionment works nicely." *Burlington Northern*, 2007 WL 2473236 at *6. Thus, the Ninth Circuit generally approved of the volumetric allocation approach affirmed in *Bell Petroleum* and relied on by Judge Lodge.

The Ninth Circuit held that such an approach was particularly applicable to a party that had engaged in activities that contributed to contamination at a site. In *Burlington Northern*, that party was Shell Oil Company, which supplied various pesticides and participated in activities on the site that resulted in releases of such pesticides into the environment. The court specifically contrasted the standard applicable to Shell with the standard to be applied to the railroads, which owned a portion of the site but did not play any role in the activities that resulted in the contamination. The Ninth Circuit recognized that the contamination caused by Shell was "easier to isolate than the Railroads', as it involved ascertainable pollutants." 2007 WL 247323 at *14. In fact, the court acknowledged that Shell "had a greater prospect of succeeding on divisibility than did the railroads, as there is some volumetric basis for comparing its contribution to the total volume of contamination . . . ." *Id.* (emphasis in original). Ultimately, the court found that apportionment of Shell's liability was not appropriate because Shell did not provide enough evidence of its contribution to support divisibility. *Id.* Nevertheless, the Court indicated that "Shell's harm was capable of apportionment" and that it could have found a reasonable basis on which to apportion the harm if Shell had indeed eventually "provided data showing the volume of chemicals shipped . . . every year, or more precise estimates of the average volume of leaked chemicals during the transfer process." *Id.* at *15 (emphasis in original). Thus, the court found that Shell's liability could potentially have been apportioned based on volume but that Shell simply had not met its burden of providing adequate evidence of volume because Shell focused instead on arguing that it was not liable at all.

The position of ASARCO here is much more analogous to that of Shell than it is to the position of the railroads, *i.e.*, it is a party that participated in contamination-causing activities. However, unlike Shell, ASARCO has provided significant data demonstrating the volume of

materials involved in mining and milling activities conducted in the Basin. Through its expert in the Idaho trial, ASARCO presented detailed evidence concerning the amount of ore produced by various operators as well as information concerning total tailings production at numerous mine and milling sites. The U.S. also presented evidence estimating the precise volume of the waste that was released into the environment (in the form of tailings). With such specific evidence and estimates of the volume of waste, the harm caused by ASARCO can be reasonably estimated and apportioned under the standard articulated by the Ninth Circuit, particularly since all these tailings – as well as those of other mine companies – contained elevated levels of lead, cadmium and zinc that contributed to the harm. Thus, even if this Court were to apply the Ninth Circuit standard under *Burlington Northern* in this estimation proceeding, the Court must still conclude that ASARCO's liability can be reasonably apportioned on the basis of volume and estimate accordingly.[4]

## II.   THE TRUSTEES HAVE OVER-ESTIMATED THEIR CLAIM FOR NATURAL RESOURCE DAMAGES

### A.   <u>Natural Resource Trustees Must Select Cost-Effective Alternatives, Which Are Feasible In This Case</u>

The U.S. has substantially overstated its claim for NRD. One of the principal reasons for this overstatement is the failure of the trustees to appropriately consider cost-effectiveness in

---

[4]   A review of recent appellate trends further suggests that it is quite unlikely that Judge Lodge's ruling on divisibility would be overturned on appeal. Based on statistics available from the Administrative Office of the U.S. Courts, over the ten-year period from Fiscal Year 1997 to Fiscal Year 2006, the Fifth Circuit reversed in whole or in part only 11.9% of civil appeals involving the United States as a party (excluding petitions from prisoners) that were decided on the merits. Even if the Court were to consider a scenario involving an appeal of Judge Lodge's ruling to the Ninth Circuit, that court over the same period reversed merely 14.3% of civil appeals involving the United States as a party that were decided on the merits. Accordingly, historical trends support the conclusion that, contrary to the assertions of the U.S., it is unlikely that Judge Lodge's ruling on divisibility would be overturned on appeal. In any event, because it is certainly conceivable in the event of a remand that Judge Lodge would take additional evidence and affirm his ruling concerning divisibility, these figures likely overstate the possibility that Judge Lodge's divisibility ruling would ultimately be vacated.

their selection of the restoration alternatives to be used in measuring the cost of redressing the injuries to natural resources in the Basin.

Department of Interior ("DOI") regulations require natural resource trustees to evaluate potential alternatives for addressing injury to natural resources based on ten factors. *See* 43 C.F.R. § 11.82(d). Two of these factors deal specifically with the cost of the alternatives. First, trustees must evaluate the "relationship of the expected costs of the proposed action to the expected benefits from the restoration, rehabilitation, replacement, and/or acquisition of equivalent resources." *Id.* § 11.82(d)(2). In addition, the trustees must evaluate the cost-effectiveness of the alternatives, which means that "when two or more activities provide the same or similar level of benefits, the least costly activity providing that level of benefits will be selected." *Id.* § 11.82(d)(3); *see also* 43 C.F.R. at § 11.14(j). DOI has stated that "[t]he cost/benefit factor provides a means of comparing alternatives that pose both different costs and different benefits, whereas the cost-effectiveness factor is designed to evaluate alternatives that provide similar benefits." 58 Fed. Reg. 39328, 39343 (July 22, 1993). According to DOI, "[t]hese factors, when considered together, protect against the selection of an alternative that poses grossly disproportionate costs." 59 Fed. Reg. 14262, 14271 (March 25, 1994). Thus, the selection of an alternative that results in grossly disproportionate costs when compared to other alternatives indicates that the trustees have failed to appropriately apply these factors.

As discussed more fully below, the U.S. has not appropriately considered "cost" in selecting NRD alternatives as required under the applicable DOI regulations. The trustees have improperly dismissed alternatives that are feasible and in doing so have eliminated alternatives that are very cost-effective. The trustees instead have chosen alternatives that result in costs that are grossly disproportionate to the value of the resources in question. Such an approach to

DC01:486229.2

12

assessment of NRD does not comport with the DOI regulations and should be rejected by the Court.

**B.    The United States Incorrectly Asserts That It May Select Any NRD Restoration Option It Desires**

The U.S. has asserted that it may reject the most cost-effective alternatives available in this case because it is entitled to select physical "restoration" of a resource as its primary and preferred alternative for addressing injuries to resources regardless of the cost implications of its approach. *See* Tr. Vol. IV at 87:23-24 (Askman) ("under the law, what we are allowed to do under CERCLA is to restore the resource"); *id*. at 88:5-8 (Askman) ("[i]f we want to go in and do [a more expensive] primary restoration, if we want to go in and clean up those wetlands, that is our right to get damages to do that under the law").

However, contrary to its assertion, the U.S. is not entitled to conduct primary restoration whenever it wants. Such an interpretation was specifically rejected by DOI when it promulgated its NRD regulations in 1994. DOI stated that the regulations did not authorize physical restoration of an injured resource "if such activities would be impractical, inordinately expensive, and unjustifiably dangerous." 59 Fed. Reg. at 14271. In any event, DOI emphasized that several factors should be addressed in deciding between physical restoration and replacement of a resource, including "technical feasibility, cost-benefit considerations, cost-effectiveness, and potential for additional injury." DOI's regulations just simply do not endow natural resource trustees with the absolute right to require physical restoration as the sole measure of NRD as claimed by the U.S.

The decision of the U.S. Court of Appeals for the D.C. Circuit in *Ohio v. Dep't of Interior*, 880 F.2d 432 (D.C. Cir. 1989), supports the conclusion that natural resource trustees are not entitled to conduct restoration activities whenever they want. In that case the court noted that

the legislative history of CERCLA indicates "that Congress intended recovery not to encompass restoration cost where restoration is infeasible or <u>where its cost is grossly disproportionate</u> to use value." *Id.* at 456 (emphasis added). The court also pointed out that "[s]cholars agree that recovery of full restoration cost in every case, no matter how large the sum is, is <u>not</u> required by CERCLA." *Id.* at 444 (emphasis added). Thus, in situations such as those encountered in the Basin, where the cost of physical restoration alternatives is grossly disproportionate to other alternatives, both DOI's regulations and *Ohio v. Dep't of Interior* confirm that the trustees do not have unfettered discretion to choose restoration alternatives as the measure of NRD.[5]

### C. The United States' Damage Assessment For Tundra Swans Is Excessive

1. The Western Population of tundra swans is healthy and thriving

The U.S. has alleged that damages to tundra swans amount to $183,480,000 in 2004 dollars; this claim was adjusted to be $209 million in 2008 dollars. *See* Tundra Swan Injury Assessment at 5  (Ex. D-91 at D-091.0006); White Demonstrative (Tundra Swans) (Ex. D-289 at D-289.0005).[6] However, this claim flies in the face of the actual status of the tundra swan populations in the Pacific Flyway, which are increasing notwithstanding allegations concerning conditions in the Basin. Indeed, the Western Population of tundra swans stands at approximately

---

[5] The U.S. may argue that its assessment of NRD is entitled to a rebuttable presumption of validity. *See* 42 U.S.C. § 9607(f)(2)(C) ("Any determination or assessment of damages to natural resources . . . made by a Federal or State trustee in accordance with the regulations . . . shall have the force and effect of a rebuttable presumption on behalf of the trustee in any administrative or judicial proceeding . . ."). However, the trustees did not follow the DOI regulations in this case because they failed to choose cost-effective alternatives that were feasible, resulting in costs that are grossly disproportionate to the lost value of the resources injured. Because the trustees failed to appropriately follow the regulations in selecting their alternatives they are not entitled to a rebuttable presumption that the alternatives selected are appropriate. *See* 43 C.F.R. § 11.10 ("The assessment procedures set forth in this part are not mandatory. However, they must be used by Federal or State natural resource trustees in order to obtain the rebuttable presumption contained in section 107(f)(2)(C) of CERCLA."). Without this presumption of validity, the burden is on the U.S. to show that its alternatives are appropriate.

[6] The trustees' claim with respect to injuries to tundra swans is premised on the implementation of the IROD. As the record shows, there is a substantial overlap between the $209 million NRD claim for tundra swans and any expanded restoration remedy such as might be included in any form of a comprehensive remedy. *See* Tr. Vol. II at 216:9-13 (Trost). However, as recognized in the law, the trustees may not claim NRD for injuries that are corrected as part of the response action itself. *See* 43 C.F.R. § 11.10; *New Mexico v. General Elec. Co.,* 467 F.3d 1223, 1250 (10th Cir. 2006).

100,000 and has been increasing for the past several years. *See* Tr. Vol. II at 238:11-24 (Trost). In fact, the Western Population of tundra swans has increased to the point that the Pacific Flyway Council recommended and the U.S. Fish and Wildlife Service ("FWS")[7] approved a tripling of the number of tundra swans that can be bagged per hunting permit, while thousands more swans are taken every year as a result of subsistence harvesting. *Id.* at 240:10-241:19.

As the trial testimony shows, tundra swans provide the public with opportunities for recreational hunting, subsistence harvesting, and viewing pleasure. *See* Tr. Vol. II at 237:14-238:3 (Trost). The Pacific Flyway Council[8] calculates that 60,000 tundra swans in the Western Population are sufficient to provide the public with these benefits. *Id.* at 238:4-10. Thus, the existing Western Population of 100,000 tundra swans more than provides the requisite natural resource benefits to the public.

>    2.    Conservation easements are available, feasible and desirable for Protecting tundra swan habitat

Despite the existence of a healthy tundra swan population, the trustees nevertheless argue that a portion of the injury to tundra swans should be redressed through physical restoration of tundra swan habitat in the Basin.[9] This physical restoration alternative would be extremely costly; indeed, it would result in a cost of $169.0 million to address only a limited portion of the alleged loss of 150 swans per year due to contamination in the Basin, or $12,206 per "discounted tundra swan year." *See* White Demonstrative (Tundra Swans) (Ex. D-289 at D-289.0002).

---

[7] FWS is one of the federal trustees seeking damages for alleged injuries to tundra swans in this proceeding.

[8] The Pacific Flyway Council is an advisory body consisting of representatives from state wildlife agencies that participates in the establishment of federal policies for the management of migratory bird species within the Pacific Flyway.

[9] Another restoration option used by the trustees with respect to tundra swan injuries is conversion of agricultural lands into wetlands. Dr. Trost's expert report appears to have overestimated how much money it would cost to convert agricultural property into wetlands. Recent estimates put the cost of conversion per acre at about half the price stated in Dr. Trost's expert report. Tr. Vol. II at 226:13-15 (Trost); *see also Conservation Easement Between Michael and Brenda Schlepp and the U.S.* (Ex. D-103); USEPA, *Design Basis Report, Schlepp Agriculture to Wetland Conversion* (Ex. USCdA142); *Cooperative Agreement between the U.S. Fish and Wildlife Service and Ducks Unlimited* (Ex. USCdA143).

Accordingly, the tundra swan remedy set forth by the U.S. is grossly disproportionate to the lost value of the resource, which must be viewed as quite limited in light of the population figures and the swan management objectives of the Pacific Flyway Council discussed above. As noted by DOI, if the costs of implementing a particular alternative "greatly exceed the lost value of the resource, trustee officials . . . should . . . select a less costly method of restoration, rehabilitation, replacement, and/or acquisition of equivalent resources." 59 Fed. Reg. at 14271. Therefore, the appropriate course here, as stated by DOI, is to select such a less costly method of restoring, rehabilitating, replacing, and/or acquiring equivalent tundra swan habitat.

In fact, in considering a wide range of alternative approaches, the U.S. itself has already put forward a much more cost-effective restoration option for addressing alleged injuries to tundra swans, *i.e.*, conservation easements. *See* Tr. Vol. II at 235:6-15; 235:19-23 (Trost) ("Q. And what did you propose to do – how did you propose to remedy the remaining injury? A. I proposed in the end that I assign the lowest cost option to those remaining 11,000 lost tundra swan years. . . . I thought it was the most reasonable thing to do given the situation we were in."). The Western Population of tundra swans migrate from Alaska to winter in California. *Id.* at 227:24-228:2; 229:23-25. (Trost). As the Government has acknowledged, along this migration path there are numerous available easements that would benefit the tundra swan population. *Id.* at 230:9-21-231:2-5. (Trost). ("We have hundreds of wetland easements around the country and throughout the migration -- throughout the entire Pacific Flyway. . . . Q. And these easements along the migration path and in California, they positively impact the tundra swan population. Correct? A. I certainly think they benefit them."); *see also* Rich Landers, *Wet and Wild: Conservancy on the Ball in Kootenai Valley*, Spokesman-Rev., May 7, 2006 (Ex. D-297), and Stuart Leavenworth, *Deal saves farm, opens coastal gem to the public in Point Arena, Calif.*,

Sacramento Bee, July 25, 2004 (Ex. D-299). Moreover, the U.S. has expressed strong support for conservation easements. *See* Tr. Vol. II at 182:9-13; 183:15-18 (Moynan); Tr. Vol. IV at 85:29-23 (Askman). Such easements represent the most cost-effective means of addressing injuries to tundra swans, costing the equivalent of $102 per "discounted tundra swan year" as compared to the much more cost-intensive $12,206 per discounted tundra swan year for physical restoration. *See* Tr. Vol. III at 46:7–47:14 (White); White Demonstrative (Tundra Swans) (Ex. D-289 at D-289.0002).[10] Consequently, instead of relying on a greatly magnified and costly claim, the much more cost-effective component of the tundra swan remedy, *i.e.*, the use of conservation easements, should be expanded to address all of the alleged injury to tundra swans.[11] This is exactly what ASARCO has proposed. *See* Tr. Vol. III at 207:18-24 (White). By using easements to address all the injury to tundra swans, ASARCO has estimated that the damages associated with tundra swan injuries should be at most $7.32 million. *See* White Demonstrative (Tundra Swans) (Ex. D-289 at D-289.0004). Accordingly, the Court should limit any recovery for NRD associated with tundra swans to no more than $7.32 million based on the alternative suggested by ASARCO.

---

[10] At the hearing, the U.S. did not present any evidence that would cast doubt on its ability to procure easements on the YK Delta in Alaska sufficient to address the substantial majority of the alleged swan injuries in the Basin. In his rebuttal report, Dr. Trost had previously noted that easements on the YK Delta were "problematic" because the land owners – native Alaskans – were not willing to grant conservation easements to the United States. *See* Expert Rebuttal Report of Robert Trost (Ex. D-17 at D-17.0003). However, Dr. Trost noted that the United States was exploring alternatives with these land owners that would serve the same purpose as a conservation easement at a similar cost. *Id.* Those alternative arrangements could include a memorandum of understanding or memorandum of agreement between the land owners and the United States regarding the protection of tundra swans from human encroachment. *See* Deposition of Robert Trost (Ex. D-144 at D-144.0018). Such alternative arrangements would certainly be available and would serve the same purpose as a conservation easement.

[11] Dr. Trost expressed concerns with using such easements as a basis for calculating damages for tundra swan injuries because of an alleged inability to quantify the benefits of such easements to tundra swans. *See* Tr. Vol. II at 231:5-9 (Trost). However, these concerns are undercut by the fact that the trustees in fact used conservation easements to calculate a portion of their claim.

**D.    The United States Seeks an Excessive Award For Damages To Injured Federal Lands**

1.    Conservation easements with natural recovery are available, can provide valuable service benefits, and are desirable

As with tundra swans, the Government's claim for NRD for injured federal lands is excessive because in valuing the claim the U.S. has improperly dismissed a feasible, desirable and cost-effective option.[12]   Conservation easements are an effective way of addressing natural resource damages.  According to Dr. LeJeune, an expert working for the natural resource trustees in the Basin, "[c]onservation easements have successfully protected millions of acres of wildlife habitat and open space, keeping them in private ownership and generating significant public benefits."  See Damages Calculation for Federal Lands at 4-6 (Ex. D-86 at D-086.0037).  In fact, Dr. LeJeune specifically considered the potential effectiveness of conservation easements with natural recovery in the Basin and concluded that this approach would return the injured federal land to baseline conditions.  Id. at 4-10 (Ex. D-86 at D-086.0041).  In addition, Dr. LeJeune has said that more than enough land is available for conservation easements to be a viable alternative for addressing injuries to federal lands in the Basin.  Id. at 4-9 (Ex. D-86 at D-086.0040) ("A total of 6,864 acres satisfied all the criteria; these are considered lands potentially available for purchase of conservation easement.  These lands could provide enhanced riparian habitat services if they were to be revegetated, either actively or through natural recovery, and protected in perpetuity.").  Moreover, the DOI regulations specifically permit natural resource trustees to utilize conservation easements with natural recovery as a way of addressing natural resource

---

[12] The trustees considered several physical restoration alternatives as well as easements with active restoration and easements with natural recovery.  White Demonstrative (Injured Federal Lands) (Ex. D-290 at D-290.0002).

damages. *See* 59 Fed. Reg. at 14271 ("[t]he rule allows trustee officials to rely upon natural recovery when appropriate").[13]

In this case, experts for both parties agree that easements with natural recovery provide the same benefits as easements with active restoration. As noted above, Dr. LeJeune concluded that easements with natural recovery would provide riparian services over time, albeit at a slower rate than easements with active restoration. ASARCO's expert, Mr. White, concurred with this view, stating that the four alternatives for redressing injury to federal lands considered by the trustees – including easements with natural recovery and with active restoration – are equivalent in relevant respects. Tr. Vol. III at 222:8-13 (White) ("They're certainly dealing with the same injury. They have the same injury number to them. They're all providing the same benefit, albeit it takes more acres for some options than others. And so at that point, it's a question of cost."). Moreover, such easements are very cost-effective, with an associated cost that is more than 30 times less than the cost of other restoration alternatives selected by the trustees. *See* White Demonstrative (Injured Federal Lands) (Ex. D-290 at D-290.0008). Thus, easements with natural recovery are cost-effective and feasible in this case.

2.     The United States has incorrectly rejected the cost-effective alternative

Nevertheless, the trustees rejected the use of such easements to address injuries to federal lands. This rejection was improper and inconsistent with the DOI regulations. The only real difference between easements with active restoration and those with natural recovery is the time it takes the environment to return to baseline conditions. However, the fact that natural recovery occurs more slowly than active restoration can be appropriately addressed by increasing the

---

[13] Even Dr. Lipton acknowledged that "there is nothing intrinsically horrible about an easement." Tr. Vol. II at 110:6 (Lipton). He went on to state that "[i]f the easement with natural recovery provided the benefits, and we were secure about those benefits, and we could capture the costs, then that could be an appropriate project." *Id.* at 110:17-19 (Lipton).

acreage of the conservation easements with natural recovery. *See* Tr. Vol. III at 222:18 to 223:1 (White). ("In effect it takes longer with natural recovery to create this benefit. . . . But that's directly offset . . . in the scaling so that in effect although you get less [benefit] per acre, you buy more acres and end up solving the same issue.") Moreover, as confirmed by Dr. LeJeune, there is adequate land available to acquire sufficient conservation easements to address the injury to federal lands within the Basin.

The Court should therefore base its assessment of damages associated with injury to federal lands on conservation easements with natural recovery because "when there's an equivalence of the options, you're expected to choose the most cost effective." Tr. Vol. III at 223:10-12 (White); *see also* 43 C.F.R. § 11.83(d)(3) and 43 C.F.R. § 11.14(j) ("when two or more activities provide the same or a similar level of benefits, the least costly activity providing that level of benefits will be selected"). Under this approach, damages for injuries to federal lands would be no more than $1.90 million. *See* White Demonstrative (NRD Summary) (Ex. D-292 at D-292.0003).

**E.     The Trustees' Claim for Aquatic Damages Is Overstated**

          1.     Injuries to aquatic resources are not properly calculated

In addition to the other NRD claims, the aquatic injuries that form the basis for the trustees' damages claim are not properly calculated for several reasons. First, the U.S. made at least two critical errors in determining the appropriate baseline. One such error is that the injury assessment prepared by the trustees did not include important reference rivers in its baseline estimation, which resulted in a substantial loss of useful information. *See* Tr. Vol. III at 24:3-6, 25:20-25, 26:1-9, 28:1-4 (Desvousges) ("the primary problem with what Dr. Lipton has done here is his . . . selection of the upper portion of the South Fork as the reference area"). The data supporting the Government's assessment of baseline would be more robust and accurate if it had

included information collected from additional control areas, specifically the St. Regis River. *See Proffer of Direct Testimony of Dr. William H. Desvousges* at 3 (Proffer Binder Tab 17). Furthermore, the Government's injury assessment assumes that the injuries to aquatic resources represent a *complete* loss of natural resource services and that this loss can be solely attributed to mining waste, which is entirely inaccurate. This determination of baseline fails to consider any prior or future non-mining impacts to the injured waters. *Id.*; *Proffer of Direct Testimony of James Chadwick* at ¶¶ 7-8, 11-14 (Proffer Binder Tab 4) (Ex. D-309 at D-309.0005-.008).

In addition, the Government does not account for the fact that the trout population within the Basin is recovering. Dr. Lipton's assessment incorrectly states that the fish density in the streams is much lower than it actually is and his expert reports do not reflect the recovery of the trout population in Canyon Creek. *See* Tr. Vol. III at 114:21-120:20 (Chadwick); *id.* at 33:3-34:14 (Desvousges). In fact, after Dr. Lipton recently re-sampled Canyon Creek and found significant trout recovery, he adjusted the baseline in order to eliminate the appearance of any natural resource recovery. Revising the baseline in this situation is completely inappropriate because it flies in the face of the purpose of a baseline assessment, which is to measure natural resource improvement against an established level of injury. *Id.* at 34:15-35:11 (Desvousges).

2.  Damages for injury to aquatic resources have been improperly calculated

The U.S. has compounded its errors in estimating the extent of injury to aquatic resources by also committing several significant errors in calculating damages for these injuries. The aquatic damage analysis prepared by Dr. Joshua Lipton is based on actions to address injuries in two categories of water bodies: medium streams and large rivers. The alternative selected for the medium streams (road bed removal) is much more costly than the alternative selected for the South Fork of the Coeur d'Alene River ("SFCDR") (addition of woody debris). Considering that 75% of the trout injury is accounted for in the SFCDR, the addition of woody debris restores

DC01:486229.2

21

more trout per dollar than the road bed removal option, making the former more cost-effective. *See* Tr. Vol. III at 211:5-212:1 (White). If the woody debris alternative selected for the SFCDR is expanded to restore all of the aquatic injury within the Basin, the injured trout population will still be restored to the appropriate level and the remedy will be much more cost-effective as required under the DOI regulations. *Id.* Expansion of the woody debris alternative to address all the aquatic injury reduces the cost of addressing the injury from $69.5 million to $48.4 million and produces the same result. *Id.*

Second, Dr. Lipton has not properly applied the real discount rate to his calculation of measures to address aquatic injury. Dr. Lipton's cost analysis is based on estimates from 2004. However, the alternatives on which his analysis is based will not actually be implemented until 2010 and will then take place over the course of ten years. *See* Tr. Vol. III at 212:6-213:13 (White). Applying a 7% real discount rate over the share of cost by year results in a 50% reduction in the cost of the alternative, from $1,539,146 to $770,761. *Id.*; *see also* White Demonstrative (Trout) (Ex. D-291 at D-291.0006).

In light of the above, the trustees' overall total for aquatic damages should not exceed $31.72 million if the Court estimates the claim based on the most cost-effective alternatives and applies the appropriate discount rate. *See* White Demonstrative (Trout) *(*Ex. D-291 at D-291-0008).

F.     **The Record Shows That ASARCO's Share of Total NRD Damages Is at Most $7.52 Million**

In opening statements counsel for the U.S. stated that the Government has limited its gross NRD claim against ASARCO to $333.2 million. *See* Tr. Vol. I at 27:12-15 (Askman) ("Damages were calculated for three resources consistent with the district court's opinion in the District of Idaho, and the amount of claim which we have set forth in this case is–or we will

prove in this case is $333.2 million"). This position was reiterated in counsel's closing remarks. *See* Tr. Vol. IV at 91:2-5 (Askman) ("We're not making a claim for Canyon Creek for the increased damages because of the increased baseline. It's not in the $333.2 million.").[14]

However, this approach fails to take into account the divisibility ruling of Judge Lodge. Doing so would limit ASARCO's liability to 22% of the NRD injuries that have occurred in the Basin. Based on the Government's own analysis this would limit ASARCO's liability to $73.3 million. In addition, this total claim should be further reduced to $7.52 million once several errors (such as double-billing for injuries and using inappropriate alternatives) are taken into account. Therefore, ASARCO's liability for natural resource damages should be no more than $7.52 million. *See* White Demonstrative (NRD Summary) (Ex. D-202 at D-202.0003).

## III.   ASARCO'S APPORTIONED SHARE OF THE GOVERNMENT'S TOTAL RESPONSE COST CLAIM IS $113.12 MILLION

As calculated by the estimates of ASARCO's experts, ASARCO's apportioned share of the Government's total response costs on a net present value basis is estimated at $113.12 million.[15] This estimate is based on the analysis by ASARCO's experts Jeffrey Zelikson and Richard White of the Government's past costs and the various probabilities associated with the

---

[14] During the estimation hearing the U.S. admitted that it was not seeking to recover damages for several injuries that it had previously alleged in its expert reports. For example, and as noted above, the U.S. is not seeking any additional damages for injuries alleged to have occurred in Canyon Creek due to recent potential baseline adjustments. Tr. Vol. IV at 91:2-4 (Askman). In addition, the U.S. has appropriately decided not to seek recovery for damages that may result from the development of the Mission/Cataldo Flats repository.

[15] In connection with this post-trial brief, ASARCO has reduced the estimate of its liability for the Government's total Site response costs by $1.8 million, from $114.95 million to $113.12 million. This $1.8 million reduction corresponds to ASARCO's 22% share of the approximately $8.33 million in post-petition interest sought by the U.S. as part of the Government's total response cost claim. *See* Tr. Vol. I at 215:13-23, 218:14-25 (Casey) (describing U.S. claim of $8,325,578.68 in post-petition interest (consisting of $7,678,447.33 in post-petition interest on past costs incurred by EPA and other federal agencies and $647,131.35 in post-petition interest on past enforcement costs incurred by the U.S. Department of Justice)). As an unsecured creditor for virtually the entire Basin, the U.S. is not entitled to post-petition interest on its claims. *See* 11 U.S.C. § 502(b)(2); *see also United Savings Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372-73 (1988); *Addison v. Langston (In re Brints Cotton Mktg., Inc.)*, 737 F.2d 1338, 1341 (5th Cir. 1984). Other than the Government's claim for post-petition interest, ASARCO is contesting the Government's calculation of its past costs in only one other respect: ASARCO submits that it is liable for no more than its 22% apportioned share of the Government's total past response costs for the Site.

potential future response actions and related costs for the Site, including the actions described in the IROD (Ex. D-64). This estimate also reflects the trial testimony demonstrating that any potential future final remedy that may be performed for the Site – such as EPA's proposed "Comprehensive Remedy" – will not commence earlier than 2032, if ever.

A.   **Proper Estimates Are Based on the Timing and Scope of the Selected Remedy Under the Interim ROD**

The 2002 IROD is the only document currently in effect that governs the implementation of response actions for the Basin. Under this IROD, EPA selected a number of specific human health and ecological response actions and expressly concluded that 30 years of prioritized ecological actions should be implemented, with additional data to be collected before a final remedy for the Basin could be selected. *IROD* (Ex. D-64 at D-064.0005). The IROD was issued by the Agency in accordance with the multi-step remedy selection process specified by the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), 40 C.F.R. Part 300. As the only ROD that has been issued for the Basin, a reviewing court should defer to the Agency's remedy selection as documented in this IROD. *In re National Gypsum*, 1992 WL 426464, *2-3 (Bankr. N.D. Tex. 1992).

The parties' respective witnesses at trial agreed on the central importance of the IROD for determining the scope and timing of the response costs to be incurred for the Basin. For example, both Jeffrey Zelikson, expert for ASARCO, and Cami Grandinetti for the U.S. agreed that:

- The IROD is the only EPA-approved ROD currently in place for the Basin. *See* Tr. Vol. III at 278:6-21 (Zelikson); Tr. Vol. I at 133: 22-24 (Grandinetti);

- The only remedy that EPA can currently implement within the Basin is the set of response actions outlined in the IROD. *See* Tr. Vol. III at 278:6-10 (Zelikson); Tr. Vol. I at 134:1-4 (Grandinetti);

- The Comprehensive Remedy has not been authorized through the administrative process. *See* Tr. Vol. III at 251:16-252:12 (Zelikson); Tr. Vol. I at 113:2-5 and 118:9-13 (Grandinetti);

- Although the Comprehensive Remedy was considered in the administrative process 5 to 6 years ago – as Ecological Alternative 3 in the Remedial Investigation and Feasibility Study ("RI/FS"), the result of this administrative process was the Interim ROD. *See* Tr. Vol. III at 251:19-253:3 (Zelikson); Tr. Vol. I at 103:18-104:2 (Grandinetti);

- Both the National Remedy Review Board ("NRRB") and the State of Idaho recommended that EPA implement just a select sub-set of the ecological remedies outlined in Ecological Alternative 3; these select interim remedies are those identified in the IROD. *See* Tr. Vol. III at 254:13-255:8 and 283:1-2 (Zelikson); Tr. Vol. I at 126:5-15, 127:9-16 and 129:6-10 (Grandinetti);

- EPA would have to issue an amended ROD or some other form of new decision document before it could begin work on the Comprehensive Remedy. *See Proffer of Direct Testimony of Jeffrey Zelikson* at ¶ 39 (Proffer Binder Tab 7) (Ex. D-307) ("*Zelikson Proffer*"); Tr. Vol. I at 121:12-122:1 (Grandinetti);

- EPA has not yet taken any formal steps outside this bankruptcy to have the Comprehensive Remedy submitted to the administrative process. *See* Tr. Vol. I at 121:12-16; 121:22; 122:1 (Grandinetti);

- The Agency's most recent 2005 5-Year Review Report for the Basin does not even address the Comprehensive Remedy at all. *See* Tr. Vol. I at 120:8-14 (Grandinetti).

At the same time, the parties do not agree about whether the Comprehensive Remedy is consistent with the IROD or EPA's administrative process.   In essence, ASARCO's witnesses have testified that there is no evidence to justify a course change from the IROD and pursue the Comprehensive Remedy, because there have been no substantive developments involving the implementation of the interim ecological remedy since the IROD was issued.   *See Zelikson Proffer* at ¶¶ 39-40 (Proffer Binder Tab 7) (Ex. D-307 at D-307.0017-0018); *see also* Tr. Vol. I at 58:24- 59: 5 (Steinway).   In fact, EPA cannot vary from the approach set forth in the IROD without either amending the IROD or issuing an "Explanation of Significant Differences" to justify an alternative approach for the Site's response actions.   Tr. Vol. I at 112:23- 113:5 (Grandinetti); Tr. Vol. III at 251:16-252:12 (Zelikson); *see also* 40 C.F.R. § 300.435(c)(2)(ii) (a

ROD amendment is required "if the differences in the remedial or enforcement action, settlement, or consent decree fundamentally alter the basic features of the selected remedy with respect to scope, performance, or cost").

The testimony at trial further demonstrates that EPA currently is implementing only the IROD remedies. The Government's lead witness, Cami Grandinetti, confirmed that EPA currently can implement only the actions identified in the IROD. Tr. Vol. I at 134:1-4 (Grandinetti). Similarly, Chris Pfahl testified for ASARCO that a recent May 2007 planning document issued by the Basin Environmental Improvement Project Commission ("BEIPC")[16] – a regional organization that includes EPA and the State of Idaho – contains numerous references to actions during 2007 through 2011 to implement the IROD, but not a single mention of the Comprehensive Remedy. *See* Tr. Vol. II at 272:6-20 (Pfahl); BEIPC, *Coeur d'Alene Basin Calendar Year 2007 Work Plan* (Ex. D-97). In essence, outside of this proceeding, EPA has not provided any indication that it is even pursuing the Comprehensive Remedy. Given the foregoing, ASARCO submits that a proper estimation of the future Site costs must be based on the timing and costs of the response actions identified in the IROD. Because the IROD was adopted in accordance with the requirements of the NCP, the Court should defer to the IROD in estimating response costs for the Site. *National Gypsum*, 1992 WL 426464, *2-3.

**B.     The Government's Proposed Comprehensive Remedy Will Not Be Implemented Until 2032, If Ever**

The U.S. also has incorrectly alleged that the Comprehensive Remedy can be implemented immediately, without waiting until the IROD is fully implemented in 2032 to

---

[16] In the IROD, EPA included the following description of this Commission: "This commission includes federal, state, tribal, and local governmental involvement. EPA anticipates working as a member of this commission for implementation of the ROD and development of priorities and sequencing of cleanup activities." IROD (Ex. D-64 at D-064.0006).

determine whether any further remedial action is warranted. In support of its claim, the U.S. has alleged that it can use EPA's 5-year review process to evaluate the on-going work at the Site and then may invoke the necessary CERCLA administrative process for amending the ROD, thereby enabling the U.S. to accelerate the potential start-date for the Comprehensive Remedy to 2008. However, the Government's witness – Ms. Grandinetti – provided inconsistent testimony on this point. On the one hand, Ms. Grandinetti testified that EPA could use the 5-year review process to review the IROD and decide to change course and adopt the Comprehensive Remedy. Tr. Vol. I at 112:1-7; 116:14-22 (Grandinetti). At the same time, when confronted with information showing that EPA's most recent 5-year review report for the Site (prepared in 2005) had not mentioned anything about the Comprehensive Remedy, she testified quite to the contrary – in this case she indicated that these reviews were not the proper forum to raise this issue. *Id.* at 120:8-21 (Grandinetti). Instead, Ms. Grandinetti testified that these reviews are intended solely to review past actions and determine whether EPA's activities are "protective." *Id.* at 119:8-10 and 110:12-14 (Grandinetti).

Regardless of Ms. Grandinetti's testimony, the record before the Court amply shows that implementation of the Comprehensive Remedy now would be at odds with the approach expressly embodied in the IROD.[17] According to the testimony of ASARCO's expert witness, Jeffrey Zelikson, EPA committed itself in the IROD to a "30-year" process of performing $350 million worth of select interim remedies and related monitoring before it would decide whether additional remedies would be necessary. Tr. Vol. III at 256:14:19-25 and 261:10-22 (Zelikson); *see also IROD* (Ex. D-64 at D-064.0005). Indeed, based on the Agency's explicit commitments

---

[17] Even Ms. Grandinetti agreed at trial that EPA has not adopted the proposed Comprehensive Remedy in the current IROD (Tr. Vol. I at 118:10-13 (Grandinetti)), and that a new ROD or IROD amendment would be needed before EPA could implement the Comprehensive Remedy. *Id.* at 121:12-21 (Grandinetti).

in the IROD and other technical and practical reasons, Mr. Zelikson testified that it is extremely likely that EPA will continue to fully implement the IROD for 30 years before it considers whether any additional work would be performed. Tr. Vol. III at 260:25-261:20 (Zelikson). In addressing this point, Mr. Zelikson further testified that the Agency needs this entire 30-year period in order to "decide whether any additional CERCLA remedial actions are necessary to attain ARARs [applicable or relevant and appropriate requirements] or to provide for the protection of human health and the environment, and whether any ARAR waivers should be applied." Tr. Vol. III at 259:1-19 and 288:1-3 (Zelikson) (*quoting* Ex. D-64 at D-064.0005); *see also IROD* (Ex. D-64 at D-064-0301). ("The scope of actions that could be implemented in the approximately 30-year response timeframe was also <u>limited by the need to further develop and verify effective, implementable methods of reducing lead exposure and recontamination</u>") (emphasis added).[18]

At the same time, Mr. Zelikson also testified that the IROD is replete with explicit statements by EPA that the interim ecological remedy will take 30 years to complete. Tr. Vol. III at 261:2-6 (Zelikson). For example, EPA stated in the IROD that the selected remedy involves "approximately 30 years of prioritized actions in areas of the Basin upstream of Coeur d'Alene Lake." *IROD* (Ex. D-64 at D-064.0005). Similarly, in response to public comments on the IROD the Agency stated that:

> It is true that given the amount and extent of mine waste contamination remaining in the Basin, cleanup will be costly and will take many years. The work described in the ROD is estimated to cost $359 million and take <u>approximately 30 years to complete.</u>

---

[18] *See also* IROD (Ex. D-64 at D-064.0294) ("Implementation of a source-by-source cleanup in Canyon Creek, as is anticipated under Alternative 3 [EPA's Comprehensive Remedy], would be very difficult, costly, and time consuming. The Selected Remedy for approximately 30 years of work in Canyon Creek will focus on identifying cost-effective technologies for improving downstream water quality in the South Fork and mainstem Coeur d'Alene River and, ultimately, in Coeur d'Alene Lake and the Spokane River").

*Id.* (Ex. D-64 at D-064.0443) (emphasis added).[19]  In fact, clearly at odds with the government's allegations, EPA in the ROD specifically rejected any suggestion that it was ready to immediately commence work on a final remedy for the Site.  *Id.*  ("no decision has been made regarding specific future work, and any additional work beyond that described in this ROD will have to undergo a public process including another Proposed Plan and a public review and comment period").

The trial record repeatedly emphasizes that any effort to implement the Comprehensive Remedy would be contrary to the prior recommendations of key review bodies and stakeholders; namely, the NRRB, the National Research Council ("NRC") of the National Academy of Sciences and the State of Idaho.  Both Ms. Grandinetti and Mr. Zelikson testified that the NRRB previously objected to the comprehensive remedy, finding that it should not be pursued at this time because of:  (a) the magnitude of contamination to be addressed; (b) uncertainties involved in predicting the effectiveness of Basin-wide ecological alternatives; and (c) the significant costs associated with any basin-wide remedial strategy.   Tr. Vol. I at 125:9-19 and 126:9-15 (Grandinetti); Tr. Vol. III at 254:21-255:8 (Zelikson); *see also* Letter from Bruce K. Means to Michael Gearheard (Ex. D-224 at D-224.0002-.0003).  The NRC voiced similar concerns about a comprehensive remedy approach for Site cleanup, stating that "[b]ecause of the long-term and uncertain nature of the cleanup process, it is unrealistic to develop comprehensive remedial schemes and assess their effectiveness *a priori*."   NRC Report (Ex. D-153 at D-153.0019) Furthermore, the State of Idaho objected to any comprehensive remedy due to concerns about

---

[19]   The IROD contains at least 25 separate references by EPA to the "30 years of prioritized actions" and/or the "approximately 30-year" period that will be needed to complete the ecological remedy.  *See IROD* (Ex. D-64 at D-064.0005, D-064.0057, D-064.0058, D-064.0252, D-064.0271, D-064.0272, D-064.0284, D-064.0285, D-064.0293, D-064.0294, D-064.0296, D-064.0298, D-064.0301, D-064.0302, D-064.0304, D-064.0306, D-064.0315, D-064.0353, and D-064.0401).  In addition, EPA in its responsiveness summary for the IROD made nine more similar statements about the "30-year" time period for implementing the ecological remedy.  *Id.*  (Ex. D-64 at D-064.0436, D-064.0443, D-064.0450, D-064.0453 and D-064.0454).

massive dredging projects and disruption to viable ecosystems.   Because of the problems

identified by the State, former Idaho Governor Dirk Kempthorne, currently Secretary of the U.S.

Department of the Interior, specifically stated that:

> In November of 2001, . . . I publicly declared that I was so frustrated by the lack
> of progress on the Coeur d'Alene Basin cleanup by the USEPA that I was ready
> to ask the agency to step aside and leave Idaho.   At the time, the agency's draft
> Proposed Plan was totally void of common sense and would have crippled the
> economy of Northern Idaho.   My feelings were also intensely shared by our
> congressional delegation.

Letter from the State of Idaho to EPA (Ex. D-65).

Moreover, even at the end of the IROD's 30-year implementation period, there is no

guarantee that EPA necessarily will decide that the Comprehensive Remedy or another

alternative final remedy should be implemented.   Mr. Zelikson testified that EPA has expressly

reserved the decision about whether "any" additional ecological remedy will be needed at the

Site after the 30-year implementation period is concluded.   Tr. Vol. III at 259:12-19 (Zelikson);

IROD (Ex. D-64 at D-064.0005) ("at the end of this approximately 30-year period, EPA will

evaluate and decide whether any additional CERCLA remedial actions are necessary to attain

ARARs or to provide for the protection of human health and the environment").

Along these lines, Mr. Zelikson testified that there are many reasons why EPA is unlikely

to implement any additional remedy after completing the 30-year IROD period, noting that:

- The potential benefits to be gained by pursuit of the Comprehensive Remedy 30 years
  from now likely would be outweighed by state, community and resident concerns
  about the massive disruption on the scale anticipated by the Comprehensive Remedy;

- The human health remedy selected in the IROD will be completed within the next
  few years, and will no longer provide a strong impetus for further cleanup in the
  Basin; and

- The IROD conceivably could be protective of human health and the environment
  after 30 years of implementation and natural recovery.

Tr. Vol. III at 305:25-307:17 (Zelikson).  In addition, Mr. Zelikson testified that there are substantial technical and practical difficulties that likely could prevent the Agency from implementing the Comprehensive Remedy.  For example, Mr. Zelikson testified about the substantial difficulties that EPA will confront in identifying and constructing repositories to receive the massive quantities of soil and sediments to be excavated under the proposed Comprehensive Remedy.  Tr. Vol. III at 298:8-24 (Zelikson).  According to Mr. Zelikson, EPA likely will face technical problems finding viable locations for these repositories, as well as significant community opposition to the siting and operation of these repositories. *Id.* at 298:18-24 and 301:14-21.

Given the foregoing, an appropriate estimation of the future response costs for the Site should take into account the substantial uncertainties about when and if any final or "Comprehensive Remedy" will be implemented.  In essence, the estimates of the future response costs for the Site should be based on the following assumptions:  (1) EPA will implement the IROD remedies over the course of a 30-year period; and (2) any future "final" remedy (such as the Comprehensive Remedy) will not commence until approximately 2032, if at all.

**C.    The U.S. Seeks Excessive Indirect Costs**

As noted at trial, ASARCO also challenges the Government's extremely high $515 million indirect cost claim.  ASARCO's experts testified that the U.S. incorrectly seeks to recover indirect costs for the full scope of the Government's future cleanup work in the Basin, even though there are other available potentially-responsible parties to perform the work and the future size of EPA's Superfund program will likely change.  Tr. Vol. III at 248:18-249:8 (Zelikson); *Zelikson Proffer* at ¶¶ 60-62 (Proffer Binder Tab 7) (Ex. D-307 at D-307.0025-.0026).  The Government's own witnesses testified at trial that indirect costs typically are not assessed (or are calculated only as a percentage on much smaller EPA oversight costs) when

potentially-responsible parties ("PRPs") are available to perform the response actions at cleanup sites. Tr. Vol. I at 200:19-25 and 201:4 (DeHoff); Tr. Vol. I at 233:14 and 234: 4 (Ammann). Since PRPs such as Hecla Mining Company are available to perform future cleanup work in the Basin, it is improper for the U.S. to ask ASARCO to pay for future indirect costs. Moreover, Mr. Zelikson testified that the Government's indirect cost claim relies on estimates that likely overstate the size of the EPA Superfund program over the next 40 years. Zelikson Proffer at ¶ 62 (Proffer Binder Tab 7) (Ex. D-307 at D-307.0026). For these reasons, ASARCO's experts have opined that no such indirect costs should be included in a reasonable estimate of the total response costs for the Site. Tr. Vol. III at 249:1-4 (Zelikson).[20]

### D.  Response Cost Scenarios

ASARCO's expert, Jeffrey Zelikson, previously has opined in this case that total response costs on a net present value basis should be estimated at $114.95 million.[21]  *See Zelikson Proffer* at ¶ 1 (Proffer Binder Tab 7) (Ex. D-307 at Ex. D-307.0004).  Since LECG assumed that the IROD would be implemented for the next 30 years, LECG's opinion primarily relies on the cost estimates contained in the IROD with adjustments noted below. In addition, LECG evaluated what would happen at the expiration of the 30 years worth of selected activities specified in the IROD to determine the likelihood and cost of any additional remedy considered for the Basin. The adjustments that LECG made to the costs contained in the IROD are as follows:

---

[20] ASARCO has separately filed an omnibus motion (#6183) on the appropriate discount rate and inflation rate factors to be applied uniformly to all claims in the bankruptcy proceeding. ASARCO would refer the Court to this separate filing for information about its views concerning the appropriate discount rate to be applied to the Government's claims for the Site.

[21] However, as noted above (*supra* n.15), this figure includes $1.8 million in post-petition interest that is not properly recoverable from ASARCO, so ASARCO's apportioned share of total Site response costs actually should be estimated at $113.12 million.

- LECG assumed a base year of 2006. *See Proffer of Direct Testimony of Richard Lane White* at ¶ 78 (Proffer Binder Tab 6) (Ex. D-308 at Ex. D-308.0028) ("*White Proffer*").

  o As has been briefed extensively, ASARCO believes there can be no serious dispute that a base year that falls close to the petition date is the correct date from which to base inflation and discount rate calculations.

- LECG performed two downward adjustments to the human health remedy

  o First, LECG assumed that property cleanups would cost only $20,000 per property rather than the $27,000 set forth in the URS June 2007 Cost Update relied on by the U.S. (Ex. D-39 at D-039.0006) simply because the actual amount of money being spent by the EPA during the course of 2006 yielded a per property average cost of $20,000. *See* BEIPC, *2006 Annual Report* at 10 (Feb. 2007) (Ex. D-95 at D-095.0011); *see also* Tr. Vol. III at 280:10-19 and 281:7-18 (Zelikson).

  o Second, LECG reduced the contingency set forth by the Government's experts from 30% to 10%. *See* Tr. Vol. III at 281:9-18 (Zelikson). As Mr. Zelikson testified, the 30% contingency is excessive given the extensive work that the EPA already has completed on the human health remedy. *Id.* at 280:21-281:18 (Zelikson).

- LECG also adjusted the oversight cost figure proposed by the U.S. The U.S. simply applied a 2.3% multiplier to total response costs in order to come up with oversight costs of $33.83 million, and then doubled that figure to estimate oversight costs for the State and Tribe. *Zelikson Proffer* at ¶ 63 (Proffer Binder Tab 7) (Ex. D-307 at D-307.0026-0027)  Mr. Zelikson testified that he believed that this amount was excessive and that by taking a "ground up" approach, or thinking about the numbers of people that actually may be required for the oversight function. In addition, Mr. Zelikson did not include an additional $33.83 million for oversight costs for the State and Tribe because those parties' Proofs of Claim did not encompass such costs. Consequently, a realistic estimate would be $11.24 million for all EPA oversight activities including five-year reviews, of which ASARCO's 22% share would be $2.47 million. *See* Tr. Vol. III at 283:6-284:4 (Zelikson); *Zelikson Proffer* at ¶¶ 63-65 (Proffer Binder Tab 7) (Ex. D-307 at Ex. D-307.0026-0027).

From these assumptions, and also by excluding post-petition interest costs (which total $1.8 million), LECG has developed the attached set of scenarios that allow the Court to see:

   a)      how response costs change when different assumptions are made about what, if any, remedy will be implemented at the end of the 30-year period required by the IROD; and

   b)      how those costs estimates can be affected by (i) the decision whether or not to include indirect costs and (ii) a decision to use either a 7%, 5% or 3% real discount rate. As

noted, these scenarios assume the application of Judge Lodge's 22% divisibility ruling and only encompass response costs (excluding amounts for natural resource damages).

The three separate scenarios are as follows:

- The base opinion presented by LECG at the estimation hearing − this scenario assumes that the IROD is implemented for 30 years, then examines a variety of scenarios including a 3% chance that the Comprehensive Remedy is ultimately implemented.

- Response Cost Scenario Two − assumes a 50% probability that the Comprehensive Remedy is implemented at the end of 30 years, and a 50% probability that another IROD or similar remedy of targeted selective actions will be implemented at that time.

- Response Cost Scenario Three − assumes a 100% probability that the EPA Comprehensive Remedy is implemented at the end of the 30 years required for the implementation of the IROD.

A chart showing the estimated claim that would result from examining these different scenarios, and including as variables the inclusion or not of indirect costs, and at discount rate scenarios of 7%, 5% and 3%, is attached hereto as Exhibit A.  In addition, decision trees that relate to these separate scenarios are attached as Exhibits B, C and D.

## IV.    CONCLUSION

In sum, ASARCO submits that the Government's claims for the Basin are greatly exaggerated and based on incorrect assumptions.  The Court can and should use the prior decision by Judge Lodge in *Coeur d'Alene* to reasonably estimate that ASARCO's liability for the Site is limited to 22% of the total U.S. claim for response costs and NRD.  In addition, the Court should base its estimates of ASARCO's liability for NRD on ASARCO's 22% divisible share of the most cost-effective restoration options presented by the trustees, as calculated by ASARCO's experts.  Similarly, a reasonable estimate of ASARCO's liability for response costs should correspond to the company's 22% divisible share of the Government's past costs (less the inappropriate post-petition interest) and the future costs for continued implementation of the

IROD over a 30-year period, as well as the low probability that any future remedy will be implemented after 30 years. Accordingly, ASARCO submits that its total liability for the Site, including past and future response costs and NRD, should not exceed $122.47 million.

Dated: November 5, 2007

Respectfully submitted,

**BAKER BOTTS L.L.P.**

Jack L. Kinzie
State Bar No. 11492130
James R. Prince
State Bar No. 00784791
Robert C. Wilmoth
State Bar No. 24037717
2001 Ross Avenue
Dallas, Texas 75201-2980
Telephone: 214.953.6500
Facsimile: 214.661.6503
Email:
    jack.kinzie@bakerbotts.com
    jim.prince@bakerbotts.com
    chris.wilmoth@bakerbotts.com

and

_____/s/_____

Tony M. Davis
State Bar No. 05556320
Mary Millwood Gregory
State Bar No. 14168730
One Shell Plaza
Houston, Texas 77002
Telephone: 713.229.1234
Facsimile: 713.229.1522
Email:
    tony.davis@bakerbotts.com
    mary.gregory@bakerbotts.com

Dated: November 5, 2007

DC01:486229.2

**MILBANK, TWEED, HADLEY & McCLOY LLP**

By: _____/s/_____
      Gregory Evans (admitted to Pro Hac Vice)
      State Bar No. 147623
      Jason B. Baim (admitted to Pro Hac Vice)
      State Bar No. 179377
      601 South Figueroa Street, 30th Floor
      Los Angeles, California 90017-5735
      (213) 892-4000

**HAYNES and BOONE, LLP**

By: _____/s/_____
      Charles A. Beckham, Jr.
      State Bar No. 02016600
      Brooks Hamilton
      State Bar No. 24046015
      1 Houston Center
      1221 McKinney, Suite 2100
      Houston, Texas  77010
      (713) 547-2000

**MILBANK, TWEED, HADLEY & McCLOY LLP**

      Luc A. Despins (LD 5143)
      Robert Winter (RW 9937)
      1 Chase Manhattan Plaza
      New York, NY  10005
      (212) 530-5000