**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Case No.  05-21207** |
| | § | |
| **ASARCO LLC, *et al*.** | § | **Chapter 11** |
| | § | |
| Debtors. | § | **(Jointly Administered)** |
| | § | |

**DISCLOSURE STATEMENT IN SUPPORT OF THE PARENT'S AND AMC'S FIRST
AMENDED PLAN OF REORGANIZATION FOR ASARCO LLC, SOUTHERN PERU
HOLDINGS, LLC, AR SACATON, LLC, AND ASARCO MASTER, INC.
UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

**MILBANK, TWEED, HADLEY &
McCLOY LLP**
Luc A. Despins
David S. Cohen
Robert E. Winter
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5660
Facsimile:  (212) 822-5660

**HAYNES AND BOONE LLP**
Charles A. Beckham, Jr.
State Bar No. 02016600
Trey Monsour
State Bar. No. 14277200
1 Houston Center
1221 McKinney, Suite 2100
Houston, Texas 77010
Telephone:  (713) 547-2000
Facsimile:  (713) 547-2600

Dated:  September 20, 2008

Co-Counsel to Plan Sponsors

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT EXHIBITS ................................................................................. 4

INTRODUCTION ......................................................................................................................... 1

SUMMARY OF ELECTION PROCEDURES ............................................................................ 2

OVERVIEW OF THE PROPOSED PLAN ................................................................................. 3

SECTION 1  GENERAL INFORMATION AND HISTORICAL BACKGROUND ..................... 12
    1.1    Factors Leading to the Need for Bankruptcy Relief ................................................ 12

SECTION 2 EVENTS DURING THE REORGANIZATION CASES ........................................... 14
    2.1    Commencement of the Reorganization Cases ........................................................ 14
    2.2    Corporate Governance .......................................................................................... 14
    2.3    Labor Issues .......................................................................................................... 14
    2.4    Asbestos Issues ..................................................................................................... 16
    2.5    Environmental Issues ............................................................................................ 19
    2.6    Plan Sponsors' Megaclaims Motion ...................................................................... 19
    2.7    Sales Process and Competing Plan ........................................................................ 20
    2.8    Hernandez Litigation ............................................................................................ 21

SECTION 3 SUMMARY OF THE PROPOSED PLAN ............................................................... 21
    3.1    General .................................................................................................................. 21
    3.2    Classification ......................................................................................................... 21
    3.3    Treatment of Unclassified Claims and Demands .................................................... 22
    3.4    Treatment of Claims and Interests ......................................................................... 23
    3.5    Voting Rights ......................................................................................................... 29
    3.6    Conditions to Effectiveness ................................................................................... 29
    3.7    Waiver of Conditions to Effectiveness ................................................................... 32
    3.8    How the Plan Will Be Implemented ...................................................................... 32
    3.9    Distributions ......................................................................................................... 35
    3.10   Procedures For Treating Disputed Claims ............................................................. 38
    3.11   Injunctions, Releases and Discharge ..................................................................... 39
    3.12   Certain Matters Incident to Plan Confirmation ...................................................... 45
    3.13   Assumption and Rejection of Unexpired Leases and Executory Contracts ............. 48
    3.14   Miscellaneous ....................................................................................................... 50

SECTION 4 SECTION 524(G) TRUST ....................................................................................... 55
    4.1    Establishment and Purpose of the Section 524(g) Trust ........................................ 55
    4.2    Section 524(g) Trust Agreement ........................................................................... 55
    4.3    Transfers and Assignments to the Section 524(g) Trust ........................................ 56
    4.4    Control of the Asbestos Insurance Actions and Asbestos Insurance Recoveries ..... 56
    4.5    Assumption of Liabilities by the Section 524(g) Trust .......................................... 56
    4.6    Tax Matters ........................................................................................................... 56
    4.7    Section 524(g) Trust Expenses .............................................................................. 56
    4.8    Initial Section 524(g) Trustees .............................................................................. 56
    4.9    The FCR ............................................................................................................... 56
    4.10   Section 524(g) Trust Advisory Committee ............................................................ 57
    4.11   Asbestos Books ..................................................................................................... 57
    4.12   Cooperation with Respect to Insurance Matters .................................................... 57
    4.13   Indemnification by the Section 524(g) Trust ......................................................... 58

SECTION 5 ASBESTOS CLAIMS TRUST ................................................................................. 58
    5.1    Establishment and Purpose of the Asbestos Claims Trust ..................................... 58

| | | |
|---|---|---|
| 5.2 | Asbestos Claims Trust Agreement | 58 |
| 5.3 | Transfers and Assignments to the Asbestos Claims Trust | 58 |
| 5.4 | Control of the Asbestos Insurance Actions and Asbestos Insurance Recoveries | 58 |
| 5.5 | Assumption of Liabilities by the Asbestos Claims Trust | 59 |
| 5.6 | Tax Matters | 59 |
| 5.7 | Asbestos Claims Trust Expenses | 59 |
| 5.8 | Initial Asbestos Claims Trustees | 59 |
| 5.9 | Asbestos Books | 59 |
| 5.10 | Cooperation with Respect to Insurance Matters | 60 |
| 5.11 | Indemnity by the Asbestos Claims Trust | 60 |

**SECTION 6 ENVIRONMENTAL LIQUIDATION TRUST** .......... 60

| | | |
|---|---|---|
| 6.1 | Environmental Liquidation Trust | 60 |
| 6.2 | Environmental Liquidation Trustees | 61 |

**SECTION 7 ESTIMATION OF CLAIMS AND VALUATION OF DISTRIBUTABLE ASSETS** .......... 61

| | | |
|---|---|---|
| 7.1 | Estimated Claims and Estimated Recoveries by Class | 61 |
| 7.2 | Funding of Plan | 62 |
| 7.3 | Working Capital | 62 |

**SECTION 8 RISKS OF THE PLAN** .......... 62

| | | |
|---|---|---|
| 8.1 | General | 62 |
| 8.2 | Confirmation Risks | 62 |
| 8.3 | Risk Factors Related to Estimates and Assumptions | 63 |
| 8.4 | Risk Factors That Could Negatively Affect the Debtors' Business | 63 |
| 8.5 | Reorganized ASARCO May Not Be Able to Achieve Projected Financial Results | 63 |
| 8.6 | Financial Projections and Other Forward Looking Statements Are Not Assured | 64 |
| 8.7 | Risk that a the Debtors' Plan may be Confirmed Instead of the Plan | 64 |
| 8.8 | Risk Relating to the Collective Bargaining Agreement with the USW and Other Unions | 64 |
| 8.9 | Appointment of Different Asbestos Claims Trustees | 65 |
| 8.10 | Appointment of Different Plan Administrator | 65 |

**SECTION 9 ALTERNATIVES TO THE PLAN** .......... 65

| | | |
|---|---|---|
| 9.1 | Alternative Plan of Reorganization | 65 |
| 9.2 | Debtors' Plan | 65 |
| 9.3 | Liquidation under Chapter 7 | 69 |

**SECTION 10 CORPORATE GOVERNANCE, POST-CONFIRMATION MANAGEMENT, EMPLOYMENT-RELATED AGREEMENTS, AND CONTINUATION OF EMPLOYEE BENEFITS PLANS** .......... 69

| | | |
|---|---|---|
| 10.1 | Retention of Existing Interests | 69 |
| 10.2 | Operations Between the Confirmation Date and the Effective Date | 69 |
| 10.3 | No Substantive Consolidation | 70 |
| 10.4 | Limited Liability Company Agreement, Certificate of Incorporation and Bylaws | 70 |
| 10.5 | Management of Reorganized ASARCO | 70 |
| 10.6 | Director and Executive Compensation | 70 |

**SECTION 11 CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** .......... 70

| | | |
|---|---|---|
| 11.1 | General | 70 |
| 11.2 | Federal Income Tax Classification of Trusts and Disputed Claims Reserve | 71 |
| 11.3 | Federal Income Tax Consequences to Debtors | 72 |
| 11.4 | Federal Income Tax Consequences to Holders of Claims | 72 |
| 11.5 | Information Reporting; Backup Withholding Tax | 73 |
| 11.6 | Importance of Obtaining Professional Tax Assistance | 74 |

**SECTION 12 FINANCIAL INFORMATION** .......... 74

| | | |
|---|---|---|
| 12.1 | General | 74 |

**SECTION 13 SOURCES OF INFORMATION PROVIDED AND THE ACCOUNTING METHOD USED** .......... 74

| | | |
|---|---|---|
| 13.1 | Sources of Information | 74 |

13.2   Accounting Method .................................................................................................... 74

SECTION 14 REQUIREMENTS FOR CONFIRMATION OF THE PLAN AND ELECTION PROCEDURES ................. 75
14.1   Acceptance or Rejection of the Plan ........................................................................ 75
14.2   Confirmation Hearing ................................................................................................ 75
14.3   Requirements for Confirmation ................................................................................. 76
14.4   Conditions to Effectiveness ...................................................................................... 78
14.5   Effect of Confirmation and Effectiveness ................................................................. 79

## DISCLOSURE STATEMENT EXHIBITS

| Exhibit Designation | Exhibit Title |
|---|---|
| DS Exhibit A | Uniform Glossary of Defined Terms for Plan Documents |
| DS Exhibit B | Parent's and AMC's Plan Of Reorganization For ASARCO LLC, Southern Peru Holdings, LLC, AR Sacaton, LLC, and ASARCO Master, Inc. Under Chapter 11 Of the United States Bankruptcy Code |
| DS Exhibit C | Order (A) Approving Disclosure Statement in Support of Parent's and AMC's Plan Of Reorganization For ASARCO LLC, Southern Peru Holdings, LLC, AR Sacaton, LLC, and ASARCO Master, Inc. Under Chapter 11 Of the United States Bankruptcy Code; and (B) Establishing Certain Procedures Related to the Confirmation of Such Plan |
| DS Exhibit D | Excerpts from Debtors' 5 year financial plan |

# INTRODUCTION

*Please consult the Uniform Glossary of Defined Terms for Plan Documents attached as **Exhibit A** to this Disclosure Statement for the meaning of defined terms.*

ASARCO Incorporated (the "Parent") and Americas Mining Corporation ("AMC" and together with the Parent, the "Plan Sponsors") are proposing their Plan of Reorganization (the "Plan," a copy of which is attached hereto as **Exhibit B**) for ASARCO LLC ("ASARCO"), Southern Peru Holdings, LLC ("SPHC"), AR Sacaton, LLC ("AR Sacaton"), and ASARCO Master, Inc. ("ASARCO Master" and together with SPHC and AR Sacaton, the "Reorganizing Subsidiaries", and together with ASARCO, the "Reorganizing Debtors").

AMC, a Delaware corporation with its principal place of business in Phoenix, Arizona, is a wholly-owned subsidiary of Grupo México, S.A.B. de C.V. ("Grupo México"), a Mexican corporation. AMC is a sub-holding company under Grupo México through which Grupo México conducts mining operations in Mexico and Peru.

AMC owns 75.1% of the capital stock of Southern Copper Corporation ("SCC") (the remaining 24.9% of SCC is held by public shareholders) and, indirectly, 100% of the capital stock of the Parent. The Parent owns 100% of the outstanding interests in ASARCO USA Incorporated, which in turn owns 100% of the outstanding interests in ASARCO. SCC's annual, quarterly and special reports, including its financial statements, filed with the U.S. Securities and Exchange Commission ("SEC"), are publicly available on the SEC's website at www.sec.gov.

The purpose of this Disclosure Statement is to set forth (a) relevant information regarding the history of the Reorganizing Debtors, their businesses, and their Reorganization Cases; (b) information concerning the Plan and alternatives to the Plan; (c) information for the holders of Claims and Interests regarding their treatment under the Plan; and (d) information to assist the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

By order dated [_____ __, 2008] (the "Disclosure Order"), attached hereto as **Exhibit C**, the Bankruptcy Court (i) approved this Disclosure Statement, in accordance with section 1125 of the Bankruptcy Code, as containing "adequate information" to enable a hypothetical, reasonable investor typical of holders of Claims against and Interests in the Reorganizing Debtors to make an informed judgment with respect to the Plan and (ii) authorized its use in connection with the solicitation of elections with respect to the Section 524(g) Treatment. **APPROVAL OF THIS DISCLOSURE STATEMENT, HOWEVER, DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

This Disclosure Statement is not intended to replace a careful and detailed review and analysis of the Plan by each holder of a Claim or an Interest, but instead is intended only to aid and supplement that review. Any description of the Plan is a summary only. Holders of Claims and Interests and other parties in interest are cautioned to review the Plan and any related attachments in their entirety for a full understanding of the Plan's provisions. This Disclosure Statement is qualified in its entirety by reference to the full text of the Plan and the exhibits and attachments thereto. If any inconsistency exists between the terms of the Plan and this Disclosure Statement, the terms and provisions of the Plan will control.

Certain of the statements contained in this Disclosure Statement are forward-looking projections and forecasts based upon certain estimates and assumptions and substantially all of the historical and financial information regarding the Debtors comes from the Debtors' own disclosure statement or is otherwise generated by the Debtors. Such statements may prove to be wrong or materially different from actual future results, and there can be no assurance that such statements will be reflective of actual outcomes. The statements contained in this Disclosure Statement, moreover, are made as of the date hereof unless otherwise specified herein, and the delivery of this Disclosure Statement does not imply that there has been no change in the information set forth herein since such date.

Holders of Claims against and Interests in the Reorganizing Debtors are encouraged to read and carefully consider the matters described in this Disclosure Statement, paying careful attention to Sections 3 (Summary of the Proposed Plan) and 8 (Risks of the Plan) of this Disclosure Statement.

This Disclosure Statement may not be relied upon for any purpose other than, in the case of holders of asbestos claims, to determine whether to accept the Plan's proposed treatment pursuant to section 524(g) of the Bankruptcy Code, and nothing contained herein shall constitute an admission of any fact or liability by any party, or be

admissible in any proceeding involving the Reorganizing Debtors, the Plan Sponsors or any other party, or be deemed evidence of the tax or other legal consequences or effects of the reorganization of the Reorganizing Debtors.

Substantially all of the statements and information about the Reorganizing Debtors, including financial information, financial projections, and information regarding Claims or Interests contained in this Disclosure Statement, have been prepared from information provided by the Debtors and their advisors and the Plan Sponsors have relied upon the Debtors with respect to these statements and information and did not independently verify the information. As such, the Plan Sponsors cannot make any representations or provide any warranties as to the accuracy or completeness of any information provided by or statement made by any of the Debtors or their professionals.

## SUMMARY OF ELECTION PROCEDURES

As no holders of Claims or Interests are impaired pursuant to the Plan, no parties are entitled to vote to accept or reject the Plan. Holders of Asbestos Personal Injury Claims are being solicited, however, to elect whether they will accept the Section 524(g) Treatment (as described in Section 3.4(e)(2)(i) below). The holders of Claims that are being solicited should use the Request For Election provided.

A.      WHO CAN MAKE THE ELECTION?

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims and Interests which are (1) "impaired" by the Plan and (2) entitled to receive a distribution under the Plan are entitled to vote on the Plan. Under the Plan, no Claims or Interests are impaired by the Plan, and, accordingly, all holders of Claims and Interests are conclusively presumed by operation of the Bankruptcy Code to have accepted the Plan.

However, holders of Asbestos Personal Injury Claims in Class 5 and the FCR are being solicited to elect whether they will accept the Section 524(g) Treatment. If less than 75% in number of holders of Class 5 Claims vote to accept the Section 524(g) Treatment, and/or if the FCR rejects the Section 524(g) Treatment, then the Plan sets forth alternative treatments for Asbestos Personal Injury Claims, one of which would go into effect if the Plan is confirmed.

The Election Record Date, _____ ___ 2008 (which is the same as the date that the Bankruptcy Court has established as a record date with respect to voting on the Debtors' Plan) will determine which holders of Class 5 Claims are eligible to make their elections.

B.      WHERE AND HOW DO I RETURN MY REQUEST FOR ELECTION?

Ballots should be returned to the Debtors' Balloting Agent at:

AlixPartners, LLP
2100 McKinney Avenue, Suite 800
Dallas, TX  75201

You may return Request For Election by mail, hand delivery, or overnight courier. A self-addressed, postage-prepaid envelope is included for your convenience.

C.      CAN MY ATTORNEY MAKE THE ELECTION FOR ME?

Yes, under certain circumstances. If you (1) have authorized your attorney to make the election for you and (2) have not changed those arrangements, your attorney may make the election as your agent. If your attorney makes the election for you, you do not need to complete the Request for Election. If you have not authorized your attorney to make the election for you, only you may make the election.

D.      WHAT DO I DO IF I DID NOT RECEIVE A REQUEST FOR ELECTION WITH MY SOLICITATION PACKAGE OR NEED A REPLACEMENT REQUEST FOR ELECTION?

If you are a holder of a Claim in Class 5 and you (1) did not receive a Request For Election Form, (2) received a damaged Request For Election, or (3) lost your Request For Election (and you are not making your election through your attorney), you should contact the Balloting Agent, at:

- • Toll-Free Telephone Inquiry Line          ___-___-_____
  (within United States only)

- • Telephone Inquiry Line                    +1-___-___-_____
  (for calls from outside the United States)

- • Facsimile                                 ___-___-_____

- • Email                                     _____

      Extra copies may also be downloaded at no charge to you from the Debtors' restructuring website: *www.asarcoreorg.com*.

      If you have any questions about the procedures for making your election with respect to the Section 524(g) Treatment, you should contact your attorney or the Debtors' Balloting Agent.

## OVERVIEW OF THE PROPOSED PLAN

      The following is a brief summary of certain material provisions of the Plan.  By necessity, this summary is incomplete and is qualified in its entirety by reference to the more detailed information appearing elsewhere in this Disclosure Statement, the attached exhibits, the Plan and the exhibits thereto, as amended from time to time.  Please read the entire Disclosure Statement carefully because your rights may be affected by implementation of the Plan.

      The Plan Sponsors have proposed a Plan that is premised upon the Parent retaining its equity interest in ASARCO, and ASARCO continuing operations as a going concern.  The Plan Sponsors believe that the Plan is fair and equitable to all parties in interest.  If approved, the Plan will implement a reorganization that will address the Reorganizing Debtors' liabilities, including asbestos-related and environmental liabilities, in a comprehensive and complete manner. The Plan provides that the Parent and AMC will fund the Reorganizing Debtors' reorganization with a contribution of $2.7 billion plus, to the extent required by the Bankruptcy Court to demonstrate feasibility, a $440 million guaranty by AMC. This contribution, together with the Reorganizing Debtors' cash on hand (at least $1 billion) and certain other assets, as detailed in the Plan, will fund the Reorganizing Debtors' obligations to creditors, including payment in full of all claims allowed by the Bankruptcy Court, unless otherwise provided in the Plan, in accordance with the priorities established by the Bankruptcy Code.  As to certain classes of claims, the Plan provides for the reinstatement of such claims which would be addressed by the Reorganized Debtors in the ordinary course of business.  To the extent of any shortfall in paying Claims or to the extent the Plan reinstates a class of Claims, the Reorganized Debtors also remain liable to the holders of such Claims, and therefore the value of Reorganized ASARCO and the AMC Guaranty also remain available to them. **Accordingly, the Plan Sponsors submit that the total consideration provided under their Plan is approximately $6.74 billion, which is well in excess of the high value ($5.7 billion) of the Debtors' estimate of aggregate amount of Claims that will ultimately be allowed.**

      The Reorganized Debtors and the Plan Administrator shall make distributions pursuant to the Plan, and prosecute objections to Claims.  Certain parties have criticized the Plan as being a "litigation plan" that could delay distributions to creditors for significant periods of time because the Plan Sponsors have not reached a global settlement with the asbestos and environmental representatives and the Unions.  Additionally, certain parties have indicated that they do not agree that the Plan provides for payment in full of Claims.  The Plan Sponsors disagree with those characterizations.  In fact, the Plan would result in distributions, in Cash, to all creditors who already have an Allowed Claims (including the Holders of environmental claims in Class 7) on the Effective Date.  As to the remaining non-asbestos and non-environmental claims that have not yet been Allowed, the Plan Sponsors assert that the timing of the Allowance of such claims is substantially in the control of the Reorganizing Debtors and not the Plan Sponsors, at least prior to the Effective Date of the Plan.  As to Asbestos Personal Injury Claims and Miscellaneous Environmental Claims that have not yet been Allowed, the Plan Sponsors intend to require the Holders of such Claims to prove their entitlement to recoveries.  To that end, as discussed in Section 2.6 below, the Plan Sponsors have filed a motion seeking to expedite the resolution of the disputes over such Claims.  Indeed, a key difference between the Plan and the Debtors' Plan is that the latter would not require the holders of such Claims to prove their entitlement in court at all, but would pay them amounts that, in the Plan Sponsors' estimation, are far in excess of the legitimate amount of such Claims.

The Plan provides that the holders of Asbestos Personal Injury Claims and Demands shall have the opportunity to elect resolution of such Claims and Demands through the establishment of a Section 524(g) Trust (the "Section 524(g) Treatment"). Under the Section 524(g) Treatment, the Section 524(g) Trust will be established to satisfy all Asbestos Personal Injury Claims and Demands and the ASARCO Protected Parties will be protected from all direct and indirect Asbestos Personal Injury Claims and Demands by a channeling injunction pursuant to section 524(g) of the Bankruptcy Code, which shall channel these Claims and Demands to the Section 524(g) Trust. If the Section 524(g) Treatment does not go into effect, an Asbestos Claims Trust shall be established to pay Asbestos Personal Injury Claims (the "Primary Asbestos Treatment"), and Demands shall be unaffected by the Plan and remain liabilities of the Reorganized Debtors, with additional recourse to the AMC Guaranty. If the Bankruptcy Court determines that the Primary Asbestos Treatment does not leave holders of Allowed Asbestos Personal Injury Claims Unimpaired, such Claims shall be Reinstated and paid, when ultimately Allowed, from a disputed claims reserve, with additional recourse to the AMC Guaranty.

The Plan provides that all environmental Claims against ASARCO, except Assumed Environmental Liabilities with respect to Real Property retained by Reorganized ASARCO and Environmental Claims with respect to the Designated Properties, shall be paid in full on the later of the Effective Date or the date upon which such Claims become Allowed Claims. The Assumed Environmental Liabilities will be assumed, paid, performed and discharged when due by Reorganized ASARCO. The Designated Properties (which shall include the Federated Metals Superfund Site in the event the settlement and compromise between ASARCO and the Texas Commission on Environmental Quality concerning such site is not approved by the Bankruptcy Court) will be transferred to an Environmental Liquidation Trust for remediation to regulatory closure; such remediation shall remain a liability of Reorganized ASARCO.

The classification of Claims and Interests, the estimated aggregate amount of Claims in each Class and the amount and nature of distributions to holders of Claims or Interests in each Class are summarized in the table below. **Please read Section 3 of this Disclosure Statement and Article III of the Plan for more detailed and complete information.** The Plan Sponsors' estimate of the amount of Claims in a Class is based upon the estimates provided by the Debtors.

Following the implementation of the Plan, the Reorganized Debtors will remain liable for Reinstated Environmental Claims, any Reinstated Secured Claims, any Reinstated Bondholder Claims, Demands (if the Section 524(g) Treatment does not go into effect). The Plan's definition of "Reinstatement" mirrors section 1124(2) of the Bankruptcy Code, which provides requirements for reinstating classes of claims and interests without impairing them. Based upon financial information received from the Debtors, Reorganized ASARCO is expected to generate free cash of approximately $273 million in 2009, and cumulative free cash of approximately $1.6 billion by 2012. Even discounting the Debtors' projections by 20%, the Plan Sponsors believe that Reorganized ASARCO will generate free cash of at least $218 million in 2009, and cumulative free cash of at least $1.2 billion by 2012. Together with any surplus funds in the Disputed Claims Reserve remaining after other Claims are paid in full, the Plan Sponsors are confident there will be sufficient cash to address all Reinstated Obligations in the ordinary course of business, even without resort to the AMC Guaranty.

Following the implementation of the Plan, the Reorganized Debtors will also remain liable for all of their Plan Obligations to the extent the Plan Sponsor Contribution, the Distributable Cash, and any other form of consideration held in the Disputed Claims Reserve together are insufficient to satisfy all Plan Obligations, and the AMC Guaranty will provide addition recourse to satisfy such Plan Obligations. Therefore, **all** holders of Allowed Claims will have the right to look to Reorganized ASARCO for payment of their Allowed Claims, and will have additional recourse to the AMC Guaranty.

A chart comparing key aspects of the Plan and the Debtors' Plan may be found in Section 9.2 below.

## Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified. For a discussion of certain additional matters related to Administrative Claims and Priority Tax Claims, see Section 3.3(a) and (b) hereof. Demands are not classified, as they are not Claims for purposes of the Bankruptcy Code; however, if the FCR and 75% of the Holders of Asbestos Personal Injury Claims vote to accept the Section 524(g) Treatment, future Demands will receive the same treatment as Class 5 Asbestos Personal Injury Claims. The estimated aggregate amount of claims set forth below in each Class is derived from the Debtors' Disclosure Statement and has not been independently verified by the Plan Sponsors.

| Description and Estimate of Claims | Description of Distributions or Treatment Under the Plan | Debtors' Estimated Aggregate Amount of Claims | Estimated Percentage Recovery Under the Plan |
|---|---|---|---|
| Administrative Claims | Each holder of an Allowed Administrative Claim (except any holder that agrees to other, lesser treatment) will receive the Allowed Amount of such holder's Administrative Claim, in Cash, in full satisfaction, settlement, release, extinguishment, and discharge of such Claim, on the later of the Effective Date or the date upon which such Administrative Claim becomes an Allowed Claim; *provided*, *however*, that (a) Allowed Administrative Claims representing (1) postpetition liabilities incurred in the ordinary course of business by the Reorganizing Debtors or (2) postpetition contractual liabilities arising under loans or advances to the Reorganizing Debtors, whether or not incurred in the ordinary course of business, will be paid in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto; and (b) the Allowed Administrative Claims of Professional Persons will be paid pursuant to order of the Bankruptcy Court.<br><br>Chase will receive the Allowed Amount of any Administrative Claim under the Credit Facility in Cash, on the Effective Date, in full satisfaction, settlement, release, extinguishment, and discharge of such Claim. The Settled Asbestos Insurance Companies will each have an Allowed Administrative Claim for the Pre-524(g) Indemnity (as such term is defined in the Asbestos Insurance Settlement Agreement), in accordance with the terms and conditions of the Asbestos Insurance Settlement Agreement.<br><br>Any Administrative Claims of the United States or any individual state under civil Environmental Laws relating to the Designated Properties will be addressed through the Environmental Liquidation Trust, as provided in Article 8.1 of the Plan. | $937 to $950 million | 100% |
| Priority Tax Claims | Each holder of an Allowed Priority Tax Claim (except any holder that agrees to other, lesser treatment), at the election of the Plan Sponsors, will (1) be Paid in Full, in full satisfaction, settlement, release, extinguishment, and discharge of such Claim, on the later of the Effective Date or the date upon which such Priority Tax Claim becomes an Allowed Claim, or (2) receive treatment in any other manner such that its Allowed Priority Tax Claim will not be impaired pursuant to section 1124 | $5 to $6 million | 100% |

| Description and Estimate of Claims | Description of Distributions or Treatment Under the Plan | Debtors' Estimated Aggregate Amount of Claims | Estimated Percentage Recovery Under the Plan |
|---|---|---|---|
| | of the Bankruptcy Code, including payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code. | | |
| Demands | If the Section 524(g) Treatment goes into effect, as set forth in Article 4.2(e) of the Plan, Demands will be included in the Section 524(g) Treatment accorded to Class 5 Asbestos Personal Injury Claims, and will be determined, processed, liquidated and paid pursuant to the terms and conditions of the Section 524(g) Trust Distribution Protocol and the Section 524(g) Trust Agreement. If the Section 524(g) Treatment does not go into effect, Demands will not be affected by the Plan and will remain liabilities of Reorganized ASARCO with additional recourse to the AMC Guaranty. | N/A | N/A |

## Classified Claims and Interests

| Description and Estimate of Claims | Description of Distributions or Treatment Under the Plan | Status/ Entitled to Vote | Debtors' Estimated Aggregate Amount of Claims | Estimated Percentage Recovery Under the Plan |
|---|---|---|---|---|
| Class 1 – Priority Claims | On the later of the Effective Date or the date on which such Priority Claim becomes an Allowed Claim, each holder of an Allowed Priority Claim (except any holder that agrees to other, lesser treatment) will be Paid in Full. If necessary, Allowed Class 1 Claims will remain liabilities of Reorganized ASARCO with additional recourse to the AMC Guaranty. | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | De Minimis | 100% |

| Description and Estimate of Claims | Description of Distributions or Treatment Under the Plan | Status/ Entitled to Vote | Debtors' Estimated Aggregate Amount of Claims | Estimated Percentage Recovery Under the Plan |
|---|---|---|---|---|
| Class 2 – Secured Claims | Each holder of an Allowed Secured Claim will, at the election of the Plan Sponsors, in full satisfaction, settlement, release, extinguishment and discharge of such Claim,  (1) be Paid in Full, on the later of the Effective Date or the date that such Secured Claim becomes due in the ordinary course, (2) be Reinstated or (3) receive from the Reorganized Debtors all Collateral securing such Allowed Secured Claim. If necessary, Allowed Class 2 Claims that are Paid in Full will remain liabilities of Reorganized ASARCO with additional recourse to the AMC Guaranty. | **Unimpaired** <br><br> Deemed to Accept the Plan <br><br> Not Entitled to Vote | $28 to $33 million | 100% or reinstated |
| Class 3 – Trade and General Unsecured Claims | Each holder of an Allowed Trade and General Unsecured Claim (except any holder that agrees to other, lesser treatment) will be Paid in Full, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, on the later of the Effective Date or the date upon which such Trade and General Unsecured Claim becomes an Allowed Claim.   If necessary, Allowed Class 3 Claims will remain liabilities of Reorganized ASARCO with additional recourse to the AMC Guaranty. | **Unimpaired** <br><br> Deemed to Accept the Plan <br><br> Not Entitled to Vote | $281 to $440 million | 100% |
| Class 4 – Bondholders' Claims | Class 4 Bondholders' Claims are treated in Article 4.2(d) of the Plan.   Each holder of an Allowed Bondholders' Claim will, at the election of the Plan Sponsors, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, (1) be Reinstated on the Effective Date (with recourse to AMC Guaranty), or (2) be Paid in Full, on the later of the Effective Date or the date upon which such Bondholders' Claim becomes an Allowed Claim.   If necessary, Allowed Class 4 Claims that are Paid in Full will remain liabilities of Reorganized ASARCO with additional recourse to the AMC Guaranty. | **Unimpaired** <br><br> Deemed to Accept the Plan <br><br> Not Entitled to Vote | $448 to $553 million | 100% or reinstated |
| Class 5 – Asbestos Personal Injury Claims, | Holders of Asbestos Personal Injury Claims will receive one of three | **Unimpaired** <br><br> Deemed to | Asserted by Holders to be in range from $1.3 | 100% under either Section |

| Description and Estimate of Claims | Description of Distributions or Treatment Under the Plan | Status/ Entitled to Vote | Debtors' Estimated Aggregate Amount of Claims | Estimated Percentage Recovery Under the Plan |
|---|---|---|---|---|
| and Demands | possible treatments under the Plan:<br><br>(i) If the Section 524(g) Treatment described in this subsection is accepted by at least 75% in number of the holders of Asbestos Personal Injury Claims actually making elections and by the FCR, then, on the Effective Date, or as soon thereafter as the Bankruptcy Court establishes the aggregate amount of consideration necessary to satisfy the requirements of section 524(g) of the Bankruptcy Code, the Section 524(g) Trust will be established and funded with the Section 524(g) Trust Assets, and liability of the Reorganizing Debtors for all Asbestos Personal Injury Claims and Demands will be assumed by, and channeled to, the Section 524(g) Trust without further act or deed, and satisfied as set forth therein. The Section 524(g) Trust is described in Article VI below. All Asbestos Personal Injury Claims and Demands will be processed, liquidated and paid pursuant to the terms and provisions of the Section 524(g) Trust Distribution Protocol and the Section 524(g) Trust Agreement;<br><br>(ii) In the alternative, if the Section 524(g) Treatment is accepted by less than 75% in number of the holders of Asbestos Personal Injury Claims actually making elections and/or if the FCR does not accept the Section 524(g) Treatment, then, on the Effective Date, or as soon thereafter as the Bankruptcy Court establishes the aggregate amount of consideration necessary to satisfy all Asbestos Personal Injury Claims in full, the Asbestos Claims Trust will be established and funded with the Asbestos Claims Trust Assets for the benefit of holders of Asbestos Personal Injury Claims, and all Asbestos Personal Injury Claims will be processed, liquidated and paid pursuant to the terms and provisions of the Asbestos Claims Trust Distribution Protocol and the Asbestos Claims Trust Agreement;<br><br>(iii) In the further alternative, if the | Accept the Plan<br><br>Not Entitled to Vote<br><br>Entitled to Elect Section 524(g) Treatment | billion to $2.1 billion.<br><br>The Plan Sponsors specifically dispute these amounts. | 524(g) Treatment or Primary Treatment; Reinstated under Alternative Treatment |

| Description and Estimate of Claims | Description of Distributions or Treatment Under the Plan | Status/ Entitled to Vote | Debtors' Estimated Aggregate Amount of Claims | Estimated Percentage Recovery Under the Plan |
|---|---|---|---|---|
| | Section 524(g) Treatment is accepted by less than 75% in number of the holders of Asbestos Personal Injury Claims actually making elections and/or if the FCR does not accept the Section 524(g) Treatment, *and* the Bankruptcy Court finds that the Primary Asbestos Treatment does not leave the holders of Asbestos Personal Injury Claims Unimpaired, then, unless the Plan Sponsors and the holder of any such Asbestos Personal Injury Claim agree to a different treatment, each Asbestos Personal Injury Claim will be Reinstated on the Effective Date. Reorganized ASARCO will have the right to challenge the allowance of any Asbestos Personal Injury Claims on any ground available in applicable law or agreements. When an Asbestos Personal Injury Claim has been resolved by (x) final order or (y) settlement approved by the Plan Sponsors, such Claim will be paid out of the Disputed Claims Reserve, with additional recourse to the AMC Guaranty. | | | |
| Class 6 – Toxic Tort Claims | Each holder of an Allowed Toxic Tort Claim (except any holder that agrees to other, lesser treatment) will be Paid in Full, in full satisfaction, settlement, release, extinguishment, and discharge of such Claim, on the later of the Effective Date or the date upon which such Toxic Tort Claim becomes an Allowed Claim. If necessary, Allowed Class 6 Claims will remain liabilities of Reorganized ASARCO with additional recourse to the AMC Guaranty. | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | $56 to $69 million | 100% |
| Class 7 – Previously Settled Environmental Claims | Each holder of an Allowed Previously Settled Environmental Claim (except any holder that agrees to other, lesser treatment) will be Paid in Full, on the Effective Date. If necessary, Allowed Class 7 Claims will remain liabilities of Reorganized ASARCO with additional recourse to the AMC Guaranty. | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | $512.5 million | 100% |

| Description and Estimate of Claims | Description of Distributions or Treatment Under the Plan | Status/ Entitled to Vote | Debtors' Estimated Aggregate Amount of Claims | Estimated Percentage Recovery Under the Plan |
|---|---|---|---|---|
| Class 8 – Miscellaneous Environmental Claims | Each holder of an Allowed Miscellaneous Environmental Claim (except any holder that agrees to other, lesser treatment) will be Paid in Full, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, on the later of the Effective Date or the date upon which such Miscellaneous Environmental Claim becomes an Allowed Claim. If necessary, Allowed Class 8 Claims will remain liabilities of Reorganized ASARCO with additional recourse to the AMC Guaranty. | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | Asserted by Holders to be in range of $1.130 billion to $3.1 billion for the Tacoma, Omaha and Coeur d'Alene sites, plus an additional $320-360 million for the remaining sites.<br><br>The Plan Sponsors specifically dispute these amounts. | 100% |
| Class 9 – Reinstated Environmental Claims | Class 9 consists of two sub-Classes of Claims.<br><br>(i) Subclass 9A consists of Claims with respect to Assumed Environmental Liabilities. Subclass 9A Claims shall be Reinstated on the Effective Date and, from and after the Effective Date, the applicable Reorganized Debtor will assume, pay, perform and discharge when due all of its Assumed Environmental Liabilities; provided that, if a Reorganized Debtor fails to so satisfy any Allowed Subclass 9A Claim, the applicable Claimant will have additional recourse to the AMC Guaranty.<br><br>(ii) Subclass 9B consists of Claims of the United States or any individual state under civil Environmental Laws relating to the Designated Properties. Subclass 9B Claims will be Reinstated on the Effective Date and will remain the obligation of the applicable Reorganized Debtor, except that, for administrative convenience, such Claims will be addressed through the Environmental Liquidation Trust, as provided in Article 8.1 of the Plan; provided that, if a Reorganized Debtor fails to so satisfy any Allowed Subclass 9B Claim, the applicable Claimant will | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | TBD | Reinstated |

| Description and Estimate of Claims | Description of Distributions or Treatment Under the Plan | Status/ Entitled to Vote | Debtors' Estimated Aggregate Amount of Claims | Estimated Percentage Recovery Under the Plan |
|---|---|---|---|---|
| | have additional recourse to the AMC Guaranty. | | | |
| Class 10 – Late-Filed Claims | Each holder of an Allowed Late-Filed Claim (except any holder that agrees to other, lesser treatment) will be Paid in Full, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, on the later of the Effective Date or the date upon which such Late-Filed Claim becomes an Allowed Claim.  If necessary, Allowed Class 10 Claims will remain liabilities of Reorganized ASARCO with additional recourse to the AMC Guaranty. | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | $10 to $26 million | 100% |
| Class 11 – Subordinated Claims | Each holder of an Allowed Subordinated Claim (except any holder that agrees to other, lesser treatment) will be Paid in Full, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, on the later of the Effective Date or the date upon which such Subordinated Claim becomes an Allowed Claim.  If necessary, Allowed Class 11 Claims will remain liabilities of Reorganized ASARCO with additional recourse to the AMC Guaranty. | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | TBD | 100% |
| Class 12 – Interests in ASARCO | Each holder of Class 12 Interests in ASARCO will retain 100% of its Interests in ASARCO, which Interests will automatically convert into Interests in Reorganized ASARCO on the Effective Date. | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | N/A | 100% |
| Class 13 – Interests in the Reorganizing Subsidiaries | Each holder of Class 13 Interests in a Reorganizing Subsidiary will retain 100% of its Interests in such Reorganizing Subsidiary, which Interests will automatically convert into Interests in the applicable Reorganized Subsidiary on the Effective Date. | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | N/A | 100% |

SECTION 1
GENERAL INFORMATION AND HISTORICAL BACKGROUND

**For a discussion of the history and business activities of the Debtors, and a discussion of current management from the Debtors' perspective, please refer to the Debtors' Disclosure Statement. The Plan Sponsors take no position (except as set forth in this Section 1) with respect to the Debtors' descriptions and statements.**

1.1     Factors Leading to the Need for Bankruptcy Relief.

        As described more fully below, although copper prices recently have reached record highs, in 2005 ASARCO was recovering from the last long downturn in the copper market. Additionally, despite its efforts to negotiate new contracts with its labor unions, ASARCO was experiencing a labor strike at its copper-mining, smelting and refining facilities. Furthermore, ASARCO was subject to substantial Environmental Claims and was burdened by Asbestos Personal Injury Claims pending against it and/or the Asbestos Subsidiary Debtors. ASARCO also had nearly $440 million in bond debt. As a result of the foregoing, ASARCO elected to seek protection under the bankruptcy laws for the benefit of all its creditors and stakeholders.

        (a)     Sale of Interest in Southern Copper Company.

        In 2002 to 2003, in order to improve its balance sheet, ASARCO and SPHC determined to sell SPHC's controlling 54.2% interest in Southern Peru Copper Corporation (now known as Southern Copper Corporation ("SCC")) to AMC, another of Grupo México's subsidiaries (the "Transaction"). The DOJ filed suit to enjoin the Transaction. The DOJ settled the suit, agreeing to dismiss its request for an injunction and providing ASARCO a three-year limitation regarding enforcement of certain Environmental Claims in exchange for the restructuring of the terms of the proposed Transaction, including the addition of a $100 million promissory note assigned to an environmental trust. In addition to funding the trust as part of the Transaction, AMC gave ASARCO a note with a nominal value of $123 million and forgave intercompany debt of $41.75 million. It was a condition of the settlement with the DOJ that ASARCO obtain a reasonably equivalent value opinion with respect to the consideration provided by AMC as part of the Transaction. Such an opinion was obtained from Ernst & Young Corporate Finance with respect to the consideration SPHC was receiving as part of the Transaction.

        On February 2, 2007, ASARCO filed an action against AMC, seeking to avoid the Transaction as an actual and/or constructively fraudulent transfer, and seeking the return of its interest in SCC. As a result of subsequent transactions involving SCC, the stock at issue constitutes about 29.5% of the currently outstanding stock in SCC, whose market capitalization as of July 18, 2008 was more than $26.5 billion. ASARCO also seeks to recover any dividends it would have received on account of its stock ownership of SCC since the transfer in 2003, which amount to approximately $1.7 billion as of July 18, 2008. In the lawsuit, ASARCO and SPHC asserted the following additional causes of action against AMC: (1) civil conspiracy; (2) breach of fiduciary duty; (3) aiding and abetting a breach of fiduciary duty; and (4) punitive damages.

        On August 30, 2008, the United States District Court for the Southern District of Texas, Brownsville Division, issued an opinion holding that AMC paid reasonably equivalent value in the 2003 transfer of 54.2% of the SCC shares to AMC. The court also found, however, that the transfer was accomplished in part to hinder or delay creditors, thus constituting an actual fraudulent transfer. The court further ruled that AMC aided and abetted ASARCO's directors' breach of their fiduciary duties to ASARCO's creditors and engaged in a conspiracy with ASARCO's directors. AMC disagrees with these holdings.

        The court ruled that neither AMC nor Grupo Mexico owed a fiduciary duty to ASARCO or its creditors such that AMC is not liable for a breach of such duty nor aiding and abetting a breach. Additionally, the court held that AMC was not liable for a conspiracy with Grupo Mexico. Finally, the court determined that plaintiffs failed to establish that AMC engaged in conduct sufficient to warrant punitive damages.

        The court expressly delayed any decision on the issue of damages, and has asked the parties to submit briefs on the damages issues by September 22. Because under the bankruptcy code ASARCO's creditors are not entitled to recover more than the amount of their claims and because AMC has already proposed a plan that pays ASARCO creditors in full, the Plan Sponsors do not believe that this ruling will have a material impact on AMC, regardless of the court's decision on damages.

No assurances may be given respecting the outcome of the court's rulings on damages

As provided in Article 11.4 of the Plan, the Claims asserted in this litigation will be dismissed and released upon the Effective Date of the Plan. The dismissal and release of these Claims is proper given that the Plan provides that all holders of Allowed Claims will be Paid in Full in Cash or Reinstated, and therefore pursuing the litigation would serve no purpose because creditors are not entitled to receive more than payment in full of their Allowed Claims.

      (b)     Environmental Obligations.

As a result of ASARCO's more than 100 years of operating history, ASARCO and certain of its non-operating subsidiaries are subject to actual and potential environmental remediation and reclamation obligations at numerous sites around the country.  There are more than 100 sites spread over approximately 16 states, in which ASARCO or one of its subsidiaries is alleged to be responsible for environmental clean-up costs.  ASARCO is a party to numerous consent decrees and lawsuits brought by federal and state governments and private parties as a result of its lead, zinc, cadmium, arsenic, and copper mining, smelting, and refining operations.  The three-year limitation regarding enforcement of certain environmental claims of the federal government described above was to end in early 2006, causing ASARCO to feel rising pressure from federal and state governments to meet increased remediation demands.

      (c)     Asbestos-Related Claims.

The Debtors' alleged asbestos liabilities relate primarily to historical operations of two of ASARCO's subsidiaries, CAPCO and LAQ[1].  Although LAQ has not milled asbestos since the late 1980's and CAPCO has not produced asbestos-containing products for over a decade, by the late 1990's, both CAPCO and LAQ had been named in thousands of asbestos lawsuits around the country.  As a result of the massive asbestos litigation, five of ASARCO's non-operating subsidiaries filed petitions for relief.

Having never mined, milled, manufactured or sold asbestos or asbestos-containing products, ASARCO has no direct liability for any materials or products mined, milled, manufactured or sold by any of its Asbestos Subsidiary Debtors.  Nonetheless, ASARCO was named as defendant in a large number of the asbestos actions against either CAPCO or LAQ.  Although a limited number of the Claims (estimated at less than one percent of the total active asbestos-related claims filed as of the Petition Date) are based on direct theories of liability arising primarily from alleged exposure to asbestos at facilities owned or operated by ASARCO, the majority are derivative of Claims against CAPCO or LAQ.  The Plan Sponsors do not believe that ASARCO has any liability for the asbestos claims against CAPCO or LAQ.

      (d)     Labor-Related Issues.

Unionized workers, represented primarily by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (the "USW"), and certain other hourly paid employees representing nearly 1500 employees in total (about 70% of the workforce), went on strike beginning on July 2, 2005.  The plants affected by the strike were ASARCO's refinery in Amarillo, Texas, its smelter in Hayden, Arizona, as well as ASARCO's Ray, Mission and Silver Bell copper mines and associated mills.  At the center of the strike were nine collective bargaining agreements.  Eight of these agreements, covering about 750 workers at ASARCO's Mission and Silver Bell mines and its smelters in Hayden and Amarillo, expired in 2004.  The ninth contract, which expired on June 30, 2005, covered about 800 workers at the Ray mine.  ASARCO used salaried employees and some temporary workers to operate these plants during the period of the strike.

Because it is a high cost producer in the copper industry, ASARCO sought to reduce costs, and a significant component of the company's cost structure was its labor costs.  Since approximately June 2004, ASARCO had

---

[1] ASARCO's subsidiaries include Lac d'Amiante du Québec Ltée (f/k/a Lake Asbestos of Quebec, Ltd.) ("LAQ"), which owns 100% of the stock of Lake Asbestos of Quebec, Ltd., and LAQ Canada, Ltd.; and Capco Pipe Company, Inc. (f/k/a Cement Asbestos Products Company) ("CAPCO"), and Cement Asbestos Products Company.  Founded in the 1950s, LAQ mined asbestos fibers from the Black Lake region of Quebec, Canada.  In 1986, LAQ ceased operations and in 1989, sold substantially all of its assets.  CAPCO manufactured asbestos-containing cement pipe until approximately 1993 when it also sold substantially all of its assets.  The Official Committee of the Unsecured Creditors of the Subsidiary Debtors (the "Asbestos Claimants Committee") and the Future Claims Representative (the "FCR") contend that ASARCO, as an "alter ego," is liable for asbestos-related liabilities of LAQ and CAPCO.

been negotiating new collective bargaining agreements and retiree benefits with union officials. The Unions filed charges against ASARCO with the National Labor Relations Board, accusing it of failing to bargain in good faith. Thereafter, the Unions commenced a four-month strike.

       (e)       <u>Bond Debt</u>.

       On the Petition Date, ASARCO had approximately $440 million in long-term bond debt, with maturities ranging from April 2013 to October 2033, as follows:

| **Bond** | **Maturity** | **Face Value** |
|---|---|---|
| CSFB JP Morgan Sec Debentures at 7.875% | April 15, 2013 | $100.00m |
| Nueces River Env Bond (IRB) Series 1998 A 5.60% | April 1, 2018 | $22.20m |
| CSFB Corporate Debentures at 8.50% | May 1, 2025 | $150.00m |
| Gila County - Installment Bond 5.55% | January 1, 2027 | $71.90m |
| Lewis & Clark County Env Bond (IRB) 5.60% | January 1, 2027 | $33.16m |
| Nueces River Env Bond (IRB) 5.60% | January 1, 2027 | $27.74m |
| Lewis & Clark County Env Bond (IRB) 5.85% | October 1, 2033 | <u>$34.80m</u> |
| **Total** | | **$439.8m** |

SECTION 2
EVENTS DURING THE REORGANIZATION CASES

**For a discussion of the events during the Reorganization Cases from the Debtors' perspective, please refer to the Debtors' Disclosure Statement. The Plan Sponsors take no position with respect to the Debtors' descriptions and statements.**

2.1     <u>Commencement of the Reorganization Cases</u>.

       ASARCO filed its voluntary petition for reorganization under chapter 11 of the Bankruptcy Code in the Bankruptcy Court on August 9, 2005. The Reorganizing Subsidiaries filed their voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code in the Bankruptcy Court on December 12, 2006. The Reorganization Cases are being jointly administered as *In re ASARCO LLC, et al.*, Case No. 05-21207.

2.2     <u>Corporate Governance</u>.

       As of its Petition Date, ASARCO was operating under that certain Limited Liability Company Agreement, dated February 4, 2005, that provided for management of ASARCO to be vested in a board of directors (the "<u>Board</u>"). On December 15, 2005, the Bankruptcy Court approved a Stipulation and Order Regarding Corporate Governance (the "<u>Corporate Governance Stipulation</u>"), agreed to by the Committees, the FCR, ASARCO, the Parent, and Carlos Ruiz Sacristan, who was the only member of the Board at the time. Pursuant to the Corporate Governance Stipulation, the Parent currently does not have the normal unilateral power of a sole owner to replace the members of ASARCO's board of directors. Given the inability of the Parent to remove and replace directors at will, the majority of the Board has caused ASARCO to pursue certain actions that, in the Parent's view, are inconsistent with their fiduciary duties to the Parent.

2.3     <u>Labor Issues</u>

       (a)       <u>New Collective Bargaining Agreement</u>

       In January 2007, ASARCO and the labor unions representing its bargaining unit employees (principally the USW) negotiated a new collective bargaining agreement (the "<u>New CBA</u>"). The New CBA includes a "work assignment flexibility provision" which, the Debtors and USW assert, allows ASARCO to assign a certain percentage of employees across departments and share maintenance crews across plants. The New CBA includes phased-in wage increases for ASARCO's hourly workers, and provides for one-time signing bonuses and other bonuses tied to copper prices. The New CBA contains successorship language and, pursuant to ASARCO's settlement with the Unions, a

separate "special successorship clause" was also agreed to whereby ASARCO agreed not to consummate any plan of reorganization or sell or transfer any operating plant or significant part thereof, or engage in any other change-of-control transaction unless the prospective buyer shall have (1) recognized the Unions as the bargaining representatives for ASARCO workers; and (2) made an agreement with the Unions establishing the terms of employment to be effective as of the effective date of such plan of reorganization, sale or other  change of control.  In connection with this provision, the Unions are obligated to negotiate in good faith with any prospective buyer and to offer reasonable terms and conditions and terms and conditions that are substantially the same as those offered to any other prospective buyer, <u>provided</u>, <u>however</u>, that the Unions may offer non-identical terms and conditions if those non-identical terms reflect differences in the natures of the prospective buyers.  The Unions' commitment to offer fair and reasonable and substantially similar terms is expressly conditioned upon the prospective buyer bargaining in good faith and providing relevant information reasonably requested.  The Bankruptcy Court has the power to terminate the special successorship provision entirely if, upon motion of the ASARCO or the ASARCO Committee, the Bankruptcy Court finds that the Unions have  breached such obligation or if the Bankruptcy Court finds, in light of exigent circumstances, that  termination of the application of the special successorship clause is necessary to the success of the chapter 11 process.  Subsequently, ASARCO and the Unions entered into the Second Stipulation and Order Regarding Modification to Collective Bargaining Agreement which states that: (1) as long as the Parent does not exercise control of ASARCO during the Reorganization Cases, the Parent is not a party or signatory to the New CBA and is not bound by any of the New CBA's terms; (2) the special successorship clause applies to a plan of reorganization where the Parent retains a majority of equity or controlling equity in the reorganized debtors (a "<u>Parent Retained Equity Plan</u>"), and if the Bankruptcy Court determines that (A) the USW has failed to satisfy its obligations under the special successorship clause or (B) in light of exigent circumstances it is necessary to a successful chapter 11 process, the Bankruptcy Court may order that the special successorship clause does not apply; and (3) the Bankruptcy Court retains jurisdiction to determine at a confirmation hearing on any Parent Retained Equity Plan whether any provision of the New CBA would violate the Parent's rights under section 1129(a) or (b) of the Bankruptcy Code and, if the Bankruptcy Court so finds, the Bankruptcy Court has the authority to terminate the New CBA.

The Bankruptcy Court approved the New CBA and the Second Stipulation on March 15, 2007 over the Parent's objection.  The following day, ASARCO, the USW and the Parent entered into another Stipulation and Order, pursuant to which the Parent agreed not to seek a stay of implementation of the Order approving the New CBA, while ASARCO and the USW agreed not to argue that the failure to obtain a stay mooted any appeal thereof.  On March 28, 2007, ASARCO and the USW gave notice of a modification to Article 11, Section B(2) of the New CBA.  The modification is reflected in a letter agreement dated March 20, 2007, between ASARCO and the USW.  Article 11, Section B(2) originally provided that, except during maintenance and repair outages and temporary production outages or shortfalls, ASARCO would not replace product that could have been produced at an ASARCO facility with product from other than Canadian or U.S. facilities that provide substantially equivalent wages and benefits, unless the ASARCO facility is operating at full capacity.  The amendment deletes the references to Canada and the U.S., so that, under the specified circumstances, ASARCO may purchase product from any facility regardless of location, so long as the replacement facility provides comparable employment terms to its workers.

The Parent filed a notice of appeal from the order, thereby initiating Civil Action No. 07-133 in the District Court.  On June 11, 2007, the USW and ASARCO entered into another Stipulation and Order, which was filed in the pending appellate case and modified the New CBA and the Second Stipulation.  This Stipulation and Order provided that the Parent is not a signatory of, a party to, or bound by any of the terms of the New CBA, regardless of its status as direct or indirect owner of the equity in ASARCO, except as provided in the special successorship clause.

The Parent's appeal of the order approving the New CBA is pending. Briefing and oral argument in the appellate case have occurred, but the District Court has not yet ruled on the appeal.  In addition, the Parent alleges that certain of the provisions of the New CBA are illegal under the labor laws, and these provisions are the subject of unfair labor practice charges currently pending before the National Labor Relations Board (the "<u>NLRB</u>").  The USW vigorously disagrees with the Parent's allegations.

The Parent and the USW have, at various dates in early 2008, exchanged proposals for a collective bargaining agreement and met.  The Parent offered to accept and assume all terms of the New CBA with what it considers some limited non-economic modifications and what the USW informs the Parent that it regards as significant non-economic modifications.  This proposal was not accepted by the USW.  The bargaining between the USW and the Parent is currently the subject of unfair labor practice charges that have been filed against the USW and are pending before the NLRB, alleging, among other things, that the USW bargained in bad faith by insisting as a condition of agreement that the Parent agree to illegal and permissive subjects of bargaining and thus engaged in bad faith bargaining within the meaning

of the labor laws. The USW informs the Parent that it vigorously disagrees with the Parent's allegations. Neither the Parent nor the USW has requested a bargaining session with each other since the Plan Sponsor Selection Meeting in Dallas on May 22 and 23, 2008.

The Parent confirms that it remains willing to attempt to negotiate, in good faith, an acceptable collective bargaining agreement with the USW and other Unions, but may also pursue its legal remedies including before the Bankruptcy Court as part of the Confirmation Hearing to address the special successorship provision discussed above. **The USW has stated that based on current circumstances it intends to object to confirmation of the Plan sponsored by the Plan Sponsors, including on the basis of a failure to comply with the special successorship clause and because the Plan is not feasible.**

(b)     Settlement of Retiree Litigation.

On July 9, 2003, ASARCO, Silver Bell Mining, L.L.C. and Encycle/Texas, Inc. filed an action against the USW and others in federal court in Arizona seeking a declaration that changes to retiree medical benefits made earlier that year were legal under the Labor Management Relations Act and under the Employee Retirement Income Security Act of 1974 ("ERISA"). On September 8, 2003, the defendants filed an answer and counterclaimed against ASARCO. On September 19, 2005, ASARCO initiated Adversary Proceeding No. 05-02078, seeking a declaration that the prosecution of claims against ASARCO and Encycle/Texas violated the automatic stay and requesting an injunction prohibiting prosecution of such claims during the pendency of the Reorganization Cases. On November 14, 2005, ASARCO obtained an order staying the Arizona litigation pursuant to a stipulation by the parties. As part of the New CBA negotiations, ASARCO, the unions and the individual members of the class of retirees reached a final agreement on the resolution of the Arizona litigation, which addresses all the claims among the parties regarding retiree medical benefits. The Bankruptcy Court approved the settlement agreement by order entered on March 15, 2007.

2.4     Asbestos Issues

Approximately 102,000 Claimants filed asbestos-related Claims or submitted electronic claims data against ASARCO and/or one or more of the Asbestos Subsidiary Debtors.[2] In a number of these claims, and in prepetition lawsuits, ASARCO was alleged to be liable, under various Alter Ego Theories, for the asbestos liabilities of certain of its subsidiaries (the "Derivative Asbestos Claims"). Having never manufactured or sold asbestos or asbestos-containing products, ASARCO denied liability for such Derivative Asbestos Claims.

On June 15, 2005, ASARCO filed a complaint initiating Adversary Proceeding No. 05-02048 against the Asbestos Subsidiary Debtors and the FCR, seeking a declaration that it was not liable for the Derivative Asbestos Claims. Pursuant to a stipulation approved on April 25, 2006, the Asbestos Subsidiary Debtors and the FCR were authorized to take the lead role in the prosecution of this action on behalf of the Asbestos Subsidiary Debtors' Estates, and to prosecute all claims, defenses, and/or counterclaims against ASARCO related to the Derivative Asbestos Claims.

In March 2006, ASARCO filed a motion seeking an estimation of the amount of ASARCO's liability, if any, for the Derivative Asbestos Claims, and proposing a procedure for such estimation proceedings (the "Asbestos Contested Matter"). The Parent was a participant in the Asbestos Contested Matter.

On May 9, 2006, the Asbestos Subsidiary Debtors and the FCR filed their Amended Complaint Realigning Parties and Seeking to Hold ASARCO LLC Liable for Tort Liabilities of the Subsidiary Debtors. In the amended complaint, they sought a judgment declaring that ASARCO is liable for the Asbestos Subsidiary Debtors' asbestos-related liabilities under Alter Ego Theories.

As set forth in the Debtors' Disclosure Statement, ASARCO, the Asbestos Claimants' Committee and the FCR (among others) participated in a mediation and agreed upon the essential terms of a settlement (the "Debtors' Proposed Asbestos Settlement") of the Asbestos Contested Matter. The Debtors' Plan proposes to compromise the issues discussed above by contributing $750 million in cash plus the right to share in the recovery, if any, realized in certain litigation (including the litigation discussed in Section 1.1(a) above) to a trust established pursuant to section 524(g) of the Bankruptcy Code.

---

[2]      Many Claimants have allegedly asserted Claims against more than one Debtor, resulting in a total asbestos-related Claim count significantly higher than 102,000.

The Plan Sponsors oppose the Debtors' Proposed Asbestos Settlement, which is embodied in the Debtors' Plan. The Plan Sponsors contend that the corporate veil cannot be pierced to hold ASARCO liable for the asbestos-related liabilities of LAQ and CAPCO. Moreover, even if the corporate veil is pierced, the Plan Sponsors believe that the Asbestos Claimants' Committee and the FCR have significantly overstated the alleged estimated damages, and therefore that the Allowed amount of Asbestos Personal Injury Claims and Demands would be significantly less.

      (a)      <u>The Asbestos Claimants' Committee and FCR Cannot Meet the Heavy Burden Needed to Succeed on a Veil-Piercing Claim</u>

The standard for piercing the corporate veil is extraordinarily difficult to meet. Courts will not pierce the veil unless there is evidence that (1) the subsidiary is ***completely*** dominated by the parent corporation such that it is the alter ego of the parent corporation ***and*** (2) the corporate form has been misused to perpetrate a fraud or injustice.

      (1)      <u>ASARCO Did Not Completely Dominate LAQ or CAPCO</u>

The domination necessary by a parent corporation to pierce the corporate veil is "**complete domination**, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own."[3] In determining whether the subsidiary is the alter ego of its parent, the courts analyze how the subsidiary corporation operates and the relationship between the subsidiary and parent corporation, including whether the subsidiary (i) is adequately capitalized, (ii) pays dividends, (iii) does business without its parent corporation, (iv) is described as a department or division of the parent, (v) has properly functioning officers and directors, (vi) functioned as a façade for the parent and (vii) observed corporate formalities. In addition, courts consider whether the parent (i) owns all or most of the stock of the subsidiary and (ii) siphoned corporate funds from the subsidiary, and, if so, whether the subsidiary was solvent at the time.

The Asbestos Claimants' Committee and FCR likely will point to documents purporting to show instances where certain of these factors bear in their favor. Such instances, however, are wholly insufficient to show the complete domination as required by the case law. Indeed, in normal parent-subsidiary relationships, many of the foregoing criteria showing a dependent relationship are met from time to time. The Plan Sponsors believe that there are numerous documents and much deposition testimony showing that the parent and subsidiaries operated independently and observed corporate formalities. By way of example, and not limitation, the Plan Sponsors believe that there is evidence demonstrating that:

- LAQ and ASARCO entered into several management and consulting services agreements, whereby LAQ paid a fee for ASARCO's provision of certain management and administrative services. When ASARCO performed services for LAQ or CAPCO, ASARCO charged that subsidiary for the service.
- LAQ and ASARCO paid separate legal fees, even when they were both sued in the same lawsuit.
- LAQ sold materials to CAPCO in arms-length transactions at prices that were charged to non-affiliate customers.
- In situations where ASARCO made payments on LAQ's behalf, ASARCO would charge LAQ via an intercompany account for a payment made.
- LAQ's short-term borrowing arrangements with ASARCO were documented legal obligations.
- CAPCO documented long-term loan payments made to ASARCO.
- LAQ and CAPCO maintained their own Board of Directors, as well as their own Board minutes, agendas and materials.
- LAQ and ASARCO's asbestos property damage insurer sent separate checks to each entity to reimburse for the costs of defense.
- ASARCO and LAQ had numerous insurance policies of their own, and ASARCO had insurance policies which covered itself and all of its subsidiaries.
- ASARCO and LAQ each had their own pension plans.
- CAPCO had its own additional compensation plan for employees.
- CAPCO and LAQ had their own corporate letterhead.
- LAQ and CAPCO conducted business with entities other than each other and other than ASARCO. At the time that LAQ and CAPCO were operating, ASARCO's principal business was as an integrated miner, smelter and

---

[3]     *Craig v. Lake Asbestos of Quebec, Ltd.,* 843 F.2d 145, 150 (3d Cir. 1988) (emphasis added) (refusing to pierce corporate veil where companies operated to evade asbestos liability and parent was involved but did not completely dominate subsidiary's affairs).

refiner of silver, copper, lead and by-product metals.  It also produced nonmetallic minerals such as coal and limestone.  In addition to these activities, ASARCO owned several diverse independent businesses, aside from LAQ and CAPCO.

- CAPCO employees received their pension payments from CAPCO.
- LAQ rented laboratory space in ASARCO's South Plainfield laboratory from ASARCO and conducted separate research operations in that space.  ASARCO would accumulate charges for items at the laboratory, such as equipment and would charge LAQ for them.  LAQ would pay ASARCO for these charges.
- LAQ's New York sales office was located at ASARCO's New York headquarters, but segregated by a locked door marked as "Lake Asbestos" or "Lac Asbestos of Quebec." LAQ's files were kept in cabinets behind the locked door.  LAQ rented and paid ASARCO for the space.
- LAQ customers' payments were always made payable to LAQ.
- In the normal course of business LAQ would keep "records of contacts with customers, correspondence" and technical service reports on every customer.  These reports would describe the customers and whether or not there were any orders.
- LAQ was not involved in hiring CAPCO employees or giving them raises.  Neither was LAQ involved in decisions about what asbestos CAPCO would purchase.

(2)   There Was No Abuse of the Corporate Form For the Purpose of Evading Liability

Even if the above facts are ignored, and there is a finding that the companies acted as a single enterprise periodically, the veil will not be pierced without a finding of "fraud or similar injustice . . . in the defendants' use of the corporate form."[4]  The required fraud or fraud-like injustice must relate directly to the misuse of the corporate structure.  Accordingly, courts examine closely the motivation for the companies' operations.  The veil piercing standard is so exacting that even if the relationship between the companies left the subsidiaries without sufficient capital to pay their liabilities, the veil will not be pierced without evidence that the corporate relationship operated with a fraudulent or unjust purpose.  *See Celotex Corp. v. Hillsborough Holdings Corp. (In re Hillsborough Holdings Corp.)*, 176 B.R. 223 (M.D. Fla. 1994) (upstreaming of assets to parent and rendering subsidiary judgment-proof in face of asbestos liability insufficient to pierce corporate veil where assets were not transferred for specific purpose of evading asbestos liability).

There is no evidence in the record that ASARCO took assets from the subsidiaries to evade asbestos-related liability or for any fraudulent purpose.  Indeed, documents show that when ASARCO did receive payments from the subsidiaries, the subsidiaries received fair consideration in return, including debt cancellation and management and administrative services.[5]

(b)   Unlike The Expert Damages Reports Of ASARCO And Creditors' Committee, The Asbestos Claimants' Committee And FCR's Expert Damages Report Contains Serious Flaws

On March 5, 2007, the parties submitted their estimates of the maximum aggregate asbestos-related liability of the Asbestos Subsidiary Debtors.  The estimates ranged from a low of $180 million to a maximum of $2.655 billion.  The Parent believes that subsequent developments, including the depositions of the various experts engaged to

---

[4]      *Brown v. Gen. Elec. Capital Corp. (In re Foxmeyer)*, 290 B.R. 229, 236 (Bankr. D. Del. 2003) (quoting *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 269 (D. Del. 1989)); *see also Whatley v. Merit Distrib. Servs.*, Nos. Civ. A. 99-0166-CB-S & 99-0167-CB-S, 2001 WL 228053, at *2 (S.D. Ala. Feb. 5, 2001) (plaintiff must "show fraud in asserting the corporate existence or must show that recognition of the corporate existence will result in injustice and/or inequitable consequences").

[5]      *See also Mobil Oil Corp.*, 718 F. Supp. at 260 (declining to pierce the corporate veil without requisite injustice even though the parent and subsidiary had the same officers and directors; for a short time, the parent and subsidiary went by the same name, the parent held all the stock of the subsidiary, the companies did not keep minutes of any meetings and the obligations of the parent were paid from the account of the subsidiary); *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. Civ. A. 1131, 1989 WL 110537, at *6 (Del. Ch. Sept. 19, 1989) ("Such a transfer of assets … is not necessarily a basis for piercing the corporate veil.  The plaintiffs must also show that such transfers were done to defraud creditors or were done merely to siphon off corporate assets, rather than to repay outstanding loans.").

calculate such aggregate liabilities, revealed serious flaws in the expert damages report submitted on behalf of the Asbestos Claimants' Committee and the FCR. Accordingly, the Plan Sponsors believe that, if the Asbestos Contested Matter were fully tried, the Bankruptcy Court would ultimately determine that, even if ASARCO has any liability for the Derivate Asbestos Claims, the aggregate liability is much closer to the low end of the range above.

For these reasons, the Plan contemplates that the issue of ASARCO's aggregate liability on the Derivative Asbestos Claims would be submitted to the Bankruptcy Court for a final determination. If at least 75% the Holders of the Asbestos Personal Injury Claims and the FCR (representing the holders of Asbestos Demands) agree to support the Section 524(g) Treatment, then the Plan Sponsors believe will cause Cash in the aggregate amount of ASARCO's liability, as determined by Final Order, to be contributed to a Section 524(g) Trust. The amount payable on account of individual Claims would thereafter be determined by procedures developed by the Asbestos Claimants' Committee and the FCR and approved by the Bankruptcy Court. If such Section 524(g) Treatment is not accepted, then one of the alternative treatments described in Section 3.4(e) below would go into effect.

## 2.5    Environmental Issues

As set forth in great detail in the Debtors' Disclosure Statement, numerous Claims have been asserted against ASARCO by the federal government, as well as a number of state and local governments, Indian tribes and private persons, under federal and state environmental laws (the "Environmental Claims"). As with the Derivative Asbestos Claims, all parties agreed initially that, without resolving or at least estimating these Claims, no reorganization plan for the Debtors could be formulated or confirmed. The disclosure statement relating to the Debtors' Disclosure Statement states that the aggregate amount of **asserted** Environmental Claims (when analyzed to eliminate obvious duplication) is approximately $6.5 billion. Although no case management orders were entered for the majority of the remaining unresolved Environmental Claims (the "Miscellaneous Federal and State Environmental Claims"), case management orders have been entered in connection with the resolution of other Environmental Claims, and could be used as a template to establish the necessary procedures.

By mid-October, 2007, the estimation proceedings with respect to what the Debtors' Plan classifies as the Residual Environmental Claims (i.e., those relating to the Coeur d'Alene, Tacoma and Omaha sites) were completed and decisions were pending. No further proceedings are required for the Court to rule on the estimation of the Residual Environmental Claims.

The mediation referred to above relating to the determination of the Debtors' liability on account of the Derivative Asbestos Claims, however, almost immediately expanded to include a global negotiation of the terms of the Debtors' Plan. The Department of Justice (the "DOJ"), which represented the federal government in connection with its Environmental Claims, joined the mediation. Thereafter, the Debtors and the DOJ requested the Court not to rule on the Residual Environmental Claims. After the Debtors decided not to proceed to a ruling on the Residual Environmental Claims, only minimal, if any, further action was taken to estimate the Miscellaneous Federal and State Environmental Claims (together with the Residual Environmental Claims, the "Unresolved Environmental Claims"). The Debtors' Plan requests the Bankruptcy Court to approve the terms of several settlements of Environmental Claims (including the settlement of the Unresolved Environmental Claims). According to the Debtors, these settlements obviate any need to proceed with the Debtors' Environmental Estimation Motion. As with the Derivative Asbestos Settlement, however, the Plan Sponsors oppose the settlement of the Unresolved Environmental Claims set forth in the Debtors' Plan. The Plan Sponsors propose to conclude the estimation of the Unresolved Environmental Claims and to pay, in Cash, the aggregate amount determined by Final Order. Those estimations that have previously been concluded would also be Paid in Full, in Cash, on the Effective Date of the Plan. Additionally, the Plan Sponsors intend to have Reorganized ASARCO comply with the terms of the Mission Mine Settlement, as attached to the Debtors' Plan as Exhibits 15A and 15B.

## 2.6    Plan Sponsors' Megaclaims Motion

On August 26, 2008, the Plan Sponsors filed a motion (the "Plan Sponsors' Megaclaims Motion") seeking to have the Bankruptcy Court determine the maximum amount of Asbestos Personal Injury Claims as well as Unresolved Environmental Claims for purposes of distributions under the Plan and the Debtors' Plan. The holders of Asbestos Personal Injury Claims previously agreed that estimation could be conducted for purposes of distribution. In addition, the Bankruptcy Court previously entered an Order, dated March 23, 2007, providing for estimation of environmental claims, with respect to unowned portions of certain sites, for purposes of allowance, voting, and distribution. The Plan Sponsors believe that the relief requested in the Plan Sponsors' Megaclaims Motion, if granted, will enable the Bankruptcy Court to liquidate the relevant claims efficiently and will enable the claims determination process

with respect to these Class 5 and Class 8 Claims to proceed on a parallel track with the plan confirmation process such that distributions to creditors could be made on or close to the Effective Date.  If the Bankruptcy Court grants the relief requested in the Plan Sponsors' Megaclaims Motion, the Plan Sponsors intend, with respect to Class 8 Miscellaneous Claims, for the Bankruptcy Court's estimation to serve as the sole claims liquidation process for such Claims, unless the Bankruptcy Court determines that the Claims must be liquidated in another forum to be unimpaired.  If either the Plan Sponsors or the holders of Asbestos Personal Injury Claims and/or Unresolved Environmental Claims do not agree with the outcome of the estimation, such party could appeal the ruling and any recoveries to Holders of such Claims could be delayed in the event of such an appeal.

2.7     Sales Process and Competing Plan

ASARCO has pursued a process to sell its assets over the Parent's objection.  On February 4, 2008, ASARCO filed a motion (the "Bid Procedures Motion") seeking the Court's approval of a one-step process aimed at selling substantially all of ASARCO's assets as a cornerstone for a plan of reorganization.  The Bankruptcy Court approved the Bid Procedures Motion on an interim basis over the Parent's objections.  Subsequently on April 30, 2008, without waiving any of its objections, the Parent submitted to ASARCO, as its Qualifying Bid (as such term is defined in the Bid Procedures Motion), a stand-alone plan that pays all Allowed Claims in full or otherwise leaves them unimpaired (the "Full Payment Plan").  The Parent believed the Full Payment Plan yielded the best possible recoveries for all constituents and, therefore, that it would be selected as the winning bid.  At the Plan Sponsor Selection Meeting (as defined in the Bid Procedures Motion) held on May 22 and 23, 2008, however, the Board did not select the Full Payment Plan, but instead chose the bid by Sterlite (USA), Inc. ("Sterlite") as the Successful Bid.

On June 2, 2008, ASARCO filed a motion (the "Bid Protections Motion") seeking court approval of the Board's selection of Sterlite's bid and certain bid protections required therein.  In response, the Parent (i) objected to approval of both the Bid Procedures and Bid Protections Motions on a final basis on the grounds, among others, that such procedures and protections were not warranted under applicable law and constituted an impermissible sub rosa plan, and (ii) renewed its motion for authority over the settlement of Claims by ASARCO.  On July 1, 2008, the Bankruptcy Court entered a final order approving the Bid Procedures and Bid Protections Motions.  The Parent appealed this order to the District Court.  Oral argument was conducted on August 20, 2008; no ruling has yet been issued.  The Debtors' Plan is premised on implementing the sale to Sterlite, terminating the Parent's equity interest in ASARCO, and distributing the cash realized upon such a sale ($2.6 billion, but subject to adjustment pursuant to the terms of the Sterlite plan support agreement) plus certain assets that Sterlite is not purchasing.  In particular, the Debtors' Plan contemplates that certain litigation including a number of actions against the Plan Sponsors and certain of their affiliates would continue, and damages recovered (if any) would be distributed to certain Claimants.  The Plan Sponsors believe that actions against the Plan Sponsors or their Affiliates are without merit and ultimately worthless.

The Plan Sponsors assert that the Debtors' Plan is unconfirmable for a number of reasons, including the payment of more than 100% of the allowable amounts of "Derivative Asbestos Claims" and "Residual Environmental Claims" (as those terms are used in the Debtors' Plan).  The Debtors' Plan, if confirmed, would violate the absolute priority rule by providing distributions to those Classes potentially far in excess of the aggregate amounts of Claims in such Classes, while providing zero distributions to the holders of Claims and Interests in Classes 10 through 14.  Under the Debtors' Plan, Classes 5 and 9 would be entitled to share 50-50 in unlimited Litigation Proceeds after payment of certain prior costs and expenses.  The maximum aggregate amount asserted for Claims and Demands in Classes 5 and 9 is $5.2 billion.  The aggregate consideration to be potentially paid to Classes 5 and 9 is $9.87 billion, exceeding the maximum asserted amount of such Claims by at least $4.6 billion.  In contrast to this $4.6 billion windfall, the Debtors' Plan potentially provides no distributions to any of the Classes below Class 9 (i.e., Classes 10 through 14).  Even if there are any excess Litigation Proceeds after payment in full of all Allowed Class 5 and 9 Claims, then such proceeds – – rather then being paid to the junior classes of claims and equity interests – – will be paid to a charity engaged in the treatment of, research regarding, or payment of, claims related to asbestos caused disorders and to the federal government's Hazardous Substance Superfund.  The absolute priority rule provides that a senior class cannot receive more than full compensation for its claims.  Courts consistently deny confirmation under section 1129(b) of the Bankruptcy Code where senior classes receive (or are likely to receive) more than 100% of the allowed amount of their claims.  Moreover, because the Plan Sponsors have offered to provide more consideration to the ASARCO estate than will be realized upon the sale to Sterlite, the sale itself is improper as set forth more fully above.  Notwithstanding the above, the Debtors assert that the Debtors' Plan complies with Sections 1129(a) and (b) and will be confirmed.  Regarding the sale process, the Debtors disagree with the Plan Sponsors' characterization, and assert that the Plan Sponsors had a full and fair opportunity to bid and declined to do so.

The Bankruptcy Court modified the Debtors' exclusive right to propose a plan of reorganization to permit the Plan Sponsors to file a competing plan. The Plan submitted by the Plan Sponsors is premised upon the Parent retaining its equity interests in ASARCO, and ASARCO continuing operations as a going concern. The Plan also contemplates the release of the various litigation claims asserted against the Plan Sponsors and their affiliates.

The Plan provides that the Parent and AMC will fund the Reorganizing Debtors' reorganization with a contribution of $2.7 billion plus, to the extent required by the Bankruptcy Court to demonstrate feasibility, a $440 million guaranty by AMC. This contribution, together with the Reorganizing Debtors' cash on hand (at least $1 billion) and certain other assets, as detailed in the Plan, will fund the Reorganizing Debtors' obligations to creditors, including payment in full of all Claims, in accordance with the priorities established by the Bankruptcy Code. As to certain Classes of Claims, the Plan provides for the reinstatement of such Claims which would be addressed by the Reorganized Debtors in the ordinary course of business. To the extent of any shortfall in paying Claims or to the extent the Plan reinstates a class of Claims, the value of Reorganized ASARCO (worth approximately $2.6 billion, based on Sterlite's bid) also remains available to the holders of such Claims. **Accordingly, the Plan Sponsors submit that the total consideration provided under their Plan is approximately $6.74 billion.**

2.8     Hernandez Litigation

Miguel Hernandez filed a proof of claim for $1,000,000 and an adversary proceeding (No. 08-2010) against ASARCO claiming unlawful discrimination in employment based on religion. ASARCO objected to the claim. A parallel action in Federal District Court was filed pre petition, but is currently abated. In addition to his claims for money damages, Hernandez seeks equitable relief including (i) an injunction against ASARCO engaging in any employment practice which discriminates on the basis of religion; (ii) an order requiring ASARCO to provide equal employment opportunities for religious observance and which eradicates the effects of ASARCO's alleged past and present unlawful employment practices; and (iii) reinstatement. ASARCO denies liability for any and all of the asserted claims. ASARCO also believes all of Hernandez's asserted claims are dischargeable in bankruptcy, and that they will be discharged upon confirmation of its plan, so that, at most, they might result in a general unsecured claim if Hernandez prevails at trial. Hernandez believes he will prevail on all his claims, including his claims for equitable relief, and that all his equitable claims are not dischargeable in bankruptcy as a matter of law, so that any plan purporting to do so is not confirmable as a matter of law. The Parent and AMC take no position with respect to the merits of this dispute, but agree with ASARCO that Hernandez' claims are dischargeable in bankruptcy. Hernandez is expected to object to confirmation of the Debtors' plan and this Plan, and has not waived any of his plan objections.

SECTION 3
SUMMARY OF THE PROPOSED PLAN

3.1     General.

The following is a summary of certain key provisions of the Plan. Before completing the Request for Election, holders of Asbestos Personal Injury Claims are referred to, and encouraged to review, the relevant provisions of the Plan, Plan Documents, and Bankruptcy Code carefully since their rights could be affected. They also are encouraged to review the Plan and this Disclosure Statement with their counsel or other advisors. Note that other provisions of the Plan not summarized in this Section 3 may be summarized elsewhere in this Disclosure Statement.

Please note that, under the Plan, "Paid in Full" means "paid in Cash the Allowed Amount of the holder's Claim with Post-Petition Interest," and "Post-Petition Interest" means "interest on an Allowed Claim or any unpaid portion thereof, (a) to the extent a written agreement forming the basis for such Allowed Claim provides for interest, at the rate specified in such written agreement, or otherwise (b) compounded annually, calculated at the rate of 3.84 percent, in accordance with section 1961 of title 28 of the United States Code, in each case from August 10, 2005 to and including five Business Days immediately prior to the date a distribution is made, until such amounts are fully satisfied. After the Effective Date, interest shall accrue on any unpaid portion of an Allowed Claim and on any unpaid Post-Petition Interest at the same rate and to the same extent."

3.2     Classification.

(a)     Generally. In accordance with section 1122 of the Bankruptcy Code, Claims and Interests, other than Administrative Claims and Priority Tax Claims, will be divided in Classes and receive such treatment as described in Article IV of the Plan. Administrative Claims and Priority Tax Claims will be treated as set forth in Article II of the Plan.

(b)    <u>Classes</u>.  Claims against, and Interests in, the Reorganizing Debtors are grouped in the following Classes (which shall be deemed divided into Subclasses or, in the case of Subclasses 9A and 9B, into sub-Subclasses) against each of the Reorganizing Debtors for purposes of the Plan in accordance with section 1122(a) of the Bankruptcy Code:

(1)    <u>Class 1 – Priority Claims</u>.  Class 1 consists of all Priority Claims against each of the  Reorganizing Debtors.

(2)    <u>Class 2 – Secured Claims</u>.  Class 2 consists of all Secured Claims against each of the Reorganizing Debtors.

(3)    <u>Class 3 – Trade and General Unsecured Claims</u>.  Class 3 consists of all Trade and General Unsecured Claims against each of the Reorganizing Debtors.

(4)    <u>Class 4 – Bondholders' Claims</u>.  Class 4 consists of all Bondholders' Claims against each of the Reorganizing Debtors.

(5)    <u>Class 5 – Asbestos Personal Injury Claims</u>.  Class 5 consists of all Asbestos Personal Injury Claims against each of the Reorganizing Debtors.

(6)    <u>Class 6 – Toxic Tort Claims</u>.  Class 6 consists of all Toxic Tort Claims against each of the Reorganizing Debtors.

(7)    <u>Class 7 – Previously Settled Environmental Claims</u>.  Class 7 consists of all Previously Settled Environmental Claims against each of the Reorganizing Debtors.

(8)    <u>Class 8 – Miscellaneous Environmental Claims</u>.  Class 8 consists of all Miscellaneous Environmental Claims against the Reorganizing Debtors.

(9)    <u>Class 9 – Reinstated Environmental Claims</u>.  Class 9 consists of all Reinstated Environmental Claims against each of the Reorganizing Debtors.

(10)  <u>Class 10 – Late-Filed Claims</u>.  Class 10 consists of all Late-Filed Claims against each of the Reorganizing Debtors.

(11)  <u>Class 11 – Subordinated Claims</u>.  Class 11 consists of all Subordinated Claims against each of the Reorganizing Debtors.

(12)  <u>Class 12 – Interests in ASARCO</u>.  Class 12 consists of all Interests in ASARCO.

(13)  <u>Class 13 – Interests in Reorganizing Subsidiaries</u>.  Class 13 consists of all Interests in each of the Reorganizing Subsidiaries.

3.3    <u>Treatment of Unclassified Claims and Demands</u>.

(a)    <u>Administrative Claims</u>.

Claims that are entitled to administrative priority under section 503 of the Bankruptcy Code are treated under Article 2.1 of the Plan.  Under that provision, each holder of an Allowed Administrative Claim (except any holder that agrees to other, lesser treatment) will be Paid in Full, in Cash, in full satisfaction, settlement, release, extinguishment, and discharge of such Claim, on the later of the Effective Date or the date upon which such Administrative Claim becomes an Allowed Claim; *provided*, *however*, that (a) Allowed Administrative Claims representing (1) postpetition liabilities incurred in the ordinary course of business by the Reorganizing Debtors or (2) postpetition contractual liabilities arising under loans or advances to the Reorganizing Debtors, whether or not incurred in the ordinary course of business, will be paid in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto; and (b) the Allowed Administrative Claims of Professional Persons will be paid pursuant to Final Order of the Bankruptcy Court.

Chase will receive the Allowed Amount of any Administrative Claim under the Credit Facility in Cash, on the Effective Date, in full satisfaction, settlement, release, extinguishment, and discharge of such Claim.  The Settled Asbestos Insurance Companies will each have an Allowed Administrative Claim for the Pre-524(g) Indemnity (as such term is defined in the Asbestos Insurance Settlement Agreement), in accordance with the terms and conditions of the Asbestos Insurance Settlement Agreement.

Any Administrative Claims of the United States or any individual state under civil Environmental Laws relating to the Designated Properties will be addressed through the Environmental Liquidation Trust, as provided in Article 8.1 of the Plan.

      (b)      <u>Priority Tax Claims</u>.

Article 2.2 of the Plan provides for treatment of Allowed Priority Tax Claims.  Under Article 2.2, each holder of an Allowed Priority Tax Claim (except any holder that agrees to other, lesser treatment), at the election of the Plan Sponsors, will (1) be Paid in Full, in full satisfaction, settlement, release, extinguishment, and discharge of such Claim, on the later of the Effective Date or the date upon which such Priority Tax Claim becomes an Allowed Claim, or (2) receive treatment in any other manner such that its Allowed Priority Tax Claim will not be impaired pursuant to section 1124 of the Bankruptcy Code, including payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code.

      (c)      <u>Demands</u>.

Article 2.3 of the Plan provides for treatment of Demands.  Under Article 2.3, if the Section 524(g) Treatment goes into effect, as set forth in Article 4.2(e) of the Plan, Demands will be included in the Section 524(g) Treatment accorded to Class 5 Asbestos Personal Injury Claims, and will be determined, processed, liquidated and paid pursuant to the terms and conditions of the Section 524(g) Trust Distribution Protocol and the Section 524(g) Trust Agreement.  If the Section 524(g) Treatment does not go into effect, Demands will not be affected by the Plan and will remain liabilities of the applicable Reorganized Debtor with additional recourse to the AMC Guaranty.

The FCR is entitled to make an election regarding whether to accept or reject the Section 524(g) Treatment.

3.4      <u>Treatment of Claims and Interests</u>.

Article IV of the Plan sets forth the treatment to be provided each of the Classes of Claims and Interests under the Plan.  The following is a summary of the treatment being provided under the Plan to each Class:

      (a)      <u>Class 1 – Priority Claims</u>.

      (1)      <u>Voting Rights</u>.

This Class is unimpaired. Holders of Priority Claims in Class 1 are presumed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

      (2)      <u>Treatment Under the Plan</u>.

Class 1 Priority Claims are treated in Article 4.2(a) of the Plan.  On the Effective Date, or, if later, the date that such Priority Claim becomes due in the ordinary course, each holder of an Allowed Priority Claim (except any holder that agrees to other, lesser treatment) will be Paid in Full, on the later of the Effective Date or the date upon which such Priority Claim becomes an Allowed Claim.

      (b)      <u>Class 2 – Secured Claims</u>.

      (1)      <u>Voting Rights</u>.

The Plan Sponsors will make their election prior to the Confirmation Hearing.  This Class is unimpaired.  Holders of Secured Claims in Class 2 are presumed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

Mitsui asserts that it has a claim secured by all silver inventory in ASARCO's possession, custody or control as of the petition date and the proceeds thereof, including $21,216,276.25 in the Mitsui Cash Collateral Account (as established by Court order, see Docket nos. 58, 1241 and 3273) and any silver imbedded in structures located at the El Paso Smelter, TX and East Helena, MT facilities. While the Plan Sponsors are unable to opine as to the validity of Mitsui's assertion and are not in control of the Reorganizing Debtors currently, they intend that $21,216,276.25 will remain segregated in the Mitsui Cash Collateral Account until Mitsui's Secured Claim is allowed or disallowed by final court order.

(2)  <u>Treatment Under the Plan</u>.

Class 2 Secured Claims are treated in Article 4.2(b) of the Plan.  Each holder of an Allowed Secured Claim will, at the election of the Plan Sponsors, (1) be Paid in Full, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, on the later of the Effective Date or the date that such Secured Claim becomes due in the ordinary course, (2) be Reinstated, or (3) receive from the applicable Reorganized Debtor all Collateral securing such Allowed Secured Claim.

Except as provided herein, any holder of an Asbestos Personal Injury Claim with a Lien against any property of the Reorganizing Debtors other than proceeds of an Asbestos Insurance Policy will retain the Lien securing such Claim, subject to the Plan Sponsors' election in Article 4.2(b) of the Plan.  If the Section 524(g) Treatment goes into effect, Asbestos Personal Injury Claims which are secured by Liens against proceeds of an Asbestos Insurance Policy will be included in the treatment accorded Class 5 Asbestos Personal Injury Claims, as set forth in Articles 4.1 and 4.2(e) of the Plan, and will be determined, processed, liquidated, and paid pursuant to the terms and conditions of the Section 524(g) Trust Distribution Protocol and the Section 524(g) Trust Agreement; <u>provided</u>, <u>however</u>, that the Section 524(g) Trust may assert any rights (including avoidance rights), defenses (including affirmative defenses) and objections that the Reorganizing Debtors have against such Claims, which rights, defenses, and objections are transferred to the Section 524(g) Trust.

Each Secured Claim will be deemed to be in a separate sub-Class of Class 2 for all purposes thereunder.

(c)  <u>Class 3 – Trade and General Unsecured Claims</u>.

(1)  <u>Voting Rights</u>.

This Class is unimpaired.  Holders of Trade and General Unsecured Claims in Class 3 are presumed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

(2)  <u>Treatment Under the Plan</u>.

Class 3 Trade and General Unsecured Claims are treated in Article 4.2(c) of the Plan. Each holder of an Allowed Trade and General Unsecured Claim (except any holder that agrees to other, lesser treatment) will be Paid in Full, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, on the later of the Effective Date or the date on which such Trade and General Unsecured Claim becomes an Allowed Claim.

(d)  <u>Class 4 – Bondholders' Claims</u>.

(1)  <u>Voting Rights</u>.

This Class is unimpaired.  Holders of Bondholders' Claims in Class 4 are presumed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

(2)  <u>Treatment Under the Plan</u>.

Class 4 Bondholders' Claims are treated in Article 4.2(d) of the Plan.  Each holder of an Allowed Bondholders' Claim will, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, at the election of the Plan Sponsors (1) be Reinstated on the Effective Date, or (2) be Paid in Full on the later of the Effective Date or the date upon which such Bondholders' Claim becomes an Allowed Claim.

The Plan Sponsors will make their election prior to the Confirmation Hearing.

The Official Committee of Unsecured Creditors of ASARCO LLC (the "<u>ASARCO Committee</u>") asserts that, to the extent that the Plan Sponsors elect to Reinstate the Bondholders' Claims, it has been informed litigation would ensue including, by way of example but not exclusion, litigation over whether Reinstatement is permissible under the terms of the indentures governing each of the Notes, and under otherwise applicable law.  The ASARCO Committee asserts that litigation over these issues would have the effect of delaying the confirmation process and possibly rendering the Plan unconfirmable.  The Plan Sponsors disagree that issues involving Reinstatement of Bondholders' Claims would lead to delay or non-confirmation of the Plan.

(e)    <u>Class 5 – Asbestos Personal Injury Claims</u>.

(1)  <u>Voting Rights</u>.

This Class is unimpaired and holders of Asbestos Personal Injury Claims in Class 5 are deemed to have accepted the Plan; *however*, the holders of Asbestos Personal Injury Claims in Class 5 are entitled to elect to accept or reject the Section 524(g) Treatment.

(2)  <u>Treatment Under the Plan</u>.

Class 5 Asbestos Personal Injury Claims are treated in Article 4.2(e) of the Plan. Holders of Asbestos Personal Injury Claims will receive one of three possible treatments under the Plan: (i) Section 524(g) Treatment (as described below), if the Section 524(g) Treatment is accepted by at least 75% in number of the holders of Asbestos Personal Injury Claims actually making the election and by the FCR; (ii) Primary Asbestos Treatment (as described below), if the Section 524(g) Treatment does not go into effect; or (iii) Alternative Asbestos Treatment (as described below), if the Section 524(g) Treatment does not go into effect <u>and</u> the Bankruptcy Court finds that the Primary Asbestos Treatment does not leave the holders of Asbestos Personal Injury Claims Unimpaired.

(i)    <u>Section 524(g) Treatment</u>.

The Section 524(g) Treatment is described in Article 4.2(e)(i) of the Plan.  If the Section 524(g) Treatment described in this subsection is accepted by at least 75% in number of the holders of Asbestos Personal Injury Claims actually making the election and by the FCR, then, on the Effective Date, or as soon thereafter as the Bankruptcy Court establishes the aggregate amount of consideration necessary to satisfy the requirements of section 524(g) of the Bankruptcy Code, the Section 524(g) Trust will be established and funded with the Section 524(g) Trust Assets, and liability of the Reorganizing Debtors for all Asbestos Personal Injury Claims and Demands will be assumed by, and channeled to, the Section 524(g) Trust without further act or deed, and satisfied as set forth therein. The Section 524(g) Trust is described in Article VI below.  All Asbestos Personal Injury Claims and Demands will be processed, liquidated and paid pursuant to the terms and provisions of the Section 524(g) Trust Distribution Protocol and the Section 524(g) Trust Agreement.  While funds sufficient to fund the Section 524(g) Trust will be transferred to the Plan Administrator on the Effective Date, such funds will not be transferred to the Section 524(g) Trust until such time as there is a Final Order determining the amount of consideration necessary to fund the Section 524(g) Trust.  If either the Plan Sponsors or the holders of Asbestos Personal Injury Claims and/or Demands do not agree with the outcome of such determination, such party could appeal the ruling and any recoveries to Holders of Class 5 Claims and Demands could be delayed in the event of an appeal.  Such an appeal will <u>not</u> result in a delay of the effectiveness of the Plan (as set forth in Section 3.8(a) below).  The sole recourse of

the holder of an Asbestos Personal Injury Claim or Demand will be to the Section 524(g) Trust and the Section 524(g) Trust Distribution Protocol, and such holder will have no rights whatsoever at any time to assert such holder's Claim or Demand against any Reorganizing Debtor, any Reorganized Debtor, or any ASARCO Protected Party.  Without limiting the foregoing, on the Effective Date, all Persons will be permanently and forever stayed, restrained and enjoined from taking any enjoined actions against any ASARCO Protected Party (or the property or interest in property of any ASARCO Protected Party) for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on or with respect to any Asbestos Personal Injury Claim or Demand (the foregoing treatment, the "Section 524(g) Treatment").

(ii)      Primary Asbestos Treatment.

The Primary Asbestos Treatment is described in Article 4.2(e)(ii) of the Plan.  In the alternative, if the Section 524(g) Treatment is accepted by less than 75% in number of the holders of Asbestos Personal Injury Claims actually making the election and/or if the FCR does not accept the Section 524(g) Treatment, then, on the Effective Date, or as soon thereafter as the Bankruptcy Court establishes the aggregate amount of consideration necessary to satisfy all Asbestos Personal Injury Claims in full, the Asbestos Claims Trust will be established and funded with the Asbestos Claims Trust Assets for the benefit of holders of Asbestos Personal Injury Claims, and all Asbestos Personal Injury Claims will be processed, liquidated and paid pursuant to the terms and provisions of the Asbestos Claims Trust Distribution Protocol and the Asbestos Claims Trust Agreement.  While funds sufficient to fund the Asbestos Claims Trust will be transferred to the Plan Administrator on the Effective Date, such funds will not be transferred to the Asbestos Claims Trust until such time as there is a Final Order determining the amount of consideration necessary to fund the Asbestos Claims Trust.  If either the Plan Sponsors or the holders of Asbestos Personal Injury Claims do not agree with the determination of such consideration, such party could appeal the ruling and any recoveries to Holders of Class 5 Claims could be delayed in the event of an appeal.  Such an appeal will not result in a delay of the effectiveness of the Plan (as set forth in Section 3.8(a) below).  The Asbestos Claims Trust is described in Section 5 below.  The Asbestos Claims Trust will assume all liabilities of the Reorganizing Debtors with respect to all Asbestos Personal Injury Claims.  Upon funding in full of the Asbestos Claims Trust, the sole recourse of the holders of Asbestos Personal Injury Claims will be to the Asbestos Claims Trust and Asbestos Claims Trust Distribution Protocol, and such Asbestos Personal Injury Claims will not be "Disputed Claims" for any purposes under the Plan (the foregoing treatment, the "Primary Asbestos Treatment").

(iii)     Alternative Asbestos Treatment.

The Alternative Asbestos Treatment is described in Article 4.2(e)(iii) of the Plan.  In the further alternative, if the Section 524(g) Treatment is accepted by less than 75% in number of the holders of Asbestos Personal Injury Claims actually making the election and/or if the FCR does not accept the Section 524(g) Treatment, *and* the Bankruptcy Court finds that the Primary Asbestos Treatment does not leave the holders of Asbestos Personal Injury Claims Unimpaired, then, unless the Plan Sponsors and the holder of any such Asbestos Personal Injury Claim agree to a different treatment, each Asbestos Personal Injury Claim will be Reinstated on the Effective Date, which means that the Asbestos Personal Injury Claims and Demands will be litigated in state or federal court as if no chapter 11 case had been commenced.  The Reorganized Debtors will have the right to challenge the allowance of any Asbestos Personal Injury Claims on any ground available in applicable law or agreements.  When an Asbestos Personal Injury Claim has been resolved by (x) Final Order or (y) settlement approved by the Plan Sponsors, such Claim will be paid out of the Disputed Claims Reserve, with additional recourse to the AMC Guaranty (the foregoing treatment, the "Alternative Asbestos Treatment").  The Debtors have asserted, in the Debtors' Disclosure Statement, that historically the costs of litigation asbestos claims has exceeded the cost of settlements on such claims.  While the Plan Sponsors are unable to estimate the cost of liquidating the Asbestos Personal Injury Claims if the Alternative Asbestos Treatment goes into effect, such costs will likely be substantial, although the Plan Sponsors believe they will be less than the Debtors' historical expenditures.  The Debtors assert that the Disputed Claims Reserve and the AMC Guaranty are capped, and that there is risk that such funds will be insufficient to pay all Claims.   The Plan Sponsors disagree.

(f)        Class 6 – Toxic Tort Claims.

       (1)   Voting Rights.

This Class is unimpaired.  Holders of Toxic Tort Claims in Class 6 are presumed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

       (2)   Treatment Under the Plan.

Class 6 Toxic Tort Claims are treated in Article 4.2(f) of the Plan.  Each holder of an Allowed Toxic Tort Claim (except any holder that agrees to other, lesser treatment) will be Paid in Full, in full satisfaction, settlement, release, extinguishment, and discharge of such Claim, on the later of the Effective Date or the date on which such Toxic Tort Claim becomes an Allowed Claim.

(g)        Class 7 – Previously Settled Environmental Claims.

       (1)   Voting Rights.

This Class is unimpaired.  Holders of Previously Settled Environmental Claims in Class 7 are presumed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

       (2)   Treatment Under the Plan.

Class 7 Previously Settled Environmental Claims are treated in Article 4.2(g) of the Plan.  Each holder of an Allowed Previously Settled Environmental Claim (except any holder that agrees to other, lesser treatment) will be Paid in Full on the Effective Date, in full satisfaction, settlement, release, extinguishment and discharge of such Claim as provided in the settlement agreement relating to such Claim.

(h)        Class 8 – Miscellaneous Environmental Claims.

       (1)   Voting Rights.

This Class is unimpaired.  Holders of Miscellaneous Environmental Claims in Class 8 are presumed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

       (2)   Treatment Under the Plan.

Class 8 Miscellaneous Environmental Claims are treated in Article 4.2(h) of the Plan. Each holder of an Allowed Miscellaneous Environmental Claim (except any holder that agrees to other, lesser treatment) will be Paid in Full, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, on the later of the Effective Date or the date upon which such Miscellaneous Environmental Claim becomes an Allowed Claim.  Miscellaneous Environmental Claims will be liquidated by the Bankruptcy Court, unless the Bankruptcy Court determines that any such Claim must be liquidated in another forum to be unimpaired.

(i)        Class 9 – Reinstated Environmental Claims.

       (1)   Voting Rights.

This Class is unimpaired.  Holders of Reinstated Environmental Claims in Class 9 are presumed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

       (2)   Treatment Under the Plan.

Class 9 Reinstated Environmental Claims are treated in Article 4.2(i) of the Plan.

Class 9 consists of two sub-Classes of Claims.

Subclass 9A consists of Claims based on the Assumed Environmental Liabilities.  Subclass 9A Claims will be Reinstated on the Effective Date and, from and after the Effective Date, the applicable Reorganized Debtor will assume, pay, perform and discharge when due all of its Assumed Environmental Liabilities; *provided* that, if the applicable  Reorganized Debtor fails to so satisfy any Subclass 9A Claim, the applicable Claimant will have additional recourse to the AMC Guaranty.

Subclass 9B consists of Claims of the United States or any individual state under civil Environmental Laws relating to the Designated Properties.  Subclass 9B Claims will be Reinstated on the Effective Date and will be obligations of the Reorganized Debtors, except that, for administrative convenience, such Claims will be addressed through the Environmental Liquidation Trust, as provided in Article 8.1 of the Plan; provided, that if the Reorganized Debtors fail to satisfy any of the Subclass 9B Claims, the applicable Claimant will have additional recourse to the AMC Guaranty.

(j)    Class 10 – Late-Filed Claims.

(1)    Voting Rights.

This Class is unimpaired.  Holders of Late-Filed Claims in Class 10 are presumed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

(2)    Treatment Under the Plan.

Class 10 Late-Filed Claims are treated in Article 4.2(j) of the Plan.  Each holder of an Allowed Late-Filed Claim (except any holder that agrees to other, lesser treatment) will be Paid in Full, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, on the later of the Effective Date or the date upon which such Late-Filed Claim becomes an Allowed Claim.

(k)    Class 11 – Subordinated Claims.

(1)    Voting Rights.

This Class is unimpaired.  Holders of Subordinated Claims in Class 11 are presumed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

(2)    Treatment Under the Plan.

Class 11 Subordinated Claims are treated in Article 4.2(k) of the Plan.  Each holder of an Allowed Subordinated Claim (except any holder that agrees to other, lesser treatment) will be Paid in Full, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, on the later of the Effective Date or the date upon which such Subordinated Claim becomes an Allowed Claim.

(l)    Class 12 – Interests in ASARCO.

(1)    Voting Rights.

This Class is unimpaired.  Holders of Interests in Class 12 are presumed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

(2)    Treatment Under the Plan.

Class 12 Interests in ASARCO are treated in Article 4.2(l) of the Plan.  Each holder of Class 12 Interests in ASARCO will retain 100% of its Interests in ASARCO, which Interests will automatically convert into Interests in Reorganized ASARCO on the Effective Date.

(m)    Class 13 – Interests in Reorganizing Subsidiaries.

(1) <u>Voting Rights</u>.

This Class is unimpaired.  Holders of Interests in Class 13 are presumed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

(2) <u>Treatment Under the Plan</u>.

Class 13 Interests in the Reorganizing Subsidiaries are treated in Article 4.2(m) of the Plan. Each holder of Class 13 Interests in a Reorganizing Subsidiary will retain 100% of its Interests in such Reorganizing Subsidiary, which Interests will automatically convert into Interests in the applicable Reorganized Subsidiary on the Effective Date.

3.5   <u>Voting Rights</u>.

(a)   <u>Presumed Acceptance of Plan</u>.

Article 5.1 of the Plan provides that Classes 1-13 are not impaired; and, pursuant to section 1126(f) of the Bankruptcy Code, the holders of Claims and Interests in such Classes are conclusively presumed to have voted to accept the Plan.  However, the holders of Asbestos Personal Injury Claims in Class 5 and the FCR are entitled to make an election regarding whether to accept or reject the Section 524(g) Treatment.

(b)   <u>Cramdown</u>.

Article 5.2 of the Plan provides that, if the Court determines by Final Order that one or more Classes are impaired by the Plan and therefore entitled to vote, but all applicable requirements for Confirmation of the Plan are met as set forth in section 1129(a)(1) through (13) of the Bankruptcy Code except subsection (8) thereof, the Plan will be treated as a request by the Plan Sponsors for Confirmation of the Plan in accordance with section 1129(b) of the Bankruptcy Code, notwithstanding the failure to satisfy the requirements of section 1129(a)(8), on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each Class of Claims and Interests that is impaired under, and has not accepted, the Plan.

3.6   <u>Conditions to Effectiveness</u>.

Article 10.1 of the Plan provides that, notwithstanding any other provision of the Plan or any order entered in connection with the Reorganization Cases, the Effective Date of the Plan will not occur until and unless each of the following conditions to effectiveness has been satisfied, or waived pursuant to Article 10.2 of the Plan:

(a)   <u>Disclosure Statement</u>.

The Bankruptcy Court has approved the Disclosure Statement.

(b)   <u>Confirmation Findings and Conclusions</u>.

The District Court makes or affirms the following findings of fact and conclusions of law, provided that findings of fact and conclusions of law with respect to the Section 524(g) Treatment, the Section 524(g) Trust, and the Permanent Channeling Injunction are conditions to effectiveness of the Plan only to the extent the Section 524(g) Treatment is accepted by at least 75% in number of the Holders of Class 5 Claims actually making the election and by the FCR:

(1) As of the Petition Date, one or more of the Reorganizing Debtors has been named as a defendant in personal injury, wrongful death, or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

(2) The Section 524(g) Treatment has been approved by creditors in Class 5 under the Plan in the requisite numbers and amounts required by sections 524(g), 1126, and 1129 of the Bankruptcy Code and by the FCR;

(3)  On the Effective Date, the Section 524(g) Trust shall assume the liabilities of the Reorganizing Debtors with respect to the Asbestos Personal Injury Claims and Demands and shall receive all transfers and assignments set forth herein;

(4)  As of the Effective Date, there were no pending or known property damage actions seeking damages as a result of property damage allegedly caused by or arising out of asbestos or asbestos-containing products;

(5)  The Section 524(g) Trust is to be funded in part by securities of the Asbestos Subsidiary Debtors and by the obligation of the Asbestos Subsidiary Debtors to make future payments;

(6)  The Section 524(g) Trust, upon the Effective Date, is to own a majority of the Interests in the Asbestos Subsidiary Debtors;

(7)  The Section 524(g) Trust shall use its assets and income to pay the Asbestos Personal Injury Claims and Demands;

(8)  The Reorganizing Debtors are likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Asbestos Personal Injury Claims, which are addressed by the Permanent Channeling Injunction and the Asbestos Insurance Company Injunction;

(9)  The actual amounts, numbers, and timing of future Demands cannot be determined;

(10) Pursuit of Demands outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with Claims and future Demands;

(11) The terms of the Permanent Channeling Injunction and the Asbestos Insurance Company Injunction, including any provisions barring actions against third parties, are set out in the Plan and in this Disclosure Statement;

(12) The Section 524(g) Trust shall operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims and Demands, or other comparable mechanisms, that provide reasonable assurance that the Section 524(g) Trust will value, and be in a financial position to pay, all Asbestos Personal Injury Claims and Demands in substantially the same manner;

(13) The FCR was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Permanent Channeling Injunction and the Asbestos Insurance Company Injunction for the purpose of, among other things, protecting the rights of persons that might subsequently assert Demands of the kind that are addressed in the Permanent Channeling Injunction and/or the Asbestos Insurance Company Injunction and that are to be assumed and paid by the Section 524(g) Trust in accordance with the Section 524(g) Trust Documents;

(14) In light of the respective benefits provided, or to be provided, to the Section 524(g) Trust by, or on behalf of, each ASARCO Protected Party, the Permanent Channeling Injunction is fair and equitable with respect to the persons that might subsequently assert Demands against any ASARCO Protected Party;

(15) In light of the respective benefits provided, or to be provided, to the Section 524(g) Trust by a Settling Asbestos Insurance Company in order to receive the benefits of the Asbestos Insurance Company Injunction, the Asbestos Insurance Company Injunction is fair and equitable with respect to the persons who might subsequently assert Demands against any Settling Asbestos Insurance Company;

(16) The Settling Asbestos Insurance Companies are alleged to be directly or indirectly liable for the Asbestos Personal Injury Claims and Demands for one or more of the reasons set forth in section 524(g)(4)(A)(ii) of the Bankruptcy Code;

(17) The Permanent Channeling Injunction and the Asbestos Insurance Company Injunction are integral parts of the Plan and may not be vacated, amended or modified after Confirmation except to the extent expressly provided in Article 12.3(a)(2) and 12.3(b)(2) of the Plan;

(18) The Plan complies with all applicable sections of the Bankruptcy Code, including, to the extent the Section 524(g) Treatment goes into effect, section 524(g) of the Bankruptcy Code;

(19) The Plan Documents which relate to the Section 524(g) Treatment are approved in all respects, and all parties thereto are authorized and directed to perform all their obligations thereunder; and

(20) Approval of all settlements and compromises embodied in the Section 524(g) Treatment is appropriate under Bankruptcy Rule 9019 and applicable law governing approval of such settlements and compromises and shall be ordered as part of the Confirmation Order.

(c)     <u>Confirmation Order</u>.

(1)   The Confirmation Date shall have occurred no later than January 31, 2009.

(2)   The Confirmation Order entered or affirmed by the District Court is acceptable to the Plan Sponsors.

(d)     <u>No Stay</u>.

The Confirmation Order is not stayed pursuant to an order issued by a court of competent jurisdiction.

(e)     <u>Plan Documents</u>.

(1)   The Plan Documents, necessary or appropriate to implement the Plan, other than those which relate to the Section 524(g) Treatment have been executed, in a form acceptable to the Plan Sponsors, delivered and, where applicable, filed with the appropriate governmental or supervisory authorities.

(2)   The Bankruptcy Court has approved the Plan Documents, other than  those that relate to the Section 524(g) Treatment, in all respects and authorized and directed all parties thereto to perform all their obligations thereunder.

(f)     <u>Funding</u>.

The Plan Sponsors have delivered the Plan Sponsor Contribution to the Plan Administrator, and ASARCO has transferred the Distributable Cash to the Plan Administrator; <u>provided</u>, <u>however</u>, that the failure of the Plan Sponsors to provide the Plan Sponsor Contribution will not relieve the Plan Sponsors of their obligation under Article 11.20 of the Plan.

(g)     <u>U.S. Trustee's Fees</u>.

Any fees owed to the U.S. Trustee by the Reorganizing Debtors as of the Effective Date have been paid in full.

(h)     <u>Approval of Asbestos Treatment</u>.

If the Section 524(g) Treatment does not go into effect, the Confirmation order approves the Primary Asbestos Treatment or the Alternative Asbestos Treatment.

(i)     <u>Approval of Plan Settlements</u>.

The Bankruptcy Court has approved all settlements and compromises embodied in the Plan, and has found that such settlements and compromises are appropriate under Bankruptcy Rule 9019 and applicable law governing such approval and such settlements and compromises shall be approved as part of the Confirmation Order.

3.7    Waiver of Conditions to Effectiveness.

Article 10.2 provides that the Plan Sponsors, in their sole discretion, may waive any condition to effectiveness in Article 10.1 of the Plan by filing a notice of such waiver with the clerk of the Bankruptcy Court and by serving a copy of such notice on the Reorganizing Debtors, the U.S. Trustee, the Committees, the FCR, and the DOJ.

3.8    How the Plan Will Be Implemented.

(a)    Sources of Cash and Other Consideration for Distributions.

Article 11.1 of the Plan provides that, on the Effective Date, (i) the Plan Sponsors shall deliver to the Plan Administrator the Plan Sponsor Contribution; (ii) ASARCO shall transfer to the Plan Administrator the Distributable Cash; and (iii) to the extent required by the Bankruptcy Court to determine the feasibility of the Plan, the Plan Sponsors shall execute the AMC Guaranty.  On or after the Effective Date, the Reorganized Debtors may also contribute assets which are not required for Reorganized ASARCO's ongoing business.  The Plan Administrator shall pay Allowed Claims that are to be paid on the Effective Date (or make other payments called for by the Plan), fund the Section 524(g) Trust or Asbestos Claims Trust, as applicable, fund the Environmental Liquidation Trust, and fund the Disputed Claims Reserve as provided for in Article 14.9 of the Plan, first from Cash on deposit in the account established by the Plan Administrator to hold the Cash portion of the Available Plan Funds, and then from other forms of consideration held by the Plan Administrator.  Claims that the Plan provides will be Reinstated shall be paid out of the applicable Reorganized Debtor's operating cash flows unless otherwise provided in the Plan.  For the avoidance of doubt, it is not a condition to the confirmation or effectiveness of the Plan that any particular Claim or Class has been Allowed by Final Order.

(b)    Appointment of Plan Administrator and Funding of Miscellaneous Plan Administration Accounts.

(1) Article 11.2 of the Plan provides that, not less than ten days prior to commencement of the Confirmation Hearing, the Plan Sponsors will designate the Entity that will initially serve as the Plan Administrator.  Upon approval by the Bankruptcy Court in the Confirmation Order, the Plan Administrator will be appointed.  The Plan Administrator will have and perform all of the duties, responsibilities, rights and obligations set forth in the Plan Administration Agreement.  The Plan Administrator will serve without bond, may employ or contract with other Persons to assist in the performance of the Plan Administrator's duties, which will be set forth in the Plan Administration Agreement, and will procure appropriate directors and officers liability insurance and other insurance coverage appropriate to the business in which the Reorganized Debtors are to be engaged.  The Plan Administrator will receive, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services.

(2) On the Effective Date (or as soon thereafter as is reasonably practicable), the Plan Administrator will establish and fund the Plan Administration Account with sufficient Cash to pay the Plan Administrator's estimated compensation and expenses, and all other anticipated costs of administration of the Plan.  The Plan Administrator shall also establish and fund Miscellaneous Plan Administration Accounts, including the Disputed Claims Reserve, the Disputed Secured Claims Escrow Account, and the Undeliverable and Unclaimed Distribution Reserve, and may also establish such general accounts as the Plan Administrator deems necessary and appropriate.

(3) The Plan Administrator will allocate the funds in the Plan Administration Account to subaccounts corresponding to the enumerated functions of the Plan Administrator.  Until the Plan Administrator has discharged its obligations, the funds in those subaccounts and the Miscellaneous Plan Administration Accounts may only be used for the purpose designated for that particular account or subaccount.

(4) To the extent there are any excess funds in the Plan Administration Account (or any subaccount thereof) or the Miscellaneous Plan Administration Accounts, the Plan Administrator will make a Subsequent Distribution of such funds to Reorganized ASARCO.

(c)    Distribution of Available Plan Funds.

Article 11.3 of the Plan provides that, on the Initial Distribution Date, the Plan Administrator will distribute the Available Plan Funds in accordance with the Plan.

(d)       Release of Litigations.

Article 11.4 of the Plan provides that on the Effective Date, all causes of action identified in **Exhibit 10** to the Plan will be deemed, without any notice, the entry of any other order, or any other action by any party to have been released and dismissed or withdrawn with prejudice.  Additionally, all causes of action of the Reorganizing Debtors and their estates under chapter 5 of the Bankruptcy Code (or similar state or federal law) shall be  released and dismissed or withdrawn with prejudice.  All other causes of action or counts thereof will continue and be pursued as provided in Articles 11.12 and 11.13 of the Plan but subject to Articles 6.4 or 7.4 of the Plan, as applicable.

(e)       Prepetition ASARCO Environmental Trust.

(1)   Article 11.5 of the Plan provides that the Prepetition ASARCO Environmental Trust will remain in existence, and will be unaffected by the Reorganization Cases or any related settlements.  The Plan Administrator will succeed to ASARCO's administrative role, and will, in its sole discretion, act as the Performing Entity (as defined in the Prepetition ASARCO Environmental Trust) from time to time, but will assume no affirmative liabilities or obligations associated with that role.  In accordance with the documents governing it, the funds in the Prepetition ASARCO Environmental Trust shall continue to be available for, among other things, (i) identified work sites; (ii) interim costs prior to the effectiveness of the Plan; and (iii) any shortfalls or unanticipated costs or any other use permitted by the terms of the Prepetition ASARCO Environmental Trust (it being understood that the terms of certain environmental settlements were based on the assumption that certain previously-identified, additional environmental response actions to be performed by ASARCO, the Plan Administrator or the United States would be reimbursed from the Prepetition ASARCO Environmental Trust).

(2)   The funds remaining in the Prepetition ASARCO Environmental Trust are separate from and without prejudice to the distributions to be made to holders of Class 7 Previously Settled Environmental Claims, Class 8 Miscellaneous Environmental Claims, and Class 9 Reinstated Environmental Claims, as described in Article IV of the Plan.

(f)       Operations and Settlements Between the Confirmation Date and the Effective Date.

Article 11.6 of the Plan provides that, except as set forth in the Plan with respect to the appointment of the Plan Administrator, during the period from the Confirmation Date through and until the Effective Date, the Reorganizing Debtors will continue to operate as debtors-in-possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, and all orders of the Bankruptcy Court that are then in full force and effect.  During the period from the Confirmation Date through and until the Effective Date, the Reorganizing Debtors will not enter into or seek approval of any settlement(s) of any Claim(s) where the amount of such settlement, or the Allowed amount of such Claims, individually or in the aggregate, would be in excess of $10 million, without prior written approval of the Plan Sponsors.

(g)       Tax Refund.

Article 11.7 of the Plan provides that, unless the Tax Refund Adversary Proceeding has been determined by Final Order prior to the Effective Date, then on the Effective Date, the Tax Refund will be transferred to Reorganized ASARCO for use as working capital following the Effective Date.

(h)       Interests in the Reorganized Debtors.

Article 11.8 of the Plan provides that, on the Effective Date, all Interests in ASARCO shall automatically convert into Interests in Reorganized ASARCO and all Interests in the Reorganizing Subsidiaries shall automatically convert into Interests in the applicable Reorganized Subsidiaries.

(i)       LLC Agreement.

Article 11.9 of the Plan provides that, on or as soon as reasonably practicable after the Effective Date, Reorganized ASARCO will file an amended LLC Agreement with the secretary of state of the State of Delaware.

(j)      Management of Reorganized ASARCO.

Article 11.10 of the Plan provides that, pursuant to section 1129(a)(5) of the Bankruptcy Code, the Plan Sponsors will disclose, by filing, on or prior to the Confirmation Date, a document disclosing the identity and affiliations of any person proposed to serve on the initial board of directors of Reorganized ASARCO or as an officer of Reorganized ASARCO.  To the extent any such person is an insider, the nature of any compensation payable to such person shall be disclosed at such time.  Reorganized ASARCO shall have a five-person board of directors, each of them nominated by the Plan Sponsors.  Each director and officer shall serve from and after the Effective Date pursuant to the terms of the amended Limited Liability Company Agreement, and applicable law.

(k)      Continued Corporate Existence and Business Operations of the Reorganized Debtors.

Article 11.11 of the Plan provides that, except as otherwise provided in Article XI of the Plan, the Reorganized Debtors will continue their existence after the Effective Date

(l)      Revesting.

Article 11.12(a) of the Plan provides that, except as otherwise expressly provided in the Plan, on the Effective Date, all of the Reorganizing Debtors' and their Estates' property and assets, will vest in the applicable Reorganized Debtor, free and clear of all Liens, Claims, charges and other encumbrances.  For the avoidance of doubt, any and all Claims and causes of action that were owned by any Reorganizing Debtor or its Estate as of the Effective Date, including, without limitation, those based on the Alter Ego Theories, will vest in the applicable Reorganized Debtor on the Effective Date, and such Reorganized Debtor will be the only Entity entitled to pursue such Claims or causes of action.

Article 11.12(b) of the Plan provides that, on the Effective Date, (i) if the Section 524(g) Treatment goes into effect, Interests in the Asbestos Subsidiary Debtors shall be transferred and assigned to the Section 524(g) Trust, or (ii) if the Section 524(g) Treatment does not go into effect, Interests in the Asbestos Subsidiary Debtors shall automatically revest in Reorganized ASARCO.

(m)      Vesting and Enforcement of Causes of Action.

Article 11.13 of the Plan provides that the causes of action asserted by ASARCO against the United States on behalf of the EPA, the Department of Agriculture, the Department of the Interior and the International Boundary and Water Commission in Adversary Proceeding No. 07-02076 will vest in Reorganized ASARCO.  If the Section 524(g) Treatment goes into effect, then the Asbestos Insurance Actions will vest in the Section 524(g) Trustees and may be pursued or compromised as deemed fit by the Section 524(g) Trustees in their sole discretion without need for approval of the Bankruptcy Court.

(n)      Further Authorizations.

Article 11.14 of the Plan provides that the Reorganized Debtors, the Plan Administrator, or the Plan Sponsors may seek such orders, judgments, injunctions, and rulings that any one or more of them deem necessary to further carry out the intentions and purposes of, and give full effect to the provisions of, the Plan.

(o)      Effectuating Documents and Further Transactions.

Article 11.15 of the Plan provides that the chief executive officer, president, chief financial officer, general counsel, secretary, treasurer, any vice president, or managing member (if applicable) of each Reorganizing Debtor or Reorganized Debtor will be authorized, to the extent consistent with such Reorganizing Debtor's or Reorganized Debtor's constituent documents, to execute, deliver, file, or record such contracts, instruments, settlement agreements, releases, indentures, and other agreements or documents and to take or direct such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan.  The secretary or any assistant secretary of each Reorganizing Debtor or Reorganized Debtor will be authorized to certify or attest to any of the foregoing actions.

(p)    Corporate Action.

Article 11.16 of the Plan provides that all matters provided for under the Plan involving the corporate structure of the Reorganizing Debtors or the Reorganized Debtors, or any corporate action to be taken by, or required of the Reorganizing Debtors or the Reorganized Debtors, will be deemed to have occurred and be effective as provided in the Plan, and will be authorized and approved in all respects without any requirement for further action by the holders of Interests in, or directors of, any of such entities.

(q)    Execution of Plan Documents.

Article 11.17 of the Plan provides that, on the Effective Date, the Reorganized Debtors and other parties thereto will execute and deliver the Plan Documents, as applicable.

(r)    Approval of Section 524(g) Trust Documents.

Article 11.18 of the Plan provides that, if the Section 524(g) Treatment goes into effect, Confirmation of the Plan will constitute approval pursuant to Bankruptcy Rule 9019 of the Section 524(g) Trust Documents, as evidenced by entry of the Confirmation Order.

(s)    Option to Create Work Trusts.

Article 11.19 of the Plan provides that, the United States may at its option elect to establish work trusts for the purpose of receiving distributions made with respect to Allowed Claims that relate to specified environmental sites.

(t)    Plan Sponsor Contribution.

Article 11.20 of the Plan provides that the Plan Sponsors will deliver to the Plan Administrator the Plan Sponsor Contribution no later than ten (10) days after the entry of the Confirmation Order.

(u)    Approval of Mission Mine Settlement Agreement.

Article 11.21 of the Plan provides that Confirmation of the Plan shall cause the Mission Mine Settlement Agreement to be binding upon all landowners and allottees who own interests in the lands affected by the Mission Mine Settlement Agreement.

3.9    Distributions.

(a)    Plan Distributions.

Article 14.1 of the Plan provides that all distributions or payments required or permitted to be made under the Plan, other than to holders of Asbestos Personal Injury Claims and Demands and/or Professional Persons, will be made by the Plan Administrator on the Initial Distribution Date and thereafter by the Plan Administrator at the time or times and in the manner provided in the Plan, unless otherwise ordered by the Bankruptcy Court. If the Section 524(g) Treatment goes into effect, distributions to holders of Asbestos Personal Injury Claims and Demands will be made by the Section 524(g) Trust in accordance with the Section 524(g) Trust Documents; otherwise, distributions to holders of Asbestos Personal Injury Claims will be made by the Asbestos Claims Trust in accordance with the Asbestos Claims Trust Documents. Distributions to Professional Persons will be made by the Plan Administrator on the Initial Distribution Date and thereafter by the Plan Administrator pursuant to order of the Bankruptcy Court. Distributions to be made on the Effective Date will be deemed actually made on the Effective Date if made either (a) on the Effective Date or (b) as soon as reasonably practicable thereafter.

(b)    Plan Administrator.

Article 14.2 of the Plan provides that, not less than ten days prior to commencement of the Confirmation Hearing, and subject to Bankruptcy Court approval in connection with Confirmation of the Plan, the Plan Sponsors will designate the Entity that shall initially serve as the Plan Administrator (which entity shall not be an Affiliate of the Plan Sponsors). The Plan Administrator will serve without bond, and may employ or contract with other Persons to

assist in the performance of the Plan Administrator's duties, which will be set forth in the Plan Administration Agreement. The Plan Administrator will receive, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services. On the Effective Date, the Plan Sponsors will (a) place in the Plan Administration Account sufficient Cash to pay for the Plan Administrator's estimated compensation and expenses and all other anticipated costs of administration of the Plan; and (b) fund the Miscellaneous Plan Administration Accounts. Upon completion of the Plan Administrator's other responsibilities under the Plan, any funds remaining in the Plan Administration Account and the Miscellaneous Plan Administration Accounts shall be distributed as a Subsequent Distribution to Reorganized ASARCO.

(c)     Delivery of Distributions.

Article 14.3 of the Plan provides that, except as otherwise expressly provided in the Plan, distributions to holders of Allowed Claims will be made at the address of the holder of such Claim as indicated in the claims register maintained by the Claims Agent. Nonetheless, if such holder holds such Claims through a Nominee, distributions with respect to such Claims will be made to such Nominee, and such Nominee will, in turn, make appropriate distributions and book entries to reflect such distributions to such holders; *provided, however*, that where an Indenture Trustee is acting on behalf of certain Bondholders, distributions on account of those Bondholder Claims will be made to such Indenture Trustee for its subsequent distribution, subject to the terms and conditions of the applicable indenture or other governing document, to the holders of such Claims. Payments may be made at the election of Reorganized ASARCO or the Plan Administrator by check, wire transfer, or the customary method used for payment by ASARCO prior to the Petition Date.

(d)     Distribution Record Date.

Article 14.4 of the Plan provides that Reorganized ASARCO and the Plan Administrator will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the Distribution Record Date and will be entitled for all purposes herein to recognize and make distributions only to those holders of Allowed Claims that are holders of such Claims or participants therein, as of the Distribution Record Date. As of the close of business on the Distribution Record Date, each transfer register for the Bonds, as maintained by the applicable Indenture Trustee, will be closed. Reorganized ASARCO and the Plan Administrator will have no obligation, and are not permitted, to recognize the transfer or sale of any Bondholder Claim that occurs after the close of business on the Distribution Record Date and will be entitled for all purposes herein to recognize and make distributions only to those holders who are holders of such Claims as of the close of business on the Distribution Record Date.

(e)     Unclaimed Property.

Article 14.5 of the Plan provides that:

(1)     Distributions by the Section 524(g) Trust or Asbestos Claims Trust.

Any Cash, assets, or other property to be distributed under the Plan by the Section 524(g) Trust or Asbestos Claims Trust, as applicable, that remains unclaimed (including by a Claimant's failure to draw upon a check issued to such Claimant) or otherwise is not deliverable to the Claimant entitled thereto one year after the initial distribution is made or attempted will become vested in, and will be transferred and delivered to, the Section 524(g) Trust or Asbestos Claims Trust, as applicable, for use in accordance with the terms of the Section 524(g) Trust Documents or Asbestos Claims Trust Documents, as applicable.

(2)     Distributions by the Plan Administrator.

(A)     If the distribution to any holder of an Allowed Claim (other than the holder of an Asbestos Personal Injury Claim or Demand) is returned to Reorganized ASARCO or the Plan Administrator as undeliverable or is otherwise unclaimed (including by a Claimant's failure to draw upon a check issued to such Claimant), no further distributions will be made to such holder unless the Plan Administrator is timely notified in writing of the holder's then current address, at which time, all missed distributions will be made to such holder without interest. The amounts in respect of such undeliverable and/or unclaimed distributions will be returned to the Plan Administrator until such distributions are claimed. The Plan Administrator will segregate and deposit into an escrow account (the "Undeliverable and Unclaimed Distribution Reserve") all undeliverable and/or unclaimed

distributions for the benefit of all such similarly situated Persons until such time as a distribution becomes deliverable or is claimed or such Claimant's right to the distribution is waived pursuant to Article 14.5(b)(2) below.  Nothing contained in the Plan will require the Reorganized Debtors or the Plan Administrator to attempt to locate any holder of an Allowed Claim.

(B)     Any funds in the Undeliverable and Unclaimed Distribution Reserve that remain unclaimed (including by Claimant's failure to negotiate a check issued to such Claimant) or otherwise are not deliverable to the Claimant entitled thereto one year after the initial distribution is made or attempted (the "Forfeited Distributions") will become vested in, and shall be transferred and delivered to, the Plan Administrator.  In such event, Claimant will be deemed to have waived its rights to such payments or distributions under the Plan pursuant to section 1143 of the Bankruptcy Code, shall have no further Claim in respect of such distribution, and will not participate in any further distributions under the Plan with respect to such Claim.  The Plan Administrator will distribute the Forfeited Distributions to Reorganized ASARCO as a Subsequent Distribution.

(f)     Compliance with Tax Requirements.

Article 14.6 of the Plan provides that the Reorganized Debtors, the Plan Administrator and the Section 524(g) Trust will comply with all applicable withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authorities, and all distributions hereunder or under any Plan Document will be subject to such withholding and reporting requirements, if any.  Notwithstanding any other provision of the Plan, each Person receiving a distribution pursuant to the Plan, or any other Plan Document, will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Authority, including income and other tax obligations, on account of that distribution.

(g)     Setoffs and Recoupments.

Article 14.7 of the Plan provides that, subject to the limitations provided in section 553 of the Bankruptcy Code, the applicable Reorganized Debtor or the Plan Administrator, as the case may be, may, but will not be required to, offset against or recoup from the holder of any Allowed Claim on which payments or other distributions are to be made pursuant to the Plan any Claims of any nature whatsoever the Estate of the applicable Reorganizing Debtor may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder will constitute a waiver or release by such Reorganized Debtor or the Plan Administrator, as the case may be, of any such Claim against such holder or right of setoff or recoupment that the applicable Estate may have against the holder of such Allowed Claim.

(h)     No Distribution Pending Allowance.

Article 14.8 of the Plan provides that, if a Claim or any portion of a Claim is disputed, no payment or distribution will be made on account of the disputed portion of such Claim (or the entire Claim, if the entire Claim is disputed), unless such Disputed Claim becomes an Allowed Claim.

(i)     Disputed Claims Reserve.

(1)  Article 14.9 of the Plan provides that the Plan Administrator will maintain, in accordance with its powers and responsibilities under the Plan, a Disputed Claims Reserve.

(2)  On the Effective Date (or as soon thereafter as is reasonably practicable), Reorganized ASARCO or the Plan Administrator, as the case may be, will deposit Cash and/or other forms of consideration in the Disputed Claim Reserve that would have been distributed to the holders of Disputed Claims if such Disputed Claims had been Allowed Claims on the Effective Date.  This amount will be determined based on the lesser of (i) the asserted amount of the Disputed Claims in the applicable Proofs of Claim, (ii) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code, or (iii) the amount otherwise agreed to by the applicable Reorganizing Debtor and the holders of such Disputed Claims.

(3)  The Plan Sponsors, the Reorganized Debtors, and/or the Plan Administrator may seek Bankruptcy Court approval to reduce the size of the Disputed Claims Reserve based upon the amount of the

remaining Disputed Claims or other changed circumstances, including increases in the Reorganized Debtors' cash position.

(4)  In the case of objections to allegedly Secured Claims, any Lien asserted by the holder of such a Claim against assets that revest in the applicable Reorganized Debtor will remain in place, pending resolution of the objection to the allegedly Secured Claim.

(5)  The Plan Administrator will distribute from the Disputed Claims Reserve to the holder of any Disputed Claim that has become an Allowed Claim, not later than the tenth Business Day after the end of the calendar month in which such Disputed Claim becomes an Allowed Claim pursuant to a Final Order, an amount equal to the Allowed Claim as if such Claim had been an Allowed Claim on the Effective Date.

(6)  If a Disputed Claim is disallowed, in whole or in part, the Plan Administrator will on a quarterly basis (and in no event later than the tenth Business Day after the end of each calendar quarter) distribute as a Subsequent Distribution the Cash reserved in respect of such disallowed Disputed Claim in accordance with the terms and conditions of the Plan and the Confirmation Order.

(7)  The Plan Administrator will treat the assets held in the Disputed Claims Reserve, as owned by Reorganized ASARCO for U.S. federal income tax purposes (and solely for U.S. federal income tax purposes), and not as a disputed ownership fund within the meaning of Treasury Regulations section 1.468B-9(b)(1).  Accordingly, tax on the income from the assets held in the Disputed Claims Reserve will be paid by Reorganized ASARCO or certain of its Affiliates.  The Plan Administrator will distribute to Reorganized ASARCO from the Disputed Claims Reserve within 30 days of the close of each calendar year an amount equal to the product of (x) the taxable income of the Disputed Claims Reserve (computed as if the Disputed Claims Reserve were a corporation for U.S. federal income tax purposes) and (y) the sum of (1) the highest rate of tax imposed by section 11 of the Internal Revenue Code with respect to such calendar year and (2) five percent.

3.10    Procedures For Treating Disputed Claims.

(a)    Objections to Claims.

Article 15.1 of the Plan provides that, after the Effective Date, the Reorganized Debtors and the Plan Administrator will have the exclusive right to file objections to Claims (other than objections to Asbestos Personal Injury Claims and Demands and objections to Claims that have been Allowed by Final Order) and litigate to judgment, settle, or withdraw such objections to Disputed Claims.  Without limiting the preceding, the Reorganized Debtors and the Plan Administrator will have the right to litigate any Disputed Claim either in the Bankruptcy Court or in any court of competent jurisdiction.  After the Effective Date, if the Section 524(g) Treatment goes into effect, only the Section 524(g) Trust will have the authority to file objections to Asbestos Personal Injury Claims and Demands and litigate to judgment, settle, or withdraw such objections, and Asbestos Personal Injury Claims and Demands, whether or not a Proof of Claim is filed, shall be satisfied exclusively in accordance with the Plan, the Section 524(g) Trust Agreement, and the Section 524(g) Trust Distribution Protocol.  For the avoidance of doubt, if the Section 524(g) Treatment goes into effect, no objection to Asbestos Personal Injury Claims or Demands shall be filed in the Bankruptcy Court.

(b)    Objection Deadline.

Article 15.2 of the Plan provides that, within the later of (a) 90 days after the Confirmation Date or (b) 90 days after a Proof of Claim is filed, objections to Claims (other than, if the Section 524(g) Treatment goes into effect, Asbestos Personal Injury Claims and Demands, which will be Allowed or disallowed as provided in the Section 524(g) Trust Distribution Protocol) will be filed with the Bankruptcy Court; *provided, however*, that the Reorganized Debtors and/or the Plan Administrator may seek to extend such period (or any extended period) for cause.

(c)    Disallowance of Improperly Filed Claims.

Article 15.3 of the Plan provides that any Administrative Claim or other Claim (except for, if the Section 524(g) Treatment goes into effect, an Asbestos Personal Injury Claim and Demand) for which the filing of a motion for allowance is required will be disallowed if such filing is not timely and properly made, subject to the right of

the Claimant to seek permission under applicable law to file a late Claim.  Any Administrative Claim timely filed on the Proof of Administrative Claim (found in Exhibit B to Docket #8549) pursuant Docket #8549 shall not require a motion for allowance.

(d)  Pre-Effective Date Settlements.

Article 15.4 of the Plan provides that any Claims that were Allowed as a result of a settlement that was approved by the Bankruptcy Court from and after September 23, 2008 over the objection of the Plan Sponsors, where the Allowed amount of such Claims, individually or in the aggregate, shall be in excess of $10 million (including, without limitation, the Debtors' Proposed Asbestos Settlement or any settlements relating to Environmental Claims other than those relating to the Previously Settled Environmental Claims) shall not be Allowed Claims for purpose of the Plan but shall be treated as Disputed Claims.

3.11  Injunctions, Releases and Discharge.

The Plan provides for entry of various releases and permanent injunctions in favor of the ASARCO Protected Parties.  These releases and injunctions are an essential part of the Plan and, if entered, will limit the rights of holders of Asbestos Personal Injury Claims and Demands and others against these entities.  If these releases and injunctions are not entered, the Plan Sponsors will have the right not to proceed with the Plan.

The Term "ASARCO Protected Parties" refers to:

- the Reorganizing Debtors and their respective predecessors,

- the Reorganized Debtors,

- the ASARCO Protected Non-Debtor Affiliates and their respective predecessors,

- the Plan Sponsors and their respective Affiliates and predecessors,

- the Plan Sponsor Parent and its Affiliates and predecessors,

- the Trusts,

- the Trustees,

- the Section 524(g) Trust Advisory Committee,

- if the Section 524(g) Treatment goes into effect, the FCR,

- if the Section 524(g) Treatment goes into effect, the Asbestos Claimants' Committee, including its members in their member capacities,

- the Plan Administrator,

- the Examiner,

- the ASARCO Committee, including its members in their member capacities, and

- the present and former directors, officers, agents, attorneys, accountants, consultants, financial advisors, investment bankers, professionals, experts, and employees of any of the foregoing, in their respective capacities as such.

If the Section 524(g) Treatment does not go into effect, the FCR and the Asbestos Claimants' Committee, including its members in their member capacities, and any of their present and former directors, officers, agents, attorneys, accountants, consultants, financial advisors, investment bankers, professionals, experts, and employees will not be ASARCO Protected Parties.

(a)  <u>Discharge and Release</u>.

    Article 12.1 of the Plan provides that, except as otherwise expressly provided in the Plan, the rights afforded in the Plan and the treatment of all Claims, Demands, and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims, Demands, and Interests of any nature whatsoever, against any Reorganizing Debtor or its Estate, assets, properties or interests in property.  Except as otherwise provided in the Plan, on the Effective Date, all Claims and Demands against and Interests in the Reorganizing Debtors will be satisfied, discharged, and released in full.  The ASARCO Protected Parties will not be responsible for any obligations of the Reorganizing Debtors except those expressly assumed by them in the Plan; *provided, however,* that if the Plan Sponsors and the Plan Sponsor Parent do not receive all protections provided for in the Plan, including, without limitation, those described in Article 12.1 and Article 12.9 of the Plan, then the protections in Article 12.1 with respect to ASARCO Protected Parties other than the Reorganizing Debtors and the Reorganized Debtors shall not go into effect.

(b)  <u>Discharge Injunction</u>.

    Article 12.2 of the Plan provides that, except as otherwise expressly provided in the Plan, the discharge and release set forth in Article 12.1 of the Plan will also operate as an injunction permanently prohibiting and enjoining the commencement or continuation of any action or the employment of process with respect to, or any act to collect, recover from, or offset (a) any Claim or Demand discharged and released in Article 12.1 and (b) any cause of action, whether known or unknown, based on the same subject matter as any Claim or Demand discharged and released in Article 12.1. Except as otherwise expressly provided in the Plan, all Persons and Entities will be precluded and forever barred from asserting against the ASARCO Protected Parties, their successors or assigns, or their assets, properties, or interests in property any other or further Claims or Demands, or any other right to legal or equitable relief regardless of whether such right can be reduced to a right to payment, based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date; *provided, however,* that if the Plan Sponsor Contribution, the Distributable Cash, and any other form of consideration (which may include assets of the Reorganized Debtors which are not required for Reorganized ASARCO's ongoing business) held in the Disputed Claims Reserve together are insufficient to satisfy all Plan Obligations, then (i) the applicable Reorganized Debtor shall continue to be liable for such Plan Obligations, and (ii) the AMC Guaranty shall provide additional recourse to satisfy such Plan Obligations; and *provided further,* that if the Plan Sponsors and the Plan Sponsor Parent do not receive all protections provided for in the Plan, including, without limitation, those described in Article 12.2 and Article 12.9 of the Plan, then the protections in Article 12.2 of the Plan with respect to ASARCO Protected Parties other than the Reorganizing Debtors and the Reorganized Debtors shall not go into effect.

(c)  <u>The Permanent Channeling Injunction and the Asbestos Insurance Company Injunction</u>.

    Article 12.3 of the Plan provides that, if the Section 524(g) Treatment goes into effect, then in order to supplement the injunctive effect of the Discharge Injunction, and pursuant to the exercise of the legal and equitable jurisdiction and power set forth in section 524(g) or 105(a) of the Bankruptcy Code (or both), the Confirmation Order will provide for issuance of the Permanent Channeling Injunction and Asbestos Channeling Injunction to take effect as of the Effective Date.

    The full texts of the Permanent Channeling Injunction and Asbestos Channeling Injunction are set forth below:

(1) <u>Permanent Channeling Injunction</u>.

    (A)  *Terms.  In order to induce, preserve and promote the settlements contemplated by and provided for in the Plan, and pursuant to section 524(g) or 105(a) of the Bankruptcy Code (or both), all Asbestos Personal Injury Claims and Demands shall be channeled to the Section 524(g) Trust for a remedy under the Section 524(g) Trust Distribution Protocol, and all holders of Asbestos Personal Injury Claims and Demands and all Entities which have held or asserted, which hold or assert, or which may in the future hold or assert, any Asbestos Personal Injury Claim or Demand shall be permanently and forever stayed, restrained, and enjoined from taking any action against any ASARCO Protected Party (or any property or interest in property of an ASARCO Protected Party) with respect to such Asbestos Personal Injury Claim or Demand, including without limitation, for the purpose of directly or indirectly obtaining a judgment, collecting, recovering, or receiving payments,*

*satisfaction, or recovery with respect to such Asbestos Personal Injury Claim or Demand, including, without limitation:*

(i)     *commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any Asbestos Personal Injury Claim or Demand against any of the ASARCO Protected Parties, or against the property or interests in property of any ASARCO Protected Parties;*

(ii)    *enforcing, levying, attaching (including by prejudgment attachment), collecting, or otherwise recovering, by any manner or means, whether directly or indirectly, any judgment, award, decree, or other order against any of the ASARCO Protected Parties, or against the property or interests in property of any ASARCO Protected Parties, with respect to any Asbestos Personal Injury Claim or Demand;*

(iii)   *creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien of any kind against any ASARCO Protected Parties, or the property or interests in property of any ASARCO Protected Parties, with respect to any Asbestos Personal Injury Claim or Demand;*

(iv)    *except as otherwise specifically provided in the Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, reimbursement, or recoupment of any kind and in any manner, directly or indirectly against any obligation due any ASARCO Protected Parties, or against the property or interests in property of any ASARCO Protected Parties, with respect to any Asbestos Personal Injury Claim or Demand; and*

(v)     *proceeding or taking any action, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, the Plan Documents or the Section 524(g) Trust Documents relating to any Asbestos Personal Injury Claim or Demand.*

(B)     *Reservations.  Notwithstanding anything to the contrary above, the Permanent Channeling Injunction will not enjoin, alter, diminish or impair:*

(i)     *the rights of Entities to the treatment accorded them under Articles II and IV of the Plan, as applicable, including the rights of Entities with Asbestos Personal Injury Claims or Demands to assert such Asbestos Personal Injury Claims or Demands in accordance with the Section 524(g) Trust Distribution Protocol;*

(ii)    *the rights of Entities to assert any Claim, Demand, debt, obligation, or liability for payment of Section 524(g) Trust Expenses against the Section 524(g) Trust;*

(iii)   *the enforceability of any of the Asbestos Insurance Policies or any Asbestos Insurance Settlement Agreement;*

(iv)    *the rights of the Section 524(g) Trustees, if any, with regard to any Asbestos Insurance Company that is not a Settling Asbestos Insurance Company (with the Section 524(g) Trust being, and deemed to be, for all purposes of insurance and indemnity, the successor to the Reorganizing Debtors in respect of all Asbestos Personal Injury Claims and Demands and other recoveries from an Asbestos Insurance Company, in its capacity as such); or*

(v)     *the rights of Entities to assert any Claim, Demand, debt, obligation, or liability for payment against an Asbestos Insurance Company that is not an ASARCO Protected Party unless otherwise enjoined by order of the Bankruptcy Court or the District Court or estopped by a provision of the Plan.*

(2)   Asbestos Insurance Company Injunction.

(A)      _Terms_.  In order to preserve and promote the property of the Estate, as well as the settlements contemplated by and provided for in the Plan, and to supplement where necessary the injunctive effect of the discharge and releases provided for in the Plan, pursuant to section 105(a) of the Bankruptcy Code, all Entities which have held or asserted, which hold or assert, or which may in the future hold or assert any Claim, Demand or cause of action (including, without limitation,  any Asbestos Personal Injury Claim or Demand or any Claim for or respecting any Section 524(g) Trust Expense) against a Settling Asbestos Insurance Company based upon, relating to, arising out of, attributable to, or in any way connected with any Asbestos Personal Injury Claim or Demand, Asbestos In-Place Insurance Coverage or an Asbestos Insurance Policy, shall be permanently and forever stayed, restrained, and enjoined from taking any action against such Settling Asbestos Insurance Company for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such Claim, Demand or cause of action, including, without limitation:

(i)      commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such Claim, Demand or cause of action against any Settling Asbestos Insurance Company, or against the property or interests in property of any Settling Asbestos Insurance Company;

(ii)      enforcing, levying, attaching, collecting, or otherwise recovering, by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against any Settling Asbestos Insurance Company or against the property or interests in property of any Settling Asbestos Insurance Company with respect to any such Claim, Demand or cause of action;

(iii)      creating, perfecting, or otherwise enforcing, in any manner, directly or indirectly, any Lien of any kind against any Settling Asbestos Insurance Company or the property or interests in property of any Settling Asbestos Insurance Company with respect to any such Claim, Demand or cause of action;

(iv)      except as otherwise specifically provided in the Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, reimbursement, or recoupment of any kind and in any manner, directly or indirectly, against any obligation due any Settling Asbestos Insurance Company or against the property or interests in property of any Settling Asbestos Insurance Company with respect to any such Claim, Demand or cause of action; and

(v)      taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents relating to such Claim, Demand or cause of action.

(B)      _Reservations_.  Notwithstanding anything to the contrary above, this Asbestos Insurance Company Injunction will not enjoin, alter, diminish or impair:

(i)      the rights of Entities to the treatment accorded them under Articles II and IV of the Plan, as applicable, including the rights of Entities with Asbestos Personal Injury Claims to assert Asbestos Personal Injury Claims or Demands against the Section 524(g) Trust in accordance with the Section 524(g) Trust Distribution Protocol;

(ii)      the rights of Entities to assert any Claim, Demand, debt, obligation, or liability for payment of Section 524(g) Trust Expenses against the Section 524(g) Trust;

(iii)      the enforceability of any of the Asbestos Insurance Policies or any Asbestos Insurance Settlement Agreement;

(iv)      the rights of the Section 524(g) Trustees, if any, with regard to any Asbestos Insurance Company that is not a Settling Asbestos Insurance Company (with the Section 524(g) Trust being, and being deemed to be, for all purposes of insurance and indemnity, the successor to

*the Reorganizing Debtors in respect of all Asbestos Personal Injury Claims, Demands, and other recoveries from an Asbestos Insurance Company, in its capacity as such);*

(v)     *the rights of Entities to assert any Claim, Demand, debt, obligation or liability for payment against an Asbestos Insurance Company that is not an ASARCO Protected Party unless otherwise enjoined by order of the Bankruptcy Court or the District Court or estopped by a provision of the Plan; or*

(vi)     *the rights of the Section 524(g) Trust or the Section 524(g) Trustees to seek relief from the Asbestos Insurance Company Injunction should a Settling Asbestos Insurance Company fail to fulfill all obligations under an Asbestos Insurance Settlement Agreement.*

(d)     <u>Limitation of Injunctions</u>.

Article 12.4 of the Plan provides that, notwithstanding any other provision of the Plan to the contrary, the releases set forth in Article 12.1 of the Plan and the Injunctions set forth in Articles 12.2 and 12.3 of the Plan, respectively, will not serve to satisfy, discharge, release, or enjoin Claims by any Entity against the Section 524(g) Trust for payment of (a) Asbestos Personal Injury Claims and Demands in accordance with the Section 524(g) Trust Distribution Protocol, or (b) Section 524(g) Trust Expenses, and such releases and/or Injunctions will not enjoin the Reorganized Debtors or the Section 524(g) Trust from enforcing any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement.

(e)     <u>Exoneration and Reliance</u>.

Article 12.5 of the Plan provides that, to the extent allowable by law, none of the ASARCO Protected Parties will be liable (other than for criminal liability, willful misconduct or bad faith, or *ultra vires* acts) to any holder of a Claim, Demand, or Interest or any other Entity with respect to any action, omission, forbearance from action, decision, or exercise of discretion taken at any time through the Effective Date in connection with (a) the management or operation of any of the Reorganizing Debtors or the discharge of its duties under the Bankruptcy Code, (b) the solicitation, negotiation, or implementation of any of the transactions provided for, or contemplated in, the Plan or other Plan Documents, (c) any action taken in connection with either the enforcement of the rights of the Reorganizing Debtors against any Entities or the defense of Claims or Demands asserted against the Reorganizing Debtors with regard to the Reorganization Cases, (d) any action taken in the negotiation, formulation, preparation, development, proposal, solicitation, disclosure, Confirmation, or implementation of the Plan, other Plan Documents, or related agreements, instruments or other documents, (e) the administration of the Plan or the assets and property to be distributed pursuant to the Plan or (f) the administration of any of the Reorganizing Debtors' Estates. The ASARCO Protected Parties will be deemed to have participated in each of the Reorganization Cases in good faith and in compliance with all applicable provisions of the Bankruptcy Code. Nothing in Article 12.6 of the Plan shall prevent the enforcement of the terms of the Plan.

(f)     <u>Post-524(g) Indemnity</u>.

Article 12.6 of the Plan provides that the Post-524(g) Indemnity (as such term is defined in the Asbestos Insurance Settlement Agreement) will go into effect if the Section 524(g) Treatment does not go into effect. Reorganized ASARCO will indemnify and hold harmless, but not defend, the Settled Asbestos Insurance Companies, as provided in paragraph III.C of the Asbestos Insurance Settlement Agreement.

(g)     <u>Additional Releases</u>.

Article 12.7 of the Plan provides that, to the extent allowable by law, on and as of the Effective Date and for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the ASARCO Protected Parties (acting in any capacity whatsoever) will be forever released and discharged from any and all Claims, Demands, obligations, actions, suits, rights, debts, accounts, causes of action, remedies, avoidance actions, agreements, promises, damages, judgments, demands, defenses, or Claims in respect of equitable subordination, and liabilities through the Effective Date (including all Claims and Demands based on or arising out of facts or circumstances that existed as of or prior to the Plan in any of the Reorganization Cases, including Claims and Demands based on negligence or strict liability, and further including any derivative Claims asserted on behalf of the Reorganizing Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that any of the Reorganizing Debtors, their respective Estates, or any of the Reorganized Debtors would have been legally entitled to assert in their own right,

- 43 -

whether individually or collectively) which any of the Reorganizing Debtors, their respective Estates, any of the Reorganized Debtors, Claimants, holders of Demands or other Persons receiving or who are entitled to receive distributions under the Plan may have against any of them in any way related to the Reorganization Cases or any of the Reorganizing Debtors (or their respective predecessors or Affiliates); *provided, however,* the releases provided for in Article 12.7 of the Plan will not extend to any Claims by any Governmental Unit with respect to criminal liability, willful misconduct or bad faith, or *ultra vires* acts; and *provided further,* that if the Plan Sponsors and the Plan Sponsor Parent do not receive all protections provided for in the Plan, including, without limitation, those described in Articles 12.1, 12.7, and 12.8 of the Plan, then the protections in Article 12.7 of the Plan with respect to ASARCO Protected Parties other than the Reorganizing Debtors and the Reorganized Debtors will not go into effect.

(h)     <u>Exculpation</u>.

Article 12.8 of the Plan provides that, to the extent allowable by law, except for willful misconduct, bad faith, criminal liability, (or liability for <u>ultra</u> <u>vires</u> acts asserted by any Governmental Unit: (a) none of the ASARCO Protected Parties, in any capacity whatsoever, will be liable to any Person or Entity for any action, failure or omission to act or other matter related to any of the Reorganizing Debtors and/or any of the Reorganization Cases, including in connection with the operation of any of the Reorganizing Debtors' business or the negotiation, formulation and preparation of the Plan and the Plan Documents, through and including the Effective Date; and (b) all parties will be permanently enjoined from initiating a suit against any of the ASARCO Protected Parties, except for actions for willful misconduct, bad faith, criminal liability, or liability for <u>ultra</u> <u>vires</u> acts asserted by any Governmental Unit, brought in the Bankruptcy Court within 90 days after the Effective Date; <u>provided</u>, <u>however</u>, that if the Plan Sponsors and the Plan Sponsor Parent do not receive all protections provided for in the Plan, including, without limitation, those described in Article 12.8, then the protections in Article 12.8 with respect to ASARCO Protected Parties other than the Reorganizing Debtors and the Reorganized Debtors will not go into effect.  Nothing in Article 12.8 will prevent the enforcement of the terms of the Plan.

(i)     <u>Releases by Holders of Claims, Demands, and Interests</u>.

Article 12.9 of the Plan provides that, to the extent allowable by law, on the Effective Date, holders of Claims, Demands, and Interests receiving distributions under the Plan will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each of the Reorganizing Debtors, the Reorganized Debtors, the ASARCO Protected Parties, the Plan Sponsors, and the Plan Sponsor Parent from any and all Claims, Demands, Interests, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including Claims and Demands based on negligence or strict liability, and including any derivative Claims asserted on behalf of any of the Reorganizing Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that such holder of a Claim, Demand, or Interest would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, (1) any of the Reorganizing Debtors, (2) any of the Reorganization Cases, (3) the subject matter of, or the transactions or events giving rise to, any Claim, Demand, or Interest, (4) the business or contractual arrangements between any of the Reorganizing Debtors and any ASARCO Protected Party, (5) the restructuring of Claims, Demands, and Interests prior to or in the Reorganization Cases, (6) the negotiation, formulation, or preparation of the Plan, the Plan Documents or related agreements, instruments or other documents, or (7) any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims, Demands, or liabilities arising out of or relating to any action or omission of an ASARCO Protected Party that constitutes a failure to perform the duty to act in good faith, with the care of an ordinarily prudent person and in a manner the ASARCO Protected Party reasonably believed to be in the best interests of the Reorganizing Debtors (to the extent such duty is imposed by applicable non-bankruptcy law) where such failure to perform constitutes willful misconduct or gross negligence, *provided, however,* that if the Plan Sponsors and the Plan Sponsor Parent do not receive all protections provided for in the Plan, including, without limitation, those described in Article 12.9 of the Plan, then the protections in Article 12.9 of the Plan with respect to ASARCO Protected Parties other than the Reorganizing Debtors and the Reorganized Debtors will not go into effect.

(j)     <u>Release of Fraudulent Transfer Claims Against Settling Asbestos Insurance Companies</u>.

Article 12.10 of the Plan provides that, if the Section 524(g) Treatment goes into effect, all fraudulent transfer claims against any Settling Asbestos Insurance Company arising under sections 544(b), 548, 549, or 550 of the Bankruptcy Code or otherwise with respect to the Claims, rights or interests released under the Asbestos Insurance Settlement Agreement will be released, and the Section 524(g) Trust shall have no authority to bring any fraudulent transfer actions arising under any applicable state or other non-bankruptcy law against any Settling Asbestos Insurance

Company with respect to the Claims, rights and interests released under the Asbestos Insurance Settlement Agreement. Article 12.10 of the Plan does not apply to any of the existing Avoidance Actions against certain Asbestos Insurance Companies that entered into prepetition settlement agreements.

      (k)        Release With Respect To Pension Plans.

      Article 12.11 provides that, notwithstanding any provision in Article 12 of the Plan, or otherwise in the Plan, or in the Confirmation Order, there shall be no release of any claim asserted by PBGC with respect to the Pension Plans against any person, other than the Debtors.

      PBGC asserts that the Plan cannot discharge or release any claims against any person other than the Debtors with respect to the Hourly and Salaried Plans (as defined in section 3.13 of this Disclosure Statement),  including any claim for breach of fiduciary duty or any claim asserted by PBGC.  PBGC also reserves all rights that it may have to object to Article XII of the Plan on this or any other grounds, as may be appropriate.

3.12      Certain Matters Incident to Plan Confirmation.

      (a)        Term of Certain Injunctions and Automatic Stay.

      (1) Article 13.1(a) of the Plan provides that all of the injunctions and/or stays provided for, in or in connection with the Reorganization Cases, whether pursuant to section 105, section 362, section 524, or any other provision of the Bankruptcy Code, other applicable law, or court order, in effect immediately prior to Confirmation will remain in full force and effect until the Injunctions become effective and thereafter if so provided by the Plan, the Confirmation Order, or by their own terms. In addition, on and after the Confirmation Date, the Plan Sponsors may seek such further orders as they may deem necessary to preserve the status quo during the time between the Confirmation Date and the Effective Date.

      (2) Article 13.1(b) of the Plan provides that each of the Injunctions will become effective on the Effective Date and will continue in effect at all times thereafter, and may not be vacated, amended or modified after the Effective Date, except as otherwise provided in the Plan. Notwithstanding anything to the contrary contained in the Plan, all actions in the nature of those to be enjoined by the Injunctions will be enjoined during the period between the Confirmation Date and the Effective Date.

      (b)        No Liability for Tax Claims.

      Article 13.2 of the Plan provides that, unless a taxing authority has asserted a Claim against any of the Reorganizing Debtors prior to the applicable Bar Date, no Claim of such taxing authority will be Allowed against such Reorganizing Debtor or the applicable Reorganized Debtor for taxes, penalties, interest, additions to tax, or other charges arising out of the failure, if any, of the applicable Reorganizing Debtor, the applicable Reorganized Debtor, or any other Entity to have paid taxes or to have filed any tax return (including, without limitation, any income tax return or franchise tax return) in or for any taxable period ending before the Petition Date or arising out of an audit of any return for a taxable period ending before the Petition Date.

      (c)        No Successor Liability.

      (1) Article 13.3(a) of the Plan provides that, except as otherwise expressly provided in the Plan, none of the ASARCO Protected Parties other than the applicable Reorganized Debtor will be deemed a successor or successor-in-interest to any of the Reorganizing Debtors or to any Entity for which the Reorganizing Debtors may be held legally responsible, by reason of any theory of law or equity, and none will be responsible for any successor or transferee liability of any kind or character.

      (2) Article 13.3(b) of the Plan provides that, except as otherwise expressly provided in the Plan, none of the ASARCO Protected Parties other than the applicable Reorganized Debtors will have any obligations to perform, pay, indemnify creditors for, or otherwise have any responsibilities for any liabilities or obligations of the applicable Reorganizing Debtors or the applicable Reorganized Debtors, whether arising before, on, or after the Confirmation Date.

(d)    Asbestos Insurance Actions and Preservation of Insurance Claims and Defenses.

Article 13.4 of the Plan provides that, subject to the terms of Article 13.4 of the Plan and the terms of the Confirmation Order, the Asbestos Insurance Actions and Asbestos Insurance Recoveries will be preserved pursuant to this provision for pursuit: (a) if the Section 524(g) Treatment or the Primary Asbestos Treatment goes into effect, by the Section 524(g) Trust or the Asbestos Claims Trust for the benefit of the Section 524(g) Trust Beneficiaries or the Asbestos Claims Trust Beneficiaries, as applicable; or (b) otherwise, by the applicable Reorganized Debtor.  If the Section 524(g) Treatment or the Primary Asbestos Treatment goes into effect, on or after the Effective Date, the Section 524(g) Trustees or Asbestos Claims Trustees, as applicable, will be entitled, in their sole and complete discre  tion, to pursue, compromise or settle any and all Asbestos Insurance Actions and Asbestos Insurance Recoveries, and all proceeds from the Asbestos Insurance Actions shall be paid to the Section 524(g) Trust or Asbestos Claims Trust, as applicable.

(e)    Insurance Neutrality.

(1)    Article 13.5(a) of the Plan provides that confirmation of the Plan will not be binding upon, and will not have any *res judicata* or collateral estoppel effect on or against, any Asbestos Insurance Company that is subject to insurance neutrality under the Bankruptcy Court's May 29, 2008 Order Extending Scope of Insurance Neutrality Addendum Attached to Order Approving Compromise and Settlement Regarding Resolution of Derivative Asbestos Claims (the "Insurance Neutrality Order") regarding its insurance coverage obligations in any pending or subsequent insurance coverage litigation, arbitration, ADR-type proceeding or other dispute concerning the existence and/or scope of its rights and/or obligations regarding asbestos-related liabilities, if any, and will not have any impact, effect or consequence in any such other context.

(2)    Article 13.5(b) of the Plan provides that neither the Reorganizing Debtors, the Asbestos Subsidiary Debtors, the Asbestos Claimants' Committee, the ASARCO Committee, the FCR, an Asbestos Insurance Company nor the Section 524(g) Trust may argue or assert, in any court proceeding, arbitration, ADR-type proceeding or other dispute involving an Asbestos Insurance Company that is subject to insurance neutrality under the Bankruptcy Court's Insurance Neutrality Order and concerning issues related to insurance coverage, that any findings or conclusions concerning 11 U.S.C. § 524(g) and/or constituting any estimation of asbestos-related liabilities contained in or referenced in any decision, order, finding, conclusion or judgment of the Bankruptcy Court relating to Confirmation of the Plan: (1) constitutes a "judgment," "adjudication," "final order," "settlement," or "finding of liability" related to, based on or relying on the principles enunciated in *UNR Indus., Inc. v. Continental Cas. Co.*, 942 F.2d 1101 (7th Cir. 1991) and/or *Fuller-Austin Insulation Co. v. Fireman's Fund Ins. Co.*, No. BC 116835, 2002 WL 31005090 (Cal. Super. Ct. Aug. 6, 2002); and (2) is binding upon such an Asbestos Insurance Company for any purpose concerning insurance coverage under any policies issued to any of the Reorganizing Debtors and transferred to the Section 524(g) Trustees in accordance with the provisions hereof.  Nothing herein shall limit the ability of the Reorganizing Debtors, the Asbestos Subsidiary Debtors, the Asbestos Claimants' Committee, the ASARCO Committee, the FCR, an Asbestos Insurance Company or the Section 524(g) Trust to offer the Plan, any of the Plan Documents, the Confirmation Order or any part of the confirmation process (including without limitation, any evidentiary hearings or any findings or conclusions therein) in any court, including any court resolving any insurance coverage litigation, as evidence that the Reorganizing Debtors, the Reorganized Debtors, or the Section 524(g) Trust are so bound.

(3)    Article 13.5(c) of the Plan provides that nothing in the Plan will operate to expand the rights of the Reorganizing Debtors, any of the Asbestos Subsidiary Debtors, the Asbestos Claimants' Committee, the ASARCO Committee, the FCR, an Asbestos Insurance Company or the Section 524(g) Trust, or diminish any of their respective duties and obligations as to those rights, duties and obligations that exist under any policies issued by an Asbestos Insurance Company that is subject to insurance neutrality under the Bankruptcy Court's Insurance Neutrality Order as of the Petition Date except as set out in Article 13.5(f) of the Plan.  Moreover, nothing in the Confirmation process will in any way operate to, or have the effect of, impairing, prejudicing or expanding such Asbestos Insurance Company's legal, equitable, or contractual rights in any respect, or of increasing, accelerating, creating, or triggering such Asbestos Insurance Company's insurance coverage obligations, if any, in comparison to what those respective rights or obligations would have been if the Plan had not been confirmed except as set out in Article 13.5(f) of the Plan and all of such Asbestos Insurance Company's rights are

expressly reserved and preserved.  Such Asbestos Insurance Company's rights will be determined pursuant to its insurance policies with the applicable Reorganizing Debtors, and under applicable law. Such Asbestos Insurance Company's rights to conduct discovery, either written or oral, in any future proceeding in any insurance coverage litigation relating to the Reorganizing Debtors' asbestos-related liabilities for or such Asbestos Insurance Company's obligations to indemnify the applicable Reorganizing Debtors on account of any or all of such asbestos-related liabilities, if any, will not be affected, restricted, expanded, altered or modified by anything in or part of the Plan or the Confirmation process.  An Asbestos Insurance Company will have no such discovery rights in any of the Reorganization Cases; *provided, however,* that such Asbestos Insurance Company will have rights to conduct discovery in the Reorganization Cases on any issue that does not relate to an Asbestos Insurance Company's alleged obligations, if any, to indemnify the applicable Reorganizing Debtors on account of any asbestos-related liabilities.  Without limiting the foregoing, except as set out in Article 13.5(f) of the Plan, no proceedings undertaken pursuant to or otherwise as part of the Confirmation process (including without limitation, any evidentiary hearings or any findings or conclusions constituting or relating to the determination of any Alter Ego Theories, contained in or referenced in any decision, order, finding, conclusion or judgment of the Bankruptcy Court) will constitute a trial or hearing on the merits, or an adjudication, Final Order, settlement, or finding of liability binding on such Asbestos Insurance Company for any purpose concerning insurance coverage for asbestos-related liability, or be used as evidence or offered into evidence in any proceeding to prove that such Asbestos Insurance Company participated in and/or consented to the procedures undertaken pursuant to the Plan.  Any ruling by the Bankruptcy Court on any issue upon which such Asbestos Insurance Company does not involve itself and the Confirmation Order will not be binding on such Asbestos Insurance Company in any insurance coverage litigation.  While the court and the finder of fact in any insurance coverage litigation may be advised of any of the proceedings and Confirmation Order in the Bankruptcy Court and while the Reorganizing Debtors, the Asbestos Subsidiary Debtors, the Asbestos Claimants' Committee, the ASARCO Committee, the FCR, an Asbestos Insurance Company or the Section 524(g) Trust may offer the Plan, any of the Plan Documents, any of the Confirmation proceedings, or the Confirmation Order as evidence of the reasonableness of a settlement between or among the Reorganizing Debtors, the ASARCO Committee, and the FCR, the court and the finder of fact in any insurance coverage litigation will be informed or instructed that such proceedings and the Confirmation Order in the Bankruptcy Court are not binding on such Asbestos Insurance Company and that it is up to the court or the finder of fact in any insurance coverage litigation to make its own independent determination as to the reasonableness of that settlement as to such Asbestos Insurance Company.

(4)  Article 13.5(d) of the Plan provides that, with regard to any Asbestos Insurance Company that is subject to insurance neutrality under the Bankruptcy Court's Insurance Neutrality Order, nothing in or as part of the Plan and the Confirmation process will be deemed to be an "adversarial process" as that concept was enunciated in *Gandy v. State Farm Fire & Cas. Co.*, 925 S.W.2d 696 (Tex. 1996).  To the extent of any insurance coverage obligation under any policies issued by such Asbestos Insurance Company, all such Asbestos Insurance Companies reserves all of their rights, if any, to adjudicate in a fully "adversarial" trial or hearing on the merits any or all of the Reorganizing Debtors' asbestos-related liabilities including, without limitation, any liability with respect to any individual asbestos Claim; and any other party reserves all of its rights, if any, to oppose such Asbestos Insurance Company's assertion of any such right.

(5)  Article 13.5(e) of the Plan provides that an Asbestos Insurance Company that is subject to insurance neutrality under the Bankruptcy Court's Insurance Neutrality Order and does not participate in the negotiation, nor the Confirmation, of the Plan will not be held against or in favor of any person or entity in any pending or subsequent insurance coverage litigation, arbitration, ADR-type proceeding, or other dispute concerning the existence and/or scope of such Asbestos Insurance Company's rights and/or obligations regarding asbestos-related liabilities, if any, except to rebut any argument affirmatively, raised by such Asbestos Insurance Company that such Asbestos Insurance Company's absence from the reorganization proceedings reflects collusion against and/or a lack of cooperation with such Asbestos Insurance Company.  Notwithstanding the foregoing, such Asbestos Insurance Company may assert in any such pending or subsequent insurance coverage litigation, arbitration, ADR-type proceeding, or other dispute concerning the existence and/or scope of such Asbestos Insurance Company's rights and/or obligations regarding asbestos-related liabilities, if any, any coverage defenses

based on collusion against and/or lack of cooperation with such Asbestos Insurance Company on any basis other than such Asbestos Insurance Company's absence from the Reorganization Cases.

(6)  Article 13.5(f) of the Plan provides that any of the Reorganizing Debtors, the Asbestos Subsidiary Debtors, the Asbestos Claimants' Committee, the ASARCO Committee, the FCR, an Asbestos Insurance Company or the Section 524(g) Trust may offer in any court, including any court resolving any insurance coverage litigation, any relevant portion of the Plan and any of the Plan Documents and/or the Confirmation Order for any purpose including, without limitation, that the Plan was a reasonable settlement; *provided*, *however*, such offer will be subject to the rights, defenses (including affirmative defenses) and objections, if any, of the Reorganizing Debtors, the Asbestos Subsidiary Debtors, the Asbestos Claimants' Committee, the ASARCO Committee, the FCR, an Asbestos Insurance Company and the Section 524(g) Trust.

3.13    Assumption and Rejection of Unexpired Leases and Executory Contracts.

(a)    Assumption or Rejection of Unexpired Leases and Executory Contracts.

Article 9.1 of the Plan provides that, on the Effective Date, except as otherwise provided in the Plan, any unexpired lease or executory contract that has not been previously assumed or rejected by any Reorganizing Debtor pursuant to an order of the Bankruptcy Court will be deemed assumed by such Reorganizing Debtor under sections 365(a) and 1123 of the Bankruptcy Code, other than those executory contracts and unexpired leases that are (a) listed on **Exhibit 2** to the Plan (as such list may be amended, supplemented or modified on or before the Confirmation Date) or (b) subject to a motion to reject that is pending on the Effective Date.  Entry of the Confirmation Order will constitute approval of such assumptions, and the rejection of the executory contracts or unexpired leases listed in **Exhibit 2** to the Plan (as such list may be amended, supplemented or modified on or before the Confirmation Date), pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Any motions to reject executory contracts and unexpired leases pending on the Effective Date will be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.

(b)    Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.

Article 9.2 of the Plan provides that entry of the Confirmation Order will, subject to and upon the occurrence of the Effective Date, constitute (a) the approval, pursuant to sections 365(a), 365(f) and 1123 of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Article 9.1 of the Plan; (b) the extension of time, pursuant to section 365(d)(4) of the Bankruptcy Code, within which the Reorganizing Debtors may assume, assume and assign, or reject the unexpired leases specified in Article 9.1 of the Plan through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such unexpired leases; and (c) the approval, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Article 9.1 of the Plan.

(c)    Inclusiveness.

Article 9.3 of the Plan provides that, unless otherwise specified on **Exhibit 2** to the Plan, each executory contract and unexpired lease listed or to be listed on **Exhibit 2** will include modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on **Exhibit 2**.

(d)    Rejection Damages.

Article 9.4 of the Plan provides that the Bankruptcy Court will determine the amount, if any, of the Claim of any Entity seeking damages by reason of the rejection of any executory contract or unexpired lease to which it is a counterparty.

(e)    Rejection Damages Bar Date.

Article 9.5 of the Plan provides that, if the rejection by a Reorganizing Debtor, pursuant to Article 9.1 of the Plan, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and discharged and will not be enforceable against the Reorganizing Debtors, the Reorganized Debtors, or their respective

properties, unless a Proof of Claim is filed and served upon the Plan Administrator within thirty days after the later of the Effective Date or the date of entry of an order approving such rejection.  To the extent any such Claim is Allowed by the Bankruptcy Court by Final Order, such Claim will become, and will be treated for all purposes under the Plan as, a Trade and General Unsecured Claim, and the holder thereof shall receive distributions as a holder of an Allowed Trade and General Unsecured Claim, pursuant to the Plan.

        (f)      <u>Payments Related to Assumption of Executory Contracts and Unexpired Leases</u>.

        Article 9.6 of the Plan provides that, to the extent that Cure Amount Claims constitute monetary defaults, such Cure Amount Claims will be satisfied by the applicable Reorganized Debtor, pursuant to section 365(b)(1) of the Bankruptcy Code:  (1) by payment of the Cure Amount Claim on the Effective Date; or (2) on such other terms as are agreed to by the Plan Sponsors and the non-debtor parties to the executory contract or unexpired lease.  In the event of a dispute regarding (A) the amount of any Cure Amount Claim or (B) any other matter pertaining to assumption and assignment of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving the assumption and assignment.

        (g)      <u>Employee Benefit Plans and Other Benefits</u>.

        (1)  Article 9.7(a) of the Plan provides that, effective as of the Effective Date, the applicable Reorganized Debtors will be responsible for all benefits and liabilities with respect to the Employee Benefit Plans.

        (2)  Article 9.7(b) of the Plan provides that all of the applicable Reorganizing Debtors' liabilities and obligations arising under the Employee Benefit Plans and workers' compensation benefits, even if such liability or obligation relates to Claims incurred (whether or not reported or paid) prior to the Effective Date, will be deemed to be, and will be treated as though they are, executory contracts that are deemed assumed under the Plan pursuant to sections 365(a), 365(f) and 1123 of the Bankruptcy Code.

        (3)  Article 9.7(c) of the Plan provides that each Reorganized Debtor will be responsible for all of such Reorganizing Debtor's obligations under the Coal Act, including the obligations (1) to provide retiree health benefits to eligible beneficiaries and their dependents pursuant to section 9711 of the Coal Act, 26 U.S.C. § 9711; (2) to pay the annual prefunding premium and the monthly per beneficiary premium required pursuant to sections 9712(d)(1)(A) and (B) of the Coal Act, 26 U.S.C. §§ 9712(d)(1)(A) and (B); and (3) to provide security to the UMWA 1992 Benefit Plan pursuant to section 9712(d)(1)(C) of the Coal Act, 26 U.S.C. § 9712(d)(1)(C).

        (4)  Article 9.7(d) of the Plan provides that ASARCO sponsors two defined benefit pension plans, the Retirement Income Plan for Hourly-Rated Employees of ASARCO, Inc. and the Retirement Benefit Plan for Salaried Employees of ASARCO, Inc. (collectively, the "Pension Plans"), which are covered by Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1301-1461 (2000 and Supp. V 2005).  ASARCO will satisfy its minimum funding obligations to the Pension Plans during the pendency of this proceeding, and through the Effective Date.  In the event that one or both of the Pension Plans terminate during the pendency of this proceeding, certain claims will arise, including joint and several liabilities of the Debtors to PBGC that may be entitled to priority under various Bankruptcy Code provisions.  As of the Effective Date, Reorganized ASARCO, and the members of its controlled group for purposes of ERISA, as applicable from time to time (the "Controlled Group"), shall be responsible for satisfying the minimum funding obligations to the Pension Plans subsequent to the Effective Date.  In the event that one or both of the Pension Plans terminate subsequent to the Effective Date, the liability of Reorganized ASARCO, and the Controlled Group, to PBGC, if any, will not be affected by any provision of the Plan or by confirmation of the Plan, and, in particular but without limitation, any claims of the Pension Benefit Guaranty Corporation with respect to the Pension Plans shall not be discharged, released, or expunged, or be subject to Article 12.2 of the Plan.

        (5)  Article 9.7(e) of the Plan provides that the Reorganized Debtors will assume and be responsible for all of the Reorganizing Debtors' obligations to pay retiree benefits, as defined in section 1114 of the Bankruptcy Court, for the duration of the period the applicable Reorganizing Debtor has obligated itself

to provide such benefits.  After the Effective Date, the Reorganized Debtors will retain their rights to amend, modify or terminate retiree benefits in accordance with all relevant agreements and applicable law, including any collective bargaining agreement that may be entered into between the USW and the Reorganized Debtors.  The USW takes the position that the provisions of the Plan in this regard do not comply with the requirements of 11 U.S.C. § 1129 (a) (13).

(h)　　Surety Bonds.

Article 9.8 of the Plan provides that all Surety Bonds will be retained or deemed Reinstated, as the case may be, on the Effective Date and will revest to the benefit of applicable Reorganized Debtors.

3.14　　Miscellaneous.

(a)　　General Retention of Jurisdiction.

Article 16.1 of the Plan provides that, until the Reorganization Cases are closed, the Bankruptcy Court (and, with respect to the Permanent Channeling Injunction and the Asbestos Insurance Company Injunction, the District Court) will retain the fullest and most extensive jurisdiction permissible, including, without limitation, that necessary (a) to ensure that the purposes and intent of the Plan are carried out, (b) to enforce and interpret the terms and conditions of the Plan Documents, and (c) to enter such orders or judgments, including, without limitation, injunctions necessary to enforce the rights, title, and powers of the Reorganizing Debtors, the Reorganized Debtors, a Settling Asbestos Insurance Company, the Plan Sponsors and/or other ASARCO Protected Party.  Except as otherwise provided in the Plan, the Bankruptcy Court will retain jurisdiction to hear and determine all Claims against and Interests in the Reorganizing Debtors and to adjudicate and enforce all other causes of action that may exist on behalf of the Reorganizing Debtors. Nothing contained herein will prevent the Reorganized Debtors, the Plan Administrator, the Plan Sponsors, either the Section 524(g) Trustees or the Asbestos Claims Trustees, as the case may be, or the Environmental Liquidation Trustee (as appropriate) from taking such action as may be necessary in the enforcement of any cause of action that such Entity has or may have and that may not have been enforced or prosecuted by the applicable Reorganizing Debtor, which cause of action shall survive entry of the Confirmation Order and occurrence of the Effective Date and will not be affected thereby except as specifically provided herein.

(b)　　Jurisdiction over the Section 524(g) Trust.

Article 16.2 provides that the Section 524(g) Trust will be subject to the continuing jurisdiction of the Bankruptcy Court in accordance with the requirements of section 468B of the Internal Revenue Code and the regulations issued pursuant to the Plan.

(c)　　Jurisdiction Retention for Specific Purposes.

Article 16.3 of the Plan provides that, without limiting the effect of Articles 16.1 and 16.2 of the Plan, the Bankruptcy Court will retain jurisdiction after Confirmation to:

(1)  modify the Plan after entry of the Confirmation Order, pursuant to the provisions of the Plan, the Bankruptcy Code, and the Bankruptcy Rules;

(2)  correct any defect, cure any omission, reconcile any inconsistency, or make any other necessary changes or modifications in or to the Plan, the Plan Documents, or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

(3)  hear and determine any cause of action, and to enter and implement such orders as may be necessary or appropriate, to execute, interpret, implement, consummate, or enforce the Plan, the Plan Documents and the transactions contemplated thereunder;

(4)  hear and determine disputes arising in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan, including without limitation the Plan Documents, and to enforce, including by specific performance, the provisions of the Plan and the Plan Documents;

(5) hear and determine disputes arising in connection with the execution, interpretation, implementation, consummation, or enforcement of the settlement agreements, asset purchase agreements or other agreements entered into by the Reorganizing Debtors during the Reorganization Cases (the "Other Agreements"), or to enforce, including by specific performance, the provisions of the Other Agreements;

(6) enter and implement orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation or implementation of the Plan, including, without limitation, to issue, administer, and enforce injunctions, releases, assignments, transfers of property or property rights, or other obligations contained in the Plan and the Confirmation Order;

(7) assure the performance by the Reorganized Debtors, the Plan Administrator, and the Trustees of their respective obligations to make distributions under the Plan and other Plan Documents;

(8) enter such orders or judgments, including injunctions as necessary to enforce the title, rights, and powers of any of the Reorganizing Debtors, the Reorganized Debtors, the Plan Sponsors, the Plan Administrator and the Trusts;

(9) hear and determine any and all motions, applications or adversary proceedings brought by or against the Trusts related to (1) enforcement or interpretation of the Trust Documents and (2) amendment, modification, alteration or repeal of any provision of the Trust Documents, if such hearing and determination by the Bankruptcy Court is required pursuant to the Plan;

(10) hear and determine any and all adversary proceedings, applications, and contested matters, including any remands after appeal;

(11) ensure that distributions to holders of Allowed Claims and Demands are accomplished as provided in the Plan;

(12) reduce the size of the Disputed Claims Reserve based upon the amount of the remaining Disputed Claims or other changed circumstances, including increases in the Reorganized Debtors' cash positions;

(13) hear and determine any timely objections to or motions or applications concerning Claims or the allowance, classification, priority, compromise, setoff, estimation, or payment of any Claim, to the fullest extent permitted by the provisions of section 157 of title 28 of the United States Code;

(14) enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

(15) hear and determine any motions, contested matters or adversary proceedings involving taxes, tax refunds, tax attributes, tax benefits, and similar or related matters with respect to any of the Reorganizing Debtors, the Reorganized Debtors, the Plan Administrator and/or the Trusts arising on or prior to the Effective Date, arising on account of transactions contemplated by the Plan Documents, or relating to the period of administration of the Reorganization Cases;

(16) hear and determine all applications for compensation of Professional Persons and reimbursement of expenses under sections 330, 331, or 503(b) of the Bankruptcy Code;

(17) hear and determine any causes of action relating to any of the Reorganizing Debtors, the Reorganized Debtors, or the Trusts to the fullest extent permitted by section 157 of title 28 of the United States Code;

(18) hear and determine any cause of action in any way related to the Plan Documents or the transactions contemplated thereby, against the ASARCO Protected Parties;

(19) recover all assets of each of the Reorganizing Debtors and property of their Estates, wherever located, including actions under chapter 5 of the Bankruptcy Code;

(20) hear and determine any and all motions pending as of the Confirmation Date for the rejection, assumption, or assignment of executory contracts or unexpired leases and the allowance of any Claim resulting therefrom;

(21) hear and determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(22) consider and act on the compromise and settlement of any Claim against, or Interest in, any of the Reorganizing Debtors or their respective Estates including, without limitation, any disputes relating to any Administrative Claims, any Bar Date, or Bar Date Order;

(23) hear and determine all questions and disputes regarding title to the assets of any of the Reorganizing Debtors, their respective Estates, or the Trusts;

(24) hear and determine any other matters related to the Plan, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Reorganization Cases;

(25) retain continuing jurisdiction with regard to the Section 524(g) Trust sufficient to satisfy the requirements of Treasury Regulations section 1.468B;

(26) hear and determine any and all applications brought by the Section 524(g) Trustees to amend, modify, alter, or repeal any provision of the Section 524(g) Trust Agreement or the Section 524(g) Trust Distribution Protocol pursuant to the Section 524(g) Trust Agreement and to declare or resolve all issues or disputes contemplated by the Section 524(g) Trust Agreement;

(27) enter and implement orders extending the Asbestos Insurance Company Injunction to insurance companies that become Settling Asbestos Insurance Companies after the Effective Date;

(28) enter such orders as are necessary to implement and enforce the Injunctions; and

(29) hear and determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan.

(d)     Exclusive Jurisdiction of District Court for Certain Matters.

(1) Article 16.4(a) of the Plan provides that the District Court will, without regard to the amount in controversy, retain exclusive jurisdiction after Confirmation over matters relating to section 524(g) of the Bankruptcy Code and the Permanent Channeling Injunction and the Asbestos Insurance Company Injunction, including, without limitation, the validity, application, or construction of the Permanent Channeling Injunction and the Asbestos Insurance Company Injunction, or of section 524(g) of the Bankruptcy Code with respect to the Permanent Channeling Injunction and the Asbestos Insurance Company Injunction; *provided, however,* that, from and after the Effective Date, the jurisdiction of the District Court will be non-exclusive with respect to any Asbestos Insurance Action or Asbestos Insurance Recovery.  Nothing contained in Article 16.4(a) will be deemed a finding or conclusion that: (a) the Bankruptcy Court or District Court in fact have jurisdiction with respect to any Asbestos Insurance Action or Asbestos Insurance Recovery; (b) any such jurisdiction is exclusive with respect to any Asbestos Insurance Action or Asbestos Insurance Recovery; or (c) abstention or dismissal or reference of actions effecting the transfer of jurisdiction of any Asbestos Insurance Action or Asbestos Insurance Recovery pending in the Bankruptcy Court or District Court to another court is precluded, inadvisable or unwarranted.  Any court other than the Bankruptcy Court or the District Court that has or is capable of having jurisdiction over any Asbestos Insurance Action or Asbestos Insurance Recovery will have the right to exercise such jurisdiction.

(2) Article 16.4(b) of the Plan provides that, notwithstanding entry of the Confirmation Order and/or the occurrence of the Effective Date, the reference to the Bankruptcy Court pursuant to the Reference Order will continue, but subject to Article 16.4 of the Plan and any other modifications or withdrawals of the reference specified in the Confirmation Order, the Reference Order, any case management order or other order of the District Court.

(e)      Post-Effective Date Status of the Committees and the FCR.

Article 16.5 of the Plan provides that the Committees and the position of the FCR will continue in existence until the Effective Date, with ASARCO to pay the reasonable fees and expenses of the Committees and the FCR through the Effective Date in accordance with the fee and expense procedures promulgated during the Reorganization Cases.  The Committees and the FCR will have standing to participate in proceedings brought by their respective professionals or, if applicable, members, for allowance of fees and/or reimbursement of expenses as permitted by law. Except as provided above, the Committees will be dissolved on the Effective Date, and the members, attorneys, accountants, and other professionals thereof will be released and discharged of and from all further authority, duties, responsibilities, liabilities, and obligations related to, or arising from, the Reorganization Cases.

(f)      Modification of Plan.

Article 16.6 of the Plan provides that the Plan Sponsors may alter, amend or modify the Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date.  After the Confirmation Date, the Plan Sponsors or the Reorganized Debtors, as the case may be, may, under section 1127(b) of the Bankruptcy Code, seek Bankruptcy Court approval to remedy any defects or omissions or reconcile any inconsistencies in the Plan or the Confirmation Order in such manner as may be necessary to carry out the purposes and intent of the Plan, so long as the proposed alteration, amendment or modification does not adversely affect the treatment of Claims or Interests under the Plan.

(g)      Non-Consummation.

Article 16.7 of the Plan provides that, if the Plan is not Confirmed by a Final Order, or if the Plan is Confirmed and does not become effective, the rights of all parties in interest in the Reorganizing Debtors' chapter 11 cases, including the Plan Sponsors, are and will be reserved in full.  Any concessions or settlements reflected herein (if any), are made for purposes of the Plan only, and if the Plan does not become effective, then (i) no party in interest shall be bound or deemed prejudiced by any such concession or settlement, (ii) the Plan shall be null and void in all respects, (iii) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, (iv) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall prejudice in any manner the rights of the Plan Sponsors or constitute an admission or waiver of any sort by the Plan Sponsors, and (v) the structure of the Plan and the classification of creditors or groups of creditors within one Class contained herein shall have no evidentiary or precedential effect.

(h)      Entire Agreement.

Article 16.8 of the Plan provides that, except as otherwise expressly provided in the Plan or the Plan Documents, the Plan and the Plan Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions and documents.

(i)      Rules Governing Conflicts Between Documents.

Article 16.9 of the Plan provides that, in the event of a conflict between the terms or provisions of the Plan and the Plan Documents, the terms of the Plan will control over the Plan Documents.  In the event of a conflict between the terms of the Plan or the Plan Documents, on the one hand, and the terms of the Confirmation Order, on the other hand, the terms of the Confirmation Order will control.

(j)      Severability.

Article 16.10 of the Plan provides that, in the event any provision in the Plan should be determined to be unenforceable either on its face or as applied to any Claim, Demand, Interest or transaction, the Plan Sponsors may modify the Plan in accordance with Article 16.6 of the Plan so that such provision will not be applicable to the holder of any Claim, Demand, Interest, or transaction.  Such determination of unenforceability will not (a) limit or affect the enforceability and operative effect of any other provision of the Plan or (b) require the re-solicitation of any acceptance or rejection of the Plan.

(k)      Headings.

Article 16.11 of the Plan provides that headings are utilized in the Plan for convenience and reference only and will not constitute a part of the Plan for any other purpose.

(l)       Bar Date for Compensation and Reimbursement Claims.

Article 16.12 of the Plan provides that all applications for final allowances of compensation or reimbursement of expenses under section 330 of the Bankruptcy Code or applications for allowance of Administrative Claims arising under subsections (b)(2) through (b)(6) of section 503(b) of the Bankruptcy Code must be filed on or before 90 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court; save and except that any application under section 503(b)(3)(D) of the Bankruptcy Code or any application for a fee enhancement or success fee under the Bankruptcy Code must be filed on or before 60 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to applications of such Professionals Persons or other Entities for compensation or reimbursement of costs and expenses or for substantial contribution Claims must be filed within 20 days after the applicable application for compensation or reimbursement was filed.

(m)      Subsequent Administrative Claims Bar Date.

Article 16.13 of the Plan provides that Claimants, other than Professional Persons, holding Administrative Claims against any of the Reorganizing Debtors that arise after the Initial Administrative Claims Bar Date (a "Subsequent Administrative Claim") that remain unpaid on the Effective Date must file a request for payment of a Subsequent Administrative Claim on or before forty-five (45) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Any holder of a Subsequent Administrative Claim that is required to file a request for payment of such Claim and that does not file such request prior to the Subsequent Administrative Claims Bar Date will be forever barred from asserting such Subsequent Administrative Claim against any of the Reorganizing Debtors, any of the Reorganized Debtors or their respective properties, and such Subsequent Administrative Claim will be deemed discharged as of the Effective Date.  Objections to Subsequent Administrative Claims must be filed with the Bankruptcy Court within 20 days after the applicable Subsequent Administrative Claim was filed, unless such objection deadline is extended by the Bankruptcy Court.  Any Subsequent Administrative Claims of the United States or any individual state under civil Environmental Laws relating to the Designated Properties shall be addressed through the Environmental Liquidation Trust.

(n)       Governing Law.

Article 16.14 of the Plan provides that, except to the extent that federal law (including, without limitation, the Bankruptcy Code and the Bankruptcy Rules) is applicable or the Plan provides otherwise, the rights and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to its conflicts of law principles.

(o)       Consent to Jurisdiction.

Article 16.15 of the Plan provides that, except for the matters within the exclusive jurisdiction of the District Court as described in Article 16.4 of the Plan, the Reorganizing Debtors, the Reorganized Debtors, the Plan Administrator, the Trustees, the Trusts, the Section 524(g) Trust Advisory Committee, and the FCR consent to the jurisdiction of the Bankruptcy Court, or any successor thereto, for all proceedings relating to the enforcement of the Plan and/or the Plan Documents, the Confirmation Order and the Asbestos Insurance Company Injunction.  As to the matters within the exclusive jurisdiction of the District Court as described in Article 16.4 of the Plan, the Reorganizing Debtors, the Reorganized Debtors, the Plan Administrator, the Section 524(g) Trustees, the Section 524(g) Trust, the Section 524(g) Trust Advisory Committee, and the FCR consent to the jurisdiction of the District Court, or any successor thereto, and agree that it will be the preferred forum for all matters within the exclusive jurisdiction of the District Court as described in Article 16.4 of the Plan.

(p)       Transfer Taxes.

Article 16.16 of the Plan provides that the issuance, transfer, or exchange of any of the securities issued under, or the transfer of any other assets or property pursuant to, or in connection with, the Plan or the making or delivery of an instrument of transfer under, or in connection with, the Plan will not, pursuant to section 1146 of the Bankruptcy Code, be taxed under any law imposing a stamp tax, transfer tax, or other similar tax.

(q)      Recordable Order.

Article 16.17 of the Plan provides that the Confirmation Order will be deemed to be in recordable form, and will be accepted by any recording officer for filing and recording purposes without further or additional orders, certifications, or other supporting documents.

(r)      Successors and Assigns.

Article 16.18 of the Plan provides that the rights, duties, and obligations of any Entity named or referred to in the Plan will be binding upon, and will inure to the benefit of, the successors and assigns of such Entity.

(s)      Waiver of Rights.

Article 16.18 of the Plan provides that holders of Claims, Demands or Interests will have the right voluntarily to waive any rights, benefits or protections that are afforded to them under the provisions of the Plan or any order issued in furtherance of the Plan, and such waiver will supersede such rights, benefits or protections.  Any such waiver will only be effective if such party expressly and specifically waives in writing one or more of such rights, benefits or protections.

SECTION 4
SECTION 524(G) TRUST

Article VI of the Plan, outlined below, will apply if the Section 524(g) Treatment goes into effect.

4.1      Establishment and Purpose of the Section 524(g) Trust.

Article 6.1(a) of the Plan provides that, on the Effective Date, or as soon thereafter as the Bankruptcy Court establishes the aggregate amount of consideration necessary to satisfy the requirements of section 524(g) of the Bankruptcy Code, the Section 524(g) Trust will be established in accordance with the Plan Documents.  When established, the Section 524(g) Trust will be empowered in accordance with the Plan and the Plan Documents.  The Section 524(g) Trust will be a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1.  The purposes of the Section 524(g) Trust will be to, among other things, (a) liquidate, resolve, pay, and satisfy all Asbestos Personal Injury Claims and Demands in accordance with the Plan, the Section 524(g) Trust Distribution Protocol, the Section 524(g) Trust Agreement, and the Confirmation Order, (b) receive, preserve, hold, manage, and maximize the Section 524(g) Trust Assets for use in paying and satisfying Allowed Asbestos Personal Injury Claims and Demands in accordance with the terms of the Section 524(g) Trust Agreement, and (c) take other actions deemed by the Section 524(g) Trustees to be in the best interests of the holders of the Asbestos Personal Injury Claims and Demands, who are the sole beneficiaries of the Section 524(g) Trust.

Article 6.1(b) of the Plan provides that the Section 524(g) Trustees will create an Asbestos Premises Liability Claims Fund for payment of Asbestos Premises Liability Claims and Demands.  The Asbestos Premises Liability Claims Fund will be funded with, directly or indirectly: (a) proceeds from certain Asbestos Insurance Policies that are subject to prepetition settlement agreements regarding Asbestos Premises Liability Claims and Demands; (b) additional proceeds, if any, from the Asbestos Insurance Recoveries that are applicable to Asbestos Premises Liability Claims and Demands; and (c) if necessary, an amount determined by the Asbestos Claims Trustees, in their sole discretion, to satisfy all Asbestos Premises Liability Claims and Demands, if any, that are not subject to coverage under the prepetition settlement agreements referenced herein.  Asbestos Premises Liability Claims and Demands shall be processed, liquidated and paid pursuant to the terms and provisions of the Section 524(g) Trust Distribution Protocol and the Section 524(g) Trust Agreement.

4.2      Section 524(g) Trust Agreement.

Article 6.2 of the Plan provides that the Section 524(g) Trust Agreement shall be substantially in the form of the "Asbestos Trust Agreement" attached as **Exhibit 6 to the Debtors' Plan**, which contains provisions customary to documents utilized in comparable circumstances, shall differ from the Debtors' Asbestos Trust Agreement solely to the extent necessary to conform to non-substantive differences between the Plan and the Debtors' Plan, and any such differences shall be subject to the reasonable approval of the FCR and the Asbestos Claimants' Committee.

4.3     Transfers and Assignments to the Section 524(g) Trust.

        Article 6.3 of the Plan provides that, on the Effective Date, or as soon thereafter as the Bankruptcy Court establishes the aggregate amount of consideration necessary to satisfy the requirements of section 524(g) of the Bankruptcy Code, the Plan Administrator will transfer and assign to the Section 524(g) Trust for the benefit of the Section 524(g) Trust Beneficiaries the Section 524(g) Trust Assets.

4.4     Control of the Asbestos Insurance Actions and Asbestos Insurance Recoveries.

        Article 6.4 of the Plan provides that the right to control the Asbestos Insurance Actions and all Asbestos Insurance Recoveries, including negotiations relating thereto and settlements thereof, will be vested in the Section 524(g) Trust on and after the Effective Date.  Notwithstanding the foregoing, Reorganized ASARCO, the Plan Administrator and the Plan Sponsors will cooperate with the Section 524(g) Trustees in pursuing the Asbestos Insurance Actions through such means, and will provide reasonable access to personnel and books and records of Reorganized ASARCO relating to the Asbestos Insurance Actions to representatives of the Section 524(g) Trust to enable the Section 524(g) Trustees to perform the Section 524(g) Trustees' tasks under the Section 524(g) Trust Agreement and the Plan, as is discussed in Article 6.11 of the Plan in regards to Reorganized ASARCO.

4.5     Assumption of Liabilities by the Section 524(g) Trust.

        Article 6.5 of the Plan provides that upon occurrence of the Effective Date or as soon thereafter as the Section 524(g) Trust is established, in exchange for funding in accordance with Article 6.3 of the Plan, the Section 524(g) Trust will be deemed, without need for further action, to have assumed responsibility and liability for all Asbestos Personal Injury Claims.

4.6     Tax Matters.

        Article 6.6 of the Plan provides that no election will be made to treat the Section 524(g) Trust as a grantor trust for U.S. federal income tax purposes.  The Section 524(g) Trust is intended to be treated as a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1, and hence as a taxable entity for federal income tax purposes, and the Section 524(g) Trustees shall be "administrators" of the Section 524(g) Trust pursuant to Treasury Regulation section 1.468B-2(k)(3).  The Section 524(g) Trustees will cause all taxes imposed on the Section 524(g) Trust to be paid using assets of the Section 524(g) Trust and will comply with all tax reporting and withholding requirements imposed on the Section 524(g) Trust under applicable tax laws, and in particular the rules applicable to a qualified settlement fund.

4.7     Section 524(g) Trust Expenses.

        Article 6.7 of the Plan provides that the Section 524(g) Trust will pay all Section 524(g) Trust Expenses (including applicable taxes) from the Section 524(g) Trust Assets.  Neither the Reorganizing Debtors, the Plan Sponsors, the Plan Administrator, nor the Reorganized Debtors will have any obligation to pay or reimburse any Section 524(g) Trust Expenses.  However, nothing will preclude the Section 524(g) Trustees from seeking reimbursement of such expenses from any Asbestos Insurance Company.

4.8     Initial Section 524(g) Trustees.

        Article 6.8 of the Plan provides that the initial Section 524(g) Trustees will be those Persons nominated by the Asbestos Claimants' Committee and the FCR, if the Asbestos Claimants' Committee and the FCR are willing to make such nominations, or otherwise nominated by the Plan Sponsors, and designated in the Confirmation Order.

4.9     The FCR.

        Article 6.9 of the Plan provides that, on and after the Effective Date, Judge Robert C. Pate will serve as the FCR, as such term is defined the Section 524(g) Trust Agreement, and will have and exercise the functions, rights, duties, powers and privileges provided in the Section 524(g) Trust Documents, if Judge Robert C. Pate is willing to so serve.  If not, the Bankruptcy Court will appoint his replacement.

4.10    Section 524(g) Trust Advisory Committee.

Article 6.10 of the Plan provides that the initial members of the Section 524(g) Trust Advisory Committee will be those Persons nominated by the Asbestos Claimants' Committee and the FCR, if the Asbestos Claimants' Committee and the FCR are willing to make such nominations, or otherwise nominated by the Plan Sponsors, and designated in the Confirmation Order.  They will consult with and advise the Section 524(g) Trustees regarding the administration of the Section 524(g) Trust and the liquidation and resolution of Asbestos Personal Injury Claims in accordance with the provisions of the Plan and the Section 524(g) Trust Documents.

4.11    Asbestos Books.

Article 6.11 of the Plan provides that, subject to the conditions set forth herein, the Section 524(g) Trust, through its duly authorized representatives, will have the right, upon reasonable prior written notice to Reorganized ASARCO: (a) to have Reorganized ASARCO transfer into the Section 524(g) Trust's possession all or part of the Asbestos Books in their current condition upon request of the Section 524(g) Trust and on the condition that the Section 524(g) Trust will incur all costs and expenses of the transfer or (b) to inspect and, at the sole expense of the Section 524(g) Trust, make copies of the Asbestos Books on any business day and as often as may reasonably be requested; provided that, if so requested, the Section 524(g) Trust will have entered into a confidentiality agreement satisfactory in form and substance to Reorganized ASARCO.  All costs and expenses associated with the storage of and access to the Asbestos Books will be the responsibility of, and paid by, the Section 524(g) Trust.  Reorganized ASARCO, the Plan Administrator and the Plan Sponsors will cooperate with the Section 524(g) Trust in transferring or providing access to the Asbestos Books in their current condition, and will also provide reasonable access to necessary or appropriate personnel and the Asbestos Books as contemplated herein.  Subject to the conditions set forth herein, the Section 524(g) Trust, through its duly authorized representatives, will also have the right, upon reasonable prior written notice, to conduct reasonable interviews of employees and other representatives of Reorganized ASARCO concerning matters reasonably related to the Asbestos Books.  Reorganized ASARCO will provide the Section 524(g) Trust with advance notice of any proposed disposition of any of the Asbestos Books and a reasonable opportunity to segregate and remove such Asbestos Books as the Section 524(g) Trust may select.  If the Section 524(g) Trust obtains from Reorganized ASARCO or its representatives any documents or communications (whether written or oral) to which any attorney-client, work-product privilege or other privilege or immunity attaches, the Section 524(g) Trust will be deemed an agent of the privilege holder for purposes of preserving the privilege, will be required to take all reasonable steps to maintain any such privilege, and may not waive any such privilege without the consent of Reorganized ASARCO.  Production of materials to the Section 524(g) Trust does not constitute a waiver or an impairment of any privilege held by Reorganized ASARCO or ASARCO.  In the event that any third party challenges any such privilege, Reorganized ASARCO may seek protection from a court of competent jurisdiction.  References in Article 6.11 of the Plan to Reorganized ASARCO will also include its successors in interest.

4.12    Cooperation with Respect to Insurance Matters.

Article 6.12 of the Plan provides that Reorganized ASARCO and the Plan Sponsors will cooperate with the Section 524(g) Trust and use commercially reasonable efforts to take or cause to be taken all appropriate actions and to do or cause to be done all things necessary or appropriate to effectuate all transfers and assignments identified herein to the Section 524(g) Trust.  By way of enumeration and not of limitation, Reorganized ASARCO and ASARCO each will be obligated (a) to provide the Section 524(g) Trust with copies of insurance policies and settlement agreements included within or relating to the Asbestos Personal Injury Claims and Demands; (b) to provide the Section 524(g) Trust with information necessary or helpful to the Section 524(g) Trust in connection with its efforts to obtain insurance coverage for the Asbestos Personal Injury Claims and Demands as well as other recoveries, including, without limitation, recoveries of extracontractual damages; (c) to execute assignments or allow the Section 524(g) Trust to pursue Claims in its own name (subject to appropriate disclosure of the fact that the Section 524(g) Trust is doing so and the reasons why it is doing so), including by means of arbitration, alternative dispute resolution proceedings or litigation, to the extent necessary or helpful to the efforts of the Section 524(g) Trust to obtain insurance coverage for the Asbestos Personal Injury Claims and Demands as well as other recoveries, including, without limitation, recoveries of extracontractual damages; and (d) to pursue and recover insurance coverage for the Asbestos Personal Injury Claims and Demands as well as other recoveries, including, without limitation, recoveries of extracontractual damages, in its own name or right to the extent that any or all of the transfers and assignments identified herein are not able to be fully effectuated, with any and all recoveries therefrom to be turned over to the Section 524(g) Trust.  The Section 524(g) Trust will be obligated to compensate Reorganized ASARCO and ASARCO for all costs and expenses reasonably incurred in connection with providing assistance to the Section 524(g) Trust under Article 6.12 of the Plan, including, without limitation, out-of-pocket costs and expenses, consultant fees and attorneys' fees.

4.13    Indemnification by the Section 524(g) Trust.

Article 6.13(a) of the Plan provides that the Section 524(g) Trust will indemnify, defend (and, where applicable, pay the defense costs for), and hold harmless each of the ASARCO Protected Parties from any and all liabilities associated with an Asbestos Personal Injury Claim or Demand that a third party seeks to impose upon any of the ASARCO Protected Parties, or that are imposed upon any of the ASARCO Protected Parties.

Article 6.13(b) of the Plan provides that, in the event that the Section 524(g) Trust makes a payment to any of the ASARCO Protected Parties hereunder, and the liability on account of which such payment was made is subsequently diminished, either directly or through a third-party recovery, the applicable ASARCO Protected Party will promptly repay the Section 524(g) Trust the amount by which the payment made by the Section 524(g) Trust exceeds the actual cost of such indemnified liability.

SECTION 5
ASBESTOS CLAIMS TRUST

Article VII of the Plan, outlined below, will apply if the Primary Asbestos Treatment goes into effect.

5.1    Establishment and Purpose of the Asbestos Claims Trust.

Article 7.1 of the Plan provides that, on the Effective Date, or as soon thereafter as the Bankruptcy Court establishes by Final Order the aggregate amount of consideration necessary to satisfy all Asbestos Personal Injury Claims in full, the Asbestos Claims Trust will be established and empowered in accordance with the Plan Documents. The Asbestos Claims Trust will be a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1. The purposes of the Asbestos Claims Trust will be to, among other things, (a) liquidate, resolve, pay, and satisfy all Asbestos Personal Injury Claims in accordance with the Plan, the Asbestos Claims Trust Distribution Protocol, the Asbestos Claims Trust Agreement, and the Confirmation Order, (b) receive, preserve, hold, manage, and maximize the Asbestos Claims Trust Assets for use in paying and satisfying Allowed Asbestos Personal Injury Claims in accordance with the terms of the Asbestos Claims Trust Agreement, and (c) take other actions deemed by the Asbestos Claims Trustees to be in the best interests of the holders of the Asbestos Personal Injury Claims, who are the sole beneficiaries of the Asbestos Claims Trust. The Asbestos Claims Trust will assume all liabilities of the Reorganizing Debtors with respect to all Asbestos Personal Injury Claims.

5.2    Asbestos Claims Trust Agreement.

Article 7.2 of the Plan provides that the Asbestos Claims Trust Agreement will be substantially in the form of the "Asbestos Trust Agreement" attached as **Exhibit 6 to the Debtors' Plan**, which contains provisions customary to documents utilized in comparable circumstances, with such changes as are necessary to reflect the differences between the Primary Asbestos Treatment and the treatment of Asbestos Personal Injury Claims under the Debtors' Plan and are approved by the Bankruptcy Court. The Plan Sponsors, Reorganized ASARCO, and the Asbestos Claims Trustees will execute the Asbestos Claims Trust Agreement.

5.3    Transfers and Assignments to the Asbestos Claims Trust.

Article 7.3 of the Plan provides that, on the Effective Date, or as soon thereafter as the Bankruptcy Court establishes by Final Order the aggregate amount of consideration necessary to satisfy all Asbestos Personal Injury Claims in full, the Plan Administrator will transfer and assign to the Asbestos Claims Trust for the benefit of the Asbestos Claims Trust Beneficiaries the Asbestos Claim Trust Assets.

5.4    Control of the Asbestos Insurance Actions and Asbestos Insurance Recoveries.

Article 7.4 of the Plan provides that the right to control the Asbestos Insurance Actions and all Asbestos Insurance Recoveries, including negotiations relating thereto and settlements thereof, will be vested in the Asbestos Claims Trust on and after the Effective Date. Notwithstanding the foregoing, Reorganized ASARCO, the Plan Administrator and the Plan Sponsors will cooperate with the Asbestos Claims Trustees in pursuing the Asbestos Insurance Actions through such means, and will provide reasonable access to personnel and books and records of Reorganized ASARCO relating to the Asbestos Insurance Actions to representatives of the Asbestos Claims Trust to enable the

Asbestos Claims Trustees to perform the Asbestos Claims Trustees' tasks under the Asbestos Claims Trust Agreement and the Plan, as is discussed in Article 7.9 of the Plan in regards to Reorganized ASARCO.

5.5     Assumption of Liabilities by the Asbestos Claims Trust.

        Article 7.5 of the Plan provides that, on the Effective Date, or as soon thereafter as the Bankruptcy Court establishes the aggregate amount of consideration necessary to satisfy all Asbestos Personal Injury Claims in full, in exchange for the funding described in Article 7.3 of the Plan, the Asbestos Claims Trust will be deemed, without need for further action, to have assumed responsibility and liability for all Asbestos Personal Injury Claims against the Reorganizing Debtors.

5.6     Tax Matters.

        Article 7.6 of the Plan provides that no election will be made to treat the Asbestos Claims Trust as a grantor trust for U.S. federal income tax purposes.  The Asbestos Claims Trust is intended to be treated as a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1, and hence as a taxable entity for federal income tax purposes, and the Asbestos Claims Trustees shall be "administrators" of the Asbestos Claims Trust pursuant to Treasury Regulation section 1.468B-2(k)(3).  The Asbestos Claims Trustees will cause all taxes imposed on the Asbestos Claims Trust to be paid using assets of the Asbestos Claims Trust and will comply with all tax reporting and withholding requirements imposed on the Asbestos Claims Trust under applicable tax laws, and in particular the rules applicable to a qualified settlement fund.

5.7     Asbestos Claims Trust Expenses.

        Article 7.7 of the Plan provides that the Asbestos Claims Trust will pay all Asbestos Claims Trust Expenses (including applicable taxes) from the Asbestos Claims Trust Assets.  Neither the Reorganizing Debtors, the Plan Sponsors, the Plan Administrator, nor the Reorganized Debtors will have any obligation to pay or reimburse any Asbestos Claims Trust Expenses.  However, nothing will preclude the Asbestos Claims Trustees from seeking reimbursement of such expenses from any Asbestos Insurance Company.

5.8     Initial Asbestos Claims Trustees.

        Article 7.8 of the Plan provides that, not less than ten days prior to the commencement of the Confirmation Hearing, the Plan Sponsors will designate the Persons who shall initially serve as the Asbestos Claims Trustees.  Upon approval by the Bankruptcy Court in the Confirmation Order, the Asbestos Claims Trustees will be appointed.

5.9     Asbestos Books.

        Article 7.9 of the Plan provides that subject to the conditions set forth herein, the Asbestos Claims Trust, through its duly authorized representatives, will have the right, upon reasonable prior written notice to Reorganized ASARCO: (a) to have Reorganized ASARCO transfer into the Asbestos Claims Trust's possession all or part of the Asbestos Books in their current condition upon request of the Asbestos Claims Trust and on the condition that the Asbestos Claims Trust will incur all costs and expenses of the transfer or (b) to inspect and, at the sole expense of the Asbestos Claims Trust, make copies of the Asbestos Books on any business day and as often as may reasonably be desired; provided that, if so requested, the Asbestos Claims Trust will have entered into a confidentiality agreement satisfactory in form and substance to Reorganized ASARCO.  All costs and expenses associated with the storage of and access to the Asbestos Books will be the responsibility of, and paid by, the Asbestos Claims Trust.  Reorganized ASARCO, the Plan Administrator and the Plan Sponsors will cooperate with the Asbestos Claims Trust in transferring or providing access to the Asbestos Books in their current condition, and will also provide reasonable access to necessary or appropriate personnel and the Asbestos Books as contemplated herein.  Subject to the conditions set forth herein, the Asbestos Claims Trust, through its duly authorized representatives, will also have the right, upon reasonable prior written notice, to conduct reasonable interviews of employees and other representatives of Reorganized ASARCO concerning matters reasonably related to the Asbestos Books.  Reorganized ASARCO will provide the Asbestos Claims Trust with advance notice of any proposed disposition of any of the Asbestos Books and a reasonable opportunity to segregate and remove such Asbestos Books as the Asbestos Claims Trust may select.  If the Asbestos Claims Trust obtains from Reorganized ASARCO or its representatives any documents or communications (whether written or oral) to which any attorney-client, work-product privilege or other privilege or immunity attaches, the Asbestos Claims Trust will be deemed

an agent of the privilege holder for purposes of preserving the privilege, will be required to take all reasonable steps to maintain any such privilege, and may not waive any such privilege without the consent of Reorganized ASARCO. Production of materials to the Asbestos Claims Trust does not constitute a waiver or an impairment of any privilege held by Reorganized ASARCO or ASARCO. In the event that any third party challenges any such privilege, Reorganized ASARCO may seek protection from a court of competent jurisdiction. References in Article 7.9 of the Plan to Reorganized ASARCO will also include its successors in interest.

5.10    Cooperation with Respect to Insurance Matters.

Article 7.10 of the Plan provides that, Reorganized ASARCO will cooperate with the Asbestos Claims Trust and use commercially reasonable efforts to take or cause to be taken all appropriate actions and to do or cause to be done all things necessary or appropriate to effectuate all transfers and assignments identified herein to the Asbestos Claims Trust. By way of enumeration and not of limitation, Reorganized ASARCO and ASARCO each will be obligated (a) to provide the Asbestos Claims Trust with copies of insurance policies and settlement agreements included within or relating to the Asbestos Personal Injury Claims; (b) to provide the Asbestos Claims Trust with information necessary or helpful to the Asbestos Claims Trust in connection with its efforts to obtain insurance coverage for the Asbestos Personal Injury Claims as well as other recoveries, including, without limitation, recoveries of extracontractual damages; (c) to execute assignments or allow the Asbestos Claims Trust to pursue Claims in its own name (subject to appropriate disclosure of the fact that the Asbestos Claims Trust is doing so and the reasons why it is doing so), including by means of arbitration, alternative dispute resolution proceedings or litigation, to the extent necessary or helpful to the efforts of the Asbestos Claims Trust to obtain insurance coverage for the Asbestos Personal Injury Claims as well as other recoveries, including, without limitation, recoveries of extracontractual damages; and (d) to pursue and recover insurance coverage for the Asbestos Personal Injury Claims as well as other recoveries, including, without limitation, recoveries of extracontractual damages, in its own name or right to the extent that any or all of the transfers and assignments identified herein are not able to be fully effectuated, with any and all recoveries therefrom to be turned over to the Asbestos Claims Trust. The Asbestos Claims Trust will be obligated to compensate Reorganized ASARCO and ASARCO for all costs and expenses reasonably incurred in connection with providing assistance to the Asbestos Claims Trust, including, without limitation, out-of-pocket costs and expenses, consultant fees and attorneys' fees.

5.11    Indemnity by the Asbestos Claims Trust.

Article 7.11(a) of the Plan provides that the Asbestos Claims Trust will indemnify, defend (and, where applicable, pay the defense costs for), and hold harmless each of the ASARCO Protected Parties from any and all liabilities associated with an Asbestos Personal Injury Claim that a third party seeks to impose upon any of the ASARCO Protected Parties, or that are imposed upon any of the ASARCO Protected Parties.

Article 7.11(b) of the Plan provides that, in the event that the Asbestos Claims Trust makes a payment to any of the ASARCO Protected Parties hereunder, and the liability on account of which such payment was made is subsequently diminished, either directly or through a third-party recovery, the applicable ASARCO Protected Party will promptly repay the Asbestos Claims Trust the amount by which the payment made by the Asbestos Claims Trust exceeds the actual cost of the associated indemnified liability.

SECTION 6
ENVIRONMENTAL LIQUIDATION TRUST

6.1    Environmental Liquidation Trust.

Article 8.1 of the Plan provides that, on the Effective Date, the Environmental Liquidation Trust will be established by Reorganized ASARCO and funded with the Designated Properties and Cash in the amount of $10 million to initiate clean-up procedures. As soon as practicable after the Effective Date, the Environmental Liquidation Trust will commence Remedial Actions with respect to the Designated Properties, and will thereafter facilitate, oversee, and fund environmental clean-up efforts such that each Designated Property is cleaned up to regulatory closure in accordance with a cleanup plan approved by the EPA or the state having authority over such Designated Property. The Environmental Liquidation Trust will liquidate Designated Properties as they are cleaned up to regulatory closure, with the proceeds of such liquidations used solely to fund further Remedial Actions with respect to the other Designated Properties. The remediation will be paid for from the assets in the Environmental Liquidation Trust, but will remain the liability of the applicable Reorganized Debtor. If the Environmental Liquidation Trust's Remedial Actions fail to satisfy any Administrative Claims or Reinstated Environmental Claims of the United States or any individual state under civil

Environmental Laws relating to the Designated Properties, the holders of such unsatisfied Claims will have recourse to the AMC Guaranty. Any funds remaining in the Environmental Liquidation Trust, after all Designated Properties have been cleaned up to regulatory closure and liquidated, will be distributed to Reorganized ASARCO. The United States does not believe that environmental claims are unimpaired under the Plan. The Plan Sponsors do not agree with the United States' position. Notwithstanding anything to the contrary in Article 8.1 of the Plan or the Environmental Liquidation Trust Agreement, (a) to the extent an Entity asserts a valid Lien with respect to property contained within or on a Designated Property, such entity shall retain such Lien unless the Allowed Secured Claim of such Entity has been Paid in Full; and (b) to the extent an Entity has asserted a Lien with respect to property contained within or on a Designated Property but does not possess an Allowed Secured Claim with respect to such purported collateral, any proceeds of such property shall be segregated by the Environmental Liquidation Trust until such time as such Entity's purported Secured Claim is allowed or disallowed and may only be utilized by the Environmental Liquidation Trust in the event such purported Secured Claim is disallowed.

With respect to the Perth Amboy Plant Site, the Plan Sponsors intend that the Designated Redeveloper rights and obligations of PA-PDC Perth Amboy, LLC will not be disturbed. The Plan Sponsors intend to support and encourage the pending settlement and sale process with respect to the Perth Amboy Plant Site. The Perth Amboy Plant Site shall be treated as a Designated Property under Class 9 of the Plan only if the pending sale of Perth Amboy Site does not close.

With respect to the El Paso Smelter Property, it occupies 123 acres of a 585 acre property along the Rio Grande River. The Plan Sponsors have consistently stated that they do not intend to operate the El Paso Smelter or sell the El Paso Smelter as an operating facility. Accordingly, the Plan Sponsors reaffirm that, if the Plan is confirmed, the Plan Sponsors will not (i) reopen the El Paso Smelter, (ii) seek to renew the El Paso Smelter's air permit, (iii) sell the El Paso Smelter as an operating facility, or (iv) transfer the El Paso Smelter's air permit to the Environmental Liquidation Trust. It is the Plan Sponsors' intention to permanently close and fully remediate the El Paso Smelter in accordance with all applicable regulations.

The Plan Sponsors believe that the Environmental Liquidation Trust, as described in Article VIII of the Plan, provides an adequate means of implementation of the Plan with respect to the Designated Properties, and that $10 million, together with the proceeds from liquidating the Designated Properties, is sufficient to fund Remedial Actions with respect to all of the Designated Properties, including those in Colorado. The Plan provides for an Environmental Liquidation Trustee who is responsible for ensuring that the Designated Properties are cleaned up to regulatory closure in accordance with a cleanup plan approved by the EPA or the state having authority over such Designated Property. To the extent there remain any concerns about the adequacy of the funding of the Environmental Liquidation Trust, Environmental Claims with respect Designated Properties will be obligations of the Reorganized Debtors, with additional recourse to the AMC Guaranty.

6.2     Environmental Liquidation Trustees.

Article 8.2 of the Plan provides that, not less than ten days prior to the commencement of the Confirmation Hearing, the Plan Sponsors will designate the Persons who shall initially serve as the Environmental Liquidation Trustees. Upon approval by the Bankruptcy Court in the Confirmation Order, the Environmental Liquidation Trustees shall be appointed.

SECTION 7
ESTIMATION OF CLAIMS AND
VALUATION OF DISTRIBUTABLE ASSETS

7.1     Estimated Claims and Estimated Recoveries by Class.

The Debtors' Estimated Aggregate Amounts of Claims, detailed in the charts beginning on page 4 above, are based on estimates provided by the Debtors; no representation can be made that such information is without inaccuracy.

The Estimated Percentage Recoveries Under the Plan, detailed in the charts beginning on page 4 above, apply to holders of Allowed Claims, and are subject to uncertainties in the estimation and/or litigation of Claims in Classes 5 and 9. Therefore, no assurance can be given that the estimated Claims are exact or that the estimated recoveries shall be achieved.

7.2     Funding of Plan.

        AMC has more than adequate readily salable assets and other sources of liquidity as may be necessary to fully fund the Plan.  As additional evidence of its Plan funding ability, AMC intends to obtain from UBS Securities LLC a $2.4 billion loan (the "Loan").  Although a commitment letter has not yet been obtained with respect to the Loan, AMC intends to enter into the Loan agreement on the Effective Date.

        AMC expects that the material terms of the Loan will include the following:

| Amount: | Up to $2.4 billion senior secured term loan, secured by the assets of AMC but not by the assets of any subsidiary of AMC |
|---|---|
| Term: | One year with an optional extension of one additional year, at the option of AMC |
| Use of Proceeds: | To support the Plan |

7.3     Working Capital.

        The Plan Sponsors believe that the operations of Reorganized ASARCO will continue to generate sufficient cash to meet the working capital needs of Reorganized ASARCO, as they have for the previous two years. ASARCO's 5-year plan shows that ASARCO is projected to generate excess working capital from operations even without receipt of the tax refund.  In addition, the contribution of the Tax Refund will provide additional cushion to working capital when it is received.

SECTION 8
RISKS OF THE PLAN

8.1     General.

        The following provides a summary of various risks associated with the Plan.  However, it is not exhaustive and should be supplemented by careful analysis and evaluation of the Plan and this Disclosure Statement as a whole by each holder of a Claim or an Interest with that holder's own advisors.

8.2     Confirmation Risks.

        In order for a plan to be confirmed, the Bankruptcy Code generally requires that impaired Classes vote to accept the Plan.  This requires that voting creditors in each Class approve the Plan by:

-    over one-half in number of creditors (50% + 1); and

-    at least two-thirds in dollar amount.

        While the Plan Sponsors do not believe that there are any impaired Classes under the Plan, there is no guarantee that the Bankruptcy Court will concur with this assessment.  The United States and certain other environmental claimants believe that certain environmental claims, including those in Class 8, are impaired under the Plan, and the Asbestos Claimants' Committee and the FCR believe that Class 5 is impaired under each of the three proposed Class 5 treatments.  The Plan Sponsors disagree with these positions.  The Debtors assert that the Plan cannot be confirmed if even one Class is found to be impaired; the Plan Sponsors disagree with that assertion. If the Bankruptcy Court determines that one or more Classes is impaired under the Plan, it may find that the Plan is not confirmable unless at least one impaired Class of creditors votes to accept the Plan.

        Any objection to the Plan also could prevent Confirmation of the Plan or delay such Confirmation for a significant period of time.

        Although the Plan Sponsors believe that the Plan will satisfy all requirements necessary for Confirmation, there is no assurance that the Bankruptcy Court and the District Court will reach the same conclusion or that the Confirmation, if challenged on appeal, will be affirmed.

Moreover, Article 10.1 of the Plan sets forth a number of conditions precedent to the effectiveness of the Plan. There can be no assurance that these conditions will be satisfied.

Ron and Linda Deen (the "Deens") reside on approximately 12 acres in Pinal County as described in their filed proof of claim (the "Property"). ASARCO has record title to the Property, but the Deens assert ownership of the Property by right of adverse possession. The Debtors objected to their claim and the Bankruptcy Court reclassified it from secured to unsecured, and the Plan Sponsors therefore believe they have only a general unsecured claim. The Deens believe that order does not affect the substance of their claim, i.e., adverse possession. The Deens also believe their claim for adverse possession is unique and should be separately classified in the Plan, and because it is not, the Plan cannot be confirmed. The Deens also believe their adverse possession claim should be litigated in an Arizona State Court, and contend that the Property cannot be sold because the Deens own the Property, not ASARCO. The Deens will object to confirmation of the Plan, and have not waived any of their plan objections by agreeing to withdraw their objection to the Disclosure Statement in exchange for the addition of this paragraph to this Disclosure Statement.

8.3    Risk Factors Related to Estimates and Assumptions.

As with any plan of reorganization or other financial transaction, there are certain risk factors that must be considered. All risk factors cannot be anticipated, some events will develop in ways that were not foreseen, and many or all of the assumptions that have been used in connection with this Disclosure Statement and the Plan will not be realized exactly as assumed. Some or all of such variations may be material. While efforts have been made to be reasonable in this regard, there can be no assurance that subsequent events will bear out the analyses set forth in this Disclosure Statement. Holders of Claims and Interests should be aware of some of the principal risks associated with the contemplated reorganization:

- There is a risk that one or more of the required conditions or obligations under the Plan will not occur, be satisfied or waived, as the case may be, resulting in the inability to confirm the Plan.

- The total amount of Allowed Claims may ultimately be materially in excess of the estimated amounts of such Claims assumed in the development of the Plan and in the valuation estimates provided above. The actual amount of all Allowed Claims in any Class may differ significantly from the estimates provided in this Disclosure Statement.

- The financial information contained in this Disclosure Statement has been prepared by the Debtors and their advisors. As a result, the Parent is unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

8.4    Risk Factors That Could Negatively Affect the Debtors' Business.

The continued operation of Reorganized ASARCO's business as contemplated by the Plan is subject to a number of risks. Continued mining or metal production operations by Reorganized ASARCO, projected quantities of future metal production, anticipated production rates, operating efficiencies, costs and expenditures as well as projected demand or supply for the products of Reorganized ASARCO are subject to factors including the risks and uncertainties relating to general U.S. and international economic and political conditions, competition, the cyclical and volatile prices of copper, other commodities and supplies, including fuel and electricity, availability of materials, insurance coverage, equipment, required permits or approvals and financing, the occurrence of unusual weather or operating conditions, lower than expected ore grades, water and geological problems, the failure of equipment or processes to operate in accordance with specifications, failure to obtain financial assurance to meet closure and remediation obligations, labor relations, litigation and environmental risks. The results of operations of Reorganized ASARCO will be directly affected by metals prices on commodity exchanges, which can be volatile.

8.5    Reorganized ASARCO May Not Be Able to Achieve Projected Financial Results.

Reorganized ASARCO may not be able to meet its projected financial results or achieve projected revenues and cash flows that have been assumed in projecting future business prospects. To the extent Reorganized ASARCO does not meet its projected financial results or achieve projected revenues and cash flows, Reorganized

ASARCO may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service its debt obligations as they come due or may not be able to meet its operational needs. Any one of these failures may preclude Reorganized ASARCO from, among other things: (a) enhancing its current customer offerings; (b) taking advantage of future opportunities; (c) growing its business; or (d) responding to competitive pressures. Further, a failure of Reorganized ASARCO to meet its projected financial results or achieve projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require Reorganized ASARCO to seek additional working capital. Reorganized ASARCO may not be able to obtain such working capital when required or may only be able to obtain additional working capital on unreasonable terms.

8.6     Financial Projections and Other Forward Looking Statements Are Not Assured.

This Disclosure Statement incorporates by reference various projections concerning the future financial results of the Reorganized Debtors' operations that were prepared by the Debtors and are attached hereto as **Exhibit D.** THE 5-YEAR PLAN (2008-2012) FINANCIAL OVERVIEW (THE "5-YEAR PLAN"), WHICH IS EXCERPTED HERE, WAS PREPARED ON FEBRUARY 15, 2008, HAS NOT BEEN UPDATED SINCE SUCH DATE AND SPEAKS ONLY AS OF SUCH DATE. THE 5-YEAR PLAN INCLUDES CERTAIN STATEMENTS, ESTIMATES AND PROJECTIONS WITH RESPECT TO ANTICIPATED FUTURE PERFORMANCE AND EVENTS AFTER THE DATE OF ITS PREPARATION ("FORWARD-LOOKING STATEMENTS"). ALL STATEMENTS OTHER THAN STATEMENTS OF HISTORICAL FACT CONTAINED THEREIN ARE FORWARD-LOOKING AND MAY REFLECT ESTIMATES OR PROJECTIONS REGARDING FINANCIAL RESULTS, ECONOMIC CONDITIONS, TRENDS AND KNOWN UNCERTAINTIES. NO REPRESENTATIONS OR WARRANTIES (EXPRESS OR IMPLIED) BY ASARCO LLC, ARE MADE AS TO THE ACCURACY OF SUCH FORWARD-LOOKING STATEMENTS. SUCH FORWARD-LOOKING STATEMENTS MAY NO LONGER BE ACCURATE BASED ON ACTUAL PERFORMANCE AND EVENTS OCCURRING SINCE THE DATE OF THE 5-YEAR PLAN. STATEMENTS AS TO PRIOR PERFORMANCE CONTAINED IN THE 5-YEAR PLAN ARE NOT GUARANTEES OR EXPECTATIONS AS TO FUTURE PERFORMANCE. ACTUAL RESULTS COULD DIFFER (AND MAY HAVE ALREADY DIFFERED) MATERIALLY FROM SUCH FORWARD-LOOKING STATEMENTS OR PRIOR RESULTS. BASED UPON THEIR SUMMARY REVIEW OF ASARCO'S FINANCIAL INFORMATION AND LIMITED SITE VISITS, THE PLAN SPONSORS BELIEVE THAT THE PROJECTIONS CONTAINED IN THE 5-YEAR PLAN MAY BE OVERLY OPTIMISTIC AND THE RESULTS MAY NOT BE ACHIEVABLE. SEE ALSO SECTION 8.5 ABOVE.

8.7     Risk that a the Debtors' Plan may be Confirmed Instead of the Plan.

If the Debtors' Plan complies with all of the requirements of the Bankruptcy Code, the Bankruptcy Court may confirm the Debtors' Plan instead of the Plan Sponsors' Plan. However, the Plan Sponsors do not believe that the Debtors' Plan complies with applicable requirements of the Bankruptcy Code as, among other objectionable provisions, it provides certain creditors with recoveries in excess of 100% of their Allowed Claims.

8.8     Risk Relating to the Collective Bargaining Agreement with the USW and Other Unions.

The Plan Sponsors have not reached a collective bargaining agreement with the USW and other unions, thereby creating a risk that the Plan will not meet the applicable requirements of the special successorship clause of the Debtors' New CBA as currently in place. See Section 2.3 above for a discussion of the New CBA's special successorship clause. **The USW takes the position that the Plan cannot be confirmed because of the failure of the Plan Sponsors to meet the requirements of the special successorship clause. It is possible that significant litigation could ensue in the Bankruptcy Court or other fora between the Plan Sponsors and the USW and other parties over this clause. The USW takes the position that it would have the right to strike in the event the New CBA was terminated by the Court pursuant to the Second Stipulation and Order Regarding Modification to Collective Bargaining Agreement (see Section 2.3, supra), and the Debtors and the USW also takes the position that the potential of any such strike would need to be considered in determining whether the Parent Plan is feasible. The Parent disagrees with the USW's position and takes the position that the Bankruptcy Court may terminate the special successorship clause without terminating the New CBA, which would preclude the USW from engaging in a strike, and even if the current New CBA is terminated, there are other legal impediments to the USW's right to strike. The USW disagrees with the Plan Sponsors' positions in this regard.**

8.9     Appointment of Different Asbestos Claims Trustees.

            Not less than ten days prior to the commencement of the Confirmation Hearing, the Plan Sponsors shall designate the Persons who shall initially serve as the Asbestos Claims Trustees. However, the Bankruptcy Court may decline the Plan Sponsors' request and appoint one or more different Asbestos Claims Trustees. If different Asbestos Claims Trustees are appointed, it could materially impact the administration of the Asbestos Claims Trust.

8.10    Appointment of Different Plan Administrator.

            Not less than ten days prior to commencement of the Confirmation Hearing, the Plan Sponsors shall designate the Entity that shall initially serve as the Plan Administrator. However, the Bankruptcy Court may decline the Plan Sponsors' request and appoint a different Plan Administrator. If a different Plan Administrator is appointed, it could materially impact the administration of the Plan.

SECTION 9
ALTERNATIVES TO THE PLAN

            If the Plan is not confirmed and consummated, alternatives to the Plan include an alternative plan of reorganization or liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

9.1     Alternative Plan of Reorganization.

            If the Plan is not confirmed, the Plan Sponsors, the Debtors or any other party could attempt to formulate a different plan of reorganization. The Plan Sponsors and their advisors have explored various alternative scenarios and believe that the Plan enables the holders of Claims and Interests to realize the maximum recovery under the circumstances. The Plan Sponsors believe that the Plan is the best plan of reorganization that can be proposed and that it serves the best interests of the Debtors and other parties in interest.

9.2     Debtors' Plan.

            The Plan Sponsors and the Debtors have each proposed their own plan of reorganization for ASARCO and some, or all, of the other Debtors. Only one plan of reorganization can be confirmed. If the plans of reorganization proposed by the Plan Sponsors and the Debtors both meet all requirements for confirmation, the Bankruptcy Court will consider the preferences of creditors and Interest holders in determining which plan of reorganization to confirm. Because all Classes of Claims under the Plan will receive Payment in Full or otherwise be unimpaired, the Plan Sponsors believe that, pursuant to case law, the creditors holding Claims in all Classes under the Plan will be deemed to support the Plan.

            The following chart (the "Plan Comparison Chart") compares certain material differences between the Plan and the Debtors' Plan. The Plan Comparison Chart has been prepared by the Plan Sponsors, and has not been reviewed or approved by the Debtors. THE PLAN COMPARISON CHART HIGHLIGHTS ONLY CERTAIN DIFFERENCES BETWEEN THE PLAN AND THE DEBTORS' PLAN, AND SHOULD NOT BE USED OR RELIED ON BY ANY PARTIES AS AN EXPLANATION OR SUMMARY OF HOW CLAIMS, INTERESTS OR DEMANDS ARE TREATED UNDER THE PLAN OR THE DEBTORS' PLAN. PARTIES SHOULD NOT RELY ON THE PLAN COMPARISON CHART IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE DEBTORS' PLAN, AND SHOULD CONDUCT THEIR OWN COMPARISON OF THE PLAN AND THE DEBTORS' PLAN, IN CONSULTATION WITH THEIR ATTORNEYS AND ADVISORS, BEFORE DECIDING ON ANY PARTICULAR COURSE OF ACTION WITH RESPECT TO THE PLAN OR DEBTORS' PLAN. Defined terms used in the Plan Comparison Chart have the meanings ascribed to them in this Disclosure Statement, or the Debtors' Disclosure Statement, as applicable.

| TOPIC | THE PLAN | THE DEBTORS' PLAN |
|---|---|---|
| Debtors to be reorganized | ASARCO LLC, Southern Peru Holdings, LLC, AR Sacaton, LLC, and ASARCO Master, Inc. Other Debtors will be liquidated or have their case converted to chapter 7 after the Effective Date. | All Debtors |

| TOPIC | THE PLAN | THE DEBTORS' PLAN |
|---|---|---|
| Plan implementation method | Reorganization | Sale of substantially all of ASARCO's assets to Sterlite (USA), Inc. |
| Plan Sponsor Contribution | $2.7 billion | $2.6 billion. |
| Premised upon purported "global settlement" with asbestos and environmental creditors. | No. | Yes. |
| Distributable Cash | Approx. $1 billion | Approx. $1 billion |
| Additional Guaranty | $440 million AMC Guaranty | None |
| Holders of certain Claims will have the right to look to Reorganized ASARCO for satisfaction of their Claims | Yes | No, but certain claims will be assumed by Sterlite, as noted below. |
| Treatment of Administrative Claims | *Substantially similar* | *Substantially similar* |
| Treatment of Priority Tax Claims | Paid in Full[6], or receive treatment in any other manner such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code, including payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code | Paid in Full |
| Treatment of Demands | Included in the Section 524(g) Treatment accorded to Asbestos Personal Injury Claims. If the Section 524(g) Treatment does not go into effect, Demands will not be affected by the Plan and will remain liabilities of Reorganized ASARCO, with additional recourse to the AMC Guaranty | Included in the Section 524(g) Treatment accorded to Asbestos Personal Injury Claims |
| Treatment of Priority Claims | *Substantially Similar* | *Substantially Similar* |
| Treatment of Secured Claims | *Substantially Similar* | *Substantially Similar*[7] |
| Treatment of Trade and General Unsecured Claims | Paid in Full | Paid Allowed Amount of Claims<br><br>Possibly paid pro rata Post-Petition Interest from (a) any Available Plan Funds after $1.5 billion combined payment to Asbestos Trust and Residual Environmental Claims; and (b) Litigation Proceeds (if any) |

---

[6]     The Plan and the Debtor's Plan both define "Paid in Full" as "paid in Cash the Allowed Amount of the holder's Claim with Post-Petition Interest."

[7]     Under the Debtors' Plan, the Secured Claims of the United States relating to the East Helena, Montana facility and the Globe, Colorado facility, and any Secured Claims relating to the Prepetition ASARCO Environmental Trust will be satisfied by having the holders of such Claims retain the Liens securing such Claims, unless a holder agrees to different treatment.

| TOPIC | THE PLAN | THE DEBTORS' PLAN |
|---|---|---|
| Treatment of Bondholders' Claims | At the election of the Plan Sponsors:<br>• Reinstated; or<br>• Paid in Full | At the election of the Debtors:<br>• Reinstated; or<br>• Paid Allowed Amount of Claims<br><br>Possibly paid pro rata Post-Petition Interest from (a) any Available Plan Funds after $1.5 billion combined payment to Asbestos Trust and Residual Environmental Claims; and (b) Litigation Proceeds (if any) |
| Treatment of Asbestos Personal Injury Claims | Channeled to a section 524(g) trust funded with:<br>• a combination of Cash and other consideration necessary to satisfy the requirements of Section 524(g) of the Bankruptcy Code, in an aggregate amount determined by Final Order to satisfy in full all Asbestos Personal Injury Claims and Demands, including (a) directly or indirectly, the Asbestos Insurance Recoveries; and (b) the Interests in the Asbestos Subsidiary Debtors (the "Section 524(g) Treatment").<br><br>If Section 524(g) Treatment does not go into effect, resolved through an Asbestos Claims Trust funded with:<br>• a combination of Cash and other consideration, including, directly or indirectly, the Asbestos Insurance Recoveries, in an aggregate amount determined by Final Order to satisfy in full all Asbestos Personal Injury Claims (the "Primary Asbestos Treatment").<br><br>If the Primary Treatment does not go into effect:<br>• Reinstated and paid, when Allowed by the Bankruptcy Court, from the Disputed Claims Reserve, with additional recourse to the AMC Guaranty (the "Alternative Asbestos Treatment") | Channeled to a section 524(g) trust funded with:<br>(a) $750 million;<br>(b) up to an additional $102 million;<br>(c) directly or indirectly, the Asbestos Insurance Recoveries;<br>(d) 50% of all Litigation Proceeds after Trade and General Unsecured Claims, Bondholders' Claims, Toxic Tort Claims, Previously Settled Environmental Claims, and Miscellaneous Federal and State Environmental Claims are Paid in Full, including right to first $100 million of such Proceeds; and<br>(e) 100% of the interests in Reorganized Covington |
| Treatment of Toxic Tort Claims | Paid in Full | Paid Allowed Amount of Claims<br><br>Possibly paid pro rata Post-Petition Interest from (a) any Available Plan Funds after $1.5 billion combined payment to Asbestos Trust and Residual Environmental Claims; and (b) Litigation Proceeds (if any) |

| TOPIC | THE PLAN | THE DEBTORS' PLAN |
|-------|----------|-------------------|
| Treatment of Previously Settled Environmental Claims | Paid in Full | Paid Allowed Amount of Claims<br><br>Possibly paid pro rata Post-Petition Interest from (a) any Available Plan Funds after $1.5 billion combined payment to Asbestos Trust and Residual Environmental Claims; and (b) Litigation Proceeds (if any) |
| Treatment of Miscellaneous Federal and State Environmental Claims (as defined in the Debtors' Plan) | Paid in Full | Paid Allowed Amount of Claims<br><br>Possibly paid pro rata Post-Petition Interest from (a) any Available Plan Funds after $1.5 billion combined payment to Asbestos Trust and Residual Environmental Claims; and (b) Litigation Proceeds (if any) |
| Treatment of Residual Environmental Claims (as defined in the Debtors' Plan) | Paid in Full<br><br>*Under the Plan, Residual Environmental Claims are combined with, and receive the same treatment as, Miscellaneous Federal and State Claims, to form Class 8: Miscellaneous Environmental Claims* | Paid (a) $750 million; (b) up to an additional $102 million; and (c) 50% of Litigation Proceeds after Trade and General Unsecured Claims, Bondholders' Claims, Toxic Tort Claims, Previously Settled Environmental Claims, and Miscellaneous Federal and State Environmental Claims are Paid in Full and next $100 million paid to Asbestos Personal Injury Claimants |
| Treatment of Environmental Claims with respect to retained Real Property (as defined in the Parent's Plan) | Reorganized ASARCO will assume, pay, perform and discharge when due all Assumed Environmental Liabilities with respect to retained Real Property; the applicable Governmental Authority will have additional recourse to the AMC Guaranty | Assumed by Sterlite (USA) Inc. |
| Treatment of Environmental Claims with respect to Designated Properties (as defined in the Parent's Plan) | Reinstated; the Designated Properties will be transferred to an Environmental Liquidation Trust for remediation to regulatory closure, and such remediation will remain a liability of Reorganized ASARCO; the applicable Governmental Authority will have additional recourse to the AMC Guaranty | Channeled to Environmental Custodial Trust |
| Treatment of Late-Filed Claims | Paid in Full | To the extent any Available Plan Funds remain after supplemental payment to Asbestos Trust and Residual Environmental Claims: Paid in Full or paid pro rata distribution of any remaining Available Plan Funds |

| TOPIC | THE PLAN | THE DEBTORS' PLAN |
|---|---|---|
| Treatment of Subordinated Claims | Paid in Full | To the extent any Available Plan Funds remain after the Late-Filed Claims are Paid in Full: Paid in Full or paid pro rata distribution of any such remaining Available Plan Funds |
| Treatment of Interests in ASARCO | The holder of Interests in ASARCO will retain 100% of its Interests in ASARCO, which Interests will automatically convert into Interests in Reorganized ASARCO on the Effective Date | Cancelled; the holders of Interests in ASARCO will receive any Available Plan Funds after Subordinated Claims have been Paid in Full |
| Treatment of Interests in Reorganizing Subsidiaries | The holders of Interests in the Reorganizing Subsidiaries will retain 100% of their Interests in the Reorganizing Subsidiaries, which Interests will automatically convert to Interests in Reorganized Subsidiaries on the Effective Date | Cancelled; the holders of Interests in the Reorganizing Subsidiaries will not receive any distributions under the Plan |
| Treatment of Interests in the Asbestos Subsidiary Debtors | If the Section 524(g) Treatment goes into effect, Interests in the Asbestos Subsidiary Debtors will be transferred to the Section 524(g) Trust | Cancelled; the holders of Interests in the Asbestos Subsidiary Debtors will not receive distributions under the Debtors' Plan |
| Treatment of Interest in the Other Subsidiary Debtors | *Not applicable* | Cancelled; the holders of Interests in the Other Subsidiary Debtors will not receive distributions under the Debtors' Plan |

9.3     Liquidation under Chapter 7.

        If the Plan cannot be confirmed, the Debtors' Reorganization Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee or trustees would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.

        The Debtors have prepared a liquidation analysis which is attached as **Exhibit F to the Debtors' Disclosure Statement**.  Based on the Debtors' liquidation analysis, creditors under the Plan will receive more than they would in a Chapter 7 liquidation of the Reorganizing Debtors.

SECTION 10
CORPORATE GOVERNANCE, POST-CONFIRMATION MANAGEMENT, EMPLOYMENT-RELATED
AGREEMENTS, AND CONTINUATION OF EMPLOYEE BENEFITS PLANS

10.1     Retention of Existing Interests.

        On the Effective Date the Parent will continue to indirectly own 100% of the outstanding Interests in ASARCO.

10.2     Operations Between the Confirmation Date and the Effective Date.

        Except as set forth herein with respect to the appointment of the Plan Administrator, during the period from the Confirmation Date through and until the Effective Date, the Reorganizing Debtors shall continue to operate as debtors-in-possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, and all orders of the Bankruptcy Court that are then in full force and effect.

10.3    <u>No Substantive Consolidation</u>.

        The Plan does not contemplate the substantive consolidation of any Debtors.

10.4    <u>Limited Liability Company Agreement, Certificate of Incorporation and Bylaws</u>.

        The LLC Agreement and bylaws of  Reorganized ASARCO shall be amended, as of the Effective Date.

10.5    <u>Management of Reorganized ASARCO</u>.

        Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Plan Sponsors shall file, on or prior to the Confirmation Date, a document disclosing the identity and affiliations of any person proposed to serve on the initial board of directors of Reorganized ASARCO or as an officer of Reorganized ASARCO.  To the extent any such person is an insider, the nature of any compensation payable to such person shall be disclosed at such time.  Reorganized ASARCO shall have a five-person board of directors, each of them nominated by the Plan Sponsors.  Each director and officer shall serve from and after the Effective Date pursuant to the terms of the amended LLC Agreement, and applicable law.

10.6    <u>Director and Executive Compensation</u>.

        Not less than ten days prior to the commencement of the Confirmation Hearing, the Plan Sponsors shall file with the Bankruptcy Court a schedule of the identities, affiliations, and annual compensation of persons proposed to serve as executives, officers, and directors of Reorganized ASARCO as of the Effective Date.

SECTION 11
CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

> **IRS Circular 230 disclosure:  To ensure compliance with requirements imposed by the IRS, holders of Claims are hereby notified that:  (a) any discussion of United States federal tax issues in this document is not intended or written to be relied upon, and cannot be relied upon, by holders of Claims, for the purpose of avoiding penalties that may be imposed on such holders of Claims under the Internal Revenue Code; (b) such discussion is written in connection with the promotion or marketing of the transactions or matters addressed herein; and (c) holders of Claims should seek advice based on their particular circumstances from an independent tax advisor.**

11.1    <u>General</u>

        Set forth below is a summary of certain federal income tax consequences of the consummation of the Plan as provided below.  The summary is based on the Internal Revenue Code, final, temporary and proposed Treasury Regulations promulgated thereunder, administrative pronouncements or practices, and judicial decisions, all as of the date hereof.  Future legislative, judicial, or administrative modifications, revocations, or interpretations, which may or may not be retroactive, may result in federal income tax consequences significantly different from those discussed herein.  This summary is not binding on the IRS or United States courts, and no assurance can be given that the conclusions reached in this summary will not be challenged by the IRS or will be sustained by a United States court if so challenged.  In addition, the Debtors have not requested, and do not intend to request, a ruling from the IRS regarding any of the federal income tax consequences of the implementation of the Plan.

        This summary does not address the federal income tax consequences to certain categories of holders of Claims subject to special rules, including holders of Claims that are (a) banks, financial institutions, or insurance companies, (b) real estate investment trusts, cooperatives, regulated investment companies, mutual funds, or small business investment companies, (c) brokers or dealers in securities, (d) tax-exempt organizations, (e) investors in pass-through entities and such entities themselves, and (f) foreign taxpayers.  Furthermore, this summary is limited to United States federal income tax consequences and does not discuss state, local or foreign tax consequences or federal estate or gift tax consequences.

        This summary is for general information purposes only and does not purport to be a complete analysis or listing of all potential federal income tax consequences that may apply to holders of Claims as a result of the implementation of the Plan.  In addition, this summary does not take into account the individual facts and circumstances of

particular holders of Claims that may affect the federal income tax consequences of the implementation of the Plan to such holders. Accordingly, this summary is not intended to be, and should not be construed as, legal or federal income tax advice. Holders of Claims should consult their own tax advisors regarding the federal, state, local, and foreign tax consequences of the Plan.

11.2    Federal Income Tax Classification of Trusts and Disputed Claims Reserve.

      The Plan provides for alternative treatments of the Class 5 Asbestos Personal Injury Claims. As described more fully in the Plan, the Class 5 Asbestos Personal Injury Claims will receive either (i) the Section 524(g) Treatment, (ii) the Primary Asbestos Treatment or (iii) the Alternative Asbestos Treatment. The federal income tax consequences of the Plan to the Debtors and Claimants will depend to a large degree on the treatment of any trusts formed in connection with the resolution of such Class 5 Asbestos Personal Injury Claims as well as the Environmental Liquidation Trust and the Disputed Claims Reserve.

      (a)      Classification of the Section 524(g) Trust, Asbestos Claims Trust and Environmental Liquidation Trust.

      The Treasury regulations promulgated under section 468B of the Internal Revenue Code provide that a fund, account, or trust will be a qualified settlement fund if three (3) conditions are met. First, the fund, account, or trust must be established pursuant to an order of, or be approved by, a government authority, including a court, and must be subject to the continuing jurisdiction of that government authority. Second, the fund, account, or trust must be established to resolve or satisfy one or more contested or uncontested Claims that have resulted or may result from an event or related series of events that has occurred and that has given rise to at least one Claim asserting liability arising out of, among other things, a tort, violation of law, or CERCLA claim. Third, the fund, account, or trust must be a trust under applicable state law or have its assets physically segregated from the other assets of the transferor and persons related to the transferor.

      The Section 524(g) Trust, Asbestos Claims Trust and the Environmental Liquidation Trust have been structured so as comply with the foregoing requirements to the maximum extent possible. However, the Debtors have not, and do not intend to, seek a ruling from the IRS or an opinion of counsel regarding the status of the Section 524(g) Trust, Asbestos Claims Trust or Environmental Liquidation Trust as qualified settlement funds. Accordingly, there can be no assurance that the IRS will not take a contrary position. Except as otherwise specified, the remainder of the tax considerations discussion assumes that the Section 524(g) Trust, Asbestos Claims Trust and the Environmental Liquidation Trust will be treated as qualified settlement funds.

      Assuming that the Section 524(g) Trust, Asbestos Claims Trust and the Environmental Liquidation Trust qualify for qualified settlement fund treatment, the trusts will be treated as separate taxable entities and will generally be subject to federal income tax on their modified taxable income at the maximum rate applicable to trusts, which is currently thirty-five percent (35%). In determining the modified taxable income of the Section 524(g) Trust, the Asbestos Claims Trust and the Environmental Liquidation Trust, (1) amounts transferred by the Debtors to such trust (other than payments in compensation for late or delayed transfers, dividends on stock of a Debtor or related person or interest on the debt of a Debtor or related person) pursuant to the Plan will generally be excluded from the trust's income; (2) any sale, exchange or distribution of property by such trust will generally be treated as a sale and result in the recognition of gain or loss in an amount equal to the difference between the fair market value of the property on the date of such disposition and the adjusted tax basis of the trust in such property; and (3) administrative costs (including state and local taxes) incurred by such trust that would be deductible in determining the taxable income of a corporation will generally be deductible by the trust. The adjusted tax basis of the Section 524(g) Trust, the Asbestos Claims Trust and Environmental Liquidation Trust in property received from the Debtors (or from an insurer on behalf of the Debtors) pursuant to the Plan will generally be the fair market value of such property at the time of such transfer.

      (b)      Classification of Disputed Claims Reserve.

      The law regarding taxation of the Disputed Claims Reserve is unclear. The Plan Administrator will treat the Disputed Claims Reserve as owned by Reorganized ASARCO for U.S. federal income tax purposes (and solely for U.S. federal income tax purposes) and not as a disputed ownership fund within the meaning of Treasury Regulations section 1.468B-9(b)(1). Accordingly, tax on the income from the assets held in the Disputed Claims Reserve will be paid by Reorganized ASARCO or certain of its Affiliates. The Plan Administrator will distribute to Reorganized ASARCO from the Disputed Claims Reserve within 30 days of the close of each calendar year an amount equal to the product of (x) the taxable income of the Disputed Claims Reserve (computed as if the Disputed Claims Reserve were a corporation for

U.S. federal income tax purposes) and (y) the sum of (1) highest rate of tax imposed by section 11 of the Internal Revenue Code with respect to such calendar year and (2) five percent.

11.3     Federal Income Tax Consequences to Debtors.

(a)     Cancellation of Indebtedness.

Under the Internal Revenue Code, a taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("COD Income") realized during the taxable year.  Section 108 of the Internal Revenue Code provides that a taxpayer does not realize COD Income from cancellation of indebtedness to the extent that payment of such indebtedness would have given rise to an income tax deduction.  Section 108 of the Internal Revenue Code provides further that COD Income may be excluded from gross income to the extent that the taxpayer is insolvent or is in bankruptcy, but such excluded amount must be applied to reduce certain tax attributes of the taxpayer.

It is expected that the satisfaction of all or substantially all of the Claims pursuant to the Plan will not result in significant COD Income to the Debtors because either (i) such Claims are being Paid in Full or (ii) payment of such Claims would have given rise to a deduction for the Debtors.

(b)     Transfers of Assets other than Cash to Trusts.

Assuming that the Section 524(g) Trust, Asbestos Claims Trust and the Environmental Liquidation Trust qualify as qualified settlement funds (as discussed above), the Debtors will be treated as having made a taxable disposition of the assets transferred to each such trust.  As result, the Debtors will generally recognize gain or loss on the transfer of any such assets other than cash in an amount equal to the difference between (1) the fair market value of the assets transferred and (2) the adjusted tax basis in the transferred assets.

(c)     Deductibility of Amounts Transferred in Satisfaction of Asbestos, Toxic Tort, and Certain Environmental Claims.

The Debtors should be entitled to a deduction for all or substantially all of the amount of cash and the fair market value of other assets paid in satisfaction of the Class 5 Asbestos Personal Injury Claims and Class 6 Toxic Tort Claims, and for a substantial portion of the amounts paid in satisfaction of the Environmental Claims in Classes 7 through 9, once the usual requirements imposed on accrual basis taxpayers with respect to the satisfaction of liabilities are met.  Assuming that the Section 524(g) Trust, Asbestos Claims Trust and the Environmental Liquidation Trust qualify as qualified settlement funds (as discussed above), these requirements should generally be met at the time cash and/or assets (other than certain obligations of Reorganized ASARCO or related parties) are transferred to the Section 524(g) Trust, Asbestos Claims Trust, and the Environmental Liquidation Trust.

The Debtors will not be allowed a deduction for payments to the Trusts to the extent that such payments represent insurance proceeds received by the Debtors.  In such case, payments of amounts representing insurance proceeds should not cause recognition of income to the Debtors.  Alternatively, if the Debtors' transfer of amounts representing insurance proceeds were to cause recognition of income by the Debtors, the Debtors should be entitled to a corresponding deduction for the payment of such amounts to the trusts.

Similarly, the Debtors will not be allowed a deduction for payments to the Trusts to the extent the Debtors have a right to reimbursement (with a positive fair market value) with respect to such payments from any third party.

Any deductions for payments made to the Trusts first would reduce or eliminate the Debtors' federal taxable income for the taxable year in which the payments are made.  To the extent these deductions created a taxable loss for such year, the loss would constitute a net operating loss.

11.4     Federal Income Tax Consequences to Holders of Claims.

The tax consequences of the Plan to a holder of a Claim will depend, in part, on the type of consideration the holder received in exchange for the Claim, whether the holder reports income on the accrual or cash-basis method, and whether the holder receives distributions under the Plan in more than one taxable year.

In general, a holder of a Claim that receives cash or property in satisfaction of its Claim in a single taxable year will recognize (a) ordinary interest income to the extent such payments are attributable to interest that has accrued but has not been previously taken into income by the holder with respect to the Claim and (b) gain or loss in an amount equal to the difference between (1) the amount of cash and the fair market value of other property received by such holder in satisfaction of such Claim (other than amounts attributable to accrued interest, which is taxed as described above) and (2) the holder's adjusted tax basis in such Claim.  This treatment is expected to apply to holders of Claims in all Classes (subject to the discussions below on Reinstatement and tax treatment of recoveries on personal injury Claims).

Unless the Alternative Asbestos Treatment is implemented, holders of Class 5 Asbestos Personal Injury Claims will receive interests in the Section 524(g) Trust or the Asbestos Claims Trust.  Holders of Class 5 Asbestos Personal Injury Claims shall not be treated as receiving property as a result of their receipt of interests in either the Section 524(g) Trust or the Asbestos Claims Trust.  Instead, such holders shall be treated as receiving cash or property when they receive distributions from either such trust.  All distributions to holders of Claims will be subject to any applicable withholding and backup withholding.

Payments under the Plan to Claimants with respect to damages on account of personal physical injuries or physical sickness, including payments received from a trust pursuant to the Plan, will not be includable in such Claimants' gross income pursuant to section 104 of the Internal Revenue Code.  However, to the extent payments under the Plan to Claimants are attributable to medical expense deductions allowed under section 213 of the Internal Revenue Code for a prior taxable year, such payments will be taxable as ordinary income to the recipient.  Payments under the Plan to Claimants representing punitive damages or interest will generally be taxable as ordinary income to the recipient.  Payments under the Plan to a Claimant attributable to attorneys' fees of such Claimant may be taxable as ordinary income to the Claimant depending upon the unique circumstances of such Claimant.  If taxable, such a Claimant may also be entitled to deduct such payments as an expense (subject to certain limitations).  Some portion of the amounts received by holders of Class 5 Asbestos Personal Injury Claims and Class 6 Toxic Tort Claims may qualify for the treatment described in this paragraph.

Under the Plan, each holder of an Allowed Class 4 Bondholders' Claim or an Allowed Class 2 Secured Claim, at the option of the Plan Sponsors, shall be Reinstated.  The Reinstatement of the Bondholders' Claims could constitute a "significant modification" for federal income tax purposes.  If Reinstatement of Class 4 Bondholders' Claims results in a significant modification of those Claims, each Bondholder could have currently taxable gain to the extent that the "issue price" of the Reinstated Bond exceeds the Bondholder's tax basis in the Bond.  The issue price would generally equal the Reinstated Bond's face amount (unless the Bonds or the Reinstated Bonds are traded on an established securities market, within the meaning of the tax law, in which case the issue price would be the fair market value of the Bonds or the Reinstated Bonds, as the case may be).  If the Bonds or Reinstated Bonds are traded on an established securities market, the Reinstated Bonds may have original issue discount in an amount equal to the amount by which the face amount of the Reinstated Bonds exceeds the issue price.  A Bondholder would be required to include, in such Bondholder's taxable income, any such original issue discount on the Reinstated Bonds over the life of the Reinstated Bonds on a constant yield basis without regard to whether cash is received.  If a holder of a Secured Claim is Reinstated, and such Secured Claim is treated as debt for federal income tax purposes, then similar rules would apply to such Reinstatement.

Where gain or loss is recognized by a holder of Claims under the foregoing rules, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount and whether and to what extent the holder had previously claimed a bad debt deduction.

Holders of Claims are strongly advised to consult their tax advisors with respect to the tax treatment under the Plan of their particular Claim.

11.5    Information Reporting; Backup Withholding Tax.

Payments made pursuant to the Plan will generally be subject to applicable federal income tax information reporting and withholding requirements.  The Internal Revenue Code imposes backup withholding tax on certain payments, including payments of interest, if a taxpayer (a) fails to furnish its correct taxpayer identification number (generally on IRS Form W-9), (b) furnishes an incorrect taxpayer identification number, (c) is notified by the IRS that it has previously failed to report properly items subject to backup withholding tax, or (d) fails to certify, under penalty of perjury, that such taxpayer has furnished its correct taxpayer identification number and that the IRS has not notified such

taxpayer that it is subject to backup withholding tax. However, taxpayers that are corporations generally are excluded from these information reporting and backup withholding tax rules provided that evidence of such corporate status is furnished to the payor. Backup withholding is not an additional federal income tax. Any amounts withheld under the backup withholding tax rules will be allowed as a credit against a taxpayer's federal income tax liability, if any, or will be refunded to the extent the amounts withheld exceed the taxpayer's actual tax liability, if such taxpayer furnishes required information to the IRS. A taxpayer that does not provide a correct taxpayer identification number may be subject to penalties imposed by the IRS. Each taxpayer should consult its own tax advisor regarding the information reporting and backup withholding tax rules.

11.6    Importance of Obtaining Professional Tax Assistance.

The foregoing discussion is intended only as a summary of certain federal income tax consequences of the Plan, and is not a substitute for careful tax planning with a tax professional. The tax consequences are in many cases uncertain and may vary depending on the individual circumstances of a holder of Claims. Accordingly, holders of Claims are urged to consult with their tax advisors about the federal, state, local, and foreign tax consequences of the Plan.

SECTION 12
FINANCIAL INFORMATION

12.1    General.

An analysis of the Debtors' financial condition appears in the historic unaudited financial information for the fiscal years 2005, 2006, 2007 and 2008 (through June 30, 2008), attached to the Debtors' Disclosure Statement as **Exhibit D** thereto.

The Debtors are required to file monthly operating reports with the Bankruptcy Court. Such financial information is on file with the clerk of the Bankruptcy Court and publicly available for review on the Bankruptcy Court's public website: *www.ecf.txsb.uscourts.gov*, or at the Debtors' restructuring website: *www.asarcoreorg.com*.

SECTION 13
SOURCES OF INFORMATION PROVIDED AND THE ACCOUNTING METHOD USED

13.1    Sources of Information.

The financial and claims-related information set forth in this Disclosure Statement and the attached exhibits was provided by the Debtors and their respective advisors, except as otherwise indicated.

13.2    Accounting Method.

The Debtors have informed us that their books and records (a) present fairly in all material respects the consolidated financial position of ASARCO as of the respective dates thereof, and the consolidated results of operations of ASARCO for the periods covered thereby and (b) have been prepared in all material respects in accordance with generally accepted accounting principles applied on a basis consistent with the past practices of ASARCO during the pendency of the Reorganization Cases, in each case, subject to (i) the absence of footnotes thereto, (ii) in the case of interim financial statements, the absence of normal year-end adjustments, and (iii) audit adjustments resulting from the independent accountants' audit, review and finalization of the ASARCO's financial statements for the years ended December 31, 2005, 2006 and 2007.

SECTION 14
REQUIREMENTS FOR CONFIRMATION OF THE PLAN AND ELECTION PROCEDURES

14.1     Acceptance or Rejection of the Plan.

Under the Bankruptcy Code, only classes of claims and interests that are impaired under a plan of reorganization can vote to accept or reject that plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest in that class, that plan:

- leaves unaltered the legal, equitable, and contractual rights to which that claim or interest entitles its holder; or

- notwithstanding any contractual provision or applicable law that entitles the holder of that claim or interest to demand or receive accelerated payment of that claim or interest after the occurrence of a default:

  - cures that default, if other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code;

  - reinstates the maturity of that claim or interest as it existed prior to that default; or

  - compensates the holder of that claim or interest for any damages incurred as a result of that holder's reasonable reliance on that contractual provision or applicable law; and

- does not otherwise alter the legal, equitable, or contractual rights to which that claim or interest entitles its holder.

Under the Plan, all Classes of Claims and Interests are unimpaired; therefore, the holders of Claims and Interests in such Classes are conclusively presumed under section 1126(f) of the Bankruptcy Code to have accepted the Plan.  The Plan Sponsors are not soliciting  any acceptances to the Plan.  Holders of Class 5 Asbestos Personal Injury Claims and the FCR are being solicited to determine whether they support the Section 524(g) Treatment.

14.2     Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the court, after notice, to hold a hearing on confirmation of a proposed plan.  The Confirmation Hearing has been scheduled for _____ __, 2008 at __:__ __.m. before the Honorable Richard S. Schmidt, United States Bankruptcy Judge for the Southern District of Texas, in his courtroom located at 1133 N. Shoreline Blvd., Second Floor, Corpus Christi, Texas.  **[The Honorable _____, United States District Court Judge for the Southern District of Texas, will sit with Judge Schmidt.]** The Bankruptcy Court **[and the District Court]** may adjourn the Confirmation Hearing from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan.  Unless otherwise directed or permitted by the Bankruptcy Court, any objection to Confirmation of the Plan must (a) be in writing, (b) conform to the Bankruptcy Rules, (c) set forth the name of the objecting party, (d) identify the nature of Claims or Interests held or asserted by the objector against the Debtors' Estates or property, (e) state the basis for the objection and the specific grounds therefore, and (f) be filed with the clerk of the Bankruptcy Court, together with proof of service, and served upon each of the following so as to be received in the offices of each such Persons no later than _____ __, 2008 at 4:00 p.m., prevailing Central Time:  (1) Luc A. Despins, Milbank, Tweed, Hadley & McCloy LLP, One Chase Manhattan Plaza, New York, New York 10005; (2) Jack L. Kinzie, Baker Botts L.L.P., 2001 Ross Avenue, Dallas, Texas   75201-2980; (3) Tony M. Davis, Baker Botts L.L.P., One Shell Plaza, 910 Louisiana, Houston, Texas  77002-4995; (4) Shelby A. Jordan, Jordan, Hyden, Womble, Culbreth, & Holzer, P.C., Suite 900, Bank of America, 500 North Shoreline, Corpus Christi, Texas  78471; (5) James C. McCarroll, Reed Smith LLP, 599 Lexington Avenue, 29th Floor, New York, NY  10022; (6) Paul M. Singer, Reed Smith LLP, 435 Sixth Avenue, Pittsburgh, PA

- 75 -

15219; (7) Sander L. Esserman, Stutzman, Bromberg, Esserman & Plifka, 2323 Bryan Street, Suite 2200, Dallas, Texas 75201; (8) John H. Tate, II, Oppenheimer, Blend, Harrison & Tate, Inc., 711 Navarro, Sixth Floor, San Antonio, Texas 78205; (9) David L. Dain and Alan S. Tenenbaum, United States Department of Justice, Environmental Enforcement Section, 601 D Street NW, Washington, DC 20004; and (10) Douglas P. Bartner, Shearman & Sterling LLP, 599 Lexington Avenue, New York, New York 10022.

14.3    Requirements for Confirmation.

     (a)    Consensual Confirmation Under Section 1129(a) of the Bankruptcy Code.

        At the Confirmation Hearing, the Bankruptcy Court will be asked to determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied.  These requirements include, among others, judicial findings that:

- the Plan complies with applicable provisions of the Bankruptcy Code;

- the Plan Sponsors have complied with the applicable provisions of the Bankruptcy Code;

- the Plan has been proposed in good faith and not by any means forbidden by law;

- any payment made or to be made by the Plan Sponsors, the Debtors or by any Person acquiring property under the Plan for services, costs, or expenses in or in connection with the Reorganization Case, or in connection with the Plan and incident to the Reorganization Case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

- the Plan Sponsors have disclosed the identity and affiliations of any individual proposed to serve as a director or an officer of Reorganized ASARCO after Confirmation of the Plan and that the appointment to, or continuance in, such office by such individual is consistent with the interests of holders of Claims and Interests and with public policy;

- the Plan Sponsors have disclosed the identity of any insider that will be employed or retained by Reorganized ASARCO, and the nature of any compensation for such insider;

- each Class of Claims or Interests has either accepted the Plan or is not impaired under the Plan;

- except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and Priority Claims will be paid in full on the Effective Date and that Priority Tax Claims will be either paid in full on the Effective Date or will receive on account of such Claims deferred cash payments, over a period not exceeding six (6) years after the date of assessment of such Claims, of a value, as of the Effective Date, equal to the Allowed Amount of such Claims;

- that the Plan is feasible; that is, Confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of Reorganized ASARCO, unless such liquidation or reorganization is proposed in the Plan;

- all fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date; and

- the Plan provides for the continuation after the Effective Date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level

established pursuant to section 1114(e)(1)(B) or (g) of the Bankruptcy Code, at any time prior to Confirmation of the Plan, for the duration of the period the Reorganizing Debtors have obligated themselves to provide such benefits.

The Plan Sponsors believe that the Plan satisfies all applicable requirements of section 1129(a) of the Bankruptcy Code.

(b)     Best Interests Test.  Under the best interests test, a Plan is confirmable if, with respect to each impaired Class of Claims or Interests, each holder of a Claim or Interest in that Class either:

- has accepted the Plan; or

- will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

As there are no impaired Classes of Claims or Interests under the Plan, the Plan Sponsors have not included a liquidation analysis.

(c)     Feasibility of the Plan.  In order for the Plan to be confirmed, the Bankruptcy Court also must determine that the Plan is feasible – that is, that the need for further reorganization or a subsequent liquidation of ASARCO is not likely to result following Confirmation of the Plan.  In determining whether a plan of reorganization is feasible, a court will consider:

- the adequacy of the proposed capital structure of the reorganized entity;

- the earning power of that entity;

- the overall economic conditions in which that entity will operate;

- the capability of its management;

- the continuity of its management; and

- any other factors the court deems relevant to the successful operation of the reorganized entity to perform the provisions of the plan of reorganization.

(d)     Requirements for Injunction Under Section 524(g) of the Bankruptcy Code.

Section 524(g) of the Bankruptcy Code authorizes the court to enjoin Entities from taking action to collect, recover, or receive payment or recovery with respect to any Asbestos Personal Injury Claim that is to be paid in whole or in part by a trust created by a plan of reorganization that satisfies the requirements of the Bankruptcy Code.  The injunction also may bar any action based on such Claims or Demands against the Reorganizing Debtors that are directed at third parties.  To the extent the Section 524(g) Treatment is elected by 75% of the holders of Asbestos Personal Injury Claims that make the election and the FCR, the injunction described above will be sought, if not then Primary Asbestos Treatment or the Alternative Asbestos Treatment will apply and no injunction will issue under section 524(g) of the Bankruptcy Code.

To obtain the injunction, a trust must be established that:

- assumes the Reorganizing Debtor's asbestos liabilities;

- is funded in whole or in part by securities of one or more of the Reorganizing Debtors and with an obligation by one or more Reorganizing Debtor to make future payments;

- owns or is entitled to a majority of the voting shares of one or more Reorganizing Debtor, a Reorganizing Debtor's parent corporation, or subsidiaries that are also Debtors; and

- uses its assets or income to satisfy Claims and Demands.

As a requirement before issuing an injunction under section 524(g) of the Bankruptcy Code, the court must determine that

- the Reorganizing Debtors are likely to be subject to substantial Demands for payments arising out of the same or similar conduct or events that give rise to the Asbestos Personal Injury Claims that are addressed by the injunction;

- the actual amounts, numbers and timing of such Demands cannot be determined;

- pursuit of such Demands outside the procedures prescribed by the plan is likely to threaten the Plan's purpose to deal equitably with Claims and Demands; and

- the Section 524(g) Trust will operate through mechanisms such as structural, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Claims and Demands, or other comparable mechanisms that provide reasonable assurance that the Section 524(g) Trust will value, and be in a financial position to pay, Claims and Demands that involve similar Claims in substantially the same manner.

The court also must ensure that the terms of any proposed section 524(g) injunction are set out in the Plan and Disclosure Statement and that 75 percent of the holders of Asbestos Personal Injury Claims who make the election on the Plan elect to approve it.

The Injunctions will be valid and enforceable as to Demands made after the Plan is confirmed only if a legal representative is appointed to protect the rights of Persons that might subsequently assert Demands and if the court determines that applying the Injunctions to future claimants in favor of the beneficiaries of the Injunction is fair and equitable with respect to the Persons that might subsequently assert such Demands, in light of the benefits provided, or to be provided, to the trust on behalf of the Reorganizing Debtors or another beneficiary of the Injunctions.

The Confirmation Order must be issued or affirmed by the District Court that has jurisdiction over the Reorganization Cases.  After the expiration of the time for appeal of the order, the Injunctions become valid and enforceable.

The Plan Sponsors believe that they will be able to satisfy all the requirements of section 524(g), so long as the requisite number of holders of Asbestos Personal Injury Claims and the FCR elect the Section 524(g) Treatment.

14.4     Conditions to Effectiveness.

In addition to the requirements for confirmation of the Plan, the terms of the Plan provide that the Plan may not become effective unless, among other things, (a) the Bankruptcy Court has approved the Disclosure Statement, (b) the Confirmation Order has become a Final Order, (c) the Plan Documents necessary or appropriate to implement the Plan have been executed, delivered, and filed where applicable, and (d) the Confirmation Order contains the findings of fact and conclusions of law set forth in Article 10.1(b) of the Plan.  See Article 10.1 of the Plan for a more complete discussion of the conditions to effectiveness of the Plan.

Upon notice, the Plan Sponsors, in their sole discretion, may waive any of the conditions to effectiveness in Article 10.1 of the Plan by filing a notice of such waiver with the clerk of the Bankruptcy Court and by serving a copy of such notice on the Debtors, the U.S. Trustee, the Committees, the FCR, and the DOJ; *provided, however*, that if Section 524(g) Treatment goes into effect, the Asbestos Claimants' Committee and the FCR must consent to any waiver of any of the conditions to effectiveness set forth in Article 10.1(f) and (k).

14.5    Effect of Confirmation and Effectiveness.

If the Plan is confirmed and becomes effective, the Plan will be binding upon the Reorganizing Debtors, all holders of Claims and Interests, and all other parties in interest.

**[REST OF PAGE DELIBERATELY BLANK]**

The undersigned have executed this First Amended Disclosure Statement as of the 20th day of September, 2008.

Respectfully submitted,

ASARCO INCORPORATED, a Delaware corporation

By:    /s/ Jorge Lazale Psihas
        Name: Jorge Lazalde Psihas
        Title: Vice President and Counsel

By:    /s/ Jaime F. Gollzo Gonzalez
        Name: Jaime F. Collazo Gonzalez
        Title: CEO and President

AMERICAS MINING CORPORATION, a Delaware Corporation

By:    /s/ Jorge Lazalde Psihas
        Name: Jorge Lazalde Psihas
        Title: Secretary

By:    /s/ Alberto de la Parra Zavala
        Name: Alberto de la Parra Zavala
        Title: Assistant Secretary