**IN THE UNITED STATES BANKRUPTCY COURT
OF THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| In re: | § | Case No. 05-21207 |
| | § | |
| ASARCO LLC, *et al.*, | § | Chapter 11 |
| | § | |
| Debtors. | § | (Jointly Administered) |

**PROFFER OF CARLOS RUIZ IN SUPPORT OF
ASARCO INCORPORATED AND AMERICAS MINING CORPORATION'S
MODIFIED SIXTH AMENDED PLAN OF REORGANIZATION FOR THE DEBTORS
<u>UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE</u>**

1.      My name is Carlos Ruiz, and I am the Chairman of the Board of Directors of

ASARCO LLC ("ASARCO" or the "Company"). This is my testimony in support of ASARCO

Incorporated and Americas Mining Corporation's Modified Sixth Amended Plan of

Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code (the

"Parent's Plan"). I will refer to the Debtors' Sixth Amended Joint Plan of Reorganization Under

Chapter 11 of the Bankruptcy Code, As Modified, as the "Debtors' Plan."  I speak herein as to

my own views, and nothing I state herein can or should be ascribed to ASARCO or its Board of

Directors, Officers, or professional advisers.

## <u>MY RELEVANT DUTIES</u>

2.      I am the Chairman of the Board of Directors (the "Board of Directors" or the

"Board") of ASARCO. I have been on the Board of Directors of ASARCO for almost four

years. My responsibilities as Chairman of the Board is to ensure that the Board analyzes and

considers all issues relating both to ASARCO's operations and to this Chapter 11 bankruptcy

proceeding as well as to participate in the decisions the Board is tasked with making.

<u>STATEMENT OF TESTIMONY</u>

**A.      The Parent's Plan is Superior to the Debtors' Plan.**

3.      It is abundantly clear that the Parent's Plan is the best option available to the Company and its creditors.  In April 2009, through both deposition testimony and testimony at the hearing on ASARCO's Motion for Order, Pursuant to §§ 363, 105, and Fed. R. Bankr. P. 9019, Approving Settlement and Release and Revised Bid Protections Contained in the New Purchase and Sale Agreement Between ASARCO LLC and Certain of its Subsidiaries, and Sterlite (USA), Inc. and for Related Relief filed in the above-styled Chapter 11 Cases on March 11, 2009 (the "9019 Motion"), I explained why I voted against the New Sterlite PSA (as that term is defined in the 9019 Motion).  Among the reason that I believed the Board should reject the New Sterlite PSA were the concerns that: (i) Sterlite might breach the terms of the New Sterlite PSA and walk away from the transaction yet again; (ii) the deposit securing Sterlite's performance would not be sufficient to ensure Sterlite's compliance with the terms of the New Sterlite PSA and could not compensate the Company in the event Sterlite walked away again; (iii) the provisions by which Sterlite would receive a release from any liability for its breach of and failure to consummate the terms of the Original Sterlite PSA (as that term is defined in the 9019 Motion) are too complicated and provide too many situations where Sterlite would be released for little or no consideration; and (iv) the no-shop provisions provide the Board an insufficient amount of time to market the Company's assets and find a buyer willing to pay more than Sterlite.  I believe all these concerns remain valid today.  Nothing in the Debtor's Plan has resolved or addressed my concerns.

4.      Further, when compared to the Parent's Plan, the Debtors' Plan becomes an even less attractive option for the Company.  First, the Debtors' Plan offers $1.1 billion in cash plus a

$770 million note that is associated with the price of copper.  The Parent's Plan, however, offers $1.4625 billion in cash, a guaranty of a $280 million note for asbestos claimants, and is not dependent upon the price of copper.  Further, under all three Treatments under the Parent's Plan, the immediate and guaranteed cash consideration under the Parent's Plan is significantly higher – in excess of $360 million.

5.     Second, the Parent's Plan is more certain than the Debtors' Plan.  Grupo Meixco and the Parent have entered into a Support Agreement under which Grupo Mexico has agreed to promptly provide the Parent with funds in an amount equal to the amount required to permit the Parent to deliver the Parent Contribution in full and Fund the Working Capital Facility.  Further, to ensure the Parent's Plan is not withdrawn prior to the Confirmation Hearing, the Parent has made available a $125 million forfeitable deposit.  And finally, after the Parent's Plan is confirmed, stock worth $1.3 billion in an escrow account will act as a forfeitable deposit ensuring the Parent will timely consummate the plan.  Sterlite, on the other hand, has breached its obligations to the Debtors once before and has provided inadequate assurance that no such breach will happen again.

6.     Finally, the Parent is the only Plan Sponsor who has demonstrated the financial ability to fund its obligations and the willingness to manage Reorganized ASARCO.  For instance, I have not been presented with a written support agreement similar to the Amended Support Agreement filed in connection with the Parent's Plan from Vedanta to demonstrate that it will support Sterlite's operations following a closing.  I am also concerned that the new enterprise will have insufficient working capital (because Sterlite is not buying ASARCO's cash) and that it will not have a line of credit or other source for financing.  I have received presentations from Barclays that indicate the enterprise post-confirmation needs working capital

of $250-400 million, but I have not seen evidence that Sterlite has such cash or line of credit in place.  Further, I am not convinced that creditors can realistically expect to be paid on the copper note issued by Sterlite.

**B.     The Board has been unable or unwilling to consider the Parent's Plan.**

7.     The Board's hands have been tied by the overly complicated release provisions recently approved by the Court and the restrictions upon the Board's consideration of other Alternative Plans.  These restrictions have caused the Board to fear inadvertently releasing Sterlite of liability for its breach of the Original Sterlite PSA if the Board considers alternative competing plans for reorganization.  As a result, the Board has become exceedingly reluctant to consider other plans, including the far superior Parent's Plan.

8.     It has also become apparent that the other Board members and the Company's professionals have no interest in negotiating with or reaching a deal with the Parent even if such would be in the best interest of the estate.  While the Company's advisors have made several presentations analyzing and comparing the competing plans, the presentations invariably exaggerate the flaws in the Parent's Plan and minimize (or fail to discuss altogether) the flaws in the Debtors' Plan.

9.     Unfortunately, the Board has not spent a lot of critical moments comparing the three plans for reorganization.  Despite the various presentations regarding the plans, it is not apparent to me that the other Board members have spent a significant amount of time considering the Company's options.

**C.    The Company's Committee of Independent Directors has inappropriately excluded me from key Board communications and decision-making.**

10.    The Company's Committee of Independent Directors (the "Committee") meets to consider issues and make decisions without my input when I have a conflict of interest.  The agreement between the independent directors and me is that if they feel they need to meet without me present to discuss an issue, they disclose the subject of the conference prior to the meeting, and then after the meeting, they report their decision to me.  It has become apparent that this agreed upon protocol is rarely followed by the Committee or the Company's counsel.  The Committee is nothing more than a pretext employed by the other Board members and ASARCO's professionals to keep me in the dark.

11.    While there could be countless instances in which the Committee has failed to comply with the agreed upon procedure, one prominent example comes to mind.  In June 2009, counsel for ASARCO announced in open court that Sterlite had entered into an agreement with the asbestos representatives which would lead to a revised plan term sheet and Sixth Amended Plan.  It was not until later that day that I learned for the first time of the agreement or the amended plan.  As Chairman of the Board of Directors, I should be among the first, as opposed to the last, person to obtain such important information.  On June 16, 2009, I sent a letter to Mr. Lovett and Mr. Caine – the other two members of the Board – expressing my concern with this occurrence and with their disregard for the principles of corporate governance.  A true and correct copy of my June 16, 2009 letter is attached hereto as <u>Exhibit "A."</u>  To date, neither Mr. Lovett nor Mr. Caine has responded to my letter.  In addition, I have been given no assurances that the Committee will operate in accordance with the agreed upon procedure in the future.

**D.      ASARCO's professionals negotiated the deal with the Majority Bondholders without Board approval.**

12.      The Majority Bondholders and the Debtors recently reached an agreement under which the Majority Bondholders agreed to support the Debtors' Plan in exchange for certain amendments to plan language regarding the treatment of bondholder claims.  Prior to the announcement of a tentative deal with the Majority Bondholder, I was not aware any negotiations were taking place.  In fact, the Board never authorized the Company's professionals to engage in such negotiations.

13.      When the Board was finally presented with the tentative terms of a deal, the Board was given minimal and insufficient time to consider the terms.  I ultimately voted against the deal with the Majority Bondholders in part because the Board lacked the information necessary to fully evaluate the deal and because the deal with the Majority Bondholders risks furthering an inferior plan of reorganization.

**E.      Concerns about a labor strike are unfounded.**

14.      I do not believe that having a deal in place with the labor union is a requirement for consummation of the Parent's Plan.  Rather, I believe that if the Parent's Plan is confirmed, the labor union and the Parent will reach an agreement because it would be in both of their best interests to do so.

15.      Concerns about a strike if the Parent's Plan is confirmed in the absence of a deal with the labor union are unfounded.  The contract with the union has not expired, leaving adequate time for negotiations.  Any time a company negotiates with a union, a strike is possible, and negotiations between the Parent and the labor union would be no different.  After confirmation and consummation of the Parent's Plan, Reorganized ASARCO will emerge from

bankruptcy having paid its debts and with adequate working capital.  It would not be in the best interest of the labor union to strike, and any such strike should not and would not be prolonged.

16.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed this 7th day of August, 2009.


/s/ Carlos Ruiz Sacristan
Carlos Ruiz Sacristan