**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No.  05-21207 |
| | § | |
| ASARCO LLC, *et al.* | § | Chapter 11 |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

---

**PARENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
REGARDING CONFIRMATION OF THE PARENT'S FULL PAYMENT PLAN AND THE
DENIAL OF CONFIRMATION OF DEBTORS' LIQUIDATION PLAN**

---

**MILBANK, TWEED, HADLEY & MCCLOY, LLP**

Robert Moore
601 South Figueroa Street
Los Angeles, CA 90017
Telephone: (213) 892-4000
Telecopier: (213) 629-5063

Robert Winter
1850 K Street, NW
Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Telecopier: (202) 835-7586

**HAYNES AND BOONE, LLP**

Charles A. Beckham, Jr.
1 Houston Center
1221 McKinney, Suite 2100
Houston, Texas 77010
Telephone: (713) 547-2000
Telecopier: (713) 547-2600

Marty L. Brimmage, Jr.
Trey A. Monsour
Arthur T. Carter
Kendyl T. Hanks
Lacy Lawrence
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: (214) 651-5000
Telecopier:  (214) 651-5940

*Counsel for ASARCO Incorporated and Americas Mining Corporation*

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................. 9

FINDINGS OF FACT ......................................................................................... 12

I.      BACKGROUND ...................................................................................... 12

        A.      Initiation of Bankruptcy Case and Appointment of Case
                Fiduciaries ....................................................................................... 12

        B.      Corporate Governance .................................................................... 15

        C.      The SCC Judgment ......................................................................... 16

                1.      The SCC Litigation .............................................................. 16

                2.      Valuation of the SCC Final Judgment. .............................. 21

        D.      Sterlite Sale and Purchase Agreement ......................................... 27

        E.      The Tax Adversary .......................................................................... 29

        F.      Environmental Claims and the Environmental 9019 Motion .................. 32

        G.      The Asbestos Claims, Litigation and Settlement ......................... 36

        H.      Agreement With Majority Bondholders ......................................... 39

II.     THE PARENT'S FULL PAYMENT PLAN .............................................. 40

        A.      Parent Offers Full Payment, in Cash, of Principal and Interest to
                Creditors ......................................................................................... 40

        B.      Treatment of Priority, Secured, and General Unsecured Claims ............. 46

        C.      Treatment of Asbestos Subsidiary Committee's and FCR's Claims ........ 47

        D.      Late Filed and Subordinated Claims .............................................. 49

        E.      The SCC Litigation ......................................................................... 49

        F.      The Sterlite Litigation .................................................................... 50

        G.      Financing .......................................................................................... 50

        H.      Post-Effective Date Management. .................................................. 54

III.    DEBTORS' LIQUIDATION PLAN ......................................................... 55

        A.      Summary of Debtors' Liquidation Plan. ........................................ 55

        B.      The Debtors' Liquidation Plan sells the SCC Judgment to Sterlite
                and releases the Sterlite Claim. ..................................................... 56

        C.      Late Filed and Subordinated Claims .............................................. 58

D.     Sterlite's Reliability as the Sponsor of the Debtors' Liquidation Plan .............................................................................................. 58

E.     The Copper Basin Railway ..................................................... 62

IV.     THE PARENT'S FULL PAYMENT PLAN PROVIDES BETTER DISTRIBUTIONS AND VALUE TO CREDITORS............................................ 64

V.     LABOR ISSUES............................................................................ 71

A.     Facts Relevant to the Collective Bargaining Agreement and the Special Successorship Clause .................................................. 72

     1.     The Terms of the CBA and the Special Successorship Clause.......................................................................... 72

     2.     The Parent has negotiated with the Unions for a New CBA in good faith. .................................................. 78

     3.     The Unions have not negotiated with the Parent for a New CBA in good faith, and have not complied with the requirement that they offer substantially the same terms to the Parent as offered to Sterlite.................................... 81

     4.     The risk of a Union strike is overstated, and does not undermine the feasibility of the Parent's Full Payment Plan........ 88

B.     Settlement of Retiree Litigation................................................ 97

C.     Pension Plans. ........................................................................ 97

VI.     THE SECTION 524(G) TRUST............................................................ 99

A.     The Section 524(g) Trust, The Permanent Channeling Injunction And The Asbestos Insurance Company Injunction Comply With Sections 105(a) And 524(g) Of The Bankruptcy Code. ........................ 99

B.     Tax Treatment of the Section 524(g) Trust............................. 105

VII.     CREDITORS' VOTES AND PREFERENCES ................................. 106

CONCLUSIONS OF LAW ................................................................... 108

I.     GENERAL CONCLUSIONS ........................................................... 108

A.     Venue; Core Proceeding; Exclusive Jurisdiction.................... 108

B.     Judicial Notice ...................................................................... 108

C.     Solicitation and Notice.......................................................... 108

D.     Good Faith Solicitation ......................................................... 109

E.     Parent's Full Payment Plan Modifications ............................. 110

F.     Acceptances of the Parent's Full Payment Plan ..................... 111

G.  Assumption, Assumption and Assignment, and Rejection of Executory Contracts and Unexpired Leases ........................................... 111

H.  Section 524(g) Injunctions ................................................................ 112

I.  Section 524(g) Trust ......................................................................... 115

J.  Deemed Substantive Consolidation Permissible ................................. 115

K.  Environmental Custodial Trust ........................................................ 116

L.  Working Capital Facility ................................................................... 116

II.  THE PARENT'S FULL PAYMENT PLAN SATISFIES THE CONFIRMATION REQUIREMENTS IN SECTION 1129(A) OF THE BANKRUPTCY CODE ........................................................................... 116

A.  Standing ........................................................................................... 116

B.  11 U.S.C. § 1129(a)(1) ..................................................................... 117

    1.  11 U.S.C. § 1122 ..................................................................... 117

    2.  11 U.S.C. § 1123 ..................................................................... 118

        a.  11 U.S.C. § 1123(a)(1) ................................................... 118

        b.  11 U.S.C. § 1123(a)(2) ................................................... 118

        c.  11 U.S.C. § 1123(a)(3) ................................................... 119

        d.  11 U.S.C. § 1123(a)(4) ................................................... 119

        e.  11 U.S.C. § 1123(a)(5) ................................................... 120

        f.  11 U.S.C. § 1123(a)(6) ................................................... 122

        g.  11 U.S.C. § 1123 (a)(7) .................................................. 122

        h.  11 U.S.C. § 1123(b) ...................................................... 123

    3.  11 U.S.C. § 1124 ..................................................................... 123

C.  11 U.S.C. § 1129(a)(2) ..................................................................... 123

D.  11 U.S.C. § 1129(a)(3) (Good Faith) ................................................ 125

E.  11 U.S.C. § 1129(a)(4) ..................................................................... 130

F.  11 U.S.C. § 1129(a)(5) ..................................................................... 131

G.  11 U.S.C. § 1129(a)(6) ..................................................................... 131

H.  11 U.S.C. § 1129(a)(7) ..................................................................... 132

I.  11 U.S.C. § 1129(a)(8) ..................................................................... 134

J.  11 U.S.C. § 1129(a)(9) ..................................................................... 135

K.  11 U.S.C. § 1129(a)(10) ................................................................... 135

L.  11 U.S.C. § 1129(a)(11) ................................................................... 136

1.      Parent's Full Payment Plan can be consummated according
        to its provisions. ................................................................... 136

2.      Under the Parent's Full Payment Plan, it is likely that
        Reorganized ASARCO will continue as a successful and
        viable entity................................................................ 137

M.      11 U.S.C. § 1129(a)(12)........................................................ 140

N.      11 U.S.C. § 1129(a)(13)........................................................ 140

O.      11 U.S.C. § 1129(a)(14), (15) and (16).................................... 140

III.    IN THE ALTERNATIVE, THE PARENT'S FULL PAYMENT PLAN
        SHOULD BE CONFIRMED UNDER 11 U.S.C. § 1129(B)............................ 141

IV.     NEITHER THE SPECIAL SUCCESSORSHIP CLAUSE NOR THE
        THREAT OF A STRIKE PREVENT CONFIRMATION OF THE
        PARENT'S FULL PAYMENT PLAN............................................... 142

A.      The Special Successorship Clause does not bind the Parent as a
        matter of law. .................................................................. 142

B.      Even if the Unions and the Debtor could unilaterally bind the
        Parent to the CBA prior to confirmation, the Court holds that it
        does not apply. ................................................................. 151

C.      The Existing CBA will continue in effect after confirmation, and
        the Unions' strike threat does not undermine the feasibility of the
        Parent's Full Payment Plan.................................................... 155

V.      THE DEBTORS' LIQUIDATION PLAN IS NOT CONFIRMABLE.............. 160

A.      The Debtors' Liquidation Plan is not Fair and Equitable and
        Violates the Absolute Priority Rule ........................................ 160

B.      The Debtors' Methods of Valuing the SCC Final Judgment Are
        Inherently Unreliable .......................................................... 167

C.      The Debtors' Liquidation Plan Is Not Proposed In Good Faith ............ 168

D.      The Debtors' Liquidation Plan Is Not Feasible ..................................... 171

1.      The Debtors' Liquidation Plan involves great execution
        risk................................................................................. 172

2.      Sterlite's inability to operate the Copper Basin Railway
        further undermines the feasibility of the Debtors'
        Liquidation Plan................................................................ 174

E.      The Debtors' Liquidation Plan Allows Governmental
        Environmental Claimants To Recover Amounts To Which They
        Are Not Legally Entitled....................................................... 180

F.     The Debtors' Liquidation Plan Does Not Satisfy the "Best Interests" Test ........................................................................... 182

VI.    THE REQUIREMENTS OF SECTION 1129(C) OF THE BANKRUPTCY CODE ARE MET BY CONFIRMING THE PARENT'S FULL PAYMENT PLAN.................................................................. 184

A.     A Plan For Reorganization Should Be Confirmed Over A Liquidation Plan.................................................................. 185

B.     The Treatment of Creditors and Equity Security Holders ..................... 185

C.     The Feasibility of the Plan ....................................................... 186

D.     The Preferences of Creditors and Equity Security Holders ................... 187

VII.   THE PARENT'S FULL PAYMENT PLAN COMPLIES WITH SECTION 1129(D) OF THE BANKRUPTCY CODE ..................................... 189

VIII.  IN THE ALTERNATIVE, PARENT'S FULL PAYMENT PLAN SHOULD BE APPROVED UNDER 11 U.S.C. § 1129(B) .............................. 189

A.     Parent's Full Payment Plan Does Not Discriminate Unfairly With Respect to Rejecting Classes ................................................. 190

B.     Parent's Full Payment Plan is Fair and Equitable With Respect to Rejecting Classes ................................................................ 192

IX.   THE DISCHARGES, RELEASES, EXCULPATIONS, INJUNCTIONS AND RELATED PROVISIONS IN THE PARENT'S FULL PAYMENT PLAN ARE APPROPRIATE ........................................................... 193

X.    CONFIRMATION OF THE PARENT'S FULL PAYMENT PLAN ............... 194

XI.   DENIAL OF CONFIRMATION OF THE DEBTORS PLAN ......................... 194

TO THE HONORABLE RICHARD S. SCHMIDT,
UNITED STATES BANKRUPTCY JUDGE:

Americas Mining Corporation ("AMC") and ASARCO Incorporated (together, the "Parent") file their Proposed Findings of Fact and Conclusions of Law (the "Parent's Proposed Findings and Conclusions").  The Parent submits these Proposed Findings and Conclusions in support of ASARCO Incorporated and Americas Mining Corporation's  Seventh Amended Joint Plan of Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code, as Modified on August 20, 2009 (Docket No. 12568), as modified by the Notice of Technical Amendments dated August 23, 2009 (Docket No. 12617) and the Notice of Further Technical Amendments Dated August 27, 2009  (Docket No. 12695), and in opposition to Debtors' Sixth Amended Joint Plan of Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code, As Modified, With Further Modifications as of August 23, 2009 (Docket No. 12623), pursuant to the Court's request and in order to assist the Court with the confirmation of a plan in the above-captioned cases.  The Parent reserves the right revise and amend these Proposed Findings and Conclusions.

****

On this day came on for consideration confirmation of competing plans of reorganization filed in the above-captioned cases.  The Court, having heard the evidence and arguments of counsel at the hearing conducted from August 10 through August 25, 2009 (the "Confirmation Hearing"), makes the following findings of fact and conclusions of law[1] in support of (a) confirmation of ASARCO Incorporated and Americas Mining Corporation's  Seventh Amended Joint Plan of Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code, as Modified on August 20, 2009 (Docket No. 12578), as modified by the Notice of Technical Amendments dated August 23, 2009 (Docket No. 12617) and the Notice of Further Technical Amendments Dated August 27, 2009  (Docket No. 12695) (together with all exhibits, supplements and addenda thereto and all documents referred to therein, the "Parent's Full Payment Plan"); and (b) denial of the Debtors' Sixth Amended Joint Plan of Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code, As Modified, With Further Modifications as of August 23, 2009 (Docket No. 12668) ("Debtors' Liquidation Plan"):[2]

---

[1]     Findings of fact shall be construed as conclusions of law and vice versa where appropriate.  *See* FED. R. BANKR. P. 7052.  The Court's findings of fact and conclusions of law announced on the record in open court are hereby incorporated by reference herein.

[2]     Capitalized terms used and not otherwise defined in this Order shall have the meanings ascribed to them in the Parent's Full Payment Plan, the Debtors' Liquidation Plan, the Joint Disclosure Statement In Support of the Respective Plans of Reorganization Proposed By (1) The Debtors; (2) ASARCO Incorporated and Americas Mining Corporation; and (3) Harbinger Capital Partners Master Fund I, Ltd. (the "Disclosure Statement") (Docket. No. 11899); ASARCO Incorporated's and Americas Mining Corporation's Supplement to the Joint Disclosure Statement In Support of the Respective Plans of Reorganization Proposed By (1) The Debtors; (2) ASARCO Incorporated and Americas Mining Corporation; and (3) Harbinger Capital Partners Master Fund I, Ltd. (the "Disclosure Statement Supplement") (Docket. No. 12253); and ASARCO Incorporated's and Americas Mining Corporation's Further Supplement to Joint Disclosure Statement In Support of the Respective Plans of Reorganization Proposed By (1) the Debtors; (2) ASARCO Incorporated and Americas Mining Corporation; and (3) Harbinger Capital Partners Master Fund I, Ltd. ("Further Disclosure Statement Supplement") (Docket No. 12493), as applicable.  In the event of any inconsistencies, the meanings in the Parent's Full Payment Plan shall control.

## PRELIMINARY STATEMENT

The Parent's Full Payment Plan is the only confirmable plan that will resolve all of the Debtors' Chapter 11 cases and reorganize ASARCO.[3]   The Parent's Full Payment Plan is superior to the Debtors' Liquidation Plan because it provides for a full cash recovery by the creditors of the principal amount of their allowed claims and interest thereon to the date of payment, provides greater certainty of payment, provides for reorganization of the Debtors' business as opposed to a liquidation of substantially all of the Debtors' assets, and channels asbestos claims into a Section 524(g) trust in accordance with the provisions of the Bankruptcy Code, all of which gives Reorganized ASARCO the best possible chance to continue – and thrive – upon exit from these Chapter 11 cases.

Pursuant to its Full Payment Plan, the Parent will make a contribution in cash at close of $2.2051 billion.   In addition, the Parent is providing (i) a guarantee by Grupo México of a $280 million promissory note payable to the Section 524(g) Trust, which is fully secured by, among other things, a lien on and security interest in the assets of Reorganized ASARCO and a pledge of 51 percent of the Equity Interests in Reorganized ASARCO and guaranteed by Grupo México; (ii) a $200 million Working Capital Facility to fund Reorganized ASARCO's operations upon emergence from bankruptcy; and (iii) a release of the Parent's claims against the estate. The Parent currently has at least two claims against the Estates: (1) an administrative expense

---

[3]       In addition to the Debtors' Liquidation Plan, the Second Amended Chapter 11 Plan Filed by Harbinger Capital Partners Master Fund I, Ltd. ( the "Harbinger Plan") has been filed in these cases.  However, on August 4, 2009, the Court entered an order abating confirmation of the Harbinger Plan and abating and suspending all deadlines and response dates relating to confirmation of the Harbinger Plan (Docket No. 12251, the "Harbinger Plan Abatement Order") in response to a motion seeking such relief filed by Harbinger on August 3, 2009 (Docket No. 12229).   Accordingly, only the Parent's Full Payment Plan and the Debtors' Liquidation Plan (collectively, the "Plans") are before the Court at the hearing that commenced on August 10, 2009 (the "Confirmation Hearing").  However, since the Harbinger Plan Abatement Order provides that it is without prejudice to Harbinger presenting the Harbinger Plan for confirmation no earlier than 20 days after the conclusion of the Confirmation Hearing, the Parent hereby reserves all rights to object to confirmation of the Harbinger Plan, to bring evidence that the Harbinger Plan is not confirmable, and to argue against confirmation of the Harbinger Plan in pleadings and at hearings before the Court.

claim for reimbursement of $161.7 million for taxes paid by AMC on account of the Debtors' income, and (2) a claim by AMC to a tax refund that is presently estimated to be worth approximately $60 million, which shall be available for distribution to creditors pursuant to the Parent's Full Payment Plan.  The Parent's commitments to make the contribution of $2.2051 billion, to guarantee the $280 million note, and to provide the working capital facility are further backstopped by Grupo México, the Parent's corporate owner.  Finally, Reorganized ASARCO will remain liable for any shortfall in the funds available to satisfy Claims.  Because these funds and other sources of non-monetary sources of consideration are sufficient to provide payment in full to all classes of claims at the allowed or agreed-upon amount, the Parent will retain 100% of the equity interests in Reorganized ASARCO.

Compared with the Debtors' Liquidation Plan, the Parent's Full Payment Plan offers substantially greater value to the estates.  Specifically, the Parent will provide $2.2051 billion in cash compared to only $2.1614 billion cash payable by Sterlite under the Debtors' Liquidation Plan (of which $722 million is used to buy litigation trust interests rather than the Debtors' assets).  Any Claim holders receiving interest under the Parent's Full Payment Plan will receive it at the same rate as they would under the Debtors' Liquidation Plan; in particular, bondholders will receive Post-Petition Interest at the rate provided for by their indentures.  Furthermore, if the Parent's Full Payment Plan is confirmed, the Parent will withdraw its appeals with respect to the orders approving the Environmental Custodial Trusts and the Environmental Unsecured Claims.  Thus, Governmental Environmental Claimants will receive the same treatment they have negotiated with the Debtors and that has already been approved by the Bankruptcy Court.

To demonstrate its earnest intention and ability to fully and timely consummate its Plan, the Parent has established an Escrow Account funded with 83,710,000 shares of stock of SCC,

with a market valuation as of the close of the Confirmation Hearing in excess of $2.4 billion.

Before the Parent's Full Payment Plan is recommended by the Bankruptcy Court for

confirmation by the District Court, such shares in the Escrow Account (valued at $125 million)

will act as a forfeitable deposit, ensuring that the Parent's Full Payment Plan is not terminated,

withdrawn, modified, or amended in a manner that would effect a materially adverse change to

the treatment afforded unsecured creditors, prior to the conclusion of the Confirmation Hearing

(the "Pre-Confirmation Deposit").  No later than August 28, 2009, the Parent's ultimate parent

company, Grupo México, is depositing into the Escrow Account an additional $500 million in

cash in U.S. dollar currency.  Upon recommendation of confirmation by the Bankruptcy Court,

the amount at risk in the Escrow Account will increase to $2.2051 billion in such shares and

cash, the full amount of the Parent Contribution.  After the Parent's Full Payment Plan is

confirmed, stock and cash in the Escrow Account worth $2.2051 billion will continue to act as a

forfeitable deposit, ensuring that the Parent will timely consummate the Parent's Full Payment

Plan (the "Post-Confirmation Deposit").

In contrast to the Parent's Full Payment Plan, the Debtors' Liquidation Plan provides for

the liquidation of the Debtors' assets for a $1,439.4 million cash contribution by Sterlite plus

$722 million to acquire Class 3 SCC Litigation Trust Interests, and releases the estates'

substantial breach of contract claims against Sterlite for little or no consideration.  The Debtors'

Liquidation Plan is not confirmable because it: (i) violates the unfair discrimination standard and

the absolute priority rule by potentially allowing uncapped distributions to Classes 3 and 4 or to a

third party as the acquirer of litigation trust interests; (ii) is not proposed in good faith; (iii) is not

feasible based on (a) inadequate security to protect the estates in the event of Sterlite's failure to

close, (b) inadequate certainty of funding to Sterlite from Sterlite Industries (India), Inc. to meet

its funding commitment at close, (c) inadequate assurance of working capital funding to Sterlite from Sterlite Industries (India), Inc. or otherwise post-close to meet Reorganized ASARCO's continuing financial operating needs, and (d) the failure of Sterlite to obtain necessary approval to operate the Copper Basin Railway; (iv) otherwise fails to demonstrate adequate means for implementation; (v) allows governmental environmental claimants to recover amounts to which they are not legally entitled; (vi) fails to satisfy the "best interests" test; (vii) includes impermissible release, injunctions, and discharge provisions; and (viii) depends on the New Plan Sponsor Agreement, which should not be approved.

Of all the Parties in this case, only the Debtors dispute the confirmability of the Parent's Plan.

## FINDINGS OF FACT

## I. BACKGROUND

### A. Initiation of Bankruptcy Case and Appointment of Case Fiduciaries

1.       The Parent is the owner of ASARCO LLC ("ASARCO"), an integrated copper-mining, smelting and refining company that has operated for more than 100 years. The Debtors[4] filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code in the

---

[4]       As used herein, the term "Debtors" includes, in addition to ASARCO, CAPCO Pipe Company, Inc. (f/k/a Cement Asbestos Products Company); Cement Asbestos Products Company; Lac d' Amiante du Quebec Ltee (f/k/a Lake Asbestos of Quebec, Ltd.); Lake Asbestos of Quebec, Ltd.; LAQ Canada, Ltd.; Encycle, Inc.; Encycle/Texas, Inc.; ALC, Inc.; American Smelting and Refining Company; AR Mexican Explorations Inc.; AR Sacaton, LLC, an Arizona limited liability company; Asarco Master, Inc. (f/a/a Asarco (Delaware) Inc., which included the following entities: AR Montana Corporation; Asarco Aginskoe, Inc.; Asarco Arizona, Inc.; Asarco de Mexico (Delaware) Inc.; Asarco Exploration Holdings Company, Inc.; Asarco Mexicana (Delaware) Inc.); Asarco Peruvian Exploration Company; Biotrace Laboratories, Incorporated; Domestic Realty Company; Federated Metals Corporation; GH Holdings, Inc.; GHH, LLC; LSLC Corp.; Midland Coal Company Incorporated; Northern Peru Mining Corporation; NPMC, Incorporated; Asarco Oil and Gas Company, Inc.; Bridgeview Management Company, Inc.; Covington Land Company; Government Gulch Mining Company Limited; Salero Ranch, Unit III; Community Association, Inc.; AR Sacaton, LLC, a Delaware limited liability company; ASARCO Exploration Company, Inc.;  Southern Peru Holdings, LLC; Alta Mining and Development Company, Blackhawk Mining and Development Company, Limited; Green Hill Cleveland Mining Company; Peru Mining Exploration and Development Company; Tulipan Company, Inc.; and Wyoming Mining and Milling Company

Bankruptcy Court at various times times starting in 2005 and continuing through 2008, as shown in Exhibit K to the Disclosure Statement.

2.        On April 11, 2005, CAPCO Pipe Company, Inc. (f/k/a Cement Asbestos Products Company), Cement Asbestos Products Company, Lac d' Amiante du Quebec L'tée (f/k/a Lake Asbestos of Quebec, Ltd.), Lake Asbestos of Quebec, Ltd., and LAQ Canada, Ltd. filed for bankruptcy protection.[5]

3.        In July 2005, unionized workers at ASARCO began a strike, which was limited in duration to approximately one month.[6]

4.        On August 9, 2005, ASARCO LLC filed, followed shortly by Encycle, Inc. and Encycle/Texas, Inc. on August 26, 2005, and Asarco Consulting, Inc. on September 1, 2005.[7]

5.        On October 13, 2005, the following companies filed bankruptcy: ALC, Inc., American Smelting and Refining Company, AR Mexican Explorations Inc., AR Sacaton, LLC, an Arizona limited liability company, and Asarco Master, Inc. (f/k/a Asarco (Delaware) Inc.), which included the following entities: AR Montana Corporation, Asarco Aginskoe, Inc., Asarco Arizona, Inc., Asarco de Mexico (Delaware) Inc., Asarco Exploration Holdings Company, Inc., Asarco Mexicana (Delaware) Inc., Asarco Peruvian Exploration Company, Biotrace Laboratories, Incorporated, Domestic Realty Company, Federated Metals Corporation, GH Holdings, Inc., GHH, LLC, LSLC Corp., Midland Coal Company Incorporated, Northern Peru Mining Corporation, NPMC, Incorporated, Asarco Oil and Gas Company, Inc., Bridgeview

---

[5]        (Disclosure Statement.)

[6]        (*See* Exhibit 72; Confirmation Hearing Tr. 8/19/09 at 80 (Ruiz Test.).)

[7]        (Disclosure Statement Ex. K.)

Management Company, Inc., Covington Land Company, Government Gulch Mining Company Limited, Salero Ranch, Unit III, and Community Association, Inc.[8]

6. AR Sacaton, LLC, a Delaware limited liability company, ASARCO Exploration Company, Inc., and Southern Peru Holdings, LLC filed for bankruptcy on December 12, 2006.[9]

7. Finally, Alta Mining and Development Company, Blackhawk Mining and Development Company, Limited, Green Hill Cleveland Mining Company, Peru Mining Exploration and Development Company, Tulipan Company, Inc., and Wyoming Mining and Milling Company filed for bankruptcy on April 21, 2008.[10]

8. The Reorganization Cases are jointly administered as *In re ASARCO LLC*, et al., Case No. 05-21207. The Debtors have remained in possession of their property and have operated their businesses as debtors-in-possession.

9. On August 25, 2005, the U.S. Trustee appointed an official committee of unsecured creditors of ASARCO ("ASARCO Committee").[11] The ASARCO Committee retained legal counsel (Reed Smith LLP) and financial advisors (FTI Consulting, Inc.).

10. On April 27, 2005, the U.S. Trustee appointed an official committee of unsecured creditors for the Asbestos Subsidiary Debtors (the "Asbestos Subsidiary Committee").[12] The Asbestos Subsidiary Committee is comprised of 12 asbestos personal injury claimants acting through their counsel, asbestos plaintiffs' lawyers.[13] The Asbestos Subsidiary

---

[8]     (Disclosure Statement Ex. K.)

[9]     (Disclosure Statement Ex. K.)

[10]    (Disclosure Statement Ex. K.)

[11]    (Notice of Appointment of Committee of Unsecured Creditors (Docket No. 182).)

[12]    (Disclosure Statement at § 2.5.)

[13]    The attorney representatives include Robert Phillips, Charles Finley, Lou Thompson Black, Ryan A.

Committee retained various professional advisors.[14] On August 26, 2008, the Bankruptcy Court directed the U.S. Trustee to appoint the "Asbestos Claimants' Committee" to represent the specific class of creditors with asbestos-related claims against the other Debtors.[15]

11.     On April 19, 2005, the Bankruptcy Court approved the selection of Judge Robert C. Pate (the "Future Claims Representative," or "FCR") as the legal representative in the Asbestos Subsidiary Cases to represent the interests of future asbestos-related claimants.[16] On August 15 and 26, 2008, the Bankruptcy Court appointed Judge Pate as the legal representative for future claimants with asbestos-related claims against ASARCO and the Other Subsidiary Debtors.[17] The FCR retained professional advisors.[18]

### B.     Corporate Governance

12.     As of its Petition Date, ASARCO was operating under that certain Limited Liability Company Agreement, dated February 4, 2005, that provided for management of ASARCO to be vested in a board of directors (the "Board"). On December 15, 2005, the Bankruptcy Court approved a Corporate Governance Stipulation, agreed to by the Committees, the FCR, ASARCO, ASARCO Incorporated, and Carlos Ruiz Sacristan, who was the only

---

Foster, Eric Bogdan, Thomas W. Bevan, Steve Baron, Natalie Duncan, Brian Blevins, Thomas M. Wilson, Steven Kazan, and Christina Skubic.

[14]     Stutzman, Bromberg, Esserman & Plifka, P.C. (legal counsel); L Tersigni Consulting PC (financial advisors terminated on June 6, 2007); Charter Oak Financial Consultants, LLC (financial advisors); Risk International (insurance advisors); Davis P. Anderson and The Claro Group, LLC (insurance advisors); Legal Analysis Systems, Inc. (asbestos claims consultant); and Law Offices of Dean Baker (Connecticut local counsel).

[15]     (Order Granting Debtors' Expedited Supplemental Motion for Order Directing the United States Trustee to Appoint an Official Committee of Asbestos Claimants, Docket No. 8859.)

[16]     (Disclosure Statement at § 2.6.)

[17]     (Disclosure Statement at § 2.6.)

[18]     Oppenheimer, Blend, Harrison & Tate, Inc. (legal counsel); Legal Analysis Systems, Inc. (asbestos claims consultant); and Charter Oak Financial Consultants (financial advisors).

member of the Board at the time.[19]  Pursuant to the Corporate Governance Stipulation, the Parent currently does not have the normal unilateral power of a sole owner to replace the members of the Board.[20]  Given the inability of the Parent to remove and replace directors at will, the majority of the Board has caused ASARCO to pursue certain actions that, in the Parent's view, are inconsistent with their fiduciary duties to the Parent.

13.     Pursuant to the Order dated April 22, 2009 approving the New Purchase and Sale Agreement with Sterlite, if the Parent's Full Payment Plan is confirmed, the Bankruptcy Court has ordered the Debtors and the Board to cooperate with the Parent in making the Parent's Full Payment Plan go effective, and such cooperation will not trigger a release of Sterlite's liability for the breach of the Original PSA.[21]  Specifically, the Sterlite 9019 Order provides: "From and after the date of confirmation of an Alternative Plan, ASARCO and its Board shall take such actions as are necessary to effectuate such Alternative Plan and such actions shall not be deemed to be support of such Alternative Plan and shall not be a Release Condition of Sterlite's liability under the Original Sterlite Purchase and Sale Agreement."[22]

### C.     The SCC Judgment

#### 1.     The SCC Litigation

14.     On February 2, 2007, ASARCO and Southern Peru Holdings, LLC ("SPH") filed an action against AMC (the "SCC Litigation"), seeking to avoid the underlying transaction ("the Transaction") as an actual and/or constructively fraudulent transfer, and seeking the return of its

---

[19]     (Stipulation and Order Regarding Corporate Governance ("Corporate Governance Stipulation"), Docket No. 1223.)

[20]     (Corporate Governance Stipulation.)

[21]     (Order Pursuant to §§ 363, 105 and Fed. R. Bankr. P. 9019, Approving Settlement and Release and Revised Bid Protections Contained in the New Purchase and Sale Agreement Between ASARCO LLC and Certain of its Subsidiaries, and Sterlite (USA), Inc., and for Related Relief ("9019 Order," Docket No. 10935) at ¶ 4(c).)

[22]     (9019 Order at ¶ 4(c).)

interest in Southern Copper Corporation ("SCC").[23]   As a result of stock splits and similar subsequent transactions involving SCC, the stock at issue constitutes 260,093,694 shares, which is approximately 30.6 percent of the currently outstanding stock in SCC (the "Transferred Shares").[24]   ASARCO also sought recovery of dividends it would have received on account of its ownership of the Transferred Shares since the transfer in 2003.[25]   In the lawsuit, ASARCO and SPH also brought claims against AMC for: (i) civil conspiracy; (ii) breach of fiduciary duty; and (iii) aiding and abetting a breach of fiduciary duty. ASARCO and SPH sought punitive damages in connection with the aiding and abetting causes of action.[26]

15.     Following a four-week bench trial, the United States District Court for the Southern District of Texas, Brownsville Division (the "District Court") issued an opinion on August 30, 2008, holding that: (i) AMC paid reasonably equivalent value for the Transferred Shares, and thus was not liable on ASARCO's constructive fraudulent transfer claim; (ii) the sale of the Transferred Shares was a legitimate means by which to restructure ASARCO; (iii) neither AMC nor Grupo México owed a fiduciary duty to ASARCO or its creditors such that AMC was not liable for a breach of such duty or aiding and abetting Grupo México's alleged breach; (iv) AMC was not liable for conspiring with Grupo México; and (v) the plaintiffs failed to establish that AMC engaged in conduct sufficient to warrant punitive damages.[27]

16.     The District Court also found, however, that the transfer was accomplished in part to hinder or delay creditors, thus constituting an actual fraudulent transfer, that AMC aided

---

[23]     *ASARCO LLC v. Americas Mining Corp.*, Case No. 1:07-cv-00018, pending in the United States Disutrict Court for the Southern District of Texas (the "SCC Litigation") (Docket No. 1 (ASARCO LLC's Complaint to Avoid and Recover Fraudulent Transfer) (the "SCC Complaint").)

[24]     (Disclosure Statement at § 2.24(c)(1).)

[25]     (Disclosure Statement at § 2.24(c)(1).)

[26]     (Disclosure Statement at § 2.24(c)(1); SCC Complaint.)

[27]     *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278 (S.D. Tex. 2008) (SCC Litigation Docket No. 465, the "SCC Order").

and abetted ASARCO's directors' breaches of their fiduciary duties to ASARCO's creditors, and that AMC conspired with ASARCO's directors.[28]   The Parent continues to dispute these findings.

17.   On April 1, 2009, the District Court issued a Memorandum Order and Opinion addressing the damages to be awarded to ASARCO[29] (the District Court issued an Amended Memorandum Opinion and Order to correct a clerical error in the April 1 order and opinion on April 14, 2009).[30]

18.   On April 15, 2009, the District Court issued a final judgment awarding ASARCO (i) the return of the Transferred Shares, and (ii) dividends paid on the Transferred Shares between March 31, 2003 and the time of entry of the SCC Final Judgment plus prejudgment interest, minus certain consideration paid by AMC for the Transferred Shares and prejudgment interest on such consideration, resulting in a net monetary award to ASARCO of $1,382,307,216.75.[31]   The District Court found that ASARCO was not entitled to damages representing a control premium because ASARCO would never have retained control over SCC.[32] The District Court denied ASARCO's request for punitive damages.

19.   On April 24, 2009, AMC filed its Notice of Appeal.[33]  In addition, on April 29, 2009, AMC filed two motions in the District Court: (i) a Motion to Alter or Amend the Judgment or for New Trial ("SCC New Trial Motion"),[34] and (ii) a Motion for Stay of Execution of

---

[28]      *Id.*

[29]      *ASARCO LLC v. Americas Mining Corp.*, 2009 WL 890551 (S.D. Tex. Apr. 1, 2009) (Docket No. 493, the "SCC Memorandum Opinion").

[30]      *ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150 (S.D. Tex. Apr. 14, 2009) (Docket No. 507).

[31]      (SCC Litigation Docket No. 508 ("SCC Final Judgment").)

[32]      (SCC Final Judgment.)

[33]      (SCC Litigation Docket No. 512.)

[34]      (SCC Litigation Docket No. 514.)

Judgment Pending Appeal (the "SCC Stay Motion").[35]  ASARCO filed oppositions to both of these motions.[36]

20.     On June 2, 2009, the District Court granted in part and denied in part the SCC Stay Motion in its Memorandum Opinion and Order:[37]

- AMC shall place 260,093,694 shares of common stock of SCC (i.e., the "Nonmonetary Award") in an escrow account with a neutral third party agreed to by ASARCO and SPH and AMC (or if no agreement can be reached, in the registry of the District Court) subject to the terms of a mutually agreed upon escrow agreement;

- In addition to the Nonmonetary Award, AMC shall place additional SCC shares in an amount equaling twice the value of $1,382,307,216.75 (the "Monetary Award") in the same escrow account, again subject to the terms of a mutually agreed upon escrow agreement.  In the event the monetary value of these shares, as determined by a 20-day trailing-average share price, falls below an amount equaling 1.75 times $1,382,307,216.75, AMC shall add more SCC stock to the escrow account in the amount of such shares necessary to return the total value to double the value of $1,382,307,216.75;

- Absent a further order of the District Court, none of the SCC stock placed into escrow to secure the SCC Final Judgment may be pledged as security, or in any other way encumbered, for any purpose other than to secure the District Court's judgment in the manner described in the Memorandum Opinion and Order;

- With respect to any dividends generated by the Nonmonetary Award or by the shares previously escrowed thereunder, between April 15, 2009, and the conclusion of AMC's appeal, AMC shall, at its discretion, either deposit such dividends into the escrow account as cash or cash equivalents or, alternatively, place an amount of unencumbered shares of common stock of SCC equaling twice the monetary value of such dividends into the escrow account, under the same terms and conditions described above.  AMC shall give ASARCO 10-days' notice of any impending dividend payment.  On June 26, 2008, the District Court orally revised its order, with ASARCO's consent, to specify that AMC does not need to escrow dividends on the shares covering the Monetary Award;

- AMC shall immediately take all necessary steps to achieve the registration of the SCC shares;

- The voting and non-transferability restrictions contained in the District Court's April 15, 2009 agreed order[38] shall apply to all of the SCC stock placed into escrow to secure the

---

[35]     (SCC Litigation Docket No. 515.)

[36]     (SCC Litigation Docket No. 519; Docket No. 520 (the "Response to Motion for Stay").

[37]     (SCC Litigation Docket No. 531 ("SCC Stay Order").

SCC Final Judgment. Either party may petition the District Court at any time regarding the issue of voting or not being able to vote the shares of stock subject to the Memorandum Opinion and Order;

- Any further terms and conditions regarding the bonding arrangements described in the Memorandum Opinion and Order shall be negotiated by the parties to the SCC Litigation, with the District Court available to resolve any disputes;

- At the earlier of November 5, 2009, or 60 days after the date any plan, other than the Parent's Full Payment Plan, is confirmed by the Bankruptcy Court, AMC shall replace the security for the monetary portion of the judgment described in paragraph 2 of these bullet points with a supersedeas bond of $1,382,307,216.75, and the security for any dividends deposited pursuant to paragraph 4 of these bullet points shall be replaced with a supersedeas bond equal to the amount of the dividends. Once replaced with a bond, the amount of stock deposited by AMC pursuant to paragraphs 2 and 4 of these bullet points shall be returned to AMC;

- If the Bankruptcy Court is unable to confirm a plan by November 5, 2009, or for other good cause, the District Court will consider an appropriate motion for an extension of the deadline described in the immediately preceding paragraph, although the movant will bear the burden to show cause;

- The District Court retained jurisdiction over the Memorandum Opinion and Order and the bonding requirements involved in the SCC Litigation unless superseded by an order of the United States Court of Appeals for the Fifth Circuit.

- The District Court's April 15, 2009 order shall remain in effect beyond June 5, 2009, and shall remain in effect unless and until superseded by a specific provision of the Memorandum Opinion and Order, or by another order of the District Court or the United States Court of Appeals for the Fifth Circuit. (The District Court noted that it contemplated entering such a superseding order by early July 2009, once it becomes clear that the above security arrangement has been instituted or, alternatively, it becomes clear that, for whatever reason, the parties have not accomplished the security arrangements contemplated by the Memorandum Opinion and Order.)

- Once the stock, cash, or cash equivalent described in the Memorandum Opinion and Order is deposited into escrow, neither party shall remove such stock, cash, or cash equivalent absent an order from the District Court or the United States Court of Appeals for the Fifth Circuit.

---

[38]   On April 15, 2009, the District Court entered an Agreed Order which (i) stays execution or enforcement of the SCC Final Judgment through June 5, 2009 (the "Agreement Period"); (ii) bars AMC from transferring, selling, exchanging, disposing of or encumbering any interest AMC has in 54.2 percent of the SCC outstanding shares during the Agreement Period; (iii) bars AMC from removing any interest AMC has in 54.2 percent of the SCC outstanding shares from the United States during the Agreement Period; and (iv) bars AMC from voting any SCC shares in such a way that would hinder, delay, or negate ASARCO's recovery of the Transferred Shares, dilute the Transferred Shares, or otherwise diminish the value of the Transferred Shares during the Agreement Period.

21.      On July 20, 2009, the District Court denied AMC's New Trial Motion.[39]  AMC filed its Amended Notice of Appeal the same day.[40]

22.      On August 20, 2009, AMC, ASARCO and the Bank of New York Mellon entered into an escrow agreement wherein AMC agreed to tender 260,093,694 shares of SCC into the escrow account.[41]

### 2.      Valuation of the SCC Final Judgment.

23.      At the time of the close of the Confirmation Hearing, the last available closing price of SCC was $48.32/share on August 25, 2009, or approximately $8,697,756,874.52 as of August 26, 2009.  The SCC Final Judgment is an existing, enforceable obligation owed by AMC to ASARCO.

24.      There are only two conceivable bases for valuing the SCC Final Judgment at a lesser amount: to account for the risk that the judgment could not be collected and to account for the risk that the judgment could be reversed on appeal.  As to the collection risk, there is no competent or credible evidence in the record to suggest that the judgment could not be fully executed upon if affirmed on appeal.  The stringent supersedeas requirements set out in the District Court's June 2, 2009 Order and AMC's tendering of 260,093,694 shares into escrow in compliance with the requirements of the District Court demonstrates the absence of any collection risk.[42]  Indeed, the Debtors themselves recognized in the Disclosure Statement that the "Debtors already have the SCC Final Judgment in hand, secured by the SCC shares held in

---

[39]      *ASARCO LLC v. Americas Min. Corp.*, 2009 WL 2168778 (S.D. Tex. July 20, 2009) (SCC Litigation Docket No. 548.)

[40]      (SCC Litigation Docket No. 549.)

[41]      (Supplemental Proffer of Alberto de la Parra in Support of ASARCO Incorporated and Americas Mining Corporation's Modified Seventh Amended Plan of Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code, as Modified on August 20, 2009 (Docket No. 12583, "Supp. de la Parra Proffer") at ¶ 14; Third Amended and Restated Escrow Agreement ("Escrow Agreement," Docket No. 12592-2.))

[42]      (SCC Stay Order at  1.)

escrow by the District Court" and that "few if any enforcement and collection issues likely to frustrate the recoveries" are anticipated.[43]

25.     As to the risk of reversal on appeal, this Court finds that there is no competent or credible evidence supporting any significant discount from the face value of the SCC Final Judgment.  This Court first notes that ASARCO has consistently downplayed AMC's chances of prevailing in its appeal from the SCC Final Judgment.  In its response to AMC's Stay Motion in the District Court, ASARCO observed: "[b]ecause the Court found 'that the return of the fraudulently transferred stock is warranted under al three liability findings,' AMC will have to convince the Fifth Circuit to reverse the Court's rulings on actual fraudulent transfer, aiding and abetting a breach of fiduciary duty, *and* conspiracy.  That is not likely to happen."[44]  ASARCO also stated in the Bankruptcy Court it "believe[s] that the grounds asserted by AMC for reversal or modification of the SCC Final Judgment lack legal and factual merit."[45]

26.     In connection with their Liquidation Plan, the Debtors urged this Court to value the SCC Final Judgment at a substantial discount to the face amount of the judgment.  They rely on the testimony of their purported expert, Kenneth Klee, and possibly the purported expert testimony of Shannon Ratliff, whose testimony was originally sponsored by the Majority Bondholder.   For the reasons set forth below, this Court finds that neither Klee nor Ratliff provided competent or credible evidence supporting a valuation other than at the face value of the SCC Final Judgment.

---

[43]     (Disclosure Statement at 33.)

[44]     (Response to Motion to Stay.)

[45]     (Disclosure Statement at 5.)

27.     Klee claims to have rigorously measured the value of the SCC Final Judgment by undertaking five different valuation methods.[46]  The first method, labeled the "Quantitative Method," "relied on a logical approach using a decision tree analysis."[47]  This method yielded an estimated value range of $1.46 billion to $2.18 billion.[48]  The second method, labeled the "Settlement Method," "relied on his purported application of the factors set forth by the Supreme Court in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968)."[49]  This method yielded an estimated value range of $700 million to $1 billion.[50]  The third method, labeled the "Competent Counsel Method," "relied upon the advice that competent counsel with appropriate knowledge skill, experience, training, and/or education would provide to a client in finding and valuing a judgment for settlement purposes."[51]  Elevating himself to the role of competent counsel, Klee stated that this method yielded an estimated value range of $840 million to $2.94 billion.[52]  The fourth method, labeled the "Auction Method," "considered relevant indicators from the auction being conducted by ASARCO's financial advisor Barclays Capital, Inc."[53]  This method yielded an estimated value range of $400 to $850 million.[54]  A fifth method employed by Klee, labeled the "Comparable Transactions" method, did not yield reliable results and was ignored for the purposes of his

---

[46]     (Final Proffer of Professor Kenneth N. Klee in Support of Confirmation of the Sixth Amended Joint Plan of Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code, As Modified (Docket No. 12514, Exhibit D156, "Final Klee Proffer") at ¶¶ 3-4.)

[47]     (*Id.* at ¶ 3.)

[48]     (*Id.* at ¶ 4.)

[49]     (*Id.* at ¶ 3.)

[50]     (*Id.* at ¶ 4.)

[51]     (*Id.* at ¶ 3.)

[52]     (*Id.* at ¶ 4.)

[53]     (*Id.* at ¶ 3.)

[54]     (*Id.* at ¶ 4.)

ultimate conclusion.[55]   Applying his "professional judgment" in reconciling these results, Klee opined that "the value of the SCC Final Judgment was $700 million to $900 million, with a mid-point value of $800 million."[56]   This calculation is roughly 9.2% of the SCC Judgment's current face value.

28.      Mr. Ratliff's testimony reflected what Klee would have called the Competent Counsel approach.  Based on his experience as an appellate advocate and following his review of *some* of the materials from the SCC Litigation, Ratliff opined that it is not "helpful or appropriate to assign specific predictions in percentage terms to possible outcomes of judicial determinations.  To say, for example, that there is a 15% to 25% chance of reversal of a given decision inevitably overstates the ability of any practitioner to predict the future."[57]   Nevertheless, in light of his assessment that "the likelihood of reversal [of the SCC Final Judgment] is very low," Ratliff opined that "a reasonable range of discounts from the full amount of the judgment would be 10% to 30%."[58]

29.      While Debtors purport to rely on both Klee's and Ratliff's testimony, the two witnesses strongly criticized each other's methodologies and reached starkly different and inconsistent  conclusions.  Ratliff concluded that a reasonable range of discounts from the full amount of the judgment would be 10% to 30%.[59]   Using the analogous Competent Counsel method, Klee testified that he would "counsel the relevant client to offer or accept a 65 to 90 percent discount in settling, selling or acquiring the SCC Judgment, yielding a range of $840

---

[55]      (*Id.* at ¶ 3.)

[56]      (*Id.* at ¶ 4.)

[57]      (Proffer of Expert Testimony by Shannon Ratliff, ("Ratliff Proffer," Docket No. 11935) at ¶ 10.)

[58]      (*Id.* at ¶ 11.)

[59]      (Ratliff Proffer at ¶ 12.)

[million] to $2.94 billion."[60]  When asked about Klee's conclusion, Ratliff testified: "I don't see what the foundation of it is."[61]  Klee acknowledged the "significant difference between their opinions"[62] and responded that he would "expect counsel versed in bankruptcy in appellate litigation . . . to advise a client to employ a significantly higher discount rate."[63]  The Court finds that the fact that two "competent counsel" reached such dramatically different results calls into question the entire validity of this approach.

30.     Ratliff testified that it is not "helpful or appropriate to assign specific predictions in percentage terms to possible outcomes of judicial determinations.  To say, for example, that there is a 15% to 25% chance of reversal of a given decision inevitably overstates the ability of any practitioner to predict the future."[64]  Under his Quantitative Method, Klee assigned an exact percentage of the chance of success for every argument that he believed AMC would raise on appeal (despite the fact that AMC has not designated, and is under no duty to designate, its appellate issues), leading to his ultimate conclusion that there was "a 56% probability that the full face amount of the SCC judgment eventually will be recovered, with an 83 percent probability of some recovery. . . ."[65]  Ratliff was again critical of Klee's approach, testifying that he "generally do[es] not rely heavily on decision trees because I believe that as you make the individual value judgments in a decision tree you inject more and more uncertainty" and because they do not "lead to any better, or quite frankly, as good a result as

---

[60]     (Final Klee Proffer at ¶ 56 (emphasis added).)

[61]     (Confirmation Hr'g Tr. 8/13/09 at 95:15-16 (Ratliff Test.).)

[62]     (Confirmation Hr'g Tr. 8/17/09 at 61:17-20 (Klee Test.).)

[63]     (Initial Proffer of Professor Kenneth N. Klee (I) in Support of Confirmation of the Sixth Amended Joint Plan of Reorganization for the Detors under Chapter 11 of the United States Bankruptcy Code, as Modified, and (II) Rebutting the Expert Report of Shannon Ratliff (Docket No. 12041, "Initial Klee Proffer") at ¶ 46.)

[64]     (Ratliff Proffer at ¶10.)

[65]     (Final Klee Proffer at ¶ 43.)

utilizing professional judgment."[66]   Moreover, while Ratliff defended his competent counsel methodology, Klee was critical of Ratliff for failing to use other valuation methods to determine the appropriate value of the SCC Judgment.[67]

31.     The valuation methods used by Klee and Ratliff resulted in a range of values of, at a minimum, several hundred million dollars.  The range of values presented by each method varied from a high variance of $2.14 billion ($400 million to $2.94 billion) with the so-called quantitative method to a low of $300 million ($700 million to $1 billion) with the settlement method.  On their face, the values represent significant degrees of variance as to the judgment's net present value.[68]  This uncertainty, especially coming from the Debtors' valuation expert, is sufficient to conclusively establish that there is no reliable method to estimate the value of the SCC Final Judgment.

32.     The Court recognizes that valuation of the SCC Judgment is not necessary in connection with confirmation of the Parent's Full Payment Plan.  Because of its dependence on the creation and funding of the SCC Litigation Trust, however, valuation of the SCC Judgment is a fundamental prerequisite to consideration of the confirmability of the Debtors' Liquidation Plan.  Additionally, it is outcome is determinative of the distribution of value among general unsecured creditors (and through them Sterlite), Asbestos Claimants, Late Filed and Subordinated Claimants, and the equity owner.  The Court finds that, given the enormous uncertainties associated with estimation of the present value of the SCC Judgment, fixing a value for an asset of this nature in these circumstances could have devastating and inequitable consequences and should be avoided.

---

[66]     (Confirmation Hr'g Tr. 8/13/09 at 92:22-93:8 (Ratliff Test.).)

[67]     (Initial Klee Proffer at ¶ 46.)

[68]     (Initial Klee Proffer at ¶ 46.)

### D.   Sterlite Sale and Purchase Agreement

33.     In May 2008, Sterlite and ASARCO entered into a purchase and sale agreement (the "Original Sterlite PSA") under which Sterlite agreed to purchase substantially all of ASARCO's assets for $2.6 billion, as well as to assume certain liabilities worth approximately $400 million.[69]  On October 13, 2008, Sterlite informed ASARCO that, as a result of the decline in copper prices and general economic downturn, it would not close under the Original Sterlite PSA without a material price reduction.[70]  Around that time, Sterlite calculated the enterprise value of the Debtors at $1.531 billion.[71]

34.     The Original Sterlite PSA did not contain any copper price or financing contingencies excusing Sterlite's performance.[72]  Mr. Krishnan also testified that at the time Sterlite asked for a renegotiation of the Original Sterlite PSA in October 2008, Sterlite had cash and the ability to close under the original terms and original purchase price.[73]

35.     Sterlite's failure to close the Original Sterlite PSA constituted an actionable breach of contract (the "Sterlite Claim").[74]

36.     On March 6, 2009, the Debtors entered into a new PSA with Sterlite (the "New Sterlite PSA"), subject to higher and better acquisition proposals, to sell to Sterlite the very same assets that Sterlite previously agreed to buy for $2.6 billion in cash, and to release Sterlite from its liability for the Sterlite Claim, for a mix of cash and a nine-year non-interest bearing note the

---

[69]      (Proffer of Joseph F. Lapinsky in Support of Confirmation of the Debtors' Joint Plan of Reorganization and in Opposition to Confirmation of the Parent's Plan of Reorganization (Docket No. 12387, Exhibit D170, "Lapinsky Proffer") at ¶ 33.)

[70]      (Lapinsky Proffer at ¶ 22.)

[71]      (Proffer of C.V. Krishnan in Support of the Debtors' Plan of Reorganization (Docket No. 12377, "Krishnan Proffer" ), Ex. E; Confirmation Hr'g Tr. 8/11/2009 at 56:7-57:21 (Krishnan Test.).)

[72]      (Disclosure Statement at § 2.28(d).)

[73]      (Disclosure Statement at § 2.28(d).)

[74]      (Lapinsky Proffer at ¶ 75.)

Debtors valued at approximately $1.277 billion.[75]  On March 11, 2009, the Debtors filed Debtors' Motion for Order, Pursuant to §§ 363, 105 and Fed. R. Bankr. P. 9019, Approving Settlement and Release and Revised Bid Protections Contained in New Purchase and Sale Agreement Between ASARCO LLC and Certain of its Subsidiaries, and Sterlite (USA), Inc., and for Related Relief (the "Sterlite 9019 Motion").[76]  The Sterlite 9019 Motion sought approval of (i) the settlement and release and back-up bid provisions in the New Plan Sponsor PSA pursuant to Bankruptcy Rule 9019 and (ii) bid protections in connection with an asset sale pursuant to 11 U.S.C. § 363.[77]

37.     There is no evidence showing what amount, if any, Sterlite, who is not a shareholder in the Estate, has offered to pay the Debtors' estate for its breach of the Original Sterlite PSA.  If the Debtors' Liquidation Plan is confirmed, the Sterlite Claim will be released, apparently without consideration.[78]

38.     Sterlite's decision to increase the amount of the Plan Sponsor Promissory Note from $600 million under an earlier version of the Debtors' Liquidation Plan to $770 million under a later version of the Debtors' Liquidation Plan was not motivated by an increase in payment for the release of the Sterlite litigation.  Instead, the increased note amount was the result of: (i) negotiations with asbestos representatives for a higher payment amount, and (ii) an

---

[75]     (Motion for Order, Pursuant to §§ 363, 105 and Fed. R. Bankr. P. 9019, Approving Settlement and Release and Revised Bid Protections Contained in the New Purchase and Sale Agreement Between ASARCO LLC and Certain of its Subsidiaries, and Sterlite (USA), Inc., and for Related Relief ("9019 Motion," Docket No. 10526), at ¶¶ 76-77.)

[76]     (9019 Motion.)

[77]     (9019 Motion at ¶ 18.)

[78]     (9019 Hr'g Tr. 4/14/09 at 54:12-25 (Mack Test.).)

increase in the projected working capital needs for the company after bankruptcy that, pursuant to the Sterlite 9019 Motion, automatically caused an adjustment in the face amount of the note.[79]

39.     The Court approved the Sterlite 9019 Motion, which authorizes a settlement of the Sterlite Claim in the event the Debtors' Liquidation Plan is confirmed.[80]   The Parent has appealed the Sterlite 9019 Order,[81] and the Parent's Full Payment Plan does not release the Sterlite Claim.[82]

### E.     The Tax Adversary

40.     On February 5, 2007, ASARCO filed a Complaint for Declaratory and Injunctive Relief (the "Tax Complaint") against the Parent and certain other defendants[83] initiating a new adversary proceeding (the "Tax Adversary").   In the Tax Adversary the Parent and the Debtor have submitted briefing and evidence concerning the parties' respective rights and obligations with regard to (1) the Parent's request for an administrative expense for $161 million plus $29.1 million in interest for post-petition taxes incurred by Debtors' estate arising from over $1 billion in post-petition income earned by the estate (the "Tax Claim"); (2) an approximately $60 million tax refund, including interest (the "Tax Refund"); and (3) a deferred tax liability from a 2003 transaction resulting in a $600 million deferred intercompany gain (the

---

[79]     (Krishnan Proffer, Ex. E; Confirmation Hr'g Tr. 8/11/2009 at 42:24-43:14 (Krishnan Test.); Lapinsky Proffer at ¶ 41.)

[80]     (9019 Order.)

[81]     (Notice of Appeal, Docket No. 11147.)

[82]     (Parent's Full Payment Plan, Ex. 2.)

[83]     Other defendants in the Tax Adversary include Lac d'Amiante du Quebec Ltee, ("Lac d' Amiante"), Lake Asbestos of Quebec, Ltd. ("Lake Asbestos"), LAQ Canada, Ltd. ("LAQ"), CAPCO Pipe Company, Inc. ("CAPCO"), Cement Asbestos Products Company ("Cement"), Rinker Materials South Central, Inc. f/k/a/ American Limestone Company ("Rinker"), Enthone Inc. f/k/a Enthone-OMI, Inc. ("Enthone"), EI Liquidation, Inc. f/k/a Enthone, Incorporated ("EI"), and OMI International Corporation ("OMI").   Debtor dismissed Rinker from the Tax Adversary Proceeding.   *See* Stipulation and Order Dismissing Claims Against Rinker Materials South Central, Inc. f/k/a American Limestone Company.  (Tax Docket No. 37.)  Collectively, Enthone, EI, and OMI are the "Enthone Defendants.

"Deferred Tax Liability").[84]   The Court heard evidence and argument from the parties on these three issues prior to these Confirmation hearings.

41.      In the Tax Adversary, the Parent asserts the Tax Claim based on a Tax Sharing Agreement between the Debtor and the Parent.  If this Court determines that the tax sharing agreement is unenforceable, the Parent claims entitlement to the Tax Refund under federal law because ASARCO is a disregarded entity.   If the Court rules that the Tax Refund is the property of ASARCO under principles of state merger or other state law, then the Parent claims  that the Deferred Tax Liability is a liability of ASARCO based on these same state law principles.

42.      TUnder the Parent's Full Payment Plan, the Parent withdraws the Parent's Tax Claim and the Deferred Tax Liability claim, as well as the Parent's claim to the Tax Refund, thereby making the value of these claims available to the ASARCO estate and its creditors.[85] Importantly, therefore, the Parent's Full Payment Plan does not depend on the outcome of the Tax Adversary.  If, however, the Parent's Tax Claim or Deferred Tax Liability claim is allowed, or the Parent is entitled to the Tax Refund, the value given by the Parent's Full Payment Plan to the estate increases by $161 million, $250 million or $60 million, respectively.

43.      The Debtors' Liquidation Plan, in comparison, assumes that the Debtors are entitled to the Tax Refund,  contains a provision disallowing any and all claims of the Parent and mandating that no reserves shall be established on account of such claims,[86] even though the Tax Adversary remains pending, and then assumes that the Parent will not prevail on the Tax Claim – and if the Debtor is incorrect with regard to either claim, it will materially affect the Debtors'

---

[84]      These tax issues are being currently litigated in *ASARCO LLC v. Americas Mining Corporation (In re ASARCO LLC)*, Adversary No. 07-02011.  Pleadings from the Tax Adversary will be referred to as "Tax Docket ___.".

[85]      (Waterfall, Ex. P433.)

[86]      (Debtors' Liquidation Plan at § 13.8(g).)

Waterfall.[87]   Notwithstanding this possibility, the Debtors' Liquidation Plan does not even address the Deferred Tax Liability.  If the Parent prevails on the Tax Claim or the Deferred Tax Liability claim, the Debtors will be required to reserve at least $161 million or $250 million, respectively,  to cover the Parent's Tax Claim or the Deferred Tax Liability claim; if the Parent prevails on the Tax Refund, the Debtors Waterfall must be adjusted to compensate for the $60 million it will not receive by virtue of the Tax Refund.[88]

44.        Either Parent or Debtor is liable for taxes that accrued with respect to the income from Debtors' operations from 2005 through 2008.  A portion of the $161 million that makes up the Tax Claim will be refunded by the IRS when deductions arising under any Plan of Reorganization with respect to the Debtor are carried back to prior tax years in the form of a tax refund.  Taking into account the taxes due from Debtor's operations and the potential future tax refunds of these taxes, there will still be an estimated $85 million of taxes and interest that is non-refundable.  The non-refundable tax is comprised of approximately $39 million in federal alternative minimum tax, plus $31 million in state income tax, plus $15 million in interest.

45.        If the Parent's Full Payment Plan is confirmed the Deferred Tax liability will remain with AMC, the SCC Judgment will be released, and the Deferred Tax liability will remain deferred unless and until there is a deconsolidation event that triggers the gain.  If the Debtors' Liquidation Plan is confirmed and the SCC Judgment is not released and is affirmed on appeal, upon the transfer of the SCC Shares from escrow to the owners of litigation trust interests, a deconsolidation event will occur that will trigger the Deferred Tax liability.   This will result in a tax liability of approximately $240 million on the $600 million

---

[87]        (*See* Proffer of Chuck Watson in Support of Confirmation of Debtors' Plan of Reorganization (Docket No. 12364, "Watson Proffer,"), at ¶ 8.)

[88]        (*See* Watson Proffer at ¶ 8.)

deferred intercompany gain.  If the Court determines that the Deferred Tax liability remains with the Parent, the Parent will be responsible for the resulting tax if and when the deferred intercompany gain is triggered.  If the Deferred Tax liability remains with the Debtor, then the Debtor's Waterfall must account for the tax that will be triggered upon the transfer of the SCC Shares.

46.    On June 5, 2009, Debtor filed an Equitable Subordination Complaint requesting the Parent's Tax Claim, if allowed, be subordinated.[89]  The Debtors' equitable subordination claim is based on the argument that the 2003 SPCC Transaction that is the subject of the SCC Litigation constitutes inequitable conduct warranting subordination.  Parent filed a Motion to Dismiss the Equitable Subordination Complaint on July 6, 2009.[90]  The Court has not yet determined whether the Equitable Subordination Adversary should be dismissed, or if the Parent's Tax Claim should be subordinated.

47.    The parties will separately submit proposed findings of fact and conclusions of law pertaining to the issues raised in the Tax Adversary.

### F.    Environmental Claims and the Environmental 9019 Motion

48.    On March 12, 2009, the Debtors filed the Environmental 9019 Motion, requesting the Bankruptcy Court to approve the terms of five consent decrees settling nearly all major outstanding environmental Claims (including the settlement of the Residual Environmental Claims).[91]  The consent decrees presented to the Bankruptcy Court propose to pay approximately $1.1 billion to settle the Debtors' liabilities in connection with: (1) the Miscellaneous Federal and State Environmental Settlement, (2) the Multi-State Custodial Trust

---

[89]    (Debtors' Original Complaint for Equitable Subordination, Docket No. 09-02020.)

[90]    (*See* Motion Under the Bankruptcy Rule 9019 For Order Approving Settlement of Environmental Claims, March 12, 2009 (the "Environmental 9019 Motion," Docket No. 10534).

[91]    (*See* Environmental 9019 Motion at ¶¶ 25-28.)

Settlement, (3) the Montana Custodial Trust Settlement, (4) the Texas Custodial Trust Settlement, and (5) the Residual Environmental Settlement.[92]

49.     The Parent opposed the requested approval of several of the unresolved environmental claims because they do not comply with approval criteria under federal environmental law.[93]  These objections are set forth in the Parent's Notice of Objection and Objection of ASARCO Incorporated to Motion Under Bankruptcy Rule 9019 For Order Approving Settlement of Environmental Claims, formally requesting that the Bankruptcy Court apply federal environmental law governing the approval of settlements reached under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), and to deny the Environmental 9019 Motion because it did not comply with CERCLA settlement standards.[94]

50.     Hearings on the Environmental 9019 Motion were held on May 18-19, 2009 and concluded on May 29, 2009.[95]  On June 5, 2009, the Bankruptcy Court approved the Environmental 9019 Motion and issued 97 pages of Findings of Fact and Conclusions of Law in support thereof which disregarded federal environmental law governing the approval of CERCLA settlements and disagreed with the Parent's contentions.[96]

---

[92]     (*See* Notice of Objection and Objection of ASARCO Incorporated to Motion Under Bankruptcy Rule 9019 For Order Approving Settlement of Environmental Claims, Apr. 6, 2009 (the "Parent's Environmental Objection," Docket No. 10741; Lapinsky Proffer at ¶ 30.)

[93]     (*See* Parent's Environmental Objection.)

[94]     (*See* Notice of Objection and Objection of ASARCO Incorporated to Motion Under Bankruptcy Rule 9019 For Order Approving Settlement of Environmental Claims, Apr. 6, 2009 (Docket No. 10741)

[95]     (See Courtroom Minutes, May, 18, 2009 (Docket No. 11342); Courtroom Minutes, May, 19, 2009 (Docket No. 11344), Courtroom Minutes, May 22, 2009 (Docket No. 11449).)

[96]     (*See* Findings of Fact and Conclusions of Law on Debtors' Motion for Order Approving Settlement of Environmental Claims, June 5, 2009 (Docket No. 11631); *see also* Proffer of Direct Testimony of Marianne Horinko Regarding the Omaha Lead Site, May, 13,2009 (Docket No. 11276) (former Acting Administrator for the U.S. Environmental Protection Agency stated that settlement with respect to residual site was inconsistent with federal environmental law and regulations.); Lapinsky Proffer at ¶ 30.)

51.     The Parent appealed the Bankruptcy Court's decision on the Environmental 9019 Motion.[97]   If the Parent's Full Payment Plan is confirmed, the appeal from the Environmental 9019 Motion will be dismissed with prejudice, and the terms of the Environmental 9019 Order will be honored.[98]   If the Debtors' Liquidation Plan is confirmed, the Parent will continue to pursue its appeal.[99]

52.     Although ASARCO claimed that it complied with all environmental laws during its control of the operating properties, as recently as on May 26, 2009, the Arizona Department of Environmental Quality ("ADEQ") cited the Debtors with three Notices of Violation ("NOV") related to environmental and worker safety.  In one NOV, the Debtors were found to have unlawfully deposited friable asbestos material into a restricted dumpsite on one of the operating properties.[100]   The Debtors were also cited for other environmental violations. The Debtors received a notice of violation from the Arizona Department of Environmental Quality for three violations of the Arizona Administrative Code with respect to asbestos waste removal and record-keeping requirements.

53.     The Debtors acknowledge that environmental and regulatory permits are essential to the continuous lawful operation of ASARCO and that the Debtors' plan requires the transfer of certain environmental permits to the Plan Sponsor.[101]   Debtors further acknowledge that they have no assurance they will be able to effect such transfers.[102]   The Parent's Full

---

[97]     (*See In Re ASARCO, LLC*, Clerk's Notice Of An Appeal Under Bankruptcy Rule 8004, 2:09-CV-138, Aug. 17, 2009 (Docket No. 1).)

[98]     (Docket No. 12578 at § 2.1.)

[99]     (Docket No. 12578 at § 2.1.)

[100]     (Confirmation Hr'g Tr. 8/11/09 at 164:4-8 (Aldrich Test.).)

[101]     (Confirmation Hr'g Tr. 8/11/09 at 164:9-167:3 (Aldrich Test.).)

[102]     (Confirmation Hr'g Tr. 8/11/09 at 164:9-167:3 (Aldrich Test.).)

Payment Plan does not call for or require the transfer of environmental permits, as the Parent retains its full ownership of ASARCO.

54.     The Parent has retained experts to assess future environmental costs and expenditures related to the currently operating ASARCO facilities at Amarillo, Hayden, Ray, Mission, and Silver Bell.[103]   These experts have, through analysis of Debtors' financial documents, site visits to each operating property and discussions with Arizona state regulators, projected for the Parent's ongoing environmental remediation costs if Parent should acquire ongoing operations.[104]

55.     Through the efforts of its environmental experts, the Parent has studied and documented all that will be required to comply with environmental laws and regulations in the operation of the Debtors' currently operating sites in Texas and Arizona should it retain ownership of those sites.   Sterlite has not conducted a similar study or analysis.  Sterlite did not provide any evidence during the Confirmation Hearing to demonstrate any understanding of the environmental requirements and obligations that it shall assume if it is allowed to operate these facilities.[105]

56.     The Debtors' senior-most environmental executive, Tom Aldridge, Vice President of Environmental Affairs for the Debtor, believes that the Parent's environmental

---

[103]     (*See* Proffer of Mark Travers in Support of ASARCO Incorporated and Americas Mining Corporation's Modified Sixth Amended Plan of Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code, Aug. 8, 2009 (Docket No. 12393, "Travers Proffer") at ¶ 1; Proffer of Adrian Brown in Support of ASARCO Incorporated and Americas Mining Corporation's Modified Sixth Amended Plan of Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code, Aug. 7, 2009 (Docket No. 12392, "Brown Proffer") at ¶1.)

[104]     (*See* Travers Proffer at ¶ 1, Brown Proffer at ¶ 1; Docket No. 11937, p. 1, § 1; Confirmation Hr'g Tr. 8/18/09 at 35:21-23 (Brown Test).)

[105]     (*See* Confirmation Hr'g Tr. 8/18/09 at 41:6-16 (Brown Test.); Confirmation Hr'g Tr. 8/18/09 at 49:8-20 (Travers Test.).)

assessment is correct, reliable, and just.  Mr. Aldrich does not prefer the Sterlite purchase over the Parent's Full Payment Plan.[106]

### G.   The Asbestos Claims, Litigation and Settlement

57.     On June 15, 2005, ASARCO initiated an adversary proceeding against the Asbestos Subsidiary Debtors and the FCR, seeking a declaration that ASARCO was not liable for the derivative asbestos claims.[107]

58.     Pursuant to a stipulation approved on April 25, 2006, the Asbestos Subsidiary Committee and the FCR were granted standing to prosecute the derivative asbestos claims on behalf of the Asbestos Subsidiary Debtors' Estates and were authorized to take the lead role in prosecuting the adversary proceeding and all claims, defenses, and counterclaims against ASARCO related to the derivative asbestos claims.[108]

59.     In March 2006, ASARCO moved for estimation of the amount of ASARCO's liability, if any, for the derivative asbestos claims, and proposed a procedure for such estimation proceedings.[109]  Objections to the estimation motion were filed by the Asbestos Subsidiary Committee, the FCR, and Fireman's Fund Insurance Company ("FFIC").  On May 9, 2006, the Asbestos Subsidiary Committee and the FCR, on behalf of the Asbestos Subsidiary Debtors, filed an Amended Complaint seeking a declaratory judgment that ASARCO is liable for the Asbestos Subsidiary Debtors' asbestos-related liabilities under alter ego theories.[110]

60.     Discovery related to the asbestos adversary proceeding and the estimation motion was extensive, and the Bankruptcy Court held numerous status conferences and

---

[106]      (Confirmation Hr'g Tr. 8/11/09 at 169:2-15 (Aldrich Test).)

[107]      (Adv. P. 05-02048.)

[108]      (Docket No. 2054,)

[109]      (Docket No. 1887.)

[110]      (Docket No. 51 in Adv. P. 05-02048.)

discovery hearings.  Millions of pages of documents were produced and many millions more were reviewed.  Historic documents relating to ASARCO and its subsidiaries, LAQ and CAPCO were collected from storage facilities around the country.  In addition to discovery from the Debtors, the Asbestos Subsidiary Committee and FCR issued third-party subpoenas to and/or gathered materials from Arthur Anderson LLP, Keegan Linscott Kenon P.C., Credit Suisse Securities ((USA) LLC, Pricewaterhouseoopers LLP, JPMorgan Chase Bank, Covington & Newman, P.C.   ASARCO produced its historic asbestos claims data.   Three expert econometricians (one retained by ASARCO, one by the FCR and Asbestos Subsidiary Committee, and one by the ASARCO Committee) issued reports, supplemental reports, and rebuttal reports were deposed.

61.     ASARCO reached agreement with the Asbestos Subsidiary Committee and the FCR regarding some aspects of a procedure for resolving the derivative asbestos claims.  The agreement provided for a stipulated process in a contested matter under Section 502 of the Bankruptcy Code to establish the aggregate amount of ASARCO's liability, if any, for the asbestos-related liability of the Asbestos Subsidiary Debtors.  The established amount would be incorporated into ASARCO's Plan of reorganization.  The Bankruptcy Court entered an order approving this agreement on March 20, 2007.[111]

62.     The order included an addendum that resolved concerns raised by FFIC in an objection and provided that estimation proceedings would be conducted to provide "insurance neutrality."[112]  Eventually, the terms of the insurance neutrality addendum were extended to all

---

[111]     (Docket No. 4215.)

[112]     (*Id.*)

insurance companies that are or may become interested parties in the Debtors' Reorganization Cases.[113]

63.     On May 16, 2007, the parties served their estimates of the maximum aggregate asbestos-related liability of the Asbestos Subsidiary Debtors as of the dates that the Asbestos Subsidiary Debtors and ASARCO filed for bankruptcy protection.  The estimate ranged from $80 million to $2.1 billion. These estimates did not include premises liability claims, direct asbestos claims against ASARCO, and defense costs.

64.     By Order dated September 20, 2007, the Bankruptcy Court appointed the Honorable Elizabeth W. Magner, United States Bankruptcy Judge for the Eastern District of Louisiana, to mediate estimation of the derivative asbestos claims.[114]   Judge Manger was specially assigned by Fifth Circuit Chief Judge Edith Jones to serve in this role.  Mediation talks began in October 2007, and continued in November and December 2007, and January 2008.  The focus of discussions expanded from asbestos claims to encompass a consensual plan of reorganization, and Judge Magner began a dialogue among ASARCO and its key constituencies. Because the talks were productive, the parties asked the Bankruptcy Court to postpone the estimation hearing regarding the derivative asbestos claims, which was set to begin on January 2, 2008.

65.     These discussions ultimately resulted in development of a global resolution of the Debtors' asbestos and environmental liabilities, which became part of a consensual plan of reorganization and, in the parties' view, obviated the need for an estimation hearing.  The agreements regarding asbestos and environmental liabilities were incorporated into a proposed plan of reorganization.  As discussed above, the Debtors suspended this plan in October 2008.

---

[113]     (Docket Nos. 7965, 11231.)

[114]     (Docket No. 5885.)

Beginning in March 2009, the ASARCO Committee requested, with the support of the Debtors, that the Bankruptcy Court resume scheduling of an estimation hearing on derivative asbestos claims against ASARCO. The Bankruptcy Court granted the request and set a date for the estimation hearing. Days before the scheduled estimation hearing, ASARCO requested that the Bankruptcy Court expand the estimation hearing to include direct claims against ASARCO.

66.     The estimation hearing was obviated by a June 2009 settlement agreement among ASARCO, the Asbestos Claimants' Committee, the Asbestos Subsidiary Committee, the FCR, and Sterlite.[115] As discussed below, under the Debtors' Plan, holders of Class 4 Unsecured Asbestos Personal Injury claims would agree to reduce their aggregate claims to $1 billion.[116] The Debtors agreed to the Debtors' Plan, for Class 4, $750 million would be used to calculate the pro rata distributions of consideration between Classes 3 and 4.

### H.     Agreement With Majority Bondholders

67.     The Debtors' Liquidation Plan and the Parent's Full Payment Plan offers the same treatment to the Bondholders. The Debtors and the Majority Bondholders have entered into an agreement in principle to resolve Bondholder Claims, and the Parent has agreed to accept the terms, as follows:

a.     Holders of the Bonds will receive Allowed Class 3 Claims in an amount equal to the $439.8 million principal amount of their Bonds, together with all accrued but unpaid prepetition interest of $7.8 million on those Bonds, for a total of $447.6 million.   These claims will be payable *pari passu* with the Allowed Claims of general unsecured creditors for principal and prepetition interest, if any.

b.     Holders of the Bonds will receive Allowed Claims for all accrued Post-Petition Interest at the non-default rate specified in the relevant Bond indentures, compounded based on when interest payments were due under the indentures (estimated to be $162 million as of December 31, 2009).

---

[115] (Docket No. 11898.)

[116] (*Id.*; Lapinsky Proffer ¶ 40; Docket No. 12387; Ex. D170.)

These Allowed Claims will be payable (a) after the Allowed Claims of general unsecured creditors for principal and prepetition interest have been paid in full and (b) *pari passu* with the Allowed Claims of general unsecured creditors for Post-Petition Interest.

c.      Holders of the Montana 2033 Bonds, the Nueces 2027 Bonds, the Montana 2027 Bonds, the Nueces 2018 Bonds and the Gila Bonds will receive Allowed Claims in the amount of the prepayment premiums expressly provided under the indentures for such bonds.  Holders of the 2013 Bonds will receive, in settlement of their claims for alleged breach of the no-call feature of those bonds, an Allowed Claim in the amount of $5 million, calculated as 5% of the principal amount of their 2013 Bonds. Holders of the 2025 Bonds will receive, in settlement of their claims for alleged breach of the no-call feature of those bonds, an Allowed Claim in the amount of $10 million, calculated as 10% of the principal amount of their 2025 Bonds.  These Allowed Claims will be payable (a) after the Allowed Claims of general unsecured creditors for Post-Petition Interest have been paid in full and (b) *pari passu* with the make whole claims of the holders of the 2013 Bonds and the 2025 Bonds set forth in the next succeeding paragraph.

d.      The fees and expenses of the Indenture Trustees under the Bonds will be paid in full as Allowed Administrative Claims.

## II.      THE PARENT'S FULL PAYMENT PLAN

68.      The Parent's Full Payment Plan is a plan of reorganization.  Under the Parent's Full Payment Plan, the Parent will continue as the owner of ASARCO, which preserves value for creditors and equity holders better than a sale or liquidation.  The Parent's Full Payment Plan was proposed in good faith and is the direct result of extensive negotiations with key constituents.[117]   The Parent's Full Payment Plan was amended several times in order to address and resolve concerns raised by the various creditor groups.

### A.      Parent Offers Full Payment, in Cash, of Principal and Interest to Creditors

69.      The Parent's Full Payment Plan provides for the Parent to provide the following: (a) a contribution by the Parent of $2.2051 billion in Cash upon close to the Debtors'

---

[117]      (Proffer of Jorge Lazalde Psihas in Support of ASARCO Incorporated and Americas Mining Corporation's Modified Sixth Amended Plan of Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code (Docket No. 12391, "Lazalde Proffer") at ¶ 27.)

estate,[118]  (b) a guaranty of a $280 million promissory note of Reorganized ASARCO issued to a

trust for the benefit of asbestos claimants,[119] (c) a forfeitable deposit in the amount of $2.2051

billion, to be obtained from shares of SCC stock having a value of $2.2051 billion, plus an

additional $500 million in Cash in the U.S. Dollar currency, to ensure the Parent's performance

of its obligations under the Parent's Full Payment Plan;[120] (d) a Working Capital Facility of $200

million for the post-confirmation operations of Reorganized ASARCO,[121] and (e) a waiver of all

claims of the Parent and its affiliates against the Debtors (including tax reimbursement claims

that the Debtors have quantified at $161.7 million and a claim of ownership of a tax refund in the

approximate amount of $60 million (the "Tax Refund")).[122]   In addition, the Parent's ultimate

owner, Grupo México has guaranteed the Parent's payment of the Parent Contribution, the

Working Capital Facility, and the timely payment of Reorganized ASARCO's $280 million

promissory note.[123]

70.     Cash and other forms of value available for distribution under the Parent's Full

Payment Plan are sufficient to satisfy all Claims in full.[124]   Nevertheless, the Parent's Full

---

[118]     (Lazalde Proffer, ¶ 6; Supp. de la Parra Proffer at ¶ 3; Confirmation Hr'g Tr. 8/20/2009 at 151: 25, 152: 1-3 (De La Parra Test.).)

[119]     (Parent's Full Payment Plan, Ex. 23 at ¶ 1.)

[120]     Notice of Filing Fully Executed Exhibits 24 and 25 to ASARCO Incorporated and Amreicas Mining Corporation's Seventh Amended Plan of Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code, as Modified on August 20, 2009, ("Executed Escrow Agreement," Docket No. 12592), Exhibit 25.)

[121]     (Parent's Full Payment Plan, Ex. 10, at § 1.)

[122]     (Parent's Full Payment Plan, Arts. 10.1, 10.8; Supplemental Proffer of Carlos Ruiz in Support of ASARCO Incorporated and Americas Mining Corporation's Seventh Amended Plan or Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code (Docket No. 12582, "Supp. Ruiz Proffer,") at ¶¶ 5-7; Second Supplemental Proffer in Support of ASARCO Incorporated's and Americas Mining Corporation's Seventh Amended Plan of Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code and in Opposition to Confirmation of the Debtors' Plan of Reorganization ("Second Supp. Poulin Proffer," Docket No. 12570), at ¶ 8; (as to(b)); Supp. de la Parra Proffer at ¶ 3.)

[123]     (Parent's Full Payment Plan Ex. 24 at ¶ 1.)

[124]     (Second Supp. Poulin Proffer at ¶ 8 and Ex. A; *see also* Supp. Ruiz Proffer at ¶ 7.)

Payment Plan also provides that, to the extent all of the foregoing consideration proves insufficient to pay all allowed claims in full, the holders of allowed claims will have recourse against Reorganized ASARCO to make up any deficiency.[125]

71.     AMC, the entity providing the Parent's Contribution, the issuer of the Working Capital Facility, and the guarantor of the $280 million promissory note,  is a Delaware corporation valued at approximately $20 billion.[126]

72.     Under the Parent's Full Payment Plan, creditors other than Class 4 Asbestos Claimants will receive 100% of the principal on their claims in Cash; additionally, all claimants will receive interest on their Claims through the date of payment in Cash.[127]   The Class 4 Asbestos Claimants will receive, through a section 524(g) trust, a $500 million Cash payment at Confirmation, a $280 million one-year secured, interest-bearing promissory note, plus approximately $137 million in post-petition interest, together with $27.5 million paid as an allowed administrative claim, and the right to pursue certain insurance coverage actions.[128]   The Parent has waived repayment of outstanding amounts under the intercompany DIP that was provided to the Asbestos Subsidiaries.[129]   Bondholders will receive interest at the contract rate (per the agreed term sheet),[130] as will any other claimant who is entitled to a contract rate.[131]   All other claimants, including the Class 4 Asbestos Claimants, will receive interest at the federal

---

[125]     (Parent's Full Payment Plan at Arts. 10.3(f), 11.1.)

[126]     (Confirmation Hr. Tr. 8/20/2009 at 160:14-2 (de la Parra Test.).)

[127]     (Parent's Full Payment Plan, Art. 4.2; Second Supp. Poulin Proffer at ¶ 8 and Ex. A.)

[128]     (Parent's Full Payment Plan, Art. 4.2(d); Second Supp. Poulin Proffer, ¶ 8 and Ex. A.)

[129]     (Notice of Technical Amendments To ASARCO Incorporated and Americas Mining Corporation's Seventh Amended Plan of Reorganization for the Debtors Under Chapter 11 of The United States Bankruptcy Code, As Modified On August 20, 2009 ("Technical Amendments Notice," Docket No. 12617), at ¶ 1.)

[130]     (Technical Amendments Notice at ¶ 2.)

[131]     (Parent's Full Payment Plan at Art. 4.4.; Second Supp. Poulin Proffer at ¶ 8.)

judgment rate.[132]   There will be $336.4 million excess Cash availability in the "Known Claims

Case" for the operation of Reorganized ASARCO.[133]   On the "High Claims Case," Reorganized

ASARCO will have $211 million excess cash availability.[134]   The Debtors have been involved

in the claim resolution process for several years, and their Director in charge of the process,

Chuck Watson, stated the following in Paragraph 9 of his Proffer dated August 7, 2009:

> For the reasons stated above and articulated in the various pleadings filed by the Debtors
> in connection with these large disputed claims, I believe that it is more likely than not
> that actual recoveries to creditors from cash and the Plan Sponsor's note will be much
> closer to the recoveries estimated under the Likely [Known] Claims Scenario than under
> the High Claims Scenario.[135]

73.      In the Known Claims Analysis and the High Claims Analysis, Lisa Poulin – a

Partner at CRG Partners Group, LLC ("CRG Partners") and an expert hired by the Parent to test

the feasibility of the Plans – analyzed the claim amounts prepared by the Debtors and made

certain adjustments based on her analysis, conversations with representatives of the Debtors and

other constituents, including Chuck Watson, Barclays, FTI, and others, and her understanding of

those claims.[136]   She determined that the better "Known Claims" number is $3,528.7 million, a

downward adjustment to the Debtors' analysis of $54.2 million.   On the "High Claims," she

adjusted the Debtors' number downward by $164.9 million, to $3,654.2 million.[137]

---

[132]      (Parent's Full Payment Plan at Art. 4.4; Second Supp. Poulin Proffer at ¶ 8.)

[133]      (Second Supp. Poulin Proffer at ¶ 8 and Ex. A.)

[134]      (Second Supp. Poulin Proffer at ¶ 8 and Ex. A)

[135]      (Second Supp. Poulin Proffer at ¶ 8)

[136]      (Second Supp. Poulin Proffer at ¶ 11.)

[137]      (Second Supp. Poulin Proffer at ¶ 11.)

74.     The High Claims estimate is subject to a further downward adjustment to $3,586 million after the announcement of the Montana Resources, Inc. settlement, reducing the High Claims estimate by approximately $60 million.[138]

75.     Regarding available sources of funds, Barclays has provided sworn testimony that the Debtors are expected to have $1.4 billion in available Cash as of December 31, 2009, and assumes $1.4 billion in Cash will be available for the purposes of the Debtors' waterfall and feasibility analysis.[139]

76.     In addition, there are other sources of Cash that must be considered and that would provide additional cushion, in particular the $50 million Letter of Credit deposit that Sterlite posted in 2008 in connection with the Original Plan Sponsor PSA.[140]   The Debtors can draw on Sterlite's $50 million Letter of Credit should the Full Payment Plan, rather than the Debtors' Liquidation Plan, be confirmed.[141]

77.     The ongoing obligations of Reorganized ASARCO include Reinstated Environmental Claims, pension and other post-retirement benefit obligations, litigation costs, capital expenditures, ordinary operating costs, tax payments, and its obligations under the ASARCO Note.[142]   The projections in the Debtors' 5-Year Plan, subject to copper price update

---

[138]     (Second Supp. Poulin Proffer at ¶ 1; Supplemental Proffer of George M. Mack in Support of Confirmation of the Debtors' Joint Plan of Reorganization and in Opposition to Confirmation of the Parent's Plan of Reorganization (Docket No. 12386, "Supp. Mack Proffer") Ex. C).)

[139]     (Second Supp. Poulin Proffer at ¶ 1; Mack .)

[140]     (Second Supp. Poulin Proffer at ¶ 13.)

[141]     (Second Supp. Poulin Proffer at ¶ 13.)

[142]     (Proffer of Lisa M. Poulin in Support of ASARCO Incorporated and Americas Mining Corporation's Modified Fifth Amended Plan of Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code ("Poulin Proffer," Docket No. 11938), at ¶ 20.)

and adjustments, are reasonable in light of the circumstances under which they were prepared and demonstrate the feasibility of the Parent's Full Payment Plan.[143]

78.     Reorganized ASARCO's operations will generate sufficient cash flow, as projected in the Debtors' 5-Year Plan, to pay its obligations under the Parent's Full Payment Plan.[144] The Parent's Full Payment Plan provides further support by the provision of the $200 million Working Capital Facility that has an initial term of two years and may be renewed annually thereafter by the Parent and Reorganized ASARCO.[145]

79.     As shown above, the Parent's Full Payment Plan provides payment in full of principal plus interest to all creditors in Cash at the effective date.[146]  The Parent's Full Payment Plan does not require any recovery from any litigation, or from any source other than the Parent Contribution and, to the limited extend described above, from Reorganized ASARCO itself, to guarantee payment in full of principal plus interest to creditors.[147]

80.     The Unions have threatened to strike Reorganized ASARCO if the Parent's Full Payment Plan is confirmed.[148]   The Parent has demonstrated that it has the capability to address a strike should that occur.[149]   Reorganized ASARCO has sufficient financial resources such that the Confirmation and consummation of the Parent's Full Payment Plan is not likely to

---

[143]     (Poulin Proffer at ¶ 20.)

[144]     (Poulin Proffer at ¶ 21.)

[145]     (Poulin Proffer at ¶ 21.)

[146]     (Supplemental Ruiz Proffer at ¶ 7; Second Supplemental Poulin Proffer at ¶ 10; Waterfall, Exhibit P433.)

[147]     (Second Supp. Poulin Proffer at ¶ 10.)

[148]     (Supp. de la Parra Proffer at ¶ 15; Proffer of Carlos Ruiz in Support of ASARCO Incorporated and Americas Mining Corporation's Modified Sixth Amended Plan of Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code (Docket No.12388, "Ruiz Proffer") at ¶ 14-15.)

[149]     (Supp. de la Parra Proffer at ¶ 15.)

be followed by the liquidation, or the need for further financial reorganization, of Reorganized ASARCO.[150]

### B.   Treatment of Priority, Secured, and General Unsecured Claims

81.     Under the Parent's Full Payment Plan, holders of Priority Claims will receive Cash in the Allowed Amount of their Claims and Post-Petition Interest.[151]

82.     Under the Parent's Full Payment Plan, holders of Secured Claims, at the Parent's election, will either: (1) receive cash in the Allowed Amount of their Claim and Post-Petition Interest; (2) be Reinstated; (3) receive from Reorganized ASARCO all Collateral securing such Allowed Secured Claim; or (4) receive such other treatment as may be agreed upon between the Parent and the holder of such Allowed Secured Claim.[152]

83.     Under the Parent's Full Payment Plan, each holder of an Allowed General Unsecured Claim will receive cash in an amount equal to the Allowed Amount of such Claim plus Post-Petition Interest.[153]

84.     If the Parent's Full Payment Plan is confirmed, the Parent will withdraw its appeals with respect to the Environmental Custodial Trusts and the Environmental Unsecured Claims.[154]   The Governmental Environmental Claimants will receive the treatment they negotiated with the Debtors and that has been approved by the Bankruptcy Court.[155]   If the Parent's Full Payment Plan is not confirmed, the Parent will continue to pursue its appeals of the Debtors' Environmental 9019 Motion and the District Court Order denying withdrawal of the

---

[150]     (Poulin Proffer at ¶¶ 19-21; *see also* Second Supp. Poulin Proffer at ¶ 12-13.)

[151]     (Parent's Full Payment Plan at Art. 4.2(a).)

[152]     (Parent's Full Payment Plan at Art. 4.2(b).)

[153]     (Parent's Full Payment Plan at Art. 4.2(c).)

[154]     (Parent's Full Payment Plan at Art. 2.1.)

[155]     (Parent's Full Payment Plan at Art. 2.1.)

reference to the Bankruptcy Court as to the Residual Superfund and the Custodial Trust Settlement Agreements.[156]   As a good faith gesture, the Parent has abated the schedule with respect to these appeals, pending this Court's submission of its report and recommendation regarding Plan confirmation.

### C.   Treatment of Asbestos Subsidiary Committee's and FCR's Claims

85.    On April 12, 2009, the Asbestos Claimants' Committee, the FCR, AMC, and the Parent executed the Asbestos/AMC/Parent Agreement in Principle, providing that:[157]

a.    The Asbestos Subsidiary Committee and the FCR will oppose the sale of the Debtors' operating assets to Sterlite and confirmation of the Debtors' Liquidation Plan;

b.    The FCR will not deliver, and the Asbestos Subsidiary Committee will not recommend that their constituents deliver, sufficient votes to support a Bankruptcy Code section 524(g) injunction under the terms of the Debtors' Liquidation Plan;

c.    The Parent will deposit the sum of $1.3 billion in cash or cash equivalents (which may include the shares of SCC stock) into an escrow account on or before June 13, 2009;

d.    The Parent will propose a chapter 11 plan of reorganization providing for the treatment of all claims in the bankruptcy and the retention of the Parent's equity ownership in ASARCO;

e.    The Parent's Full Payment Plan will release all claims against the Parent, Grupo México, and affiliates, including the multi-billion dollar SCC Final Judgment;

f.    The Parent's Full Payment Plan will allow contingent asbestos claims in the aggregate amount of $1.0 billion; and

g.    Asbestos claims will be channeled to a trust and such trust will be funded with (1) cash in the amount $527.5 million, $27.5 million of which is earmarked for administrative costs of the trust;[158] (2) a one-year, $280 million promissory note from reorganized ASARCO bearing interest at six

---

[156]    (*See* Disclosure Statement Supplement.)

[157]    (Disclosure Statement § 2.32.)

[158]    (Poulin Proffer at ¶ 14(c).)

percent and secured by a first lien on all of reorganized ASARCO's assets and a pledge from the Parent of 51 percent of the equity in reorganized ASARCO;[159] and (3) rights to insurance proceeds with respect to asbestos claims.[160]

86.     On June 12, 2009, the Asbestos Claimants' Committee and the FCR informed the Parent that they were exercising their fiduciary out under the Asbestos/AMC/Parent Agreement in Principle and intend, instead, to enter into the Asbestos Settlement with the Debtors and Sterlite.[161]

87.     The Parent, the Asbestos Claimants' Committee, and the FCR have subsequently entered into the Amended Asbestos/AMC/Parent Agreement in Principle which provides, among other things, that the asbestos representatives will exercise the Fiduciary Out as that term is defined in the Sterlite Plan Agreement in Principle Term Sheet and will (a) recommend that holders of Asbestos Claims vote to accept both the Parent's Full Payment Plan and the Debtors' Liquidation Plan; (b) not recommend that holders of Asbestos Claims indicate a preference for any Plan; (c) inform the Bankruptcy Court that the asbestos representatives are neutral or have no preference between confirmation of the Parent's Full Payment Plan or the Debtors' Liquidation Plan, but prefer confirmation of the Parent's Full Payment Plan or the Debtors' Liquidation Plan over any other plans for the Debtors' reorganization; and (d) recommend that the holders of asbestos Claims vote to reject all plans other than the Parent's Full Payment Plan and the Debtors' Liquidation Plan.[162]   The Asbestos Representatives agreed that, even if any other plan of reorganization is proposed that increases

---

[159]     (Parent's Full Payment Plan Ex. 14; Supplemental Proffer of Jorge Lazalde Psihas in Support of ASARCO Incorporated and Americas Mining Corporation's Seventh Amended Plan of Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code (Docket No. 12546, "Supp. Lazalde Proffer") at ¶ 6.)

[160]     Lapinsky Proffer at ¶ 37.

[161]     (Disclosure Statement § 2.32; Lapinsky Proffer at ¶ 39.)

[162]     (Disclosure Statement § 2.32; Parent's Full Payment Plan Ex. 27.)

the aggregate consideration payable to the holders of Asbestos Claims and/or to the holders of Unsecured Claims over the amounts set forth in the Parent's Full Payment Plan or the Debtors' Liquidation Plan, the Asbestos Representatives shall continue to recommend that the holders of Asbestos Claims vote in favor of the Parent's Full Payment Plan and the Debtors' Liquidation Plan and support the section 524(g) channeling injunction set forth in such Plans.[163]

88.     In addition, pursuant to the Amended Asbestos/AMC/Parent Agreement's "fiduciary out" clause, the Section 524(g) Trust shall receive the same consideration set forth under the original Asbestos/AMC/Parent Agreement in Principle, except that the one-year, six percent promissory note to be issued to the trust shall be increased from $250 million to $280 million and shall be guaranteed by AMC and secured by a first lien on all of Reorganized ASARCO's assets and a pledge by the Parent of 51% of the equity of Reorganized ASARCO.[164] This note subsequently was included as an obligation subject to the Grupo México Guarantee.  In addition, the Section 524(g) Trust will now receive post-petition interest, calculated at the federal judgment rate upon $780 million through the date of payment, for an aggregate interest payment projected to be $140.5 million if the closing occurs on December 31, 2009.

### D.     Late Filed and Subordinated Claims

89.     Holders of Late Filed and Subordinated Claims will, in full satisfaction, settlement, release, extinguishment, and discharge of such Claims, receive the Allowed Amount of such Claim plus Post-Petition Interest.[165]

### E.     The SCC Litigation

---

[163]     (Disclosure Statement § 2.32; Parent's Full Payment Plan Ex. 27.)

[164]     (Disclosure Statement § 2.32; Parent's Full Payment Plan Ex. 27; Second Supp. Poulin Proffer at ¶ 8; Lapinsky Proffer at ¶ 42.)

[165]     (Parent's Full Payment Plan, Arts. 4.2(f) and (g).)

90.     The Parent's Full Payment Plan does not rely on recovery from the SCC Judgment to compensate creditors, and releases the SCC Judgment on the Effective Date once the Parent Contribution has been made and the Parent's Full Payment Plan has become effective.[166]

### F.     The Sterlite Litigation

91.     Under the Parent's Full Payment Plan, the right to pursue litigation against Sterlite and various other parties will revest in Reorganized ASARCO  The Parent is not relying on any recovery from the Sterlite Litigation to compensate ASARCO's creditors in the Parent's Full Payment Plan.[167]

### G.     Financing

92.     AMC has negotiated and executed a Commitment Letter providing a $1.3 billion senior secured term financing facility with several prominent internationally-recognized lending institutions, including Banco Inbursa, S.A., Institucion de Banca Multiple, Grupo Financiero Inbursa (together with its affiliates, "Inbursa"), BBVA Securities Inc. (together with its affiliates, including BBVA Bancomer, "BBVA"), Calyon New York Branch ("Calyon"), Credit Suisse Securities (USA) LLC (together with its affiliates, "CS", and together with Inbursa, BBVA  and Calyon, the "Joint Lead Arrangers"), Credit Suisse, Cayman Islands Branch ("Credit Suisse") and BBVA Bancomer S.A., Institución de Banca Múltiple, Grupo Financiero BBVA Bancomer (together with its affiliates, "BBVA Bancomer", and together with Credit Suisse, Inbursa and Calyon, the "Initial Lenders").[168]

---

[166]     (Parent's Full Payment Plan, Ex. 2; Second Supp. Poulin Proffer at ¶ 10.)

[167]     (Second Supp. Poulin Proffer at ¶ 7.)

[168]     (Supp. de la Parra Proffer at ¶ 7.)

93.      The Commitment Letter provides the Parent with a commitment consisting of a three-year tranche and a five-year tranche from the Initial Lenders.[169]  Each Lender has advised that its commitment shall be as follows:[170]

|  | **3 Year Tranche** | **5 Year Tranche** |
| --- | --- | --- |
| Inbursa |  | US$ 600,000,000 |
| Credit Suisse | US$ 250,000,000 |  |
| BBVA Bancomer |  | US$ 250,000,000 |
| Calyon | US$ 200,000,000 |  |

The Parent has provided for ample security such that the Lenders will hold a perfected first priority security interest in the Collateral.[171]  The Parent has paid a $21 million commitment fee, and all commitments will be obtained by the Effective Date of the Parent's Full Payment Plan.[172]

94.      The Commitment Letter has many standard provisions, but it has four provisions that are better for the Parent compared to typical lender commitment letters.   Unlike most standard letters, the Committee Letter does not contain an "out" excusing the Initial Lenders from performing due to a material adverse change (in the assets, operations, financial condition, or otherwise), due diligence, market flex, or syndication provision.[173]

95.      The Parent has had a relationship with each of the Lenders on prior occasions.[174]  These relationships have proven to be sound.  History between the Parent and the Lenders shows that these Lenders are reliable, and neither the Parent nor any other party has any reason to doubt these Lenders' full and timely performance.[175]

---

[169]      (*Id.* at ¶ 8.)

[170]      (*Id.*)

[171]      (*Id.* at ¶ 9.)

[172]      (Confirmation Hr'g Tr. 8/20/2009 at 242:10-24 (De La Parra Test.).)

[173]      (Supp. de la Parra Proffer at ¶ 10.)

[174]      (*Id.* at ¶ 11.)

[175]      (*Id.*)

96.     The Parent's financial projections demonstrate that the Parent will be able to repay this facility.[176]

97.     In addition to the financing represented by the fully-executed Commitment Letter, the Parent Contribution under the Full Payment Plan requires additional cash of $905.1 million.[177]   Grupo México has sufficient cash to meet this obligation.[178]

98.     The Parent and Grupo México have entered into the Guarantee Agreement, dated August 19, 2009 (the "Guarantee Agreement"), pursuant to which Grupo México has agreed to provide the Parent with the funds required to permit the Parent to deliver the Parent Contribution in full ($2.2051 billion), as well as to fund the revolving Working Capital Facility ($200 million) and has guaranteed the timely performance by Reorganized ASARCO of its obligation under its $280 million promissory note to the Section 524(g) Asbestos Trust.[179]   The Guarantee Agreement amends and supplements the Grupo México Support Agreement dated as of July 30, 2009.[180]   The Guarantee Agreement is enforceable against Grupo México by the ASARCO Committee (after consultation with the Asbestos Representatives).[181]   The Guarantee Agreement has been further amended to include the obligations under the ASARCO Note ($280 million) and to provide that that portion of the guarantee is enforceable by the page on the ASARCO Note.

99.     In addition, the Parent has previously established an Escrow Account funded with 67,280,000 shares of stock of SCC and $500 million in Cash, and has prepared the certain

---

[176]     (*Id.*)

[177]     (*Id.* at ¶ 13.)

[178]     (*Id.*; Confirmation Hr'g Tr. 8/12/2009 at 130:5-13 (Mack Test.).)

[179]     (Supp. de la Parra Proffer at ¶ 13.)

[180]     (*Id.*)

[181]     (*Id.*)

Third Amended and Restated Escrow Agreement.[182]   In connection with the Parent's Full Payment Plan, the Parent has increased the Escrow Account by 16,430,000, such that it holds 83,710,000 shares.[183]   Additionally, Grupo México has agreed to advance $500 million in U.S. Dollar currency to AMC for deposit into the Escrow Account on account of the $905.1 million Cash required to fund the Parent Contribution in addition to proceeds from the Commitment Letter financing.   Thus, the Third Amended Escrow Agreement provides that shares worth $2.2051 billion are forfeitable if the Parent withdraws or adversely amends the Full Payment Plan after the Bankruptcy Court enters a report and recommendation in favor of confirming the Parent's Full Payment Plan.[184]   That right is enforceable by the ASARCO Committee (after consultation with the Asbestos Representatives).[185]   The Escrow Account holds SCC shares worth $2,205,130,675, based on the average closing price of the last 20 trading days (using August 18, 2009 as the 20th day),[186] and an aggregate market share price of $2,438,472,300, as of the close of the market on August 21, 2009.   With the deposit into the Escrow Account of the additional $500 million in U.S. Dollar currency, the aggregate value of the cash and shares of SCC stock in the Escrow Account exceed $2.9 billion.

100.     Grupo México, separate and apart from its subsidiaries, presently has free cash in excess of $1.5 billion.[187]

---

[182]     (*Id.* at ¶ 14; Proffer of Alberto de la Parra in Support of ASARCO Incorporated and Americas Mining Corporation's Modified Sixth Amended Plan of Reorganization for the Debtors under Chapter 11 of the United States Bankruptcy Code (Docket No. 12390, the "de la Parra Proffer") at ¶ 9; Supp. Poulin Proffer at ¶ 7; *see also* Confirmation Hr'g Tr.  8/20/2009 at 215:1-5 (de la Parra Test.). )

[183]     (Supp. de la Parra Proffer at ¶ 13.)

[184]     (*Id.*)

[185]     The Parent has represented that, subject to Lender consent, the Escrow Agreement will be amended to make the Debtors parties thereto, with rights of enforcement in the Bankruptcy Court.

[186]     (Supp. de la Parra Proffer at ¶ 13.)

[187]     (de la Parra Proffer at ¶ 4.)

101.     The evidence supports a finding that Grupo México and the Parent have resources and creditworthiness to satisfy their financial obligations with regard to the Parent's Full Payment Plan.[188]

102.     The Parent has shown its financial strength and support.  The Parent has proven its financial commitment to fund the Parent's Full Payment Plan and to provide the best option for the Debtors' creditors.[189]

**H.     <u>Post-Effective Date Management.</u>**

103.     The Parent is ready, willing, and able to perform its obligations under the Parent's Full Payment Plan.[190]

104.     The Parent's officers and directors have given full authority to enforcement of the Parent's Full Payment Plan.[191]

105.     The Parent will appoint the following individuals to serve as directors of Reorganized ASARCO:[192]

  a.     Carlos Ruiz Sacristan

  b.     Agustin Santamarina

  c.     Jorge Lazalde Psihas

106.     The Parent will appoint the following individuals to serve as officers of Reorganized ASARCO:[193]

  a.     Manuel E. Ramos Rada – Chief Executive Officer/Chief Operating Officer

---

[188]     (*Id.* at ¶ 6)

[189]     (*Id.* at ¶ 17.)

[190]     (*Id.* at ¶ 18.)

[191]     (*Id.* at ¶ 19.)

[192]     (Technical Amendments Notice at ¶ 7; Supp. de la Parra Proffer at ¶ 20.)

[193]     (Technical Amendments Notice at ¶ 7.)

     b.    Oscar González Barron – Chief Financial Officer

107.    Mark Roberts of Alvarez & Marsal has been designated as the Parent's Full Payment Plan Administrator.[194]

108.    The trustees and other officials responsible for the Section 524(g) Trust and the Environmental Custodial Trusts shall be identified by the Asbestos Representatives and the DOJ in consultation with the states that have Allowed Environmental Trust Claims.[195]

## III.    DEBTORS' LIQUIDATION PLAN

### A.    Summary of Debtors' Liquidation Plan.

109.    The Debtors' Liquidation Plan proposes a sale of substantially all the Debtors' operating assets and all of the Class 3 interests in the SCC Litigation Trust to Sterlite for $1.43944 billion, plus an additional $722 million, as adjusted in an amount that would ensure that Allowed Claims in Class 3 are Paid in Full.[196]   The Debtors' Liquidation Plan also contemplates that the Court will determine the value the SCC Litigation Trust Interests and the amount necessary for Classes 3 and 4 to be Paid in Full (the "Total Class 3 and Class 4 Claims Calculation").[197]   Depending on these valuations, these cash proceeds, along with interests in the SCC Litigation Trust, are then distributed to ASARCO's creditors, with the Class 3 Claimants' aggregate 73% of the beneficial interests in the SCC Litigation Trust thereafter sold and assigned to Sterlite.[198]

---

[194]    (Technical Amendments Notice and ¶ 7; Supp. de la Parra Proffer at ¶ 18; Supp. Lazalde Proffer at ¶ 10.)

[195]    (Parent's Full Payment Plan, Arts. 6.8, 6.10, 7.2.)

[196]    (*See* Debtors' Liquidation Plan §§ 4.2(c), 10.1; Second Supplemental Proffer of George M. Mack in Support of Confirmation of the Debtors' Joint Plan of Reorganization and in Opposition to Confirmation of the Parent's Plan of Reorganization (Docket No. 12456, "Second Supp. Mack Proffer") at ¶ 6.)

[197]    (*See* Debtors' Liquidation Plan § 4.3.)

[198]    (*See* Debtors' Liquidation Plan § 4.3.)

110.     Only if the Court determines that the value of the Debtors' Liquidation Plan consideration (including the SCC Litigation Trust Interests) exceeds the amount necessary for unsecured creditors to be paid in full (including principal plus post-petition interest and attorneys' fees and costs if permitted by applicable law) will the excess be distributed to the holders of Late-Filed Claims, Subordinated Claims, and Interests in ASARCO (Classes 6-8).[199] This valuation mechanism allows for the possibility that unsecured creditors might be paid in full but might also receive amounts vastly in excess of 100% of their allowed claims plus post-petition interest, at the sole expense and exposure of the Parent as the sole equity holder.[200] Thus, the valuation can reasonably be expected to provide a substantial windfall to Sterlite as the successor holder of 73% of the SCC Litigation Trust Interests that otherwise would have been distributed to Class 3 Claimants and to the Class 4 Claimants, as holders of 27% of SCC Litigation Trust Interests, both at the sole expense and exposure of the Parent with no compensation therefore.[201]

### B.     The Debtors' Liquidation Plan sells the SCC Judgment to Sterlite and releases the Sterlite Claim.

111.     The Debtors' Liquidation Plan proposes to allow Sterlite – a third party that does not have a claim against or interest in the Debtors' estate – to purchase significant interests in the SCC Litigation.[202]   The effect of the Debtors' proposal would be that Class 3 creditors would be paid by Sterlite, and Sterlite would defend the SCC Judgment on appeal in the hopes of

---

[199]      (*See* Debtors' Liquidation Plan § 4.3.)

[200]      (*See* Debtors' Liquidation Plan § 4.3(c); *see also* Debtors' Supplemental Brief in Support of Confirmation of Debtors' Sixth Amended Plan of Reorganization Under the United States Bankruptcy Code, As Modified ("Debtors' Supp. Confirmation Brief," Docket No. 12621) Ex. A (Shortfall Analysis - Debtors' Liquidation Plan).)

[201]      (*See* Debtors' Liquidation Plan § 4.3(c).)

[202]      (*See* Debtors' Liquidation Plan § 10.1.)

recovering the full $7-8 billion judgment from AMC.[203]  If the SCC Judgment is affirmed on appeal, Sterlite would potentially recover over $6 billion more than the amount for which it proposes to acquire ASARCO.  This is value that would otherwise be available to ASARCO's shareholder, ASARCO Incorporated.

112.    The Debtors' Liquidation Plan contemplates that the Bankruptcy Court make a determination of the value the SCC Litigation Trust Interests.[204]  Under the Debtors' Liquidation Plan, the Debtors will ask the Court to estimate the Total Class 3 and Class 4 Claims Calculation and then determine the amount by which it exceeds the Consideration for Classes 3 and 4 minus the SCC Litigation Trust Interests or the Sterlite Class 3 SCC Trust Payment (the "Class 3 and Class 4 Non-SCC Consideration").[205]  If the Court determines that the difference between the Total Class 3 and Class 4 Claims Calculation and the Class 3 and Class 4 Non-SCC Consideration exceeds the SCC Litigation Trustee Interests, then Classes 3 and 4 will receive 100% of the interests in the SCC Litigation Trust.[206]  If, on the other hand, the Court determines that the difference between the Total Class 3 and Class 4 Claims Calculation and the Class 3 and Class 4 Non-SCC Consideration is less than the value of the SCC Litigation Trust Interests, then the Court will determine the percentage of interests in the SCC Litigation Trust that should be distributed to Classes 3 and 4.[207]  Under this scenario, the remaining interests in the SCC Litigation Trust would be distributed to junior Classes.[208]  Under either scenario, it is possible that the ultimate value of the SCC Final Judgment will be higher than the value estimated at

---

[203]     (*See* Debtors' Liquidation Plan § 10.1(b), 4.2(c).)

[204]     (*See* Debtors' Liquidation Plan § 4.3.)

[205]     (*See* Debtors' Liquidation Plan § 4.3.)

[206]     (*See* Debtors' Liquidation Plan § 4.3.)

[207]     (*See* Debtors' Liquidation Plan § 4.3.)

[208]     (*See* Debtors' Liquidation Plan § 4.3; Debtors' Supp. Confirmation Brief, Ex. A (Shortfall Analysis - Debtors' Plan).)

confirmation, with the result that Classes 3 (and Sterlite, through Sterlite's acquisition of the Class 3 SCC Litigation Trust Interests) and 4 will receive a greater percentage of the SCC Litigation Trust Interests than is necessary for Claims in Classes 3 and 4 to be Paid in Full.[209] Sterlite, standing in the shoes of the Class 3 creditors and Class 4 creditors, thus stands to reap an enormous windfall if the ultimate value of the SCC Final Judgment is greater than estimated at Confirmation.[210]

113.     The Debtors' Liquidation Plan further proposes to release the $2.6 billion Sterlite Claim.  This is value that otherwise would be available to ASARCO's shareholder, ASARCO Incorporated.

### C.        Late Filed and Subordinated Claims

114.     The Debtors' Liquidation Plan provides that to the extent there is sufficient value in the SCC Litigation Trust, as determined by the Court, it will be distributed to the holders of Class 6 (Late-Filed Claims), Class 7 (Subordinated Claims), and Class 8 (Interests in ASARCO) so that such holders may, after General Unsecured Claims are Paid in Full and the distributions to the Asbestos Trust are made, become entitled to receive distributions from the SCC Litigation Trust.[211]

### D.        Sterlite's Reliability as the Sponsor of the Debtors' Liquidation Plan

115.     The Debtors' Liquidation Plan is sponsored by Sterlite (USA), Ltd.  As discussed above, Sterlite previously breached an agreement with the Debtor to purchase the Debtors' assets for $2.6 billion.

---

[209]     (*See* Debtors' Liquidation Plan § 4.3.)

[210]     (*See* Debtors' Liquidation Plan § 4.3; Debtors' Supp. Confirmation Brief, Ex. A (Shortfall Analysis - Debtors' Plan).)

[211]     (*See* Debtors' Liquidation Plan § 4.3.)

116.     According to the Debtors' own expert, the current location of the Sterlite parties' assets and operations (outside the United States) would deprive a party of any meaningful legal recourse to enforce a judgment against Sterlite in the United States.[212] Although a number of international enforcement and litigation enforcement alternatives may be available, these alternatives would almost certainly depend on the aid of foreign judicial systems and necessarily involve high levels of risk and delay.[213] Given that, in all probability, the amounts at stake in such claims would be sizeable, there would also likely be a host of procedural maneuvers to shield Sterlite's assets from enforcement actions, even in countries with more efficient legal procedures.[214]

117.     Sterlite has acknowledged that the acquisition of the Debtors would be its largest acquisition to date and would carry with it a number of risks, including the size of the acquisition, the price, Sterlite's ability to integrate the Debtors' business with its own, an increase in the geographic scope of Sterlite's operations that would expose Sterlite to U.S. laws and regulations, and Sterlite's ability to retain management and key employees of the Debtors.[215]

118.     The Guarantor for the Debtors' Liquidation Plan is Sterlite Industries (India), Inc., an Indian company located in India.  The Debtors have asserted that the Guarantor is essentially judgment proof.[216]   The difficulty of enforcing a judgment was the Debtors'

---

[212]      (Westbrook 9019 Proffer at ¶¶ 4, 15-18.)

[213]      (Westbrook 9019 Proffer at ¶¶ 4, 19-30.)

[214]      (Westbrook 9019 Proffer at ¶ 5.)

[215]      (Krishnan Proffer, Ex. A at p. 12-13; *see also* Rebuttal Proffer of Lisa M. Poulin in Support of ASARCO Incorporated and Americas Mining Corporation's Modified Fifth Amended Plan of Reorganization for the Debtors under Chapter 11 of the United States Bankruptcy Code and in Opposition to Confirmation of the Debtors' and Harbinger Plans of Reorganization (Docket No. 12031), ¶¶ 35-36 (citing Sterlite Indus. (India) Ltd., Annual Report (Form 20-F) at 12-13 (July 29, 2009), available at http://sec.gov/edgar/data).)

[216]      (*See* Sterlite 9019 Motion at ¶¶ 55-62.)

justification for releasing (potentially for no consideration) their $3 billion claim against Sterlite for its breach of the Original Plan Sponsor PSA.[217]

119.    The Debtors' expert relies on reports that Sterlite's parent corporation, Vedanta Resources plc, has sufficient resources to fund the cash portion of the purchase price and provide working capital.[218]   Vedanta has not made any commitment to fund Sterlite's acquisition of the Debtors.[219]   Sterlite has not segregated the remainder of the $1.67 billion cash purchase price into a forfeitable account.[220]   It is unclear whether the Guarantor would be able to access the necessary funds from its subsidiaries.[221]

120.    If the Debtors' Liquidation Plan were confirmed, the post-Effective Date obligations of Sterlite would include the Plan Sponsor Promissory Note, Put Option, reinstated and assumed environmental obligations, pension, other post-retirement benefit obligations, litigation costs, capital expenditures, ordinary operating costs, and tax payments.[222]

121.    Sterlite's own witness has admitted that there is no legal assurance that Sterlite will not walk away again from its agreement to acquire ASARCO.[223]

122.    Sterlite asserts that the Guarantor "intends" to fund Sterlite's working capital requirements on an as-needed basis if the Debtors' Liquidation Plan is confirmed.[224]   Other than

---

[217]      (*See* Sterlite 9019 Motion at ¶¶ 55-62.)

[218]      (Second Supp. Mack Proffer at ¶ 5.)

[219]      (Mack Proffer at ¶ 36; *see also* Poulin Rebuttal Proffer at ¶ 32.)

[220]      (Poulin Rebuttal Proffer, ¶ 33.)

[221]      (Poulin Rebuttal Proffer, ¶ 35.)

[222]      (*See* Debtors' Liquidation Plan Ex. 9; *see also* Joint Disclosure Statement Ex. M § 3.3.)

[223]      (Confirmation Hr'g Tr. 8/11/09 at 101:19-102:25 (Krishnan Test.).)

[224]      (Krishnan Proffer at ¶ 18; Confirmation Hr'g Tr. 8/11/09 at 66:6-8:19 (Krishnan Test.).)

guaranteeing Sterlite's obligations under the New Plan Sponsor PSA, however, the Guarantor has not agreed in writing to provide funding to Sterlite.[225]

123.    Sterlite also claims that it "intends" to implement significant capital investments estimated to be approximately $500 million over the next ten years if the Debtors' Liquidation Plan is confirmed.[226]   Nothing in the New Plan Sponsor PSA or other agreement obligates Sterlite to any level of commitment on capital expenditures, however, nor is there any commitment of Sterlite Industries (India), Inc. with respect to financial support for Sterlite to meet those anticipated expenditures.[227]

124.    Sterlite further asserts that it "intends" to comply with environmental and regulatory requirements if the Debtors' Liquidation Plan is confirmed.[228]   Sterlite was unable to identify any document that obligates Sterlite to conduct its operations in accordance with those requirements, however.[229]   Further, Sterlite's capital expenditure projections are not in line with what the Debtors' representatives have said would be necessary.[230]

125.    Sterlite asserts that it "intends" to improve environmental compliance and safety systems and practices.[231]   There is no agreement that obligates Sterlite to take such measures, however.[232]

---

[225]    (Confirmation Hr'g Tr. 8/11/09 at 53:19-54:11 (Krishnan Test.).)

[226]    (Krishnan Proffer at ¶ 13.)

[227]    (Confirmation Hr'g Tr. 8/11/09 at 70:15-71:4 (Krishnan Test.).)

[228]    (Krishnan Proffer at ¶ 13.)

[229]    (Confirmation Hr'g Tr. 8/11/09 at 71:6-72:1 (Krishnan Test.).)

[230]    (Krishnan Proffer Exhibit E; Confirmation Hr'g Tr. 8/10/09 at 213:16-214:5 (Lapinsky Test.).)

[231]    (Krishnan Proffer at ¶ 13.)

[232]    (Hr'g Tr. 8/11/09 at 72:2-12 (Krishnan Test.).)

E.      **The Copper Basin Railway**

126.      Under the Debtors' Liquidation Plan, the assets that Sterlite will acquire include the Copper Basin Railway (the "CBRY"), a railway owned and operated by the Debtors that runs between the Ray Mine and the Hayden complex.[233]   This acquisition is to take the form of a cash purchase. The CBRY is vital to the operation of the Ray Mine and the Hayden complex because it transports ore and sulfuric acid necessary to those sites.  ASARCO's President and CEO, Joseph Lapinsky, described the CBRY as "critical" to operations.[234]   The characterization has been confirmed by this Court.[235]

127.      The proposed sale of the CBRY to Sterlite requires review and approval by the United States Surface Transportation Board (the "STB").[236]   The STB has exclusive and plenary authority over the proposed purchase and sale, and continuing operation of the CBRY.[237]   Without STB approval, Sterlite cannot lawfully purchase or operate the CBRY.[238]

128.      Sterlite may apply to obtain STB approval of the transaction through three methods:  (1) filing a Notice of Exemption, (2) filing a Petition for Exemption, or (3) filing an Application for Purchase, Sale, and Operation.[239]  On August 14, 2009, Sterlite filed a Verified

---

[233]      (*See* Disclosure Statement Ex. M § 3.1; *see also* Disclosure Statement Ex. A-1 at  ¶ 284, 398; Proffer of Sidney L. Strickland, Jr. in Support of ASARCO Incorporated and Americas Mining Corporation's Modified Fifth Amended Plan of Reorganization for the Debtors under Chapter 11 of the United States Bankruptcy Code at ¶¶ 10-11(Docket No. 12056) (the "Strickland Proffer").)

[234]      *See Asarco buys remainder of Copper Basin Railway*, THE ARIZONA REPUBLIC (Phoenix) (Sept. 30, 2006).

[235]      (*See* Order Authorizing Debtor (1) to Assume Stockholders Agreement and Related Contract For Sale, And (2) Purchase Remaining Shares of Copper Basin Railway, Sept. 12, 2006 (Docket No. 2980).)

[236]      (Strickland Proffer at ¶ 4; Confirmation Hr'g Tr. 8/10/2009 at 231:8-18 (Lapinsky Test.).)

[237]      *See* 49 U.S.C. § 10901(a).

[238]      (Strickland Proffer at ¶ 4; Confirmation Hr'g Tr. 8/10/2009 at 231:8-18 (Lapinsky Test.).)

[239]      (Strickland Proffer at ¶ 15; Confirmation Hr'g Tr. 8/10/2009 at 231:8-18 (Lapinsky Test.).)

Notice of Exemption whereby it sought STB review for the transaction.[240]   This Notice of Exemption followed Sterlite's previously filed opposition to a Petition for Declaratory Order requesting STB to assert its jurisdiction over the transaction.[241]   On or before August 19, 2009, STB suspended Sterlite's Notice of Exemption finding that the Notice of Exemption was devoid of required information pursuant to 49 C.F.R. § 1150.33(h).[242]   If Sterlite consummates its proposed purchase of the CBRY prior to its Notice of Exemption becoming effective, it is subject to potential divestiture of the CBRY and unwinding of its purchase thereof.[243]   The STB approval process is lengthy and will cause a substantial delay in Sterlite's operation of the CBRY, a delay of one or more years.[244]   That delay is also evident from the suspension of Sterlite's application issued on August 19, 2009. [245]   Such a delay will likely be more lengthy due to Sterlite's continued failure to appropriately submit its proposed purchase and operation of the CBRY for STB approval.[246]   Sterlite cannot avoid STB review by structuring the transaction

---

[240]   (*See Sterlite (USA), Inc. – Acquisition and Operation Exemption – Copper Basin Railway, Inc., Line In Pinal and Gila Counties, AZ, Verified Notice of Exemption of Sterlite (USA), Inc., Pursuant to 49 C.F.R. §§ 1150.31-1150.34*, STB Finance Docket No. 35291 (STB served Aug. 14, 2009) ("Notice of Exemption").)

[241]   (*See Reply of Sterlite (USA), Inc., to Petition for Declaratory Order of ASARCO Incorporated and Americas Mining Corporation*, STB Finance Docket No. 35286 (STB served Aug. 11, 2009))

[242]   (*See Sterlite (USA), Inc. – Acquisition and Operation Exemption – Copper Basin Railway, Inc., Line in Pinal and Gila Counties, AZ*, STB Finance Docket No. 35291 (STB served August 19, 2009).)

[243]   (*See* Confirmation Hr'g Tr. 8/18/09 at 62:4-18 ((Strickland Test.) ("Now… during that 30-day period [prior to effectiveness of Notice of Exemption], they can go and in theory consummate, but, if they did that then there's the potential of divestiture that could take place….you want to make sure that you've gone through the process without anything that can create any hiccups because you really don't want to unwind -- and the agency for that matter doesn't want to unwind -- any transactions.").)

[244]   (Strickland Proffer at ¶ 17.)

[245]   (*See Sterlite (USA), Inc. – Acquisition and Operation Exemption – Copper Basin Railway, Inc., Line in Pinal and Gila Counties, AZ*, STB Finance Docket No. 35291 (STB served August 19, 2009).)

[246]   (*See* Supplemental Proffer of Sidney L. Strickland, Jr. in Support of ASARCO Incorporated and Americas Mining Corporation's Modified Sixth Amended Plan of Reorganization for the Debtors under Chapter 11 of the United States Bankruptcy Code, Aug. 8, 2009 (Docket No. 12389), at ¶ 6 ("Supp. Strickland Proffer"); *see also* Confirmation Hr'g Tr. 8/18/09 at 59:7-10 (Strickland:  And so based on…the fact that I've seen many cases where folk believe they don't have to come to the Board or the ICC that eventually -- I mean, there could be protracted litigation on that issue.")  The court stated in closing argument that "the Parent's expert" testified that a stock purchase could allow Sterlite to avoid STB jurisdiction.  Mr. Strickland did not so testify.)

as a stock purchase.  A stock purchase does not shield a transaction involving the purchase of a railroad from STB review.[247]  All railroad transactions must be submitted to the STB for review, whether it be a stock purchase or, as in this case, an asset purchase.[248]

129.     The CBRY issue makes the Debtors' Liquidation Plan less feasible because the proposed purchaser, Sterlite, cannot lawfully operate a railroad that is critical to ASARCO's efficient mining operations until STB approval is obtained.[249]  Approval will take over one year. The Parent's Full Payment Plan needs no such approval.

## IV.     THE PARENT'S FULL PAYMENT PLAN PROVIDES BETTER DISTRIBUTIONS AND VALUE TO CREDITORS.

130.     The express terms of the Parent's Full Payment Plan make it evident that the Parent's Full Payment Plan is superior to the Debtors' Liquidation Plan and is the best option for the Debtors and its creditors.[250]  The Parent's Full Payment Plan contains several advantages over the Debtors' Liquidation Plan.  In the Parent's Full Payment Plan, the Parent seeks to improve the conditions offered to the creditors and/or to respond favorably to the creditors' desires and suggestions.[251]

131.     A comparison of the financial terms of the Plans demonstrates that the Parent's Full Payment Plan provides the highest and best recovery to the various constituencies.[252]  The

---

[247]     (*See, e.g., Canadian Nat'l Ry. and Grand Trunk Corp. – Control – EJ&E W. Co.*, STB Finance Docket No. 35087 (STB served Sept. 8, 2008) (stock purchase not treated separately for purposes of compliance with STB requirements); *Patriot Rail, LLC and Patriot Rail Corp. – Control Exemption – Rarus Ry. Co.*, STB Financial Docket No. 35013 (STB served Apr. 17, 2007) (STB presided over stock purchase where transaction involved new rail operator); *Fenway Partners Capital Fund III, L.P. and Coach America Holdings, Inc. – Control – Renzeberger, Inc.*, STB Finance Docket No. 35254 (STB Served June 25, 2008) (STB presided over stock purchase even where transaction did not involve new rail operator).)

[248]     (*See State of Maine*, 8 I.C.C. 2d 835, at *6 (May 20, 1991).)

[249]     (Strickland Proffer at ¶ 16.)

[250]     (Second Supp. Poulin Proffer at ¶ 7.)

[251]     (Second Supp. Poulin Proffer at ¶ 7.)

[252]     (Exhibit 433.)

Parent's Full Payment Plan's funding is certain, the Parent's Full Payment Plan provides a safety net for Reorganized ASARCO that the Debtors' Liquidation Plan does not offer, and the Parent's Full Payment Plan provides the highest certain recovery to all creditors rather than relying on speculative litigation recoveries.[253]

132.     First, the Parent's Full Payment Plan contributes $2.2051 billion in cash on the Effective Date, as compared to the consideration paid by Sterlite under the Debtors' Liquidation Plan consisting of $1.43944 billion and an additional amount to purchase the Class 3 SCC Litigation Trust Interests. Sterlite's proposed contribution fails to account for the payment in cash on the Effective Date of between approximately $266 million and $305 million paid under the Parent's Full Payment Plan.[254] The Debtors count on prevailing in the Tax Adversary on disallowance of the Parent's approximate $190 million administrative Tax Claim and the recovery of the approximately $60 million Tax Refund. Until the administrative Tax Claim is resolved and entitlement to the approximate $60 million Tax Refund is determined, the Debtors would need to reserve for the administrative Tax Claim and not include the Tax Refund in cash available for distribution on the Effective Date. Moreover, the Parent cannot be compelled to accept the SCC Litigation Trust interests in exchange for any allowed administrative Tax Claims without the Parent's consent.

133.     Second, the Parent's Asbestos Agreement in Principle resolves asbestos claims against the Debtors in a more favorable fashion.  The Parent agreed that the asbestos claims and demands have an aggregate value of $1.0 billion, which is a reduction from the $1.25 billion claim that the Debtors attempted to allow in prior versions of their plan.[255]  The Parent's Full

---

[253]       (Second Supp. Poulin Proffer at ¶ 87.)

[254]       (Exhibit 433.)

[255]       (*See* the Parent's Full Payment Plan § 4.2(d).)

Payment Plan provides for payment in full, in Cash, of $780 million plus Post-Petition Interest on that amount on the asbestos claim, while the Debtors' Liquidation Plan provides for payment of $697 million on the claim ($700 million less the $3 million Asbestos Subsidiaries DIP Loan Repayment), with Post-Petition Interest to accrue on the amount of only $750 million, and the $50 million in principal deficiency and the more limited amount of Post-Petition Interest to be recoverable only from the Asbestos Put Option and/or a speculative recovery on the Class 4 SCC Litigation Trust Interests.[256]   Thus, under the Parent's Full Payment Plan, the Section 524(g) Trust is guaranteed distributions on the full $780 million:  (i) $640.5 million will be provided to the trust from the estates' cash, and (ii) Reorganized Debtors will provide a $280 million interest-bearing, one-year promissory note (aggregating $915.3 in present value) to the Section 524(g) Trust.  The note will be fully secured by the assets of Reorganized ASARCO and a pledge of 51% of the equity in Reorganized ASARCO and guaranteed by AMC and Grupo México.  Under the Debtors' Liquidation Plan, however, any amount in excess of $697 million will come only from the Put Option (with a present value of $137.2 million, for an aggregate present value of $834.2 million) and/or the proceeds of the SCC Litigation (the final amount of which remains uncertain).[257]

134.    The Asbestos Representatives have recommended that their constituents accept this treatment, even though the aggregate recovery represents just 78% of the aggregate allowed amount of asbestos claims and demands.  The Asbestos Claimants did, in fact, vote in sufficient number and amount to accept the treatment proposed by the Parent.[258]

---

[256]    (*See* the Parent's Full Payment Plan § 4.2, *see also* the Debtors' Liquidation Plan § 4.3)

[257]    The Debtors' Liquidation Plan also provides an asbestos Put Option in the amount of $160 million with a present value of $137 million.

[258]    (*See* Chart, Proffer of Meade Monger of AlixPartners, LLP Certifying the Ballots Accepting or Rejecting the Debtors', Parent's, and Harbinger's Plans of Reorganization (Docket No. 12551, "Monger Proffer")at p. 5.)

135.     The Parent's Full Payment Plan offers creditors superior immediate cash recovery and the ability to recover 100% of the principal amount plus Post-Petition Interest.[259] The Debtors' Liquidation Plan, on the other hand, provides significantly smaller initial distributions to creditors on the Effective Date, provides a lower recovery than the Parent's Full Payment Plan with greater uncertainty for the recovery of any remaining consideration, has substantial execution risks, and may not be feasible.  In addition, the Parent's Full Payment Plan, unlike the Debtors' Liquidation Plan, provides a "safety net" for Reorganized ASARCO.  The Parent's Full Payment Plan provides for a $50 million holdback for working capital purposes and the $200 million Working Capital Facility to mitigate copper price fluctuations or operational problems.[260]   These funds are available to satisfy any shortfall in paying claims Allowed under the Parent's Full Payment Plan.

136.     The Debtors argue that the Debtors' Liquidation Plan is more feasible, alleging that the "Parent's Plan carries significant financing risks."[261]  The risks identified by the Debtors are: (1) the Parent's funding requirements; (2) conditions to the financing under the Parent's Full Payment Plan and the lack of negotiated financial covenants; (3) insufficient capitalization; and (4) deficiencies with the Third Amended Escrow Agreement.  The "financial risks" identified by the Debtors are not significant and do not impact the feasibility of the Parent's Full Payment Plan.  The alleged risks associated with the Parent's funding of its obligations under the Plan are negligible as the Parent has a strong Commitment Letter for $1.3 billion, owns assets with a

---

[259]     (Second Supp. Poulin Proffer at ¶ 8.)

[260]     The Debtors' Expert admits that liquidity of $250 million would be "prudent" for Reorganized ASARCO. (Rebuttal Report of George M. Mack in Response to the Proffer of Lisa M. Poulin in Support of ASARCO Incorporated and Americas Mining Corporation's Modified Fifth Amended Plan of Reorganization for the Debtors under Chapter 11 of the United States Bankruptcy Code (Docket No. 12029, "Mack Rebuttal Proffer") at ¶ 14. Sterlite has not evidenced any commitment to provide this level of liquidity to the Debtors post-confirmation. (Confirmation Hr'g Tr. 8/12/2009 at 124:13-20 (Mack Test.).)

[261]     (Debtors' Supp. Confirmation Brief at 11-12.)

value exceeding $20 billion, and is the beneficiary of the Grupo México Guarantee and Grupo México's pre-funding of $500 million of its $910 million funding to the Parent into the Good Faith Escrow Agreement.  The alleged risks with respect to the financing consist of usual and customary terms and conditions to commercial financing that are not likely to prevent closing and funding of the financing.  The risks associated with Reorganized ASARCO's capitalization are unrealistic given the $50 million working capital retention, the $200 million Working Capital Facility, the $50 million Sterlite Letter of Credit issued in connection with Sterlite's Original Plan Sponsor PSA, the Parent's Guaranty of the $280 million Asbestos Note, and the Grupo México Guaranty of the AMC Working Capital Facility, and the $280 million Asbestos Note.[262] Finally, the alleged deficiencies with the Third Amended Escrow Agreement largely consist of difficulties in enforcement of the agreement.  These issues referenced by the Debtors are entirely unfounded because the Escrow Account is funded with shares of SCC stock with a value in excess of $2.4 billion and Cash of $500 million, and the ASARCO Committee has the right to enforce the Escrow Agreement in the Bankruptcy Court.

137.    The Parent has obtained the services and expertise of several professionals to make certain that the Parent's Full Payment Plan is the best alternative and most feasible Plan, particularly with regard to creditor, labor, asbestos, and environmental issues.[263]

138.    For example, the Parent has engaged CRG Partners to analyze not only the feasibility of each Plan, but also to conduct a liquidation analysis for each Plan. Based on its expertise, CRG Partners has concluded that Cash and other forms of value available for

---

[262]    (Parent's Full Payment Plan Ex. 23.)

[263]    (*See generally* Travers Proffer; Brown Proffer; *see also* Supp. Lazalde Proffer at ¶¶ 44-45; Evaluation of Environmental Obligations and Costs at ASARCO Operating Sites, July 10, 2009 at , p. 1, § 1 (Docket No. 11937).)

distribution under the Parent's Full Payment Plan are sufficient to satisfy all Allowed Claims.[264] Moreover, CRG Partners has concluded that the Confirmation and consummation of the Parent's Full Payment Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of Reorganized ASARCO.[265]

139.    Under its Plan, the Parent will waive its claims against the estate, including a claim for reimbursement of $161.7 million for taxes paid by AMC upon the Debtors' income and a claim by AMC to a tax refund with a value presently estimated at $60 million.  Thus, greater amounts of funds will be available for distribution on the Effective Date under the Parent's Full Payment Plan.  Under the Debtors' Liquidation Plan, if the Debtors pursue objections to the Parent's claims against the estate, the amounts in dispute will be tied-up in the Disputed Claims Reserve until the conclusion of such objections and any further appeals.  Moreover, unlike the Parent's Full Payment Plan, distributions under the Debtors' Liquidation Plan to other creditors will be directly reduced in proportion to the amount of the Parent's claims that are ultimately allowed.

140.    The Parent's Full Payment Plan will result in a greater benefit the Debtors' creditors than if the estates were liquidated under chapter 7.  If liquidated under chapter 7, the value of the Estates would diminish substantially due to, among other things:  (a) the increased costs and expenses of liquidation under chapter 7 arising from fees payable to the chapter 7 trustee and attorneys and other professional advisors to such trustee; (b) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation; (c) further erosion of the value of the Debtors' assets in the context of an expedited liquidation required under chapter 7; and (d) cost and expense attributable to the time value of

---

[264]    (Second Supp. Poulin Proffer at ¶ 8.)

[265]    (*Id.* at ¶ 12.)

money resulting from what is likely to be a more protracted proceeding.  By comparison, the Parent's Full Payment Plan provides that creditors in all Classes other than Class 4 will receive payment in full, in cash, with post-petition interest.[266]  No greater recovery is possible in chapter 7, so the best interests test is satisfied as to creditors in such Classes.[267]  As to holders of Claims in Class 4, such holders are receiving the benefit of the bargain negotiated between the Parent and the Asbestos Representatives, and that treatment results in demonstrably greater recovery that that provided under the Debtors' Liquidation Plan, let alone in a liquidation.  Consequently, the Parent believes that confirmation of the Parent's Full Payment Plan will provide each holder of a Claim in an Impaired Class with a greater recovery than such holder would have received under a chapter 7 liquidation of the Debtors.

141.     The Debtors assert that "[t]he Debtors' Plan provides the best overall value to creditors with the least amount of risk," stating that the assumption of liabilities for disputed claims will ensure that "all allowed claims will be paid in full with postpetition interest at closing without any risk of dilution."[268]   The Debtors further state that, "[u]nder the Parent's Plan, however, creditors would have to look to future income from Reorganized ASARCO for any recovery in excess of the consideration distributed on the effective date."[269]  The Court rejects the Debtors' arguments with respect to the value distributed and risk of less than full payment under the Parent's Full Payment Plan because the Parent's Full Payment Plan actually results in a higher probability of payment in full, including Post-Petition Interest, of all claims, unimpairs claims in all Classes other than Class 4, which consents to its treatment, all with greater

---

[266]          (*Id.* at ¶ 8.)

[267]          (Second Supp. Poulin Proffer at ¶ 8.)

[268]          (Debtors' Supp. Confirmation Brief at 7-8.)

[269]          (Debtors' Supp. Confirmation Brief at 8.)

demonstrated assurance of payment, whereas the Debtors' Liquidation Plan impairs creditors and bears higher risk of not achieving payment in full, including interest, generally, and specifically for Classes 4, 6 and 7.

142.    In summary, the Parent's Full Payment Plan is the best available option for both creditors and equity in the Debtors' estates.  The Debtors' Liquidation Plan is not the best available option for the Estate and its stakeholders because it fails to provide the highest and best recovery to the various constituencies as it provides a lower immediate recovery than the Parent's Full Payment Plan, a higher portion of the recovery than the Parent's Full Payment Plan is uncertain, and it is not feasible.  Moreover, the Debtors' Liquidation Plan does not adequately protect the interests of equity and instead prefers a third party that holds no interest in the estate to the interests of the equity holder.

## V.    <u>LABOR ISSUES</u>

143.    The United Steel Workers (the "<u>USW</u>") and other unions (together with the USW, the "<u>Unions</u>") object to the confirmation of the Parent's Full Payment Plan raising two principle arguments: (1) the Parent's Full Payment Plan may not be confirmed because the Parent has not secured a new collective bargaining agreement (a "<u>New CBA</u>") with the Unions; and (2) if the Parent's Full Payment Plan is confirmed, the Unions have threatened possibly to strike, which they believe will undermine the feasibility of the Parent's Full Payment Plan.[270]

144.    The Parent disagrees, and argues that the Parent's Full Payment Plan can and should be confirmed whether or not the Parent has secured a New CBA with the Unions.  The Parent further believes that the Unions will not be permitted to strike based on the no-strike

---

[270]    (*See, e.g.*, Docket No. 1261 at 15-16 (Debtors' argument that the lack of New CBA renders Parent's Full Payment Plan less feasible than Debtors' Plan); Docket No. 1214 (same – Environmental Agencies); Docket No. 12612 (Committee admitting that Parent's Full Payment Plan is confirmable but noting that the possibility of a strike renders the Debtors' Plan more feasible).)

clause in the post-petition collective bargaining agreement (the "Existing CBA") between ASARCO and the Unions.[271]   The Parent has also presented evidence that even in the event of a strike, the feasibility of the Parent's Full Payment Plan is not undermined.

### A.   Facts Relevant to the Collective Bargaining Agreement and the Special Successorship Clause

#### 1.   The Terms of the CBA and the Special Successorship Clause.

145.   On January 22, 2007, the Debtors filed a Motion seeking the Court's approval the Existing CBA between ASARCO and the Unions.[272]   Attached to the CBA was a Letter of Understanding dated January 18, 2007 (the "LOU"), which contains a Special Successorship Clause (the "SSC").[273]   The LOU was executed by Joseph Lapinsky (current President and CEO of ASARCO) and Terry Bonds on behalf of the USW, and is incorporated by reference into the CBA.[274]

146.   The SSC provides that the "*the Company* . . . will not consummate any transaction resulting in Change of Control of the Company" (which includes a plan of reorganization) unless the buyer first recognizes the Unions and enters into a new CBA covering the terms and conditions of employment post-confirmation (a "New CBA").[275]

147.   The Existing CBA defines "the Company" to include "any current or future Affiliate" of ASARCO; the term "Affiliate" in turn includes "any business enterprise that Controls, is under the Control of, or is under common Control with ASARCO," and "control" is defined to include possession, directly or indirectly, of 50% of the equity of the enterprise.[276]

---

[271]   (Docket No. 3617 (the "Labor Motion") and Exhibit A thereto (the Existing CBA).)

[272]   (*Id.*)

[273]   (Docket No. 3617, Ex. A at 2.)

[274]   (LOU at 1.)

[275]   (LOU at ¶¶ 2(a), 2(e) (emphasis added).)

[276]   (CBA at Art. 1, § A(3).)

Therefore, the CBA purports to include the ASARCO's upstream affiliates, including the Parent, in the definition of "the Company."  The LOU at ¶ 4 defines "the Company" the same way, as well as stating that "the Company" means "ASARCO LLC."[277]  The Unions and the Debtors, however, have taken the position that the term "Company" means only the Debtor – and does not include the Parent – for the purposes of the LOU.[278]

148.    The Special Successorship Clause was added specifically in an attempt to preclude the Parent from reacquiring control over the company.[279]

149.    In the SSC, the Unions agreed to negotiate with all prospective buyers in good faith, and promised to offer each potential buyer fair and reasonable terms that are "substantially the same" as the terms that it has offered to other buyers.[280]  The Unions may offer "non-identical terms and conditions" to buyers only to the extent those terms "reflect differences in the nature of the prospective Buyer," such as financial buyers as compared to strategic buyers.[281]  Although the LOU requires the buyer to negotiate a New CBA with the Unions in good faith, it

---

[277]    (LOU at 1 and ¶ 4.)

[278]    (*See* Debtors' Objection to ASARCO Incorporated and Americas Mining Corporation's Modified Sixth Amended Plan of Reorganization for the Debtors Under Chapter 11 of the Bankruptcy Code (the "Debtor's Objection," Docket No. 12293) at 9-10 (arguing that the Parent lacks standing to seek to terminate the SSC because only the Company (*i.e.*, the Debtor) or the Unions may bring a motion to challenge it); (1) Objection of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial Union AFL-CIO to Confirmation of ASARCO Incorporated and Americas Mining Corporation's Modified Sixth Amended Plan of Reorganization for the Debtors Under Chapter 11 of the Bankruptcy Code (Related Docket Nos. 11886, 12193) (the "Unions' Objection," Docket No. 12517) at ¶ 34 (arguing that only a motion by the Company – meaning the Debtor – may raise an argument that the Unions did not negotiate in good faith); Memorandum of Law in Support of the Unions' Objection (the "Unions' Objection Memorandum," Docket No. 12619) at 11-12 (same).)

[279]    (*See* Exs. 63 at 4, 78, 79 and 423; Supp. Lazalde Proffer at ¶ 24; Confirmation Hr'g Tr. 8/12/09 at 122-130 (Armenta Test).)

[280]    (LOU at ¶ 2(b); *see also* Supp. Lazalde Proffer at ¶ 19.)

[281]    (LOU at ¶ 2(b); *see also* Supp. Lazalde Proffer at ¶ 19.)

does not impose a requirement on a buyer that it offer the substantially the same terms to the Unions as those offered by another buyer.[282]

150.     At the hearing on the Labor Motion, the Parent expressed its concern that the Unions and the Debtor would later rely on the SSC in an attempt to block a Parent-sponsored plan of reorganization.[283]   The Parent did not, however, concede that the CBA would have the legal effect that the Unions now assert.  Rather, the Parent urged that *if* the Court approved the CBA, the SSC was an illegal provision that could not, as a matter of law, bind the Parent.[284]

151.     As it considered the question of whether to approve the CBA, the Court expressed reservations about the Unions' and the Debtors' ability to bind the Parent against its will, and force it to secure a New CBA with the Unions before it could confirm a plan.[285]   In response to these concerns, counsel for the Debtors and the Unions reassured this Court that the CBA and the SSC do not bind the Parent prior to confirmation. Debtors' counsel informed the Bankruptcy Court, "one of the first principals of this agreement . . . and of the Debtors' decision to enter into it, [is] that we can't bind Grupo."[286]

152.     The Court specifically asked Mr. Kinzie, "assuming there's equity, do I have to decide today whether you can propose a plan where Grupo is forced to either take this agreement or give up its ownership?"  Mr. Kinzie responded, "Absolutely, I think you do not have to decide that today."[287]

---

[282]     (LOU at ¶ 2(b).)

[283]     (*See* Hr'g Tr. 3/7/09 (the "CBA Hr'g").)

[284]     (CBA Hr'g at 107-108, 113 (arguing that to the extent the CBA purported to bind the Parent without its consent, it is illegal).)

[285]     (*See* CBA Hr'g at 127 (Comments of the Court) ("I do have a problem with altering the rights of . . . interest holders of this case, prior to confirmation."); *see also id.* at 9-11, 64-65, 125-26.)

[286]     (CBA Hr'g at 11 (remarks of Mr. Kinzie).)

[287]     (*Id.* at 41-42.)

153.     To address the Court's concerns the Debtor and the Unions agreed to and filed a stipulation concerning the SSC language contained in the LOU.[288]   The Second Stipulation states as follows:

> [N]otwithstanding anything to the contrary in the CBA, prior stipulations or any other agreements between the Parties: (I) Prior to the effective date of any plan of reorganization of or for the Debtor, and provided that the Parent does not exercise control of the Debtor, the Parent (a) is not a signatory to the CBA, (b) is not a party to the CBA and (c) is not bound by any of the terms of the CBA regardless of its status as a direct or indirect owner of the equity in the Debtor.[289]

This language in the Second Stipulation had the effect of altering the LOU's definition of "the Company," which under the original CBA definition would have included the Parent,[290] and confirmed that the CBA (with its successorship clause) does not bind the Parent unless and until its plan is confirmed.

154.     The Second Stipulation further states that "the court may order that the Special Successorship Clause . . . does not apply" if: (1) exigent circumstances exist; (2) the Unions fail to negotiate in good faith; (3) the Unions fail to offer either identical or "substantially the same" terms to the Parent as the Sterlite CBA; or (4) 11 U.S.C. § 1129 would be violated.[291] The Court signed the Second Stipulation on March 15, 2007.[292]

155.     Following the execution of the Second Stipulation, the Bankruptcy Court entered an order approving the CBA.[293]   The CBA Order states that the "special successorship

---

[288]     (*See* The Second Stipulation and Order Regarding Modification to Collective Bargaining Agreement (the "Second Stipulation," Docket 4177).)

[289]     (*See* Second Stipulation at C(I).)

[290]     (CBA at Art. 1, § A(3).)

[291]     (*See* Second Stipulation at C(II) (incorporating by reference the LOU at ¶ 2(b)) and C(III).)   The Court finds that the conditions of (1) and (4) have been met.   Payment of creditors in full through the Parent's Full Payment Plan is an exigent circumstance in the context of this case.   *See also supra* discussion of 11 U.S.C. 1129.

[292]     (Docket No. 4177.)

[293]     (Docket 4179, the "CBA Order.")

provision of the CBA provides that *the Debtors* will not consummate" a transaction with a buyer that has not secured a New CBA with the Unions.[294]  It further confirms, based on the Second Stipulation, that "before any plan of reorganization of or for the Debtors, the Parent is not a signatory or a party to the CBA and is not bound by any of the terms of the CBA."[295]  The CBA Order further states that "*if*" ASARCO Incorporated retains the equity of the reorganized ASARCO, the provisions will then "apply" to ASARCO Incorporated.[296]  In other words, while the CBA will apply to the Parent (through Reorganized ASARCO) *after* confirmation, under the plain terms of the LOU, the Second Stipulation and the CBA Order, the Special Successorship Clause does not bind the Parent *before* confirmation.  Rather, confirmation is a precondition to the requirement that the Parent comply with the CBA and its successorship provision.

156.     With regard to the SSC, the Court stated that "[w]hoever is to own or control the reorganized ASARCO . . . *may* negotiate a new labor agreement with the [Unions] as part of the confirmation process."[297]  The CBA Order does not state that the CBA or the SSC *require* the Parent to secure a new CBA as a condition precedent to submitting its own plan of reorganization.[298]  It also does not state that the SSC precludes confirmation of the Parent's Full Payment Plan if the Parent fails to secure a new CBA with the Unions, or that the Parent is required to negotiate a new CBA before its plan is confirmable.[299]

157.     The Parent did not participate in the negotiation or drafting of the CBA, the LOU, the SSC or the Second Stipulation, nor did the Unions or the Debtor invite the Parent to

---

[294]     (CBA Order at ¶ 14 (emphasis added).)

[295]     (CBA Order at ¶ 14; *see also* Second Stipulation (Docket No. 4147) at ¶ C(I).)

[296]     (CBA Order at ¶ 14 n.1 (emphasis added).)

[297]     (CBA Order at ¶ 16 (emphasis added).)

[298]     (*See generally* CBA Order.)

[299]     (*See generally* CBA Order.)

participate in their negotiation or drafting, or to comment on their terms before they were executed by ASARCO and the Unions.[300]

158.    The Parent appealed the CBA Order to the District Court (Head, C.J.).[301]  At the hearing at the District Court, the Debtors assured Judge Head that the SSC was not binding on the Parent prior to confirmation: "I was intimately involved in drafting this, [and] in my view is that the debtor and the union can't impose liability on a third party as a matter of law . . . .  I know of no principle of law that two parties can sit down and through their agreement impose liability on a third party that neither of them controls."[302]

159.    In the appeal to the District Court, the Debtors and the Unions (but not the Parent) agreed to an additional stipulation (the "Third Stipulation")[303] (together with the Second Stipulation, the "Stipulations").)    The Third Stipulation purported to revise the Second Stipulation, ¶ C(I) as follows:

> [N]otwithstanding anything to the contrary in the CBA, prior stipulations or any other agreements between the Parties: (I) the Parent (a) is not a signatory to the CBA, (b) is not a party to the CBA and (c) is not bound by any of the terms of the CBA regardless of its status as a direct or indirect owner of the equity in the Debtor, *except as provided in the Special Successorship Clause as modified by this Stipulation or under applicable labor law*.[304]

160.    While the Third Stipulation was filed by the Debtors and the Unions with the District Court, it was never signed by Judge Head.[305]  The District Court subsequently denied the

---

[300]    (Supp. Lazalde Proffer at ¶ 18.)

[301]    Civil Action No. CA-C-07-133, in the United States District Court for the Southern District of Texas, Corpus Christi Division.

[302]    (*See* Hr'g Tr. 5/30/07, No. Civ. CC-07-133 (Docket No. 18) at 106 (statement of Mr. Kinzie; *see also* CBA Hr'g at 13 ("[T]he parent is not a party to the agreement during the bankruptcy period.") (statement of Mr. Seltzer).)

[303]    (Civil Action No. CA-C-07-133, Docket No. 22.)

[304]    (Third Stipulation at ¶ D (emphasis added).)

[305]     (*Id.*)

Parent's appeal and affirmed the CBA Order.[306]   The Parent perfected an appeal to the Fifth Circuit, but voluntarily dismissed the appeal.

161.    On August 25, 2009 the Parent filed a motion seeking a declaration that the Special Successorship Clause does not apply to the Parent.[307]

### 2.    The Parent has negotiated with the Unions for a New CBA in good faith.

162.    The Parent negotiated with the Unions concerning a New CBA with these definitions in mind, and therefore believed that the Parent was not required to accept terms that are substantially different from the terms of the Sterlite CBA.[308]

163.    The Existing CBA is one of the best in the copper mining industry – which is largely non-union – in terms of the protections and benefits it gives employees.[309]   The Parent has repeatedly conveyed its intent to remain bound by the Existing CBA after confirmation.[310] The Existing CBA will remain in effect following confirmation, and will expire on June 30, 2010.[311]  In addition, the Parent has agreed to extend the Existing CBA until June 30, 2011, in order to allow the Parent and the Unions sufficient time to negotiate the terms of a New CBA.[312]

---

[306]    *Asarco Inc. v. Asarco LLC*, NO. CIV CC-07-133, 2008 WL 4609997 (S.D. Tex. Oct. 14, 2008).

[307]    (ASARCO Incorporated and Americas Mining Corporation's Motion for Declaration that Special Successorship Clause Does Not Apply to Parent (Docket No. 12647 ).)

[308]    (Supp. Lazalde Proffer at ¶ 19; Confirmation Hr'g Tr. 8/12/2009 at 150 (Armenta Test.).)

[309]    (Supp. Lazalde Proffer at ¶ 16; Confirmation Hr'g Tr. 8/12/2009 at 174 (Armenta Test.) (Question: "I mean, it's probably the best labor agreement in the copper industry ever; isn't that correct? Answer:  I would think so, in my career in copper."); *see also* Confirmation Hr'g Tr. 8/13/2009 at 24 (LaVenture Test.) (noting that most of the mining industry is non-union).)

[310]    (Supp. Lazalde Proffer at ¶ 40; Confirmation Hr'g Tr. 8/25/2009.)

[311]    (Supp. Lazalde Proffer at ¶ 17.)

[312]    (*See* Confirmation Hr'g Tr. 8/25/09 (statement of Mr. Brimmage).)

164.     Having a New CBA in place with the Unions is not a requirement for confirmation of the Parent's Full Payment Plan.[313]   However, the Parent had a number of incentives to negotiate with the Unions to secure a New CBA.[314]   First, the Debtors and the Unions take the position that the Parent's Full Payment Plan cannot be confirmed without a New CBA in place.[315]   In addition, having the support of the Unions would possibly make it easier for the Parent to garner the support of certain creditor constituencies that had not previously supported the Parent's Full Payment Plan.[316]   The Parent's Full Payment Plan is also making a substantial investment in the business, and the Parent accordingly desires to have a productive relationship with employees so the company can remain profitable.[317]   These are strong motivations for the Parent to secure a New CBA with the Unions.[318]

165.     Consistent with these incentives, the Parent met and bargained with the Unions on numerous occasions in 2008 and 2009, in an effort to reach an agreement on terms of a New CBA that would take effect upon the expiration of the Existing CBA in 2010.[319]   As part of a New CBA, the Parent has agreed to accept and assume virtually all of the provisions of the Existing CBA, including all of the economic provisions, such as wages, copper bonuses, and benefits.[320]   On June 25, 2009, the Parent submitted a proposal to the Unions that in summary provided that (a) all employees of ASARCO would be retained; (b) almost all of the provisions

---

[313]     The Parent's Full Payment Plan specifically provides that "it is not a condition to Confirmation of the Parent's Full Payment Plan nor to Consummation of the Parent's Plan that the Parent and Reorganized ASARCO have entered into a CBA for the period following the Effective Date."  (*See* Parent's Full Payment Plan at § 9.7; *see also* Ruiz Proffer at ¶ 14; Supp. Lalzalde Proffer at ¶ 19.)

[314]     (Supp. Lalzalde Proffer at ¶ 21.)

[315]     (*Id.*)

[316]     (*Id.*)

[317]     (*Id.*)

[318]     (*Id.*)

[319]     (Lalzalde Proffer at ¶¶ 31-32; Supp. Lalzalde Proffer at ¶ 17.)

[320]     (Supp. Lalzalde Proffer at ¶ 22.)

of the existing CBA would be accepted (nine of the twelve articles); (c) a proposal to amend some of the language in six of the articles of the existing CBA and (d) third party mediation to facilitate the negotiation of a successor agreement.[321]   In its July 15, 2009 counterproposal, the USW rejected all of the Parent's proposals except some minor terms.[322]

166.     At meetings in Phoenix, Arizona on July 16 and 17, 2009 the Parent made a counterproposal to some of the Unions' proposals.[323]   In response on July 21, 2009, the Unions rejected each of the Parent's counterproposals.[324]   On July 24 the Parent presented another counterproposal to the Unions.[325]   The same day, the USW presented its counterproposal rejecting almost everything proposed by the Parent.[326]   These negotiations ended just as these Confirmation Hearings were set to begin.   Ultimately, the Parent's efforts to secure a New CBA with the Unions prior to confirmation were unsuccessful.

167.     The Parent has responded to the Unions' information requests and has provided information to the Unions concerning the details of the Parent's Full Payment Plan.[327]

168.     The Court finds that the Parent has negotiated with the Unions in good faith.[328] If the Parent's Full Payment Plan is confirmed, the Chairman of the Board of ASARCO and the Parent believe that the Unions and the Parent will reach an agreement on a new CBA because it will be in both of their bests interests to do so.[329]

---

[321]     (Lazalde Proffer at ¶ 33.)

[322]     (*Id.* at ¶ 34.)

[323]     (Lazalde Proffer at ¶ 35; Proffer of Manuel Armenta in Support of USW Objection to Confirmation of Parent Plan of Reorganization (Docket No. 12375, "Armenta Proffer") at ¶ 23.)

[324]     (Lazalde Proffer at ¶ 35.)

[325]     (*Id.* at ¶ 36; Armenta Proffer ¶ 23.)

[326]     (Lazalde Proffer ¶ 36.)

[327]     (Supp. Lazalde Proffer ¶ 22.)

[328]     (*Id.* at ¶ 21-23.)

[329]     (Ruiz Proffer at ¶ 14; Supp. Lazalde Proffer at ¶ 17.)

### 3. The Unions have not negotiated with the Parent for a New CBA in good faith, and have not complied with the requirement that they offer substantially the same terms to the Parent as offered to Sterlite.

169.     The Unions have agreed with Sterlite on terms for a new CBA (the "Sterlite CBA").[330]

170.     The evidence suggests that the Unions have used the Special Successorship Clause to prevent a Parent-sponsored plan from being confirmed by pursuing a "Grupo No Más" strategy.[331]  For example, the Unions' witness admitted that this Special Successorship Clause was added specifically in an attempt to preclude the Parent from reacquiring control over the company in these confirmation hearings.[332]

171.     The Unions have frequently and publicly stated their opposition to the Parent's plan of reorganization, and their view that the Parent regaining control over ASARCO would be detrimental to the workers and communities.[333]  In light of the fact that the Unions already have a new CBA in place with Sterlite, the Unions' only motivation has been to avoid reaching a CBA so that a Parent-sponsored plan would not be confirmed.[334]  The Parent believes that the Unions would not be willing to reach an agreement with the Parent on a New CBA before confirmation under any circumstances.[335]

172.     There is little material consequence for the Unions if the Parent's Full Payment Plan is confirmed without a New CBA in place.  The Unions are currently operating under the

---

[330]     (Exhibit No. D184, the "Sterlite CBA"); *see also* Supp. Lazalde Proffer at ¶ 19.)

[331]     (*See, e.g.*, Supp. Lazalde Proffer at ¶¶ 23-24; Exhibit 423 ("Grupo No Más" flyer).)

[332]     (*See* Exs. 63 at 4, 78, 79 and 423; Supp. Lazalde Proffer at ¶ 24; Confirmation Hr'g Tr. 8/12/09 at 122-130 (Armenta Test.).)

[333]     (Supp. Lazalde Proffer at ¶ 23; Confirmation Hr'g Tr. 8/12/2009 at 123-24 (Armenta Test.); *see also* Ex. 79.)

[334]     (Supp. Lazalde Proffer at ¶ 23.)

[335]     (*Id.*.)

Existing CBA with the Debtors, which the Unions and the Parent agree is one of the best in the copper mining industry, particularly in terms of the economic benefits it provides to employees.[336]  If the Parent's Full Payment Plan is confirmed, the ASARCO employees will still be operating under the Existing CBA until June 30, 2010 or 2011.[337]   Even if a New CBA is not agreed to by that time, as discussed *infra* in the conclusions of law, virtually all of the terms of the Existing CBA (specifically including wages and benefits) will continue in effect pursuant to the NRLA, at least until the terms for a New CBA are reached.[338]  In short, unlike the creditors, the Unions are not motivated by recovery on their claims, but by their admitted intention to prevent the Parent from regaining control over ASARCO.  In light of these facts, the Unions have little or no incentive to negotiate in good faith with the Parent.

173.     The Unions entered into a new CBA with Sterlite that will go into effect if the Debtors' Liquidation Plan is confirmed.[339]  The Sterlite CBA was executed on or about June 16, 2008.[340]   The Unions conducted minimal due diligence on Sterlite or its parent company, Vedanta, before agreeing to the Sterlite CBA terms,[341] and have not made the same demands of Sterlite for information as they have from the Parent.[342]

---

[336]     (*See* Confirmation Hr'g Tr. 8/12/2009 at 174 (Armenta Test.) (Question: "I mean, it's probably the best labor agreement in the copper industry ever; isn't that correct? Answer:  I would think so, in my career in copper."); *see also* Confirmation Hr'g Tr. 8/13/2009 at 24 (LaVenture Test.) (noting that most of the mining industry is non-union).)

[337]     The Parent has unilaterally offered to extend this deadline to June 30, 2011 (Confirmation Hr'g Tr. 8/25/2009.)

[338]     *See United Paperworkers Int'l Union, AFL-CIO, Local 274 v. Champion Int'l Corp.*, 81 F.3d 798, 801-02 (8th Cir. 1996)

[339]     (Exhibit 64.)

[340]     (*Id.*)

[341]     (Lazalde Proffer at ¶ 40).  As Mr. Krishnan testified, the Unions did not even inquire into Sterlite's history with regard to labor strikes.  (Confirmation Hr'g Tr. 8/11/2009 at 53 (Krishnan Test.) (noting that Sterlite has dealt with labor strikes in the past); *see also* Confirmation Hr'g Tr. 8/12/2009 at 243-55 (Potok Test.).)

[342]     (Lazalde Supp. Proffer at ¶ 22).

174.     The undisputed facts confirm that the Parent and Sterlite are very similar companies.[343]   The Parent and Sterlite are both wholly- and privately-owned mining companies that deal internationally in the same commodities markets.[344]   Both are owned by private parent companies that are based in foreign countries and controlled by a single family.[345]   Both are seeking to participate in the copper mining market in the United States, and both own a number of wholly-owned subsidiaries.[346]   Perhaps the only significant difference between Sterlite and the Parent is that Sterlite has made it clear that it could walk away from a binding contractual obligation, as it did when it abandoned its Original PSA to purchase ASARCO's operating assets for $2.6 billion in 2008.[347]   Based on these similarities, the "nature" of the companies is virtually identical, and the Unions have not established grounds for offering terms to the Parent that are "non-identical" to the terms of the Sterlite CBA.[348]

175.     Consistent with their lack of economic incentive to negotiate with the Parent for a New CBA, and their stated motivation to prevent the Parent's plan of reorganization from being confirmed, the Unions offered terms to the Parent that are not substantially the same as the terms of the Sterlite CBA.[349]   For example, the Unions offered to the Parent terms that are substantially different than the terms of the Sterlite CBA[350] in the areas of competitive status/ capital expenditures,[351] funded indebtedness,[352] retiree healthcare,[353] employment security,[354] and

---

[343]     (*Id.* at ¶ 20.)

[344]     (*Id.*)

[345]     (*Id.*)

[346]     (*Id.*)

[347]     (*Id.*)

[348]     (*Id.*)

[349]     (*Id.* at ¶ 25; Exhibit P424.)

[350]     (*See also generally* Exs. 69, 70, 424.)

[351]     (Supp. Lazalde Proffer at ¶ 26; Exhibit P424.) The Sterlite agreement requires the Company to make capital expenditures to merely maintain current competitive status and capacity, while the Unions demanded that the

additional security and assurance by upstream parties.[355]   In addition to these substantially different terms, the Unions told the Parent that there would be additional contract approval requirements; thus, even if the Unions and the Parent were able to reach a New CBA at the bargaining table, the Unions would submit the New CBA to the employees for ratification.[356]  In light of the Unions' enmity for the Parent,[357] requiring an employee ratification vote as a condition of final approval of any agreement with the Parent would virtually assure that the CBA would not be approved.[358]   The Sterlite CBA does not include a provision for employee ratification of the agreement, and it was not submitted to an employee ratification vote.[359]

---

Parent make capital expenditures necessary to both achieve and thereafter maintain "world class" standard or an "internationally competitive" status.  (*See* Ex. 243; Confirmation Hr'g Tr. 8/12/2009 at 262-64 (Potok Test.).)

[352]   (Supp. Lazalde Proffer at ¶ 27.)   The Unions agreed to a $1.125 billion debt limit for Sterlite, while demanding the Parent agree to a $350 - $700 million limit.  The upper limit of $700 million was an unlikely scenario because it depended on the Debtor's credit rating, and it would be emerging from bankruptcy.  (*See generally* Ex. 243; Confirmation Hr'g Tr. 8/12/2009 at 267-69 (Potok Test.).)

[353]   (Supp. Lazalde Proffer at ¶ 28.)  Sterlite is obligated to fund retiree healthcare through December 31, 2013.  In contrast, the Unions proposed that the Parent be required to fund retiree healthcare until December 31, 2019.  (*See generally* Ex. 243; Confirmation Hr'g Tr. 8/12/2009 at 275 (Potok Test.).)

[354]   (Supp. Lazalde Proffer at ¶¶ 29, 34.)   The Unions have no agreement with Sterlite with regard to employment security.  In contrast, the Unions proposed requiring the Parent guarantee that it will provide at least 40 hours of work each week to every bargaining unit employee and that it will maintain 90% of the existing employment levels through June 30, 2016.  (*See* Lazalde Proffer at ¶ 34.)

[355]   (Supp. Lazalde Proffer at ¶ 30.)  Under the Sterlite CBA, upstream parties would "ensure" that ASARCO complies with three provisions of the CBA, only two of which Vedanta ensures.  The Unions demanded additional "unconditional guarantees" from the Parent of the retiree benefits obligations and the employment security obligations.  (*See* Lazalde Proffer at ¶ 34.)  Further, the Unions are seeking all of these assurances and unconditional guarantees from Grupo México, as well as the Parent.  (Exhibit 70.)  The Unions also demanded that the Parent provide "adequate security" to guarantee the retiree health benefits and employment security obligations.  (*See generally* Ex. 243; Confirmation Hr'g Tr. 8/12/2009 at 264-67 (Potok Test.).)

[356]   (Supp. Lazalde Proffer at ¶ 31.)  Notably, the Unions' witness would neither confirm nor deny that an employee ratification vote would be a condition to final approval of a CBA with the Parent.  (*See* Confirmation Hr'g Tr. 8/13/2009 at 34-35 (LaVenture Test.).)

[357]   (*See, e.g.*, Confirmation Hr'g Tr. 8/12/2009 at 123-24 (Armenta Test.).)

[358]   (Supp. Lazalde Proffer at ¶ 31; Confirmation Hr'g Tr. 8/12/2009 at 123 (Armenta Test.).)

[359]   (Confirmation Hr'g Tr. 8/12/2009 at 160 (Armenta Test.).)

176.     The differences in the terms of the Sterlite CBA and the terms offered to the Parent do not appear to be connected to any difference between the companies, but instead seem based on the Unions' negative perception of the Parent.[360]

177.     The Sterlite CBA does not provide for Union membership on the ASARCO Board.[361]   Instead, Sterlite agreed to quarterly meetings between ASARCO's CEO and the Unions.[362]   In contrast, the Unions have demanded that the Parent agree to a position for the Unions on the ASARCO Board.[363]   The Parent responded with an offer to establish a special committee of the ASARCO Board that would meet with designated Union representatives both before and after each Board meeting and also to agree to the Sterlite quarterly meeting provision.[364]   Even though this was much more than Sterlite agreed to, the Unions rejected the Parent's counterproposal and again demanded Board membership.[365]   Further, a Board member's sole fiduciary duty is to the shareholder(s), not "interested parties."   This demand for Board membership is unreasonable in light of the fact that ASARCO LLC has a single shareholder – the Parent.

178.     The Unions also proposed the Parent agree to a six-year extension to be triggered by final offer arbitration, while the Sterlite CBA provides only for a three-year extension.[366]   A six-year extension would extend all of the obligations contained in the

---

[360]     (*See, e.g.*, Supp. Lazalde Proffer at ¶¶ 20, 23.)

[361]     (Supp. Lazalde l Proffer ¶ 32; *see also* Sterlite CBA; Confirmation Hr'g Tr. 8/12/2009 at 148-49 (Armenta Test.).)

[362]     (Supp. Lazalde Proffer ¶ 32; *see also* Sterlite CBA; Confirmation Hr'g Tr. 8/12/2009 at 149, 153 (Armenta Test.).)

[363]     (Supp. Lazalde Proffer ¶ 32; *see also* Exhibit P242; Armenta Proffer ¶ 31.)

[364]     (Exhibit P242; Confirmation Hr'g Tr. 8/12/2009 at 151-53 (Armenta Test.).)

[365]     (Exhibit P242; Confirmation Hr'g Tr. 8/12/2009 at 155 (Armenta Test.).)

[366]     (Supp. Lazalde Proffer at ¶¶ 33-34; Exhibit P242; Confirmation Hr'g Tr. 8/12/2009 at 150 (Armenta Test.).)

agreement – with the only changes being increased wages and pension benefits – including, most notably, the employment security and retiree healthcare obligations.[367]

179.    The Unions' successorship proposal also reflects substantial differences between the Sterlite CBA and the terms proposed to the Parent.[368]   A few weeks before the confirmation hearing was scheduled to begin, the Unions proposed broadening the CBA's successorship provision to apply not only to any "Change of Control" of ASARCO, but also to any Change of Control of "any direct or indirect holding company that controls ASARCO."[369] Thus, any entity seeking to gain control (*i.e.*, ownership) of Grupo, AMC, or ASARCO Incorporated would first have to recognize and secure a new agreement with the Unions, or, in the event that the Unions bargained in bad faith, the entity would have to "assume and become a party to the existing Agreement."[370]   This request – giving the employees of a subsidiary, who harbor vocal ill will toward the Parent, veto power over restructuring decisions at the parent level – would be "an unprecedented amount of power to confer on the USW," and is clearly intended to give the Unions leverage to block the Parent's plan of reorganization.[371]   The Unions did not make a similar demand of Sterlite, and the Sterlite agreement does not contain any provision pertaining to changes of control of the direct and indirect owners of ASARCO, such as Vedanta, Sterlite India, and Sterlite USA.[372]

---

[367]      (Supp. Lazalde Proffer at ¶ 29.)

[368]      (Exhibit P242.)

[369]      (Exhibit 70; Supp. Lazalde Proffer at ¶ 33; Lazalde Proffer at ¶ 43; Confirmation Hr'g Tr. 8/12/2009 at 166 (Armenta Test.).)

[370]      (Supp. Lazalde Proffer at ¶ 33; Lazalde Proffer at ¶ 43; Confirmation Hr'g Tr. 8/12/2009 at 166 (Armenta Test.).)

[371]      (Lazalde Proffer at ¶ 44.)

[372]      (Supp. Lazalde Proffer at ¶ 33; *see also* Sterlite CBA; Exhibit P242.)

180.     Due to the volatility of copper prices, potential technological, labor and product market changes, all of which can dramatically impact a mining company's operations, any reasonable business would be reluctant to agree to the long-term lock-in of the CBA terms proposed by the Unions.[373]   The Parent feared that the additional terms the Unions demanded would set the Company up for failure in the future if copper prices decline and stay depressed for any extended period of time – "It simply would not be good business practice to place such long term economic burdens on the reorganized company."[374]

181.     The demands the Unions made of the Parent in negotiations for a New CBA were unreasonable, potentially economically unfeasible, and represent a substantial difference between the terms offered to Sterlite and to the Parent.[375]   In addition to the fact that the terms offered to the Parent were substantially different from the terms of the Sterlite CBA, the Parent viewed the Unions' conditions as predictably unacceptable and designed to ensure that the Parent and the Unions did not reach a New CBA prior to Confirmation.[376]

182.     For example, the Unions repeatedly re-submitted the same terms without negotiating the Parent's counter-proposals, making it clear to the Parent that negotiations would be futile.[377]   When the Parent met with the Unions in Dallas, Texas on May 23, 2008, the Unions rejected all of the Parent's proposed terms without negotiation, and instead demanded that the Parent agree to all of the terms that the Unions had previously proposed.[378]   At that same

---

[373]     (Mack Rebuttal Proffer at ¶ 7; Supp. Lazalde Proffer at ¶ 29; Lazalde Proffer at ¶ 34 (noting that the Unions had not conducted a feasibility analysis to determine whether such a proposal could be sustained during times of declining copper prices); *see also* Ex. 243; Confirmation Hr'g Tr. 8/12/2009 at 256-77 (Potok Test.).)

[374]     (Lazalde Proffer at ¶ 38; *see also* Supp. Lazalde Proffer at ¶ 35.)

[375]     (Supp. Lazalde Proffer at ¶ 35.)

[376]     (Supp. Lazalde Proffer at ¶¶ 24-36.)

[377]     (Supp. Lazalde Proffer at ¶ 36.)

[378]     (Exhibit 681 (May 22, 2008 letter setting forth Parent's proposals, a review of which shows an attempt to meet the Union halfway, which the Unions rejected *en toto*); Supp. Lazalde Proffer at ¶ 36.)

meeting, although the Unions had previously agreed to withdraw their proposal for Union membership on the Board, the Unions reasserted their demand for Board membership and indicated that they expected a seat on the board of directors of Grupo México – a plainly unreasonable demand.[379]  In the 2009 negotiations, the Unions rejected almost every proposal the Parent made and selectively accepted only a few minor terms from the Parent's proposals, without agreeing to any concessions in return.[380]

183.    In light of these facts, it is doubtful that the Unions would ever be willing to reach an agreement with the Parent under any circumstances.[381]  Thus, the Court finds that the Unions have failed to negotiate in good faith – and instead have negotiated with the intent that no CBA can be secured by the Parent, in the hopes that they will prevent the confirmation of the Parent's plan of reorganization.[382]

### 4.    The risk of a Union strike is overstated, and does not undermine the feasibility of the Parent's Full Payment Plan.

184.    The Debtors and the Unions assert as grounds for rejecting the Parent's Full Payment Plan that the ASARCO employees may strike if the Parent's Full Payment Plan is confirmed.[383]

185.    The Chairman of the ASARCO Board, Ruiz, testified that "[c]oncerns about a strike if the Parent's plan is confirmed in the absence of a deal with the labor union are

---

[379]    (Supp. Lazalde Proffer at ¶ 36.)

[380]    (Supp. Lazalde Proffer at ¶ 36.)

[381]    (*See* Lazalde Proffer at ¶ 41 (noting the Unions' "hostile attitude" toward the Parent); Supp. Lazalde Proffer at ¶¶ 23, 35-36; *see also* Confirmation Hr'g Tr. 8/13/09 at 39-40 (LaVenture Test.).)

[382]    (Supp. Lazalde Proffer at ¶ 23.)

[383]    (*See* Unions' Objection at ¶¶ 71-72; *see also* Confirmation Hr'g Tr. 8/12/2009 at 93 (Armenta Test.); Confirmation Hr'g Tr. 8/13/2009 at 19 (LaVenture Test.).)

unfounded."[384]  His testimony is particularly credible because he helped resolve the 2005 strike, and has been with ASARCO since that time.[385]

186.     The Unions' own witnesses acknowledged that the Unions routinely secures a strike authorization as a "pre-negotiation" bargaining tactic, and that in many cases where strike authorization has been obtained, strikes never occur.[386]  For example, when the Unions have been highly critical of an employer, as evidenced by its views of Rio Tinto (a company with a supposed history of labor and environmental abuses) and whom it describes in the same terms as the Parent, it has not struck in the face of very difficult negotiations even though armed with a strike vote.[387]

187.     The Unions cite to the 2005 ASARCO strike as evidence that they will strike despite the associated hardships.[388]  But the circumstances in 2009 are materially different.[389]  In 2005, about half of the workers had been operating under an expired CBA for approximately two years, and they were facing cuts in wages and benefits.[390]  In contrast, here the Parent has not proposed to cut wages or benefits.[391]  ASARCO employees are all covered under a CBA that is still in effect and which provides substantial benefits to employees.[392]  Therefore, the fact of the strike in 2005 does not necessarily support a finding that the Unions would strike in 2009.

---

[384]     (Ruiz Proffer at ¶ 15; *see also* Supp. Lazalde Proffer at ¶ 37 ("I agree with Mr. Ruiz.").)

[385]     (Confirmation Hr'g Tr. 8/19/09 at 78-81 (Ruiz Test.).)

[386]     (Confirmation Hr'g Tr. 8/11/2009 at 132 (Mack Test.) (acknowledging that it is possible that a strike will not occur); Confirmation Hr'g Tr. 8/12/2009 at 100, 181 (Armenta Test.); Confirmation Hr'g Tr. 8/13/2009 at 26, 28, 31-35 (LaVenture Test.); *see also* Supp. Alberto de la Parra Proffer at ¶ 15; Supp. Lazalde Proffer at ¶ 39.)

[387]     (Exhibit 60 (reflecting Unions' antipathy for Rio Tinto, and yet no strike); Confirmation Hr'g Tr. 8/13/2009 at 28:20-23, 31:22-25, 32:1-7 (LaVenture Test.); Confirmation Hr'g Tr. 8/12/2009 at 100-01 (Armenta Test.).)

[388]     (Supp. Lazalde Proffer at ¶ 41.)

[389]     (*Id.*)

[390]     (*Id.*)

[391]     (*Id.*; Confirmation Hr'g Tr. 8/12/2009 at 168-171; 177 (Armenta Test.).)

[392]     (Supp. Lazalde Proffer at ¶ 41; Confirmation Hr'g Tr. 8/12/2009 at 168-171; 177 (Armenta Test.).)

188.    There are several legal and practical impediments to any strike.[393]  Legally, the Unions are barred from striking by the CBA's "no-strike" clause, and are further constrained from striking by the notice requirements of section 8(d) of the NRLA.[394]  Because the Court can reject the SSC while leaving the CBA intact, the Unions will not have the right to strike.[395]

189.    Practically speaking, the fact that a CBA is currently in place, and the parties have one to two years to negotiate a New CBA, supports a finding that a strike is unlikely. As Carlos Ruiz noted, the current CBA "with the union has not expired, leaving adequate time for negotiations" for a New CBA after confirmation.[396]  If the Parent's Full Payment Plan is consummated, the Parent and Union will have every incentive to work together before the CBA terminates in June, 2010.[397]

190.    Employees under the current CBA are not facing proposed wage and benefit reductions but, instead, are drawing some of the highest wages and benefits ever paid in the copper industry.[398]  A Union strike would force ASARCO employees to trade the industry leading wages and benefits they currently enjoy under the Existing CBA for minimal Union strike benefits.[399]  The economic impact on ASARCO employees (and their families and communities) therefore decreases the probability of a Union strike.[400]

---

[393]     (Supp. Lazalde Proffer at ¶ 37; Confirmation Hr'g 8/19/09 at 69:12-14.; 70:10-11 (Ruiz Test.).)

[394]     (Second Stipulation ¶ C.)

[395]     (CBA at Art. 5, § K ("There shall be no strikes, sympathy strikes, or other work stoppages or the interruption or impeding of work); *see also* Supp. Lazalde Proffer at ¶ 38.)

[396]     (Ruiz Proffer at ¶ 15; *see also* Supp. de la Parra Proffer at ¶ 16; Confirmation Hr'g Tr. 8/20/2009 at 232:2-20 (de la Parra Test.).)  The fact that the Parent has unilaterally offered to extend the CBA for one year, until June 30, 2011, further supports the finding that there will be ample time for the parties to pursue a New CBA after confirmation, and outside the context of adversarial litigation.

[397]     (Ruiz Proffer ¶¶ 13-14, Supp. de la Parra Proffer ¶ 16.)

[398]     (Supp. Lazalde Proffer at ¶ 40; *see also generally* Confirmation Hr'g Tr. 8/12/2009 at 100-101, 111-112 (Armenta Test.).)

[399]     Striking employees would no longer be entitled to the wages and benefits provided in the CBA (as well as unemployment benefits or food stamps).  (Confirmation Hr'g Tr. 8/12/2009 at 180 (Armenta Test.).)  In calling for a

191.     Striking employees would no longer be entitled to the wages and benefits provided for in the CBA.[401]    Nor would they be entitled to unemployment benefits or food stamps.[402]    In calling a strike, the Unions would be asking employees to turn their backs on the "substantial economic gains" contained in the CBA – all of which the Parent has offered to assume – including an upcoming $1/hour wage increase, copper price bonuses, comprehensive employer-paid health benefits, pension benefits, and 401(k).[403]    Striking employees would be forced to live off of whatever savings they have and strike benefits provided by the Unions, which currently average a $150 per employee per week, based on need, and which only start being paid after a 3 week waiting period.[404]    Striking employees would be subject to termination if the strike was illegal, or permanent replacement if the strike was lawful.[405]

192.     The Union has acknowledged that any strike would necessarily harm the communities in which the employees live.[406]    The harm that the employees (and their families and communities) would suffer during any strike also decreases the likelihood of a strike.[407]

193.     Both the likelihood and the impact of a strike would be minimized by economic realities in the communities surrounding ASARCO's facilities.[408]    As Union Representative

---

strike, the Union would be asking employees to turn their backs on the "substantial gains" contained in the CBA – all of which the Parent has offered to assume – including an upcoming wage increase, copper price bonuses, comprehensive employer-paid health benefits, pension benefits, and 401(k), in exchange for $150 per week in strike benefits and potentially permanent loss of their jobs.  (*See generally id.* at 168-78, 179-183.)

[400]     (*See generally id.* at 178-83.)

[401]     (Supp. Lazalde Proffer at ¶ 40; Confirmation Hr'g Tr. 8/12/2009 at 178 (Armenta Test.).)

[402]     (Supp. Lazalde Proffer at ¶ 40.); Confirmation Hr'g Tr. 8/12/2009 at 180 (Armenta Test.).)

[403]     (Exhibits 63, 65; Supp. Lazalde Proffer at ¶ 40; Confirmation Hr'g Tr. 8/12/2009 at 168-81 (Armenta Test.).)

[404]     (Supp. Lazalde Proffer at ¶ 40; Confirmation Hr'g Tr. 8/12/2009 at 180:18-25, 181:1-2 (Armenta Test.).)

[405]     (Supp. Lazalde Proffer at ¶ 40.)

[406]     (Confirmation Hr'g Tr. 8/12/2009 at 181:8-12 (Armenta Test.).)

[407]     (*See generally* Confirmation Hr'g Tr. 8/12/2009 at 178-83 (Armenta Test.).)  *See* 29 U.S.C. 158(d); *NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333 (1938); *Laidlaw*, 171 NLRB 1366 (1968), enfd. 414 F.2d 99 (7th Cir. 1969), *cert. denied* 397 U.S. 920 (1970).

Manuel Armenta admitted, a factor that the Union would take into account in calling a strike is unemployment and the availability of replacement workers.[409]   The Unions further admitted there are currently many unemployed workers in and around Arizona from which replacements could be sought, including many employees who have been laid off by competing (mostly non-union) mining operations.[410]   As of June 2009, the unemployment rate in Arizona was 8.7%, and mining employment was down nearly 20% from a year earlier.[411]   ASARCO's copper mining competitors in the area, most of which are nonunion, have recently laid off more than 2000 employees.[412]   Due to the recession and high unemployment rates, it is in the interest of all parties to negotiate in good faith and arrive at a consensual arrangement.

194.     Any reasonable cost-benefit analysis of a strike would include a consideration of whether there are available, experienced workers that the employer can hire in an effort to weather the strike.[413]   The fact, therefore, that there is a large pool of available, qualified miners in the area from which replacements can be hired should make a strike less likely in this case.

195.     Based on the practical impediments to a strike, in addition to the legal impediments discussed *infra*, and the economic consequences the Unions and the employees might suffer with any strike, it is not reasonable to assume that the Unions will actually strike.[414]

196.     The Parent presented evidence supporting a finding that, even if the Unions and employees do strike, the Parent is capable of withstanding, and is prepared to minimize, the

---

[408]     (Exhibits 75-77 (reflecting mining job losses); Supp. Lazalde Proffer at ¶ 42.)

[409]     (Confirmation Hr'g Tr. 8/12/2009 at 108-109 (Armenta Test.).)

[410]     (Exhibits 74-77; Confirmation Hr'g Tr. 8/12/2009 at 108-109 (Armenta Test.); *see also* Supp. Lazalde Proffer at ¶ 43.)

[411]     (Exhibit 77; Confirmation Hr'g Tr. 8/12/2009 at 108-09 (Armenta Test.).)

[412]     (Exhibits 74-77; Confirmation Hr'g Tr. 8/12/2009 at 106-07 (Armenta Test.).)

[413]     (Confirmation Hr'g Tr. 8/20/2009 at 122:5-14 (Poulin Test.); *see also generally* Confirmation Hr'g Tr. 8/12/2009 at 192 (Armenta Test.).)

[414]     (Supp. Lazalde Proffer at ¶¶ 37, 42.)

impact the operations of Reorganized ASARCO.[415] The Parent has begun to make strike preparations, both internal and external, regarding the operations and financial well-being of the company.[416]

197.    The Parent would secure workers who are already familiar with ASARCO's mines, facilities and Unions, and if necessary could reduce production at certain facilities.[417] The Parent has already contacted Andrews International, a labor strike and security management firm that specializes in assisting companies with labor disruption issues, including replacement workforce and security issues.[418]   Personnel at Andrews have personal experience with ASARCO's facilities and have assisted with ASARCO strikes in the past, and they are ready and available to assist ASARCO should there be a strike.[419]

198.    To ensure minimal disruption of ASARCO's operations, the company would also be able to draw from the available and experienced pool of mining workers in and around Arizona from which replacements could be sought, including many employees who have been laid off by competing (mostly non-union) mining operations.[420]  It is foreseeable, therefore, that the presence of a large pool of available, qualified miners who can be hired as replacement workers would mitigate the impact a Union strike would have on Reorganized ASARCO's operations and, because parties can anticipate such effects, would decrease the probability of a Union Strike altogether.

---

[415]    (Supp. Lazalde Proffer at ¶¶ 37, 42; Supp. Alberto de la Parra Proffer at ¶¶ 15-17; *see also generally* Confirmation Hr'g Tr. 8/20/2009 (Poulin Test.).)

[416]    (Supp. de la Parra Proffer at ¶ 15.)

[417]    (*Id.*)

[418]    (*Id.*)

[419]    (*Id.*)

[420]    (Confirmation Hr'g Tr. 8/12/2009 at 182-183 (Armenta Test.).)

199.    The Parent presented evidence that any challenges resulting from a strike could be addressed without undue strain on the company due to Reorganized ASARCO's reserve capital resources, *e.g.*, the $200 million dollar Working Capital Facility provided under the Parent's Full Payment Plan, the Sterlite Letter of Credit, and the additional cash that the Parent anticipates will remain even after the "high side" of creditor claims are satisfied.[421]  Additionally, the depressed labor market in the Arizona mining industry, as discussed above, would offer management low-cost solutions to temporary labor shortages.[422]

200.    The Court is also confident that Reorganized ASARCO would have sufficient resources to address reduced production.  For example, Reorganized ASARCO could draw on the $50 million in retained working capital, the $200 million Working Capital Facility, or the draw on the $50 million Sterlite Letter of Credit.[423]  Additionally, the claim estimates, even on the high end, suggest that Reorganized ASARCO will have plenty of cash even after paying all claims in full.[424]  The Parent has also contacted a strike management firm that is available to assist the Parent with labor disruption and security services in the event of a strike.[425]  Finally, CRG Partners has independently concluded that the confirmation and consummation of the Parent's Full Payment Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of Reorganized ASARCO.[426]

201.    In the event of a strike, the Parent is prepared to secure the services of a labor disruption management firm to assist with securing ASARCO facilities and temporary

---

[421]    (Confirmation Hr'g Tr. 8/20/2009 at 103-104 (Poulin Test.); Supp. Alberto de la Parra Proffer at ¶ 15.)

[422]    (Confirmation Hr'g Tr. 8/20/2009 at 104 (Poulin Test.).)

[423]    (Supp. de la Parra Proffer at ¶ 15.)

[424]    (*Id.*)

[425]    (*Id.*)

[426]    (Poulin Proffer at ¶ 4; Second Supp. Poulin Proffer at ¶¶ 12-31; *see also* Confirmation Hr'g Tr. 8/20/09 at 122-23 (Poulin Test.).)

workers.[427]   The Parent's ability to hire sufficient replacements to continue to operate the business is not remote or speculative.[428]   ASARCO could draw from the available and experienced pool of mining workers in and around Arizona from which replacements could be sought, including many employees who have been laid off by competing mining operations.[429]   It is foreseeable, therefore, that the presence of a large pool of available, qualified miners who can be hired as replacement workers would mitigate the impact a Union strike would have on Reorganized ASARCO's operations and, because parties can anticipate such effects, decrease the probability of a Union Strike altogether.

202.    A strike by ASARCO employees would certainly force management to implement plans and alter operations to meet Reorganized ASARCO's obligations.  But these challenges and changes could be addressed without undue strain on the company due to Reorganized ASARCO's reserve capital resources, *e.g.*, the $200 million dollar Working Capital Facility provided under the Parent's Full Payment Plan.[430]   Additionally, the depressed labor market in the Arizona mining industry, as discussed above, would offer management low-cost solutions to temporary labor shortages.[431]

203.    Finally, the Unions cite to the 2005 strike as evidence that a post-confirmation strike would undermine the feasibility of Reorganized ASARCO.  The Unions claims' that ASARCO's bankruptcy filing resulted from the 2005 strike is overstated.  It is clear that ASARCO was headed for bankruptcy long before the strike occurred.  The vast majority of ASARCO's current creditors are environmental and asbestos claimants.  The ASARCO

---

[427]    (Supp. Alberto de la Parra Proffer at ¶¶ 15-17.)

[428]    (Supp. Lazalde Proffer at ¶ 43; Confirmation Hr'g Tr. 8/20/09 at 122 (Poulin Test.).)

[429]    (Supp. Lazalde Proffer at ¶ 43.)

[430]    (Confirmation Hr'g Tr. 8/19/2009 at 103-104, 122-23 (Poulin Test.).)

[431]    (*Id*. at 104.)

bankruptcy was precipitated by these liabilities, not the strike.  *See, e.g.*, *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 315 (S.D. Tex. 2008) ("By the time ASARCO was looking seriously at bankruptcy in 2005, there were thousands of asbestos claims involving ASARCO or its subsidiaries and they were increasing on a daily basis.").

204.     The 2005 strike is described in the Disclosure Statement,

> Unionized workers, represented primarily by the USW, and certain other hourly paid employees representing nearly 1500 employees in total (about 70 percent of the workforce), went on strike beginning on July 2, 2005.  The plants affected by the strike were ASARCO's refinery in Amarillo, Texas, its smelter in Hayden, Arizona, as well as ASARCO's Ray, Mission, and Silver Bell copper mines and associated mills.  At the center of the strike were nine collective bargaining agreements.  Eight of these agreements, covering about 750 workers at ASARCO's Mission and Silver Bell mines and its smelters in Hayden and Amarillo, had expired in 2004.  The ninth contract, which expired on June 30, 2005, covered about 800 workers at the Ray mine.  ASARCO used salaried employees and some temporary workers to operate these plants during the period of the strike.[432]

Therefore, the 2005 labor strike began in July, 2005 – *after* the asbestos subsidiaries filed for bankruptcy – and lasted only a few months.[433]  *ASARCO LLC*, 396 B.R. at 315 ("ASARCO put its subsidiaries, Capco and LAQ, into a prepackaged 524(g) bankruptcy on April 11, 2005. Ultimately (and reluctantly), on advice of counsel, ASARCO followed these subsidiaries into Chapter 11 on August 9, 2005.").

205.     While the strike did not have a positive impact on ASARCO's operations, it would be an overstatement to say that a one-month strike caused ASARCO's 2005 bankruptcy. A post-confirmation strike against the company would have a substantially deflated impact because now – unlike in 2005 – ASARCO is not facing the substantial asbestos and

---

[432]     (*See* Disclosure Statement at 51.)

[433]     (*See* Exhibit 72; Confirmation Hr'g Tr. 8/19/09 at 80 (Ruiz Test.).)   A Memorandum of Agreement reflecting the agreement of the Unions and ASARCO was filed with the Court on November 7, 2005.  (Docket No. 852-1.)

environmental liabilities that caused its financial troubles in 2005.  Instead, it will emerge free of these liabilities, having satisfied those claimants in full, with sufficient cash reserves to withstand a labor strike.  Therefore, the Unions' strike threat has minimal impact on the feasibility of the Parent's Full Payment Plan.

**B.**       **Settlement of Retiree Litigation.**

206.       On July 9, 2003, ASARCO, Silver Bell Mining, L.L.C. and Encycle/Texas, Inc. filed an action against the USW and others in federal court in Arizona seeking a declaration that changes to retiree medical benefits made earlier that year were legal under the Labor Management Relations Act and under ERISA.  On September 8, 2003, the defendants filed an answer and counterclaimed against ASARCO.  On September 19, 2005, ASARCO initiated Adversary Proceeding No. 05-02078, seeking a declaration that the prosecution of Claims against ASARCO and Encycle/Texas violated the automatic stay and requesting an injunction prohibiting prosecution of such Claims during the pendency of the Reorganization Cases.  On November 14, 2005, ASARCO obtained an order staying the Arizona litigation pursuant to a stipulation by the parties.  As part of the New CBA negotiations, ASARCO, the Unions and the individual members of the class of retirees reached a final agreement on the resolution of the Arizona litigation, which addresses all the Claims among the parties regarding retiree medical benefits.  The Bankruptcy Court approved the settlement agreement by order entered on March 15, 2007.

**C.**       **Pension Plans.**

207.       ASARCO sponsors two defined benefit pension plans, the Pension Plans, which are covered by ERISA.  The Parent understands that ASARCO will satisfy its legal obligations to the Pension Plans during the pendency of this proceeding, and through the Effective Date.  Therefore, the Court does not find that the 2005 is credible evidence that the

Unions' strike threat undermined the feasibility of Parent's Full Pay Plan for ASARCO going forward.

208.    The Parent further understands that ASARCO does not intend to terminate the Pension Plans prior to the Effective Date.  After the Effective Date, pursuant to the Parent's Full Payment Plan, Reorganized ASARCO will continue to sponsor the Pension Plans. Accordingly, after the Effective Date, Reorganized ASARCO will continue to be required to make contributions to the Pension Plans in the amounts necessary to meet the minimum funding standards prescribed by 29 U.S.C. § 1082 and 26 U.S.C. § 412, and for the payment of any PBGC premiums prescribed by 29 U.S.C. §§ 1306 and 1307.

209.    The PBGC is a United States government corporation, created under Title IV of ERISA, which guarantees the payment of certain pension benefits upon termination of a pension plan covered by Title IV.  The Parent's Full Payment Plan does not affect in any way, including by discharge, the Debtors' liabilities with respect to the Pension Plans, including their liabilities to PBGC for the Pension Plans' unfunded benefit liabilities under 29 U.S.C. § 1362(b), the Pension Plans' funding deficiencies under 29 U.S.C. § 1362(c), or unpaid PBGC premiums under 29 U.S.C. §§ 1306 and 1307, should either or both of the Pension Plans terminate after the Parent's Full Payment Plan is confirmed.

210.    Additionally, notwithstanding anything in the Parent's Full Payment Plan, including Article XI thereunder, or any order confirming the Parent's Full Payment Plan, no Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities whatsoever against any entity with respect to statutory liabilities arising under ERISA concerning the Pension Plans shall be released, exculpated, discharged, enjoined, or otherwise affected by the Plan, nor shall the entry of the Confirmation Order constitute the approval of any

release, exculpation, discharge, injunction, or other impairment of any Claims obligations, suits, judgments, damages, demands, debts, rights, cause of action or liabilities whatsoever against any entity with respect to statutory liabilities arising under ERISA concerning the Pension Plans.

211.     PBGC has the statutory authority to seek involuntary termination of a pension plan under certain circumstances.  29 U.S.C. § 1342.

## VI.     THE SECTION 524(G) TRUST.

### A.     The Section 524(g) Trust, The Permanent Channeling Injunction And The Asbestos Insurance Company Injunction Comply With Sections 105(a) And 524(g) Of The Bankruptcy Code.

212.     The Debtors were first named as defendants in asbestos-related personal-injury actions in the mid-1960s, and asbestos-related personal-injury claims against the Debtors have risen dramatically in recent years.  More than 102,000 asbestos-related claims have been filed against one or more of the Debtors in this bankruptcy proceeding.[434]  Neither the Debtors nor the Parent have reason to expect that asbestos claims will cease, and industry experts have forecasted continued increases in the rates of asbestos claims to be brought against similar defendants over the next several decades.[435]  Although ASARCO contends that it never manufactured or sold asbestos, various alter ego theories asserted by many asbestos claimants leave ASARCO vulnerable to claims arising out of the activities of LAQ and CAPCO, ASARCO's asbestos-related subsidiaries, as well as to claims arising for ASARCO's direct liability for asbestos claims.[436]

213.     The Parent's Full Payment Plan provides in Article 11.3 for issuance of a Permanent Channeling Injunction and Asbestos Insurance Company Injunction pursuant to

---

[434]     (Lapinsky Proffer at ¶ 31 (Dkt 12387, Ex. D170).)

[435]     (Proffer of Dr. Francine F. Rabinovitz Regarding Projected Asbestos-Related Liabilities (Docket No. 11925, "Rabinovitz Proffer") at ¶¶ 30-31.)

[436]     (Rabinovitz Proffer at ¶¶ 6, 11, 23.)

Section 524(g)(1) of the Bankruptcy Code.  The Parent's Full Payment Plan comports with the Bankruptcy Code's requirements for issuance of the Permanent Channeling Injunction and Asbestos Insurance Company Injunction.

214.     The Parent has provided proper notice of the Confirmation Hearing and the terms of the Permanent Channeling Injunction.  The Parent published notice of the Confirmation Hearing in numerous local and national newspapers.[437]  In addition, the terms of the Permanent Channeling Injunction are set forth in the Parent's Full Payment Plan and the Disclosure Statement.[438]

215.     The Permanent Channeling Injunction and Asbestos Insurance Company Injunction enjoin entities from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any claim or demand that, under the Parent's Full Payment Plan, is to be paid in whole or in part by the Section 524(g) Trust, except as otherwise expressly allowed by the Parent's Full Payment Plan.[439]

216.     The Permanent Channeling Injunction and the Asbestos Insurance Company Injunction are to be implemented in connection with the Section 524(g) Trust, which assumes the Debtors' liabilities for Debtors who have been named as defendants in personal injury, wrongful death, or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.[440]  Pursuant to the Parent's Full Payment Plan, on the Effective Date, the Section 524(g) Trust will assume all of the Debtors' Unsecured Asbestos Personal Injury Claims and Demands which represent its liabilities

---

[437]     (Proffer of Adam B. Levin Regarding Publication of the Confirmation, Asbestos, and Mission Notices (Docket No. 12340, "Levin Proffer") at ¶ 2.)

[438]     (Parent's Full Payment Plan Art. 11.3; Disclosure Statement § 3.10(c)(1).)

[439]     (Parent's Full Payment Plan Art. 11.3.)

[440]     (Lapinsky Proffer at ¶ 44(i).)

arising from the personal injury, wrongful death, and property damage actions, and the Section 524(g) Trust shall receive all transfers and assignments as set forth in the Parent's Full Payment Plan.[441]

217.     As of the Petition Date, ASARCO and the Asbestos Subsidiary Debtors have each been named as a defendant in personal injury, wrongful death, or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.[442]

218.     The Parent's Full Payment Plan establishes Class 4 (Asbestos Personal Injury Claims) for claims to be addressed by the Section 524(g) Trust, and 84.16% of voting Class 4 Claim holders have voted to accept the Parent's Full Payment Plan.[443]

219.     On the Effective Date of the Parent's Full Payment Plan, the Section 524(g) Trust shall assume the liabilities of the Debtors with respect to the Unsecured Asbestos Personal Injury Claims and Demands and shall receive all transfers and assignments as set forth in the Parent's Full Payment Plan.[444]

220.     As of the Petition Date and as of the Confirmation Date, there were no pending or known property damage actions seeking damages as a result of property damage allegedly caused by or arising out of asbestos or asbestos-containing products.

221.     The Section 524(g) Trust is to be funded in part by securities of Reorganized ASARCO and by its obligation to make future payments.  In addition, the Section 524(g) Trust

---

[441]     (*See* Parent's Full Payment Plan Art. 6.3; Lapinsky Proffer ¶ 44(iii).)

[442]     (Disclosure Statement at 51.)

[443]     (Parent's Full Payment Plan Art. 3.1(d); *see also* Monger Proffer at 5.)

[444]     (Parent's Full Payment Plan Art. 6.3.)

documents provide that, upon the occurrence of specified events, the Section 524(g) Trust would control a majority of the equity of ASARCO LLC.[445]

222.     The Debtors are likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the Unsecured Asbestos Personal Injury Claims, which are addressed by the Permanent Channeling Injunction and the Asbestos Insurance Company Injunction.

223.     In accordance with Section 524(g)(2)(B)(ii)(II) of the Bankruptcy Code, the actual amounts, numbers, and timing of future Demands cannot be determined.[446]

224.     The Debtors' asbestos-estimation expert, Dr. Francine Rabinovitz, estimated the range of the Debtors' asbestos-related liability as between $938.3 million and $1,009.3 million.[447]  The Asbestos Subsidiary Committee's asbestos-estimation expert, Dr. Mark Peterson, estimated the range of the Debtors' asbestos-related liability as between $1.3 billion and $2.1 billion.[448]   Dr. Peterson's estimation does not include ASARCO's liability for premises and other direct asbestos claims against ASARCO.  Furthermore, as noted by the FCR, "ASARCO's prior history of increasing asbestos litigation, the lengthy and unpredictable latency period associated with various asbestos diseases, and evolving medical technology make it virtually impossible to predict with certainty the timing or the extent of Future Asbestos Claims that may be asserted against ASARCO."[449]   Although the estimates regarding future claims are

---

[445]     (Parent's Full Payment Plan, Ex. 11.)

[446]     (Rabinovitz Proffer at ¶¶ 38-40.)

[447]     (Rabinovitz Proffer at ¶ 7.)

[448]     (Proffer of Mark A. Peterson Regarding the Liability of ASARCO LLC and its Subsidiaries for Asbestos Bodily Injury Claims and Estimations of those Liabilities (Docket No. 12383, "Peterson Proffer"); *see also* Declaration of Future Claims Representative Robert C. Pate in Support of Confirmation of the Respective Reorganization Plans Proposed By (i) the Debtors' and (ii) ASARCO Incorporated and Americas Mining Corporation ("Pate Declaration") ¶ 30 (Docket 12381).)

[449]     (Pate Declaration at ¶ 49.)

reasonable, they are only estimates; the actual amount, number, and timing of future asbestos-related claims and demands against the Debtors cannot be determined.[450]

225.    The Section 524(g) Trust shall operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Unsecured Asbestos Personal Injury Claims and Demands, or other comparable mechanisms, that provide reasonable assurance that the Section 524(g) Trust shall value, and be in a financial position to pay, all Unsecured Asbestos Personal Injury Claims and Demands in substantially the same manner.

226.    The Section 524(g) Trust Agreement contains mechanisms such as the creation of the Section 524(g) Trust Advisory Committee, the appointment of successor future claims representatives, and ongoing Bankruptcy Court oversight that will ensure both long-term viability of the Section 524(g) Trust and fairness to claimants over the life of the trust.[451]

227.    The Bankruptcy Court appointed Robert C. Pate as the FCR as part of the proceedings leading to the issuance of the Permanent Channeling Injunction and the Asbestos Insurance Company Injunction for the purpose of, among other things, protecting the rights of persons that might subsequently assert demands of the kind that are addressed by those injunctions and that are to be assumed and paid by the Section 524(g) Trust under the Parent's Full Payment Plan.

228.    The provisions of the Parent's Full Payment Plan establishing the Section 524(g) Trust and Permanent Channeling Injunction accord with Section 524(g)(4)(B) of the Bankruptcy Code.   The FCR participated throughout the plan process and engaged in negotiations with the Parent, the Asbestos Subsidiary Committee, and the Asbestos Claimants'

---

[450]        (Rabinovitz Proffer at ¶¶ 39-40.)

[451]        (*See* Parent's Full Payment Plan, Ex. 11 (Section 524(g) Trust Agreement, §§ V, VI, and 7.14).)

Committee to ensure that substantial contributions were made on behalf of all parties that will benefit from the Permanent Channeling Injunction ("the ASARCO Protected Parties," as defined in the Parent's Full Payment Plan).  As a result of these negotiations and in light of the contributions that the Parent will make to the Section 524(g) Trust, the extension of these benefits to the ASARCO Protected Parties is fair and equitable to holders of future demands. Moreover, the evidence presented at the Confirmation Hearing shows that the Parent, the Asbestos Subsidiary Committee, the Asbestos Claimants' Committee, and the FCR all have conducted extensive negotiations and due diligence and all have concluded, and the Bankruptcy Court finds, that extending the Permanent Channeling Injunction to future claimants is fair and equitable in light of the substantial contributions being made to the Section 524(g) Trust by or on behalf of the ASARCO Protected Parties.

229.     In light of the respective benefits provided, or to be provided, to the Section 524(g) Trust by, or on behalf of, each ASARCO Protected Party, the Permanent Channeling Injunction is fair and equitable with respect to the persons that might subsequently assert Demands against any ASARCO Protected Party.

230.     In light of the respective benefits provided, or to be provided, by a Settling Asbestos Insurance Company in order to receive the benefits of the Asbestos Insurance Company Injunction, the Asbestos Insurance Company Injunction is fair and equitable with respect to the persons who might subsequently assert Demands against any Settling Asbestos Insurance Company.

231.     The Settling Asbestos Insurance Companies are alleged to be directly or indirectly liable for the Unsecured Asbestos Personal Injury Claims and Demands for one or more of the reasons set forth in Section 524(g)(4)(A)(ii) of the Bankruptcy Code.

232.     The Permanent Channeling Injunction and the Asbestos Insurance Company Injunction are integral parts of the Parent's Full Payment Plan and may not be vacated, amended, or modified after Confirmation except to the extent expressly provided in Article 11.3(a) and (b) of the Parent's Full Payment Plan.

### B.     Tax Treatment of the Section 524(g) Trust

233.     The Section 524(g) Trust shall be treated as a "qualified settlement fund" within the meaning of Treasury Regulation Section 1.468B-1, and the Section 524(g) Trustees shall be the "administrator" of the Section 524(g) Trust pursuant to Treasury Regulation Section 1.468B-2(k)(3).  No election shall be made to treat the Section 524(g) Trust as a grantor trust for U.S. federal income tax purposes.  Accordingly, the Section 524(g) Trust shall be treated as a taxable entity for federal income tax purposes.  The Section 524(g) Trustees shall cause all taxes imposed on the Section 524(g) Trust to be paid using assets of the Section 524(g) Trust and shall comply with all tax reporting and withholding requirements imposed under applicable tax laws. Any amount so withheld from a distribution or payment by the Section 524(g) Trust to a Claimant or other payee shall be treated as having been paid to, and received by, such payee for purposes of the Parent's Full Payment Plan and the Parent's Full Payment Plan Documents.

234.     Any and all Claims of the Asbestos Subsidiary Debtors against ASARCO, including any and all Derivative Asbestos Claims, shall be deemed satisfied by the funding of the Section 524(g) Trust as contemplated under the Parent's Full Payment Plan. Any and all Administrative Claims under the Secured Intercompany DIP Credit Facility shall be waived on the Effective Date of the Parent's Full Payment Plan.[452]

---

[452]     (Parent's Full Payment Plan Art. 4.2(d).)

## VII.   CREDITORS' VOTES AND PREFERENCES

235.    The Debtors are the only party to dispute the confirmability of the Parent's Full Payment Plan.  All other parties either do not dispute the confirmability of the Parent's Full Payment Plan, pr agree that the Plan is confirmable.  The following parties in interest, some of which are not voting creditors, filed pleadings expressing the view that both the Parent's Full Payment Plan and the Debtors' Liquidating Plan are "confirmable," but that such party preferred the Debtors' Liquidating Plan:  the ASARCO Committee; [453] Montana Resources, Inc.;[454] the Unions;[455] the United States, on behalf of the U.S. Environmental Protection Agency, the United States Department of the Interior, the United States Department of Agriculture, and the United States International Boundary Water Commission; the State of Arizona; the State of Montana, on behalf of the Montana Department of Environmental Quality and the Montana Department of Justice, and the State of Washington, on behalf of the Washington State Department of Ecology;[456] and the Texas Commission on Environmental Quality.[457]

236.    In accordance with their previous agreements, the Asbestos Subsidiary Committee and the FCR recommended that holders of asbestos claims vote for both the Debtors' Liquidation Plan and the Parent's Full Payment Plan, and against the Harbinger Plan.  The Asbestos Committee and the FCR took no position on a preference between the Debtors' Liquidation Plan and the Parent's Full Payment Plan.  Holders of Claims in Class 4 did vote to

---

[453]    (Docket No. 12612.)

[454]    (Docket No. 12613.)

[455]    (Docket No. 12619.)

[456]    (Docket No. 12614.)

[457]    (Docket No. 12644.)

accept the Parent's Full Payment Plan.[458]  The other classes of Claims did not vote to accept the Parent's Full Payment Plan.[459]

237.    To be tabulated and included in the record of votes of acceptance or rejection of a plan, or expressions of preference for one plan or the other, Ballots had to be received by 4:00 p.m. Central Daylight Time, August 17, 2009.  The Parent's Full Payment Plan was not filed until August 20, 2009, with technical amendments evidencing further enhancements filed on August 23 and 27, 2009.  Creditors thus did not have an opportunity to vote to accept the Parent's Full Payment Plan or to express a preference for it on a Ballot.  Moreover, because the Parent's Full Payment Plan provides for payment in full of such Claims, together with Post-Petition Interest, the creditors are deemed to have accepted the Parent's Full Payment Plan.[460]

238.    At trial, evidence was submitted indicating that the balloting procedures may not be reliable.  Specifically, the Parent introduced evidence in the form of a Ballot that the Parent's vote was improperly calculated as indicating a first preference for both the Parent's Full Payment Plan and Harbinger's Plan.[461]

239.    Harbinger Capital Partners Master Fund I, Ltd. and Citigroup Global Markets, Inc. filed a pleading expressing the view that both the Parent's Full Payment Plan and the Debtors' Liquidation Plan are "confirmable," but that they have *conditionally* supported the Debtors' Liquidation Plan.[462]

---

[458]    (*See* Chart, Monger Proffer at 5.)

[459]    (*See* Chart, Monger Proffer at 5.)

[460]    *See* 11 U.S.C. § 1126(f).

[461]    (Ex. P428.)

[462]    (Docket No. 12615.)

240.     Halcyon Master Fund L.P. announced that it believed both the Parent's Full Payment Plan and the Debtors' Liquidation Plan are "confirmable," and that it did not have a preference for one over the other.[463]

## CONCLUSIONS OF LAW

I.     **GENERAL CONCLUSIONS**

   A.     **Venue; Core Proceeding; Exclusive Jurisdiction**

241.     The Debtors were qualified and are qualified to be debtors pursuant to Section 109(d) of the Bankruptcy Code.  Venue was proper as of the Petition Date and continues to be proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The Debtors continue to manage and operate their respective businesses and properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  Confirmation of the Parent's Full Payment Plan is a core proceeding under 28 U.S.C. § 157(b)(2).  The Court has jurisdiction over the Cases pursuant to 28 U.S.C. §§ 157 and 1334, and the Court has exclusive jurisdiction to determine whether the Parent's Full Payment Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

   B.     **Judicial Notice**

242.     The Court takes judicial notice of the Docket in the Cases maintained by Clerk of the Court and/or its duly-appointed agent, including all pleadings and other documents filed, all Orders entered, and all evidence introduced (unless withdrawn) and arguments made at the hearings held before the Court during the Cases, including the hearings to consider the adequacy of the Disclosure Statement and the Confirmation Hearing.

   C.     **Solicitation and Notice**

---

[463]     (Docket No. 12603.)

243.     As evidenced by the Affidavits of Mailing, and as required by the Disclosure and Solicitation Order, adequate notice has been provided of the Confirmation Hearing and Ballots have been solicited accepting or rejecting the Plans and indicating preferences, as applicable, by timely transmitting the Disclosure and Solicitation Order, the Disclosure Statement, the Plans, the Confirmation Hearing Notice, and, as appropriate, Ballots to accept or reject the Plans to all holders of Claims and Interests entitled to vote on the Plans, in accordance with the Disclosure and Solicitation Order, the Bankruptcy Code, the Bankruptcy Rules, and Orders of the Court.  Due, adequate, and sufficient notice of the Disclosure Statement, the Confirmation Hearing, as well as all deadlines for voting on or filing objections to the Plans, has been given to all known holders of Claims and Interests in accordance with Bankruptcy Rules 2002(b), 3017(d), (e), and (f), and the procedures set forth in the Disclosure and Solicitation Order.  The Disclosure Statement, the Plans, the Ballots, the Solicitation Order, and the Confirmation Hearing Notice were transmitted and served in substantial compliance with the Disclosure and Solicitation Order and the Bankruptcy Rules, and such transmittal and service were adequate and sufficient.  Adequate and sufficient notice of the Confirmation Hearing, the Parent's Full Payment Plan, cure claim estimates, injunctions and third party releases, bar dates, and other hearings described in the Disclosure and Solicitation Order and the Parent's Full Payment Plan was given in compliance with the Bankruptcy Code, the Bankruptcy Rules and the Disclosure and Solicitation Order, and no other or further notice is or shall be required.

### D.     Good Faith Solicitation

244.     Based on the record in the Cases, votes for acceptance and rejection of the Parent's Full Payment Plan and indications of preference were solicited and sought in good faith and in compliance with the Bankruptcy Code (including Sections 1125, 1126 and 1129 of the Bankruptcy Code), the Bankruptcy Rules (including Bankruptcy Rules 3017 and 3018), the

Disclosure and Solicitation Order, and all other applicable statutes, rules, laws and regulations by the Parent and all of its officers, directors, members, partners, employees, affiliates, agents, counsel, and advisors (including, without limitation, all of the Parent's attorneys, financial advisors, investment bankers, accountants, solicitation agents and other professionals retained by the Parent) and all of the foregoing have acted in "good faith" and in compliance with the applicable provisions of the Bankruptcy Code, within the meaning of Section 1125(e) of the Bankruptcy Code, and are entitled to the protections thereof, and are entitled to the protections contained in Article XI of the Parent's Full Payment Plan, which are reasonable and appropriate under the circumstances.

### E.   Parent's Full Payment Plan Modifications

245.     Section 1127(a) of the Bankruptcy Code provides, with respect to chapter 11 plan modifications, as follows:

> The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of Sections 1122 and 1123 of this title.  After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan.[464]

In addition, Bankruptcy Rule 3019 provides as follows:

> In a chapter 9 or chapter 11 case, after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan.  If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by

---

[464]     11 U.S.C. §1127(a).

all creditors and equity security holders who have previously accepted the plan.[465]

246.     The only substantive modifications to the Parent's Full Payment Plan improve the treatment for the holders of certain Allowed Claims, and such changes do not materially adversely affect or change the treatment of any other Claims or Interests under the Parent's Full Payment Plan.  All other modifications to the Parent's Full Payment Plan constitute non-material changes.   Accordingly, pursuant to Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the modifications to the Parent's Full Payment Plan do not require additional disclosure under Section 1125 of the Bankruptcy Code or re-solicitation of votes under Section 1126 of the Bankruptcy Code, nor do they require that holders of Claims be afforded an opportunity to change any previously cast acceptances or rejections of the Parent's Full Payment Plan.

### F.     Acceptances of the Parent's Full Payment Plan

247.     The holders of Claims in Class 4 accepted the Parent's Full Payment Plan by more than one-half in number of those voting and by holders of Claims totaling at least two-thirds in amount of Class 4 Claims voting.[466]  The other classes of Claims are deemed to have accepted the Parent's Full Payment Plan because they are being paid in full, with post-petition interest, at the allowed or agreed-upon amount.[467]

### G.     Assumption, Assumption and Assignment, and Rejection of Executory Contracts and Unexpired Leases

248.     The provisions of Article VIII of the Parent's Full Payment Plan governing the assumption, assumption and assignment, or rejection of executory contacts and unexpired leases,

---

[465]     FED. R. BANKR. P. 3019.

[466]     (Monger Proffer at 5.)

[467]     *See* 11 U.S.C. § 1126(f).

including without limitation, the right of the Parent and Reorganized ASARCO, at any time prior to the Effective Date, to amend the Parent's Full Payment Plan to: (a) delete any Assumed Contract listed therein, thus providing for its rejection pursuant to the Parent's Full Payment Plan; or (b) add any executory contract or unexpired lease thereto, thus providing for its treatment as an Assumed Contract pursuant to the Parent's Full Payment Plan, satisfy the requirements of all applicable provisions of Section 365 of the Bankruptcy Code.  Under the Parent's Full Payment Plan, reasonable business judgment has been exercised in determining whether to assume, assume and assign, or reject each of the Debtors' executory contracts and unexpired leases as set forth in the Parent's Full Payment Plan.

249.    The Parent or Reorganized ASARCO, as applicable, have cured, or provided adequate assurance that Reorganized ASARCO will cure, defaults (if any) under or relating to each of the Assumed Contracts.

250.    The Parent has provided adequate assurance of future performance by Reorganized ASARCO under each of the Assumed Contracts.

**H.    Section 524(g) Injunctions**

251.    The Permanent Channeling Injunction and Asbestos Insurance Company Injunction comply with Section 524(g)(1) of the Bankruptcy Code.  They enjoin entities from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any claim or demand that, under the Parent's Full Payment Plan, is to be paid in whole or in part by the Section 524(g) Trust, except as otherwise expressly allowed by the Parent's Full Payment Plan.

252.    The Permanent Channeling Injunction and Asbestos Insurance Company Injunction comply with Section 524(g)(2)(B)(i)(I) of the Bankruptcy Code.  These injunctions are to be implemented in connection with the Section 524(g) Trust, which assumes the Debtors'

liabilities for Debtors who have been named as defendants in personal injury, wrongful death, or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.[468]   Pursuant to the Parent's Full Payment Plan, on the Effective Date, the Section 524(g) Trust will assume all of the Debtors' Unsecured Asbestos Personal Injury Claims and Demands which represent its liabilities arising from the personal injury, wrongful death, and property damage actions, and the Section 524(g) Trust shall receive all transfers and assignments as set forth in the Parent's Full Payment Plan.  See Parent's Full Payment Plan Art. 6.3; Lapinsky Proffer ¶ 44(iii) (Docket 12387, Ex. D170).

253.    The Parent's Full Payment Plan satisfies Section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.

254.    The Parent's Full Payment Plan has been approved by creditors in Class 4 under the Parent's Full Payment Plan in the requisite numbers and amounts required by Sections 524(g), 1126, and 1129 of the Bankruptcy Code.

255.    Section 524(g)(2)(B)(ii)(IV)(bb) requires establishment of a separate class of claimants whose claims are to be addressed by a trust and "votes, by at least 75 percent of those voting, in favor of the plan."[469]   The Parent's Full Payment Plan establishes Class 4 (Asbestos Personal Injury Claims) for claims to be addressed by the Section 524(g) Trust, and 84.16% of voting Class 4 Claims voted in favor of the Parent's Full Payment Plan.[470]

256.    The Permanent Channeling Injunction and the Asbestos Insurance Company Injunction comply with Section 524(g)(2)(B)(i)(II) of the Bankruptcy Code because the Section

---

[468]    (Lapinsky Proffer at ¶ 44(i).)

[469]    11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).

[470]    (*See* Chart, Monger Proffer at 5.)

524(g) Trust is funded in whole or in part by the securities of one or more Debtors and its obligations to make future payments, including dividends.

257.      The Parent's Full Payment Plan complies with Section 524(g)(2)(B)(i)(IV) of the Bankruptcy Code because the Section 524(g) Trust will use its assets and income to pay the Unsecured Asbestos Personal Injury Claims and Demands.[471]

258.      The Parent's Full Payment Plan satisfies the requirements of Section 524(g)(2)(B)(ii) of the Bankruptcy Code regarding the necessity of injunctive relief and the operation of the trust.

259.      The Parent's Full Payment Plan provides in Article 11.3 for issuance of a Permanent Channeling Injunction and Asbestos Insurance Company Injunction pursuant to Section 524(g)(1) of the Bankruptcy Code.[472]  The Parent's Full Payment Plan comports with the Bankruptcy Code's requirements for issuance of the Permanent Channeling Injunction and Asbestos Insurance Company Injunction.

260.      Pursuit of asbestos-related demands outside the procedures prescribed by the Parent's Full Payment Plan is likely to threaten the Parent's Full Payment Plan's purpose to deal equitably with Claims and future Demands.   Accordingly, the requirements of Section 524(g)(2)(B)(ii)(III) of the Bankruptcy Code are met.

261.      Section 524(g)(2)(B)(ii)(IV)(aa) of the Bankruptcy Code is satisfied with respect to the Parent's Full Payment Plan because the terms of the Permanent Channeling Injunction and the Asbestos Insurance Company Injunction, including any provisions barring actions against third parties, are set out in the Parent's Full Payment Plan and in the Disclosure Statement.

---

[471]      (*See* Parent's Full Payment Plan Art. 6.5; Section 524(g) Trust Agreement § 1.2.)

[472]      (Parent's Full Payment Plan Art. 11.3.)

262.     The Section 524(g) Trust will operate in conformity with Section 524(g)(2)(B)(ii)(V) of the Bankruptcy Code.

**I.     Section 524(g) Trust**

263.     The creation of the Section 524(g) Trust is an essential element of the Parent's Full Payment Plan.  Entry into the Section 524(g) Trust Agreement and the Section 524(g) Trust Distribution Procedures is in the best interests of the Debtors, their Estates and all holders of asbestos Claims and Demands.  The establishment of the Section 524(g)Trust, the selection of Al Wolin, David Levi, and Ellen Pryor to serve as Section 524(g) Trustees, the selection of Steve Baron (co-chair), Steve Kazan (co-chair), Robert Phillips, Al Brayton, and Bryan Blevins as members of the Section 524(g) Trust Advisory Committee, and the form of the proposed Section 524(g) Trust Agreement, as the same may subsequently be amended or modified, are appropriate and in the best interests of creditors.  Upon its execution, the Section 524(g) Trust Agreement and the Section 524(g) Trust Distribution Procedures shall be valid, binding and enforceable in accordance with its terms.  The vesting in the Section 524(g) Trust of the Section 524(g) Trust Assets, as specified in the Parent's Full Payment Plan, is a material component of the Parent's Full Payment Plan, and nothing in this opinion, the Parent's Full Payment Plan, or the Disclosure Statement shall be deemed or construed to prejudice or preclude the full assertion of such rights.

**J.     Deemed Substantive Consolidation Permissible**

264.     The deemed substantive consolidation of the Debtors solely for the limited purposes of voting and distributions, as provided by Article 10.21 of the Parent's Full Payment Plan, is in the best interest of the Debtors and their Estates and creditors, is within the powers of the Bankruptcy Court to grant under Section 105 of the Bankruptcy Code, does not violate any Sections of the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure.

K.    **Environmental Custodial Trust**

265.    The creation of the Environmental Custodial Trusts is an essential element of the Parent's Full Payment Plan.  Entry into the Environmental Custodial Trust Agreements is in the best interests of the Debtors, their Estates and their creditors.  The establishment of the Environmental Custodial Trust, the selection by the DOJ pursuant to the provisions of Section 7.2 of the Parent's Full Payment Plan of the Environmental Custodial Trustees, the designation of the Environmental Custodial Trust Boards on or before Confirmation, and the form of the proposed Environmental Custodial Trust Agreements, as the same may subsequently be amended or modified, are appropriate and in the best interests of creditors.  Upon their execution, the Environmental Custodial Trust Agreements shall be valid, binding and enforceable in accordance with their terms.  The vesting in the Environmental Custodial Trust of the Environmental Custodial Trust Assets, as specified in the Parent's Full Payment Plan, is a material component of the Parent's Full Payment Plan, and nothing in this opinion, the Parent's Full Payment Plan, or the Disclosure Statement shall be deemed or construed to prejudice or preclude the full assertion of such rights.

L.    **Working Capital Facility**

266.    Entry into the Working Capital Facility is in the best interests of the Debtors and their Estates and creditors.

II.    **THE PARENT'S FULL PAYMENT PLAN SATISFIES THE CONFIRMATION REQUIREMENTS IN SECTION 1129(A) OF THE BANKRUPTCY CODE**

A.    **Standing**

267.    Section 1121 of the Bankruptcy Code provides who may file a plan of reorganization.  Pursuant to Section 1121(b) of the Bankruptcy Code, the debtor has the exclusive right to file a plan during the first 120 days of the case commencing on the Petition

Date.  In this case, the Court terminated exclusivity for certain parties in interest, including the Parent.  Pursuant to the Court's Exclusivity Termination Order, the Parent has standing, and is authorized, to file a plan and disclosure statement in the Debtors' chapter 11 cases.

### B.        11 U.S.C. § 1129(a)(1)

268.        The Parent's Full Payment Plan complies with all applicable provisions of the Bankruptcy Code.

### 1.        11 U.S.C. § 1122

269.        The Parent's Full Payment Plan satisfies Section 1122 of the Bankruptcy Code.  Each Claim or Interest placed in a particular Class under the Parent's Full Payment Plan is substantially similar to the other claims or interests in that Class.  In addition, valid business, legal and factual reasons exist for the separate classification of each of the Classes of Claims and Interests created under the Parent's Full Payment Plan and set forth in Sections 4.2 of the Parent's Full Payment Plan.  There is no improper gerrymandering or unfair discrimination between or among holders of Claims and Interests.

270.        In particular, and without limiting the preceding, reasonable business reasons, including the minimization of administrative expenses associated with distributions to the holders of Convenience Claims, exist for separately classifying General Unsecured Claims in Class 3 and Convenience Claims in Class 5.  Valid business reasons and legal requirements exist separately classifying General Unsecured Claims in Class 3 and Asbestos Claims in Class 4.  The nature of the Asbestos Claims and provision of Section 524(g) of the Bankruptcy Code require the creation of the Section 524(g) Trust, the assumption of the Asbestos Claims by such trust, and the establishment of a channeling injunction under Section 524(g) of the Bankruptcy Code; all of these requirements are inapplicable to the General Unsecured Claims in Class 3.  The

classification scheme in the Parent's Full Payment Plan was not an attempt to obtain an Impaired consenting Class.

### 2.   11 U.S.C. § 1123

#### a.   11 U.S.C. § 1123(a)(1)

271.     The Parent's Full Payment Plan satisfies Section 1123(a)(1) of the Bankruptcy Code, which requires that a plan designate classes of claims, other than claims of a kind specified in Sections 507(a)(2) (administrative expense claims), 507(a)(3) (claims arising during the "gap" period in an involuntary case), or 507(a)(8) (priority tax claims) of the Bankruptcy Code.[473] Articles III and IV of the Parent's Full Payment Plan classify Claims and Interests other than Administrative Claims and Priority Tax Claims into eight Classes of Claims and one Class of Interests, and therefore the Parent's Full Payment Plan complies with Section 1123(a)(1) of the Bankruptcy Code.

#### b.   11 U.S.C. § 1123(a)(2)

272.     The Parent's Full Payment Plan satisfies Section 1123(a)(2) of the Bankruptcy Code.   Section 1123(a)(2) of the Bankruptcy Code requires that a plan "specify any class of claims or interests that is not impaired under the plan."[474]   Article IV of the Parent's Full Payment Plan specifies that the following Classes are classified as Unimpaired under the Parent's Full Payment Plan:  Class 1 Priority Claims; Class 2 Secured Claims; Class 3 General Unsecured Claims; Class 5 Convenience Claims; Class 6 Late-Filed Claims; Class 7 Subordinated Claims; Class 8 Environmental Reinstated Claims; and Class 9 Equity Interests in

---

[473]     *See* 11 U.S.C. § 1123(a)(1); *see also In re Eagle Bus. Mfg., Inc.*, 134 B.R. 584, 596 (Bankr. S D. Tex. 1991), *aff'd*, 158 B.R. 421 (S.D. Tex. 1993) ("Administrative and Priority Tax Claims are not classified because Section 1123(a)(1) of the Bankruptcy Code does not require the classification of such Claims, and because they must receive the treatment specified in Section 1129(a)(9) of the Bankruptcy Code and cannot be otherwise impaired.").

[474]     11 U.S.C. § 1123(a)(2).

ASARCO.  The requirements of 11 U.S.C. § 1123(a)(2) are therefore satisfied by the Parent's Full Payment Plan.

### c.    11 U.S.C. § 1123(a)(3)

273.    The Parent's Full Payment Plan satisfies Section 1123(a)(3) of the Bankruptcy Code.  Section 1123(a)(3) of the Bankruptcy Code requires that a plan "specify the treatment of any class of claims or interests that are impaired under the plan."[475]  Class 4 (Asbestos Personal Injury Claims) is the only Class of Claims that is Impaired under the Parent's Full Payment Plan, and Article 4.2(d) of the Parent's Full Payment Plan specifies the treatment provided to Class 4. Therefore, the Parent's Full Payment Plan satisfies Section 1123(a)(3) of the Bankruptcy Code.

### d.    11 U.S.C. § 1123(a)(4)

274.    The Parent's Full Payment Plan satisfies Section 1123(a)(1) of the Bankruptcy Code.   Section 1123(a)(4) of the Bankruptcy Code requires that a plan provide "the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[476]   This provision provides creditors of the same class with a right to equality of treatment.  Article IV of the Parent's Full Payment Plan provides for equality of treatment for each Claim or Interest within a particular Class.   The Parent's Full Payment Plan therefore complies with Section 1123(a)(4) of the Bankruptcy Code.

275.    While Article 4.2(b) of the Parent's Full Payment Plan provides that the Parent may elect, prior to the Confirmation Hearing, different treatment to different secured claims, such provision does not violate Section 1123(a)(4) because each secured Claim constitutes its

---

[475]    11 U.S.C. § 1123(a)(3).

[476]    11 U.S.C. § 1123(a)(4).

own sub-Class, and the votes of the holders of Claims in each such sub-Class are considered separately. Moreover, no such election was made by the Parent.

### e.      11 U.S.C. § 1123(a)(5)

276.      Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide "adequate means" for its implementation and sets forth specific examples of such adequate means, including, but not limited to: cancellation or modification of indentures or other instruments, amendment of the debtor's charter, issuance of new securities, retention by the debtor of all or any part of property of the estate, sales of the debtor's property, extension of maturity dates or changes in interest rates or other terms of outstanding securities.[477]   The Parent's Full Payment Plan meets this requirement.

277.      The Parent's Full Payment Plan provides adequate and proper means for its implementation, to wit:

> (i)      Section 10.3 provides that, upon approval by the Bankruptcy Court in the Confirmation Order, the Parent's Plan Administrator will be appointed, and thereafter, the Parent's Plan Administrator will perform all of the estates' obligations under the Parent's Full Payment Plan.[478]

> (ii)      Section 10.1 provides that the Parent's Plan Administrator will be adequately funded as of the Effective Date by (a) the Parent delivering to the Parent's Plan Administrator Cash in the aggregate amount of $2.2051 billion, (b) Reorganized ASARCO delivering to the Parent's Plan Administrator the Distributable Cash, and (c) the Parent's waiver of its claim as to the approximately $60 million Tax Refund, and (d) the delivery to the Section 524(g) Asbestos Trust of a promissory note in the face amount of $280 million secured by the assets of Reorganized ASARCO, together with a guaranty by the Parent and pledge of a majority of the equity in Reorganized ASARCO.[479]

> (iii)      Article 10.3(f) further provides that, to the extent there is any Distribution Deficiency, the Plan Administrator will, on behalf of all holders of Allowed

---

[477]      11 U.S.C. § 1123(a)(5).

[478]      (Parent's Full Payment Plan Art. 10.3.)

[479]      (Parent's Full Payment Plan Art. 10.1.)

Claims, have recourse against Reorganized ASARCO for any amount of such Distribution Deficiency.[480]

(iv)      Section 10.1 also provides that, on the Effective Date, (a) the Parent will provide the $200 million Working Capital Facility to Reorganized ASARCO, and (b) those Claims that are being Reinstated will be paid out of the operating cash flow of Reorganized ASARCO.[481]

(v)      Section 10.2 provides that Grupo México has agreed to provide the Parent with funds in an amount equal to the amount required to permit the Parent to deliver the Parent Contribution in full and fund the borrowings under the Working Capital Facility, and guaranty Reorganized ASARCO's obligations under the $280 million promissory note to the Section 524(g) Trust.[482]

(vi)      the Parent has established an Escrow Account funded with 83,710,000 shares of stock of SCC and $500 million in U.S. Dollar currency and has put in place an escrow agreement for the Escrow Account to demonstrate its intention to fully and timely consummate the Parent's Full Payment Plan.[483]   Before the Parent's Full Payment Plan is recommended for Confirmation by the Bankruptcy Court, stock in the Escrow Account worth $125 million will act as a forfeitable deposit ensuring that the Parent's Full Payment Plan is not terminated, withdrawn, or amended or modified in a manner that would effect a material adverse change in the treatment of general unsecured creditors prior to the conclusion of the Confirmation Hearing.[484]   After the Parent's Full Payment Plan has been recommended by the Bankruptcy Court for confirmation by the District Court, stock in the Escrow Account worth $2.2051 billion and U.S. Dollar currency in the amount of $500 million will continue to act as forfeitable deposit, ensuring that the Parent will timely consummate the confirmed Parent's Full Payment Plan.[485]

(vii)      Articles VI and VII provide, respectively, that on the Effective Date the Section 524(g) Trust and the Environmental Custodial Trusts will be established and properly funded to resolve and pay Allowed Claims in their respective jurisdictions.[486]

(viii)      Section 10.6 provides that the Prepetition ASARCO Environmental Trust will remain in existence and continue to have access to the funds currently

---

[480]      (Parent's Full Payment Plan Art. 10.3(f).)

[481]      (Parent's Full Payment Plan Art. 10.1.)

[482]      (Parent's Full Payment Plan Art. 10.3.)

[483]      (Supp. de la Parra Proffer at ¶ 14.)

[484]      (Supp. de la Parra Proffer at ¶ 5.)

[485]      (Supp. de la Parra Proffer at ¶ 5.)

[486]      (Parent's Full Payment Plan Arts. VI and VII.)

available to it.[487]   It further provides that the Parent will make any remaining required contributions to the Prepetition ASARCO Environmental Trust in the ordinary course.[488]

278.     Thus, the Parent's Full Payment Plan meets the requirements of Section 1123(a)(5).

### f.     11 U.S.C. § 1123(a)(6)

279.     Section 1123(a)(6) of the Bankruptcy Code requires that the plan provide for the inclusion in a corporate debtor's charter provisions (i) prohibiting the issuance of nonvoting equity securities, and (ii) providing for an "appropriate distribution" of voting power among those securities possessing voting power.[489]   The Parent's Full Payment Plan meets this requirement:   Section 10.9 provides that the Amended LLC Agreement that is to be filed with the Secretary of State of the State of Delaware on or as soon as practicable after the Effective Date, will "prohibit the issuance of nonvoting equity securities and provide for an appropriate distribution of voting power among classes of securities."[490]

### g.     11 U.S.C. § 1123 (a)(7)

280.     Section 1123(a)(7) of the Bankruptcy Code requires that the plan's provisions with respect to the manner of selection of any director, officer, or trustee, or any successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy . . . ."[491]   The Parent's Full Payment Plan complies with this provision by providing, in Section 10.10, that the initial board of directors of Reorganized ASARCO will consist of up to five directors, each of them nominated by the Parent, who will serve from and after the Effective

---

[487]     (Parent's Full Payment Plan Art. 10.6.)

[488]     (Parent's Full Payment Plan Art. 10.6.)

[489]     11 U.S.C. § 1123(a)(6).

[490]     (Parent's Full Payment Plan Art. 10.9.)

[491]     11 U.S.C. § 1123(a)(7).

Date in accordance with the Amended LLC Agreement and applicable law.[492]  The Parent has identified the director, officers and individual designated to serve as the Parent's Full Payment Plan Administrator.[493]

### h.    11 U.S.C. § 1123(b)

281.    The Parent's Full Payment Plan satisfies Section 1123(b) of the Bankruptcy Code.  Section 1123(b) of the Bankruptcy Code sets forth the permissive provisions that may be incorporated into a chapter 11 plan.  The Parent's Full Payment Plan contains permissive provisions which are appropriate pursuant to Section 1123(b) of the Bankruptcy Code, and which are not inconsistent with the Bankruptcy Code.  As contemplated by Section 1123(b)(2) of the Bankruptcy Code, Article VIII of the Parent's Full Payment Plan provides for the assumption or rejection of the executory contracts and unexpired leases of the Debtors not previously assumed or rejected under Section 365 of the Bankruptcy Code.  The Parent's Full Payment Plan's provisions are not inconsistent with the Bankruptcy Code and are consistent with Section 1123(b) of the Bankruptcy Code.

### 3.    11 U.S.C. § 1124

282.    The Parent's Full Payment Plan satisfies Section 1124 of the Bankruptcy Code. The Parent's Full Payment Plan does not artificially "manufacture" the impairment of any Class of Impaired Claims or Interests under the Parent's Full Payment Plan.

### C.    11 U.S.C. § 1129(a)(2)

283.    Section 1129(a)(2) of the Bankruptcy Code requires that the plan proponent "comply with the applicable provisions of [title 11]."[494]  The primary purpose of

---

[492]    (Parent's Full Payment Plan Art. 10.10.)  The Parent intends to assume the CBA, pursuant to which, upon assumption, the Unions have the right to designate one member of the Board of Directors.

[493]    (Supp. de la Parra Proffer at  ¶¶ 19-21.)

[494]    11 U.S.C. § 1129(a)(2).

Section 1129(a)(2) is to ensure that the plan proponents have complied with the requirements of Sections 1125 and 1126 of the Bankruptcy Code.

284.     As noted earlier, this Court has approved the Disclosure Statement and the Disclosure Statement Supplement pursuant to Section 1125 of the Bankruptcy Code as containing "adequate information" of a kind and in sufficient detail to enable hypothetical reasonable investors typical of the Debtors' creditors to make an informed judgment whether to accept or reject each of the Plans.[495]   In addition, this Court approved the proposed form and manner of notice of the Disclosure Statement and the Disclosure Statement Supplement on August 4, 2008 by the Order Granting Emergency Motion of ASARCO Incorporated And Americas Mining Corporation to Supplement Joint Disclosure Statement and Modify Solicitation Procedures.[496]

285.     Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan of reorganization.[497]   Under Section 1126, only holders of allowed claims and allowed equity interests in impaired classes of claims or equity interests that will retain property under a plan on account of such claims or equity interests may vote to accept or reject such plan.  Class 4 (Asbestos Personal Injury Claims) and Class 9 (Interests in ASARCO) have voted to accept the Parent's Full Pay Plan;[498] all other Classes of Claims and Interests are unimpaired and deemed to have accepted the Parent's Full Payment Plan.[499]   Based upon the foregoing, the requirements of Section 1129(a)(2) have been satisfied.

---

[495]     *See, e.g.*, *In re Cajun Elec. Power Co-Op, Inc.*, 150 F.3d 503, 512 n.3 (5th Cir. 1998); *In re Texaco Inc.*, 84 B.R. 893, 906-07 (Bankr. S.D.N.Y. 1988); *In re Prudential Energy Co.*, 58 B.R. 857, 867 (Bankr. S.D.N.Y. 1986).

[496]     (Docket No. 12252.)

[497]     11 U.S.C. § 1126.

[498]     (*See* Chart, Monger Proffer at 5.)

[499]     11 U.S.C. § 1126(f).

### D.    11 U.S.C. § 1129(a)(3) (Good Faith)

286.    Section 1129(a)(3) provides that a court shall confirm a plan only if the "plan has been proposed in good faith and not by any means forbidden by law."  While the Bankruptcy Code does not define "good faith," the standard of good faith under Section 1129 applied by many courts, including Texas courts, is whether there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and the purposes of the Bankruptcy Code.[500]  In this vein, the Fifth Circuit has repeatedly noted that the "requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start."[501]  "The standard of proof required by the debtor to prove a Chapter 11 plan was proposed in good faith is by a preponderance of the evidence."[502]

287.    The Parent's Full Payment Plan is proposed in good faith because it achieves the two ultimate objectives of the Bankruptcy Code: (a) paying creditors the maximum amounts to which they are entitled, and (b) enabling ASARCO to reorganize successfully and emerge from bankruptcy.  In addition, the Parent's Full Payment Plan preserves value in the estate for shareholders.

288.    The Debtors and the Unions cite the lack of a new collective bargaining agreement with the Unions as an indication that the Parent's Full Payment Plan is not proposed in good faith.[503]  Not so.  The Parent has repeatedly expressed its intent to abide by the CBA

---

[500]    *Texas Extrusion Corp. v. Palmer, Palmer & Coffee (In re Texas Extrusion Corp.)*, 68 B.R. 712, 723 (N.D. Tex. 1986); *aff'd*, 844 F.2d 1142 (5th Cir. 1988).

[501]    *Financial Security Assurance, Inc. v. T-H New Orleans Limited Partnership (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997); *see also Public Finance Corp. v. Freeman (In re Public Finance Corp.)*, 712 F.2d 219, 221 (5th Cir. 1983).

[502]    *In re T-H New Orleans Ltd. P'ship*, 116 F.3d at 802.

[503]    (Docket No. 12288 at ¶¶ 64-65; Docket No. 12293 at ¶¶ 7-11.)

*after* confirmation, and the Parent's Full Payment Plan is premised upon an assumption of the existing CBA and Reorganized ASARCO will continue to honor that agreement, including the provision providing for the Unions to occupy one seat on Reorganized ASARCO's Board of Directors.[504]   Moreover, although the parties have not yet been able to reach a new labor agreement, the Parent believes a new labor agreement can be reached.[505]   Indeed, during the Confirmation Hearing, the Parent offered to extend the term of the existing CBA by one year.[506] The lack of an agreement with the Unions does not prevent confirmation of the Parent's Full Payment Plan.

289.     Debtors object to the Parent's Full Payment Plan, claiming it is not made in good faith because it includes a release of certain claims by the Debtors against the Parent and its affiliates.  In exchange for the releases, the Parent is contributing over $2.2 billion in cash to the Debtor's Estates—enough to ensure cash payment of full principal and interest on all claims at their allowed or agreed-upon amounts and in conformity with the absolute priority rule of distribution in chapter 11—and will grant a release of the Parent's claims against the Debtors.[507] The Parent has exhibited a commitment to fully and timely consummate the Parent's Full Payment Plan and reorganize and continue the operations of the Debtors.

290.     The Debtors rely on the SCC Final Judgment and as evidence that the Parent's Full Payment Plan is not proposed in good faith.  The Debtors argue that "the Parent's past behavior in conspiring with faithless fiduciaries ought to prevent confirmation of the Parent's

---

[504]     (Supp. Lazalde Proffer at ¶ 17; Confirmation Hr'g Tr. 8/25/09 at 60:11-13 (Statement of Mr. Brimmage).)

[505]     (*Id.*)

[506]     (Confirmation Hr'g Tr. 8/25/09 at 60:11-13 (Statement of Mr. Brimmage).)

[507]     (Supp. de la Parra Proffer at ¶ 3; Parent's Full Payment Plan Art. 11.7.)

Full Payment Plan."[508]   The Section 1129 good faith analysis applies only to the plan and its acceptance, and does not apply to the plan proponent's pre-petition behavior.[509]

291.     For example, the District Court for the Northern District of Texas has affirmed a bankruptcy court's finding that a plan proposed by a fraudulent conveyance defendant was proposed in good faith, noting: "All the evidence that appellants cite concerns acts allegedly committed prior to the filing for bankruptcy and is hence not relevant to the plan."[510]   Similarly, the Bankruptcy Court for the Southern District of Texas has rejected allegations that a plan was not proposed in good faith because of pre-petition misdeeds in connection with a failed attempt to restructure the debtors outside of bankruptcy.[511]

292.     The Debtors also suggest that the Parent's desire to release the SCC Final Judgment in the Full Payment Plan's releases, means that the Plan is proposed in bad faith.  This argument is inconsistent with cases holding that settling fraudulent transfer liability under a plan is permissible under Section 1123(b)(3)(A), and that there is nothing inherently impermissible about a plan proponent proposing to settle claims against itself.  For example, in *Texas Extrusion Corp.*, the Fifth Circuit Court of Appeals affirmed confirmation of a plan proposed jointly by the debtors' largest secured creditor and the creditors committee, which plan included a release of fraud and fraudulent conveyance claims against the secured creditor in exchange for a release of

---

[508]     (*Id*. at 18.)

[509]     *See, e.g.*, *In re Machine Menachem, Inc*., 371 B.R. 63, 69 (Bankr. M.D. Pa. 2006) (finding debtor's pre-petition corporate law violations not a factor in determining whether plan is proposed in good faith).

[510]     *Texas Extrusion Corp. v. Palmer, Palmer & Coffee (In re Texas Extrusion Corp.)*, 68 B.R. 712, 723 (N.D. Tex. 1986) ("The test for good faith is not based on what the plan proponents' behavior prior to petition was.  It is only based on the Plan itself and its acceptance."), *aff'd*., 844 F.2d 1142 (5th Cir. 1988).

[511]     *In re General Homes Corp.*, 134 B.R. 853, 862 (Bankr. S.D. Tex. 1991) ("The evaluation of good faith is not based on the plan proponents' behavior prior to the filing of the bankruptcy petition. It is only based on the Plan and its acceptance.")

a majority of secured creditor's claims against the debtors.[512]   In affirming confirmation of the

plan, the Fifth Circuit affirmed the bankruptcy court's finding that the plan was proposed in good

faith under Section 1129(a)(3).[513]

293.     The Debtors rely on the case of *In re Unichem Corp.* for the proposition that

"Congress did not intend the objectives and purposes of the Bankruptcy Code to include

rewarding [a shareholder] for breaching his fiduciary duty."[514]   In *Unichem*, the court refused to

approve a disclosure statement describing a plan proposed by the debtor's former president who

had been found liable for breach of fiduciary duties to the debtor.   The Court denied approval of

the former president's disclosure statement on the grounds that: (a) it did not adequately disclose

that the plan would release the president's liability for breach of fiduciary duty, or that the plan

would likely result in a liquidation of the debtor; and (b) the plan was proposed with the goal of

eliminating the debtor as a business competitor, and therefore was not proposed in good faith.

*Unichem* is distinguishable from this case.   First, the Court did not address the plan's release of

fiduciary duty liability as an element of its good faith analysis; rather, the release was an element

of the court's adequate information analysis.   Thus, the plan was not found to be proposed in bad

faith on the grounds that the proponent sought to eliminate his breach of fiduciary duty liability.

Second, the court found that the plan was proposed in bad faith because the former president

sought to eliminate the debtor as a business competitor, noting that the objective of the

Bankruptcy Code do not include:   "allowing an individual to utilize the Bankruptcy Code to

---

[512]     *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1157-60 (5th Cir. 1988).

[513]     *Id.*; *see also In re BBL Group, Inc.*, 205 B.R. 625, 633 (Bankr. N.D. Ala. 1996) (confirming a Chapter 11 plan proposed by a creditor / fraudulent transfer defendant and noting that, under 11 U.S.C. § 1123(b)(3)(A), "a plan may provide for the settlement or adjustment of any claim belonging to the debtor or to the estate"); *In re Cellular Information Systems, Inc.*, 171 B.R. 926, 937 (Bankr. S.D.N.Y. 1994) ("The evaluation of good faith is not based on the plan proponents' behavior prior to the filing of the bankruptcy petition, but instead, in light of the totality of the circumstances surrounding confirmation.") (citations omitted).

[514]     *In re Unichem Corp.*, 72 B.R. 95, 100 (Bankr. N.D. Ill. 1987)

drive a competitor out of business."[515]  Moreover, here the Parent is not motivated to eliminate ASARCO as a business competitor, but rather seeks to reorganize ASARCO as a viable and profitable entity.  Finally, as the District Court confirmed, the Parent does not owe fiduciary duties to ASARCO.[516]  Therefore, *Unichem* does not support the conclusion that the Parent's Full Payment Plan is proposed in bad faith.

294.     In addition, the SCC Litigation arose out of events that occurred over six years ago.  The District Court concluded that AMC paid ASARCO reasonably equivalent value for the SCC Shares, and did not award punitive damages.  In addition, the purpose of Section 550 is to avoid transfers "for the benefit of the estate," which is uniformly interpreted to mean only until the allowed claims of creditors have been paid in full.[517]  Here, the estate has been made whole, and thus there is no cause for referring to the SCC Final Judgment as grounds for denying the Parent's Full Payment Plan.  Therefore, the SCC Final Judgment has minimal probative value, if any, to the question of whether the Parent's Full Payment Plan is proposed in good faith.

295.     Therefore, the release of the SCC Litigation and other litigations is a settlement permissible under Section 1123(b)(3)(A), and for which the Parent will provide consideration of $2.6468 billion ($2.2051 billion in Cash, a $280 million promissory note, and $161.7 million in administrative expense claim forgiveness), plus the AMC Guarantee Agreement, plus the Grupo México Guarantee Agreement.  Given the testimony of the Debtors' expert witness that the

---

[515]     *Id*. at 100.

[516]     *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 415-16 (S.D. Tex. 2008).

[517]     *ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150, 161 (S.D. Tex. 2009); *Adelphia Recovery Trust v. Bank of America, N.A.*, 390 B.R. 80 (S.D.N.Y. 2008); *Murphy v. Town of Harrison (In re Murphy)*, 331 B.R. 704, 714-15 (S.D.N.Y. 2005).

enterprise value of ASARCO is between $950 million and $1.25 billion, value well in excess of $1 billion is being paid for the release.[518]

296.     The Debtors and the Unions also claim that the lack of a new collective bargaining agreement with the Unions is an indication that the Parent's Full Payment Plan is not proposed in good faith.  The Parent's Full Payment Plan assumes the Existing CBA will remain in effect and that Reorganized ASARCO will continue to honor that agreement, including the provision providing for the Unions to occupy one seat on Reorganized ASARCO's Board of Directors.[519]  Moreover, although the parties have not yet been able to reach a new labor agreement, the Court believes that a new labor agreement can be reached.  As explained *supra*, the lack of an agreement with the Unions does not prevent confirmation of the Parent's Full Payment Plan.

297.     The Parent's Full Payment Plan achieves good objective consequences because it provides a cash recovery in full satisfaction of creditor's claims, the greatest immediate recovery to various constituencies, and certainty of funding.  In short, there is simply no basis for Debtors or any of the creditors to assert that the Parent's Full Payment Plan was not proposed in good faith.  For these reasons, Section 1129(a)(3) has been satisfied.

### E.     11 U.S.C. § 1129(a)(4)

298.     The Parent will not make any payments "for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case," unless such payments either have been approved by the Court as reasonable or are subject to approval of the Court as reasonable, thus satisfying the requirements of Section 1129(a)(4) of the

---

[518]     (Proffer of George M. Mack in Support of Confirmation of the Debtors' Joint Plan of Reorganization and in Opposition to Confirmation of Parent's and Harbinger's Plans of Reorganization (Docket No. 11936, "Mack Proffer") at 5.)

[519]     (Docket No. 12620.)

Bankruptcy Code.[520]   This Section has been construed to require that all payments of professional fees that are made from estate assets be subject to review and approval by the Court as to their reasonableness.[521]

299.     Section 2.1 of the Parent's Full Payment Plan provides for the payment of only "Allowed" Administrative Claims, and specifically provides that "Allowed Administrative Claims of Professional Persons shall be paid pursuant to a Final Order of the Bankruptcy Code."[522]   In addition, Section 15.2(q) of the Parent's Full Payment Plan provides that the Court will retain jurisdiction after the Effective Date to hear and determine all applications for compensation of Professional Persons and reimbursement of expenses under Sections 330, 331, or 503(b) of the Bankruptcy Code.   Accordingly, the Parent's Full Payment Plan fully complies with the requirements of Section 1129(a)(4) of the Bankruptcy Code.

### F.     11 U.S.C. § 1129(a)(5)

300.     Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity of certain individuals who will hold positions with Reorganized ASARCO the Effective Date.[523]   As set forth *supra*, the Parent has disclosed the identity and affiliations of any person proposed to serve as a director or an officer of Reorganized ASARCO and thus the Parent's Full Payment Plan complies with 11 U.S.C. 1129(a)(5).

### G.     11 U.S.C. § 1129(a)(6)

301.     Section 1129(a)(6) of the Bankruptcy Code requires, with respect to a debtor whose rates are subject to governmental regulation following confirmation, appropriate

---

[520]     *See* 11 U.S.C. § 1129(a)(4); *see also In re Resorts Int'l, Inc.*, 145 B.R. 412, 475-76 (Bankr. D.N.J. 1990).

[521]     *See In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

[522]     *See In re Elsinore Shore Assocs.*, 91 B.R. 238, 268 (Bankr. D. N.J. 1988) (holding that requirements of Section 1129(a)(4) were satisfied when the plan provided for payment of only "allowed" administrative expenses).

[523]     11 U.S.C. § 1129(a)(5).

governmental approval has been obtained for any rate change provided in the plan, or that such rate change be expressly conditioned on such approval.[524]  Because the Debtors do not conduct operations in a regulated industry, Section 1129(a)(6) is inapplicable to the Parent's Full Payment Plan.

### H.    11 U.S.C. § 1129(a)(7)

302.    Section 1129(a)(7) of the Bankruptcy Code provides protection to creditors and interest holders who are impaired under a plan and who have not voted to accept such plan by imposing on any plan a "best interests of creditors" requirement.   Under this requirement, holders of impaired claims and interests who do not vote to accept the plan must:

> receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 [of the Bankruptcy Code] on such date.[525]

Under the Parent's Full Payment Plan there is only one impaired class of creditors (Class 4 (Asbestos Personal Injury Claims)).

303.    The analysis requires that each holder of a claim or interest either accept the plan or receive or retain under the plan property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.[526]

304.    In a liquidation under chapter 7, the value of the Estates would diminish substantially due to, among other things: (a) the increased costs and expenses of liquidation under chapter 7 arising from fees payable to the chapter 7 trustee and attorneys and other

---

[524]      11 U.S.C. § 1129(a)(6).

[525]      11 U.S.C. § 1129(a)(7)(A)(ii).

[526]      *In re Briscoe Enters., Ltd. II*, 994 F.2d at 1167 (the best interests of creditors test "requires that each holder of a claim in a class either accept the plan or receive at least as much as it would receive in a chapter 7 liquidation").

professional advisors to such trustee; (b) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation; (c) further erosion of the value of the Debtors' assets in the context of an expedited liquidation required under chapter 7; and (d) cost and expense attributable to the time value of money resulting from what is likely to be a more protracted proceeding.

305.     By comparison, the Parent's Full Payment Plan provides that creditors in all Classes other than Class 4 will receive payment in full, in Cash, with post-petition interest.  No greater recovery is possible, so the best interests test is satisfied as to creditors in such Classes. As to holders of Claims in Class 4, such holders are receiving the benefit of the bargain negotiated between the Parent and the Asbestos Representatives, and that treatment results in demonstrably greater recovery that that provided under the Debtors' Liquidation Plan, let alone in a liquidation.  Consequently, the Court concludes that confirmation of the Parent's Full Payment Plan will provide each holder of a Claim in an Impaired Class with a greater recovery than such holder would have received under a chapter 7 liquidation of the Debtors.

306.     Holders of Allowed Secured Claims will either (a) receive (i) Cash equal to the principal amount of such Allowed Secured Claim and (ii) Post-Petition Interest on such Claim, (b) be Reinstated, (c) receive the Collateral securing such Secured Claims, or (d) receive other treatment as may be agreed upon between the Parent and the holder of the Allowed Secured Claim.

307.     Holders of Asbestos Personal Injury Claims and Demands will be channeled to, and assumed and satisfied by, the Section 524(g) Trust funded with the Section 524(g) Trust Assets (consisting of (a) Cash in the amount of $500 million and Cash in an amount representing Post-Petition Interest calculated at the Plan Rate on a principal amount of $780 million; (b) the

ASARCO Note; (c) the ASARCO Security Agreement; (d) the ASARCO Deed of Trust; (e) the

Parent Pledge Agreement; (f) directly or indirectly, the Asbestos Insurance Recoveries; and (g)

Cash in the amount of $27.5 million to administer the Section 524(g) Trust).

308.    Holders of General Unsecured Claims will receive Cash equal to the principal

Allowed Amount of such Claim plus Post-Petition Interest.

309.    Holders of Late Filed and Subordinated Claims, in full satisfaction, settlement,

release, extinguishment, and discharged of such Claim, will receive Cash equal to the principal

Allowed Amount of such Claim plus Post-Petition Interest.

310.    Interests in ASARCO will be, as of the Effective Date, retained by ASARCO

USA, Incorporated.

I.      **11 U.S.C. § 1129(a)(8)**

311.    Section 1129(a)(8) of the Bankruptcy Code requires that a plan must, with

respect to each class of claims or interests, either provide for the non-impairment of such class or

be accepted by each impaired class.[527]   Pursuant to Section 1126(c), a class of impaired claims

has accepted a plan if the holders of at least two-thirds in dollar amount and more than one-half

in number of claims in that class actually voting in connection with the plan vote to accept the

plan.

312.    Class 4 (Asbestos Personal Injury Claims) is the only Impaired Class under the

Parent's Full Payment Plan.  Its impairment relates solely to the agreement of its constituent

holders to accept a $280 million interest-bearing, secured one-year promissory note as part of its

distribution in satisfaction of the Claims of its Holders.  The Holders of Asbestos Personal Injury

Claims have voted in sufficient number and amount to accept the Parent's Full Payment Plan.

---

[527]     11 U.S.C. § 1129(a)(8)(A).

Holders of Claims representing 89.78% in dollar amount and 84.16% in number of voting Claims in Class 4 voted to accept the Parent's Full Payment Plan.[528]  Thus, the Parent's Full Payment Plan satisfies the requirements of Section 1129(a)(8) of the Bankruptcy Code.

313.     All other Classes are Unimpaired under the Parent's Full Payment Plan. Accordingly, they are deemed to have accepted the Parent's Full Payment Plan pursuant to Section 1126(f) of the Bankruptcy Code.

314.     If the Court determines that another Class is Impaired that has not accepted the Parent's Full Payment Plan, the Parent's Full Payment Plan may nevertheless be confirmed pursuant to Section 1129(b) of the Bankruptcy Code (as described in detail in the Confirmation Brief) because the Parent's Full Payment Plan does not discriminate unfairly and is fair and equitable to each rejecting Class.

### J.     11 U.S.C. § 1129(a)(9)

315.     Section 1129(a)(9) of the Bankruptcy Code contains a number of requirements concerning the payment of priority claims.  *See* 11 U.S.C. § 1129(a)(9).  The Parent's Full Payment Plan meets the requirements of all three subsections of Section 1129(a)(9). Specifically, the treatment of Administrative Claims and Priority Claims satisfies the requirements of Section 1129(a)(9)(A) and (B) of the Bankruptcy Code, and the treatment of Priority Tax Claims satisfies the requirements of Section 1129(a)(9)(C) of the Bankruptcy Code.[529]

### K.     11 U.S.C. § 1129(a)(10)

316.     If a plan has any impaired class of claims, Section 1129(a)(10) of the Bankruptcy Code requires that at least one such impaired class of claims vote to accept the plan,

---

[528]     (Monger Proffer at ¶ 10.)

[529]     (*See* Parent's Full Payment Plan, §§ 2.1, 2.2 and 4.2(a).)

determined without including the acceptance of the plan by any insider.[530]   The Holders of
Asbestos Personal Injury Claims, an impaired Class of Claims, have voted in sufficient number
and amount to accept the Parent's Full Payment Plan..

**L.**   **11 U.S.C. § 1129(a)(11)**

317.   Section 1129(a)(11) of the Bankruptcy Code requires the Court to find that the
Parent's Full Payment Plan is feasible, and that "[c]onfirmation of the plan is not likely to be
followed by liquidation, or the need for further financial reorganization, of the debtor or any
successor to the debtor under the plan, unless such liquidation or reorganization is proposed in
the plan."[531]   The feasibility requirement involves two determinations: (i) that the provisions of
the plan can realistically be consummated, and (ii) if consummated, the plan will enable the
debtor to emerge from bankruptcy as a viable entity.[532]   The Parent has satisfied both elements.

**1.**   **Parent's Full Payment Plan can be consummated according to its provisions.**

318.   The first element of feasibility requires the court to examine whether, as a
practical matter, the plan can be performed according to its provisions.[533]   The bulk of funding
for the Parent's Full Payment Plan is to be provided in cash or cash equivalents.[534]   This includes
a binding commitment from the Parent to deposit $2.2051 billion in shares of stock of SCC and
$500 million in U.S. Dollar currency into an escrow account to demonstrate its commitment to
confirmation and consummation of the Parent's Full Payment Plan, and provision of a

---

[530]   11 U.S.C. § 1129(a)(10); *see also In re Anderson Oaks (Phase I) Ltd. P'ship*, 77 B.R. 108, 111 (Bankr. W.D. Tex. 1987).

[531]   11 U.S.C. § 1129(a)(11).

[532]   *See In re Lakeside Global II, Ltd.*, 116 B.R. 499, 506-07 (Bankr. S.D. Tex. 1989).

[533]   *See In re Clarkson*, 767 F.2d 417, 420 (8th Cir. 1985); *see also In re Seatco, Inc.,* 259 B.R. 279, 288 (Bankr. N.D. Tex. 2001) (noting that feasibility means that "the reorganized debtor can perform the plan and make those payments promised to it under the plan").

[534]   ***

$200 million Working Capital Facility.[535]  The SCC stock that will be deposited into the escrow account are not the same SCC shares that currently secure the SCC Final Judgment.[536]  The funding also includes the $280 million ASARCO Note, guaranteed by AMC and Grupo México and fully secured by a first lien on Reorganized ASARCO's assets and a pledge of 51 percent of the New Equity Interests in Reorganized ASARCO.[537]  In addition, the Parent has paid over $21 million to obtain a binding commitment with a consortium of lenders to provide $1.3 billion senior secured term financing facility with several prominent, internationally-recognized lending institutions.[538]  The Parent has also obtained a guarantee by Grupo México to provide the other $905.1 million, $500 million of which has been pre-funded into the Escrow Account, thus ensuring the Parent's ability to fund its obligations.[539]

319.     The evidence therefore supports the conclusion that the Parent's Full Payment Plan can realistically be consummated according to its provisions.

## 2.     Under the Parent's Full Payment Plan, it is likely that Reorganized ASARCO will continue as a successful and viable entity.

320.     The second element, which requires that the court determine that it is likely that the reorganized company continue as a successful and viable entity, is also satisfied.  To satisfy this element, the success of the reorganized entity need not be guaranteed.[540]  "Only a reasonable assurance of commercial viability is required."[541]  This requirement is not meant to prohibit the confirmation of plans that have a reasonable likelihood of success.  Instead, "[t]he purpose of the

---

[535]     (Supp. de la Parra Proffer at ¶ 13; Executed Escrow Agreement, Ex. 25.) .

[536]     (Confirmation Hr'g Tr. 8/27/2009 at 95:10-25, 96:1-5 (Statements of Mr. Winter and Mr. Antweil).)

[537]     (Parent's Full Payment Plan Exhibit 23.)

[538]     (Supp. de la Parra Proffer at ¶ 7 and Ex. A.)

[539]     (Supp. de la Parra Proffer at  ¶¶ 19-20, Ex. A.)

[540]     *See In re Lakeside Global II, Ltd.*, 116 B.R. at 507.

[541]     *Id.*

feasibility requirement is 'to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.'"[542]

321.    As described in Section L(1), above, Reorganized ASARCO will have more than adequate funding to succeed as a viable entity after confirmation of Parent's Full Payment Plan.

322.    Following confirmation, the Parent's Full Payment Plan contemplates that Reorganized ASARCO will have certain ongoing obligations, including pension and other post-retirement benefit obligations, Reinstated Environmental Claims, litigation costs, ordinary operating costs, tax payments, and obligations under the ASARCO Note.[543]  Further, the Parent intends to operate Reorganized ASARCO in accordance with the Five Year Business Plan prepared by ASARCO and as contemplated by the Proffer and Rebuttal Proffer of Lisa Poulin.[544]

323.    Reorganized ASARCO is projected to generate sufficient cash flow to satisfy its obligations, resulting in positive EBITDA for each year of the Plan.[545]  According to the Poulin Proffer, the projections in the Parent's Full Payment Plan are reasonable under the circumstances.[546]  Furthermore, the feasibility of the Parent's Full Payment Plan is enhanced by a renewable two-year term $200 million working capital facility provided by the Parent—which, pursuant to the Guarantee Agreement, is fully backed by Grupo México.  The $200 million working capital facility will ensure that Reorganized ASARCO has sufficient resources to pay its

---

[542]    *Id.* (quoting *Pizza of Hawaii, Inc. v. Shakey's Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985)).

[543]    (Poulin Proffer at ¶ 15.)

[544]    (Poulin Proffer at ¶ 20-21; Poulin Rebuttal Proffer at ¶ 14; Lazalde Proffer at ¶ 30.)

[545]    (Poulin Proffer, Ex. C).

[546]    (Poulin Proffer at ¶ 20.)

obligations as they come due.[547]   In addition, the Parent, a U.S. corporation, possesses approximately 680 million shares of Southern Peru Copper Corporation Stock with an aggregate market value of in excess of $20 billion.[548]

324.     The Parent has obtained the services and expertise of several professionals to make certain that the Parent's Full Payment Plan is the best alternative and most feasible Plan, particularly in regard to creditor, labor, asbestos, and environmental issues.[549]   To evaluate the feasibility of the Parent's Full Payment Plan and the Debtors' Liquidation Plan, the Parent has engaged CRG Partners to analyze not only the feasibility of each Plan, but also to conduct a liquidation analysis of each Plan.   Based on its expertise, CRG Partners has concluded that Cash and other forms of value available for distribution under the Parent's Full Payment Plan are sufficient to satisfy all Claims and even more certain under the Parent's Full Payment Plan, as modified.   Moreover, CRG Partners has concluded that the Confirmation and consummation of the Parent's Full Payment Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of Reorganized ASARCO.

325.     Finally, as stated *supra*, the Court has found that a strike is unlikely, and that even if a strike does occur, the Parent's resources in the form of readily available labor, labor disruption advisors, and financial reserves will minimize the impact of any labor strike on ASARCO's operations.[550]

326.     Barclays Capital Inc. ("<u>Barclays</u>") has argued that the Plan is not feasible without establishing a reserve to "provide for the indemnity of [Barclays], as well as for the

---

[547]     (Poulin Proffer at ¶ 21).

[548]     (de la Parra Proffer at ¶ 9.)

[549]     (*See, e.g.,* Travers Proffer; *see also* Brown Proffer; Evaluation of Environmental Obligations and Costs at ASARCO Operating Sites, July 10, 2009 (Docket No. 11937).)

[550]     (Ruiz Proffer at ¶¶ 13-14; de la Parra Proffer at ¶ 16.)

indemnity to the officers and directors of the Debtors."[551]  Based on the findings set forth <u>supra</u> regarding Reorganized ASARCO's financial position, the Parent's Full Payment Plan need not establish an independent reserve to demonstrate feasibility.

327.     The Court therefore concludes that the Parent's Full Payment Plan is feasible, and the requirements of Section 1129(a)(11) of the Bankruptcy Code are satisfied.

**M.     <u>11 U.S.C. § 1129(a)(12)</u>**

328.     Section 1129(a)(12) of the Bankruptcy Code requires that certain fees listed in 28 U.S.C. § 1930, determined by the Court at the hearing on confirmation of a plan, be paid or that provision be made for their payment.[552]  Such fees incurred through confirmation of the Parent's Full Payment Plan have either been paid by the Debtors during the pendency of these Cases or will be paid on or before the Effective Date in accordance with Section 9.3(d) of the Parent's Full Payment Plan.[553]  Thus, the requirements of Section 1129(a)(12) of the Bankruptcy Code have been satisfied.

**N.     <u>11 U.S.C. § 1129(a)(13)</u>**

Section 1129(a)(13) of the Bankruptcy Code requires that the plan provide for the continuation of retiree benefits at levels established pursuant to Section 1114 of the Bankruptcy Code for the duration of the period that the debtor has obligated itself to provide such benefits.[554] Section 8.7(d) of the Parent's Full Payment Plan satisfies this requirement.[555]

**O.     <u>11 U.S.C. § 1129(a)(14), (15) and (16)</u>**

---

[551]     (Docket No. 12567 at ¶ 3.)

[552]     11 U.S.C. § 1129(a)(12).

[553]     (Parent's Full Payment Plan Art. 9.3.)

[554]     11 U.S.C. § 1129(a)(13).

[555]     (Parent's Full Payment Plan Art. 8.7(d).)

329.     Since none of the Debtors is an individual, Section 1129(a)(14) is not applicable.

330.     Since none of the Debtors is an individual, Section 1129(a)(15) is not applicable.

331.     Although none of the Debtors is a nonprofit entity, and the Parent does not anticipate that any transfers of property under the Parent's Full Payment Plan will be made by a nonprofit corporation or trust, to the extent that any such transfers are contemplated by the Parent's Full Payment Plan, they will be made in accordance with applicable nonbankruptcy law. Accordingly, the Parent's Full Payment Plan satisfies the requirements of Section 1129(a)(16) of the Bankruptcy Code.

## III.     IN THE ALTERNATIVE, THE PARENT'S FULL PAYMENT PLAN SHOULD BE CONFIRMED UNDER 11 U.S.C. § 1129(b)

332.     The Parent's Full Payment Plan satisfies Section 1129(b) of the Bankruptcy Code.  Under the Parent's Full Payment Plan, the Parent will not receive or retain any property unless and until each holder of an Impaired Claim has been Paid in Full (including Post-Petition Interest), consented to a different treatment, or appropriate provisions are made to ensure such payment following the Effective Date.  Thus, the Parent's Full Payment Plan is "fair and equitable" and does not violate the absolute priority rule as codified pursuant to Section 1129(b)(1) and (2) of the Bankruptcy Code.

333.     The Parent's Full Payment Plan satisfies Section 1129(b) of the Bankruptcy Code.  The Parent's Full Payment Plan does not unfairly discriminate with respect to the only class that is impaired, Class 4 (Asbestos Personal Injury Claims), which class has accepted the Parent's Full Payment Plan by the requisite numbers and amounts.  Thus, the Parent's Full

Payment Plan does not unfairly discriminate against any Claim pursuant to Section 1129(b)(1) of the Bankruptcy Code.

## IV.   NEITHER THE SPECIAL SUCCESSORSHIP CLAUSE NOR THE THREAT OF A STRIKE PREVENT CONFIRMATION OF THE PARENT'S FULL PAYMENT PLAN

### A.   The Special Successorship Clause does not bind the Parent as a matter of law.

334.     Although the Unions may be heard on the economic impact of a plan, the Unions do not have standing to object to confirmation of the Parent's Full Payment Plan based on the CBA. *See* FED. R. BANKR. P. 2018(d). "[T]he [Bankruptcy] Code makes no provision for the court to override the requirements of confirmation in favor of the public interest. . . .  It would be singularly inappropriate . . . for the court to import into chapter 11 an overriding test for confirmation based on . . . the public interest or the needs of a debtor's employees. . . . ." *In re Gen. Electrodynamics Corp.*, 368 B.R. 543, 548-49 (Bankr. N.D. Tex. 2007) (emphasis added).   Instead, "[t]he court must administer the Code according to its terms.   The role the public interest or the needs of creditors or a debtor's employees should play in plan confirmation must be left to Congress." *Id.*

335.     Because the Special Successorship Clause states that "the Company" will not consummate a reorganization unless the buyer has a New CBA with the Unions, and because the Unions acknowledge that the term "Company" in the LOU includes only the Debtors, then the LOU (which includes the SSC) applies only to ASARCO, not the Parent, at least until a plan has been confirmed that leaves the Parent in control of Reorganized ASARCO.[556]

---

[556]     "[W]hy should this [the LOU] not be read to say that the debtor is binding itself, that it will not confirm a plan or it won't support – it won't propose a plan in which ASARCO Incorporated retains its equity unless they've entered into an agreement?  Why does this bind the Parent at all?"  (Confirmation Hr'g Tr. 8/20/09 at 134 (Comment of the Court).)

336.     The conclusion that the SSC does not bind the Parent is also supported by the Second Stipulation, which states that the CBA does not bind the Parent.[557]  Although the Unions and the Debtors attempted to modify this language with the Third Stipulation, so that the SSC would apply to the Parent prior to confirmation, the Third Stipulation is not signed by the District Court and it is not adopted by reference in the order affirming the CBA Order, and thus it does not have the effect of a court order.[558]   Therefore the Third Stipulation does not apply, and the CBA does not bind the Parent in any respect prior to confirmation, as provided in ¶ C(I) of the Second Stipulation.  *See, e.g.*, *Hill v. City of Seven Points*, 230 F.3d 167 (5th Cir. 2000) (magistrate judge's summary judgment ruling had no legal effect because the reference, while signed by the parties, was not signed by the district judge).

337.     This Court's CBA Order rejects the notion that the Parent can be bound to the SSC or the CBA before confirmation.  Nothing in the Court's CBA Order allows the Unions to enforce the CBA against the Parent prior to confirmation and consummation of the Parent's Full Payment Plan.  "[T]he interpretation of a court order is purely a question of law."  *New Nat'l Gypsum Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.)*, 219 F.3d 478, 483 (5th Cir. Tex. 2000).  Although the Unions cite their own interpretation of the effect of the CBA in support of their argument, the Supreme Court has held that "[a]ny command of a consent decree or order must be found within its four corners, and not by reference to any purposes of the parties or of the underlying statutes." *United States v. ITT Continental Baking Co*., 420 U.S. 223, 233 (1975) (quotations and citations omitted); *see also United States v. Atlantic Refining Co*., 360 U.S. 19, 23 (1959) (rejecting a loose interpretation of the consent decree even though such an interpretation might better effectuate the purposes of the acts assertedly violated); *Hughes v.*

---

[557]      (Second Stipulation at ¶ C(I).)

[558]      *ASARCO Inc. v. ASARCO LLC*, No. Civ. CC-07-133, 2008 WL 4609997 (S.D. Tex. Oct. 14, 2008).

*United States*, 342 U.S. 353, 356-57 (1952) (rejecting an invitation to advance the asserted purpose of the consent decree through an interpretation of a consent decree not justified by the four corners of the decree).

338.     The Parent's Full Payment Plan qualifies as a "Parent-Retained Equity Plan." If, however, the Parent's Full Payment Plan is instead a new value plan, the SSC would not apply by its own terms because the Parent is not subject to the Special Successorship Clause unless there is a Parent Retained Equity Plan.[559]

339.     In any event, regardless of the language to which the Parent and the Unions agreed in the CBA, LOU, SSC and the Second Stipulation, the Unions and the Debtor do not have the power to bind the Parent, over its objection, to the CBA or the SSC in any respect before the Parent's Full Payment Plan is confirmed.  As the United States Supreme Court held in the seminal *Burns* case, "although successor employers may be bound to recognize and bargain with the union," except in rare circumstances, "*they are not bound by the substantive provisions of a collective-bargaining contract negotiated by their predecessors but not agreed to or assumed by them.*"  *N.L.R.B. v. Burns Int'l Sec. Services, Inc.*, 406 U.S. 272, 284 (1972) (emphasis added); *see also Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 40 (1987) ("[T]he successor ... is not bound by the substantive provisions of the predecessor's collective-bargaining agreement."); *J. Vallery Elec., Inc. v. N.L.R.B.*, 337 F.3d 446, 450-51 (5th Cir. 2003) ("'Although a bona fide successor is not in general bound by a prior collective bargaining agreement, an alter ego will be so bound.'") (quoting *Carpenters Local Union No. 1846, United*

---

[559]     By the plain terms of the Labor Agreements, the Parent is not subject to the Special Successorship Clause unless there is a Parent Retained Equity Plan.  (Second Stipulation at ¶ C(II).)

*Bhd. of Carpenters & Joiners of Am., AFL-CIO v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 507 (5th Cir. 1983)).[560]

340.    No court has ever enforced a successorship clause against a non-party "buyer" to require it to negotiate a CBA with a union before it has the right to buy the company, or to prevent confirmation of a non-party's plan of reorganization under the Bankruptcy Code.  The cases on which the Unions rely merely stand for the proposition that a successor clause may be enforced against the employer-entity that agreed to it in a manner that prevents that entity from consummating a sale or plan of reorganization.  (*See* Unions' Objection at ¶ 59 n.22 (citing *United Steel Workers of America, AFL-CIO-CLC v. Cooper-Standard Automotive of Bowling Green*, No. 1:04-CV-358-TS, 2004 WL 2599132 (N.D. Ind. Nov. 2, 2004) (unreported decision)).)  Those cases do not apply her, where the Debtors and Unions are trying to enforce the contract against the Parent – a non-party.  Similarly, where DIP financing agreements give lenders the right to block a plan of reorganization by a debtor, those agreements are enforced against the debtor that agreed to them – no case has held that a DIP lender may block a competing plan proposed by a third party supported by its own financing arrangements.

341.    In addition, requiring the Parent to negotiate CBA with a union before it ever owns the company would violate labor laws.  Under the National Labor Relations Act ("NLRA"), it is unlawful for an employer to recognize and bargain with a union before the

---

[560]      *See also Ameristeel Corp. v. Int'l Brotherhood of Teamsters*, 267 F.3d 264, 273-74 (3d Cir. 2001) (an unconsenting successor employer cannot be bound by the substantive terms of a collective bargaining agreement negotiated by its predecessor); *Howard Johnson Co. v. Detroit Local Joint Executive Board*, 417 U.S. 249, 258 n.3 (1974) (mere existence of successorship clauses in bargaining agreements between union and seller could not bind purchaser when it was clear that purchaser refused to assume any obligations under the agreements); *Johnson v. Pullman, Inc*., 845 F.2d 911, 912 (11th Cir. 1988) (purchaser was not bound by successorship clause requiring it to adopt collective bargaining agreement; purchaser was not a party to the agreement and could not be held accountable for any breach thereof); *Oil Workers Local 7-517 v. Uno-Ven Co*., 170 F.3d 779, 781 (7th Cir. 1999) (company hired by successor of dissolved company to operate refinery and thus new "employer" was not bound by labor contract to which it was not signatory); *Clothing & Textile Workers v. After Six*, Civ. A. No. 92-4294, 1992 WL 202166, at *2 (E.D. Pa. Aug. 6, 1992) (employer that takes over another business generally is not bound by its predecessor's collective bargaining agreements).

employer takes over the operations and employs a substantial and representative complement of employees, a majority of whom the union represents.  It is, in turn, unlawful for a union to demand such recognition and bargaining.[561]  Accordingly, the Special Successorship Clause also violates the NLRA.  For that reason, too, the Special Successorship Clause does not apply and cannot bar confirmation of the Parent's Full Payment Plan.

342.  It would also violate the due process clause of the U.S. Constitution to bind a third party against its will to a collective bargaining agreement prior to assuming ownership or control over the company.

343.  The Debtors argue that the Court must enforce the SSC against the Parent because failing to do so would constitute an improper rejection of the CBA, which is a post-petition contract.  They also argue that the Parent's claim not to be bound by the CBA is precluded by "law of the case."[562]  The Debtors and the Unions confuse *enforcement* of the CBA and the CBA Order with *interpretation.* The Court's approval of the CBA between the Debtor and the Unions does not decide the question of whether the Court can confirm the Parent's Full Payment Plan over the Unions' objection, or whether the Parent is excluded from the confirmation process unless it secures a New CBA.

344.  The question before the Court in 2007 was whether the Existing CBA should be approved between the Debtors and the Unions under 11 U.S.C. § 363(b).  The question today is entirely different: Whether the Existing CBA between the Unions and ASARCO can restrict the Court's authority to approve a full payment plan proposed by the sole equity holder.  As Mr.

---

[561]      *See Int'l Ladies' Garment Workers' Union*, 366 U.S. at 736; *Majestic Weaving Co.*, 147 NLRB 859, 860-61 (1964), *enf. denied on other grounds*, 355 F.2d 854 (2d Cir. 1966); *Plastech Engineered Prods., Inc.*, Cases 10-CA-35554 & 10-RD-1440 (NLRB Advice Memo. June 27, 2005) (finding that "the Employer and the Union engaged in unlawful pre-recognition bargaining…by implementing a neutrality agreement that established terms and conditions of employment"); *Thomas Built Buses, Inc.*, Case 11-CA-20038 (NLRB Advice Memo. Sept. 17, 2004) (same).

[562]      (*See* Unions' Objection at ¶¶ 58-59.)

Kinzie told the Court at the CBA Hearing: "This isn't confirmation.  This isn't a bidding frenzy where we're trying to get the highest and best bid in a sale.  It isn't a sale transaction.  This is a collective bargaining agreement.  And the test for a collective bargaining agreement is whether or not it is within the reasonable business judgment of the Debtors."[563]

345.     The Court specifically asked Debtors' counsel, "[A]ssuming there's equity, do I have to decide today whether you can propose a plan where Grupo is forced to either take this agreement or give up its ownership?"  The Debtors responded, "Absolutely, I think you do not have to decide that today."[564]

346.     The "law of the case doctrine" is a discretionary and procedural doctrine, and does not prevent the Court from revisiting a prior order.  *See, e.g.*, *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415 (5th Cir. 1995).  This discretionary rule of practice "does not limit the power of a court to revisit a legal issue."  Tawes v. Barnes, 2008 U.S. Dist. LEXIS 26300, at *37  (S.D. Tex. Mar. 31, 2008) (J. Rainey) (citing *Copeland*, 47 F.3d 424 ("When the law of the case doctrine is applied by a court to its own prior decisions, it is properly characterized as discretionary in nature.").[565]  As counsel for the Debtors acknowledges, when the CBA was approved the Court was not considering the question of whether and to what extent the CBA or the SSC could be enforced to prevent the Parent's Full Payment Plan from being confirmed.

---

[563]     (CBA Hr'g at 27-28.)

[564]     (*Id.* at 41-42 (Statements of Mr. Kinzie).)

[565]     *See also Perillo v. Johnson*, 205 F.3d 775, 780-781 (5th Cir. 2000) (when court is reviewing its own prior decision, law of case doctrine is matter of judicial discretion rather than judicial power); *In re Herrera*, 380 B.R. 446, 452 (Bankr. W.D. Tex. 2007)  ("the law of the case doctrine does not prevent a court from revising its view of the law if it believes its earlier rulings might have been in error.") (citing *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002)).

Therefore, anything in the CBA Order or the record concerning that issue is, at most, dicta and does not bind the court here.[566]

347.    Debtors' reliance on the SSC as a vehicle for barring the Parent's Full Payment Plan should be rejected because it works a manifest injustice by depriving creditors of their statutory right under Section 1121(c) of the Bankruptcy Code to file a plan and having it confirmed by providing the Unions with a de facto veto over Section 1121(c).[567]   "When the Bankruptcy Code establishes a right explicitly, a bankruptcy court cannot expand or contract that right implicitly through use of equitable powers." *Carter v. Peoples Bank & Trust Co. (In re BNW, Inc.)*, 201 B.R. 838, 847 (Bankr. S.D. Ala. 1996); *In re Szostek*, 1989 U.S. Dist. LEXIS 3220 at *19 (E.D. Pa. Mar. 30, 1989) (noting that, while confirmation generally binds creditors, the "proposition has no bearing in a case where the plan was confirmed in explicit violation of the Bankruptcy Code" … and would "impermissibly shift the burden of not only guarding the constitutionally protected property right of the creditor but also insuring compliance with the provisions of the Bankruptcy Code exclusively on the creditor.").

348.    In addition, confirmation of the Debtors' Liquidation Plan over the Parent's Full Payment Plan based on the Special Successorship Clause would violate public policy, and therefore section 1129(a)(1)-(3), which requires that a plan and a plan proponent comply with all applicable provisions of the Bankruptcy Code and that the plan be proposed in good faith.  11

---

[566]    *See, e.g.*, *Hanover Ins. Co. v. American Engineering Co.*, 105 F.3d 306, 312 (6th Cir. 1997) ("peripheral misstatements" of law about an issue not presented to the appellate court are dicta and therefore not law of the case); *Ducey v. United States*, 830 F.2d 1071, 1072 (9th Cir. 1987) ("Dicta is not given preclusive effect under the law of the case doctrine in this circuit."); *In re: Meridian Reserve, Inc.*, 87 F.3d 406, 410 (10th Cir. 1996) (noting that a majority of our sister courts hold that dicta not law of the case).

[567]    *See In re Pero Bros. Farms, Inc.*, 91 B.R. 1000, 1001 (Bankr. S.D. Fla. 1988) (denying debtors' debtor's motion to convert after confirmation of creditor's plan and stating "I am persuaded that this court, under the discretion granted in § 105(a), should deny conversion (or dismissal) by the debtor in possession as long as a non-debtor chapter 11 plan remains under the court's consideration.  Any other analysis would give a debtor in possession the power to veto or negate any plan it disapproves and, thereby, deprive creditors of their statutory right under § 1121(c) to file a plan and have that plan confirmed by the court. Such an absurd imbalance is nowhere suggested in the legislative history and could not have been contemplated by Congress.").

U.S.C. § 1129(a)(1)-(3).  Congress enacted section 1121 of the Bankruptcy Code providing a chapter 11 debtor an "exclusive period" to file a plan of reorganization.  After the exclusive period terminates on its own or upon order of the Court, Congress sought to facilitate the bankruptcy process by allowing parties in interest to file a plan of reorganization and thus promote efficient administration of the bankruptcy estate.  The policy reasons for allowing other parties the ability to file a plan include promoting competition for the most favorable plan for all creditors.[568]   Here, the Unions and the Debtors sought to contract around the Bankruptcy Code and create perpetual *de facto* exclusivity with the Special Successorship Clause because the Unions would be able to veto any competing plan of reorganization by refusing to enter into a New CBA with another bidder.

349.     In addition, relying on the Special Successorship Clause to reject the Parent's Full Payment Plan would ignore the balance set forth in the Bankruptcy Code between creditors and equity by elevating the Unions to the status of a priority claimant that can veto a plan with an objection, regardless of whether it is in the best interest of creditors and equity.  This reordering of statutory bankruptcy priorities by private contract is inconsistent with the Code and the standards by which this Court's confirmation order will be reviewed on appeal.  Therefore, public policy dictates that the Special Successorship Clause is unenforceable because it was negotiated to circumvent statutory mandates in the Bankruptcy Code, and therefore violates section 1129(a)(1)-(3).  *See also* Restatement (Second) of Contracts § 178 (1981) ("A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides

---

[568]       *See, e.g., In re BMW Group I, Ltd.*, 168 B.R. 731, 748 (Bankr. W.D. Okla. 1994) ("Barring creditors from presenting their own plans by extensions of the period of exclusivity or by timing plan proposals so that creditors are disadvantaged in their attempts to establish a market price for the business and compete for purchase of the business is unjustified.").

that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.").

350.    Therefore, the CBA and the SSC, contracts between the Unions and the Debtors that were approved by the Court, do not bar the Parent's Full Payment Plan from confirmation.

351.    The Unions attempt to avoid the conclusion that they cannot bind the Parent as a matter of law to the SSC by arguing that they are only binding the Debtors from "consummating a plan." Their argument appears to be that if the Parent's Full Payment Plan is confirmed, the Court should deem the Debtor to be the party consummating the plan, something the Debtor is prohibited from doing by the SSC.[569] However, due to the Debtors' opposition to confirmation of the Parent's Full Payment Plan, it would be solely the Parent (with the assistance of the Court) that would be taking steps to consummate its plan once confirmed. Anything the Debtor did would only result from an order of this Court, compelling the Debtors to assist the Parent in effectuating the confirmed plan.[570] Therefore, the SCC does not bar the Parent's Full Payment Plan from being consummated by the Court.

352.    Even if there were any viable legal theory under which the CBA could be enforced against the Parent before its plan is confirmed, the CBA does not require the Parent to execute a new CBA before confirmation. The CBA and the SSC state that the Company is obligated to ensure that a buyer negotiates a new CBA prior to confirmation of a plan. As the Court's order approving the CBA confirms, this means the Debtor – "the CBA provides that the

---

[569]    (See, e.g., Confirmation Hr'g Tr. 8/20/09 at 134 (statements of Mr. Seltzer); see also Unions' Objection Memorandum at 7-8.)

[570]    (See Order Pursuant to §§ 363. 105 and Fed. R. Bankr. P. 9019, Approving Settlement and Release and Revised Bid Protections Contained in the New Purchase and Sale Agreement Between ASARCO LLC and Certain of its Subsidiaries, and Sterlite USA), Inc., and for Related Relief (Docket No. 10935) at ¶ 4(c) ("ASARCO and its Board are specifically prohibited from taking any action in support of an Alternative Plan without prior approval of this Court through the date of confirmation of such Alternative Plan.").)

Debtor will not consummate any sale . . . unless the buyer has entered into an agreement" with the Unions.[571]  The Parent's Full Payment Plan neither seeks nor requires the Debtor's approval to be confirmed – rather, the Parent seeks the Court's confirmation of the Parent's Full Payment Plan pursuant to bankruptcy law.  Indeed, the Debtor continues to object to the Parent's Full Payment Plan – and thus the benefit of the Unions' bargain is preserved.

**B.    Even if the Unions and the Debtor could unilaterally bind the Parent to the CBA prior to confirmation, the Court holds that it does not apply.**

353.    Even if the Debtor and the Unions had the ability to bind the Parent to the CBA or the SSC prior to confirmation, it will not be applied in this case.

354.    The Parent has standing to challenge the application of the SSC.  The Second Stipulation states that the SSC does not apply "if the court determines" that the Unions did not negotiate in good faith, or that exigent circumstances exist, or if the Court "finds" that the CBA would violate the rights of the Parent under 11 U.S.C. § 1129.[572]  The Second Stipulation does not express any limitation on which party can challenge the CBA.[573]

355.    The LOU states that the Court may terminate the SSC "upon motion of the Company."[574]  The LOU does not expressly limit the Parent's standing to challenge the SSC on its plain terms, and the Court will not do so here.  Moreover, the SSC itself applies to "the Company."  Therefore, if the SSC applies to the Parent at all, then it also must confer standing upon the Parent to challenge it.  Even if the LOU could be read to limit the Parent's standing, that language was superseded by the Second Stipulation ¶ C, which modified the LOU specifically to protect the Parent and contains no such limiting language.  *E.E.O.C. v. R.J.*

---

[571]    (Docket No. 4179 at ¶ 14.)

[572]    (Second Stipulation at ¶ C(II)-(III).)

[573]    (*See* Second Stipulation at ¶ C.)

[574]    (LOU at 2(c).)

*Gallagher Co.*, 181 F.3d 645, 651 (5th Cir. 1999) (the court must "giv[e] effect to new provisions and discard[] old provisions which are inconsistent with the new terms").  In addition, it would violate the due process clause of the Constitution to enforce the contractual SSC against the Parent without its consent and over its objection while, in the same stroke, depriving the Parent of the right to challenge it.  The Parent therefore has standing to challenge the SSC.

356.    Because the Parent has negotiated in good faith, and the Unions have failed to negotiate in good faith, the Court concludes that the SSC does not apply to the Parent.[575]

357.    In addition, the Unions have not established grounds for offering "non-identical" terms to Sterlite and the Parent because the "nature" of those companies is virtually identical.[576]   Besides having failed to establish the different nature of the entities, the Unions did not establish how the differences in its proposals to Sterlite and the Parent were related to the alleged differences in the nature of each company.

358.    Even if the nature of the entities were different and "non-identical" terms were therefore permitted, the Unions still must offer terms that are "substantially the same" as those offered to Sterlite.[577]   It is undisputed that the Unions have not offered terms to the Parent that are either identical to, or substantially similar to, the terms of the Sterlite CBA.[578]   Instead, the terms that the Unions offered to the Parent are substantially different from those in the Sterlite CBA.  Therefore, the Court concludes for this alternative reason that the SSC does not apply to the Parent.[579]

---

[575]    (Second Stipulation at ¶ C(II); *see also* Lazalde Proffer ¶¶ 37-41.)

[576]    (LOU at ¶ 2(b).)

[577]    (LOU at ¶ 2(b).)

[578]    (*See* Exhibits 61-70 (reflecting proposals and counterproposals for CBA).)

[579]    (Second Stipulation at ¶ C(II).)

359.     In addition, the Court finds that exigent circumstances exist that warrant the conclusion that the SSC does not apply to the Parent.[580]   The parties defined exigent circumstances as the circumstances in which "it is necessary to the success of the Chapter 11 process." [581]   The Parent has submitted a plan that pays all creditors in full, in cash, for both principal and interest.   Under the relevant terms of the Bankruptcy Code, the Court is required confirm the Parent's Full Payment Plan.   As the Unions told the Court on March 2, 2007, exigent circumstances "could mean many things," but at the very least "in the event that equity was retaining equity, that . . . would have some application to the, what was necessary to the success of the process."[582]

360.     "[T]he [Bankruptcy] Code makes no provision for the court to override the requirements of confirmation in favor of the public interest or on the basis that support for the Plan by creditors . . . is overwhelming."   *In re Gen. Electrodynamics Corp.*, 368 B.R. 543, 548-49 (Bankr. N.D. Tex. 2007).   "The court must administer the Code according to its terms. The role the public interest or the needs of creditors or a debtor's employees should play in plan confirmation must be left to Congress."   *Id.*   Based on this law, and because the Unions' objection is an unnecessary and unreasonable impediment to confirmation – and fairness among the competing plans – it should be rejected in equity and contract, as "exigent circumstances."

361.     Exigent circumstances also exist here because it is unreasonable to expect the parties to reach a CBA in the context of highly contentious litigation.   The Parent met with the Unions repeatedly in 2008 and 2009, and as confirmation approached it became clear that no CBA would be reached prior to the Confirmation Hearing.   The Parent has offered to extend the

---

[580]     (Second Stipulation at ¶ C(II).)

[581]     (LOU at ¶ 2(c).)

[582]     (CBA Hr'g at 16 (statement of Mr. Seltzer); *see also id.* at 17 ("I think exigent circumstance means whatever you decide it means.") (statement of Mr. Kinzie).)

CBA one additional year, to June 31, 2011, in order to facilitate negotiations for a New CBA. These are exigent circumstances that warrant holding that the CBA does not apply, in the anticipation that the Parent and the Unions will negotiate the terms of a New CBA after confirmation.

362.    In addition, exigent circumstances exist because it would be illegal for the Parent to negotiate a New CBA before confirmation.[583]  For these same reasons, the Parent believes that the CBA negotiated between Sterlite and the Unions is illegal.

363.    The Second Stipulation provides that the Court has the power to find at the Confirmation Hearing that the SSC violates the Parent's rights under section 1129(a) or (b) of the Bankruptcy Code, and thereafter to terminate the CBA.[584]  Because the SSC does indeed violate the Parent's rights, the Court will, in the alternative, exercise its authority to terminate the CBA and the Special Successorship Provision.

364.    Section 1129, which sets forth the requirements for a confirmable plan, is carefully constructed to balance the rights of all constituents in a bankruptcy case as well as the public interest.  11 U.S.C. § 1129.  It establishes a number of hurdles to confirmation, which must be met before a court can find a plan is confirmable.  As between themselves, parties can agree that they will not pursue a plan of reorganization that does not meet certain conditions – a classic lock-up arrangement, for example – but, even then, that agreement binds only the parties to the agreement.  There is no legal support for the conclusion that two parties can, by private

---

[583]     *See Int'l Ladies' Garment Workers' Union*, 366 U.S. at 736; *Majestic Weaving Co.*, 147 NLRB 859, 860-61 (1964), *enf. denied on other grounds*, 355 F.2d 854 (2d Cir. 1966); *Plastech Engineered Prods., Inc.*, Cases 10-CA-35554 & 10-RD-1440 (NLRB Advice Memo. June 27, 2005) (finding that "the Employer and the Union engaged in unlawful pre-recognition bargaining…by implementing a neutrality agreement that established terms and conditions of employment"); *Thomas Built Buses, Inc.*, Case 11-CA-20038 (NLRB Advice Memo. Sept. 17, 2004) (same).

[584]     (Second Stipulation at ¶ C(III).)

agreement, impose additional hurdles upon a third party plan proponent beyond those enacted by Congress. *See In re Gen. Electrodynamics Corp.*, 368 B.R. at 548-49.

365.    Congress did not give the bankruptcy courts the power to deny confirmation of a third party's plan without the pre-confirmation approval of workers who do not hold claims. Because the terms of the SSC purport to alter the statutory hurdles erected by Section 1129, and to interfere with an equity owner's fundamental right to continue to own its company if the strictures of Section 1129 are satisfied, the SSC violates the Parent's rights. Both by operation of the Bankruptcy Code and the express terms of the Second Stipulation, the Court concludes that the SSC does not bar confirmation of the Parent's Full Payment Plan.

C.    **The Existing CBA will continue in effect after confirmation, and the Unions' strike threat does not undermine the feasibility of the Parent's Full Payment Plan.**

366.    The Court further rejects the Unions' contention that the Parent's Full Payment Plan is not confirmable because the Unions will likely strike if a new CBA is not reached.[585] First, the CBA contains a "no-strike" provision.[586] This no-strike pledge is enforceable under Section 301 of the Labor Management Relations Act for the term of the agreement, and the Unions would be liable for the damages caused by its strike in violation of the agreement.[587]

---

[585]    (*See* Unions' Objection ¶ 72 at p. 39).

[586]    (CBA at Art. 5, § K (prohibiting the Unions from engaging in a strike, without exception).)

[587]    *See* 29 U.S.C. § 185 ("Suits for violation of contracts between an employer and a labor organization…, may be brought in any district court of the United States having jurisdiction of the parties…"); *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 241 (1962) (employer may bring action in federal court under Section 301 to recover damages for union's breach of no-strike provision). Further, any employee who engaged in the strike would be subject to discharge. *See, e.g., Otis Elevator Co. v. Int'l Union of Elevator Constructors, Local 4*, 408 F.3d 1, 9 (1st Cir. 2005) (an employee who strikes in violation of a contractual no-strike clause "engages in unprotected activity and as such may be subject to discipline"); *Bechtel Corp.*, 200 NLRB 503, 512 (1972) ("The strike…was in violation of the no-strike clause of the contract and, therefore, was an unprotected activity. It follows that the discharge of those employees who participated in the strike did not constitute a violation…of the Act.") (citing *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 246 (1961)).

367.     The current CBA will apply if the Parent's Full Payment Plan is confirmed. Because the Existing CBA was entered into by the Debtors and the Unions, and approved by the Court pursuant to 11 U.S.C. § 363, it should remain in effect as to the Debtors and the Unions. But as to the Parent and prior to the effectiveness of its Plan, the SSC cannot force the Court to reject the Parent's Full Payment Plan, and the Unions do not have a unilateral right to terminate the CBA if the Parent's Full Payment Plan is confirmed.

368.     Section 8(d) of the NLRA governs the termination of existing labor agreements and applies to the Existing CBA here.  Section 8(d) bars unilateral termination or repudiation of the Existing CBA by the Unions during the agreement's term; *i.e.*, at least through June 30, 2010.  The United States Supreme Court has held that Section 8(d) must be read as an implied part of all labor agreements, and regardless of what the parties say in their agreements, Section 8(d) cannot be contracted away.  It prohibits unilateral termination of a labor agreement during the agreement's term and requires, at a minimum, 60 days' advance written notice of a desire to terminate the agreement before it can actually be terminated.  Where there is a fixed term agreement, such as the Existing CBA (*see* Art. 1, § B.2), the 60 days' notice cannot be given any sooner than 60 days before the stated expiration date and, during that 60 days, the agreement must be maintained in full force and effect, that is, at least until June 30, 2010.  Any strike by the Unions before they gave any of the notices and/or waited out any of the periods required by Section 8(d) would be illegal.[588]

369.     In addition, it is well-established, that the parties cannot override Section 8(d) by contract, and the Court cannot ignore those requirements either.  *See, e.g., NLRB v. Lion Oil*

---

[588]     It is well-established that the failure to comply with any of Section 8(d)'s notice requirements renders the strike illegal and therefore unprotected.  *See, e.g., Freeman Decorating Co.*, 336 NLRB 1, 4 n. 15 (2001) ("A labor organization that calls a strike less than 30 days after notifying the FMCS of a dispute violates Sec. 8(d)(4) and also Sec. 8(b)(3)."), *enf. denied on other grounds by* 334 F.3d 27 (D.C. Cir. 2003).

*Co.*, 352 U.S. 282, 292-93 (1957); *General Marine Transp. Corp.*, 228 NLRB 1107, 1107-09 (1977). Therefore, the strike will be prevented despite the fact that the Unions claim that the LOU allows them to terminate the CBA with a mere 72 hours notice.[589]

370.     Furthermore, the NLRB will refuse to give effect to a union disclaimer made in bad faith to avoid a legal obligation, such as the Unions' termination of the Existing CBA in these circumstances, and this Court should do the same.[590] This further warrants the Court's conclusion that the SSC cannot be enforced against the Parent.

371.     The Court's conclusion that the SSC does not apply to the Parent does not terminate the CBA. The Court has concluded that the SSC does not apply to the Parent due to exigent circumstances, lack of good faith by the Unions, and because the Unions failed to offer substantially the same terms to the Parent as they offered to Sterlite.[591] Rejection of the Special Successorship Clause under ¶ C(II) does not require or result in the termination of the remainder of the CBA.

372.     In the alternative, paragraph C(III) of the Second Stipulation states that, if the Parent's rights would be violated under 11 U.S.C. § 1129, the Court "shall have the authority to

---

[589]     *See, e.g., George C. Christopher & Son*, 290 NLRB at 474 (rejecting argument that parties' agreement excused the notices required by Section 8(d) and noting that such argument "overlooks, or ignores, the often-cited ruling by the Supreme Court that the 8(d) 'notice requirement operates wholly independently of whatever notice requirement the parties have fixed for themselves'") (quoting *NLRB v. Lion Oil Co.*, 352 U.S. 282, 292-93 (1957)); *Petroleum Maint. Co.*, 290 NLRB at 462 n. 3 (failure to give required 8(d) notices "extends the time during which [a party] has an independent statutory, not contractual, obligation to refrain from altering terms and conditions of employment established by the contract").

[590]     *See, e.g., Limbach Co.*, 305 NLRB 312, 314-15 (1991) (disclaimer and repudiation of expiring labor agreement was ineffective because done in support of an "unlawful objective"); *Sweetner Prods. Co.*, 268 NLRB 1106, 1111 (1984) (disclaimer made, at least in part, in an attempt to avoid what union considered to be "a bad agreement" was made in bad faith, was ineffective, and was ordered rescinded); *Cf. Retail Clerks Int'l Ass'n v. Lion Dry Goods, Inc.*, 369 U.S. 17, 28 (1962) (enforcing labor agreement under Section 301 despite unions' disclaimer of representative status).

[591]     (*See* Second Stipulation at ¶ C(II).)

terminate the CBA."  That does not mean, however, that the Court *must* terminate the Existing CBA.  Here, there is no reason for terminating the Existing CBA.

373.     The Existing CBA will continue to apply to the Parent and the Unions after confirmation.  Upon confirmation of the Parent's Full Payment Plan, the Existing CBA will bind Reorganized ASARCO as a matter of law.  There will be no change in the ownership, corporate structure, or operations of the Debtor.  Thus, the employing entity – ASARCO LLC – will continue, and it will be bound by the Existing CBA.[592]  Finally, in light of the fact that the Unions have acknowledged the Existing CBA to be one of the best in the industry, leaving the Existing CBA intact would further the interests of ASARCO, its creditors and the bankruptcy process.  If the Parent's Full Payment Plan is consummated, the Parent and Union will have every incentive to work together before the CBA terminates in June, 2010.[593]

374.     Even in the event the Unions and the Parent are unable to reach a New CBE before the termination of the Existing CBA in 2010 or 2011, the terms of the CBA will continue pending negotiations.  Under federal labor law, the fact that a CBA has expired does not mean that any of its terms and conditions have been eliminated.  An employer has a duty to maintain, as the status quo, all existing terms and conditions of employment contained in the expired labor agreement until either reaching bilateral agreement with the union or an overall impasse, *i.e.*,

---

[592]     *See, e.g.*, *NLRB v. Hosp. San Rafael, Inc.*, 42 F.3d 45, 50-51 (1st Cir. 1994) (holding that alter ego bound by predecessor's labor agreement because it was mere continuance of predecessor) (citing *Howard Johnson Co. v. Hotel Employees*, 417 U.S. 249, 259 n.5 (1974) (where there is "a mere technical change in the structure or identity of the employing entity…the courts have had little difficulty holding that the successor is in reality the same employer and is subject to all the legal and contractual obligations of the predecessor"); *Esmark, Inc. v. NLRB*, 887 F.2d 739, 752 (7th Cir. 1989) (noting that allowing termination of labor agreement where only the ownership of the stock of the employing entity has changed would be inconsistent with both "elementary corporate law" and "the purposes of the labor laws"); *EPE, Inc. v. NLRB*, 845 F.2d 483, 487 (4th Cir. 1988) ("Obviously, a continuing unchanged employer remains bound by its obligations, including a collective bargaining agreement, just as any corporation remains bound by contracts into which it enters.").

[593]     (Ruiz Proffer at ¶¶ 13-14, Supp. de la Parra Proffer at ¶ 16.)

deadlock on each and every issue and topic covered in the CBA.[594]  In other words, an employer must bargain and not change anything until it is "plain that the parties are deadlocked in their negotiations as a whole."  *Duffy Tool & Stamping, L.L.C., v. N.L.R.B*, 233 F.3d 995, 999 (7th Cir. 2000).

375.     Finally, the Court must consider the consequence for this and future cases if it allows a labor union – which does not even have a claim against the Debtors' estate – to legally bar a full-payment plan of reorganization with a strike threat.  Submitting to the Unions' argument here would invite unions in every major bankruptcy case to shop collusive agreements among competing bidders and agree to a CBA with the prospective buyer that offers the union the most money.  The union could then agree, in return for financial remuneration, to refuse to enter into a CBA with any competing proponent of another plan of reorganization, and therefore block confirmation of that competing plan *even if* it offers better terms for creditors and shareholders.  This would violate the priorities set forth in the Bankruptcy Code, in addition to public policy.

376.     The Court therefore concludes that the Parent's Full Payment Plan is feasible, irrespective of the Unions' strike threat.  Because the CBA will remain in effect, the Unions will be barred by the CBA's no-strike provision from striking.  However, in the event a strike does occur, the Court concludes that, based on the evidence that the Parent's Full Payment is still feasible.

---

[594]     *See United Paperworkers Int'l Union, AFL-CIO, Local 274 v. Champion Int'l Corp.*, 81 F.3d 798, 801-02 (8th Cir. 1996) ("After a CBA has expired, [the NLRA] requires that the employer maintain the status quo, that is, the terms of the expired contract, during negotiations for a new agreement . . .  Moreover, when the parties have bargained to an impasse, the employer may unilaterally change terms and conditions of employment, so long as these changes are consistent with offers that the union has rejected.") (internal citations omitted).

## V.    THE DEBTORS' LIQUIDATION PLAN IS NOT CONFIRMABLE

### A.    The Debtors' Liquidation Plan is not Fair and Equitable and Violates the Absolute Priority Rule

377.    The Debtors' Liquidation Plan is not fair and equitable and, if confirmed, would unfairly discriminate against Class 8 Interests in ASARCO, and would violate the "absolute priority rule" of section 1129(b) of the Bankruptcy Code by providing distributions to certain Classes potentially far in excess of the aggregate amounts of Claims in such Classes, while providing zero distributions to the holders of Claims and Interests in junior Classes, and by exposing Class 8 Interests to substantial liability to creditors (or their successors) after all creditors have received payment in full.  Pursuant to the Debtors' Liquidation Plan, distributions from the SCC Litigation Trust to the holders of Class 3 and Class 4 Claims (or their successors in interest) would be made "<u>without limitation or restriction</u> to the recipients … and such recipients shall be entitled to retain all Cash or other property ultimately realized … *even if the amount ultimately realized in the future exceeds the amount necessary for such Claimants to have been Paid in Full under this Plan.*[595]

378.    Due to its structure, the Debtors' Liquidation Plan provides that holders of Allowed Claims (or their successors) may receive distributions in excess of the allowed amount of their claims (including interest) at the expense of junior creditors – including the Parent – which has proposed a payment in full plan to all creditors.  The proposed distribution scheme is impermissible under applicable bankruptcy law and principles of equity.  As the Supreme Court

---

[595]    Sixth Amended Joint Plan of Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code, As Modified, With Further Modifications As Of August 23, 2009 (the "<u>Debtors' Liquidation Plan</u>" Docket No. 12623) at § 4.3(c).

has explained, creditors "are not entitled to more than full payment" and "are under a duty to account . . . for any surplus remaining after they have been made whole."[596]

379.     Distributions to holders of Allowed Claims must be distributed in accordance with the absolute priority rule, with any proceeds remaining after the Allowed Claims in senior Classes are Paid in Full being distributed to junior Classes of Claims and Interests.  Under the absolute priority rule, a plan may not provide an undue benefit to the holder of any allowed claim by virtue of overpayment of its claim.[597]   Consequently, the District Court has instructed if "a plan gives creditors more than the law allows, the plan cannot be confirmed."[598]

380.     In this regard, courts consistently have recognized as a firm and mandatory corollary to the absolute priority rule that the rule "requires that a senior class be satisfied in full before any provision for junior classes, but which also prohibits a greater than full return to the senior class to the detriment of the junior class.[599]   Excess value must be allocated to junior

---

[596]     *Reconstruction Finance Corporation v. Denver & R.G.W.R. Co.*, 328 U.S. 495, 530–31 (1946).

[597]     *See Asarco LLC v. Ams. Mining Corp.*, 404 B.R. 150, 175–76 (S.D. Tex. 2009); *see also In re Simmons*, 288 B.R. 737, 751 n.49 (Bankr. N.D. Tex. 2003).

[598]     *Asarco*, 404 B.R. at 175–76.

[599]     *Simmons*, 288 B.R. at 751;  *see also In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims. . . ."); *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. Del. 2003) ("Courts have decided that a 'corollary of the absolute priority rules is that a senior class cannot receive more than full compensation for its claims.'"); *In re Genesis Health Ventures*, 266. B.R. 591, 612 (Bankr. Del. 2001) (confirming plan only after concluding that senior creditors would not receive more than 100% of their claims); *see also In re Millburn Peat Co.*, 384 B.R. 510, 515 (Bankr. N.D. Ind. 2008) ("Courts have held that a plan does not meet the fair and equitable standard when it pays a creditor more than the value of its claim"); *In re Future Energy Corp.*, 83 B.R. 470, 495, n. 39 (Bankr. S.D. Ohio 1988) ("Clearly, overpayment of senior creditors is violative of the fair and equitable standard."); *In re Walat Farms*, 70 B.R. 330, 335 (Bankr. E.D. Mich. 1987) ("[A] point is likely to come where the proponents would do violence to the 'fair and equitable' standard by paying [a senior creditor] more than its claim."); *In re Evans Products Co.*, 65 B.R. 870, 873 (Bankr. S.D.Fla. 1986) ("[T]he plan must be fair and equitable to each class of claims impaired under the plan… . [T]he plan should be confirmed if . . . no specific group of creditors are recovering more than 100% of their claims."); *In re Victory Constr. Co., Inc.*, 42 B.R. 145, 155 (Bankr. C.D. Cal. 1984) ("It is clear that the drafters [of the Bankruptcy Code] intended the court to deny confirmation where the plan proposes to pay more than 100 percent to a senior class without the consent of a junior [class]."). Indeed, interpreting the Code, courts consistently deny confirmation under Section 1129(b) when senior classes receive (*or are likely to receive*) more than 100% of the allowed amount of their claims.  *See, e.g., In re Trans Max Techs., Inc.*, 349 B.R. 80, 89-90 (Bankr. D. Nev. 2006) ("One component of fair and equitable treatment is that a plan may not pay a premium to a senior class. . . . [evidence must be presented to] ensure that no class surviving confirmation will be paid more than

---

classes of debt and equity.[600]   A plan that proposes to pay more than 100% to a senior class without the consent of junior classes should not be confirmed.[601]   Judge Hanen recognized the importance of this requirement in his remedies opinion, admonishing that "[s]hould a plan give creditors more than the law allows, the plan cannot be confirmed."[602]

381.     In fact, a Bankruptcy Court in this District has denied confirmation of a plan under circumstances strikingly similar to the case at bar.[603]   In *MCorp*, the debtor proposed a plan that would eliminate existing equity interests, while allocating to a class of creditors senior to such interests all proceeds from a pending lawsuit, without providing any upper limit to the creditors' recovery from such proceeds.   Judge Paul refused to confirm the plan because it was not "fair and equitable to equity interests."[604]   The open-ended and uncapped distribution to the senior creditor class created a possibility that the members of such class would be paid "more than in full" at the expense of equity.[605]   "If former shareholders' interests are impaired and a class of creditors is provided for more than in full, the plan will not be confirmed."[606]   Just as in *MCorp's* rejected plan, Debtors' Liquidation Plan potentially provides more than full recovery to creditors while freezing equity out, in violation of the absolute priority rule.

---

in full through the capture of value that rightly belongs to the eliminated class"); *Future Energy Corp.*, 83 B.R. at 495 (same).

[600]     *Granite Broad. Corp.*, 369 B.R. at 140.

[601]     *Victory Constr.*, 42 B.R. at 155.

[602]     *Asarco LLC*, 404 B.R. at 175–76;  *see also In re MCorp Financial, Inc.*, 137 B.R. 219 (Bankr. S.D. Tex.), *appeal denied*, 139 B.R. 820 (S.D. Tex. 1992).   In *MCorp*, the debtor's proposed plan eliminated existing equity interests and allocated all interest in a judgment to certain creditors without providing any upper limit to the creditors' recovery from the litigation proceeds.   Reasoning that providing senior creditors with the possibility of a distribution in excess of their allowed claims without any distribution to equity would not be "fair and equitable to equity interests," Judge Paul refused to confirm the plan.  *Id.* at 235.

[603]     *MCorp*, 137 B.R. at 219.

[604]     *Id.* at 235.

[605]     *Id.*

[606]     *Id.*

382.    *MCorp* involved a potential claim for approximately $330 million.  If damages had eventually been awarded at $330 million, some of the value of that judgment would have gone to equity.  The Court reasoned that a judgment of $330 million was possible, and concluded it was improper to award the entire interest in the litigation to creditors because the arrangement could result in creditors being overpaid.[607]  The present case is even stronger because it involves a *judgment* of $7 billion.  Following the logic of *MCorp*, the *MCorp* court would have allocated a portion of that judgment to creditors and reserved the rest for equity.  The Debtors downplay the likelihood of an over-recovery by certain classes of creditors by pointing out that ultimate recovery on the SCC judgment is uncertain, and that the final amount paid out may be far less than $7 billion dollars.  What the Debtors fail to mention is that the interests in the SCC litigation assigned to creditors under Debtors' Liquidation Plan are true lottery tickets.  The potential outcomes are essentially binary.  Either: (1) the full judgment will eventually be paid, and certain creditors will be overcompensated for their claims, unfairly freezing equity out of the recovery, or (2) the Parent will ultimately prevail, and the SCC Judgment will not be worth anything at all.  Under that outcome, creditors will fare much more poorly under the Debtors' Liquidation Plan than they would under the plan proposed by the Parent.  The reason why the Debtors rely on the lottery ticket model is clear; the Debtors will not, or perhaps cannot, put forward a plan with a greater cash value than the Parent's, so they have impermissibly attempted to bribe creditors to accept a "lottery ticket" share of the SCC litigation in the hopes that the litigation proceeds will eventually result in a windfall recovery.

383.    The Debtors could have chosen a plan that caps distributions from the trust at 100% with the spillover flowing down the Waterfall, ultimately to equity.  They instead opted

---

[607]     *Id.*

for an approach that overcompensates creditors and third parties to the detriment of ASARCO's

sole shareholder.  Under the Debtors' Liquidation Plan, the Debtors propose to transfer the SCC

Final Judgment – which is potentially worth over $8 billion – and other litigation rights to the

SCC Litigation Trust.  Acknowledging that the SCC Litigation Trust could result in distributions

in excess of creditors' allowed claims, the Debtors argue that:

> because of the inherently speculative nature of litigation assets as a sole
> source of recovery, the Debtors' Plan contemplates that <u>creditors</u> should
> be compensated for this increased risk with the possibility of recovering
> an <u>appropriate premium</u> over the simple collection of the amounts that
> they are unquestionably owed.[608]

Because the Parent's Full Payment Plan provides for payment in cash of 100% of all creditor

claims, including interest, with no risk of collection and without looking to a speculative source,

the premise under the Debtors' Liquidation Plan, that "litigation assets [are] a sole source of

recovery" to provide for a possibility of payment in full at some speculative point in the future, is

patently false in the context of this chapter 11 case.  The notion of granting a "risk premium" to

creditors or contemplating a sale of its SCC Judgment on SCC Litigation Trust Interests to third

parties such as Sterlite with the possibility of a windfall recovery in excess of that required to

achieve payment in full to creditors is irrational and unwarranted as a matter of law where

creditors are being compensated at 100% of their claims and there is no risk for which they need

to be compensated.  The value of the SCC Judgment thus is a moot inquiry.

384.    The Debtors' request to distribute interests in the SCC Judgment violates the

Bankruptcy Code's priority scheme. Moreover, based on the Debtors' agreement to sell the

majority of the SCC Litigation Trust Interests to Sterlite, the proposed "risk premium" for the

---

[608]      *See* Debtors' Supp. Brief Regarding the Operation of the SCC Litigation Trust Under the Debtors' Sixth
Amended Plan of Reorganization for the Debtors Under Chapter 11 of The United States Bankruptcy Code, as
Modified with Further Modifications as of August 11, 2009 (the "<u>Debtors' Supp. Brief</u>") (Docket No. 12524), p. 2
(emphasis added).

most part will no longer even inure to the benefit of creditors, but rather to the benefit of a third party and at the expense of the Parent, which has proposed a payment in full plan.

385.    The Debtors' request for a "risk premium" is inconsistent with the fundamental purposes of the Bankruptcy Code, which should "not be interpreted to allow debtors to avoid the state property law consequences of their actions except to the extent necessary to serve a valid bankruptcy purpose."[609]   As explained by the court in *Murphy* as its justification to refuse to avoid a transfer that would have resulted in a surplus over the amount necessary to pay creditors in full, "there is no federal bankruptcy interest in disrupting any legally binding state property relationships to the extent that creditors or administrative creditors are not harmed under Section 548."[610]

386.    Sterlite's purchase of approximately 73% the SCC Litigation Trust Interests, and its attempt to ultimately take for itself the proceeds of the SCC Final Judgment as contemplated in the Debtors' Liquidation Plan, is inconsistent with Section 550(a) of the Bankruptcy Code because it would allow Sterlite to reap a substantial profit at the expense of equity, and it does not provide "benefit to the estate."  Sterlite's purchase of the Class 3 General Unsecured Claims distribution of the SCC Litigation Trust and the assets of ASARCO over the objection of the equity owner that is sponsoring a full-pay plan misappropriates an asset of the estate which should be distributed to the Debtors' creditors and interest holders in accordance with the priority provisions of the Bankruptcy Code, and assigns the asset, along with the associated potential windfall recovery, to a third party with no connection whatsoever to the estate to the detriment of the true equity stakeholder.  This result violates the principles of Section 550.  "Recovery will

---

[609]    *In re Murphy*, 331 B.R. 107, 125 (Bankr. S.D.N.Y. 2005).

[610]    *Id.* at 107 (emphasis added).

not be allowed under section 550 if the benefit is only for particular creditors as opposed to all creditors of the estate."[611]

387.    The Court is mindful of the Supreme Court's admonition in *Reconstruction Finance* that a senior creditor class must account to the junior equity class "for any surplus after they have been made whole."[612]  Because the Parent's Full Payment Plan provides payment in full in Cash to creditors at closing, there is no justification for the Debtors' proposed Litigation Trust structure.

388.    In the SCC litigation, Judge Hanen agreed that under the Bankruptcy Code creditors may not be paid more than what is allowed under the law, but deferred to this Court the determination that the goals of the Bankruptcy Code in this regard "will be best effectuated by the bankruptcy judge in the context of the bankruptcy proceedings."[613]  The Debtors' Liquidation Plan violates Section 550 of the Bankruptcy Code, is inconsistent with the statutory absolute priority rule and prohibition of unfair discrimination among classes and the case law uniformly interpreting those principles, and runs afoul of Judge Hanen's decision in the SCC litigation.

389.    Because it is impossible to accurately estimate the value of the SCC Final Judgment, and thus the Plan Consideration, if the Debtors' Liquidation Plan were confirmed holders of Claims in Classes 3 and 4 could potentially recover on account of their Claims more than 100% of the maximum allowed amount of such Claims, and a third party without an interest in the estate would recover a windfall at the expense of holders of Claims and Interests in

---

[611]     5 COLLIER ON BANKRUPTCY 550.02 (15th Rev. Ed. 2009) (citing *Research-Planning, Inc. v. Segal (In re First Capital Mortgage Loan Corp.)*, 917 F.2d 424 (10th Cir. 1990)).

[612]     328 U.S. at 530–31.

[613]     *Asarco*, 404 B.R. at 161-62.

Classes 6 through 10, who may receive nothing.[614]  This potential windfall is impermissible and renders the Debtors' Liquidation Plan unconfirmable.

### B.  The Debtors' Methods of Valuing the SCC Final Judgment Are Inherently Unreliable

390.    The Debtors argue that the Court should estimate the net present value of the SCC Final judgment at confirmation, and award proportional interests in the judgment based on that value.  The Debtors rely on the testimony of Kenneth Klee as expert testimony in support of the value of the SCC Judgment.[615]  As discussed above, this testimony does not reliably value the SCC Judgment.

391.    The Supreme Court has expressed concern about whether true value can be determined by a battle of competing experts, in the context of equity holders attempting to cram down a secured creditor.[616]  The Supreme Court stated that under a plan proposed during the debtor's period of exclusivity "making no provision for competing bids or competing plans, any determination that the price was top dollar would necessarily be made by a judge in bankruptcy court, whereas the best way to determine value is exposure to the market."[617]    Here, there is simply no reliable market for a judgment of this size.

---

[614]    (Rebuttal Proffer of H. Malcolm Lovett, Jr. in Response to the Proffer of Carlos Ruiz in Support of ASARCO Incorporated and Americas Mining Corporation's Modified Sixth Amended Plan of Reorganization for the Debtors under Chapter 11 of the United States Code (Docket No. 12530, Exhibit D294, "Lovett Rebuttal Proffer") at ¶ 3.)

[615]    (Final Klee Proffer).

[616]    *Bank of America National Trust & Savings Association v. 203 North La Salle Street Partnership*, 526 U.S. 434 (1999).

[617]    526 U.S. at 457.

392.     The Court concludes that the proper value of the SCC Final Judgment is the current face amount of the judgment.[618] That is particularly in true in light of the absence of any credible or competent evidence supporting a discount to the face amount.

393.     After carefully considering the evidence, the Court finds that the value of the SCC Final Judgment is the face amount of the judgment, and that no competent or credible evidence exists to support any significant discount to this amount.  Even if some discount could be calculated to take into account the risk of reversal on appeal, it would be so small that the value of the SCC Judgment still would greatly exceeds the amount required to satisfy all of ASARCO's creditor claims in full.

### C.     The Debtors' Liquidation Plan Is Not Proposed In Good Faith

394.     The Debtors' Liquidation Plan has not been proposed in good faith.[619]  The Debtors have failed to prove that the Debtors' Liquidation Plan would achieve a result consistent with the objective and purposes of the Bankruptcy Code – which protects creditors *and* shareholders and their relative priorities under the Code.

395.     The Parent, as the equity holder in the estate, is entitled to the protection afforded by the priority provisions of the Bankruptcy Code.  To the extent creditor claims are satisfied, any residual value in the estate falls to the shareholders.  Allowing creditors to receive a "risk premium" over an above 100% of their claims, when they have no risk, and allowing

---

[618]     *See In re Gryberg*, 48 B.R. 726, 729-30 (D. Colo. 1983) ("Instead the parties to the October, 1981 agreement apparently reduced the value of the December, 1980 judgment to reflect the fact that it was on appeal and might be modified or reversed. While such a procedure is entirely proper between parties attempting to settle a dispute between them, it is entirely inconsistent with the notion of setoff. Until the December, 1980 judgment is altered or reversed, its value for purposes of setoff is the face amount."); *In re Wissman*, 121 B.R. 739, 741 (Bankr. N.D. W. Va. 1990) (declining to value potential lawsuit under an "open market sale test" and finding that "the best evidence of the value of the potential claim . . . is the recovery, if any, that the debtors ultimately achieve in the underlying action.").

[619]     11 U.S.C. § 1129(a)(3).

Sterlite—a third party with no interest in the estates—to earn a substantial profit by purchasing the SCC Litigation Trust interests would be inconsistent with the Bankruptcy Code, which is impermissible.[620]

396.     Moreover, the ASARCO directors continue to owe fiduciary duties to the sole shareholder.  Because all creditor claims will be satisfied in full, in cash, all remaining value must go to the equity holder – any other result (such as giving value to Sterlite, which has no interest in the estate) would be a breach of the ASARCO board's fiduciary duties to the Parent as the sole shareholder.  The Debtors do not claim that the ASARCO directors do not owe fiduciary duties to the Parent – nor could they.  Even if the directors' duties expand to include creditors due to insolvency, they are not absolved of their fiduciary duty to protect the Parent as the sole shareholder should there be any remaining value in the estate after satisfaction of creditor claims.[621]  As recently noted by one bankruptcy court addressing this very point,

> While protection by the performance of fiduciary duties is *expanded to include* creditors of insolvent corporations, the nature and extent of the performance of fiduciary duties by directors and officers of insolvent corporations do not change. The duties are still owed to the corporations, not to any specific group or class of protected beneficiaries.[622]

397.     The fact that the corporate enterprise to which the directors owe duties expands to include creditors upon insolvency does not mean that shareholders' interests are suddenly

---

[620]     *See In re Block Shim Dev. Co.-Irving*, 939 F.2d 289 (5th Cir. 1991) (to be proposed in good faith, a chapter 11 plan must fairly achieve result consistent with Bankruptcy Code).

[621]     *See Carrieri v. Jobs.com*, 393 F.3d 508, 534 n.24 (5th Cir. 2004) (under Delaware law, "when a corporation reaches the 'zone of insolvency', as with actual insolvency, the officers and directors have an expanded fiduciary duty to all creditors of the corporation, *not just the equity holders*") (emphasis added).

[622]     *In re Security Asset Cap. Corp.*, 2008 WL 2609811, at *4 (Bankr. D. Minn. July 1, 2008) (emphasis added); *see also In re Scott Acquisition Corp.*, 344 B.R. 283, 290 (Bankr. D. Del. 2006) ("[T]he Court rejects the suggestion that upon insolvency a director of a wholly-owned subsidiary owes a duty to that corporation's creditors but not to the corporation itself.  A more natural reading of Delaware law is that upon insolvency directors of a wholly-owned subsidiary owe fiduciary duties to the subsidiary and its creditors.").

irrelevant or may be ignored.  Instead, the directors must continue to operate the insolvent corporation in the interest of *both* creditors and shareholders.[623]

398.    This principle–that directors continue to owe fiduciary duties to shareholders in insolvency, even if creditors also are owed duties—is consistent with bankruptcy law, where even in the context of formal bankruptcy proceedings the interests of the equity holders must be considered, even if the creditors enjoy a superior priority.[624]

---

[623]    *See Prod. Resources Group LLC. v. NCT Group, Inc.,* 863 A.2d 772, 788 n.52 (Del. Ch. 2004) (noting that insolvency is not a "magic dividing line that should signal the end to some, most, or all risk-taking on behalf of stockholders or even on behalf of creditors"); *see also In re Amcast Indus. Corp.*, 365 B.R. 91,107 n.7 (Bankr. S.D. Ohio 2007) ("Even jurisdictions recognizing that directors of an insolvent corporation have a fiduciary duty to creditors as the residual owners of the corporation do not require the directors to treat the assets as a trust for the benefit of those creditors. . . .  Instead, these jurisdictions recognize that creditors are just one constituency of the corporate enterprise whose interests should be considered when a corporation is facing a financial crisis. Consequently, directors of an insolvent corporation are not required to immediately liquidate assets, even if such action is advocated by creditors, any more than they are required to take extremely risky actions on behalf of the stockholders.") (internal citations omitted); *Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del., Inc.),* 274 B.R. 71, 89 (D. Del. 2002). ("[W]hile this duty does not necessarily place creditor interests ahead of the interests of stockholders, it requires the board to maximize the corporation's long-term wealth creating capacity." ); *In re Ben Franklin Retail Stores, Inc.,* 2000 WL 28266, at *4 (N.D. Ill. Jan. 12, 2000) (holding that directors do not owe a special duty to liquidate and pay creditors when the corporation is near insolvency, and discussing the balance with shareholders' interests); *Odyssey Partners, L.P. v. Fleming Companies, Inc.*, 1999 WL 316903, at *30 (Del. Ch. May 13, 1999) ("[T]he fiduciary duties at the moment of insolvency may cause directors to choose a course of action that best serves the entire corporate enterprise rather than any single group interested in the corporation at a point in time when shareholders' wishes should not be the directors only concern."); *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp*., 1991 WL 277613, at *36 n.55 (Del. Ch. Dec. 30, 1991) (discussing the "community of interests," including shareholders and creditors, that must be balanced by a director when corporation enters the zone of insolvency).

[624]    *See, e.g.*, *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) (stating that a Chapter 11 trustee owes a "fiduciary duty … to shareholders as well as to creditors"); *see also In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (creditors' committee insistence that debtor sell its 82% interest in a profitable corporation was insufficient grounds, as a matter of law, for approving the sale out of ordinary course of debtor's business because it ignored "the equity interests required to be weighed and considered"); *Brown v. Presbyterian Ministers Fund*, 484 F.2d 998, 1005 (3d Cir. 1973) ("As an officer, director, and principal stockholder of an insolvent corporation . . . [the defendant] was duty bound to act 'with absolute fidelity *to both creditors and stockholders*.'") (emphasis added, quoting *Drury v. Cross*, 7 Wall. 299, 74 U.S. 299, 302, 19 L.Ed. 40 (1869)); *In re Rajabali*, 365 B.R. 702, 708 (Bankr. S.D. Tex. 2007) ("When a corporation becomes insolvent, creditors have a priority of distribution of the corporation's assets over that of shareholders."); *Hallinan v. Republic Bank & Trust Co.*, NO. 06 CIV.185 HB, 2007 WL 39302, at *8 n.29 (S.D.N.Y. Jan. 8, 2007) ("[O]nce a corporation enters the 'zone of insolvency,' the directors owe fiduciary duties to the corporations' creditors, *in addition to its shareholders*.") (internal quotes and citation omitted); *see also generally* Harvey L. Miller, *Corporate Governance in Chapter 11: The Fiduciary Relationship Between Directors and Stockholders of Solvent and Insolvent Corporations*, 23 SETON HALL L. REV. 1467 (1993) (noting that while the fiduciary duties of directors expand to include a responsibility to creditors, a debtor in possession "is require to act as a fiduciary for both the creditors *and stockholders* of the corporation").

---

399.     Moreover, "[t]he view that a debtor owes no duties to the stockholders of an insolvent corporation in chapter 11 is [] contrary to the scheme and purposes underlying the chapter 11 reorganization provisions of the Bankruptcy Code."[625]   This principle of law is codified by – inter alia – sections 726(a)(6) and 1129(b) of the Bankruptcy Code which provide that equity holders shall receive a distribution upon payment of allowed claims (11 U.S.C 726(a)(6)) and that no claim – including equity claimants – shall be unfairly discriminated against under a plan of reorganization unless the claimant accepts such treatment by voting in favor of the plan.[626]   Moreover, the fact that equity is generally permitted to continue to manage the estate and operations of a debtor under sections 1107 and 1108 of the Bankruptcy Code as a debtor-in-possession exemplify the fact that the interests of equity holders are not disregarded as alleged by ASARCO.

400.     The fact that the Debtors' Liquidation Plan is based on a release of the Sterlite Claim in favor of a new plan with Sterlite, which is not an equity security holder, and that the Sterlite's proposed plan is favored over the full payment plan proposed by the equity owner is further support for the Court's conclusions that the Debtors' Liquidation Plan is not proposed in good faith.

401.     Because ASARCO's liquidation plan would constitute a breach of the ASARCO board's fiduciary duties to its sole shareholder, and because it is inconsistent with the it is not proposed in good faith and is not confirmable.

### D.     <u>The Debtors' Liquidation Plan Is Not Feasible</u>

---

[625]     Miller, *Corporate Governance in Chapter 11*, at 1490 (reviewing legislative history of the code).

[626]     11 U.S.C. § 1129(b).

402.     The test for feasibility applies to the Debtors' Liquidation Plan even though the Debtors' Liquidation Plan provides for the liquidation of the Debtors' assets.[627]  Confirmation of the Debtors' Liquidation Plan would likely be followed by the liquidation, or the further financial reorganization, of the successor to the Debtors under the Debtors' Liquidation Plan.[628] It is likely that the Plan Sponsor would be unable to close the transactions and fund the obligations contemplated by the Debtors' Liquidation Plan.

### 1.     The Debtors' Liquidation Plan involves great execution risk.

403.     There is a risk the Plan Sponsor will not close under the Debtors' Liquidation Plan, which is evidenced most clearly by Sterlite's prior breach of the Sterlite PSA.   The Debtors' Liquidation Plan is contingent upon Sterlite closing, yet Sterlite has already demonstrated its willingness to simply abandon a deal if it does not feel like closing.   The Debtors suspended the solicitation of votes on, and abandoned their previous plan of reorganization at great subsequent expense to the estates because Sterlite, without any contractual or other legal justification, repudiated its obligations and refused to close under the $2.6 billion Original Plan Sponsor PSA, which it entered into after participating in a Court-sanctioned auction process.   This intentional breach of its contractual obligations was accompanied by a demand for a material price reduction because of a deterioration in copper prices and the global collapse of financial and commodity markets.[629]   The Original Plan Sponsor PSA did not contain any provision that would excuse Sterlite's performance based upon any financial contingencies or change in market conditions, and Sterlite's President, C.V. Krishnan, acknowledged that Sterlite had cash and the ability to close under the original terms

---

[627]      *Danny Thomas Props II L.P. v. Beal Bank, S.S.B., (In re Danny Thomas Props L.P.)*, 241 F.3d 959, 963 (8th Cir. 2001).

[628]      11 U.S.C. § 1129(a)(11).

[629]      (Krishnan Proffer at ¶ 20; Confirmation Hr'g Tr. 8/11/2009 at 80:7-16 (Krishnan Test.).)

and purchase price.[630]    Sterlite's past conduct indicates that Sterlite is likely to breach the New Plan Sponsor PSA with impunity if copper prices decline materially or other circumstances make it unfavorable for Sterlite to close.  Sterlite has admitted that there are no legal assurances that it will not walk away from the New Plan Sponsor PSA as it did from the Original Plan Sponsor PSA.[631]

404.    If this Court were to confirm the Debtors' Liquidation Plan and Sterlite were to breach the New Plan Sponsor PSA, the $3 billion claim the Debtors are presently holding against Sterlite could be reduced to a $1.3 billion claim or no claim at all if Sterlite successfully argued the existence of a "Release Condition" under the convoluted release provisions in the New Plan Sponsor PSA.  These release provisions were unclear to this Court and the parties in these cases, and may prove incomprehensible to a court or relevant tribunal in India.

405.    Sterlite has little incentive to close under the Debtors' Liquidation Plan if it decides it does not like the economics.  Sterlite has acknowledged that the acquisition of the Debtors would be its largest acquisition to date and carries with it a number of risks.[632]   In addition, the New Plan Sponsor PSA essentially gives Sterlite a lengthy option period in which it can decide whether conditions favor its acquisition of the Debtors.  If Sterlite breaches its obligations under the New Plan Sponsor PSA, it would risk only $625 million.[633]

406.    The fact that the Guarantor is a privately-held company located in India complicates any collection process the Debtors might undertake if the Plan Sponsor and

---

[630]    (Hr'g Tr. 4/22/2009 at 193:19-20, 250:13-14 (Docket No. 10980) (Krishnan Test.); Confirmation Hr'g Tr. 8/11/2009 at 80:17-81:14 (Krishnan Test.).)

[631]    (Confirmation Hr'g Tr. 8/11/2009 at 101:17-102:5 (Krishnan Test.).)

[632]    (Krishnan Proffer, Ex. A at p.12-13.)

[633]    (Confirmation Hr'g Tr. 8/24/09 at 115: 1-4 (Statement of Mr. Bartner).)

Guarantor were to breach their obligations under the New Plan Sponsor PSA.  The Debtors have asserted with great conviction that the Guarantor is essentially judgment proof.[634]

> ## 2.   Sterlite's inability to operate the Copper Basin Railway further undermines the feasibility of the Debtors' Liquidation Plan

407.    The Debtors' Liquidation Plan is not feasible for the additional reason that Sterlite will be unable to operate a vital asset—the CBRY—because it has not obtained the necessary regulatory approval from STB.  Even under the best case scenario, regulatory approval of the proposed transaction by the STB will likely cause a substantial delay in the in the operation of the CBRY by Sterlite.[635]  Unrefuted expert testimony and evidence from the Confirmation Hearing establishes that (1) prior approval by the STB is required for Sterlite's lawful purchase and operation of the CBRY and (2) STB approval under the circumstances related to the Sterlite purchase of the CBRY will be a lengthy and uncertain process taking from one to many years.  Without STB approval, the CBRY may not be operated, unlawful operation may be enjoined, and a purchase consummated without STB authority may be divested.   Sterlite's failure to account for this process will derail its operation of CBRY, the primary method by which the mining operations transport copper.  The CBRY is vital to the operation of the Hayden and Ray facilities because it transports ore and sulfuric acid necessary to those sites.   ASARCO's President and CEO, Joseph Lapinsky, has described the CBRY as "critical" to operations.[636]  The

---

[634]     Motion for Approval of Settlement and Release and Revised Bid Protections (the "Sterlite 9019 Motion" Docket No. 10935) at  ¶¶ 55-62.)

[635]     (Strickland Proffer, ¶ 17.)

[636]     *See Asarco buys remainder of Copper Basin Railway*, THE ARIZONA REPUBLIC (Phoenix) (Sept. 30, 2006).

characterization has been echoed by this Court.[637] Consequently, for at least one year, Sterlite will not profit as predicted.  The Debtors' Liquidation Plan is therefore not feasible.

408.    STB may suspend its review of Sterlite's proposed purchase and operation of the CBRY for failure to comply with reporting requirements under 49 C.F.R. § 1150.33(h).   On August 14, 2009 Sterlite filed a Verified Notice of Exemption whereby it sought STB review for the proposed transfer.[638]   In its Notice of Exemption, Sterlite was required to provide the STB with certain information regarding potential effects on railroad transportation interchange. Because Sterlite failed to provide this information, the STB has indicated that it may suspend the effective date of its Notice of Exemption pending the correction of this issue.[639]  The issue of whether or not Sterlite is in compliance with requirements for the effectiveness of a Notice of Exemption is an issue which has yet to be resolved before the STB.[640]  Now that Sterlite's application for approval of the transaction may be suspended by the federal agency with plenary authority over the sale and operation of the CBRY, the long regulatory delay already established by testimony will likely be even longer than estimated.  Sterlite is not close to receiving federal regulatory approval (as distinct from "transfer of permits") needed to lawfully operate a railroad that is vital to its mining operations.

---

[637]    Order Authorizing Debtor (1) to Assume Stockholders Agreement and Related Contract For Sale, and (2) Purchase Remaining Shares of Copper Basin Railway (Docket No. 2980).

[638]    *See Sterlite (USA), Inc. – Acquisition and Operation Exemption – Copper Basin Railway, Inc., Line In Pinal and Gila Counties, AZ, Verified Notice of Exemption of Sterlite (USA), Inc., Pursuant to 49 C.F.R. §§ 1110.31-1150.34*, STB Finance Docket No. 35291 (STB served Aug. 14, 2009) (the "Notice of Exemption").

[639]    *See Sterlite (USA), Inc. – Acquisition and Operation Exemption – Copper Basin Railway, Inc., Line in Pinal and Gila Counties, AZ*, STB Finance Docket No. 35291 (STB served August 19, 2009).

[640]    *See Sterlite (USA), Inc. - Acquisition and Operation Exemption - Copper Basin Railway, Inc., Line in Pinal and Gila Counties, AZ*, Verified Notice of Exemption of Sterlite (USA), Inc. Pursuant to 49 C.F.R. §§ 1150.31-1150.34, STB Finance Docket No. 35291 (STB served on Aug. 14, 2009); *see also Sterlite (USA), Inc. - Acquisition and Operation Exemption - Copper Basin Railway, Inc., Line in Pinal and Gila Counties, AZ*, STB Docket No. 35291 (Aug. 19, 2009) (noting STB's proposed delay of Notice of Exemption's Effective Date).

409.    STB approval is required for Sterlite's proposed purchase of the CBRY.[641] Pursuant to 49 U.S.C. § 10901, the STB is charged with presiding over any proposed transfer of ownership and operations of rail services.[642]  The STB, in fact, has exclusive authority to certify such transactions.[643]  Additionally, 49 C.F.R. § 1150, *et seq.*, contain tailored procedures which must be followed by all potential rail purchasers and operators, including Sterlite.[644]

410.    Notwithstanding this uncontroverted evidence, Sterlite has, for an extended period of time, refused to initiate proceedings before the STB.  The evidence shows that Sterlite had no intention of seeking STB approval.[645]  A "closing checklist" shows that counsel for Sterlite and/or the Debtors believed that prior STB approval of purchase and operations of the CBRY was "not necessary."[646]  Moreover, Sterlite failed to initiate STB proceedings during the period in which it was previously obligated, through an executed purchase and sale agreement, to purchase the CBRY.  It had not done so with respect to its current purchase and sale agreement, in relation to the Debtors' Plan until the Parent filed a Petition for Declaratory Order before the STB to establish that the STB did, in fact, have jurisdiction over the purchase.

411.    Because Sterlite has filed a Notice of Exemption before the STB, it has exposed operations of the CBRY to a lengthy, and uncertain process.[647]  The only relevant expert testimony and evidence before the Court establishes that this process will take one year or

---

[641]    (Strickland Proffer at ¶ 16 ("The concurrent purchase, sale, and operation of the CBRY is not permitted by law without STB approval.").)

[642]    *See* 49 U.S.C. § 10901(a).

[643]    *See* 49 U.S.C. § 10901(a).

[644]    (Strickland Proffer at ¶ 15.)

[645]    (Project Centaur Closing Checklist  (Exhibit 116, "Centaur Checklist") at ¶ 20.).

[646]    (Centaur Checklist at ¶ 20.)

[647]    (Confirmation Hr'g Tr. 8/18/2009 at 68:14-18 (Strickland Testimony) (Q: So Mr. Strickland, as far as the delay issue goes, the Surface Transportation Board approval process can be a long difficult, complicated, and extracted process, is that right, sir? A. it can be.).

more.[648]  Mr. Strickland, the Parent's expert on regulations governing railway transfers testified that, based on his substantial experience practicing with and before the STB and its predecessor agency, that any controversy will cause further delay.[649]

412.    Sterlite has caused additional controversy by attempting to bypass the sixty (60) day employee notice requirement under 49 C.F.R. § 1150.32(e).[650]  This Petition for Waiver is unsupported by STB decisions.[651]  Moreover, it undermines the public policy behind that requirement[652] and may trigger conflict with CBRY employees and within their communities. Thus, Sterlite, through its Petition for Waiver, complicates and adds controversy to its proceedings before the STB.  This, as Mr. Strickland testified, is a indication of how protracted the process has already become.[653]

---

[648]    (Supp. Strickland Proffer at ¶ 6.).

[649]    (Supp. Strickland Proffer at ¶ 6; Confirmation Hr'g Tr. 8/18/2009 at 69:2-8 (Strickland Testimony)  ("I've seen situations where you have this combative kind of scenario where one side believes that they do not need to be before the [STB] and the other side does; or there are other issues that can come up that we don't even know about right now that can prolong the process. That's what I'm saying; that there are things that can surface that will prolong it.").

[650]    S*ee Sterlite (USA), Inc. – Acquisition and Operation Exemption Copper Basin Ry., Inc., Line in Pinal and Gila Counties, AZ Petition for Waiver of 49 C.F.R. § 1150.32(e),* STB Finance Docket No. 35291 (STB served Aug. 14, 2009), Admitted as Ex. D-91 (the "Petition for Waiver").

[651]    In cases cited by Sterlite in its Petition for Waiver, waiver of the employee notice requirement was granted only in the context of corporate family transactions in which there was no change in management.  *See ARZC Operating Co. – Acquisition & Operation Exemption – ParkSierra Corp.*, STB Finance Docket No. 34198 (STB served May 14, 2002);  *CFNR Operating Co. – Acquisition & Operation Exemption – ParkSierra Corp.,* STB Finance Docket No. 34199 (STB served May 14, 2002);  *PSAP Operating Co. – Acquisition & Operation Exemption – ParkSierra Corp.*, STB Finance Docket No. 34200 (STB served May 14, 2002).

[652]    *See Acquisition of Rail Lines Under 49 U.S.C. 10901 and 10902 – Advance Notice of Proposed Transactions*, STB Ex Parte No. 562 (Served Sept. 9, 1997) (noting that the 60 day employee notice requirement is intended to "make available more information to employees, and thus to their local communities, that may be affected by line sale transactions.").

[653]    (Confirmation Hr'g Tr. 8/18/2009 at 69:25-70:9 (Strickland Testimony)) (Q. And how is it, sir, when you say that you're seeing parties not permitting an airing of the issues, are you referring to parent or are you referring to some other issue? A. I'm referring to filings that I've seen before the board. Q. And what filing in particular prevents the airing of issues in your opinion?  A. Well, the board will make a decision but the one on labor is one in which the agency would decide whether or not labor will be able to have the full time period to deal with labor notices.").

413.    Sterlite cannot operate the CBRY without prior approval by the STB.  Federal law and regulations are clear that the STB must certify transfer of the CBRY to Sterlite prior to its operations.[654]  Under 49 U.S.C. § 10901 Sterlite must comply with all procedural and substantive requirements set forth by the STB.  If it does not, it is subject to STB divestiture and ceasing of its operations.   The STB, in fact, may significantly forestall proposed transactions through moratorium.[655]   To avoid these consequences, Sterlite must continue to abide by STB procedures, even when doing so means non-operation of the CBRY.

414.    Sterlite cannot circumvent STB jurisdiction by structuring its acquisition of the CBRY as a stock purchase rather than a purchase of assets.  There are over one hundred reported cases in which the STB has presided over railroad stock purchases.[656]  In these cases, the STB paid no special consideration to the fact that a transaction was accomplished through sale of securities rather than physical assets.  Rather, it rendered decisions based on substantive aspects of the transaction.

415.    Permit transfer should not be confused with regulatory approval.  Regulatory approval cannot be avoided by a stock transfer.  The STB has specifically exercised jurisdiction over stock transfer of Class III railways, such as the CBRY.[657]  STB will preside over a stock

---

[654]      *See* 49 U.S.C. § 10901 (noting that railroad operation by a noncarrier is permitted "only if the board issues a certificate authorizing such activity.").

[655]      *W. Coal Traffic League v. Surface Transp. Bd.*, 216 F.3d 1168, 1170 (D.C. Cir. 2000) (upholding STB moratorium of 15 months over proposed merger where compliance with regulations was unclear.).

[656]      *See, e.g.*, *Canadian Nat'l Ry. and Grand Trunk Corp. – Control – EJ&E W. Co.*, STB Finance Docket No. 35087 (STB served Sept. 8, 2008) (stock purchase not treated separately for purposes of compliance with STB requirements); *Patriot Rail, LLC and Patriot Rail Corp. – Control Exemption – Rarus Ry. Co.*, STB Financial Docket No. 35013 (STB served Apr. 17, 2007) (STB presided over stock purchase where transaction involved new rail operator); *Fenway Partners Capital Fund III, L.P. and Coach America Holdings, Inc. – Control – Renzeberger, Inc.*, STB Finance Docket No. 35254 (STB Served June 25, 2008) (STB presided over stock purchase even where transaction did not involve new rail operator).

[657]      *See Genesse & Wyoming Inc. – Control Exemption – Columbus and Greenville Ry. Co., The Chattooga and Chickamauga Ry. Co, and Luxaplila Valley R.R. Inc.*, STB Finance Docket No. 35139 (STB served on May 15, 2008); *RailAmerica, Inc., et al. – Control Exemption – Point Comfort and N. Ry. Co., Rockdale, Sandow and S. R.R.*

purchase of the CBRY by Sterlite, should Sterlite try to withdraw all of its filings made thus far before the STB and attempt to restyle the transaction as a stock transfer. All of the extended delays that are unrefuted and in evidence with this court will be present in either case.

416.    The undisputed evidence demonstrates that (1) Sterlite's proposed acquisition and operation of the CBRY must be approved by the STB, (2) this approval process is lengthy, lasting one year or more, and (3) Sterlite cannot close the railroad purchase or operate the CBRY until approval is given. Such a delay would be catastrophic to the Debtors' Liquidation Plan, which depends upon continued, uninterrupted operation of the CBRY. Consequently, the Debtors have not demonstrated that their Plan is feasible.

417.    In addition to the operational difficulties Sterlite will face, it is uncertain whether Sterlite will even have the ability to fund the Debtors' Liquidation Plan. The Debtors have failed to establish by a preponderance of the evidence that the Debtors' Liquidation Plan complies with the requirements of section 1129(a) of the Bankruptcy Code.[658] Proponents of liquidation plans, like proponents of reorganization plans, must demonstrate feasibility.[659] In the Fifth Circuit, the test for feasibility of a liquidation plan is a showing that the plan is not dependent or contingent on any future, uncertain event.[660] Neither the Debtors nor Sterlite have produced evidence that Sterlite will be able to fund its initial obligation under the Debtors' Liquidation Plan or satisfy its post-Effective Date obligations if the Debtors' Liquidation Plan is confirmed. Such uncertainty does not satisfy the feasibility requirement.

---

*Co., The Massena Terminal R.R. Co. and Bauxite & N. Ry. Co.*, STB Financial Docket No. 34758 (STB served Oct. 19, 2005).

[658]    *In re Briscoe Enters., Ltd. II*, 994 F.2d 1160, 1163 (5th Cir. 1993)*, cert. denied*, 510 U.S. 992 (1993); *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 505 (Bankr. S.D. Tex. 1989).

[659]    *See Holmes v. United States (In re Holmes)*, 301 B.R. 911, 915 (Bankr. M.D. Ga. 2003).

[660]    *In re The Heritage Organization, L.L.C.*, 375 B.R. 230, 311 (Bankr. N.D. Tex. 2007).

E.     **The Debtors' Liquidation Plan Allows Governmental Environmental Claimants To Recover Amounts To Which They Are Not Legally Entitled**

418.    The Debtors' Liquidation Plan provides for Governmental Environmental Claimants to recover amounts to which they are not legally entitled on account of their claims, including interest on claims for future response costs and proceeds of the SCC Final Judgment.

419.    Under the Debtors' Liquidation Plan, if confirmed, Governmental Environmental Claimants will be entitled to recover interest on claims for both past and future response costs.

420.    The Comprehensive Environmental Response, Compensation and Liability Act,[661] is clear that interest does not begin to accrue on the Government's future cost claims until the Government actually expends funds toward planned environmental remediation.  Pursuant to section 107 of CERCLA, the Government can collect interest accruing "from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned."  Interest can be collected only on funds that have been expended.  Under the Debtors' Liquidation Plan, the Government would recover interest on money it has not yet spent and is still in its possession.  Payment of interest in this circumstance, therefore, is contrary to law.

421.    In order to recover interest under CERCLA, the Government must issue both a written demand for response costs and the actual expenditure.[662]  Although the Court-approved environmental settlements between the Debtors and the Government resolve both past and future cost claims asserted by the Government in these bankruptcy cases, CERCLA does not authorize an award of interest to the Government on account of its future cost claims because the

---

[661]     42 U.S.C. § 9601 *et seq.* ("CERCLA")

[662]     *Colorado v. U.S.*, 867 F. Supp. 948, 951 (D. Colo. 1994); *Dow Chemical Co. v. Sinclair Oil Corp.*, 3 F. Supp. 2d 1252, 1253 (D. Wyo. 1998) (citing *Bancamerica Commercial v. Mosher Steel of Kansas*, 100 F.3d 792 (10th Cir. 1996)); *In re Bell Petroleum Servs.*, 3 F.3d 889, 908 (5th Cir. 1993).

Government has not yet incurred these costs of remediation.  Moreover, when these costs are incurred, the money for them will already be in the Government's possession.  Interest cannot not be paid for monies advanced by the government for environmental clean-up.

422.     The Government's claims are based on its estimates of the cost of future cleanup work.  By settling the future cost claims for specific allowed amounts, the Debtors are effectively paying the Government in advance for its anticipated future expenditures in remediating the contaminated sites at issue.  Until the Government actually incurs these future response costs, it has no claim under CERCLA for any amount of interest even if the environmental settlements allow recovery on account of future cost claims.

423.     CERCLA specifically limits recovery of interest to past costs by providing that interest accrues at the earliest "from the date of the expenditure concerned."[663]  Only then can the claimant receive reimbursement from the responsible party for its cleanup costs.

424.     By virtue of the Debtors' bankruptcy filings, the Government was able to assert claims for future response costs because such claims arose prepetition and would therefore be subject to discharge.[664]  This does not mean, however, that the Government may also recover interest on its future cost claims, because CERCLA does not authorize any interest payments until both the written demand and the actual expenditure requirements are met.[665]  The Government brought its response cost claims under CERCLA and is bound by the statute's provisions with respect to the recovery of interest.

425.     While the Bankruptcy Code may allow for the collection of post-petition interest by general unsecured creditors in certain circumstances, it does not give a claimant an

---

[663]     CERCLA, at § 9607(a)(4).

[664]     *In re National Gypsum Co*., 139 B.R. 397 (Bankr. N.D. Tex. 1992).

[665]     *Dow Chemical Co*., 3 F. Supp. 2d at 1253; *Bell Petroleum Servs*., 3 F.3d at 908.

unequivocal right to receive post-petition interest in the face of contrary federal statutory provisions. CERLCA provisions and common law requirements have been consistently applied by bankruptcy courts in other contexts.[666] Moreover, a variety of bankruptcy issues ranging from dischargeability to standards for estimation and liability to priority of claims are all impacted by CERCLA requirements which cannot be ignored by a bankruptcy court.[667] Accordingly, there is no reason that section 107 of CERCLA should not be applied to prohibit the recovery of post-petition interest by the Governmental Environmental Claimants.

426. Moreover, it would be both unlawful and inequitable for the Government to receive these monies as proceeds of the SCC Final Judgment, when the Government settled identical fraudulent transfer claims, expressly negotiated and approved the terms of the transaction, and as a result, was preferred and received millions of dollars in consideration in the transaction. The Government is barred from receiving any portion of the SCC Final Judgment under *res judicata* and other preclusive doctrines arising from the previous settlement of the Government's prepetition fraudulent transfer lawsuit.[668]

### F.      The Debtors' Liquidation Plan Does Not Satisfy the "Best Interests" Test

427. With respect to each class of claims and interests, each holder of a claim or interest of such class will not receive or retain under the Debtors' Liquidation Plan on account of such claim or interest property of a value, as of the effective date of the Debtors' Liquidation

---

[666]      *See Eagle-Picher Indus.*, 197 B.R. 260, 262 (Bankr. S.D. Ohio 1996); *U.S. v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409 (6th Cir. 1991); *Southern Pac. Transp. Co. v. Voluntary Purchasing Groups*, 252 B.R. 373 (E.D. Tex. 2000); *Nat'l Gypsum*, 134 B.R. at 188, 193.

[667]      *See id.* (citing *In re Chateaugay Corp.*, 944 F.2d 997(2d Cir. 1991)).

[668]      *See In re Marlar*, 267 F.3d 749, 756 (8th Cir. 2001).

Plan, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.[669]

428.    If the SCC Final Judgment is ultimately worth approximately $7 billion there will be more than sufficient funds to satisfy all Allowed Claims against the Debtors' estates.  In that event, because creditors would be paid in full pursuant to the Debtors' Liquidation Plan or a chapter 7 liquidation, the proper focus of the "best interests" analysis is the Parent as the holder of 100% of the equity in ASARCO.

429.    In this scenario, the Debtors' Liquidation Plan clearly fails to satisfy the "best interests" test as to the Parent.  Under the Debtors' Liquidation Plan, the Parent may recover residual interests in the SCC Litigation Trust or may recover nothing if the Court estimated the SCC Final Litigation at an amount less than necessary to pay creditors in full.  The Parent would also be denied the opportunity of recovering anything based on the Debtors' claims against Sterlite for breach of the Original Plan Sponsor PSA because those claims would be released if the Debtors' Liquidation Plan is confirmed.  In contrast, in a chapter 7 liquidation, the Parent would retain its equity interest in ASARCO, would recover any amount of the SCC Final Judgment remaining after creditors were paid in full, and would retain the Debtors' claims against Sterlite.

430.    If the SCC Final Judgment is ultimately worthless, the Debtors' Liquidation Plan still fails to satisfy the "best interests" test.  If the Debtors' Liquidation Plan were confirmed, creditors as well as the Parent would be denied the possibility of sharing in any recovery on the claims against Sterlite.  As a matter of course in a chapter 7 liquidation, the Sterlite litigation

---

[669]    11 U.S.C. § 1129(a)(7).

claims would be left in the estates to be pursued for the benefit of its creditors.  Any recovery against Sterlite litigation in a chapter 7 liquidation would enhance distributions to creditors.

## VI.    THE REQUIREMENTS OF SECTION 1129(C) OF THE BANKRUPTCY CODE ARE MET BY CONFIRMING THE PARENT'S FULL PAYMENT PLAN

431.    The Bankruptcy Code provides that a "court may confirm only one plan."[670] In an instance in which two plans are confirmable, however, a court may not confirm a plan which disenfranchises equity over the objection of equity if equity has provided for the payment of creditors in full.  To do so would be an improvident and unprecedented taking of a valuable property right.  Chapter 11 is not a bidding war for the purchase of an owner's equity.  In an insolvent estate, Chapter 11 can create a bidding war for a debtor's assets.  If creditors are paid in full, however, no legitimate sale of a debtors assets can take place over equity's objection.  Third parties simply don't have an opportunity to displace an owner who has paid creditors in full.  The Court cannot allow ownership of the Debtors to be yanked from the hands of the Parent when the Parent has proposed to pay all creditors in full.

432.    Alternatively, if the Court finds that each of the Parent's Full Payment Plan and Debtors' Liquidation Plan is confirmable, the Court must choose which one of them to confirm. The Court finds that the Parent's Full Payment Plan should be confirmed.

433.    Section 1129(c) of the Bankruptcy Code provides that when two plans meet the requirements for confirmation, "the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm."[671]  Due to the limited guidance provided by Section 1129(c), courts have developed multiple factors to determine which plan should be

---

[670]    11 U.S.C. § 1129(c).

[671]    11 U.S.C. § 1129(c).  In this regard, Bankruptcy Rule 3018 provides that, when creditors and equity holders vote to accept more than one plan, they "may indicate a preference or preferences among the plans so accepted." FED. R. BANKR. P. 3018(c).

confirmed.  These factors include: "(1) the type of plan; (2) the treatment of creditors and equity security holders; (3) the feasibility of the plan; and (4) the preferences of creditors and equity security holders."[672]  Each of the factors favor confirming the Parent's Full Payment Plan.

### A.      A Plan For Reorganization Should Be Confirmed Over A Liquidation Plan.

434.      With respect to the first factor, "[a] reorganization plan is usually preferable to a liquidation plan."[673]  This preference is justified based on the policies of chapter 11 – the successful rehabilitation and the prevention of the liquidation of the debtor.[674]  At least one court has stated that the type of plan is determinative: a reorganization plan is preferable to a liquidation plan.[675]

435.      The Debtors' Liquidation Plan is a liquidation plan that provides for the sale of the Debtors' assets and distribution of the proceeds to creditors.  The Debtors' Liquidation Plan does not necessarily provide a distribution to equity.  In contrast, the Parent's Full Payment Plan makes full payment to creditors under a true reorganization and provides value to equity.  Because the Parent's Full Payment Plan accomplishes the fundamental goals of bankruptcy through a true reorganization and maximization of benefit to the estate, the Court finds that the first factor favors confirmation of the Parent's Full Payment Plan of reorganization over the Debtors' Liquidation plan.

### B.      The Treatment of Creditors and Equity Security Holders

---

[672]      *In re River Valley Fitness One L.P.*, 2003 Bankr. LEXIS 1252 (Bankr. D.N.H. 2003) (citing *In re Internet Navigator Inc.*, 289 B.R. 128, 131 (Bankr. N.D. Iowa 2003)); *In re Holley Garden Apartments, Ltd.*, 238 B.R. 488, 493 (Bankr. M.D. Fla. 1999)).

[673]      *In re Holley Garden Apts., Ltd.*, 238 B.R. 488, 495 (Bankr. M.D. Fla. 1999) (citing *In re Oaks Partners, Ltd.*, 141 B.R. 453, 465 (Bankr.N.D.Ga. 1992)).

[674]      *Nat'l Labor Relations Bd. v. Bildisco & Bildisco*, 465 U.S. 513, 527, 528 (1984) (citing H.R.Rep. No. 95-595, p. 220 (1977)).

[675]      *In re Valley View Shopping Center, L.P.*, 260 B.R. 10, 40 (Bankr. D. Kan. 2001).

436.     The second factor examines the treatment of creditors and equity.  This requires that "[t]he Court must make the choice that is most beneficial to all creditors and equity security holders."[676]  While the mechanics of the competing plans differ, both Plans purport to pay allowed claims in full with interest.  Despite the beneficial treatment to creditors, the Plans provide a dramatically different treatment for the second class of interests – equity.[677]  While the Debtors' Liquidation Plan makes only a token acknowledgment of equity's rights, the Parent's Full Payment Plan provides for the payment of allowed claims in full and then retention of equity, all in accordance with the absolute priority rule.

437.     In determining which plan to confirm, the Court should seek to benefit both creditors and equity.  Because the competing plans are substantially equal in their treatment of creditors and only the Parent's Full Payment Plan provides for the retention of equity, the Court finds that the second factor favors confirmation of the Parent's Full Payment Plan over the Debtors' Liquidation Plan.

## C.     The Feasibility of the Plan

438.     The third factor – the feasibility of the Plan – also favors confirmation of the Parents' Full Payment Plan.  The Parent's Full Payment Plan is feasible and is supported by (a) a binding commitment letter pursuant to which a consortium of international banks are bound to lend the Parent $1.3 billion to make the Parent Contribution of $2.2051 billion; (b) a guarantee by Grupo México of the Parent's obligation to make the Parent Contribution on the Effective Date of the Parent's Full Payment Plan; (c) an Escrow Account funded with shares of SCC stock

---

[676]     *River Valley Fitness*, 2003 Bankr. LEXIS at 1252 (emphasis added) (citing *In re Sound Radio, Inc.*, 93 B.R. 849, 859 (Bankr. D.N.J. 1988)).

[677]     Confirmation of the Debtors' Liquidation Plan, which fails to provide any distribution on account of the Parent's property interests in ASARCO might result in an involuntary taking without just compensation.  *Cf.* U.S. CONST. amend. V; *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 590 (U.S. 1935) ("The bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment.").

worth in excess of $2.9 billion, forfeitable to the extent of $2.2015 billion if the Bankruptcy Court recommends confirmation of the Parent's Full Payment Plan but the Parent fails to perform; and (d) a working capital facility of $200 million, backed by Grupo México's guarantee.[678]  The uncontroverted testimony demonstrates that the Parent's Full Payment Plan contains a sufficiently large cushion to ensure the payment of all Claims, even if they come in on the "high" side of the Debtors' estimates.[679]

439.      In contrast, the Debtors' Liquidation Plan lacks necessary regulatory approvals and is not feasible because of the issues with the CBRY discussed above.  Moreover, the performance of Sterlite's obligations under the Debtor's Liquidation Plan requires funding from Sterlite Industries (India), Inc. with respect to which there are significant collection obstacles upon breach and default and which at this point are backstopped by only $125 million in letters of credit (increasing to just $625 million some days after the Bankruptcy Court's recommendation in favor of the Debtors' Liquidation Plan, were the Court so inclined).  The Court finds that the third factor favors confirmation of the Parent's Full Payment Plan over the Debtors' Liquidation Plan.

### D.    The Preferences of Creditors and Equity Security Holders

440.      The plain language of Section 1129(c) only requires a bankruptcy court "to consider the preferences of the creditors and equity interests, not obey them."[680]

---

[678]      (Supp. de la Parra Proffer at ¶¶ 3,7, 13, and 14.)

[679]      (Second Supp. Poulin Proffer at ¶¶ 11-13.)

[680]      *River Village Assocs*, 181 B.R. at 807.  It should be noted that the forms and amounts of consideration and the implementation structures in both the Parent's Full Payment Plan and the Debtors' Liquidation Plan are materially different than they were in the forms of respective Plans upon which creditors voted and expressed a preference.  For example, the form of Parent's Full Payment Plan circulated did not provide for payment in full, in Cash, upon close, as it now does.  There can be no support for the notion that votes in connection with consideration of a prior form of the Parent's Full Payment Plan under which general unsecured creditors were impaired, as contrasted with the unimpaired and "deemed accepted" treatment under the full pay Parent's Full Payment Plan that

441.    In the bankruptcy case most on point, the court confirmed a plan based on the unimpairment of creditors.[681]    While the creditor's plan left all creditors and equity holders unimpaired (and thus no votes—or preferences—were solicited), the debtor's plan did have one approving impaired class that expressed preference for the debtor's plan.    The court, having concluded that both plans met the requirements for confirmation, assumed that the creditors, if solicited, would have favored the creditor's plan because it paid their claims in full.    Thus, ignoring the expressed creditor preference, the court confirmed the creditor's plan that, objectively, provided a better treatment for all parties in interest.

442.    Similarly, in another similar bankruptcy case where the debtor's plan left all creditors and equity holders unimpaired and thus solicited no votes, the competing plan proposed by a creditor (Condor) contained impaired classes, so the proponent solicited votes and asked for indications of preferences.[682]    While the majority of creditors, which happened to be affiliated with or controlled by Condor, favored Condor's plan, the court focused on the preferences of only those creditors that were unrelated to either plan proponent, all of whom favored the debtor's plan.    Thus, the court confirmed the debtor's plan based on factors other than the preferences expressed by the majority of creditors.

443.    As in *Internet Navigator* and *Holley Garden Apartments,* the Parent's Full Payment Plan should be confirmed in spite of the creditors' preferences because it (a) provides for the reorganization of ASARCO while the Debtors' Liquidation Plan provide for the sale of substantially all of its assets to a third party, (b) provides for a more substantial, certain, and expeditious recovery to creditors and equity holders alike without the delay of further appeals,

---

is now properly before the Court for confirmation, or that preferences expressed with respect to prior and inferior forms of the Parent's Full Payment Plan, should have any bearing on the Court's determination.

[681]    *In re Internet Navigator Inc.,* 289 B.R. 128, 131 (Bankr. N.D. Iowa 2003).

[682]    *Holley Garden Apartments*, 238 B.R. at 496.

(c) is more feasible than the Debtors' Liquidation Plan, and (d) has the presumed support of all creditors and equity.

444.     In this case, creditors' preferences should be disregarded because all creditors will be paid in full plus interest under the Parent's Full Payment Plan, where creditors in Classes 4, 6 and 7 under the Debtors' Liquidation Plan may not be paid in full, and the owners' Interests under Class 8 are improperly and unlawfully transferred to a third party.

445.     The Parent's Full Payment Plan will be confirmed because it (a) provides for the reorganization of ASARCO while the Debtors' Liquidation Plan provide for the sale of substantially all of its assets to a third party, and (b) provides for a more substantial, certain, and expeditious full recovery to creditors and equity holders alike.  Creditors in Classes 1,2 3, 5, 6, 7 and 8 are deemed to have voted to accept the Parent's Full Payment Plan.  Creditors in Class 4 actually voted to accept the Parent's Full Payment Plan.  The Parent's Full Payment Plan respects the rights of creditors and equity alike, unlike the Debtors' Liquidation Plan.

## VII.   THE PARENT'S FULL PAYMENT PLAN COMPLIES WITH SECTION 1129(D) OF THE BANKRUPTCY CODE

446.     The principal purpose of the Parent's Full Payment Plan is neither the avoidance of taxes nor the avoidance of Section 5 of the Securities Act of 1933, and no party has objected to the confirmation of the Parent's Full Payment Plan on any such grounds. Accordingly, the Parent's Full Payment Plan satisfies section 1129(d) of the Bankruptcy Code.

## VIII.   IN THE ALTERNATIVE, PARENT'S FULL PAYMENT PLAN SHOULD BE APPROVED UNDER 11 U.S.C. § 1129(B)

447.     Section 1129(b) provides that, if a plan of reorganization satisfies all of the requirements of Section 1129(a) other than Section 1129(a)(8) (requiring all impaired classes to accept the plan), a plan may be confirmed without such class's affirmative acceptance of the plan

if "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."[683]

448.     In this case, the majority of creditors have voted to reject the prior versions of the Parent's proposed plan of reorganization.  The Parent's Full Payment Plan, which was amended after the voting deadline, provides for the unimpairment of creditors of all Classes other than Class 4, which has accepted the Parent's Full Payment Plan, and therefore eliminates any votes of rejection as a matter of statute. In the alternative, the Parent requests confirmation of the Parent's Full Payment Plan in the alternative under Section 1129(b) of the Bankruptcy Code. Similarly, the Debtor's Liquidation Plan impairs certain classes, and must also satisfy the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code.

449.     To be confirmed pursuant to the provisions of Section 1129(b) of the Bankruptcy Code, the Parent's Full Payment Plan must be fair and equitable and must not discriminate unfairly with respect to Classes 6, 7 and 9, and potentially Class 3, (collectively, the "Rejecting Classes").   The Parent's Full Payment Plan clearly satisfies both of these requirements as to each of the Rejecting Classes.

A.     **Parent's Full Payment Plan Does Not Discriminate Unfairly With Respect to Rejecting Classes**

450.     The Parent's Full Payment Plan does not discriminate unfairly with respect to any of the Rejecting Classes.  Although Congress did not define "discriminate unfairly," the case law views it "as a horizontal limit on non-consensual confirmation . . . Just as the fair and equitable requirement regulates priority among classes of creditors having higher and lower priorities, creating inter-priority fairness, so the unfair discrimination provision promotes intra-

---

[683]     11 U.S.C. § 1129(b)(1).

priority fairness, assuring equitable treatment among creditors who have the same level or priority."[684]  To clarify, discrimination is permissible as long as it is not unfair.[685]

451.    In determining whether discrimination is unfair, courts in the Fifth Circuit have applied a test that factors in whether there exists a dissenting class and another class of the same priority, and the plan purports to treat the two classes in a way that results in materially lower percentage recovery for the dissenting class or allocates materially greater risk than that class.[686]

452.    Under the foregoing standards, the Parent's Full Payment Plan does not "discriminate unfairly" with respect to any of the Rejecting Classes.  The Claims in Class 3 are General Unsecured Claims that are not similarly situated to any other unsecured Claims against the Debtors dealt with by the Parent's Full Payment Plan:  (a) the treatment of Claims in Class 4 is based on a settlement reached with the fiduciaries to holders of such Claims that have agreed to consensually accept certain treatment under a plan, (b) a different treatment for a convenience class (Class 5) is specifically envisioned by Section 1122(b) of the Bankruptcy Code, and (c) reinstatement of Class 8 claims is envisioned by Section 1124(2)(B)  of the Bankruptcy Code.[687]

453.    The Claims in Classes 6 (Late-Filed Claims) and 7 (Subordinated Claims) are also not similarly situated to Claims in any other Classes.  Class 9 consists of the Interests in ASARCO.[688]  There are no other Classes under the Parent's Full Payment Plan comprised of Interests.  Thus, there is no unfair discrimination with respect to Claims or Interests in any of the Rejecting Classes.

---

[684]    *In re Sentry Operating Co. of Tex. Inc.*, 264 B.R. 850, 863 (Bankr. S.D. Tex. 2001).

[685]    *Id.*

[686]    *Id.*

[687]    11 U.S.C. §§ 1122(b), 1124(2)(B).

[688]    Parent's Full Payment Plan at Art. 3.1(i).

### B.    Parent's Full Payment Plan is Fair and Equitable With Respect to Rejecting Classes

454.    In addition to not discriminating unfairly, the Parent's Full Payment Plan must be fair and equitable with respect to the Rejecting Classes, which means it must comply with the absolute priority rule.[689]

455.    A corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims and that excess value must be allocated to junior classes of debt and equity, as the case may be.[690]  "It is clear that the drafters [of the Bankruptcy Code] intended the court to deny confirmation where the plan proposes to pay more than 100 percent to a senior class without the consent of a junior [class]."[691]

456.    Indeed, courts consistently deny confirmation under Section 1129(b) of the Bankruptcy Code when senior classes receive (or are likely to receive) more than 100 percent of the allowed amount of their claims.[692]

457.    Accordingly, the Parent's Full Payment Plan that complies with this corollary is superior to the Debtors' Liquidation Plan, which does not.  The Debtors' Liquidation Plan

---

[689]    *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) ("fair and equitable" means that a plan must "comply with the absolute priority rule"); *In re Montgomery Court Apartments of Ingham County, Ltd.*, 141 B.R. 324, 343 (Bankr. S.D. Ohio 1992) (fair and equitable standard means that "[holders] of junior claims or interests cannot receive distributions under a proposed plan unless senior creditors have been fully paid").

[690]    *Genesis Health*, 266 B.R. at 612; *Granite Broadcasting*, 369 B.R. at 120.

[691]    *Victory Constr.*, 42 B.R. at 155 (citing legislative history).

[692]    *See, e.g., Trans Max Technologies,* 349 B.R. at 89-90 ("One component of fair and equitable treatment is that a plan may not pay a premium to a senior class. . . . [evidence must be presented to] ensure[] that no class surviving confirmation will be paid more than in full through the capture of value that rightly belongs to the eliminated class"); *Exide Technologies*, 303 B.R. at 62 (same); *Future Energy Corp.*, 83 B.R. at 495 (same).  In fact, a Bankruptcy Court in this District has denied confirmation of a plan under circumstances strikingly similar to the case at bar. *MCorp*, 137 B.R. at 219.  In *MCorp*, the debtor proposed a plan that would eliminate existing equity interests, while allocating to a class of creditors senior to such interests all proceeds from a pending lawsuit, without providing any upper limit to the creditors' recovery from such proceeds.  Judge Paul refused to confirm the plan because it was not "fair and equitable to equity interests." *Id.*  The open-ended and uncapped distribution to the senior creditor class created a possibility that the members of such class would be paid "more than in full" at the expense of equity.  "If former shareholders' interests are impaired and a class of creditors is provided for more than in full, the plan will not be confirmed."  *Id.*  Just as in *MCorp's* rejected plan, Debtors' Liquidation Plan potentially provides more than full recovery to creditors while freezing equity out, in violation of the absolute priority rule.

permits the holders of Class 3 Claims (through their transferee, Sterlite) and Class 4 Claims to receive uncapped distributions from the proceeds of the SCC Litigation, in excess and under certain circumstances, massively in excess, of payment in full in derogation of applicable law.[693]

## IX.   THE DISCHARGES, RELEASES, EXCULPATIONS, INJUNCTIONS AND RELATED PROVISIONS IN THE PARENT'S FULL PAYMENT PLAN ARE APPROPRIATE

458.     Pursuant to section 1123(b)(3) of the Bankruptcy Code, the discharges, releases, exculpations and injunctions set forth in the Parent's Full Payment Plan, including, without limitation, Article X of the Parent's Full Payment Plan, and implemented by the Confirmation Order, constitute good faith compromises and settlements of the matters covered thereby.  Such compromises and settlements are made in exchange for substantial consideration and are hereby approved as fair, equitable, reasonable and in the best interests of the Debtors, the Estates, Reorganized ASARCO, the Parent, Creditors and Equity Interest Holders.  The releases contained in Article X of the Parent's Full Payment Plan are, under the circumstances presented, fair, reasonable and necessary to the successful effectuation of the Parent's Full Payment Plan and justified by the substantial consideration contributed under the Parent's Full Payment Plan for the benefit of the Holders of Allowed Claims.   Each of the discharge, release, indemnification, and exculpation provisions set forth in the Parent's Full Payment Plan:

- is within the jurisdiction of the Court under 28 U.S.C. §§ 1334(a), (b), and (d);

- is an essential means of implementing the Parent's Full Payment Plan pursuant to section 1123(a)(5) of the Bankruptcy Code;

- is an integral element of the settlements and transactions incorporated into the Parent's Full Payment Plan;

- confers material benefit on, and is in the best interests of, the Debtors, their estates, and the holders of Claims and Interests;

---

[693]     *See MCorp.*, 137 B.R. at 219; *Reconstruction Finance*, 328 U.S. at 530-531.

- is important to the overall objectives of the Parent's Full Payment Plan to finally resolve all Claims among or against the parties-in-interest in the Cases with respect to the Debtors, their organization, capitalization, operation, and reorganization; and

- is consistent with 11 U.S.C. §§ 105, 1123, and 1129, and other applicable provisions of the Bankruptcy Code.

459.     The failure to effect the discharge, release, indemnification, and exculpation provisions described in Article X of the Parent's Full Payment Plan would seriously impair the Parent's ability to confirm the Parent's Full Payment Plan.

460.     Accordingly, the discharges, and the releases of the Released Parties and the exculpation of the Exculpated Parties as set forth in the Parent's Full Payment Plan are consistent with sections 105, 524, 1123, and 1129 of the Bankruptcy Code and applicable law in the Fifth Circuit.

## X.     CONFIRMATION OF THE PARENT'S FULL PAYMENT PLAN

461.     The Parent's Full Payment Plan complies with all of the requirements of the Bankruptcy Code and should be confirmed.

## XI.     DENIAL OF CONFIRMATION OF THE DEBTORS PLAN

462.     Confirmation of the Debtors' Liquidation Plan should be denied.

*Remainder of Page Intentionally Blank*

Dated: _____, __, 2009

_____

RICHARD S. SCHMIDT
United States Bankruptcy Judge