IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

ENTERED
09/11/2009

| | | |
|---|---|---|
| In re: | § | Case No. 05-21207 |
| | § | |
| ASARCO LLC, *et al.*, | § | Chapter 11 |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

## AMENDED AND SUPPLEMENTAL REPORT AND RECOMMENDATION FOR ENTRY OF FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAN CONFIRMATION

In accordance with deadlines set out in the Plans of Reorganization and to facilitate confirmation and consummation before the end of the year, on Monday, August 31, 2009, this Court entered its Report and Recommendation. The Report was entered ten days after the close of evidence in the confirmation hearing and only six days after conclusion of closing arguments. After further review of the Report and Recommendation and upon the suggestion of several interested parties, the Court now amends its Report and Recommendation to correct typographic and editing mistakes, to correct one factual error, and to include updates to the Parent's Plan in compliance with the Court's September 2, 2009, *Sua Sponte* Order. The amendment also includes a section recommending approval of the 9019 Asbestos Settlement previously omitted.

Beginning on August 10, 2009, and continuing through August 25, 2009, the Bankruptcy Court conducted an evidentiary hearing (the "Confirmation Hearing") to consider confirmation of two competing plans of reorganization for the Debtor, ASARCO LLC (the "Debtor" or "ASARCO") and its Chapter 11 subsidiaries:

- Sixth Amended Joint Plan of Reorganization for the Debtors under Chapter 11 of the United States Bankruptcy Code, As Modified, With Further Modifications As of August 23, 2009 ("Debtors' Plan"), and

- ASARCO Incorporated and Americas Mining Corporation's Seventh Amended Plan of Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code As Modified on August 20, 23, and 27 2009, ("Parent's Plan").[1] A conformed Plan containing all modifications was filed on August 30, 2009.

In connection with the Confirmation Hearing, the Bankruptcy Court received testimony from more than 20 witnesses and admitted more than 400 documentary exhibits and 2000 additional documents related to asbestos claims. The Court has considered all testimony presented (whether live or by proffer) and evidence admitted at the Confirmation Hearing. The Court also has considered the Disclosure Statement dated July 6, 2009, supplemental disclosure statements, plan objections and modifications, and briefs and memoranda filed in connection with confirmation. In addition, the Court has taken judicial notice of the prior proceedings, the Bankruptcy Court docket, all pleadings and other documents filed, all previous Orders entered, and all previous hearings and evidence and argument presented in these bankruptcy cases and all associated adversary proceedings.

Because both plans of reorganization seek a permanent channeling injunction under 11 U.S.C. §524(g), by Order dated August 6, 2009, the District Court withdrew the reference regarding proceedings related to confirmation of a plan of reorganization in this case and related requests for a channeling injunction. The August 6, 2009, Order also referred these issues to the Bankruptcy Court for hearing and directed the Bankruptcy Court to make proposed findings of fact and conclusions of law. Accordingly, the Bankruptcy Court recommends that the District Court enter the following proposed findings of fact and conclusions of law[2] in support of

---

[1]   A third plan, the Second Amended Chapter 11 Plan filed by Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger's Plan"), was also filed, but the plan proponent requested that it be held in abeyance and not considered.

[2]   Findings of fact shall be construed as conclusions of law and vice versa where appropriate. *See* Fed. R. Bankr. P. 7052. The Court's findings of fact and conclusions of law announced on the record in open court are hereby incorporated by reference herein.

confirmation of the Plan of Reorganization of Americas Mining Corporation ("AMC") and

ASARCO Incorporated (together, the "Parent") and denying confirmation of the Debtor's Plan.

## PRELIMINARY STATEMENT AND OVERVIEW

The Confirmation Hearing marked the culmination of this four-year bankruptcy case.

When ASARCO sought bankruptcy protection in 2005, the company had essentially run out of

cash and was saddled with massive environmental liability, financial debt, potential asbestos-

related liability, falling copper prices, and a striking workforce.  Moreover, two of ASARCO's

three board members had resigned. ASARCO's ability to reorganize successfully results directly

from the diligent efforts of management installed early on in this case as well as ASARCO's

workforce.   In the course of the bankruptcy case, ASARCO's leadership and its workers

achieved a cooperative relationship that enabled ASARCO to improve operations and capitalize

on rising copper prices during the past four years.

In that time, the Debtor[3] has devoted significant attention to continuing operations in

Chapter 11 with minimal disruption, improving corporate governance and controls, stabilizing

the Debtors' financial condition, increasing productivity, improving labor relations, and most

importantly, improving the Debtor's cash condition, all of which paved the way to a successful

---

[3]      As used herein, in addition to ASARCO LLC, who filed August 9, 2005, , the term "Debtor" includes, , Lac d'Amiante du Québec Ltée (f/k/a Lake Asbestos of Quebec, Ltd.);  Lake Asbestos of Quebec, Ltd.;  LAQ Canada, Ltd.;  CAPCO Pipe Company, Inc. (f/k/a/ Cement Asbestos Products Company); and Cement Asbestos Products Company ("Asbestos Subsidiary Debtors"), which filed for bankruptcy protection on April 11, 2005. The Asbestos Subsidiary Debtors were affiliated companies which had been out of business for many years and had as their principal asset a lawsuit in the State District Court of Nueces County, Texas. Therefore, venue was proper in the Southern District of Texas, Corpus Christi Division as to the Asbestos Subsidiary Debtors. 28 U.S.C. §1408.

"Debtor" also includes Encycle, Inc., which filed on August 26, 2005; ASARCO Consulting, Inc., which filed on September 1, 2005; ALC, Inc.; American Smelting and Refining Company; AR Mexican Explorations Inc.; Asarco Master, Inc.; Asarco Oil and Gas Company, Inc.; Bridgeview Management Company, Inc.; Covington Land Company; Government Gulch Mining Company, Limited; which filed on October 13, 2005; and Southern Peru Holdings, LLC; AR Sacaton, LLC, a Delaware limited liability company; and ASARCO Exploration Company, Inc. which filed December 12, 2006.  "Debtor" also includes Alta Mining and Development Company, Blackhawk Mining and Development Company, Limited, Green Hill Cleveland Mining Company, Tulipan Company, Inc., Peru Mining Exploration and Development Company and Wyoming Mining and Milling Company.  Encycle/Texas, Inc., which has been converted to a chapter 7 bankruptcy, is not referenced by the term "Debtors."

reorganization. Moreover, the Debtor and its professionals continuously moved this case toward the confirmation of a plan that resulted in the best possible recovery for creditors - - full payment.

The bankruptcy case contains over 12,500 docket entries, numerous adversary proceedings and consumed thousands of hours of court hearing time. The Court was assisted by two bankruptcy judges who conducted mediations and by the District Court who presided over trial of the SCC litigation. This Court is extremely grateful for the assistance of those three judges, their staff, and the Office of the Clerk of the Court.

The Court is now presented with two competing reorganization plans which  improved on an almost daily basis during the confirmation hearing.  Both plan proponents believe their plans to be full-payment plans which return full principal and interest to the creditors.

The Debtor's Plan sells the assets of ASARCO to Sterlite (USA) Inc. ("Sterlite") for consideration of $1.4394 billion in cash plus $722 million to monetize the SCC Litigation Trust interest of Class 3.[4] This is the second plan proposed by the Debtor based on a sale to Sterlite. As described below in detail, Sterlite originally contracted to purchase the assets of ASARCO for $2.6 billion, but later defaulted. The Debtor's plan sets up the SCC Litigation Trust which is assigned beneficiary interest based upon the value of the judgment as determined by this Court. The SCC Litigation Trust is also used to back-stop payment in full to creditors. The Debtor's plan consideration, plus ASARCO's cash on hand estimated at $1.4 billion, is used to pay creditors in full with interest. Sterlite is obligated to pay any additional amounts necessary to pay the claims in full plus reasonable expenses incurred by the plan administrator. These obligations are guaranteed by Sterlite Industries (India), Ltd. To ensure that Sterlite closes upon

---

[4] The SCC Litigation is described in detail in Section IV. I., below.

confirmation, it agreed to provide $625 million in the form of a letter of credit as security for closing.

Throughout this case, the Parent has proposed and withdrawn many plans. On numerous occasions, attorneys for the Parent suggested that the Parent would propose a full payment plan. However, the history of this case demonstrates that all of the Parent's plans were proposed in reaction to other plans, tactically designed to regain control of the Debtor during this case or as an effort to limit liability in the SCC Litigation. Finally, on the sixth day of a ten-day confirmation hearing, the Parent proposed a plan which pays all creditors in full with interest.

Pursuant to the Parent's Plan, the Parent will contribute to the Debtor $2.2051 billion cash. Simultaneous with the delivery of the consideration to an independent plan administrator, the Debtor shall release the SCC Judgment. In addition, the Parent is providing (i) AMC's guarantee of a $280 million promissory note payable to the Section 524(g) Trust, backed by a pledge of 51 percent of the Equity Interests in Reorganized ASARCO; (ii) a $200 million Working Capital Facility to fund Reorganized ASARCO's operations upon emergence from bankruptcy; and (iii) a release of the Parent's claims against the Estates. The Parent currently has at least two claims against the Estates: (1) an administrative expense claim for reimbursement of $161.7 million (estimated to be approximately $190 million with interest) for ASARCO's liability for taxes attributable to the Debtors' post-petition income, and (2) a claim by AMC to a tax refund that is presently estimated to be worth approximately $60 million, which shall be available for distribution to creditors pursuant to the Parent's Plan. The Parent's commitments to make the contribution of $2.2051 billion, to guarantee the $280 million note, and to provide the working capital facility are further guaranteed by AMC. Grupo México, the Parent's corporate owner, has guaranteed AMC's obligations, as set forth in the Second

Amended Grupo México Guarantee Agreement filed on September 5, 2009. AMC is a U.S. corporation subject to jurisdiction and service of process in the United States. Grupo México has voluntarily submitted to the jurisdiction of the courts in the Southern District of Texas, and waived service of process, for the limited purpose of any action to enforce Grupo México's obligations by a party to or third party beneficiary of the Grupo México Guarantee Agreement. Finally, Reorganized ASARCO will remain liable for any unlikely shortfall in the funds available to satisfy Claims. These funds and other sources of consideration are sufficient to provide payment in full to all classes of claims at the allowed or agreed-upon amount. The Parent will retain 100% of the equity interests in Reorganized ASARCO.

To demonstrate its intention and ability fully and timely to consummate its Plan, the Parent has established an Escrow Account funded with 83,710,000 shares of stock of SCC, with a market valuation as of the close of the Confirmation Hearing in excess of $2.4 billion. Before the Parent's Plan is recommended by the Bankruptcy Court for confirmation by the District Court, such shares in the Escrow Account will act as a forfeitable deposit, ensuring that the Parent's Plan is not terminated, withdrawn, modified, or amended in a manner that would effect a materially adverse change to the treatment afforded unsecured creditors, prior to the conclusion of the Confirmation Hearing (the "Pre-Confirmation Deposit"). No later than August 28, 2009, the Parent's ultimate parent company, Grupo México, is depositing into the Escrow Account an additional $500 million in cash in U.S. dollar currency.[5] The Escrow Account will be maintained through consummation of the Parent's Plan and will act as a forfeitable deposit, ensuring that the Parent will timely consummate the Parent's Plan.

---

[5] The Parent filed a document purporting to evidence the transfer of $500 million from BBVA Bancomer to an escrow account at Bank of New York on August 28, 2009.

Although both plan proponents raised objections to confirmation of the other's plan, the Court believes that both plans are confirmable. The only objections remaining to the Debtor's Plan are the objections of the Parent. The only objections remaining to the Parent's Plan are the objections of the Debtor and the United Steel Workers Union (the "Union"). The creditors voted overwhelmingly in favor of confirmation of the Debtor's Plan. With respect to the Parent's Plan, all creditors are unimpaired except for Class 4, and Class 4 voted overwhelmingly in favor of confirmation of the Parent's Plan.[6] Section 1129(a) of the Bankruptcy Code permits confirmation of only one plan of reorganization. Considering 1) the type of plans, 2) the treatment of creditors and equity, 3) the relative feasibility of each plan, and 4) the preferences of creditors and equity, this Court believes that the Parent's Plan of reorganization is superior. Both plans provide for the continuation of the business of the Debtor. Both plans pay creditors in full. The Parent's Plan retains the Parent's equity, while the Debtor's plan allows the Parent only the potential to retain a share of the SCC Litigation Trust after payment of creditors based upon a formula after determination of the value of the SCC Litigation Trust at confirmation. The Debtor's Plan is overwhelmingly preferred by creditors. However, the Parent's Plan is more likely to pay creditors in full in that it is funded with sufficient cash to pay creditors in full at confirmation, while the Debtor's Plan relies upon some recovery of the SCC Judgment. Although both plans are feasible, both plans raise feasibility questions. The Parent failed to reach a collective bargaining agreement with the Union which could result in a crippling strike. The Parent's Plan saddles the reorganized Debtor with obligations requiring it to upstream dividends and sales

---

[6]        In the original Report and Recommendation the Court stated that "the creditors voted overwhelmingly in favor of both plans." The statement is inaccurate because only the class 4 creditors voted in favor of the Parent's Plan. The votes of the remaining creditors, however, do not impact the Court's overall recommendation, since these creditors are unimpaired under the Parent's Plan and deemed to have accepted the Parent's Plan. Further, the Court made no error when discussing the preference of the creditors at ¶281 below.

proceeds to the Parent to pay off the borrowing facility used to fund the plan. Under the Parent's Plan the Debtor would also be liable for any creditor shortfall. On the other hand, support for the future operation of the reorganized debtor under the Debtor's Plan relies on the good graces of the Sterlite parent and not on any legal commitment. The Debtor's Plan guarantees performance with a $625 million letter of credit. The Parent's Plan guarantees performance with the escrow of $2.2 billion in cash and securities. In total, the Parent's Plan pays $2.4799 billion for the assets of the Debtor while the Debtor's Plan pays only $2.1675 billion.

Ultimately, this exceedingly complex bankruptcy case boils down to two major issues. Although other issues are raised and discussed herein, this Court believes that confirmation turns on: 1) whether the Parent's Plan violated the Special Successorship Clause ("SSC") of the Collective Bargaining Agreement between the Debtor and the Union[7] and 2) assuming it does not, which plan should be confirmed under Section 1129(c) of the Bankruptcy Code.[8] Because this Court believes both plans are confirmable but that the Parent's Plan should be confirmed, the Court will make detailed recommended findings with respect to the Parent's Plan. If the District Court disagrees with the Bankruptcy Court's proposed findings regarding either the SSC or Section 1129(c), it should return the case back to the Bankruptcy Court for further findings if it so desires.[9]

For the reasons detailed below, the Bankruptcy Court recommends that the District Court confirm the Parent's Plan and deny confirmation of the Debtor's Plan. The Bankruptcy Court also recommends that the District Court issue all injunctions set forth in the Parent's Plan.

---

[7]    Discussed in detail at IX. A. & B., below.

[8]    Discussed in detail at X below.

[9]    The Court would have to satisfy itself that the Debtor's Plan is still feasible because after the Bankruptcy Court's recommendation, Sterlite is no longer obligated to close under its Purchase and Sale Agreement.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.    INITIATION OF BANKRUPTCY CASE AND APPOINTMENT OF CASE FIDUCIARIES

1.      ASARCO is an integrated copper-mining, smelting and refining company that has operated for more than 100 years.  The Debtor's need for bankruptcy protection arose when five interrelated and compounding problems—longstanding insolvency, debilitating bond debt, the lingering effects of a falling copper market, mounting asbestos and environmental claims, and an ongoing labor strike—converged.[10]  As is detailed further below, some of these problems stemmed directly from actions taken by ASARCO's corporate parent, AMC, under the direction of the entities' ultimate parent, Mexican conglomerate Grupo México.

2.      The Debtors filed voluntary petitions for reorganization in the Bankruptcy Court under chapter 11 of the Bankruptcy Code at various times in 2005, 2006, and 2008 as shown in Exhibit K to the Disclosure Statement and in footnote 3 herein.  The Reorganization Cases are jointly administered as *In re ASARCO LLC, et al.*, Case No. 05-21207.[11]  ASARCO voluntarily petitioned for relief under chapter 11 on August 9, 2005.  The Debtor has remained in possession of its property and has operated its businesses as debtor in possession.

3.      On August 25, 2005, the U.S. Trustee appointed an official committee of unsecured creditors of ASARCO ("ASARCO Committee").   (Dkt 182)   The ASARCO Committee retained legal counsel (Reed Smith LLP) and financial advisors (FTI Consulting, Inc.).

4.      On April 27, 2005, the U.S. Trustee appointed an official committee of unsecured creditors for the Asbestos Subsidiary Debtors (the "Asbestos Subsidiary Committee").

---

[10]      *See* Affidavit in Support of First-Day Motions ("First-Day Affidavit") ¶ 14.  (Dkt 24, Ex. D248)

[11]      Except where otherwise noted, references to the docket sheet ("Dkt") refer to the docket sheet in case No. 05-21207.

(Dkt 46 in Case No. 05-20521)  The Asbestos Subsidiary Committee is comprised of 11 asbestos personal injury claimants acting through their counsel, asbestos plaintiffs' lawyers.[12]  The Asbestos Subsidiary Committee retained various professional advisors[13] and has actively participated in the Reorganization Cases.  Both Committees attended all court-ordered mediations, were involved in development of the plan sponsor selection process, and engaged in plan negotiations.

5.  On August 26, 2008, the Bankruptcy Court directed the U.S. Trustee to appoint an Official Committee of Asbestos Claimants (the "Asbestos Claimants' Committee") to represent the specific class of creditors with asbestos-related claims against all Debtors. (Dkt 8859)  The members of the Asbestos Subsidiary Committee were appointed as members of the Asbestos Claimants' Committee along with three additional members with premises liability claims.  (*Id.*)

6.  On April 19, 2005, the Bankruptcy Court approved the selection of Judge Robert C. Pate (the "Future Claims Representative" or "FCR") as the legal representative in the Asbestos Subsidiary Cases to represent the interest of future asbestos-related claimants.  (Dkt 37 in Case No. 05-20521)  On August 15 and 26, 2008, the Bankruptcy Court appointed Judge Pate as the legal representative for future claimants with asbestos-related claims against ASARCO and the subsidiary debtors other than the Asbestos Subsidiary Debtors.  (Dkt 8734)  The FCR

---

[12]    The attorney representatives include Al Brayton, Ann Harper, Brent Coon, Bryan Blevins, Charles Finley, Ryan A. Foster, Eric Bogdan, Thomas W. Bevan, Steve Baron, Thomas M. Wilson, Steven Kazan, Christina Skubic, Robert Phillips.

[13]    Stutzman, Bromberg, Esserman & Plifka, P.C. (legal counsel), L Tersigni Consulting PC (financial advisors terminated on June 6, 2007), Charter Oak Financial Consultants, LLC (financial advisors), Risk International (insurance advisors), David P. Anderson and The Claro Group, LLC (insurance advisors), Legal Analysis Systems, Inc. (asbestos claims consultant), and Law Offices of Dean Baker (Connecticut local counsel).

retained various professional advisors.[14]   The FCR also participated actively in the Reorganization Cases, attended all court-ordered mediations, was involved in development of the plan sponsor selection process, and engaged in plan negotiations.   The FCR acted with diligence and reasonable prudence, and in all respects fulfilled his duties, responsibilities, and obligations as the legal representative of Demand holders in accordance with section 524(g) of the Bankruptcy Code.   The FCR neither holds nor represents an interest that is adverse to the interests of any future asbestos claimant respecting the scope of his appointment.

## II. SIGNIFICANT MILESTONES IN THE PROGRESS TOWARD ASARCO'S REORGANIZATION.

7.     As detailed in the Disclosure Statement dated July 6, 2009, the four-year history of this complex case involved a vast array of issues and a huge number of parties in interest.  Some of the milestones in the case are briefly summarized below.

### A.     Corporate Governance.

8.     One of the first issues addressed by the Bankruptcy Court was ASARCO's corporate governance.  By November 2005, due to a series of resignations after the August 2005 bankruptcy filing, ASARCO's sole director was Carlos Ruiz Sacristán, Grupo México's appointee.  Ruiz was simultaneously a director of another Grupo México affiliate, Southern Peru Copper Corporation ("SPCC"), which competes directly against ASARCO.  In addition, as is detailed below, SPCC[15] was the subject of a fraudulent transfer proceeding brought by ASARCO against AMC.

9.     Raising possible conflicts of interest, the creditors' committees in the bankruptcy, supported by other major stakeholders, moved to restructure ASARCO's corporate

---

[14]     Oppenheimer, Blend, Harrison & Tate, Inc. (legal counsel), Legal Analysis Systems, Inc. (asbestos claims consultant), and Charter Oak Financial Consultants (financial advisors).

[15]     SPCC is now known as Southern Copper Corporation ("SCC").

governance. After numerous bankruptcy court hearings, the corporate governance issues ultimately were resolved in December 2005 by a court-approved stipulation to which all parties, including the Parent, agreed. The Corporate Governance Stipulation (Dkt 1223, Ex. D250) added two independent directors—H. Malcolm Lovett, Jr. and Edward R. Caine—to ASARCO's board. The express purpose of the Stipulation was to "assure the independence of [ASARCO's] Board of Directors from interests of . . . Grupo." (*Id.*)

10.     On January 23, 2006, the board unanimously determined to create a special committee of independent directors to handle matters where conflicts of interest may develop. The independent committee would oversee all transactions with Grupo México and its affiliates. Thereafter, additional matters, including but not limited to all litigation regarding the Tax Sharing Agreement between ASARCO and AMC and the SCC Litigation, were also referred to the independent committee. Disclosure Statement at 56. (Dkt 11899, Ex. 16)

11.     Despite the fact that the Parent agreed to the Corporate Governance Stipulation and that the conflicts continued to persist, the Parent repeatedly sought to undo the independence of the Board. On January 23, 2007, the Parent moved to amend the Corporate Governance Stipulation to provide for ASARCO to have a five-person board, with three directors appointed by the Parent. (Dkt 3630, Ex. D251) After the Bankruptcy Court rejected this request, the Parent filed a second motion, this time seeking access to information or, alternatively, for an order amending the Corporate Governance Stipulation to provide for a five-member board. (Dkt 4245) When the Bankruptcy Court denied its request again, the Parent filed a third motion seeking to require ASARCO to obtain the Parent's consent before entering into any settlement or compromise that would result in a cash payment or claim allowance in excess of $10 million. (Dkt 5532, Ex. D254) The Bankruptcy Court denied that request as well. (Dkt 6329, Ex. D255)

The District Court rejected the Parent's appeal.   Order, *In re ASARCO,* LLC, No. 2:07-CV-00461 (S.D. Tex. Apr. 18, 2008).   The Parent dismissed its further appeal to the Fifth Circuit.

### B.     Labor Issues.

12.     One of the principal factors leading to ASARCO's bankruptcy filing was a strike by nearly 1500 unionized workers representing about 70 percent of the company's workforce that began in July 2005.[16]   Union representatives testified that in the period preceding the strike, ASARCO was starved of financial support and engaged in an antagonistic labor relations policy that included, among other things, elimination or modification of promised retiree health care benefits.[17]   The policy, coupled with ASARCO's demands for "massive wage and benefit concessions" at the time of high copper prices, precipitated the four-month strike.[18] The vote approving the strike was nearly unanimous.   By the time the strike began, collective bargaining agreements had expired, and most of the striking workers had been without any agreement for more than a year.   The disruption caused by the strike resulted in immediate and substantial loss of sales, eroded customer confidence, stressed salaried employees and management, undermined worker moral, and diminished productivity.   As the Bankruptcy Court previously found, the strike "significantly injured the debtor."[19]

---

[16]     *See* Lapinsky Proffer ¶ 76.  (Dkt 12387, Ex. D170); Proffer of George M. Mack in Support of Confirmation of the Debtors' Joint Plan of Reorganization and in Opposition to Confirmation of Parent's and Harbinger's Plans of Reorganization ("Mack Proffer") ¶ 56.  (Dkt 11936, Ex. 54); *see also* First-Day Aff. ¶ 19.  (Dkt 24, Ex. D248)

[17]     *See* Proffer of Manuel Armenta In Support of USW Objection to Confirmation of Parent Plan of Reorganization ("Armenta Proffer") ¶ 10.  (Dkt 12375, Ex. USW669)

[18]     *See* Proffer of Terry Bonds in Support of Motion ("Bonds Proffer") ¶¶ 11-12.  (Dkt 4007, Ex. D166) Union representatives testified that the strike was precipitated by a hostile relationship with Grupo México which, according to the Union, "operated ASARCO solely in the interest of Grupo and ignored the interests of ASARCO's employees, creditors, and the communities in which it operated."  *Id.* at ¶ 11.

[19]     *See* March 15, 2007 Order Approving New Collective Bargaining Agreement with Unions, Including Monetary Obligations Thereunder, Pursuant to 11 U.S.C. §§ 363(b) and 105(a) ("CBA Order") ¶ 7.  (Dkt 4179, Ex. D229); *see also* Rebuttal Report of George M. Mack in Response to the Proffer of Lisa M. Poulin in Support of ASARCO Incorporated and Americas Mining Corporation's Modified Fifth Amended Plan of Reorganization for the Debtors Under Chapter 11 of the Bankruptcy Code ("Mack Rebuttal to Poulin Proffer") ¶ 19 ("The labor strike in the second half of 2005 resulted in materially lower production and sales.  For example, from July 2005 through

13.     The strike was temporarily resolved in November 2005 with an interim agreement with approximately a year's duration.  Even after workers returned to the job, labor relations were strained.  Ed Caine, who became a member of ASARCO's Board of Directors in December 2005, concluded that "ASARCO needed to undertake significant efforts to improve its damaged relations with its hourly employees."  Proffer of Ed Caine in Support of the Debtor's Collective Bargaining Agreement ("Caine CBA Proffer") at ¶ 5.  (Dkt 12288-1, Ex. D275)  As Caine explained:

> The company, as was assumed when the independent directors were named, had a very, very angry work force, very antagonistic. The operations were allowed to deteriorate substantially. The mines had been hydrated (sic). They weren't doing the stripping. Equipment was transferred.

2/28/07 Tr. at 168.  (Ex. USW652)  Joseph Lapinsky, after being appointed CEO of ASARCO by the new Board, visited each of the facilities and estimated that 98 percent of the acrimony was directed toward the Parent and 2 percent "to some of the management people who were perceived to be the face of Grupo."  *Id.* at 243.  He described the impact of the strike as "devastating."  Proffer of Joseph F. Lapinsky in Support of the Debtor's Collective Bargaining Agreement ("Lapinsky CBA Proffer") at ¶ 58.  (Dkt 12288-1, Ex. D276)

14.     After months of arduous negotiations in anticipation of the expiration of the interim labor agreement, ASARCO and the Union finally agreed on the terms of a new Collective Bargaining Agreement ("CBA").   The CBA was supported by the creditors' committees, the FCR, and ASARCO's majority bondholders.  The Bankruptcy Court approved the CBA on March 15, 2007.  (Dkt 4179, Ex. D229)

---

November 2005, aggregate mine production was 92 million pounds, which is 48 percent lower than the 177 million pounds produced during the same five-month period in 2008.").  (Dkt 12029, Ex. 55)

15.     In approving the CBA, the Bankruptcy Court found that the CBA included significant concessions from the Union to allow ASARCO to "optimize efficiencies through job combinations, simplification of job classes, and similar arrangements."  *See* Dkt 4179 at ¶ 9. These concessions by the Union were designed to "greatly improve efficiency and . . . lead to significant cost savings for the Debtor."  (*Id.*)  In short, the CBA was critical to a successful reorganization and assisted in the Debtor being in position to generate $1.4 billion in cash that makes both the Debtor's Plan and the Parent's Plan possible. By Order dated October 14, 2008, the District Court affirmed the approval order.  *See ASARCO Inc. v. ASARCO LLC*, Civil No. CC-07-133, 2008 WL 4609997, at *1 (S.D. Tex. Oct. 14, 2008).  (Ex. D279)  The Parent appealed that decision to the Fifth Circuit, but subsequently dismissed its appeal.  (Ex. D280)

### C.     Plan Sponsor Selection Process.

16.     ASARCO and its professional advisors devoted two years' effort to identifying and negotiating with a plan sponsor in order to maximize the value of the Debtor's Estates.  After evaluating different alternatives to maximize Estate assets and consulting with its legal and financial advisors, the ASARCO Board approved an auction of the Debtor's assets as the best way to maximize value.  At an April 11, 2007, hearing before the Bankruptcy Court, the Debtor submitted a process and tentative timetable to identify parties (including creditors, the Parent, and third parties) interested in co-sponsoring a Debtor-proposed plan of reorganization and to provide those parties access to the Debtor's information for the purpose of assessing plan alternatives. *See* Courtroom Minutes Apr. 27, 2007.  (Dkt 4583, Ex. D265)

17.     Over the next year, ASARCO's financial advisor, Lehman Brothers, implemented an aggressive marketing program to find a plan sponsor. This included collecting information, populating a virtual data room, and executing confidentiality agreements. Also, during this time, the Parent filed a motion seeking the appointment of an examiner to investigate

the good faith of ongoing plan negotiations, which the Court approved.  (Dkt 7081, 7350)  The Examiner monitored and assessed the plan selection process, and ultimately reported that the process was conducted in accordance with all relevant orders.

18.    On March 25, 2008, the Bankruptcy Court approved the Bid Procedures Order for selecting a Chapter 11 plan sponsor.  (Dkt 7239, Ex. D269)  The plan-sponsor-selection procedures were designed to maximize the value of the assets of the Estates by encouraging bidders to submit qualifying bids in order to participate in a plan-sponsor-selection meeting and to increase their bids at the meeting relative to other competing bidders.  By establishing guidelines for the process, the procedures were intended to advance the process to completion, maintain a level playing field among participants, and promote healthy competition.

19.    In May 2008, ASARCO conducted a plan-sponsor-selection meeting attended by more than 130 individuals.  Four bidders, including the Parent, competed to be selected as plan sponsor.  The result of the plan-sponsor-selection meeting was the selection of Sterlite, a global mining company based in India, as plan sponsor.  Sterlite and ASARCO entered into a purchase and sale agreement (the "Original Sterlite PSA") under which Sterlite agreed to purchase substantially all of ASARCO's assets for $2.6 billion, as well as to assume certain liabilities worth approximately $400 million. In a July 1, 2008, Order, the Bankruptcy Court found that "ASARCO's selection of Sterlite as the Successful Bidder was made pursuant to ASARCO's sound business judgment and in accordance with the procedures approved in the earlier Interim Order."  (Dkt 8005)  The Court further found that the procedures were "designed to maximize the value of ASARCO's estate" and that ASARCO had "fully marketed" its assets and demonstrated the likelihood that "all bidders that would be interested in this sale process have been identified." (*Id.*)

16

20.     The Parent appealed the Bankruptcy Court's July 1, 2008, Order.   The District Court concluded that the order was not final or appealable and alternatively found "no error in the Bankruptcy Court's legal conclusions and no clear error in its factual findings." Order Dismissing Appeal, *ASARCO Inc. and Americas Mining Corp. v. ASARCO LLC,* No. CC-08-214 (S.D. Tex. Sept. 26, 2008).   The Parent appealed to the Fifth Circuit, but later dismissed its appeal.

**D.     Lifting of Exclusivity.**

21.     In July 2008, in conjunction with approval of selection of Sterlite as plan sponsor, the Bankruptcy Court lifted exclusivity, allowing the Parent to file a competing plan of reorganization to that of the Debtor's planned sale to Sterlite.

**E.     Default by Sterlite.**

22.     On October 13, 2008, Sterlite informed ASARCO that, as a result of the decline in copper prices and general economic downturn, it would not close under the Original Sterlite PSA without a material price reduction. The Original Sterlite PSA did not contain any copper price or financing contingencies excusing Sterlite's performance (as acknowledged by Mr. C.V. Krishan, President of Sterlite USA and Managing Director of Sterlite India, in his testimony on April 14, 2009). Mr. Krishnan also testified that at the time Sterlite asked for a renegotiation of the Original Sterlite PSA in October 2008, Sterlite had cash and facilities to close under the original terms and original purchase price. ASARCO accordingly suspended solicitation and balloting with respect to the plan. The Parent likewise suspended its competing plan of reorganization.

F.     **Continuation of the Plan Selection Process.**

23.     Shortly thereafter, Barclays (which ASARCO retained as its financial advisor after Barclays' acquisition of certain businesses of Lehman Brothers) began efforts to re-market the assets to other potential plan sponsors, albeit under substantially different market and financial conditions than when it began the initial marketing process in 2007.   ASARCO presented evidence that since October 2008, at least fifteen major mining companies had announced that, as a result of significant reduction in copper prices, they were decreasing production through mine closures, production halts, or slowdowns, and several copper miners had delayed or canceled planned operational expansions.   Merger and acquisition activity in the copper market had slowed dramatically.   In addition, debt and equity financing, frozen in late 2008, had been slow to thaw.   Proffer of George M. Mack in Support of Motion for Order, Pursuant to §§ 363, 105, and Fed. R. Bankr. P. 9019, Approving Settlement and Release and Revised Bid Protections Contained in the New Purchase and Sale Agreement Among ASARCO LLC and Certain of its Subsidiaries and Sterlite (USA), Inc. and for Related Relief ¶¶ 16-18. (Dkt 10801, Ex. D150)

24.     In addition to seeking other third-party transactions, ASARCO's Board of Directors also directed its advisors not only to continue negotiating with Sterlite on a modified transaction but also to develop a stand-alone plan alternative.   As part of this process, ASARCO formulated a stand-alone plan that was circulated to its creditor constituents in December 2008.

25.     Ultimately, after four months of vigorous negotiations with Sterlite, more than 20 meetings of the ASARCO Board of Directors between October 2008 and February 2009, and a full vetting of the advantages and disadvantages of a Sterlite-sponsored, stalking-horse plan and other plan structures potentially available to ASARCO, the Board, in consultation with

ASARCO's advisors and some of the key creditor constituents, determined that a modified transaction and settlement with Sterlite would yield the highest and best value, and thus, was in the best interests of the Debtor, its creditors, and the Estates. ASARCO entered a new purchase and sale agreement with Sterlite that as subsequently amended ("New Plan Sponsor PSA") forms the basis of the Debtor's Plan.

26.    After an evidentiary hearing, the Bankruptcy Court approved certain provisions of the New Plan Sponsor PSA by Order entered April 22, 2009. (Dkt 10935, Ex. D270) The Bankruptcy Court expressly found, among other things, that in connection with the New Plan Sponsor PSA, ASARCO and its Board complied with fiduciary duties and "acted in the best interest of the Debtors, their estates and all creditors and stakeholders." (*Id.*)

27.    The New Plan Sponsor PSA addresses a potential release of Sterlite's liability for breach of the earlier purchase and sale agreement. The Bankruptcy Court's April 22, 2009, Order found that the release provisions are "the result of good-faith, arm's-length bargaining" and represent "a reasonable, fair and equitable resolution of the controversy between ASARCO and Sterlite." (*Id.*) Whether or not Sterlite ultimately will be released depends on a variety of circumstances, including whether the Debtor's Plan is confirmed.[20]

28.    The Parent appealed the April 22, 2009, Order, but before briefing moved to stay the appeal, conceding that the appeal was likely to be mooted by subsequent events.

29.    The continuation of the Plan Selection Process resulting in the New Plan

---

[20]    The April 22, 2009 Order explicitly clarifies situations in which Sterlite will not be released. In particular, in accordance with the parties' representations to the Bankruptcy Court, the Order provides that Sterlite will not be released if a reorganization plan filed by the Parent is confirmed without support of ASARCO. The Order further prohibits ASARCO from taking action in support of an alternative plan without court approval, provides that abstaining from supporting an alternative plan shall not be deemed "support" so as to trigger a release of Sterlite, and provides that the ASARCO Board may in the exercise of its fiduciary duties abstain from supporting an alternative plan so as to avoid releasing Sterlite, if that course of action is in the best interest of the estate. (Dkt 10935, Ex. D270)

Sponsor PSA resulted in tangible benefit to the estate by promoting plan competition that resulted in the filing and prosecution of the Parent's Plan.

**G.      Environmental Claims and Settlement.**

30.     This case is perhaps the largest and most complex in bankruptcy history with respect to claims for environmental liability.   Asserted environmental claims against ASARCO total approximately $6.5 billion and involve more than 50 different sites throughout the United States.   Claimants include the United States, sixteen state governments, two Indian tribes, and numerous private parties.   On January 30, 2007, ASARCO moved the Bankruptcy Court to estimate the environmental claims.

31.     After discussions with interested parties, the Bankruptcy Court issued a case management order on March 23, 2007, which set forth procedures for estimating environmental claims at 21 sites.   These 21 sites together comprised approximately $6 billion of the approximately $6.5 billion in asserted environmental claims.   (Dkt 4238)   Before estimation hearings began, ASARCO settled claims related to all or part of 19 of the 21 sites; these settlements were approved by the Court, and no party appealed.   Between August 6, 2007, and October 12, 2007, the Court proceeded with scheduled estimation hearings regarding certain claims at the three largest sites that had not been settled.

32.     Soon thereafter, a Bankruptcy Court-ordered mediation that originally was intended to focus on asbestos liability (which is discussed below) broadened to encompass environmental issues and ultimately resulted in an agreement in principle with respect to the majority of the Debtors' environmental liability.   Based on this agreement in principle, the parties requested that the Bankruptcy Court defer ruling on the three pending estimation

proceedings and defer hearing additional estimation proceedings regarding environmental claims.

33.     The agreement in principle reached at the mediation was incorporated into the plan of reorganization that the Debtors filed on July 31, 2008, and as amended on September 12, 2008, and September 25, 2008.  (Dkt 8569, 9101, 9350)  As is discussed above, this plan was based on the original purchase and sale agreement and was subsequently suspended.  Following suspension of that plan, however, the Debtors and the federal and state governments continued negotiations to resolve issues left open by the agreement in principle and ultimately reached a comprehensive settlement comprised of five separate settlement agreements that resolved approximately $3.5 billion of environmental claims filed against the estate.

34.     Just before the Bankruptcy Court was to conduct a hearing on the Debtors' motion to approve the environmental settlements, the Parent moved to withdraw the reference and remove the proceeding to the District Court.   In its report and recommendation on the motion, the Bankruptcy Court concluded:

> [T]he Parent's last minute attempt to remove . . . cannot be viewed as anything more than forum shopping and delay tactics. . . .  If the Parent can delay the process and cause the Sterlite deal to fall apart, the Parent will arguably be the only contender for the Debtor.  The Parent's motion to withdraw the reference is simply another delay tactic aimed at knocking out competitive bidders.

(Dkt 10992).  The District Court denied the motion to withdraw the reference and subsequently denied the Parent's motion to certify that decision for interlocutory review and to stay further proceedings on the motion to approve the environmental settlements.  Order Denying Motion to Withdraw the Reference, *In re ASARCO, LLC*, No. CC-09-91 (S.D. Tex. May 12, 2009); Order Denying the Parent's Motion for Certification of Interlocutory Appeal and Stay, *In re ASARCO, LLC*, No. CC-09-91 (S.D. Tex. May 15, 2009).

35.     The Bankruptcy Court conducted evidentiary hearings regarding the environmental settlements on May 18-29, 2009, and heard closing argument on May 29, 2009. The Bankruptcy Court considered testimony from almost 50 witnesses and admitted 1700 exhibits.   On June 5, 2009, the Bankruptcy Court issued a 96-page Findings of Fact and Conclusions of Law (Dkt 11631) and issued orders approving the environmental settlement agreements under bankruptcy and environmental law.  (Dkt 11631, 11637-11642)  Although the Parent appealed the approval order, the Parent's Plan provides that it will withdraw its objection and appeal and implement the settlement agreements if the Parent's Plan is confirmed.   On August 6, 2009, the District Court granted the Parent's motion to stay its appeal pending confirmation.

**H.     Asbestos-related Claims and Settlement.**

36.     Another factor precipitating the Debtor's bankruptcies was the specter of asbestos-related liability.    More than 100,000 claimants filed asbestos-related claims or submitted electronic claims data against ASARCO or one or more of the Subsidiary Debtors. Lapinsky Proffer ¶ 31.  (Dkt 12387, Ex. D170)  In a number of these claims against the Asbestos Subsidiary Debtors, and in prepetition lawsuits, ASARCO was alleged to be derivatively liable for claims against the Asbestos Subsidiary Debtors, an allegation ASARCO has denied.  *Id.*

37.     On June 15, 2005, ASARCO initiated an adversary proceeding against the Asbestos Subsidiary Debtors and the FCR, seeking a declaration that ASARCO was not liable for the derivative asbestos claims.  (Adv. P. 05-02048)  Pursuant to a stipulation approved on April 25, 2006, the Asbestos Subsidiary Committee and the FCR were granted standing to prosecute the derivative asbestos claims on behalf of the Asbestos Subsidiary Debtors' Estates and were authorized to take the lead role in prosecuting the adversary proceeding and all claims,

defenses, and counterclaims against ASARCO related to the derivative asbestos claims. (Dkt 2054)

38.     In March 2006, ASARCO moved for estimation of the amount of ASARCO's liability, if any, for the derivative asbestos claims, and proposed a procedure for such estimation proceedings.  (Dkt 1887)  Objections to the estimation motion were filed by the Asbestos Subsidiary Committee, the FCR, and Fireman's Fund Insurance Company ("FFIC"). On May 9, 2006, the Asbestos Subsidiary Committee and the FCR, on behalf of the Asbestos Subsidiary Debtors, filed an Amended Complaint seeking a declaratory judgment that ASARCO is liable for the Asbestos Subsidiary Debtors' asbestos-related liabilities under alter ego theories. (Dkt 51 in Adv. P. 05-02048)

39.     Discovery related to the asbestos adversary proceeding and the estimation motion was extensive, and the Bankruptcy Court held numerous status conferences and discovery hearings.  Millions of pages of documents were produced and many millions more were reviewed.  Historic documents relating to ASARCO and its subsidiaries, LAQ, and CAPCO were collected from storage facilities around the country.  In addition to discovery from the Debtors, the Asbestos Subsidiary Committee and FCR issued third-party subpoenas to and/or gathered materials from Arthur Andersen LLP, Keegan Linscott Kenon P.C., Credit Suisse Securities (USA) LLC, PricewaterhouseCoopers LLP, JPMorgan Chase Bank, Covington & Burling LLP, and Porzio Bromberg & Newman, P.C.  ASARCO produced its historic asbestos claims data.  Three expert econometricians (one retained by ASARCO, one by the FCR and Asbestos Subsidiary Committee, and one by the ASARCO Committee) issued reports, supplemental reports, and rebuttal reports and were deposed.

40.     ASARCO reached agreement with the Asbestos Subsidiary Committee and the FCR regarding some aspects of a procedure for resolving the derivative asbestos claims. The agreement provided for a stipulated process in a contested matter under section 502 of the Bankruptcy Code to establish the aggregate amount of ASARCO's liability, if any, for the asbestos-related liability of the Asbestos Subsidiary Debtors. The established amount would be incorporated into ASARCO's plan of reorganization. The Bankruptcy Court entered an order approving this agreement on March 20, 2007. (Dkt 4215)

41.     The order included an addendum that resolved concerns raised by FFIC in an objection and provided that estimation proceedings would be conducted to provide for "insurance neutrality." (*Id.*) Eventually, the terms of the insurance neutrality addendum were extended to all insurance companies that are or may become interested parties in the Debtor's reorganization cases. (Dkt 7965, 11231)

42.     On May 16, 2007, the parties served their estimates of the maximum aggregate asbestos-related liability of the Asbestos Subsidiary Debtors as of the dates that the Asbestos Subsidiary Debtors and ASARCO filed for bankruptcy protection. The estimates ranged from $80 million to $2.1 billion. These estimates did not include premises liability claims, direct asbestos claims against ASARCO, and defense costs.

43.     By order dated September 20, 2007, the Bankruptcy Court appointed the Honorable Elizabeth W. Magner, United States Bankruptcy Judge for the Eastern District of Louisiana, to mediate estimation of the derivative asbestos claims. (Dkt 5885) Judge Magner was specially assigned by Fifth Circuit Chief Judge Edith Jones to serve in this role. Mediation talks began in October 2007, and continued in November and December 2007, and January 2008. The focus of discussions expanded from asbestos claims to encompass a consensual plan

of reorganization, and Judge Magner began a dialogue among ASARCO and its key constituencies. Because the talks were productive, the parties asked the Bankruptcy Court to postpone the estimation hearing regarding the derivative asbestos claims, which was set to begin on January 2, 2008.

44. These discussions ultimately resulted in development of a global resolution of the Debtor's asbestos and environmental liabilities, which became part of a consensual plan of reorganization and, in the parties' view, obviated the need for an estimation hearing. The agreements regarding asbestos and environmental liabilities were incorporated into a proposed plan of reorganization. As discussed above, the Debtor suspended this plan in October 2008. Beginning in March 2009, the ASARCO Committee requested, with the support of the Debtor, that the Bankruptcy Court resume scheduling of an estimation hearing on derivative asbestos claims against ASARCO. The Bankruptcy Court granted the request and set a date for the estimation hearing. Days before the scheduled estimation hearing, ASARCO requested that the Bankruptcy Court expand the estimation hearing to include direct claims against ASARCO.

45. The estimation hearing was obviated by a June 2009, settlement agreement among ASARCO, the Asbestos Claimants' Committee, the Asbestos Subsidiary Committee, the FCR, and Sterlite. (Dkt 11898) As discussed below, under the Debtor's Plan, holders of Class 4 Unsecured Asbestos Personal Injury Claims would agree to reduce their aggregate claims to $1 billion. (*Id.*); Lapinsky Proffer ¶ 40. (Dkt 12387, Ex. D170) The Debtor agreed to the allowance of an aggregate Class 4 claim of $1 billion. The parties further agreed that, under the Debtor's Plan, for Class 4, $750 million would be used to calculate the pro rata

distributions of consideration between Classes 3 and 4.   (Dkt 11898); Lapinsky Proffer ¶ 13.
(Dkt 12387, Ex. D170)

46.     Ultimately both the Debtor and the Parent reached agreements with the
Asbestos Claimants' Committee, the Asbestos Subsidiary Committee, and the FCR. Both plans
provide for similar consensual treatment of the asbestos liability and for a Section 524(g)
channeling injunction.

## I.     The SCC Litigation Against AMC.

47.     In February 2007, ASARCO filed a Complaint to avoid the 2003
fraudulent transfer of its 54.2 percent ownership interest in Southern Peru Copper Company
("SPCC") to its parent, AMC, a wholly owned subsidiary of Grupo México.  By agreement
between the District Court and the Bankruptcy Court, and at the request of the Bankruptcy
Judge, the reference was withdrawn with respect to this avoidance action, and the action was
transferred to the District Court in Brownsville, Texas.   The Honorable Andrew S. Hanen
presided over a four-week bench trial of the action in May and June 2008.

48.     In August 2008, the District Court issued a Memorandum Opinion and
Order on liability issues.  *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278 (S.D. Tex.
2008) ("*ASARCO I*").   The District Court found AMC liable for actual fraudulent transfer
because AMC entered into the challenged transaction with full knowledge that ASARCO's
creditors would be hindered or delayed as a result. *See id.*  The District Court further held that
AMC aided and abetted and conspired with the directors of ASARCO to accomplish the
challenged transaction in breach of the ASARCO directors' fiduciary duties owed to ASARCO
for the benefit of ASARCO's creditors. *See id.*  Among other things, the District Court found
that AMC "did not engage in fair dealing" and showed "callous indifference" with respect to

ASARCO's creditors. *Id.* at 408, 420. The District Court concluded that, at the time of the challenged transaction, AMC "had an agreement with ASARCO's directors to abandon their duties to ASARCO and ASARCO's creditors and instead act to structure and accomplish the SPCC transfer, knowing that the transaction as contemplated would constitute a transfer in fraud of ASARCO's creditors." *Id.* at 420.

49.     The District Court's liability opinion described the history of the Parent's prepetition conduct, directed by Grupo México, that contributed to ASARCO's precarious financial condition in the years preceding ASARCO's bankruptcy. According to the opinion, this conduct included, but was not limited to, planning and executing the 2003 fraudulent transfer:

- Grupo México's leveraged buyout of ASARCO in 1999 saddled ASARCO with a total long-term debt of $1.767 billion and a $450 million revolving credit facility. *Id.* at 301.

- To reduce the debt from the 1999 leveraged buyout, ASARCO almost immediately had to begin selling its "non-core" assets. *Id.* at 305.

- To stay afloat between 1999 and 2002, ASARCO monetized insurance policies, sold equipment, high graded certain mines, and failed to make payments and cash calls on certain legal obligations, investment properties, and/or mining prospects. *Id.* at 307.

- These actions proved futile. At the end of fiscal 2003, ASARCO—then insolvent—had a negative annual cash flow of $151.1 million. *See id.* at 300-01, 305-07, 314-15, 401.

- When Grupo México and AMC realized that the SPCC stock, which was ASARCO's crown jewel, might be lost to creditors, Grupo México and AMC decided that ASARCO should sell its interest in SPCC to AMC. *Id.* at 410.

- Grupo México and AMC had a strong desire and intent to transfer the SPCC shares from ASARCO to AMC so that Grupo México and AMC could have this asset unencumbered by the claims of others. *Id.* at 375.

- Grupo México and AMC concealed and manipulated information, broke promises, and ultimately closed the transaction over the objections and

contrary to the advice of ASARCO's independent directors, financial advisors, legal advisors, and management. *Id.* at 386.

- In consideration for ASARCO's 54.2 percent interest in SPCC, AMC "forgave" $41.75 million in intercompany debt and gave ASARCO $500 million in cash, a note with a face value of $123.5 million (to be paid in seven equal installments with 7 percent interest), and a note with a face value of $100 million (to be paid in eight equal installments with 7 percent interest and to be used to pay environmental claims). *Id.* at 339.

- AMC did not pay a fair price for ASARCO's interest in SPCC, but rather structured the transaction to leave a cash-starved ASARCO with less cash than it had prior to the transfer. *Id.* at 411, 414.

- Between the 2003 fraudulent transfer and ASARCO's bankruptcy filing in August 2005, ASARCO, controlled by Grupo México and AMC, continued to survive from hand to mouth. It cannibalized assets, sold or abandoned other assets, fired employees, high graded mines, monetized badly needed insurance policies, and cut costs. It also maintained a pattern of delaying or refusing to pay creditors. In layman's terms, it was constantly "robbing Peter to pay Paul." *Id.* at 314.

50.     On April 1, 2009, the District Court issued a Memorandum Opinion and Order, amended on April 14, 2009 to correct a clerical error, in which it ordered AMC to return all stock traceable to the fraudulently transferred SPCC stock and to pay money damages exceeding $1 billion. *ASARCO LLC v. Americas Mining Corp.*, No. 1:07-CV-00018, 2009 WL 890551 (S.D. Tex. April 1, 2009); *ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150 (S.D. Tex. 2009) ("*ASARCO II*").

51.     The District Court issued its Final Judgment on April 15, 2009 ("SCC Judgment"). The SCC Judgment awards ASARCO the return of more than 260 million shares of SCC common stock (which represents approximately 30.6 percent of the 850,000,000 total shares of SCC common stock currently outstanding) and money damages and prejudgment interest of $1,382,307,216, plus post-judgment interest. As of August 21, 2009, based on the price of SCC stock, which is publicly traded, the SCC Judgment on its face exceeds $8.8 billion.

52.     On July 20, 2009, the District Court denied AMC's motion to alter or amend the SCC Judgment or for new trial.  The District Court concluded:

> AMC planned, ordered, and engineered the transfer of ASARCO's "crown jewel" (i.e., the [SCC stock]) and then reaped the benefit of this illicit transfer.  It was aware of the fiduciary duty owed by ASARCO's directors and was on notice that this transfer would be considered a violation of that duty.  For AMC to claim immunity from liability for these wrongful actions simply because, rather than directly effecting the transfer itself, AMC accomplished its goal by inducing ASARCO's inside directors, over whom AMC had total control, to breach their fiduciary duty to ASARCO's creditors, is contrary not only to law, but to principles of equity and any plausible notion of ethical conduct.

*ASARCO LLC v. Americas Mining Corp.*, No. 1:07-CV-00018, 2009 WL 2168778, at *6 (S.D. Tex. July 20, 2009).

53.     AMC's appeal of the SCC Judgment is currently pending in the Fifth Circuit.  As the District Court required, AMC secured the SCC Judgment pending appeal by, among other things, (i) placing 260,093,694 shares of common stock of SCC into an escrow account with a neutral third party, and (ii) placing additional shares of SCC common stock into the same escrow having a value equal to twice the value of the $1,382,307,216.75 cash portion of the SCC Judgment.  *See* Memorandum Opinion and Order, *ASARCO LLC v. Americas Mining Corp.*, No. 1:07-CV-00018 (S.D. Tex., June 2, 2009).

**J.     Auction of the SCC Judgment.**

54.     The SCC Judgment is a valuable asset of ASARCO's estate.   At ASARCO's direction, ASARCO's financial advisors, Barclays, evaluated alternatives for monetizing the SCC Judgment.  Barclays contacted more than 150 persons, including hedge funds and private equity and institutional investors, that it had identified as potentially interested in acquiring all or a portion of the SCC Judgment.  Barclays then distributed a series of informational materials to these persons depending on their level of interest.  Eventually, Barclays received numerous indicative offers demonstrating interest in purchasing all or part of

the SCC Judgment.  A select group of these were identified as having the financial wherewithal to consummate the potential purchase and were invited to conduct additional due diligence and make binding proposals.  *Proffer of George M. Mack in Support of the Debtors' Motion for an Order Approving the Expense Reimbursement in Connection with the Auction and Proposed Sale of the SCC Judgment* ¶¶ 10-11.  (Ex. D151)

55.    Following hearings on July 21, July 23, and July 28, 2009, the Bankruptcy Court granted ASARCO's motion for approval of reimbursement of certain expenses to be incurred in connection with the auction and potential sale of the SCC Judgment.  (Dkt 12144)[21] ASARCO received a total of eight indicative offers in the first round of the auction.  *See Final Proffer of Professor Kenneth N. Klee in Support of Confirmation of the Sixth Amended Joint Plan of Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code, As Modified* ("Klee Proffer") ¶¶ 61, 62.  (Dkt 12514, Ex. D156)

56.    ASARCO, in consultation with its advisors, invited selected initial bidders to proceed to the second phase of the process during which they were given the opportunity to conduct additional due diligence and make a binding proposal for the purchase of all or a portion of the SCC Judgment.  ASARCO received a binding bid for SCC Litigation Trust Interests on August 14, 2009.  *See* Klee Proffer ¶ 62 (Dkt 12514, Ex. D156).  Information regarding the auction was analyzed by Professor Klee in connection with his opinion of the value of the SCC Judgment.  *Id.*

57.    Initiation of the auction process brought tangible benefit to the Debtor's estate and was perhaps the final impetus needed to encourage the Parent to file its plan which pays creditors in full.

---

[21]    The Parent appealed the expense reimbursement order.  The Bankruptcy Court subsequently stayed payment of reimbursements until September 30, 2009.

**K.     Asset Sales.**

58.     As part of efforts to maximize recovery to the estate, the Debtor obtained Bankruptcy Court orders authorizing it to sell certain real property and other non-operating assets.  *See, e.g.*, Dkt 3100, Ex. D259.  These sales included the $63.5 million sale of the Tennessee Mines Division to Glencore Ltd. in 2006.  (Dkt 2269, Ex. D260)  In total, the Debtor has sold approximately $82.5 million in real property.  *See* Disclosure Statement at 62. (Dkt 11899, Ex. 16)  In addition, ASARCO sold certain stocks on the open market, which has yielded approximately $21.25 million, all for the benefit of the Estates.  *Id.*

**L.     The Tax Adversary Proceeding**

59.     On February 5, 2007, ASARCO filed a Complaint for Declaratory and Injunctive Relief (the "Tax Complaint") against the Parent and certain other defendants[22] initiating a new adversary proceeding (the "Tax Adversary").  In the Tax Adversary the Parent and the Debtor have submitted briefing and evidence concerning the parties' respective rights and obligations with regard to (1) the Parent's request for an administrative expense for $161.7 million, plus $29.1 million in interest, for ASARCO's liability for post-petition taxes (for a total of approximately $190 million) incurred by Debtor's estate arising from over $1 billion in post-petition income earned by the estate (the "Tax Claim"); (2) an approximately $60 million tax refund, including interest (the "Tax Refund"); and (3) a deferred tax liability from a 2003 transaction resulting in a $600 million deferred intercompany gain (the "Deferred Tax

---

[22]     Other defendants in the Tax Adversary include Lac d'Amiante du Quebec Ltee, ("Lac d' Amiante"), Lake Asbestos of Quebec, Ltd. ("Lake Asbestos"), LAQ Canada, Ltd. ("LAQ"), CAPCO Pipe Company, Inc. ("CAPCO"), Cement Asbestos Products Company ("Cement"), Rinker Materials South Central, Inc. f/k/a/ American Limestone Company ("Rinker"), Enthone Inc. f/k/a Enthone-OMI, Inc. ("Enthone"), EI Liquidation, Inc. f/k/a Enthone, Incorporated ("EI"), and OMI International Corporation ("OMI").  Debtor dismissed Rinker from the Tax Adversary Proceeding.  *See* Stipulation and Order Dismissing Claims Against Rinker Materials South Central, Inc. f/k/a American Limestone Company.  (Tax Docket No. 37.)  Collectively, Enthone, EI, and OMI are the "Enthone Defendants.

Liability").[23]  The Court heard evidence and argument from the parties on these three issues prior to these Confirmation hearings.

60.     In the Tax Adversary, the Parent asserts the Tax Claim based on a Tax Sharing Agreement between the Debtor and the Parent.  The Parent asserts a claim to the Tax Refund under federal law because ASARCO is a disregarded entity.   If the Court rules that the Tax Refund is the property of ASARCO under principles of state merger or other state law, then the Parent asserts that the Deferred Tax Liability is a liability of ASARCO based on these same principles.

61.     The Parent asserts that the Parent's Plan withdraws the Parent's Tax Claim and the Deferred Tax Liability claim, as well as the Parent's claim to the Tax Refund, thereby making the value of these claims available to the ASARCO estate and its creditors.[24]   Therefore, the Parent's Plan does not depend on the outcome of the Tax Adversary.  If, however, the Parent's Tax Claim or Deferred Tax Liability claim is allowed, or the Parent is entitled to the Tax Refund, the value given by the Parent's Plan to the estate increases by $190 million, $250 million or $60 million, respectively.

62.     The Debtor's Plan, in comparison, assumes that the Debtor is entitled to the Tax Refund, and assumes that the Parent will not prevail on the Tax Claim – and if the Debtor is incorrect with regard to either claim, it will materially affect the Debtor's Waterfall.  If the Parent prevails on the Tax Claim or the Deferred Tax Liability claim, or if the matter remains unresolved on the Effective Date, the Debtor will be required to reserve at least $190 or $250 million, respectively, to cover the Parent's Tax Claim or the Deferred Tax Liability claim; if the

---

[23]     These tax issues are being currently litigated in *ASARCO LLC v. Americas Mining Corporation (In re ASARCO LLC)*, Adversary No. 07-02011.  Pleadings from the Tax Adversary will be referred to as "Tax Docket __."

[24]

Parent prevails on the Tax Refund, the Debtor's Waterfall must be adjusted to compensate for the $60 million it will not receive by virtue of the Tax Refund.

63.     Either the Parent or Debtor is liable for taxes that accrued with respect to the income from Debtor's operations from 2005 through 2008. A portion of the $161 million that makes up the Tax Claim will be refunded by the IRS when deductions arising under either plan of reorganization are carried back to prior tax years in the form of a tax refund claim. Taking into account the taxes due from Debtor's operations and the potential future tax refunds of such taxes, there will still be an estimated $85 million of taxes and interest that is non-refundable even after the maximum amount of tax refunds are obtained by Parent. The non-refundable tax is comprised of approximately $39 million in federal alternative minimum tax plus $31 million in state income tax plus $15 million in interest.

64.     If the Parent's Plan is confirmed the Deferred Tax liability will remain with AMC, the SCC Judgment will be released, and the Deferred Tax liability will remain deferred unless and until there is a deconsolidation event that triggers the gain. If the Debtor's Plan is confirmed, and the SCC Judgment is not released and is affirmed on appeal, upon the transfer of the SCC Shares from escrow to Sterlite, a deconsolidation event will occur that will trigger the Deferred Tax liability, which will result in a tax liability of approximately $250 million on the $600 million deferred intercompany gain. If the Court determines that the Deferred Tax liability remains with the Parent, the Parent will be responsible for the resulting tax if and when the deferred intercompany gain is triggered. If the Deferred Tax liability remains with the Debtor, then the Debtor's Waterfall must account for the tax that will be triggered upon the transfer of the SCC Shares to Sterlite.

65.         On June 5, 2009, Debtor filed an Equitable Subordination Complaint requesting the Parent's Tax Claim, if allowed, be subordinated.[25]  Debtor's equitable subordination claim is based on the argument that the 2003 SPCC Transaction that is the subject of the SCC Litigation constitutes inequitable conduct warranting subordination.  The Parent filed a Motion to Dismiss the Equitable Subordination Complaint.  The Court has not yet determined whether the Equitable Subordination Adversary should be dismissed, or if the Parent's Tax Claim should be subordinated. The Debtor's Plan, however, subordinates any tax liability to the Parent.

**M. Agreement With the Majority Bondholders.**

66.         The Debtor's Plan and the Parent's Plan offer the same treatment to the Bondholders.  The Debtor and the Majority Bondholders entered into an agreement in principle to resolve Bondholder Claims, and the Parent agreed to accept the terms, as follows:

a.      Holders of the Bonds will receive Allowed Class 3 Claims in an amount equal to the $439.8 million principal amount of their Bonds, together with all accrued but unpaid prepetition interest of $7.8 million on those Bonds, for a total of $447.6 million.   These claims will be payable *pari passu* with the Allowed Claims of general unsecured creditors for principal and prepetition interest, if any.

b.      Holders of the Bonds will receive Allowed Claims for all accrued Post-Petition Interest at the non-default rate specified in the relevant Bond indentures, compounded based on when interest payments were due under the indentures (estimated to be $162 million as of December 31, 2009). These Allowed Claims will be payable (a) after the Allowed Claims of general unsecured creditors for principal and prepetition interest have been paid in full and (b) *pari passu* with the Allowed Claims of general unsecured creditors for Post-Petition Interest.

c.      Holders of the Montana 2033 Bonds, the Nueces 2027 Bonds, the Montana 2027 Bonds, the Nueces 2018 Bonds and the Gila Bonds will receive Allowed Claims in the amount of the prepayment premiums expressly provided under the indentures for such bonds.  Holders of the 2013 Bonds will receive, in settlement of their claims for alleged breach of the no-call feature of those bonds, an Allowed Claim in the amount of $5

---

[25]      (Main Dkt. 11633, Adversary No. 09-02020, (the "Equitable Subordination Adversary").)

million, calculated as 5% of the principal amount of their 2013 Bonds. Holders of the 2025 Bonds will receive, in settlement of their claims for alleged breach of the no-call feature of those bonds, an Allowed Claim in the amount of $10 million, calculated as 10% of the principal amount of their 2025 Bonds.  These Allowed Claims will be payable (a) after the Allowed Claims of general unsecured creditors for Post-Petition Interest have been paid in full and (b) *pari passu* with the make whole claims of the holders of the 2013 Bonds and the 2025 Bonds set forth in the next succeeding paragraph.

d.   The fees and expenses of the Indenture Trustees under the Bonds will be paid in full as Allowed Administrative Claims.

## III.   HISTORY OF PROPOSED PLANS OF REORGANIZATION

67.   In July 2008, the Court modified the Debtor's exclusive right to file a plan to allow the Parent to file its own plan and in May 2009 permitted Harbinger to file a plan.  Since exclusivity was modified, a succession of plan amendments and modifications demonstrates that creditors have benefited from robust competition between multiple plan sponsors.

### A.   2008 Plans.

68.   On July 31, 2008, the Debtor filed a plan of reorganization and accompanying disclosure statement that provided for a sale of ASARCO's operating assets to Sterlite.  The plan and disclosure statement were amended on September 12, 2008, and on September 25, 2008.

69.   On August 26, 2008, the Parent filed a disclosure statement and plan of reorganization for only ASARCO and three subsidiaries.  The plan and disclosure statement were amended on September 20, 2008, and on September 25, 2008.

70.   On September 25, 2008, the Bankruptcy Court approved the disclosure statements for the plans proposed at that time by the Debtorsand the Parent and approved procedures for solicitation and voting on both plans.  Plans and ballots were mailed to all those entitled to vote.  Before the October 27, 2008, voting deadline, as discussed above, Sterlite