IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

United States District Court
Southern District of Texas
ENTERED

NOV 13 2009

ENTERED
Clerk of Court

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 09-CV-177 |
| | § | |
| ASARCO LLC, *et al.* | § | CASE NO. 05-21207 |
| | § | CHAPTER 11 |
| Debtors. | § | (Jointly Administered) |

## MEMORANDUM OPINION, ORDER
## OF CONFIRMATION, AND INJUNCTION

# TABLE OF CONTENTS

I.    Introduction ........................................................................................ 1

II.   Case History ........................................................................................ 3

III.  Confirmation History ........................................................................ 4

IV.   The Report and Recommendations from the Bankruptcy Court ...... 7

V.    Summary of Objections ...................................................................... 9

VI.   Debtor's Plan v. Parent's Plan ........................................................ 11

      A.  Summary of the Plans ............................................................ 11
          1.   The Debtor's Plan ........................................................ 11
          2.   The Parent's Plan ........................................................ 14
      B.  Findings by the Bankruptcy Court .......................................... 16
          1.   Findings Regarding Confirmability of the Plans ............ 16
          2.   Findings Regarding Which Plan Should be Confirmed Under Section
               1129(c) of the Bankruptcy Code .................................. 17
      C.  Objections to the Bankruptcy Court's Findings ...................... 18
          1.   Objections to the Bankruptcy Court's Findings Regarding the Value of
               the Debtor's Plan ...................................................... 19
          2.   Objections to the Bankruptcy Court's Findings Regarding Confirmability
               of the Parent's Plan ................................................... 20
          3.   Objections to the Bankruptcy Court's Analysis Under Section 1129(c) ... 21
      D.  Discussion ............................................................................. 22
          1.   The Value of the Debtor's Plan Is Not Greater Than the Value of the
               Parent's Plan .............................................................. 22
          2.   The Parent's Plan is Confirmable .................................. 25
          3.   The Section 1129(c) Analysis Compels Configuration of the Parent's
               Plan ........................................................................... 27
               a.   Type of Plan ....................................................... 27
               b.   Treatment of Creditors and Equity ...................... 27
               c.   Feasibility .......................................................... 29
               d.   Preferences of Creditors and Equity .................... 32
               e.   Synthesis of the Section 1129(c) Test .................. 36

VII.  Consideration of the Debtors' September 10th Plan ........................ 37

      A.  The Bankruptcy Court's Findings and Recommendation ........ 37
      B.  Arguments of the Parties ......................................................... 39
      C.  Discussion ............................................................................. 39
          1.   The Procedure Proposed by the Parties and Adopted by the District
               Court Does Not Provide for Plan Modification Following the Bankruptcy
               Court's Recommendation ............................................ 41
          2.   The Bankruptcy Code Does Not Guarantee the Debtors an Absolute
               Right to Modify Their Plan of Reorganization ............... 45
      D.  Even if the Debtor's September 10th Plan Were Considered, the Parent's
          Plan Remains Superior Under the Section 1129(c) Analysis ........... 48

**VIII.  Labor and Special Successorship Objections** ............................................... **48**

    A.  The Lack of a CBA Does Not Bar Confirmation of the Parent's Plan ............ 55
    B.  The SSC Does Not Apply Because Exigent Circumstances Exist ................... 59
    C.  The Possibility of a Strike Does Not Make the Parent's Plan Infeasible ........ 62

**IX.  Objections of Governmental Entites** ...................................................................... **63**

**X.  Clean Hands** ............................................................................................................ **65**

**XI.  Conclusion** .............................................................................................................. **67**

**XII.  Order of Confirmation, Injunctions, and Matters Incident to**
      **Confirmation** ..................................................................................................... **68**

    A.  Treatment of Claims ............................................................................... 70
    B.  Section 524(g) Trust ............................................................................... 74
    C.  Environmental Custodial Trusts ............................................................ 78
    D.  The Special Successorship Clause of the Collective Bargaining
        Agreement ............................................................................................ 79
    E.  Employee Benefit Plans and Other Benefits ......................................... 80
    F.  Preservation of Causes of Action .......................................................... 81
    G.  Authorizations ...................................................................................... 82
    H.  Consideration ........................................................................................ 84
    I.  Parent's Plan Administrator .................................................................. 86
    J.  Deemed Substantive Consolidation ....................................................... 87
    K.  Other Implementation Provisions .......................................................... 89
    L.  Operations from Confirmation Date to Effective Date ........................... 91
    M.  Injunctions, Releases, and Discharge .................................................... 92
    N.  Plan Distributions ............................................................................... 115
    O.  Bar Date Provisions ............................................................................. 121
    P.  Disputed Claims .................................................................................. 123
    Q.  Objections to Parent's Plan ................................................................. 126
    R.  Miscellaneous ..................................................................................... 129

**XIII.  Notice of Effective Date** ..................................................................................... **135**

**XIV.  Confirmation Order Exhibit 1 Schedule of Released Litigation**

United States District Court
Southern District of Texas
ENTERED

NOV 1 3 2009

Clerk of Court

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 09-CV-177 |
| | § | |
| ASARCO LLC, *et al.* | § | CASE NO. 05-21207 |
| | § | CHAPTER 11 |
| Debtors. | § | (Jointly Administered) |

## MEMORANDUM OPINION, ORDER
## OF CONFIRMATION, AND INJUNCTION

### I.    Introduction

This Court has before it the Report and Recommendation of the Bankruptcy Court as to the

confirmation of the plan for reorganization in the bankruptcy case styled, *In re ASARCO, LLC, et*

*al.* (Doc. Nos. 8, 22), as well as objections and replies to objections filed by the various parties

affected by that Report and Recommendation.  Also before the Court is an additional Report and

Recommendation pertaining to the Debtor's Sixth Amended Joint Plan of Reorganization filed by

the Debtor[1] on September 10, 2009 and the objections pertaining to it.  (Doc. No. 55.)

The procedure by which these matters were initially before the Bankruptcy Court and by

which this case is now back before this Court (*i.e.*, the withdrawal of the bankruptcy reference and

the referral back to the Bankruptcy Court for a Report and Recommendation) was conceived of and

agreed upon by the parties, and finally submitted to both the Bankruptcy Court and this Court for

approval.  It was ultimately approved by both in a hearing presided over both by the Bankruptcy

Judge and the undersigned.  The main interests of the parties in involving the District Court and

---

[1]  As used in the first eleven sections of this Opinion, the term "Debtor" is used in the
same manner as the Bankruptcy Court's usage, and includes all of the entities and companies
listed in the Bankruptcy Court's Report and Recommendation at Doc. No. 22 at 3 n.3.

requesting this not altogether unique procedure were two-fold. It enabled the Bankruptcy Court—which has extensive knowledge of bankruptcy issues generally, this bankruptcy proceeding specifically, and the parties associated in various capacities with this proceeding—to decide the principal bankruptcy issues, including those related to which Plan should be confirmed, while at the same time allowing this District Court (with the jurisdiction to enter a § 524 channeling injunction) the ability to enter all final and necessary orders to complete the contemplated legal and jurisdictional requirements.

As noted above, this was the procedure conceived of and agreed upon by all parties. This Court (as well as the Bankruptcy Court) relied upon the representations of the parties in granting the motion adopting their request. (Doc. No. 7.)[2] All parties (especially the two proponents of reorganization plans under the Bankruptcy Code) emphasized to both the Bankruptcy Court and this Court the fact that the timing of the confirmation of one of the two plans and the issuance of final order by this Court was of critical importance and that any delay could lead to the loss of financial commitments which were the foundation of the proposed plans.[3] This matter, originally pending before a different district judge, was no doubt transferred to the undersigned because of this request of expediency since this Court already had more than a passing familiarity with some of the issues involved.[4] By the time this Court signed the necessary order implementing the parties' proposal on

---

[2] Where a document has been filed as part of both the Bankruptcy Docket for Case No. 05-21207 and the Civil Docket for Case No. CC-09-177, citations refer to the Civil Docket entry. Where a document has been filed only as part of the Bankruptcy Docket, citations use "(Bk. Doc. No. ##)" to refer to the appropriate docket entry.

[3] (*See* August 6, 2009 Hrg. Tr., Bk. Doc. No. 12500 at 16–22.)

[4] This Court has had prior experience with the Debtor, the parent and a number of creditors when it tried the adversary proceeding styled, *ASARCO, LLC, et al. v. Americas Mining*

August 6, 2009, the Bankruptcy Court already had a case management plan in place and discovery concerning the competing plans was ongoing. Subsequently, the Bankruptcy Court held a timely confirmation hearing pursuant to the established schedule and ruled promptly. This Court has now complied with the procedures agreed to by the parties and the governing statutory/procedural time limits for objections to the Report and Recommendation and has held a hearing to allow all parties so inclined to voice their concerns. This Court hereby issues its ruling.

## II.  **Case History**

This case is now in its fifth year of bankruptcy proceedings. While the path has not necessarily been as expedient or as unerring as some would have preferred, it has led all concerned to a point where the end, barring appeals, is now in sight. The Bankruptcy Court detailed the history of the proceedings held in that Court in its Report and Recommendation and this Court feels no need to repeat that history here. Of further importance to understanding many of the objections filed in this Court is the history between the Debtor and the Parent, as well as the relationships the Debtor has, and has had, with its workforce, its creditors and various governmental entities. Many of those relationships, while not discussed in the context of these objections, are detailed in this Court's opinion in *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278 (S.D. Tex. 2008). Again, this

---

*Corporation*, Civil Action No. B-07-CV-018 (Adversary Number 07-2009). *See ASARCO LLC v. Americas Mining Corp.*, 382 B.R. 49 (S.D. Tex. 2007) ("ASARCO I"); *ASARCO LLC v. Americas Mining Corp.*, Civil Action No. B-07-CV-018, 2008 WL 2714661 (S.D. Tex. 2008) ("ASARCO II"); *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278 (S.D. Tex. 2008) ("ASARCO III"); *ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150 (S.D. Tex. 2009) ("ASARCO IV"); *ASARCO LLC v. Americas Mining Corp.*, Civil Action No. B-07-CV-018, 2009 WL 2168778 (S.D. Tex. 2009) ("ASARCO V"). These may be referred to collectively as the "SCC Litigation." Due to this Court's history with at least some of the issues, it was assigned by the Chief Judge of this District to preside over the current matter. (Doc. No. 6.)

Court feels no need to repeat those details except to the extent and in the context required to address the matters at hand.

In many ways, the course of this bankruptcy has been a contentious and hard-fought piece of litigation, with multiple adversary proceedings, including one which required a month-long trial. In other ways, this proceeding can be labeled as one of the most successful bankruptcy proceedings in recent history, for the Bankruptcy Court ultimately had before it not just one, but two confirmable plans—both of which have been described by most as "full payment plans." Additionally, the Debtor in the past few years has been operated as a successful mining venture and has accumulated over one billion dollars ($1,000,000,000) in cash assets while awaiting plan confirmation. Whether this result was due to good stewardship, excellent management, higher copper prices, appropriate judicial oversight by the Bankruptcy Judge, extraordinary good luck, or a combination of all these factors may be debated, but the ultimate result is inarguable.

## III.  Confirmation History

While the bankruptcy proceeding and its ancillary adversary proceedings have brought both the Bankruptcy Court and this Court many complex and unique legal questions, the recent pathway leading up to confirmation has been comparatively straight-forward. The Bankruptcy Court was initially faced with three competing confirmation plans: (1) the Debtor's (Sterlite) plan[5]; (2) the plan proposed by the parent (Americas Mining Corporation, or "AMC"); and (3) a plan proposed by

---

[5] Sterlite is the sponsor behind the Debtor's Plan. Therefore, Sterlite's plan for acquisition, which will be discussed in greater detail below, is the same plan being urged by the Debtor. Throughout this opinion it will be referred to interchangeably as the "Debtor's" Plan or the "Sterlite" Plan. A reference to "Sterlite" is a reference to "Sterlite USA" unless otherwise noted. AMC is the parent corporation of the Debtor, and its plan will be referred to as the Parent Plan.

Harbinger Capital Partners Master Fund I, Ltd., and Citigroup Global Markets, Inc. ("Harbinger").[6] On June 11, 2009, the Bankruptcy Court entered an order setting the schedule for plan confirmation. (Bk. Doc. No. 11698.) Objections to the Joint Disclosure Statement had to be made by June 22, 2009; objections to the plans had to be filed by July 29, 2009; and the actual confirmation proceeding was scheduled for back-to-back weeks in August. In the same order, the Court similarly addressed other items, among which were: (1) the need to consult with the District Court to formulate a procedure for the issuance of a § 524(g) channeling injunction; (2) the discovery that was being permitted with regard to the competing plans; (3) the overall timing of a multitude of events and deadlines; and (4) the establishment of a document depository. Finally, the Bankruptcy Court set August 7, 2009 as its final pre-confirmation status conference to discuss all of the trial issues in preparation for the actual presentation of testimony. The confirmation hearing was then to begin as scheduled the following Monday.

On August 6, 2009, the day before the pre-trial conference, a hearing was held in Brownsville. (*See* Bk. Doc. No. 12500.) The undersigned, as well as the Bankruptcy Judge, presided over the consideration of a joint motion to withdraw the reference and to refer the case back to the Bankruptcy Court for a Report and Recommendation on the confirmation issues. It was emphasized at that hearing that capital was sitting on the sidelines waiting to conclude the transaction and that those investors providing support for the competing plans would not let that cash sit idle indefinitely. With that concern in mind, both plan proponents stressed to this Court and the Bankruptcy Court that time was of the essence.

---

[6] As the case progressed, the Harbinger Plan was withdrawn, leaving only two competing plans for the Bankruptcy Court to consider.

To further that purpose, the parties submitted an agreed order for this Court's consideration—an order signed after hearing the arguments of all concerned. (Doc. No. 7.) By virtue of that order, this Court withdrew the reference from the Bankruptcy Court and then referred all issues relating to the plan confirmation back to the Bankruptcy Court to conduct a hearing on confirmation. The Bankruptcy Court was to issue a Report and Recommendation to this Court and then the parties would then have ten (10) days to object to those findings of fact and conclusions of law.

The Bankruptcy Court held confirmation hearings over the prescribed two-week period and promptly issued its initial Report and Recommendation on August 31, 2009.[7] That opinion recommended the confirmation of the Parent's Plan. (Doc. Nos. 8, 22.) By the September 10, 2009 deadline, many parties had filed a variety of objections. The Debtor, however, not only filed objections, but also filed a Sixth Amended Joint Plan of Reorganization—a new version of the Sterlite Plan which contains different or increased proposals that were never contained in prior versions. That new plan had not been considered by any of the parties or witnesses at the confirmation hearing, nor was it the subject of either the Report and Recommendation dated August 31, 2009, or its successor, the Amended and Supplemental Report and Recommendation dated September 11, 2009. In its Report and Recommendation to this Court, the Bankruptcy Judge gave exhaustive consideration to both the Debtor's and Parent's Plans and then recommended that this

---

[7] It later issued an Amended and Supplemented Report and Recommendation for Entry of Findings of Fact and Conclusions of Law on Plan Confirmation on September 11, 2009 (Doc. No. 22), which contained the same basic findings and conclusions, but which tidied up some ministerial matters. For purposes of this opinion and order, the Court need not differentiate between these two versions, but the Court will cite to the Amended Report and Recommendation. (Doc. No. 22.)

Court confirm the Parent's Plan as being most appropriate. Ultimately, the Bankruptcy Court, in an attempt to further aid this Court, reviewed the newly proposed Sixth Amended Joint Plan of Reorganization filed by the Debtor and issued a show cause order questioning whether it could or should even consider the new plan. Briefing on this issue was filed and the Bankruptcy Court ultimately issued a third Report and Recommendation which recommended that the new version should not be considered. (Doc. No. 55.) It further concluded that if one were to consider the Debtor's "new" plan, it was still inferior to the plan proposed by the Parent. Thus, after all was said and done, the conclusion of the Bankruptcy Court remained the same.

## IV. The Report and Recommendations from the Bankruptcy Court

As stated above, the Bankruptcy Court has, in effect, filed three Reports and Recommendations for this Court's consideration. The first, dated August 31, 2009, is the Original Report and Recommendation resulting from the confirmation hearing. (Doc. No. 8.) The second is the Amended and Supplemental Report and Recommendation filed September 11, 2009. (Doc. No. 22.) These will be referred to jointly as the "Original Report and Recommendation." The third Report and Recommendation is the Report and Recommendation to the District Court Regarding Debtor's Sixth Amended Joint Plan of Reorganization dated September 24, 2009. (Doc. No. 55.) This will be referred to separately as the "September 24th Recommendation." It was issued to address the Plan filed by the Debtor after the Original Report and Recommendation was submitted to this Court.

The Original Report and Recommendation was the one contemplated by the parties and by this Court when it adopted the procedures to be followed. It was generated to report the findings of fact and conclusions of law that resulted from the plan confirmation hearing. The Bankruptcy Court

7

found that the Parent's Plan complied with all of the requirements of the Bankruptcy Code and should be confirmed. It found that the Debtor's Plan was ultimately feasible and confirmable but was inferior to the Parent's Plan and should not be confirmed.

While this Court is writing for the purpose of addressing the Original Report and Recommendation, the September 24th Recommendation, and to enter a final judgment in this matter, it finds no need to rehash each and every finding of fact or conclusion of law. Instead, it will address topically the primary objections. As with the arguments of counsel, those findings and conclusions addressed will not be taken seriatim as numbered in the Original Report and Recommendation, but instead will be addressed in a manner similar to the parties' presentation of objections to the Court. Therefore, any finding or conclusion not specifically discussed, rejected, or revised in whole or in part is ADOPTED. Those objections not specifically granted are hereby DENIED.

With regard to the September 24th Recommendation, the Court will address it and the Bankruptcy Court's recommendations on the "new" plan in a separate sub-section of this opinion. Again, any specific objection not granted can be considered DENIED. Any finding of fact or conclusion of law not specifically rejected or revised should be considered ADOPTED.

Finally, the Court notes that while a number of parties have made objections to the Original Report and Recommendation and the September 24th Recommendation, very few objections, if any, relate to technical compliance with the provisions of the Bankruptcy Code. In the Original Report and Recommendation, this Court finds no non-compliance with either the requirements of Code nor with any procedure required by law or adopted by the parties. Consequently, to the extent any objection applies to the Bankruptcy Court's compliance with the Code or with any notice or procedural requirement, it is overruled. This opinion will limit itself almost entirely to the

8

substantive choices recommended by the Bankruptcy Court and the objections thereto.

## V.    Summary of Objections

This Court has received multiple objections from a variety of parties interested in the outcome of this matter. The Court will not attempt to address each objection in the order made, but will instead combine its analysis and address the major, or most frequently raised, objections to the rulings in a global fashion. There are objections which the Court has elected not to address directly in this opinion. To the extent that is the case, the Court notes that it has considered those objections and hereby overrules them.

The most prevalent objections can be divided into three (3) main categories. The first grouping attacks the primary decision (and reasoning supporting it) to recommend that the Parent's Plan be confirmed. These objections not only include attacks on the ultimate conclusion, but also focus on the analysis of the two competing plans and the Bankruptcy Court's reliance upon, application of, and interpretation of certain governing Code provisions.

A large subset of these objections is really aimed at the specifics of the two plans and the reasoning underlying the conclusion that Parent proposed the best plan. A second subset of these objections attacks the Bankruptcy Court's analysis and treatment of creditors and equity—more specifically, complaints are made that the Bankruptcy Court put too much emphasis on the interests of equity at the expense of the creditors or, more accurately, in spite of the creditors' preference for the Debtor's Plan. A third, but by no means insubstantial, subgroup of objections questions the Bankruptcy Court's analysis of the relative feasibility of the two plans, which includes the ability to fund the obligations at closing, the likelihood that the plan will actually close, the ability to fund the ongoing company, and the projected stability of the post-bankruptcy company.

There is clearly a second major area of dispute over whether, and, if so, the extent to which the Bankruptcy Court should have considered the plan filed after it issued its adverse recommendation that the Parent's Plan be confirmed. This, of course, includes a secondary dispute between the parties as to how much, if at all, this Court should consider it. Additionally, there is a disagreement as to whether this new plan results in a change of the ultimate result or whether the Parent's Plan remains superior.

The third major area of dispute is the area of the relationships between the Debtor, the Parent, Sterlite, and the United Steelworkers ("USW" or "Union"), the principal labor union at ASARCO's mines. While there is some overlap between this topic and that of feasibility, substantial legal objections have been asserted based upon certain provisions of the Collective Bargaining Agreement and certain subsequent provisions and stipulations. Additionally, certain objections were raised based on prior relations that the USW and the Governmental Entities have had with the Parent. These objections are concerned with the behavior that the objectors fear the Parent would continue to engage in if its plan were selected.

In the final portion of this opinion and order, the Court will address the request for a so-called "channeling injunction" under § 524(g) of the Bankruptcy Code. While the two plan proponents disagree as to which proponent should ultimately be the beneficiary of such an injunction, there is little or no dispute over the propriety of such an injunction. In fact, in their competing plans, both have included proposed language for such an injunction that borders on being identical at least in effect.[8] In addition to issuing the injunction, the final portion of this opinion and order contains the

---

[8] The Court notes that the primary parties have disputed what standard of review this Court should implement in resolving the objections. (*See* October 19, 2009 Hrg. Tr., Doc. No. 67 at 8–12.) The Debtor, and those opposing the Parent's Plan, suggest this Court should treat it

language necessary to implement the confirmed plan.

## VI.   Debtor's Plan v. Parent's Plan

### A.   Summary of the Plans

#### 1.   The Debtor's Plan

The Debtor's Plan is based on the New Plan Sponsor PSA, which is the Settlement and Purchase and Sale Agreement entered into by Sterlite, the Debtor, and other parties, on March 6, 2009. (*See* Plan Exhibit 18 to Debtor's Plan (Executed Form of New Plan Sponsor PSA), Bk. Doc. Nos. 12648-4, 12648-5; Amendments No. 6 and 7, Bk. Doc. No. 12648-6.) In total, the Debtor's Plan Sponsor (Sterlite) would pay $2.1355 billion in cash. This figure is composed of the cash paid pursuant to the New Plan Sponsor PSA, as described in the following paragraph, plus a $722 million payment for interests in the SCC Litigation Trust, further detailed below. In addition to the $2.1355 billion in cash, Sterlite would offer a put option of $160 million ($137 million net present value) to the Asbestos Creditors.

Pursuant to the New Plan Sponsor PSA and the Debtor's Plan, Sterlite agrees to pay the following consideration for the Debtor's assets: (1) "an amount equal to" (a) $1.1 billion as the Closing Payment; (b) $224.84 million as the Class 3 Monetization Payment; (c) $88.66 million as the Class 4 Copper Note Payment; and (2) assumption of Assumed Liabilities by the Sterlite.

---

like any other Report and Recommendation that one might receive from a United States Magistrate Judge and, therefore, the review is basically *de novo* as to contested facts and law. 28 U.S.C. § 636(b). The Parent, having prevailed in the Court below, not surprisingly suggests a higher standard applies—that of "clearly erroneous"—at least with respect to core issues. The Parent further argues that the choice of which plan to confirm is a core issue. Given the procedural history of this case, this issue would be one that only a law professor would relish. This Court, however, finds no need in resolving this case to "decide this issue" and leaves it open to the wild world of academic debate. Nevertheless, since the Parent prevailed in the Bankruptcy Court, this Court, out of an abundance of caution, utilized the standard proposed by the Debtor.

(Debtor's Plan, Bk. Doc. No. 12694 at Art. 10.1(b); Bk. Doc. No. 12648-6 at Section 4.1.)

The Debtor's Plan also creates the "SCC Litigation Trust," which would essentially hold the rights to pursue certain claims of the Debtor. Certain classes of claims[9] would be given interests in the SCC Litigation Trust, and as beneficiaries would be entitled to cash recovered by the Trust. By far, the litigation with the greatest potential pay-out is the fraudulent transfer judgment in favor of ASARCO LLC decided by this Court.[10] Under the Debtor's Plan, Sterlite would pay an additional amount, approximately $722 million, in exchange for Class 3's interests in the SCC Litigation Trust. (Bk. Doc. No. 12694 at Art. 4.2(c); Amendment Nos. 5 and 7 to the New Plan Sponsor PSA, Bk. Doc. Nos. 12445-2 at 9, 12648-6 at 8.) The Debtor's Plan would then distribute interests in the SCC Litigation Trust to Classes 4, 6, 7, and 8 in priority order. (Bk. Doc. No. 12694 at Arts. 4.2(d)–(h), 4.3.) The equity interests in ASARCO, or Class 8, would only be paid after all other creditors' allowed claims are paid out, and the current equity owner would not retain its ownership. (Bk. Doc. No. 12694 at Arts. 4.2(h), 4.3(b).)

In addition to their interests in the SCC Litigation Trust, holders of the Class 4 Asbestos Claims would be given an option to sell their interests in the Trust back to Sterlite for $160 million.

---

[9] Under the Debtors' Plan, the classes of claims and interests are set out as follows: Class 1 is Priority Claims; Class 2 is Secured Claims; Class 3 is General Unsecured Claims; Class 4 is Unsecured Asbestos Personal Injury Claims; Class 5 is Convenience Claims; Class 6 is Late-filed Claims; Class 7 is Subordinated Claims; Class 8 is Interests in ASARCO; Class 9 is Interests in the Asbestos Subsidiary Debtors; and Class 10 is Interests in the Other Subsidiary Debtors. (Bk. Doc. No. 12694 at Art. 3.2.)

[10] *See ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150 (S.D. Tex. 2009). Pursuant to the Debtor's Plan, if it were confirmed, the Bankruptcy Court would enter findings regarding the total amount of allowed claims and the value of the SCC Litigation in order to calculate the appropriate assignment of interests. This case remains on appeal. Certain testimony and exhibits in evidence contain widely varied predictions regarding the current value of this judgment – all of which are well-below the estimated value of the stock in question.

This "Asbestos Put Option" has been given a net present value of $137 million. (Doc. No. 12 at 13 n.15; Ex. D471; Ex. P433.)[11] An Asbestos Trust would be created under the Debtor's Plan, and pursuant to a channeling injunction, if the Debtor's Plan were confirmed, the Asbestos Trust would process and pay out Class 4 claims. (Doc. No. 12694 at Art. 4.2(d).) The Asbestos Trust would be funded by assets including $700 million in cash, an additional $27.5 million in cash for administrative expenses, the Class 4 interests in the SCC Litigation Trust,[12] equity interests in Reorganized Covington,[13] and interests in the liquidation trust.[14] (Id.) The Court notes that these cash payments are not in addition to the consideration listed above in the first paragraph of this section, but come out of the funds paid by Sterlite for transfer of the Debtor's assets and other available "distributable cash" held by the Debtor. (See Debtor's Glossary, Bk. Doc. No. 12696-1 at ¶¶ 55, 63, 109 (defining Asbestos Trust Assets, Available Plan Funds, and Class 4 Payment).) Finally, under the Debtor's Plan, Sterlite agrees to pay additional amounts as necessary to ensure that allowed claims for Classes 1, 2, and 3, and unclassified claims, are paid in full. (Bk. Doc. No. 12694 at Art. 10.1(d).)

---

[11] As used in this opinion and order, Exhibits (noted "Ex. _____") refer to the exhibits offered and admitted in the confirmation hearing held by the Bankruptcy Court unless otherwise noted.

[12] These interests could be sold in exchange for $160 million, as per the aforementioned Asbestos Put Option.

[13] Reorganized Covington means on or after the Effective Date, The Covington Land Co., LLC. Before the Effective Date of Reorganization, Covington refers to the Delaware Corporation of The Covington Land Company. (Bk. Doc. No. 12696-1 at ¶¶ 138, 158.)

[14] The Liquidation Trust is set out and described in Article VI of the Debtor's Plan. (Bk. Doc. No. 12694 at Art. VI.) The Liquidation Trust would be vested of certain litigation claims as detailed in Exhibit 14-B to the Debtor's Plan. (See Schedule of Litigation to Vest in the Liquidation Trust, Bk. Doc. No. 11898-16.)

13

As a deposit for implementation of the Debtor's Plan, Sterlite currently has secured its performance by posting letters of credit totaling $125 million ($50 million of which was apparently left in place after its first failed attempt to buy the assets of ASARCO)[15] and would be required to post additional letters of credit in the amount of $500 million upon either a recommendation of confirmation by the Bankruptcy Court or a confirmation order by this Court. (Bk. Doc. No. 12694 at Art. 10.1(c).) Thus, if the Debtor's Plan had been recommended or confirmed, the plan terms would have obligated Sterlite to secure its future performance by a deposit totaling $625 million in letters of credit. (*Id.*)

### 2. The Parent's Plan

Under the Parent's Plan, the Parent agrees to pay $2.2051 billion in cash for the payment in full of allowed claims in Classes 1 through 8.[16] (Conformed Parent's Plan, Bk. Doc. No. 12728-1 at Arts. IV, X; Parent's Glossary, Bk. Doc. No. 12728-27 at ¶258.) Class 9, the equity interests in ASARCO, would retain equity in the Reorganized ASARCO. (Bk. Doc. No. 12728-1 at Art. 4.2(i).) In addition to the cash contribution, the Parent would also guarantee a $280 million note[17] for Asbestos Claimants, for which Reorganized ASARCO would be principally liable. (*Id.* at Art. 10.1;

---

[15] *See* (New Plan Sponsor PSA, Bk. Doc. No. 12648-4 at Art. 4.2 ("Deposit. Purchaser [Sterlite] shall make available to ASARCO funds in the aggregate amount of $125,000,000.00 (the 'Deposit') as follows: (a) Prior to the execution of this Agreement, Purchaser posted a letter of credit . . . in the amount of $50,000,000.00.").)

[16] Under the Parent's Plan, the classes of claims and interests are set out as follows: Class 1 is Priority Claims; Class 2 is Secured Claims; Class 3 is General Unsecured Claims; Class 4 is Asbestos Personal Injury Claims; Class 5 is Convenience Claims; Class 6 is Late-filed Claims; Class 7 is Subordinated Claims; Class 8 is Environmental Reinstated Claims; and Class 9 is Equity Interests in ASARCO. (Bk. Doc. No. 12728 at Art. 3.2.)

[17] The net present value of the Asbestos Note is $274.8 million. (Doc. No. 22 at ¶ 272 n.233; *see also* Ex. P433 at 2.) The term of the note is one year.

*see also* Form of ASARCO Note and Guarantee (Ex. 23 to the Parent's Plan), Bk. Doc. No. 12728-

24.) Asbestos claimants would have their claims channeled to a § 524 trust structured similarly to

the one set out in the Debtor's Plan. (*Compare* Bk. Doc. No. 12694 at Art. VII *with* Bk. Doc. No.

12728-1 at Art. VI.) Funding of the trusts under these two plans would differ, as discussed later in

this opinion. The Parent's Plan also provides a Working Capital Facility under which Reorganized

ASARCO would be able to borrow $200 million from the Parent for its working capital needs, and

this loan would be secured by an interest in proceeds of "preserved litigation claims." (Bk. Doc. Nos.

12728-1 at Art. 10.1; 12728-27 at ¶ 382; Exs. 9 and 10 to the Parent's Plan, Bk. Doc. Nos. 12728-10

and 12728-11.)[18] Finally, the Parent would agree to waive several claims that the Parent and its

affiliates have against the Debtor, including the pending tax litigation. (Bk. Doc. No. 12728-1 at

Arts. 10.1, 10.8.) The Parent's Plan would also provide the release of liability in several cases,

including the Debtor's fraudulent transfer action against the Parent. (Bk. Doc. No. 12728-1 at Art.

10.5; *see* Schedule of Released Litigation (Ex. 2 to the Parent's Plan), Bk. Doc. No. 12728-3.)[19]

Consistent with its plan, the Parent deposited $500 million in cash and more than 83.7 million shares

of SCC stock into escrow to secure performance of its Plan after the Bankruptcy Court entered the

Original Report and Recommendation. (Bk. Doc. No. 12728-1 at Art. 10.2; Doc. No. 55 at 3.)[20]

---

[18] According to Parent's Plan Exhibit 9, these litigation claims do include litigation against Sterlite. (Schedule of Preserved Litigation Claims, Bk. Doc. No. 12728-10 at ¶ 8. (preserving "[a]ny and all pending or potential claims of the Debtors against Sterlite (USA), Inc.").)

[19] *See ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150 (S.D. Tex. 2009).

[20] According to counsel, the value of that stock was approximately $2.9 billion at the time of the hearing held on October 19, 2009 and the total value in escrow is thus approximately $3.4 billion. (October 19, 2009 Hrg. Tr., Doc. No. 67 at 27:5–12.) No one has really questioned the value of this stock, although some have questioned how rapidly it could be monetized since it is to date unregistered.

B.  Findings by the Bankruptcy Court

      1.  Findings Regarding Confirmability of the Plans

The Bankruptcy Court found that the Debtor's Plan is a full payment plan, which would be worth about $2.2954 billion in cash and other assets.[21] It found the Parent's Plan to be worth $2.4799 billion.[22] The Bankruptcy Court believed that the Debtor's Plan (along with the Parent's Plan) is confirmable (Doc. No. 22 at 7), and it found that all objections to it, other than the § 1129(c) objection, either had been resolved or were without merit. (*Id.* at ¶¶ 99–124.) Due to the fact that the Bankruptcy Court recommended the confirmation of the Parent's Plan, it did not formally analyze the 11 U.S.C. § 1129 requirements for confirmation with respect to the Debtor's Plan, and it only briefly addressed the objections to the Debtor's Plan. (*See id.* at ¶¶ 85–124.)

The Bankruptcy Court recommended that the Parent's Plan be confirmed. It engaged in a thorough analysis of the Bankruptcy Code's requirements and found that the Parent's Plan satisfied each of the requirements of 11 U.S.C. § 1129(a). (*Id.* at ¶¶ 165–248.) It also found that, if necessary, the Parent's Plan could be confirmed under the provisions of 11 U.S.C. § 1129(b). (*Id.* at ¶¶ 249–50.) Finally, it determined that the objections to the Parent's Plan were without merit, including the Debtor's and Union's argument that the Special Successorship Clause prohibits confirmation of the Parent's Plan. (*Id.* at ¶¶ 251–65.) Based on its comparison of the plans under

---

[21] (*See* Doc. No. 22 at ¶ 272 n.233.) The Bankruptcy Court reached the $2.2954 billion figure by adding $1.4394 billion cash (the amount the Bankruptcy Court determined would be paid for the assets of ASARCO and monetization of the Class 3 and Class 4 interests in the Sterlite Copper Note), $722 million (to be paid for the Class 3 interests in the SCC Trust), and $134 million (the value that the Bankruptcy Court used for the estimated present value of the asbestos put). (Doc. No. 22 at ¶ 108 n.233.)

[22] (Doc. No. 22 at ¶ 272 n.233.) The Bankruptcy Court reached this figure by adding the cash on closing ($2.2051 billion) to the present value of the Asbestos Note ($274.8 million).

11 U.S.C. § 1129(c), which will be discussed below, the Bankruptcy Court ultimately decided to recommend the Parent's Plan for confirmation. (*See id.* at ¶¶ 268–83.)

### 2. Findings Regarding Which Plan Should be Confirmed Under Section 1129(c) of the Bankruptcy Code

Since both the Debtor's Plan and Parent's Plan are confirmable, but only one may be confirmed pursuant to § 1129(c) of the Bankruptcy Code, in cases where there are multiple confirmable plans, a court "shall consider the preferences of creditors and equity security holders in determining which plan to confirm." 11 U.S.C. § 1129(c). In other cases involving multiple confirmable plans, courts have applied a four-factor analysis, considering "(1) the type of plan; (2) the treatment of creditors and equity security holders; (3) the feasibility of the plan; and (4) the preferences of creditors and equity security holders." *See, e.g.*, *In re River Valley Fitness One Ltd. Partnership*, Civil Action No. 01-12829-JMD, 2003 WL 22298573 at *9 (Bankr. D.N.H. Sept. 19, 2003); *In re Internet Navigator Inc.*, 289 B.R. 128, 131 (Bankr. N.D. Iowa 2003); *In re Holley Garden Apartments, Ltd.*, 238 B.R. 488, 493 (Bankr. M.D. Fla. 1999).

Applying the four-factor analysis, the Bankruptcy Court determined that the Parent's Plan should be confirmed primarily because of its more favorable treatment towards equity. It found that there was no significant difference between the plans under the first factor (type of plan). (Doc. No. 22 at ¶ 269.) Nor did it find a significant difference as to the third factor (feasibility), although it found the Parent's Plan to be more secure in assurance of performance. (*Id.* at ¶¶ 274, 283.)

Under factor two (treatment of creditors and equity), the Bankruptcy Court found that the plans were essentially equal in their treatment of creditors. (*Id.* at ¶ 270.) The Bankruptcy Court also found that the Parent's Plan gave better treatment to equity and that the Parent's bid is "significantly higher" than Sterlite's bid. (*Id.* at ¶ 272.) In its comparison of the consideration

offered by each plan, the Bankruptcy Court found that the Parent would pay $184.5 million more than Sterlite. (*Id.* at ¶ 272.) Thus, the Bankruptcy Court found that the second factor "strongly favors confirmation of the Parent's Plan over the Debtor's Plan." (*Id.* at ¶ 273.)

With respect to factor four (the preferences of creditors and equity), the Bankruptcy Court found that although the creditors favored the Debtor's Plan (their votes had been taken before the final plans were proposed), the Creditors' Committee was required by agreement to recommend the Debtor's Plan and the text of § 1129(c) "only requires a bankruptcy court 'to consider the preferences of the creditors and equity interest, not obey them.'" (*Id.* at ¶¶ 281–83 (quoting *In re River Village Assoc.*, 181 B.R. 795, 807 (E.D. Pa. 1995)).) Obviously, the Bankruptcy Court found that equity supports and is treated more favorably under the Parent's Plan. That being the case and given the "totality of the circumstances," the Bankruptcy Court concluded that "there is insufficient difference in feasibility or type of plan to allow the will of creditors to outweigh the difference in treatment of equity" and that the Parent's Plan should be confirmed. (*Id.* at ¶ 283.)

C.    Objections to the Bankruptcy Court's Findings

Several parties filed comments or objections after the Bankruptcy Court entered its initial Report and Recommendation on August 31, 2009. (*See* Doc. No. 10 (United States), Doc. No. 11 (ASARCO Committee), Doc. No. 12 (Debtors), Doc. No. 13 (Future Claims Representative), Doc. No. 14 (Sterlite), Doc. No. 18 (Union), Doc. No. 32 (Arizona).) These objections were primarily raised to dispute (1) factual findings made regarding the actual value of the Debtors' Plan as compared to the Parent's Plan; (2) the confirmability of the Parent's Plan; and (3) the Bankruptcy Court's analysis under § 1129(c) of the Bankruptcy Code, which resulted in the finding that the Parent's Plan should be confirmed. The objections are briefly summarized below.

1. Objections to the Bankruptcy Court's Findings Regarding the Value of the Debtor's Plan

One of the Debtor's primary objections is that its plan was not properly valued in comparison to the Parent's Plan. The Debtor contends that the Bankruptcy Court's determination that the Parent's Plan should be confirmed is based on a comparison that does not "accurately reflect[] the total consideration that would ultimately be paid to creditors" under the Debtor's Plan. (Doc. No. 12 at 11.)

First, the Debtor contends the Bankruptcy Court's determination is in error is because it believes that Sterlite's "open-ended" assumption of liability for full payment of claims of Classes 1, 2, 3, and 5 was not attributed any value by the Bankruptcy Court. (*Id.* at 12.)

Second, the Debtor asserts that the Bankruptcy Court's findings were incorrect with respect to the implications of the pending tax litigation. (*Id.* at 14.) The Debtor claims that under Article 10.1(d) of its plan, Sterlite would pay 100% of the allowed tax amounts assessed against the Debtor. (*Id.*) For this reason, it objects to the Bankruptcy Court's determination that the Debtor "will be required to reserve at least $190 or $250 million" to cover certain tax claims. (*Id.* (citing Doc. No. 22 at ¶ 62).)

Third, it claims that the Bankruptcy Court's Report and Recommendation undervalued what would be paid to the Asbestos Trust under the Debtor's Plan versus the Parent's Plan. (*Id.* at 12–13; *see also* Doc. No. 14 at Annex II.) Under the Debtor's Plan, the Asbestos Trust would receive $700 million in cash plus "interests in litigation trusts to satisfy the remainder of their $1 billion claim plus post-petition interest." (Doc. No. 12 at 13.) The Parent's Plan would provide $641 million in cash on the Effective Date, plus a one-year note with a present value of $274.8 million. (*Id.* at 12–13.) The Debtor objects that this difference in treatment, however, should not be the basis of a decision

under § 1129(c) "because the record does not support any finding that asbestos claimants are better off under the Parent's Plan." (*Id.* at 14; *see also* Comment of FCR and Official Committee of Asbestos Claimants, Doc. No. 13 at 2 ("Asbestos Fiduciaries supported confirmation of both plans, without expressing a preference for either").) It contends that the value of the interests in the litigation trust was not properly considered in determining the ultimate value of the Debtor's Plan, and asserts that the litigation trust interests are worth "in excess of $200 million." (*See* Doc. Nos. 12 at 13; 14 at 9–10.)

2. Objections to the Bankruptcy Court's Findings Regarding Confirmability of the Parent's Plan

The assertion that the Parent's Plan is not confirmable rests on three main objections: first, that the Parent's chosen method of financing threatens the feasibility of its Plan;[23] second, that confirmation of the Parent's Plan would violate the Special Successorship Clause because of the Parent's lack of a new collective bargaining agreement with the Union; and third, that the Parent's Plan was not filed in good faith.

First, several parties object that the Parent's use of a revolving debt facility threatens the feasibility of the Parent's Plan. (*See* Doc. Nos. 12 at 16–17 (Debtors); 14 at 22 (Sterlite); 33 at 5–8 (Arizona).) The Debtor and many who support the Debtor's Plan are concerned that the loan contemplated by the Parent's Plan would saddle Reorganized ASARCO with levels of debt that would threaten its operations. Some of this concern is based on the Parent's prior treatment of

---

[23] The Debtor asserts that the feasibility concern renders the Parent's Plan unconfirmable under §1129(a)(11) of the Bankruptcy Code, which requires that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). In the alternative, it claims that the feasibility concern should tip the § 1129(c) analysis in its favor. (Doc. No. 12 at 18.)

ASARCO following the leveraged buyout in the original purchase, and the Debtor also raises an argument that the Parent did not file its plan in good faith because of its past bad conduct. (Doc. No. 12 at 18–21.) Concerns about the debt facility are also based on the fear that if copper prices fall or other unanticipated costs arise, Reorganized ASARCO might find itself mired in debt again and neglect its other duties to the environment. (Doc No. 33 at 5–8.)

Second, parties object that the Parent's relationship with the Union threatens the feasibility of and may even bar confirmation of the Parent's Plan. These arguments will be more fully discussed below, but they range from assertions that the Parent's Plan cannot be confirmed because of the Special Successorship Clause to claims that the lack of a CBA will result in a strike if the Parent's Plan is confirmed.

Third, the Debtor objects that the Parent did not propose its plan in good faith. Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). This objection is based both on the pre-petition conduct of the Parent with respect to the fraudulent transfer case and the "obstructionist and tactical behavior in the bankruptcy case." (Doc. No. 12 at 18–21.) The Debtor hinges some of its argument on policy concerns as well, urging that confirmation of the Parent's Plan would "set an undesirable precedent for future equity holders to follow." (*Id.* at 21.)

### 3. Objections to the Bankruptcy Court's Analysis Under Section 1129(c)

Finally, the Debtor objects to the Bankruptcy Court's § 1129(c) four-factor analysis. First, with respect to the second factor (treatment of creditors and equity), the Debtor argues that the Bankruptcy Court inaccurately found that the Parent's "bid" was higher. (Doc. No. 12 at 11–15.) Second, with respect to the third factor (feasibility), the Debtor asserts that the Bankruptcy Court

miscalculated the feasibility risks given the Parent's poor labor relations.  (*Id.* at 24–26.)  Third, with respect to the fourth factor of the § 1129(c) inquiry (preferences of creditors and equity), it contends that the Bankruptcy Court failed to sufficiently weigh the interests of creditors, who generally preferred the Debtor's Plan.  (*Id.* at 8–10.)  Sterlite echoes some of these objections, especially those which complained that the Bankruptcy Court did not give enough weight to the interests of creditors and their preferences and that the Bankruptcy Court erred in its determination that the Parent's Plan outbid the Debtor's Plan.  (Doc. No. 14 at 6–27.)

      D.    <u>Discussion</u>

          1.    <u>The Value of the Debtor's Plan Is Not Greater Than the Value of the Parent's Plan.</u>

This Court adopts the Bankruptcy Court's finding that the Debtor's Plan is confirmable because it would pay all claims of creditors in full and otherwise complies with the requirements of 11 U.S.C. § 1129(a).  To the extent that the Bankruptcy Court failed to attribute value to the Debtor's Plan insofar as (a) Sterlite would pay as much as necessary to ensure that Classes 1, 2, and 3 are paid in full[24] and (b) Sterlite would pay 100% of allowed tax amounts assessed against the Debtors,[25] this Court hereby grants the Debtor's objections and finds that these elements of the Debtor's Plan should be considered in comparing the two plans.  The Court finds there is no evidence to support a specific dollar amount with regard to the former.  Further, it finds that the tax amounts which would be

---

[24] Article 10.1(d) of the Debtor's Plan states: "to the extent the Cash is not sufficient for all Allowed unclassified Claims and Allowed Claims in Classes 1, 2, and 3 to be Paid in Full, the Plan Sponsor shall be obligated to pay to the Plan Administrator such additional amounts as are necessary for such Claims to be Paid in Full."  (Bk. Doc. No. 12694 at Art. 10.1(d).)

[25] The allowed Tax claims would qualify as "unclassified," and be subject to payment in full by Sterlite according to Article 10.1(d) of the Debtor's Plan.

attributed to the Debtor would correspondingly have to be added to the Parent's Plan as it has agreed to resolve this liability as well.

This Court declines to find that the litigation trust interests that would be distributed to Class 4 Asbestos Claimants are worth "in excess of $200 million." The record simply does not support a finding that the value of the SCC Litigation Trust can be reliably determined, especially based upon the evidence presented at the confirmation hearing, and the Court finds it telling that the two experts both testified as to the value of the SCC Judgment according to the "competent counsel" methodology and their opinions did not even overlap. (*See* Conf. Day 5 Tr., August 17, 2009, Bk. Doc. No. 12556 at 63:13–64:22.)[26] Shannon Ratliff determined that "a reasonable range of discounts from the full amount of the judgment would be 10% to 30%," which would make the judgment worth $5.6 to $7.2 billion according to his analysis. (Ex. P301; Conf. Day 5 Tr., August 17, 2009, Bk. Doc. No. 12556 at 64:5.) Professor Klee found an extremely wide range of potential values, from $400 million to $2.94 billion, using several different valuation methodologies. (Ex. D156.) Moreover, this lower estimate of Professor Klee seems more in line with the value actually placed on the judgment by the market place. (*See* Ex. D156 at ¶¶ 60, 63 (implied range of value based on market indications of interest is $400 million to $850 million).) Additionally, before the Court is a sealed exhibit which is very probative of the fact that the actual market place (bidders that might actually buy the judgment) assigns a much lower range of values.[27] Given such wide discrepancies, this Court agrees with the Bankruptcy Court's use of the net present value of the Asbestos Put Option ($137 million) to calculate the certain amount that the Debtor's Plan would pay to the

---

[26] The Confirmation Hearing Transcripts will be referenced as ("Conf. Day X Tr.").

[27] The average value implied by the sealed bids is less than $500 million.

Asbestos Trust. To the extent that the Bankruptcy Court valued the Asbestos Put Option at $134 million rather than $137 million, this Court grants the Debtor's objection. (Doc. No. 12 at 15 n.15.) Both the Debtor and Parent used $137 million in their calculations, and the Court finds that $137 million is the appropriate figure. (*See* Exs. P433; D471.)

The Court's resolution of these value calculation-based objections, however, is not determinative either way with respect to which plan should be confirmed, and it certainly does not result in the conclusion that the Debtor's Plan pays more value. Since both plans are full-payment plans, Sterlite's promise to pay the unfunded claims of Classes 1, 2, and 3 in full does not give them an edge. The record does not support such a finding. The same is true with respect to the tax claims. Under both plans, the claims would be either withdrawn or paid or otherwise resolved. Consequently, they are, at best, a wash. With respect to the difference in asbestos treatment, however, the Bankruptcy Court did not err in refraining from assigning a particular value to the SCC Judgment. Its use of the Asbestos Put Option value (which is at least a stable figure and one that was a product of negotiation) was a logical way of determining how much value the Debtor is paying. (*See* Doc. No. 22 at ¶ 272 n.233.) The $3 million discrepancy, however, is not enough to give the Debtor's Plan any edge because the Parent's Plan is still paying roughly the same and likely more to the Asbestos Claimants.[28] After considering the objections regarding the value of the Debtor's

---

[28] The Debtor's Plan pays to the Asbestos Creditors: $700 million plus the Class 4 interests in the SCC Litigation Trust (or, if exercised, the $137 million net present value Asbestos Put), plus interests in the liquidation trust and Reorganized Covington. (Bk. Doc. No. 12694 at Arts. 4.2(d), 6.2(h)(1).) The amount paid to the Trust by Sterlite under Debtor's Plan is thus $837 million, plus interests in other entities. The Parent's Plan pays $500 million for the principal, $141 million for the interest, and $274.8 million in the form of a one-year note guaranteed by the Parent (of face value $280 million) (Bk. Doc. No. 12728-27 at ¶ 318 (defining "Section 524(g) Trust Assets"). The amount paid by the Parent under its plan is thus $915.8 million. The Court takes note that under the Debtor's Plan, it is theoretically possible that Asbestos Creditors could eventually be paid more; however, it is also possible that they would

24

Plan, this Court concludes that while it should be credited the value it would pay to ensure full payment of creditor Classes 1 through 3 and the tax claims, this does not make the Debtor's Plan worth more than the Parent's Plan.

2.   The Parent's Plan is Confirmable.

With respect to the first main confirmability objection, that the Parent's financing of its plan is unfeasible, this Court adopts the findings by the Bankruptcy Court regarding the Parent's financial status and ability to satisfy its debt obligations. (Doc. No. 22 at ¶¶ 149–59.) The Parent has more than enough assets in cash and stock to cover its obligations under the financing agreement, and has deposited more than sufficient cash and stock into escrow to secure its Plan. (*Id.*) This Court therefore overrules all objections that assert the Parent's Plan is unfeasible because of its financing arrangement.

Second, as previously mentioned, the Court will address the Special Successorship Clause arguments later in this opinion.

Third, with respect to the good faith objection, this Court finds that the Bankruptcy Court properly applied the good faith standard, which requires that "there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." (Doc. No. 22 at ¶¶ 184–85 (citing *In Re Texas Extrusion Corp.*, 68 B.R. 712, 723 (N.D. Tex. 1986), *aff'd*, 844 F.2d 1142 (5th Cir. 1988)).) This Court also adopts the Bankruptcy Court's conclusion that the Parent's Plan was proposed in good faith "because it achieves the two ultimate objectives of the Bankruptcy Code"—paying creditors in full and enabling the debtor to reorganize and emerge

---

eventually be paid less than the Parent's guaranteed $915.8 million. In either case, the Asbestos Creditors have approved both treatments, and the Court views them as roughly equal. (*See* Decl. of the Future Claims Representative, Bk. Doc. No. 12381.)

successfully from the bankruptcy. (Doc. No. 22 at ¶ 185.)

Even considering the Parent's pre-petition conduct, which this Court agrees was not model corporate behavior, the Parent has by a preponderance of the evidence met the good faith standard: its deposit of roughly $1 billion more than the price of its plan in cash and stock into escrow ($3.4 billion) suffices to demonstrate that its plan will at the very *least* allow it to pay off the allowed creditor claims and thereby erase nearly all of the burdensome liabilities that stand between the Debtor and profitability.[29] Thus, this Court adopts the findings and conclusions of the Bankruptcy Court with regard to good faith (*Id.* at ¶¶ 18–21), and overrules any and all objections that the Parent's Plan cannot be confirmed on good faith grounds. Furthermore, as will be discussed later in this opinion, any pre-petition misconduct is at least offset by Sterlite's post-petition conduct.

With respect to the policy concern of the Debtor and Sterlite that confirmation of the Parent's Plan would condone pre-petition misconduct, this Court finds that argument unpersuasive. If this Court were to confirm the Debtor's Plan, the logic of that policy argument would counsel that such a decision sets bad precedent as well because this Court would be rewarding a plan proponent even after it had unilaterally terminated a prior agreement, resulting in greater delay of this proceeding than might have otherwise occurred.[30]

---

[29] (*See supra* n.20.) In addition to the $3.4 billion in escrow, this Court further notes that the Parent's likelihood of closing is also secured pragmatically and indirectly by the SCC Judgment. If the Parent does not close as it is now obligated to do, it would not be able to release the SCC Judgment against it, which has been valued at more than $8 billion and which is secured by an estimated $12 billion dollars worth of stock.

[30] The Court's text with respect to Sterlite's termination of the initial purchase and sale agreement is not a finding of fact or conclusion of law such that it can be used to collaterally estop Sterlite in future litigation. The issue was not fully briefed, nor has this Court taken evidence concerning the facts and documents that govern Sterlite's aborted effort to purchase the ASARCO assets in 2008.

This Court also hereby overrules all other objections that the Parent's Plan is not confirmable, and hereby adopts the Bankruptcy Court's conclusions that the Parent's Plan is confirmable either under 11 U.S.C. § 1129(a) or (b).

3.      <u>The Section 1129(c) Analysis Compels Confirmation of the Parent's Plan.</u>

Since this Court agrees that both the Parent's Plan and the Debtors' Plan are confirmable, it turns to the § 1129(c) analysis, using the four factors (type of plan, treatment of creditors and equity, feasibility, and preferences of creditors and equity holders) described above and applied by the Bankruptcy Court.

a.      <u>Type of Plan</u>

Under the "type of plan" analysis, "[a] reorganization plan is usually preferable to a liquidation plan." *In re Holley Garden*, 238 B.R. at 495. This Court adopts the Bankruptcy Court's determination with respect to the type of plan, that the Parent's and Debtor's Plans are substantially equal under the first factor, because both are reorganization plans. (Doc. No. 22 at ¶ 269.)[31]

b.      <u>Treatment of Creditors and Equity</u>

Under this second factor, the Court "should confirm the plan that provides better treatment for the creditors and equity security holders." *In re Holley Garden*, 238 B.R. at 495. Due to the fact that both plans are full-payment plans, their treatment of creditors is essentially the same. Once creditors have been fully paid, the preferences of creditors, while relevant, are not as important as that of the remaining equity holder. Thus, the Bankruptcy Court considered the treatment of equity highly relevant. Under the Debtor's Plan, equity would lose all ownership interests and only receive

---

[31] The Court recognizes that the Debtor's Plan is an asset-purchase plan, while the Parent's Plan is an equity-retention plan. Under both plans, however, the business of the reorganized Debtor would continue, thus this Court considers them substantially the same for the purposes of factor one.

whatever remains, if anything, in the SCC Litigation Trust after the creditors' claims are paid off. (*See* Bk. Doc. No. 12694 at Arts. 4.2(h), 4.3(b).) The Parent's Plan would allow the Parent to retain its equity ownership in Reorganized ASARCO after all creditor claims are paid off. (Bk. Doc. No. 12728-1 at Art. 4.2(i).) This far exceeds the recovery of equity under the Debtor's Plan.

Since the plan sponsors can be viewed as "purchasing" equity interests in Reorganized ASARCO—with Sterlite acquiring the equity under the Debtor's Plan and the Parent buying back rights to equity under the Parent's Plan—the Bankruptcy Court compared the consideration paid by each plan sponsor to determine which sponsor offers the highest "bid." It concluded that the Parent was paying roughly $184.5 million more than Sterlite. (Doc. No. 22 at ¶ 272.) As stated above, this analysis, however, failed to account for Sterlite's promise to pay any cash shortfall necessary to ensure that Classes 1, 2, and 3 are paid in full, as well as its promise to pay any allowed tax claims. (Bk. Doc. No. 12694 at Art. 10.1(d).)[32] It also did not, perhaps because to do so would be nearly impossible, account for the value of the SCC Trust interests or other less stable assets. Given that, this Court declines to adopt the Bankruptcy Court's findings of fact regarding a <u>specific</u> difference (e.g., $184.5 million dollars) in value paid for equity. Nevertheless, it is clear that under the Parent's Plan, the amount being paid in cash, and in other forms of consideration that the Court feels certain

---

[32] With respect to the Parent's Plan, the various tax claims (the Tax Claim, Tax Refund, and Deferred Tax Liability, as defined in the Bankruptcy Court's Report and Recommendation (Doc. No. 22 at ¶ 59), are not additional costs against the value it is paying because the Parent's Plan would withdraw the Tax Claim and Deferred Tax Liability Claims, as well as its claim to the Tax Refund, "thereby making the value of these claims available to the ASARCO estate and its creditors." (Doc. No. 22 at ¶ 61.) As mentioned earlier, since that is the case, it is the functional equivalent of a tie: *i.e.*, under the Debtors' Plan, the cost will be covered and under the Parent's Plan it would not exist, so under both plans Reorganized ASARCO would not be burdened by it.

will be paid by the Parent, is far greater than that being paid by Sterlite.[33]

Given that both plans are reorganization plans and their sponsors have the means and commitment in place to pay in full all creditor claims, this Court finds that their treatment of creditors is essentially the same. The Parent's Plan allows the Parent to retain its full interests in equity. This is enough to find that the Parent's Plan would result in better treatment of the equity holder.[34] Thus, factor two weighs strongly in favor of the Parent's Plan. Accordingly, the Court hereby overrules any and all objections to the conclusion that the Parent's Plan affords better treatment to equity.

### c. Feasibility

The feasibility factor dictates that the Court "should give preference to the plan that is more feasible than the other proposed plans." *In re Holley Garden*, 238 B.R. at 496. With respect to objections regarding the feasibility determination, it no secret that the Parent and the Debtor both face feasibility risks. The primary feasibility risks for the Debtor's Plan are the risk of closing and

---

[33] At closing under the Parent's Plan, the Parent would pay $2.2051 billion Cash and would guarantee a note worth $174.8 million net present value. (Bk. Doc. Nos. 12728-1 at Arts. IV, X; 12728-27 at ¶ 258; *see also* Ex. P433 at 2.) At closing under the Debtors' Plan, Sterlite would pay $2.1355 billion cash (this is composed of a $1.1 billion Closing Payment plus $224.84 Class 3 Monetization Payment plus $88.66 million Class 4 Copper Note Payment plus $722 million for Class 3 interests in SCC Litigation Trust) and would give Asbestos Creditors a put option worth $137 million net present value. (Bk. Doc. Nos. 12694 at Arts. 4.2(c), 10.1(b); 12648-6 at 12 (Section 4.1); 12445-2 at 9, 12648-6 at 8.) This leads to the conclusion that the Parent would pay at least $100 million more than Sterlite.

[34] The Court notes that even if the Debtor's September 10th Plan were considered and bidding re-commenced, the Parent would almost certainly be able to bid more than even Vedanta's available cash because of the $8 billion SCC Judgment. Counsel for both plans conceded this in arguments before this Court. (*See, e.g.*, October 19, 2009 Hrg. Tr., Doc. No. 67 at 57–58, 93–94.) Anything up to $8 billion would still be a gain for the Parent because it would release that judgment, and the Parent has indicated that it is ready and willing to bid higher if need be.

the funding of the SCC Litigation Trust, on which payment of the claims of several classes of creditors depends. The Debtor has backstopped its Plan with only $625 million in letters of credit versus the Parent's stock and cash in escrow sufficient to cover the price of their plan. (Doc. No. 22 at ¶ 274.) Debtor also lacks a formal legal commitment from Sterlite's ultimate parent, Vedanta Resources, to provide support after confirmation. (*Id.* at ¶¶ 274, 279.) Sterlite India has guaranteed certain obligations of Sterlite USA and has agreed to the jurisdiction of this Court, but it has no assets here in the United States. Debtor's parent, AMC, and ultimate parent, Grupo Mexico, are both subject to the jurisdiction of this Court. The Parent has also put up more security that the plan requires. Thus, this Court adopts the Bankruptcy Court's findings that the Parent's Plan has a greater likelihood of arriving at consummation. (*Id.* at ¶ 274.)

Furthermore, the Debtor's Plan risks the chance that the SCC Litigation Trust would not be sufficiently funded, and thus the creditors might not all be paid in full, because it is dependent upon the final outcome of the SCC litigation. (*Id.* at ¶ 276.) In contrast, the Parent's Plan provides for a cash payment of $2.2051 billion on the Effective Date, which is sufficient to pay off all creditor claims, except those covered by the 1-year Asbestos Note. (*See* Bk. Doc. Nos. 12728-1 at Art. 10.1, 12728-27 at ¶ 258.) This Court therefore adopts the Bankruptcy Court's finding that the Debtor's Plan "involves more risk than the Parent's Plan," as well as the conclusion that this sub-factor—the likelihood that creditors will be paid in full—should be given little weight because "[b]oth the amount and risk is small." (Doc. No. 22 at ¶ 276.)[35]

---

[35] The total amount at risk would not affect any unclassified creditors or Classes 1, 2, or 3. Furthermore, the Class 4 claimants are still guaranteed $700 million plus their $160 million Asbestos Put Option. Setting aside that they have agreed to the risk involved in the SCC Litigation Trust, in the worst case scenario, they would be paid $860 million out of their $1.0 billion claim, and they would still have rights to the other assets, including the Liquidation Trust and Reorganized Covington. The risk and amount at stake are thus not enough to make the

The primary feasibility risk for the Parent's Plan is the lack of a collective bargaining agreement with the Union. Sterlite has reached a collective bargaining agreement with the Union under which it would fund ASARCO's employee benefit and retirement plans through December 2013. (Doc. No. 22 at ¶ 96; Ex. D184.) Throughout the confirmation process, labor relations have been a particularly touchy issue. The union has not offered and has indicated that it will not accept a similar offer from the Parent. (October 19, 2009 Hrg. Tr., Doc. No. 67 at 145–47, 174:10–23 (comments by USW's and by Parent's Counsel).) How much of this attitude is cast in stone and how much of it is hard-negotiating is an open question since the Parent has not yet offered to extend the term of the current collective bargaining agreement by three years. The legal implications of the special successorship clause will be addressed more in-depth later in this opinion, but this Court notes for now that the Union's vigorous involvement in the confirmation proceedings and its numerous objections to the Parent's Plan are telling. Even at the October 19, 2009 hearing, more than a month after the Bankruptcy Court issued its Report and Recommendation, the Union and the Parent had still failed to reach an agreement. The Bankruptcy Court did not ultimately find the threat of labor unrest a significant enough feasibility risk to disfavor the Parent's Plan, based on the evidence regarding the unlikelihood of a strike, the costs of a strike, the existence of non-Union labor, and Reorganized ASARCO's ability to withstand a strike. (*See* Doc. No. 22 at ¶¶ 223–43.)

Overall, with regard to feasibility, under the absolute worst-case scenario involving either Debtor's or Parent's feasibility nightmare, the result could be catastrophic for all involved. In Debtor's case, if Sterlite walked away again after the Parent's funding deadline, creditors would be left without any plan and a deposit insufficient to pay the creditors. In the Parent's case, if copper

---

Debtor's Plan infeasible or to really threaten the likelihood that creditors will be paid in full.

prices tumbled (ruining its ability to repay its loan) and/or the Union decided to strike, future creditors conceivably could be left with insufficient payment and the Debtor could find itself back in Bankruptcy Court. The feasibility risks, while real for each plan, are ultimately low-probability risks and thus do not weigh heavily in favor of either plan, with the exception that the Court notes that Debtor's failure to close has happened before—just last year. All things considered, therefore, the Court overrules any and all objections that assert the Debtor's Plan is more feasible.

d.     Preferences of Creditors and Equity

According to the statute, "the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm." 11 U.S.C. § 1129(c). In its analysis of this factor, the Bankruptcy Court considered the preferences of creditors but found them not to be controlling because the votes had been taken prior to the announcement of final plans, and because it believed the totality of the circumstances outweigh the significance of the creditors' "will." (Doc. No. 22 at ¶¶ 281, 283.) At the same time, it also noted that none of the creditors asked to change their preference at the confirmation hearing, and the United States and eleven states even expressed preferences for the Debtor's Plan at the closing arguments. (*Id.* at ¶ 281.) The Court will address the governmental compliance issues in Section IX. Even after the Parent proposed its full payment plan, some creditors continued to support the Debtor's Plan. After the Bankruptcy Court filed its Report and Recommendation, the United States filed a limited objection reiterating that it had stated a preference for the Debtor's Plan, (Doc. No. 10); the Official Committee of Unsecured Creditors filed a statement to the same effect, (Doc. No. 11); the Union, which includes some retiree creditors, filed an objection to confirmation of the Parent's Plan and expressed its preference for the Debtor's Plan, (Doc. No. 18); and the State of Arizona also filed an objection to confirmation of the Parent's

Plan, expressing a preference for the Debtor's Plan (Doc. No. 33). The Future Claims Representative and Official Committee of Asbestos Claimants filed a comment indicating that they have no preference. (Doc. No. 13.) Thus, this Court declines to find that the preferences of the creditors are ambiguous.

At the same time, notwithstanding the substance of creditors' preferences, the context in which preferences were developed and stated is also highly relevant. The issue of expression of preferences was dissected by two of the creditors' counsel in argument before this Court:

> MR. ESSERMAN: Hello, Your Honor. Sandy Esserman. This is the first time I think I've addressed you. We represent the Asbestos Committee.
>
> I want to address the creditor preference issues and make sure that Your Honor understands, I think you do, the context of these plans.
>
> This was a bidding process that occurred during the confirmation hearing. The plans that were voted on were not the plan's final-day argument that were presented to the Court. So, for example, this payment in full with preimposed petition interest did not exist when the disclosure statement went out, when the creditors, in fact, voted. In fact, if that had happened under the Bankruptcy Code, they wouldn't have voted because they were unimpaired. A creditor that is unimpaired doesn't even vote. That doesn't mean that some of the states wouldn't have - - that have continuing relationships would not have expressed, necessarily, preferences one way or another. But a pure creditor that is getting paid full and post-petition interest, which they are in this case, plus attorney's fees, I believe, were applicable, would not even vote at all.
>
> So you had a situation where you had Sterlite made a bid, the parent made a bid, then they kept on going up and up and up and up. For example, as to the asbestos creditors, who I represent, during the confirmation hearing, the parent increased their proposal to the asbestos creditors by approximately $140.5 million additional cash that was to be paid to the asbestos creditors. This was not contained in the disclosure statement which my creditors voted on.
>
> In addition, you heard about the $500 million cash escrow and the $2.9 billion of stock that the parent is putting up. This was not contained in the disclosure statement the people voted on.

Let me look at the other side. Sterlite agreed to put an extra $500 million letter of credit in. That wasn't contained in the disclosure statement either. And Sterlite post-petition for the asbestos creditors agreed, if you will, to cash out the 27-and-a-half percent of the litigation interest for cash and raise the asbestos payment to about 912, $914 million cash plus what I refer to as the bells and whistles, which both sides agreed to do. That wasn't in the disclosure statement. So that was - - that the committee viewed as an enhancement and a positive step by Sterlite also because, as Mr. Bartner so eloquently stated, Judge Schmidt did not value the 27-and-a-half percent of the litigation interest that went to the asbestos creditors, and perhaps it cannot be valued. Perhaps it cannot be evaluated. Perhaps he did evaluate it. That was one of the reasons why we negotiated the $160 million put in the first go-around, because there was concern as to that, and we wanted to make sure that we didn't wind up with a vacated judgment or a reduced judgment or whatever.

So creditor preferences, I think, are important under the code, but creditor preferences, cast when they were cast in this particular case, may not be as informative as the court would normally like.

THE COURT: And at least for some classes of creditors, there was no fiduciary out?

MR. ESSERMAN: For - - I believe the Creditors Committee had no fiduciary out, that is correct. They agreed to support the Sterlite plan come hell or high water. My committee agreed to support both plans. So I think the context of the payment - - of the payments to the creditors, that is, payment in full, creates a little bit different 1129(c) argument that normally would take place in a case. And, in fact, when those preferences were cast, if the - - if the plan had been revoted on, most of those people wouldn't have even voted at all.

Now, whether the court would have allowed a preference to be stated or not is a different issue. Maybe yes, maybe no. I can see an argument why a state, for instance, that has continuing relationships with the company would be allowed to so state a preference. There's some logic to that.

On the other hand, if someone is walking out with a dollar bill and that's all he's owed from the courtroom and he gets his dollar bill from either side, what difference should it make? And I think that's probably the more logical argument. Thank you.

THE COURT: Okay.

MR. BAKER: Good morning, YOUR HONOR. Derek Baker from Reed Smith on behalf of the Official Committee of Unsecured Creditors. Your Honor, I wanted to just address the one point you made about the fiduciary out, and I wanted to sort of explain to the court how those issues came up.

34

> They were presented to Judge Schmidt. I think he did understand the ongoing back and forth that was going on that led up to the issues that were ultimately agreed to right before the commencement of the confirmation hearing.

(October 19, 2009 Hrg. Tr., Doc. No. 67 at 71–74 (emphasis added).) Thus, the creditors' preferences were not uniform, many were made prior to full payment plans being proposed, some were handcuffed by a lack of a fiduciary out, and some, had they known they would be paid in full, would either not have expressed a preference or not have been allowed to vote.

On the other hand, the equity holder clearly supports the Parent's Plan because the Parent is the current owner of equity and its plan would not only release AMC from the SCC judgment, but would allow it to keep its ownership of the Debtor once the creditors are paid off. The Debtor's Plan would only refund to the equity owners whatever portion of the SCC Litigation Trust, if any, is not needed to pay off creditors, but Sterlite would be the new owner of Reorganized ASARCO. Equity under the Debtor's Plan could end up with nothing.

Once one comprehends the timing and sequence of the expression of the preferences, the ultimate full payment of creditors under both plans and the preferences and treatment of equity, the Bankruptcy Court's conclusion is inescapable. This conclusion was finally buoyed by the fact that the Bankruptcy Court (as well as this Court) found that the Parent's Plan was more likely to close.

The Court, therefore, finds the preferences of creditors, while being considered, should not be a controlling factor because the creditors will be paid in full under either plan. Sterlite's counsel supported its criticism of the Bankruptcy Court by focusing on the text of the statute, which states that the court "shall consider the preferences of creditors," without regard to whether they will be paid in full, and by pointing to the risk of closing. (October 19, 2009 Hrg. Tr., Doc. No. 67 at 49:12–22.) Even giving the creditors their due consideration, this Court finds their preference to be

35

unpersuasive in this case where they are not uniform, and where they get paid in full by either plan. This is especially true in a case in which the Debtor's Plan has a greater risk of not closing.

e.    Synthesis of the Section 1129(c) Test

The Debtor complains that what the Bankruptcy Court did was effectively rule that a "tie goes to equity." This is not accurate and certainly understates the analysis performed by the Bankruptcy Court. It ignores the fact that the Bankruptcy Court weighed the factors set out in § 1129(c) and it also ignores the fact that in weighing the plans it was faced with two plans—both of which treated the creditors equally—one of which all but disregarded the treatment of equity and one of which is much more generous to equity. This hardly qualifies as a tie. At least one objector suggests that the Code requires the Court balance not the treatment given, but only the expressed preferences (*i.e.*, the votes). The Bankruptcy Court did both. It noted that the preferences of the creditors were overwhelmingly for the Debtor while equity was soundly in the Parent's camp.

If the Court had stopped its analysis there, the complaint that it merely "gave the tie to equity" might be valid. It did not stop there. It analyzed both the preferences of creditors and equity, the treatment of creditors and equity, and the likelihood of closure. With respect to the preferences, it was clear that equity was for the Parent's Plan, while the opposite conclusion as to the creditors was not so discernable.

Under the four-factor analysis, the only factor that is overwhelmingly in favor of Debtor's Plan is the preference of creditors. Every other factor is either neutral or favors the Parent's Plan, with the latter being vastly superior in its treatment of equity. The purposes of bankruptcy proceedings are generally to ensure that creditor claims are paid as close to "in full" as possible and to allow the debtor to emerge with the ability to carry out its business. Given that the Parent's Plan

36

is more likely to close and that each plan will pay creditors in full, the Court finds that the Parent's Plan should be confirmed based upon a weighing of all § 1129(c) factors.

## VII.   Consideration of the Debtors' September 10th Plan[36]

### A.   The Bankruptcy Court's Findings and Recommendation

On September 10, 2009, well after the Bankruptcy Court had entered its initial Report and Recommendation, the Debtor filed a modified version of its Sixth Amended Joint Plan of Reorganization. (September 10th Plan, Bk. Doc. No. 12822.) Modifications to the Debtor's plan were made primarily to increase the amount of cash paid by Sterlite.[37] (Letter to Bankruptcy Court from Debtor's Counsel Bk. Doc. No. 12830.) The next day, the Bankruptcy Court ordered the Debtor to show cause why the September 10th Plan should even be considered. (Bk. Doc. No. 12849.) On September 14, the Parent filed a Response to the Court's Order to Show Cause. (Bk. Doc. No. 12872.) It argued that the Bankruptcy Court should not consider the September 10th Plan because doing so would disrupt the review process that the District Court established by granting the Joint Agreed Motion to Withdraw the Reference. (*Id.* at 3.) In addition, the Parent argued that even if the Bankruptcy Court were to consider the September 10th Plan, the Parent's Plan remains superior. (*Id.* at 14.)

At the show cause hearing held on September 15, 2009, the Debtor disputed the notion that additional discovery or reopening of the record would be necessary. (September 15, 2009 Hrg. Tr.,

---

[36] This Court shall refer to the amended plan filed by the Debtor on September 10, 2009 as the "September 10th Plan." The plan filed by the Debtor, last modified on August 27, 2009, shall be referred to as the "Debtor's Plan."

[37] The bulk of the increased cash would be payments made in exchange for Sterlite's purchase of interests in the SCC Litigation Trust. (*See* September 10th Plan, Blacklined, Bk. Doc. No. 12828 at Arts. 4.2–4.3; September 10th Plan Glossary, Blacklined, Bk. Doc. No. 12828-1 at 43.)