# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 05-21207 |
| | § | |
| **ASARCO LLC**, *et al.*, | § | Chapter 11 |
| | § | |
| Debtors. | § | Jointly Administered |

# APPLICATION OF STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, A PROFESSIONAL CORPORATION, FOR AN ORDER <u>GRANTING ENHANCEMENT OF ITS FEES</u>

TABLE OF CONTENTS

TABLE OF CONTENTS…………………………….……………………...……………..i

TABLE OF AUTHORITIES………………………………..………………………………….iv

APPLICATION OF STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, A PROFESSIONAL CORPORATION, FOR AN ORDER GRANTING ENHANCEMENT OF ITS FEES………………………………………..1

I.   THE OUTSTANDING RESULTS OBTAINED IN ASARCO'S REORGANIZATION ARE DIRECTLY ATTRIBUTABLE TO APPLICANT'S CAREFULLY CONCEIVED AND WELL-TIMED ENGAGEMENT OF THE PARENT…………1

II.  INTRODUCTION……………………………………………………………….4

III. APPLICANT'S DYNAMIC AND PIVOTAL ROLE IN THE REORGANIZATION OF ASARCO, et al. ………………….……………11

A.  Staring into the Abyss:  ASARCO, et al., on the Cusp of Chapter 11..........................................................................................11

B.  ASARCO, et al.'s Reorganization at Inception……………………..14

1.  Labor Unrest Virtually Halts ASARCO's Production of Copper………………………………………………..14

2.  The Strike Highlights Conflicts in ASARCO's Corporate Governance that Applicant Undertakes to Address……………………..14

3.  ASARCO's New Leadership Moves Swiftly to Address Pressing Problems……………………………….…………………18

C.  A Phoenix Rises:  the Alter Ego Case Looms Large in the Arizona Desert. ………………………….……………………19

1.  The backdrop for the expedition to Arizona that reconstructed ASARCO's asbestos history from millions of disparate, decaying documents……….……19

2.  Noses to the grindstone and pedals to the metal…………………………23

3.  The story told by ASARCO's own documents of its extraordinary

*entanglement with LAQ and CAPCO and the asbestos industry generally*…………………………………………………………24

    a.  ASARCO's role in the start-up venture that became LAQ……………………………………………....25

    b.  ASARCO's operational entanglement with LAQ……………………………………………….27

    c.  ASARCO's operational entanglement with CAPCO…….…28

    d.  ASARCO's other asbestos concessions, activities, and pretensions………………..………………………30

    e.  ASARCO recognizes asbestos-related health risks and tries hiding behind LAQ and CAPCO …..…………….…..31

**D.**  **The Magner Mediation, Conceived to Help Resolve ASARCO's Aggregate Derivative Asbestos Liabilities, Yields a Template for a Plan that Had Applicant's Fingerprints All Over It**. ……….…..33

**E.**  **The Brownsville Litigation:  A Staggering Judgment Against the Parent Is the Penultimate Watershed in the Plan Process**. …………37

    *1.  Backdrop for the Lawsuit*………………………………………..37

    *2.  Pre-Trial Proceedings*…………………………………….....…38

    *3.  Trial*…………………………………………………………..39

    *4.  The First Shoe Drops: The Liability Ruling*……………………………41

    *5.  The Other Shoe Drops: The Damages Ruling*…………….…………..42

**F.**  **Sterlite's Bid for ASARCO, *et al*.'s Operating Assets, Its Subsequent Breach, and the "Deal Fatigue" that Jeopardized Reorganizational Success**. ……………….………………………………………….…..44

    *1.  Light at the end of the tunnel?* ……………………….………44

    *2.  Corpus Christi, we have a problem*………..……………………..47

    *3.  Déjà vu All Over Again:  ASARCO's Second Deal with Sterlite*…...…..52

**G.** **The Final Ascent**. ………………………………………………………54

    *1.* *"Deal Maker" Sandy's "masterful tactical procedure."* ……………….....55

    *2.* *Sterlite Ups the Ante*.……………………………………….....58

    *3.* *The Parent Raises*………….…………………………………62

    *4.* *A bidding war at confirmation*………….………………………....64

    *5.* *What if Applicant Had Not Been Involved in the Case?* ………………73

**IV.** **ARGUMENTS AND AUTHORITIES**………………………………………….....….……..74

    **A.** **In "Rare and Exceptional" Circumstances, Fee Enhancements are Appropriate**. ……………………………….……………………....74

    **B.** **Fifth Circuit Jurisprudence Regarding Fee Enhancements in Bankruptcy**. ……………………………….…………………80

    **C.** **This is a "Rare and Exceptional" Case in which an Enhancement to Applicant's Lodestar Fee is Appropriate**. …………………….…81

**V.** **CONCLUSION** …………………………………………………………85

# TABLE OF AUTHORITIES

## CASES

*ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278 (S.D. Tex. 2008)……………40

*ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150 (S.D. Tex. 2009)………......…43

*Blum v. Stenson*, 465 U.S. 886 (1984)……………………………………....…..75, 77, 80

*In re Cahill*, 428 F.3d 536 (5th Cir. 2005)…………………………....…………..……80

*In re D.W.G.K. Rests.*, 106 B.R. 194 (Bankr. S.D. Cal. 1989)……………...………….81

*In re El Paso Refinery, L.P.*, 257 B.R. 809 (Bankr. W.D. Tex. 2000)……..…………81

*In re Farah*, 141 B.R. 920 (Bankr. W.D. Tex. 1992)……………………………..76, 84

*In re First Am. Health Care of Ga., Inc.*, 212 B.R. 408 (Bankr. S.D. Ga. 1997)……...…81

*In re Gencor Indus., Inc.*, 286 B.R. 170 (Bankr. M.D. Fla. 2002)………………77, 81, 84

*In re Lawler*, 807 F.2d 1207 (5th Cir. 1987)……………………………....……..80

*In re Mirant Corp.*, 354 B.R. 113 (Bankr. N.D. Tex. 2006)……………..…..…78, 79, 84

*In re THCR/LP Corp.*, No. 04-46898/JHW, 2008 WL 3194056,
(Bankr. D.N.J. Aug. 1, 2008)…………………………………………………..79, 83

*In re UNR Indus. Inc.*, 986 F.2d 207 (7th Cir. 1993)………………...……………76

*In re Vista Foods USA, Inc.*, 234 B.R. 121 (Bankr. W.D. Okla. 1999)…………..……77

*Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 713 (5th Cir. 1974)………...…………80

*Pennsylvania v. Del. Valley Citizens' Counsel for Clean Air ("Delaware I")*,
478 U.S. 546 (1986)……………………………………………….……………75

*Pennsylvania v. Del. Valley Citizens' Council for Clear Air ("Delaware II")*,
483 U.S. 711 (1987)………………....……………….……………………..76

*PSI Energy, Inc. v. Roberts*, 802 N.E.2d 468 (Ind. Ct. App. 2004)………..………..39

*Rose Pass Mines, Inc. v. Howard*, 615 F.2d 1088 (5th Cir. 1980)………...……………80

*Shipes v. Trinity Indus.*, 987 F.2d 311 (5th Cir. 1993)……………………......4, 76, 77, 80

*Transam. Natural Gas Corp. v. Zapata P'ship, Ltd. (In re Fender)*,
12 F.3d 480 (5th Cir. 1994)……………………………...……………4, 75, 76, 80, 81

## STATUTES

11 U.S.C. § 330………………………………….………………...……...80

11 U.S.C § 330(a)(1)(A) & (B)……………………………….………………..……..74

11 U.S.C. § 330(a)(3)………………………………………………………………75

11 U.S.C. § 541(a)(7)…………………………………………….………...……………53

11 U.S.C. § 524(g)………………………………………………………………………36

11 U.S.C. § 524(g)(2)(B)(ii)(V)……………………………………………..……...……48

42 U.S.C. § 1988……………………………….………………………………..76

## OTHER AUTHORITIES

American Cancer Society, Inc., What is Asbestos?,
last visited Feb. 5, 2010, available at http://cancer.org/docroot/PED/content/
PED_1_3X_asbestos.asp?sitearea_PED……………………………...………………39

Bob Hoye, *Copper–Opportunities in the Base Metal Sector*, 321gold,
http://www.321gold.com/editorials/hoye/hoye112305.html
(last viewed Feb. 5, 2010)……………………………………...……………………..15

*Denver Post, ASARCO Bankruptcy deal will aid Denver Cleanup*,
http://www.denverpost.com/_headlines/ci_12862136
(last viewed Dec. 23, 2009)…..…………………………………………………...…..5

*Environmental News Service* newswire, *ASARCO Parent Pays $1.79
Billion in Record Environmental Bankruptcy Settlement*, http://www.ens-
newswire.com/ens/dec2009/2009-12-10-092.asp (last viewed Feb. 5, 2010)………..4

http://finance.yahoo.com/q/hp?s=PCU&a=03&b
=1&c=2009&d=03&e=15&f=2009&g=d (last viewed Feb. 5, 2010)……………...43

http://www.dailyfutures.com/metals/ (last viewed Feb. 5, 2010)…………………58

http://googlesightseeing.com/2005/10/20/casa-grande-copper-mine/
(last visited Feb. 5, 2010)……………………………………………..……22

http://www.provincequebec.com/chaudiere-appalaches/black-lake/
(last viewed Feb. 5, 2010)………………………………………………....…..…25

Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation ("SBEP" or "Applicant"), Counsel for the Official Committee of Asbestos Claimants (the "Asbestos Committee"),[1] respectfully applies for an enhancement of its fee for services rendered from the date of its retention as counsel for the Subsidiary Committee.  Applicant seeks a fee enhancement of twenty-five percent (25%) of lodestar for all services it rendered on behalf of the Subsidiary Committee and the Asbestos Committee, which amounts to an enhancement of $4,829,318.70 against lodestar fees of $19,317,274.78 through January 2010.

## I.   THE OUTSTANDING RESULTS OBTAINED IN ASARCO'S REORGANIZATION ARE DIRECTLY ATTRIBUTABLE TO APPLICANT'S CAREFULLY CONCEIVED AND WELL-TIMED ENGAGEMENT OF THE PARENT.

Not long ago, nearly all participants in the jointly-administered chapter 11 cases of ASARCO, LLC ("ASARCO")[2] and its affiliated debtors (with ASARCO, "ASARCO, *et al.*") were assembled in what amounted to two armed camps squaring off against each other.  A huge chasm separated the would-be combatants, whose mutual mistrust and divergent view of ASARCO's responsibilities seemed, at times, insurmountable.

---

[1]   Prior to the Asbestos Committee's formation, and subsequently, SBEP has represented the Official Committee of Unsecured Creditors of the Subsidiary Debtors (the "Subsidiary Committee"), which is part of the larger Asbestos Committee.  References below to the "Asbestos Committee" are to the Subsidiary Committee prior to the Asbestos Committee's formation and, subsequently to the Subsidiary Committee and the Asbestos Committee collectively unless specifically noted to the contrary.

[2]   As used herein, "ASARCO" refers to ASARCO LLC, successor by merger to ASARCO, Inc., formerly known as American Smelting and Refining Company.

One camp consisted of the "Parent"[3]—ASARCO Incorporated and Americas Mining Corporation ("AMC"), ASARCO's indirect parent companies, as well as its ultimate parent, the Mexican mining conglomerate, Grupo México. The Parent viewed ASARCO as existing largely for the Parent's own protection, an outlook that bred conflict with ASARCO, *et al.*'s creditors and quickly cast the Parent as an outsider in the reorganization case even though it owned all equity in ASARCO.

In the opposing camp were ASARCO, its environmental creditors,[4] financial creditors, and unions, all of whom were unimpressed by the Parent's stewardship of ASARCO in the years preceding bankruptcy.[5] This group had been conditioned over time to be deeply skeptical of the Parent's intentions and pronouncements, a mindset that, regrettably, was intensified by many developments in the chapter 11 case. The United States and a number of other environmental creditors had long been frustrated in their dealings with ASARCO under the Parent's stewardship. Financial creditors were affronted by what they regarded as the pillaging of ASARCO in the years prior to bankruptcy. ASARCO's relations with the unions representing most of its workforce were in tatters at the time of ASARCO's filing, having deteriorated

---

[3]   As used herein, "Parent" refers collectively to the affiliated entities under the Grupo México umbrella that own ASARCO directly or indirectly.

[4]   ASARCO's environmental creditor constituency included various agencies of the federal government, various agencies of numerous state governments, local government agencies, Indian tribes, and certain private environmental claimants. During the administration of the case, representatives of the United States Department of Justice generally undertook to speak to matters of common interest to the ASARCO, *et al.*'s environmental creditors, particularly governmental creditors.

[5]   Two financial creditors, two non-governmental environmental creditors, the United Steelworkers, and the Pension Benefit Guaranty Corporation comprised the membership of the Official Committee of Unsecured Creditors appointed in ASARCO's chapter 11 case (the "ASARCO Committee").

markedly on the Parent's watch.  For its part, the Parent at times seemed piqued that ASARCO's bankruptcy constrained its options.  In short, a lot of constituencies brought a lot of baggage into the reorganization case.

Asbestos creditors, however, traveled lighter.  Their focus was never on who would "win" the reorganization case.  Their participation in ASARCO, *et al.*'s reorganization was guided throughout by a solitary, singularly pragmatic objective: obtaining just compensation for their injuries.  Asbestos creditors were largely unconcerned with where the money to fund their recoveries came from, so long as it was adequate and reliable.  Their flexibility and relative detachment from the armed camps cast Applicant, as counsel to the Asbestos Committee, as the *only* participant in the case with any realistic prospect of bridging the divide.

As so it did.  With skill, tenacity, and delicacy, Applicant devised a strategy for bringing the Parent and its considerable resources credibly into the plan process.  Together with the FCR, it implemented its strategy at the pivotal moment, precisely when the Parent was most in need of a friend in Court.[6]  No other participant in the case could have accomplished this feat, which led, less than 6 months later, to confirmation of a Parent-sponsored plan that paid most creditors in full and provided, for asbestos creditors, a substantial payment toward their aggregate claim.

Applicant's extraordinary efforts were critically significant in achieving the rare and exceptional results in ASARCO, *et al.*'s reorganization that support the

---

[6]   Applicant had sought to "make friends" with Grupo México through negotiations on numerous prior occasions, in the process laying the groundwork for a deal when Grupo México was sufficiently serious about forging an alliance.

enhancement award sought by this application.  *See Transam. Natural Gas Corp. v. Zapata P'ship, Ltd. (In re Fender)*, 12 F.3d 480 (5th Cir. 1994); *Shipes v. Trinity Indus.*, 987 F.2d 311 (5th Cir. 1993).

Following a brief introduction in Part II, Part III of this application recounts in appropriate detail Applicant's substantial and constructive role in achieving the outstanding results obtained in ASARCO, *et al.*'s reorganization.

## II.   INTRODUCTION.

The view today from the summit of ASARCO, *et al.*'s reorganization is breathtaking by almost any measure.  The trust established for ASARCO, *et al.*'s legions of asbestos victims has been capitalized with nearly a billion dollars, to be supplemented by further asbestos insurance recoveries.  Environmental creditors have fared well, too, with $1.79 billion having been paid to fund clean-up and restoration in "the largest environmental bankruptcy in U.S. history."[7]  Bond and trade claims have been fully paid with interest.

Superlatives abound.  This Court has remarked on "[t]he remarkable success of this bankruptcy case resulting in the generation of $1.4 billion in cash and two competing plans of reorganization which pay creditors in full with interest … ."[8] Judge Hanen concurred with this Court's characterization, describing the case as "one

---

[7]   *Environmental News Service* newswire, *ASARCO Parent Pays $1.79 Billion in Record Environmental Bankruptcy Settlement,*  http://www.ens-newswire.com/ens/dec2009/2009-12-10-092.asp  (last viewed Feb. 5, 2010).

[8]   Amended and Supplemental Report and Recommendation for Entry of Findings of Fact and Conclusions of Law on Plan Confirmation, Docket No. 12844 at 46 (Sept. 11, 2009).

of the most successful bankruptcy proceedings in recent history."[9]  Colorado's attorney general acknowledged the reorganization as "exceptional."[10]

Many convergent factors account for the extraordinary success of ASARCO, *et al.*'s reorganization.  One, of course, has been the generally favorable market for ASARCO's main product, copper, during the pendency of the case.  Apart from late 2008 through early 2009, which coincided with the worst of the global economic downturn, copper prices have been historically strong, buoyed by global demand, especially from China.  The prevailing strength of the copper market, in combination with other factors, allowed ASARCO to amass roughly $1.4 *billion* in cash while in bankruptcy—a tidy sum that figured materially in the full payment of most creditors' claims with interest.

It might not have been so.  Bad business decisions during the administration of the case that might have materially inhibited ASARCO's ability to exploit the favorable copper market were avoided.  Of crucial significance, too, was the copper market's resurgence in the spring and summer of 2009, following quickly on the heels of late 2008's sharp decline.  Other factors undoubtedly played a role, like ASARCO's estate-employed professionals whose performance was, almost without exception, consistent with the Court's appropriately high standards and expectations.

---

[9]   Memorandum Opinion, Order of Confirmation, and Injunction, *In re ASARCO LLC, et al.*, Case No. 09-CV-177 (S.D. Tex., Nov. 13, 2009) (Docket No. 79 at 4, the "Confirmation Order").

[10]   *Denver Post*, *ASARCO Bankruptcy deal will aid Denver Cleanup*, http://www.denverpost.com/ headlines/ci_12862136 (last viewed Dec. 23, 2009) and available in the *Denver Post*'s online archives as of January 26, 2010, for a nominal fee.

Still, Applicant's role in this extraordinary case stands out.  At several critical junctures—forks in the road that in hindsight were highly consequential—Applicant consistently charted the optimal path, strategically steering the case toward the result now being uniformly lauded.  Applicant's initiatives were not always popular.  Its engagement of the Parent, for example, subjected Applicant to criticism and the risk that funding of its fees might be in jeopardy despite benefiting the estate and creditors generally.

It was clear from the outset that asbestos creditors faced a daunting challenge if they were ever to be appropriately or even meaningfully compensated for their injuries.  When ASARCO's asbestos-entangled subsidiaries[11] sought bankruptcy protection in April 2005, they had almost no assets.  Unless ASARCO could be adjudicated as alter ego of these entities, asbestos creditors were almost certain to get nothing apart from insurance recoveries in prospect.  Further, given ASARCO's liquidity issues and other pressing problems prior to its own bankruptcy filing in August 2005, it was not then obvious that asbestos creditors would fare much better even if ASARCO's status as alter ego of its asbestos subsidiaries were successfully established.

Undeterred, Applicant—in collaboration with counsel for Future Claimants Representative Robert C. Pate (the "FCR")—built the alter ego case against ASARCO from the ground up.  It dispatched numerous lawyers to an Arizona warehouse in the summer of 2006 to sift through a literal mountain of corporate

---

[11]   The "Subsidiary Debtors" as more precisely defined below.

records of ASARCO, *et al.* that had accumulated for more than a century.  Working with lawyers from the firm of Oppenheimer, Blend, Harrison + Tate, Inc. (the "Oppenheimer Firm"), counsel for the FCR, Applicant's lawyers spent months sorting through millions of disorganized documents culled from thousands of boxes, painstakingly compiling the evidence to establish ASARCO's direct and indirect liability to asbestos creditors.

Later, after amassing an evidentiary *tour de force* attesting to ASARCO's alter ego status, Applicant and the Oppenheimer Firm summarized their findings in a presentation to ASARCO's board.  This foreboding glimpse of ASARCO's pervasive entanglement in the affairs and operations of its asbestos subsidiaries was subsequently shared with representatives of Grupo México.  It was the meticulous work undertaken by Applicant and the Oppenheimer Firm that validated asbestos creditors' status as a major constituency in ASARCO, *et al.*'s reorganization.

It bears noting, parenthetically, that most of Applicant's lodestar fee over the course of the 4+ years of ASARCO, *et al.*'s reorganization was funded by cash from insurance settlements originally intended to satisfy asbestos claims.  It was only after this source of funding was exhausted, largely as a result of the substantial costs incurred in reconstructing ASARCO's asbestos history from the documents in Arizona, that ASARCO began funding Applicant's fees.  Had Applicant's efforts and those of the FCR and his counsel not met with success, there would have been virtually nothing left for ASARCO, *et al.*'s asbestos victims.

Another watershed in the case was the mediation before Honorable Elizabeth W. Magner, which got underway in October 2007 and continued into 2008. Applicant was a major participant, given that the mediation had originally been intended to address only ASARCO, *et al.*'s asbestos liabilities. What came to be known as the Magner mediation was soon expanded to include ASARCO's major environmental creditors, and it ultimately morphed into negotiation of a consensual plan. The template that emerged from the Magner mediation—an agreement in principle between asbestos and environmental creditors—would have concluded the case but for **Sterlite (USA), Inc.**'s ("Sterlite") later breach of the initial Purchase and Sale Agreement.

Sterlite's breach in October 2008, coinciding with general, global economic upheaval and a free fall in copper prices, inspired panic in some quarters as ASARCO and its creditor constituencies groped for a viable alternative to the Sterlite transaction. The approach favored by ASARCO, the ASARCO Committee, bondholders, and environmental creditors was a re-traded sale of ASARCO, *et al.*'s operating assets to Sterlite for greatly reduced consideration—barely $1 billion compared to the $2.6 billion Sterlite had previously contracted to pay.

Applicant, working with counsel for the FCR, helped to forestall an improvident fire sale to Sterlite at a time when copper prices were hovering near their nadir. Applicant ambitiously pursued other alternatives, including a "stand alone" plan that would have avoided an immediate sale of ASARCO, *et al.*'s operating assets, thereby allowing creditors to benefit from the copper market's inevitable recovery.

Creditors would also have retained two huge litigation claims, enhancing the appeal of the stand-alone option:  against Sterlite for its prior breach, and against the Parent in connection with the Brownsville Litigation.

Meanwhile, Applicant carefully laid the groundwork for what was perhaps the most promising alternative and the one that ultimately carried the day—a plan sponsored by the Parent.  Applicant, along with the FCR and his counsel, recognized that future developments in the Brownsville Litigation could spur the Parent into becoming an earnest participant in the plan process.  Even when there was only a liability finding in the Brownsville Litigation and speculation about the amount of the Parent's liability was all over the map, Applicant missed no opportunity to engage the Parent in furtherance of coaxing it seriously into the plan process.  Applicant's Sander L. Esserman, often accompanied by one or more members of the Asbestos Committee, the FCR, and/or the FCR's counsel, assiduously met with representatives of Grupo México in New York City, Los Angeles, Chicago, and the Dallas-Fort Worth Airport during 2008 and into 2009, maintaining lines of communication and urging the Parent to commit significant resources to ASARCO, *et al.*'s reorganization.

Then came a "major game changer."[12]  In April 2009, Judge Hanen entered his ruling on damages in the Brownsville Litigation.  It was a "home-run" for ASARCO.  To Applicant, it was clear that Grupo México *had* to make a play to retain

---

[12]   Commenting on the judgment in the Brownsville Litigation that had just been handed down, Mr. Esserman referred to it as "a major game changer."  He expressed hope that it would spur the Parent pro-action in the plan process, noting that "the parent has incredible incentive right now to put together something."  Hrg. Transcr., 145:22-146:8 (Apr. 13, 2009).

ASARCO and would need a friend in court.  In Applicant's view, the Parent simply could not risk losing ASARCO and being stuck with the staggering Brownsville judgment.  At last, there was a definitive opening, a catalyst spurring the Parent to action.

Applicant, with the FCR and his counsel, seized the opportunity.  Their respective clients entered into an agreement in principle with the Parent on or about April 12, 2009, pursuant to which they provisionally agreed to support a Parent-sponsored plan that made acceptable provision for asbestos creditors and provided significant recoveries for other creditors.[13]  With that, the Parent seriously embraced the plan process as never before, culminating in the confirmation of a Parent-sponsored plan just 6 months later that provided a substantial payment to asbestos creditors and paid most other creditor claims in full with interest.

Despite having thrown early support to the Parent, Applicant continued to press for a better deal for asbestos creditors and the estate generally.  Exercising fiduciary outs, the Asbestos Committee and the FCR endorsed an improved Sterlite-sponsored plan, and then later agreed to support both the improved Sterlite plan and a further improved Parent plan.  Even at the confirmation hearing, Applicant continued negotiations—with delicacy, in light of the Asbestos Committee's agreement to support both plans—by successfully urging both Sterlite and the Parent to further improve their respective plans for the benefit of all creditors.  In the end,

---

[13]   Notice of Filing of Redacted Agreement in Principle between the Official Committee of Asbestos Claimants, Future Claims Representative Robert C. Pate, Americas Mining Corporation, and ASARCO Incorporated, Docket No. 10873 (Apr. 17, 2009).

the Parent's plan prevailed.  Asbestos creditors received a substantial settlement and, as noted, most creditors got paid in full with interest.  The Parent retained its equity in ASARCO.  And a chorus of voices was lauding "one of the most successful bankruptcy proceedings in recent history."[14]

### III.   APPLICANT'S DYNAMIC AND PIVOTAL ROLE IN THE REORGANIZATION OF ASARCO, *et al.*

**A.    Staring into the Abyss:  ASARCO, *et al.*, on the Cusp of Chapter 11.**

With the ink just dry on the orders confirming that plan, one could forget just how elusive reorganizational success appeared to be just a few short years ago.  The Court hasn't forgotten, however, remarking at the end of the confirmation hearing that

> the case began with an extremely troubled company with little hope of reorganization.  And I don't think anyone would—in fact, I think everyone would have thought at that time that the case would probably at best pay pennies on the dollar to creditors.[15]

In the months prior to its August 9, 2005, bankruptcy filing, ASARCO's reorganizational prospects seemed bleak indeed.  The company had little or no liquidity.  Its costs of production were high relative to competitors, even exceeding the price of copper at times.  Obsolescent plant and equipment figured into ASARCO's relatively high cost structure.  Labor problems and management issues created an atmosphere of poor morale, exacerbating productivity problems.

---

14    See footnote 9 *supra.*

15    Hrg. Transcr., 163:8-12 (Aug. 25, 2009).

ASARCO was a company very much on the ropes.  Liquidation—not reorganization—seemed the likely endgame.

Five of ASARCO's wholly-owned direct or indirect subsidiaries sought refuge in chapter 11 on April 11, 2005.  The legacies of these "Subsidiary Debtors"—known by the acronyms LAQ and CAPCO[16]—are infamous, destructive, lethal, and still playing out in consequence of the latency periods associated with various asbestos diseases.  Toxic asbestos was the Subsidiary Debtors' stock-in-trade.  LAQ debuted as an operating asbestos mining concern in 1952 with the development of a mine in Quebec.  It rapidly became a major North American producer of asbestos.  CAPCO got started in 1963 as a manufacturer of cement asbestos pipe, which it produced at two locations in the United States and sold to a wide market.  ASARCO's history is similarly tainted by the asbestos scourge; as noted, Applicant pieced together a considerable volume of evidence post-petition attesting to ASARCO's status as alter ego of both CAPCO and LAQ.

Pre-petition, an ad hoc committee of asbestos victims of the Subsidiary Debtors—the Asbestos Committee's unofficial precursor—was formed and convened for the first time in 2004.  The scene it surveyed appeared virtually hopeless.  LAQ and CAPCO had no operations and were almost completely bereft of assets, apart from a little cash from insurance settlements that was nominal given the scope and duration of their historical, asbestos-related activities.  These far-flung

---

[16]   The Subsidiary Debtors were Lac d'Amiante du Québec Ltée (f/k/a Lake Asbestos of Quebec, Ltd.); Lake Asbestos of Quebec, Ltd.; and LAQ Canada, Ltd. (referred to collectively as "LAQ"); and CAPCO Pipe Company, Inc. (f/k/a Cement Asbestos Products Company); and Cement Asbestos Products Company (referred to collectively as "CAPCO").

activities had given rise to vast asbestos liabilities.  At first blush, there appeared to be few assets available to satisfy the mounting claims of asbestos victims.

ASARCO funded the pre-petition asbestos committee, whose professionals struggled constantly to get paid.[17]  ASARCO, a severely failing company at the time, was nearing its own tipping point.  There had been some thought to confining the formal reorganization process to the Subsidiary Debtors, but ASARCO's hastening decline made that impossible.  ASARCO itself sought refuge in chapter 11 just four months after the Subsidiary Debtors.

Asbestos creditors' prepetition settlement opportunities were altogether unimpressive.  At an October 2004 meeting in Dallas, ASARCO offered the ad hoc asbestos committee approximately $17 million cash plus an insurance pittance and a small boost from a copper price-driven option to just "go away."  This token proposal was orders of magnitude less than the nearly $1 billion flowing to asbestos creditors under the confirmed plan four years later.  There was little cause for optimism in early 2005, however, and the conundrum posed by ASARCO, *et al.*'s tremendous asbestos liabilities and bleak fiscal circumstances presented a challenge of extreme risk and complexity.  Still, it was an opportunity that Applicant, as counsel for the pre-petition asbestos committee, embraced fully.

The table was being set to adjudicate ASARCO as LAQ's and CAPCO's alter ego even before the former consigned itself to chapter 11.  In June 2005, ASARCO had sued the Subsidiary Debtors seeking a declaration that it was not liable to

---

[17]    Pre-petition, ASARCO's own counsel, Baker Botts, LLP ("Baker Botts") shared this struggle.

creditors of LAQ and CAPCO for anything and bore no financial responsibility for damages associated with asbestos claims.[18]  The Asbestos Committee's first bold initiative after ASARCO initiated this adversary proceeding was, in tandem with the FCR, to seize the reins of this fledgling litigation.  The Asbestos Committee and FCR each filed motions to intervene, requesting realignment of the parties and authority to prosecute the litigation on behalf of the Subsidiary Debtors' estates.[19]  Upon stipulation, the Court entered an agreed order in April 2006 granting such relief.  The Asbestos Committee and FCR were henceforth denominated "plaintiffs" and proceeded to prosecute the adversary on behalf of the Subsidiary Debtors' estates.[20] They filed an amended complaint seeking a declaration that ASARCO was liable for asbestos claims asserted against LAQ and CAPCO based on alter ego theories.[21]

**B.     ASARCO, *et al.*'s Reorganization at Inception.**

### 1.     *Labor Unrest Virtually Halts ASARCO's Production of Copper.*

The prospect of vast alter ego liability to the Subsidiary Debtors' creditors was a severe problem for ASARCO, but not the only one confronting it at the time of its bankruptcy filing.  Labor unrest was the problem that most acutely steered ASARCO into chapter 11.  In early July 2005, approximately 1,500 unionized miners and other

---

[18]    Complaint for Declaratory Judgment (Docket No. 1 in Case No. 05-2048) (June 15, 2005).

[19]    Motion of the Official Committee of Unsecured Creditors in the Subsidiary Debtors' Chapter 11 Reorganizations to Intervene as Realigned Party Plaintiff and for Authority to Prosecute Claims and Causes of Action on Behalf of Subsidiary Debtors' Estates (Docket No. 8 in Case No. 05-2048) (Sep. 2, 2005).

[20]    Stipulation and Agreement Regarding the Prosecution of Alter Ego Claims on Behalf of the Asbestos Subsidiary Debtors' Estates (Docket No. 46 in Case No. 05-2048) (Apr. 25, 2006).

[21]    Amended Complaint Realigning Parties and Seeking to Hold ASARCO, LLC, Liable for Tort Liabilities of the Subsidiary Debtors (Docket No. 51 in Case No. 05-2048) (May 9, 2006).

workers—about 70% of ASARCO's workforce—struck.  The work stoppage was especially acrimonious and lasted for months.[22]  For ASARCO, the timing couldn't have been worse.  In 2005, between July and November—precisely when ASARCO's copper production was mostly sidelined as a result of the strike—copper "enjoyed a terrific rally."[23]  One observer characterized the upward movement of copper prices during that period as "historically remarkable."[24]  To be sure, ASARCO did seek to maintain a semblance of production using salaried workers, a few non-union employees who crossed picket lines, and a handful of replacement workers, but the strike severely compromised its ability to exploit the recovering copper market and shore up its cash position.[25]

### 2.    The Strike Highlights Conflicts in ASARCO's Corporate Governance that Applicant Undertakes to Address.

The protracted labor unrest drew attention to a problem with ASARCO's board, which at the time was controlled by Grupo México.  ASARCO, *et al.*'s creditor constituencies concluded early in the administration of ASARCO's chapter 11 case that some manner of change was needed based on their shared concern that

---

[22]  The union characterized management's labor relations policy as antagonistic, claiming it included elimination or alteration of promised retiree health care benefits.  ASARCO was seeking financial concessions that the union regarded as "massive" at a time when the market for copper was strengthening.  The vote to approve the strike was nearly unanimous.  Report and Recommendation for Entry of Findings of Fact and Conclusions of Law on Plan Confirmation, Docket No. 12748, ¶12 (Aug. 31, 2009).

[23]  *See*  Bob  Hoye,  *Copper–Opportunities  in  the  Base  Metal  Sector*,  321gold, http://www.321gold.com/editorials/hoye/hoye112305.html (last viewed Feb. 5, 2010).

[24]  *Id.*

[25]  Motion for Order (1) Approving Settlement Agreement with Labor Unions, (2) Authorizing Debtor to Honor Interim Collective Bargaining Agreements, as Amended, and (3) Staying Arizona Litigation, Docket No. 852, ¶ 8 (Nov. 8., 2005).

ASARCO's board was not consistently acting in the best interest of creditors. Applicant, on the Asbestos Committee's behalf, and other creditor constituencies proceeded in complementary fashion to address this problem swiftly and constructively.  Needed adjustments to ASARCO's corporate governance were implemented, partly as a result of Applicant's efforts, with the Parent's consent.  The importance of the consensual resolution cannot be understated; had the Parent contested changes, reorganizational progress would likely have been stunted for an extended period.

The ASARCO Committee initiated the push for governance changes on November 21, 2005, via an emergency motion asking the Court to appoint Douglas McAllister, ASARCO's Vice President, General Counsel and Secretary, as its chief restructuring officer.[26]  On the following day, the Asbestos Committee filed its own emergency motion seeking Mr. McAllister's appointment as a responsible person with full decision-making authority, including the authority to hire, with the Court's approval, an independent chief restructuring officer and a chief operating officer.[27]

At that time, ASARCO's sole director was a Grupo México appointee.  Grupo México, however, owned other subsidiaries with interests in copper mines, most notably Southern Peru Copper Corp. n/k/a Southern Copper Corp. ("SPCC"), which the Brownsville Litigation was to later adjudicate had been obtained by way of

---

[26]   Emergency Motion for Appointment of a Chief Restructuring Officer, Docket No. 974 (Nov. 21, 2005).

[27]   Emergency Motion of the Official Committee of Unsecured Creditors of the Subsidiary Debtors to Appoint Doug McAllister as Responsible Person for Debtor-in-Possession, Docket No. 978 (Nov. 22, 2005).

a fraudulent transfer from none other than ASARCO.[28]  Overlapping board

memberships of ASARCO with other companies under the Grupo México umbrella,

including SPCC, raised potentially troublesome issues that needed to be addressed.

Both committees had been frustrated by ASARCO's inability to resolve the

disastrous work stoppage.  The strike, which began July 4, 2005, dragged on until

November 8, 2005, when intense negotiations finally resulted in a breakthrough

"interim agreement" that, in addition to ending the strike, reinstated the expired

collective bargaining agreement (CBA) through the end of 2006.  Production at

ASARCO's facilities resumed in earnest—none too soon, given the company's acute

liquidity problem.  The Court approved the interim agreement in mid-November.[29]

Prompted mostly by the committees' emergency motions seeking to put Mr.

McAllister in charge, the Parent agreed to a "Corporate Governance Stipulation"

acceptable to the major creditor constituencies, which was approved by the Court in

mid-December.[30]  Pursuant thereto, two independent directors, H. Malcolm Lovett,

Jr., and Edward R. Caine, were appointed to ASARCO's board and Mr. McAllister

was appointed as ASARCO's Interim Chief Executive Officer until the newly-

constituted board could determine whether he should be retained in that capacity.[31]

---

[28]   Grupo Minera México was another Grupo México subsidiary with a copper mining concession.

[29]   Order Approving Settlement Agreement with Labor Unions, Authorizing Debtor to Honor Employee Retiree Benefit and Pension Plan Obligations Under Collective Bargaining Agreements, as Amended, and Staying Arizona Litigation, Docket No. 909 (Nov. 14, 2005).

[30]   Stipulation and Order Regarding Corporate Governance, Docket No. 1223 (Dec. 15, 2005).

[31]   Following a search that began in late 2005, Joseph Lapinsky was selected as ASARCO's Chief Executive Officer and President, and Thomas S.Q. Yip became its Chief Financial Officer.  Mr. McAllister was retained as Executive Vice President, General Counsel and Secretary, reporting directly to Mr. Lapinsky.  The Asbestos Committee has high regard for Mr. Lapinsky's

### 3. *ASARCO's New Leadership Moves Swiftly to Address Pressing Problems.*

ASARCO's reconstituted leadership wasted little time in addressing the company's lingering labor issues. With the interim agreement that ended the strike set to expire December 31, 2006, ASARCO returned to the bargaining table in August 2006 to work out a new CBA with its unions. An understanding on key terms of a new CBA was reached just before Christmas. Negotiations continued, and the parties reached a final agreement January 6, 2007. ASARCO filed a motion to approve the new CBA later that month, which the Court approved as modified by stipulations of the parties in mid-March.[32] The new CBA was set to expire on June 30, 2010.

With a new CBA in place, diligently and timely negotiated by new leadership the Asbestos Committee had a hand in installing, ASARCO avoided any notable labor difficulties throughout the pendency of its chapter 11 case. The significance of this proved tremendous, as ASARCO was able to proceed undeterred to exploit a highly favorable copper market, amassing substantial cash from operations that figured prominently in its reorganizational success.

Additionally, under its new leadership, ASARCO expanded the compensation and retention programs so critical to a firm in a competitive industry, especially one

---

stewardship of ASARCO during his tenure, and credits the ASARCO Committee's counsel, Paul Singer of Reed Smith, for recommending Mr. Lapinsky to ASARCO's board and other stakeholders.

[32] Motion for Order Approving New Collective Bargaining Agreement with Unions, Including Monetary Obligations Thereunder, Pursuant to 11 U.S.C. §§ 363(b) and 105(a), Docket No. 3617 (Jan. 22, 2007); Order Approving, Docket No. 4179 (Mar. 15, 2007).

obliged to operate within the confines of chapter 11 for an extended period. ASARCO's new board and management team also worked with creditor constituencies to develop an expanded capital expenditure program and implement a revised mine plan, both critical to improving production levels and efficiencies that had been so problematic to ASARCO's prepetition operations.  Applicant's efforts, on behalf of the Asbestos Committee, working in tandem with the ASARCO Committee and the FCR, were an important catalyst for many salutary changes that enhanced ASARCO's reorganizational prospects.

**C.**     **A Phoenix Rises:  the Alter Ego Case Looms Large in the Arizona Desert.**

As noted above, ASARCO filed a complaint prior to its own bankruptcy seeking a declaration that it was not liable with respect to asbestos personal injury claims asserted against LAQ and CAPCO.  This filing, an adversary proceeding in the Subsidiary Debtors' jointly administered bankruptcy cases, became known informally as the alter ego litigation.

> ***1.***     ***The backdrop for the expedition to Arizona that reconstructed ASARCO's asbestos history from millions of disparate, decaying documents.***

In Spring 2006, with the strike settled and corporate governance issues largely resolved, the alter ego litigation became a focal point in the reorganization case. Applicant was centrally involved in all its aspects.  First, there had been the threshold question of who would prosecute the alter ego claims against ASARCO on behalf of the Subsidiary Debtors' estates.  A stipulation approved by the Court in April 2006

supplied the answer.[33]  ASARCO, the Subsidiary Debtors, the Asbestos Committee, and the FCR agreed, and the Court concurred, that the Asbestos Committee and the FCR would take the lead in prosecuting the alter ego case on behalf of the LAQ and CAPCO estates.  The stipulation effected a realignment of the parties, with the Asbestos Committee and FCR (sometimes collectively referred to as "Plaintiffs" below) formally designated as plaintiffs in the alter ego litigation.

Plaintiffs immediately directed their energies to obtaining critical discovery from ASARCO.  Documents—ASARCO's documents, especially—were critical to the alter ego litigation because there were few surviving witnesses who could offer relevant factual testimony.  LAQ, after all, had come into existence at the height of the Korean War.  CAPCO hit the scene the year President Kennedy was assassinated.  Applicant had recognized from the beginning that the story of ASARCO's entanglement with LAQ and CAPCO—and the adversary proceeding to determine whether asbestos creditors would receive meaningful compensation for their injuries—would have to be developed, told, and adjudicated largely on the documentary record.  That record was almost entirely in ASARCO's possession, custody, and control.[34]  Indeed, ASARCO even controlled the historical corporate records of LAQ and CAPCO, the very entities on whose behalf Plaintiffs were prosecuting the alter ego litigation.

---

[33]  See footnote 20 *supra.*

[34]  Plaintiffs also sought document discovery from ASARCO's principal banker, JPMorgan Chase Bank, N.A., among other third parties.

Applicant, with the Oppenheimer Firm, prepared and served ASARCO with initial written discovery requests, including all-important requests for production, on May 12, 2006.  It was ASARCO's position, expressed during a hearing that day, that it would be virtually impossible for ASARCO to review and produce its own documents because it would take too much time and entail too great an expense to go through them.[35]

On a second front, ASARCO had filed a motion that March seeking to estimate its derivative asbestos liabilities.  ASARCO steadfastly maintained that it had never been in the asbestos business and its derivative asbestos liabilities were therefore nominal.[36]  ASARCO sought entry of a case management order establishing a very short timetable for the estimation.[37]  This would have made it difficult for Applicant and the Oppenheimer firm to sift through ASARCO's documentary leviathan and cull the evidence that confirmed ASARCO was indeed the alter ego of LAQ and CAPCO.  The Court heard arguments with respect to ASARCO's estimation motion on May 12, but deferred its ruling, urging the parties to negotiate consensual discovery protocols and deadlines for incorporation into an eventual case management order.

---

[35]  Hrg. Transcr., 44:13-20 (May 12, 2006).

[36]  Notably, despite the enmity that generally characterized the Parent's relationship with ASARCO post-petition, Grupo México concurred in the view that ASARCO's asbestos liabilities were, essentially, zero.

[37]  ASARCO LLC's Motion to Estimate Derivative Asbestos Liabilities and for Entry of Case Management Order Establishing Procedures for Such Estimation.  Docket No. 1887 (Mar. 24, 2006).

The ensuing negotiations made it clear to Applicant and the Oppenheimer Firm that they had little choice but to roll up their sleeves and spend most of Summer 2006 in southern Arizona. Essential document discovery could not be deferred, even if moving forward entailed plowing through an epic accumulation of corporate documents. The Parties spent several weeks that spring coordinating informal information exchanges. In late June, they agreed to the Sacaton Protocol Agreement, stating generally ASARCO's non-intention to waive privileges with respect to documents that would be made available for Plaintiff's examination in Arizona.[38]

On June 26, 2006, a compromise was reached with respect to ASARCO's estimation motion.[39] The parties to the alter ego litigation agreed to procedures and a schedule for resolving ASARCO's derivative asbestos liability and the aggregate amount of such liability as a contested matter. This compromise required all fact discovery to be completed by December 1, 2006—a challenging deadline for Plaintiffs in the face of what appeared to be looming. But it was not until June 29 that Applicant and the Oppenheimer Firm got a definitive sense of the ordeal that awaited them. That day, ASARCO's representatives led them on a tour of ASARCO's various Arizona document repositories. Applicant learned that the

---

[38]   Sacaton, along Interstate 10 between Tucson and Phoenix, is a barren, forbidding, largely uninhabited place. Desert sequences for the 1999 satirical Gulf War drama *Three Kings*, starring George Clooney, were filmed there. *See* http://googlesightseeing.com/2005/10/20/casa-grande-copper-mine/ (last visited Feb. 5, 2010). It was the site of ASARCO's primary document storage facility, not so much a "repository" as a series of cavernous warehouses adjacent to an abandoned open-pit copper mine.

[39]   Motion Approving Compromise and Settlement Regarding Resolution of Derivative Asbestos Claims, Docket No. 2395 (June 27, 2006).

repositories actually consisted of a number of facilities in Phoenix and the desert town of Sacaton, which collectively housed approximately 40,000 boxes containing millions of pages of ASARCO, *et al.*'s corporate records.  The boxes were neither reliably labeled nor meaningfully organized; ASARCO did not provide Plaintiffs with any manner of index to the boxes or the documents they contained.

ASARCO's document strategy put Applicant and the Oppenheimer Firm to the task of reconstructing ASARCO's asbestos history.  It required them to commit personnel to go through every decrepit box and separate the documentary wheat from the chaff.  Applicant accepted the Herculean task and, mindful of the December 1 deadline, dispatched lawyers to Arizona without delay.[40]

### 2.    *Noses to the grindstone and pedals to the metal.*

It was in early August 2006 that teams of lawyers from Applicant and the Oppenheimer Firm descended on ASARCO's warehouse on the outskirts of Phoenix, which became an unlikely beehive of activity for two full months.  The combined teams consisted of 8 to 12 lawyers per week.[41]  Collectively, they opened and conducted an initial review of the contents of every box there.  These efforts

---

[40]   The Phoenix facility where most of the documents were reviewed was equipped with "blowers"—not air conditioning—that maintained the warehouse temperature at about 90° F. Lawyers from Applicant and the Oppenheimer Firm subsequently spent several days in Sacaton flagging additional boxes for shipment to Phoenix.

[41]   Counsel worked closely with representatives of L Tersigni Consulting, P.C. ("LTC"), which Plaintiffs had employed as their financial advisor, later succeeded in that role by Charter Oak Financial Consultants, LLC, with significant continuity in personnel.  Plaintiffs' financial advisor, in addition to being present and engaged in the initial phase of document review in Phoenix, was extensively involved in the subsequent review and analysis of documents obtained from ASARCO, particularly those related to the financial arrangements and misdealings between ASARCO and the Subsidiary Debtors.

identified approximately 3,200 boxes that contained, or appeared upon preliminary inspection to contain, information relevant to the alter ego litigation. Plaintiffs had the contents of these culled boxes—approximately 3 million pages—digitally scanned for more thorough review and organization into evidentiary use.

During the fall of 2006 and into 2007, Applicant and the Oppenheimer Firm each committed larger teams of people—12 to 18 lawyers per week—devoting most of their professional time to more in depth review, analysis, and organization of the digitized documents. Relevant documents were noted and categorized by the issues to which they related, and organized into an evidentiary picture of ASARCO's pervasive involvement with asbestos.[42]

### 3. The story told by ASARCO's own documents of its extraordinary entanglement with LAQ and CAPCO and the asbestos industry generally.

The documents compiled from ASARCO's warehouses tell the story of ASARCO's international asbestos enterprise and demonstrate that it was ASARCO itself—not merely its subsidiaries—that was a key player in the global asbestos industry. The story starts with ASARCO's intimate involvement in the start-up ventures that became LAQ and CAPCO, financial and otherwise, and its long-term entanglement in their activities. In includes the long shadow ASARCO sought to cast

---

[42]   Along the way, issues arose. Among the more noteworthy, it took a motion to compel against ASARCO, *et al.*, for Plaintiffs to be afforded complete access to the Subsidiary Debtors' own documents—an odd necessity, given that Plaintiffs were championing the rights of the Subsidiary Debtors' creditors by prosecuting the alter ego litigation on behalf of the Subsidiary Debtors' estates. Another point of contention stemmed from indications that some of ASARCO, *et al.*'s historical accounting records were tied up in an old database that was never produced, necessitating a further motion to compel.

in the asbestos community until personal injury lawsuits started flaring up in the
1970s.  The story ends with ASARCO's desperate efforts to dodge the derivative
liability bullet despite having loaded the gun, cocked the hammer, turned the weapon
on itself, and pulled the trigger.  Along the way, ASARCO sought to leave the history
of its asbestos activities to decay in the desert where it would have remained but for
the efforts of Applicant and the Oppenheimer Firm to piece it all back together.

        a.      <u>ASARCO's role in the start-up venture that became LAQ</u>.

ASARCO, the documents show, wanted to get into the asbestos business in
the early 1950s.  It conducted a thorough market survey and felt assured that an
asbestos venture would be commercially successful.[43]  ASARCO obtained
exploratory rights to Black Lake in Quebec[44] in 1952, using its engineers to evaluate
the site's potential for asbestos mining.[45]  It did extensive exploratory drilling,
negotiated contracts that its legal department drafted and that ASARCO itself

---

[43]    Memorandum from V. I. Mann, to R. F. Goodwin, Re: United Asbestos Corporation Ltd. Black
Lake, Quebec, Canada of Jan. 18, 1952, BR1026434-BR1026435, at -35.; memorandum from R.
F. Goodwin, to R. W. Straus, Re: United Asbestos Company Province of Quebec of Mar. 5,
1952, BR1026390-BR1026392; letter from Goodwin, All America, to Mining Department, A. S.
& R. Co., of May 7, 1952, BR1026334-BR1026338 (enclosing copies of telegram correspondence
regarding investigations).

[44]    Black Lake is a borough in the City of Thetford-Mines in the Chaudière-Appalaches
administrative region of Quebec.  It was officially named after the nearby lake, no longer in
existence, which appeared black when the adjacent mountain cast a shadow on its waters at dusk.
*See* http://www.provincequebec.com/chaudiere-appalaches/black-lake/ (last viewed Feb. 5,
2010).

[45]    Letter from M. W. Hotchkin, Asarco Exploration Company of Canada, Limited, Vice President
and Managing Director, to C. E. Prior, American Smelting and Refining Co., of Jan. 30, 1952,
BR1026430; letter from C. E. Prior, to Steve Ogryzlo, Re: Quebec – Asbestos of Feb. 20, 1952,
BR1026426; letter from C. E. Prior, American Smelting and Refining Company, Resident
Engineer, to R. F. Goodwin, American Smelting and Refining Company, Vice President, Re:
Quebec – United Asbestos of May 8, 1952, BR1026333.

guaranteed, and procured the necessary deeds.[46]  Then ASARCO proceeded to

reroute a river and a railroad, relocate a highway, erect dams, and drain the lake—

Black Lake—that its coveted asbestos lay beneath.[47]  In the process, 36 million cubic

yards of earth were dredged pursuant to a contract that ASARCO negotiated and

guaranteed.[48]  In the process, ASARCO spent $36 million of its own money to add

asbestos to its product line.[49]  The phrase "ASARCO asbestos" appeared in

ASARCO's publications, brochures, and discourse—internal and public—with the

---

[46]  Agreement, dated Sep. 17, 1952, executed by United Asbestos Corporation Limited, Lake Asbestos of Quebec, Ltd., and American Smelting and Refining Company, BR1252544-BR1252578 (legible conformed copy); agreement, dated Sep. 17, 1952, executed by United Asbestos Corporation Limited, Lake Asbestos of Quebec, Ltd., and American Smelting and Refining Company, BR0093280-BR0093328, at -311-312 (original, portions illegible); letter from G. A. Brockington, to H. Smith, of Sep. 23, 1952, BR2386703-BR2386704, at -04; letter from Harry Smith, American Smelting and Refining, to C. E. Prior, re: Agreement with Continental Asbestos of Jan. 28, 1954, BR1518101; agreement, dated Oct. 30, 1952, executed by Construction Aggregates Corporation, and ASARCO, SC010263-SC010265.

[47]  *See* BR2581724-BR2581725; Letter from Eugene P. Florsheim, Construction Aggregates Corp., Secretary, to John F. O'Connor, American Smelting and Refining Company, dated May 11, 1954; BR2394637 (transmitting a fully executed copy of the contract between Construction Aggregates and LAQ, together with the executed letter agreement by ASARCO guaranteeing performance); contract dated May 10, 1954, executed by Construction Aggregates Corporation and Lake Asbestos of Quebec, Ltd., BR2394638-BR2394674 (conformed copy).

[48]  Memorandum from R. Worth Vaughn, AS&R, to R.F. Goodwin, Re: Proposed Agreement Between Lake Asbestos of Quebec, Ltd. and Construction Aggregates Corporation of April 29, 1954, BR1024968; Letter from American Smelting and Refining Company, to Construction Aggregates Corporation, of May 10, 1954, BR1024969 (showing draft of letter agreement whereby ASARCO guarantees LAQ's performance under contract with Construction Aggregates Corporation).;  Letter from Eugene P. Florsheim, Construction Aggregates Corp., Secretary, to John F. O'Connor, American Smelting and Refining Company, of May 11, 1954, BR2394637 (transmitting a fully executed copy of the contract between Construction Aggregates and LAQ, together with the executed letter agreement by ASARCO guaranteeing performance); Contract dated May 10, 1954, executed by Construction Aggregates Corporation and Lake Asbestos of Quebec, Ltd., BR2394638-BR2394674 (conformed copy).; Memorandum from R. M. Belliveau, to C. E. Prior, of June 8, 1954, BR0309689-BR0309690.

[49]  Letter from V. I. Mann, to R. D. Bradford, Lake Asbestos of Quebec, Ltd., President, Re: Capital Cost Estimate, BR1036311-BR1036312, at -11; Memorandum from F. S. Miller, to R. D. Bradford, Re: United Asbestos of Jan. 9, 1959, BR0030757-BR0030783, at -61.

boast that "Lake Asbestos of Quebec is backed by the world-wide resources of American Smelting and Refining Co."[50]

        b.     <u>ASARCO's operational entanglement with LAQ</u>.

Although LAQ nominally owned the Black Lake facility, ASARCO ran the show.  ASARCO actively solicited and serviced asbestos customers, made customer calls, marketed asbestos as an ASARCO product, designed labeling, and affixed the ASARCO trademark prominently on each bag of asbestos fiber produced.[51]  It was ASARCO that tested asbestos fibers for customers and even for LAQ, worked with industry groups to solve asbestos application problems, monitored health issues at plants, and kept abreast of the latest in asbestos research and health issues.[52]

---

[50]    *Special report on the Black Lake Asbestos Project,* Lake Asbestos of Quebec, Ltd., BR2553578-BR2553579.

[51]    Ed Farrell, employed and paid by ASARCO, was the sales manager for LAQ products from 1965 to 1982.  BR2543146.  ASARCO maintained files on LAQ customers, managed LAQ accounts, approved customer credit, collected (for its own account) on invoices, and cut off non-paying customers.  Memorandum from Fred Jean, ASARCO, Inc., Credit Division, Treasure's Department, to R.J. O'Keefe, New York Office, of May 7, 1980, BR0416609.

[52]    Deposition of Michael J. Messel on Aug. 19, 1980, in *Charles Lee Austin, et al., v. Johns-Manville, et al.*, in the United States District Court, District of New Jersey, Civil Action 75-754, BR1338201-BR1338399, at -247.; *see, e.g.,* Special Meeting of the Quebec Asbestos Mining Association, Keltic Lodge, Cape Breton Island, Nova Scotia, on July 27, 1965, BR2551679-BR2551689, at -80 (evidencing that ASARCO conducted asbestos-related research testing for QAMA on the "Filterability of Asbestos Cement Silica Mixes"); letter from K. W. Nelson, Asarco, to Dr. V. Kudryk, Asarco, Central Research, Re: "[W]e [ASARCO] should participate in the round robin asbestos fiber counting test being arranged by the ATI" of Apr. 13, 1976, BR0099601; letter from Donald A. Robbins, Asarco, Chief Chemist, to R.J. Brindley, National Gypsum Company, Gold Bond Building Products Division, Re: "[T]he Asarco Laboratory would be pleased to participate in the round-robin asbestos fiber sampling and exchange program sponsored by the Asbestos Information Association/North America" of Oct. 28, 1977, BR2339867; letter from Gary E. Walter, Asarco, Senior Environmental Scientist, to Warren Whitley, Capco-Birmingham, Re: Indication that ASARCO had performed asbestos sampling "for the Asbestos Information Association" of May 2, 1984, BR0352249-BR0352258, at -49; letter from Sherman S. Pinto M.D., to M. J. MacKenzie, American Smelting & Refining Co., of Sep. 30, 1958, BR0694271; letter from Sherman S. Pinto M.D. American Smelting and Refining Company, to Douglas Soutar, American Smelting & Refining Co., of Apr. 27, 1965, BR0090487.

ASARCO, as opposed to LAQ, also maintained a library of asbestos research and publications, researched and developed new asbestos processes and products, acquired numerous patents on asbestos processes, and marketed asbestos-related patents to industry.[53]   None of this evidence was volunteered.  Every item lay among millions of unindexed pages in half-collapsed boxes in the desert.  Only through the efforts of Applicant and the FCR's counsel can this saga now be told.

> c.      ASARCO's operational entanglement with CAPCO.

CAPCO, like LAQ, was a start-up venture.  ASARCO created the "recipe" for latex-lined cement asbestos pipe, wanted to get in the business of producing it, and had the Black Lake asbestos mine as a ready source of raw asbestos fiber for the new venture.[54]  The Woodward Company made iron pipe and owned a cement plant.[55] CAPCO was formed in 1963 as a joint venture between the two firms as "a substantial U.S. outlet for asbestos fiber."[56]

---

[53]   Agreement, dated Sep. 25, 1957, executed by American Smelting and Refining Company, and The Research Foundation of State University of New York, BR2413098-BR2413111; memorandum from R. D. Taylor, American Smelting and Refining Company Central Research Laboratories, to File, Re: Lone Star Cement Company: Tredco Steam Shattering Process of Sep. 20, 1968, BR0122500-BR0122501; internal report, entitled "Memorandum by Lac D'Amiante Du Quebec Ltee Supporting its Position Against the Proposed Notices of Reassessment of its 1977 to 1981 Taxation Years" by Clarkson, Tetrault Avocats Barristers and Solicitors, BR1665521-BR1665649, at -569. ASARCO's magnetic separation patent, for example, was a huge innovation in the asbestos milling process.  Asbestos-related patents were issued to ASARCO from the 1960s into the 1980s.  Letter from Berger and Altman, to Jeanette Mattea, ASARCO, Inc., re: title reports as to various U.S. patents, of May 7, 1990, BR0122619-BR0122628, at -20; memorandum from E. J. Schaffer, to R. L. Hennebach, re: Magnetic Beneficiation of Asbestos Ore Canadian Patent No. 925,473 Issued May 1, 1973 Licensing Lake Asbestos Corporation of June 27, 1973 BR2437305-BR2437307, at -06.

[54]   Internal Report of Sep. 24, 1974 entitled "Purchase of the Mead Corp.'s Shares of Capco" by R. L. Hennebach, BR0409803-BR0409804, at -03.

[55]   BR1108873

[56]   See footnote 54 *supra*.

Plants to manufacture cement asbestos pipe were constructed in Ragland, Alabama, and Van Buren, Arkansas.[57]  ASARCO engineers tested the water at the Ragland plant site to determine its suitability for cement asbestos pipe.[58]  Testing and research relating to cement asbestos pipe were centralized in ASARCO, whose Department of Environmental Services regulated and set policy over CAPCO's operations beginning in 1974 when ASARCO bought out Woodward Iron to gain full control of CAPCO.[59]

As with LAQ, ASARCO handled CAPCO's collections and credit approvals.[60] ASARCO dictated CAPCO's health policies.[61]  ASARCO's Traffic Department handled shipments of cement asbestos pipe and later imported the especially deadly blue asbestos from South Africa and delivered it to CAPCO.[62]  CAPCO's latex-lined pipe design was even developed by ASARCO and patented by ASARCO.[63]  All of this evidence lay entombed in the desert until unearthed by Applicant and the Oppenheimer Firm.

---

[57]  *Id.*

[58]  BR1108876.

[59]  Memorandum from R. L. Hennebach, to the ASARCO Advisory Committee, re: Capco, Oct. 11, 1974, BR1982350.

[60]  *Men on the Move,* ASBESTOS, Sep. 1978, CRM0008802-CRM0008852, at -36 (discussing ASARCO personnel movements including Fred Jean's appointment as General Credit Manager); letter from J. N. Albetta, ASARCO, to W. Perrell, re: R. L. Thibodo Deduction of $961.31 of Sep. 30, 1985, BR0450783.; memorandum from Rex C. Beckstead, Dep't of Safety and Technical Employment, Director, to R.J. Rivera, Purchasing Agent, New York Office, re: Fire Protection Equipment Contracts, of March 5, 1975, BR0067865 (making arrangements for safety equipment at "our Van Buren, Alabama Plant," "our Ragland, Alabama Plant," and "our Birmingham, Alabama Plant").

[61]  BR0148033-BR0148050.

[62]  BR1017646; BR0475843; BR0085998; BR0085961.

[63]  BR0197323-BR0197324.

d.    ASARCO's other asbestos concessions, activities, and pretensions.

ASARCO sold asbestos through one of its own divisions, the Federated

Metals division.[64]  Customers could order asbestos by telex addressed to "TLX –

ASARCOBEST."[65]  ASARCO's Exploration Department vetted asbestos

opportunities in Alaska and elsewhere.[66]  ASARCO considered buying another

asbestos mine in California[67] and imported "blue asbestos" from South Africa for

shipment to customers within the United States.[68]  ASARCO participated in the

major asbestos trade organizations,[69] and lobbied governmental agencies and

regulators regarding asbestos issues on its *own* behalf.[70]  In short, ASARCO was up to

its ears in asbestos, a blending of businesses and identities into one happily blurred

ASARCO enterprise, all run from ASARCO's New York City headquarters.

Apparently, ASARCO even aspired to asbestos royalty.  In 1969, Ralph

Hennebach, ASARCO's Executive Vice President and a member of its board who

---

[64]   BR0509578.

[65]   Memorandum from Godfrey, to Farrell, Re: NY 2 of May 1, 1969, BR0194753; Memorandum from E. A. Farrell, to R. P. Gagnon, of Jan. 27, 1975, BR0298559; memorandum from Farrell, to ASARCO A NYK, Re: Armstrong of Dec. 4, 1974, BR0298608.; memorandum from E. A. Farrell, to R. P. Gagnon, of December 4, 1974, BR0298460; memorandum from E. A. Farrell, to R. P. Gagnon, of Mar. 5, 1976, BR0298794; memorandum from E. A. Farrell, to R. P. Gagnon, of Feb. 26, 1975, BR0298552.

[66]   BR0533363-BR0533364.

[67]   BR0464507.

[68]   Blue asbestos, or crocidolite, is universally regarded as the nastiest, worst type of asbestos fiber there is because of its close association with mesothelioma, an incurable, fatal asbestos-related cancer.  See footnote 89 *infra*.

[69]   These included the Quebec Asbestos Mining Association (QAMA) and the Asbestos Textile Institute (ATI).

[70]   BR0344223; BR1526458-BR1526459; BR0565655-BR0565656.

would later become chairman, commented to Forrest Hamrick, an ASARCO Vice

President:

> We should forget about becoming *asbestos kings* and instead
> plan for the long term most profitable operation of the
> mineral property we now have.[71]

ASARCO, however, did not quickly abandon its asbestos royalty pretensions.

Seven years later, in 1977, ASARCO proudly proclaimed to the world in an ad

published in the *Wall Street Journal*: "ASARCO basic in ASBESTOS."[72]  The ad

included the following text:

> In 1976, ASARCO's two asbestos mines in Canada produced
> 248,000 tons of asbestos fiber.  These fibers became a vital
> part of such products as automobile and truck brake linings,
> asbestos-cement pipe and sheet, fireproof clothing and floor
> tile.
>
> Asbestos is one of 24 basic metals and minerals ASARCO
> produces to keep industry on the go.  Our headquarters are at
> 120 Broadway, New York, N.Y. 10005.[73]

> e.    <u>ASARCO recognizes asbestos-related health risks and tries
> hiding behind LAQ and CAPCO.</u>

ASARCO's  Medical Department closely followed asbestos health research

from the earliest days of the company's involvement in asbestos.  It found unfolding

health research unsettling and foresaw that asbestos disease would be a compensable

injury.[74]  Yet, having become informed of the health risks posed by its product,

---

[71]   BR0415810 (emphasis added).

[72]   *Wall Street Journal*, 1977, BR1114315.

[73]   *Id.*

[74]   *See* BR1332772; BR0100073-BR0100074; BR1510097-BR1510103; BR2566916.

ASARCO forged ahead undeterred, having apparently concluded that the lucrative

profits justified the mounting human toll.

Documents obtained in Arizona show that ASARCO assessed the risks of

asbestos, insured against the risks, litigated regarding the risks, entered into

settlements accounting for the risks, and paid some settlements while guaranteeing

others.[75]  It wasn't until the mid-1970s that asbestos personal injury lawsuits started

nipping at ASARCO's heels.[76]  These were just the first ripples of the coming

tsunami, as ASARCO was still trumpeting its "Basic in Asbestos" line in 1977.[77]  Still,

asbestos health issues ASARCO had long recognized were coming into sharp public

focus in the United States, prompting ASARCO to take a close look at its

relationship with LAQ.

In December 1976, Robert Muth, ASARCO's Assistant General Counsel,

wrote to Mike Messell, LAQ's President, to express concern about the

LAQ/ASARCO relationship; specifically, whether ASARCO was insulated and

whether LAQ's separate corporate identity was being adequately observed.[78]  The die

had already been cast, however.  For decades, ASARCO had proudly embraced

---

[75]   Memorandum from R. J. Muth, to file, re: Austin vs. Lake Asbestos of Quebec of Sep. 16, 1976, BR2063074; memorandum from R. J. Muth, ASARCO Incorporated, to M. J. Messel, re: Products Liability Claims against Lake Asbestos of Quebec Ltd. of Dec. 21, 1976, BR0306659-BR0306660, at -59; BR2063066; letter dated Feb. 7, 2002, from Martin K. Berks to Frank Fazio, BR1530091.

[76]   Letter from Charles P. Caliendo, Grunewald, Turk, Gillen & Caliendo, to Coopers & Lybrand re: Austin, et al. v. Johns-Manville Products Corp., et al. Docket No. 76-735 and Alessi, et al. v. Johns-Manville Products Corp., et al. Docket No. 76-1817, of Jan. 14. 1977, BR0223864-BR0223870.

[77]   *See* footnote 72 *supra*.

[78]   *See* BR0306659-BR0306660.

asbestos, aggressively melding its own corporate identity to those of LAQ and

CAPCO.  Faced with the specter of asbestos liabilities jeopardizing its very existence,

ASARCO did an abrupt about-face and began disclaiming any involvement in the

asbestos businesses of LAQ and CAPCO—an approach it was not able to maintain

in bankruptcy after Applicant and the Oppenheimer Firm reconstituted voluminous

evidence to the contrary from the boxes in Arizona.  ASARCO's prepetition

persistence in hiding behind corporate fictions it had never properly respected

ultimately collapsed in bankruptcy negotiations solely through the efforts of

Applicant and those working with it.

**D.**     **The Magner Mediation, Conceived to Help Resolve ASARCO's
Aggregate Derivative Asbestos Liabilities, Yields a Template for
a Plan that Had Applicant's Fingerprints All Over It.**

By 2007, after the fruits of the expedition to Arizona had been largely

digested, one thing was becoming clear:  ASARCO's derivative asbestos liabilities

were much better substantiated and far larger than ASARCO had thus far been

willing to acknowledge.  Following the summer and fall spent on the initial phases of

the Arizona document review, Applicant and the Oppenheimer Firm continued to

engage ASARCO to resolve both the matter and the extent of ASARCO's derivative

asbestos liabilities.  In furtherance of that effort, the parties to the alter ego

litigation—now being handled as a contested matter—exchanged their respective

estimates of the maximum aggregate asbestos-related liability of the Subsidiary

Debtors on March 5, 2007.  The estimates ranged from $180 million to $2.655 billion,

and the Court determined that mediation might be well-suited to narrow the divide of almost $2.5 billion.

On September 20, 2007, the Court appointed the Honorable Elizabeth W. Magner, United States Bankruptcy Judge for the Eastern District of Louisiana, to mediate the estimation of ASARCO's derivative asbestos liability.[79]  The initial, two-day mediation session was convened in New Orleans on October 29, 2007.  A consensus soon emerged that the focus of the mediation should be expanded to explore the possibility of a consensual plan of reorganization.

Applicant was present, along with several members of the Asbestos Committee at the initial session in New Orleans.  Representatives of Grupo México attended the first day of the mediation, and the possibility of a settlement with Grupo México was discussed.  It did not take long, however, for the mediation to evolve into a plan negotiation.

Applicant was prepared for this, and played a pivotal role having already conceived two important attributes of a workable plan.  First, was the notion of a "split."  Applicant had envisioned that a portion of the cash available at confirmation would be split in some manner between the two largest creditor constituencies, asbestos and environmental.  Additionally, a portion of the cash provisionally slated for asbestos and environmental creditors at confirmation would pass over a

---

[79]   Order Appointing Mediator for Asbestos Estimation and Alter Ego Dispute, Docket No. 5885 (Sep. 20, 2007).  The Honorable Edith H. Jones, Chief Judge of the United States Court of Appeals for the Fifth Circuit, with the concurrence of the Honorable Hayden W. Head, Jr., Chief Judge of the Southern District of Texas, formally assigned Judge Magner to mediate the matter. Docket No. 6315 (Nov. 16, 2007).

metaphoric "waterfall," meaning it would be subject to diminution by various reserves necessary to cover claims of other creditors.  Under this construct, "waterfall" cash would expose asbestos and environmental to two types of uncertainty:  how much would be left over after reserve requirements were met and attendant payment delays.

Judge Magner facilitated a robust dialogue between ASARCO and its key creditor constituencies, including environmental creditors who accepted an invitation to join in the mediation.  Subsequent mediation sessions were convened in New Orleans November 29-30 and December 19-20.  When the mediation concluded January 24, 2008, it yielded a key "agreement in principle" regarding the global settlement of ASARCO, *et al.*'s asbestos and environmental liabilities.  Mediation participants also reached significant agreement on a structure for a sale process, through which substantially all the assets of ASARCO and certain of its operating affiliates were to be sold to a purchaser whose identity was to be determined.  It was a quantum leap in the direction of confirming a plan.[80]

Pursuant to the agreement in principle, the United States Department of Justice, on behalf of environmental creditors; the Asbestos Committee and FCR, on behalf of their respective asbestos constituencies; and ASARCO, *et al.*, agreed how

---

[80]   ASARCO, *et al.*, generally sought to resolve their environmental liabilities on a site-by-site basis. One of Applicant's lawyers, on behalf of the Asbestos Committee, attended in person nearly all the dozens of site-specific environmental mediations and all contested estimation hearings relating to environmental sites as to which attempts at mediation had proven unsuccessful.  The information and perspective thus derived was critical to Applicant's successful engagement of ASARCO's environmental creditors in the context of the Magner mediation.

debtors' various "baskets" of environmental liabilities would be resolved.[81]  The
agreement in principle also included a framework for resolving the asbestos liabilities
that had given rise to the Magner mediation in the first place.  Asbestos personal
injury claims would be channeled to a trust pursuant to 11 U.S.C.  § 524(g).
ASARCO, *et al.*, agreed to a payment of up to $750 million, subject to a waterfall,
together with up to $102 million that might be available after paying certain other
creditors pursuant to an eventual plan of reorganization.[82]

The enormous significance of this agreement in principle was lost on no one.
In one fell swoop, ASARCO, *et al.*, had provisionally settled all but an immaterial
portion of their environmental liabilities *and* asbestos liabilities.  The sizeable claims
of both major creditor constituencies had been tentatively addressed, allowing
debtors to formulate a workable plan and focus on the mechanics of an asset sale to
fund the plan.  And, in fact, ASARCO, *et al.*, did file a plan in late July 2008.[83]  This
plan, built around the agreement in principle, assuredly would have carried the day
had its sponsor—Sterlite—not declined to honor its contractual undertakings.

---

[81]   These "baskets" included (i) non-operating, debtor-owned sites slated for transfer to custodial
trusts; (ii) the non-debtor owned sites that had already been successfully mediated; (iii) the vast
majority of remaining federal and state claims; and the three (3) "residual" sites—Coeur d'Alene
Basin, Omaha Lead, and future remediation costs associated with the Tacoma Smelter Plume—
that had already been the subjects of contested estimation proceedings and, as to which, the
parties would request that the Court not rule.

[82]   Additionally, the § 524(g) trust would have the right to insurance coverage for asbestos-related
claims, the first $100 million in proceeds from the Brownsville Litigation plus half of all
subsequent proceeds (to be shared with the environmental claimants involved in the "residual"
sites, reflecting the "split" concept) and 100% of the interests in reorganized Covington Land
Company, one of the debtors.

[83]   Joint Plan of Reorganization for the Debtors under Chapter 11 of the United States Bankruptcy
Code, Docket No. 8569 (July 31, 2008).

There was more to it than that, however.  The agreement in principle gave asbestos and environmental creditors a stake in the same emergent plan, minimizing the potential for serious conflict between ASARCO's largest creditors groups.  The plan process it spawned was truly consensual, a remarkable achievement for a mediation that had been intended only to address asbestos liabilities, and due in large part to Applicant's efforts.

**E.    The Brownsville Litigation:  A Staggering Judgment Against the Parent Is the Penultimate Watershed in the Plan Process.**

### 1.    *Backdrop for the Lawsuit.*

From the outset of the financial difficulties that precipitated its bankruptcy, a major concern of ASARCO and its creditor constituencies were the dubious circumstances attending the 2003 divestment of ASARCO's 54.2% ownership stake in Southern Peru Copper Corporation (defined above as "SPCC").[84]  ASARCO's SPCC stake had been widely and accurately perceived as the "crown jewel" of ASARCO's holdings.  In February 2007, ASARCO initiated an adversary proceeding against AMC, its indirect parent and the transferee of ASARCO's SPCC stake. Through that proceeding, which was initially before this Court, ASARCO sought to avoid the transfer, which it alleged to have been fraudulent, and recover the SPCC stock.  As a result of the meteoric rise in the price of copper since 2003, the value of ASARCO's former stake in SPCC had multiplied and was worth *billions* of dollars— far more than the $726 million or so that AMC had paid ASARCO for it.

---

[84]    SPCC filed its voluntary petition for relief under the Bankruptcy Code on December 12, 2006.

The litigation attacking the transfer as fraudulent thus had material implications for ASARCO, *et al.*'s reorganization.  In March 2007, the reference was withdrawn and the litigation transferred to the United States District Court for the Southern District of Texas, Brownsville Division before the Honorable Andrew S. Hanen.  Thereafter, it became generally known as the "Brownsville Litigation."

### 2.    *Pre-Trial Proceedings*.

The Asbestos Committee, the FCR, and the ASARCO Committee sought to intervene in the Brownsville Litigation, which AMC opposed.[85]  Negotiations ensued, in which Applicant participated, leading to an "Intervention Agreement" intended to address the scope of the proposed interventions.  Judge Hanen granted the motions to intervene under the terms of the Intervention Agreement, which limited the intervenors' prerogatives.[86]

Applicant participated in discovery, on behalf of the Asbestos Committee, from September 2007 until the four-week bench trial in mid-2008, and one of

---

[85]   Opposition of Americas Mining Corporation to the Motion to Intervene filed by the Official Committee of Unsecured Creditors for the Subsidiary Debtors and Future Claims Representative Robert C. Pate, Docket No. 85 in Case No. 1:07-CV-00018 (May 24, 2007).

[86]   Generally, as counsel for the Asbestos Committee as intervenor, Applicant could appear and speak at hearings after the principle parties had presented their arguments, attend depositions, and review non-privileged documents.  However, as with counsel for the other intervenors, Applicant could not examine privileged documents absent consent of the principal parties, could only suggest deposition questions to ASARCO's counsel and agreed to leave portions of depositions involving privileged matters, and could not participate in the trial or in settlement discussions without Judge Hanen's permission on a showing of good cause.  Order, Case No. 1:07-CV-00018, Docket No. 105.

Applicant's lawyers attended every day of the trial.[87]  But Applicant's participation in the Brownsville Litigation amounted to far more than passive due diligence.  The Brownsville Litigation was a promising avenue for discovery of information relevant to the alter ego litigation that Applicant was concurrently prosecuting.[88]  It was also a crucial window into the mindset of the Parent.  Insights derived from the Applicant's involvement in the Brownsville Litigation proved indispensable in Applicant's continuing efforts to engage the Parent in the plan process.

   *3.     Trial.*

   ASARCO's asbestos victims loomed large in its trial presentation.  In opening arguments, ASARCO's counsel characterized "3385 mesothelioma victims"[89] as being among the "real plaintiffs" and observed that ASARCO's recovery from AMC would help compensate asbestos victims if it were determined that ASARCO had alter ego liability.  Counsel noted that, in 2003, ASARCO's estimated its asbestos liabilities as between $860 million and $1.18 billion—substantially higher than

---

[87]   This was similar to Applicant's engagement in the environmental aspects of the reorganization. ASARCO, *et al.*, generally sought to resolve environmental liabilities on a site-by-site basis.  One of Applicant's lawyers, on behalf of the Asbestos Committee, attended in person nearly all the dozens of site-specific mediations and all contested estimation hearings relating environmental sites as to which attempts at mediation had proven unsuccessful.

[88]   For example, in the Brownsville Litigation, ASARCO demonstrated a far greater willingness to acknowledge its asbestos liabilities and the magnitude of those liabilities, as a tactical weapon against the Parent, than it had in the alter ego litigation.

[89]   "According to the American Cancer Society, mesothelioma is a rare form of cancer that affects the thin membranes lining the abdomen and chest.  Mesothelioma is closely linked with asbestos; most cases of mesothelioma result from direct occupational asbestos exposure."  *PSI Energy, Inc. v. Roberts*, 802 N.E.2d 468, 472 n.3 (Ind. Ct. App. 2004) (*citing* American Cancer Society, Inc., What is Asbestos?), last visited Feb. 5, 2010, which is available at http://cancer.org/docroot/PED/content/PED_1_3X_asbestos.asp?sitearea_PED.

ASARCO had ever conceded in the alter ego litigation.[90]  He further observed that a favorable outcome to the case would yield resources for ASARCO's environmental clean-up costs.

Douglas McAllister, general counsel for both ASARCO and AMC at the time ASARCO transferred its SPCC stock to AMC, testified that German Larrea Mota-Velasco, then chairman of the board and CEO of both ASARCO and AMC's parent, Grupo México, had been extremely concerned about ASARCO's asbestos and environmental liabilities.  Mr. McAllister testified the Parent had intended to remove SPCC from ASARCO to protect it from asbestos and environmental creditors.[91]

No thought of benefiting ASARCO lay behind the transfer of the SPCC stock.  ASARCO's bankruptcy expert testified that the stock transfer was not an attempt to restructure ASARCO, since none of the proceeds went to ASARCO's operations.  The sole rationale for the transaction, according to ASARCO's expert, was to insulate SPCC from ASARCO's creditors.  ASARCO's only two independent directors at the time of the stock transfer had even resigned in protest after their objections to the transfer were ignored.[92]

Evidence revealed Mr. Larrea's control over the stock transfer, consummation of which he insisted upon.  One email introduced into evidence noted pointedly that

---

[90]   ASARCO had been telling this Court that its asbestos liability was approximately $400 million, while the ASARCO Committee was contending that it was less than $200 million.

[91]   *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 375 (S.D. Tex. 2008).

[92]   *Id.* at 370.

"German wants to accomplish [the transfer] at all costs and by any means."[93]  Daniel Tellechea, a board member of AMC, ASARCO and Grupo México at various times, testified that no one overruled German Larrea, and that he had never won a dispute with German Larrea regarding SPCC.[94]

German Larrea testified at the trial, but only after Judge Hanen ordered that he do so.[95]  On cross-examination by ASARCO, Mr. Larrea testified that independent board members were appointed to give recommendations and analysis, not to make decisions.  He took issue with the independent directors for being focused only on ASARCO and for not taking into account the full panoply of Grupo México's holdings.[96]

### 4.       _The First Shoe Drops:  The Liability Ruling_.

The trial ended with Judge Hanen taking the matter under advisement.  Several months passed until, in August 2008, Judge Hanen issued a Memorandum Opinion and Order on liability issues, finding AMC liable for actual fraudulent transfer because it had full knowledge that the transfer would hinder and delay ASARCO's creditors.  _Id._ at 394.  The District Court also held that AMC had aided,

---

[93]   _Id._

[94]   _Id._

[95]   AMC's counsel, in its opening statement delivered May 23, 2008, represented that Messrs German Larrea, Genaro Larrea and Daniel Tellechea would be testifying at the trial in person, but counsel recanted a week later.  On ASARCO's motion to compel his attendance, Judge Hanen ruled that German Larrea would be called to testify by the Court pursuant to FED. R. EVID. 614.

[96]   Mr. Larrea's view seems to have been that ASARCO was beholden to the Parent, and he was evidently troubled by the independent directors' commitment to their fiduciary duties to ASARCO and its creditors at the expense AMC's or Grupo México's other interests.  This mindset likely accounted for much of the Parent's alienation in the reorganization case from ASARCO and some creditor constituencies.

abetted, and conspired with ASARCO's board to implement the transaction in breach

of the directors' fiduciary duties.  *Id.* at 413-14.  At the time of the SPCC stock

transfer from ASARCO to AMC, Judge Hanen found that AMC "had an agreement

with ASARCO's directors to abandon their duties to ASARCO and ASARCO's

creditors and instead act to structure and accomplish the SPCC transfer, knowing that

the transfer as contemplated would constitute a transfer in fraud of ASARCO's

creditors."  *Id.* at 420.

### 5. *The Other Shoe Drops:  The Damages Ruling*.

Meanwhile, everyone waited for Judge Hanen's damages ruling, as to which

arguments were heard in October 2008.  ASARCO had argued that the only

appropriate remedy was for it to recover the SPCC stock transferred to AMC and the

dividends AMC had been paid on the stock post-transfer, together with interest.

AMC maintained that ASARCO's approach would result in an unjust windfall, and

urged that the remedy be tailored to fit the conduct.  AMC insisted that ASARCO's

damages should be limited to the difference between what AMC paid for the stock

(about $726 million) and the value of the stock at the time of transfer as determined

by Judge Hanen (around $820 million), plus (i) $42 million for the intercompany loan

that AMC forced ASARCO to repay using a portion of the sales price paid by AMC;

and (ii) an additional amount derived from a hypothetical discounted payoff of the

so-called "Yankee Bonds."  AMC's damages construct posited ASARCO's damage

recovery at no more than about $200 million.

The damages ruling came down April 1, 2009.[97]  Conjecture about how Judge Hanen would rule on damages had been rampant in the eight months since the liability ruling and back-of-the-envelope estimates of ASARCO's recovery were all over the map.  The Parent maintained that the damages ruling, whenever it came down, would not fundamentally alter the landscape of the reorganization case, but its optimism proved misplaced.

Judge Hanen ordered AMC to return all stock traceable to the fraudulently transferred SPCC stock and to pay money damages exceeding $1 billion.  *ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150, 181-83 (S.D. Tex. 2009).  The final judgment, issued April 15, 2009 (the "SPCC Judgment"), returned more than 260 million shares of SPCC common stock to ASARCO, worth approximately $5.5 *billion*,[98] ordered repayment of dividends on that stock amounting to about $1.8 *billion*,  and awarded money damages and prejudgment interest totaling almost $1.4 *billion*, with provision for post-judgment interest.  All in all, it amounted to about a $8.7 *billion* hit.

ASARCO's victory was total, and the Parent's loss devastating.  Baker Botts, counsel for the ASARCO in the Brownsville Litigation, is to be commended for its skillful representation culminating in the SPCC Judgment.  All creditor constituencies benefited, and ASARCO, *et al.*'s successful reorganization was markedly advanced.

---

[97]  It was amended to correct a clerical error on April 14, 2009.

[98]  Based on the $21.08/share closing stock price on the date of the amended judgment. *See* http://finance.yahoo.com/q/hp?s=PCU&a=03&b=1&c=2009&d=03&e=15&f=2009&g=d (last viewed Feb. 5, 2010).

The ruling changed the dynamics of the plan process almost overnight, and Applicant adjusted to the new status quo with exceptional swiftness and dexterity, having largely anticipated what would happen, and led the final, critical push to the reorganizational summit.

**F.      Sterlite's Bid for ASARCO, *et al.*'s Operating Assets, Its Subsequent Breach, and the "Deal Fatigue" that Jeopardized Reorganizational Success.**

   **1.      *Light at the end of the tunnel?***

In May 2008, about three months before the liability ruling in the Brownsville Litigation, a much anticipated, multiday meeting occurred at Baker Botts' Dallas office.  Its purpose was to select a plan sponsor—a high-bidding stalking horse to be penciled in as the prospective purchaser of substantially all of ASARCO, *et al.*'s operating assets.  This "Plan Sponsor Selection Meeting" was the culmination of tremendous efforts on the part of Applicant, on behalf of the Asbestos Committee, and ASARCO, *et al.*, the FCR, the ASARCO Committee, and their respective professionals.[99]  Lehman Brothers, Barclays' predecessor as ASARCO's investment banker, had played a critical, extensive, and highly constructive role in marketing the assets, identifying potentially interested purchasers, facilitating due diligence, and, with Baker Botts in consultation with creditor constituencies, formulating and stage managing the plan sponsor selection process.

---

[99]   That the Plan Sponsor Selection Meeting occurred just four months after the conclusion of the Magner mediation attests to the singular importance of its "agreement in principle" to the advancement of the plan process.

The emergent plan contemplated, generally and appropriately, that ASARCO, *et al.*'s operating assets would be sold to whatever entity with suitable bona fides was willing to pay the most for them.  Proceeds from the asset sale would then be combined with ASARCO's stockpile of cash from operations—about $1.3 billion at the time and growing as the favorable copper market persisted—and then disbursed to creditors.  It was hoped that there would be enough cash to fully satisfy most creditor claims, but that depended on how much a buyer—the plan sponsor or a subsequent bidder who offered more—was willing to pay for the assets.

Numerous drafts of plans, plan provisions, plan exhibits, and accompanying disclosure statement materials had been circulated, largely by Baker Botts, over a period of months.  Applicant reviewed all these materials carefully and commented on many of them quite extensively.  Additionally, great effort had been expended by debtors and the major creditor constituencies to formulate and obtain the Court's approval of procedures and protocols for (i) information dissemination (to facilitate appropriate due diligence by potential bidders), and (ii) the bidding process itself.

Getting a handle on the bidders and their bids—who was willing to pay what so that an appropriate plan sponsor could be selected—was the central purpose of the Plan Sponsor Selection Meeting.  Four bids were considered.  Three specified, more or less, the consideration their respective proponents were willing to pay for the assets.  The fourth, from the Parent, was different.  With the damages ruling in the Brownsville Litigation still nearly a year away, the Parent was proposing, essentially, a "litigation-in-full" plan; it proposed to litigate nearly all creditor claims to the ends of

the earth and only pay upon final, non-appealable rulings.  This bid was not well-received by ASARCO, *et al.*, or any creditor constituencies, and was not susceptible to straightforward comparison with competing bids because of its heavy reliance on litigation.  Nevertheless, it was afforded due consideration.

Vedanta Resources, plc, a London-based, diversified metals and mining enterprise with most of its operations in India, proposed paying $2.6 billion in cash for the assets through its indirect U.S. subsidiary, Sterlite.  Vedanta's bid was materially higher than the other bids and seemed credible, given the extent of its existing mining operations and the logical and desirable entrée into the U.S. market that the ASARCO purchase afforded.  Despite objections lodged by the Parent and another unsuccessful bidder, Sterlite was, with the Court's approbation, formally designated as Plan Sponsor in July 2008.[100]  Sterlite entered into a Purchase and Sale Agreement with ASARCO and certain of its affiliates to purchase the assets for $2.6 billion as Vedanta's bid had specified.[101]  Plan documents were revised to incorporate Sterlite's selection, and confirmation proceedings were set to proceed in November 2008.[102]  Everything looked good, and all systems were "go."

---

[100]  Final Order Granting Motion of ASARCO LLC for an Order Approving (1) Bid Procedures in Connection with Selecting a Chapter 11 Plan Sponsor and Exit Transaction Under a Chapter 11 Plan and (2) Bid Protections to Sterlite (USA), Inc. in Connection Therewith, Docket No. 8262 (July 1, 2008).

[101]  Had the initial plan been confirmed following Sterlite's payment of $2.6 billion as it had agreed, the resulting § 524(g) trust would have received up to $750 million based on a waterfall, plus a supplemental distribution slightly in excess of $100 million after others were paid.  Additionally, it would have gotten asbestos insurance recoveries; the equity of Reorganized Covington, an ASARCO affiliate; and half of the SCC Litigation Trust associated with the Brownsville Litigation (with an agreement that it would receive the first $100 million therefrom).

[102]  See footnote 100 *supra*.

2. ***Corpus Christi, we have a problem.***

In mid-October 2008, as the global economy teetered on collapse, with credit and capital markets in broad disarray, Sterlite informed ASARCO's counsel and the Court that it would not proceed with the transaction contemplated by the Purchase and Sale Agreement.[103]  The copper bull had turned decidedly bearish.  Cresting near $4/lb. in early 2008, the price of copper plummeted, ultimately hitting a floor of $1.26/lb. in December 2008—a price at or below ASARCO's cost of production.

The Purchase and Sale Agreement did not give Sterlite an "out" for any manner of materially adverse changes in circumstance.  It was clear that Sterlite, in walking away from the Purchase and Sale Agreement to which it had agreed, was breaching its contractual undertaking.[104]  But despite the prospect of an eventual meritorious lawsuit against Sterlite and its London-based parent, which had guaranteed Sterlite's obligations under the Purchase and Sale Agreement, a sense of gloom—even desperation—descended on many of the constituencies and professionals involved in the ASARCO's reorganization.  Mr. Lapinsky, ASARCO's CEO, frankly acknowledged that "deal fatigue" was a factor for some participants as ASARCO's reorganization stretched into its fourth year.[105]

---

[103]  The Troubled Asset Relief Program legislation was enacted October 6, 2009.

[104]  Applicant, in fact, was instrumental in getting Sterlite's breach of the Purchase and Sale Agreement acknowledged on the record.  Off the record, Mr. Esserman had urged Mr. Luc Despins, then lead counsel for the Parent, to press for an acknowledgement of the breach at an emergency hearing called to address the issue.  In response to Mr. Despins' questioning, Sterlite's counsel conceded the breach.  Hrg. Transcr., 19:11-20:20 (Oct. 14, 2008).

[105]  Deposition of Joseph F. Lapinsky, 130:1-24 (Apr. 2, 2009).

While global economic unrest, collapsing copper prices, and Sterlite's fickleness did give rise to legitimate concerns, these challenging developments energized Applicant. As counsel to the Asbestos Committee, Applicant was constrained to evaluate plan-funding mechanisms for their long-term efficacy—not their short-term expediency. The lengthy latency periods associated with asbestos diseases allowed for nothing else. Asbestos victims of ASARCO, *et al.* would be falling ill through the mid-21st century, far beyond a period of fleeting volatility in the copper market. A § 524(g) asbestos trust must be funded such that it will be able to pay claims presented in 2050 "in substantially the same manner" as it pays "similar claims" in the first year of its existence.[106] Applicant and the Asbestos Committee were compelled to look beyond the horizon as it appeared in late 2008.

But even then, all was not doom and gloom. The liability ruling in the Brownsville Litigation that August heralded the possibility of a damages ruling that could radically alter the reorganizational landscape. The Parent, while nominally participating thus far in the plan process for its own tactical reasons, had remained largely disengaged. Applicant in particular had long recognized that a big hit on damages in the Brownsville Litigation was both plausible and likely to motivate the Parent to move in a direction that could significantly benefit creditors.

Furthermore, there remained a viable reorganizational option. Applicant and the Asbestos Committee, together with the FCR, had become very interested in a

---

[106] Section 524(g)(2)(B)(ii)(V) requires that there be "reasonable assurances that the trust will value, and be in a financial position to pay present claims and future demands that involve similar claims in substantially the same manner."

stand-alone plan—one pursuant to which ASARCO, *et al.*'s operating assets would be retained for the benefit of creditors, likely to be sold at a later date when market conditions were more favorable.  While a stand-alone plan would subject creditors to a degree of market risk, it also afforded them an opportunity to participate in the recovery of the copper market.  Additionally, creditors would retain two potentially significant litigation claims under a stand-alone plan:  against the Parent (based on the Brownsville Litigation) and against Sterlite and its parent for breach of the Purchase and Sale Agreement.  In late 2008 and into the first few months of 2009, Applicant put together a stand-alone plan and pitched the concept to ASARCO's major creditor constituencies.

In early 2009, at the Court's urging, major participants in ASARCO, *et al.*'s reorganization converged for a "what should be done now" mediation before the Honorable Marvin Isgur, United States Bankruptcy Judge for the Southern District of Texas.[107]  Going into the mediation, the option being favored by ASARCO and its environmental and financial creditors was a revival of the sale to Sterlite, albeit at a fire sale price of barely a billion dollars (compared to the $2.6 billion Sterlite had previously agreed to pay).  Sterlite had floated the possibility of a revived sale transaction at greatly reduced consideration in November 2008, undoubtedly motivated in part by the potential liabilities and other pitfalls associated with its

---

[107]  Docket No. 9994 (Nov. 13, 2008).  The "Isgur Mediation," which convened in Houston several times over the course of two months, did not yield an alternative consensual plan.  It did, however, create a forum for interested participants in the reorganization case to assemble and exchange ideas for moving the case forward.

earlier breach.[108]  As part of any revived purchase, Sterlite insisted that it and its

parent be completely released from any liabilities associated with the prior Purchase

and Sale Agreement.

Applicant was working busily on several fronts.  Its interest in a stand-alone

plan grew as the price of copper bottomed out in December and prospects for the

emergence of any new bidders to compete with Sterlite appeared dim.

Environmental creditors, however, were not receptive to retaining equity interests in

reorganized ASARCO under a stand-alone plan; they preferred cashing out their

claims immediately even if doing so meant foregoing participation in the eventual

market recovery.  Consideration was given as to how their preference might be

accommodated in the context of a stand-alone arrangement.

Concurrently, Applicant pressed for improvements to the emergent new deal

with Sterlite.  Obtaining a substantially higher price was the paramount objective.

Largely due to Applicant's skepticism of its revived purchase proposal, Sterlite did

improve its offer.  Eventually, Sterlite proposed paying $1.1 billion in cash plus a 9-

year, no-interest note tied to future fluctuations in the price of copper (*i.e.*, "copper

note").  On a present value basis, this brought the total consideration Sterlite was

offering to about $1.3 billion—better than what it had been proposing, but still just

half of what it had agreed to pay under the initial Purchase and Sale Agreement.[109]

---

[108]  A substantial adverse judgment issued by a U.S. court, for example, could have disrupted subsequent attempts by Vedanta or its affiliates to enter the U.S. market or to avail themselves of U.S.-based credit and capital markets.

[109]  Proffer  of George M. Mack, Docket No. 10801 at ¶ 25 (Apr. 13, 2009).

Notably, the additional consideration Sterlite had agreed to throw in stood to benefit all creditors—not just asbestos—if the fledgling new deal with Sterlite "took." Nevertheless, the Asbestos Committee and Applicant, along with the FCR and his counsel, remained uncomfortable with the level of consideration associated with Sterlite's mulligan bid and did not abandon their hope of bringing Grupo México earnestly into the plan process.

There were two related problems with the "copper note" Sterlite was proposing as part of its revived play for the ASARCO assets. First, the note did not go far to fill the "consideration gap" between the "old" deal, from which Sterlite had walked away, and the new one taking shape. Second, its discounted present value, calculated in early 2009 to be slightly in excess of $200 million, represented an unacceptably meager share of the eventual market upside. Applicant pressed hard, both directly and through ASARCO, for Sterlite to commit to a second copper note, with a view to capturing for the benefit of the estate a greater portion of the copper market upside.

It was to no avail; ASARCO, *et al.*, had been signaling consistently from late 2008 into early 2009 that it favored a new deal with Sterlite and that Sterlite's current proposal represented the best terms that could be negotiated.[110]  Due in large part to Applicant's subsequent efforts, this ultimately proved incorrect; however, with

---

[110]  One of ASARCO's independent directors, Mr. Malcolm Lovett, conceded in early 2009 that ASARCO had limited leverage from which to negotiate.  Deposition of H. Malcolm Lovett, Jr., 82:3-83:2 & Exh. 12 thereto (Apr. 1, 2009).

Sterlite having apparently gone as far as it was willing to go, it became clear that ASARCO, *et al.*, were impatient to confirm a plan.

Meanwhile, however, there had been promising indications of the Parent's waxing receptiveness to a plan that the Asbestos Committee could support.  In July 2008, a counsel-to-counsel agreement on a global settlement between Grupo México, on the one hand, and the Asbestos Committee and the FCR, on the other, was reached.  Pursuant thereto, Grupo México would have committed to fund a § 524(g) trust with a $750 million unsecured claim for waterfall purposes, though the total compromised claim was set at $1 billion.  Although the Parent backed out of the deal at the last minute, this provided to Applicant the strongest indication yet of where the Parent might go if the forthcoming damages ruling in the Brownsville Litigation supplied a helpful nudge or, as it turned out, a formidable shove.

### 3.    *Déjà vu All Over Again:  ASARCO's Second Deal with Sterlite.*

ASARCO, *et al.*, did execute a "new" Purchase and Sale Agreement with Sterlite as of March 6, 2009, agreeing to pay $1.1 billion in cash plus the "copper note" worth another $200 million or so in present value terms.  As with the "old" Purchase and Sale Agreement, ASARCO, *et al.*, sought by motion the Court's approval with respect to the contract's "bid protection" aspects.[111]  This time around, however, ASARCO filed its motion pursuant to Bankruptcy Rule 9019 because the

---

[111]   Motion for Order, Pursuant to §§ 363, 105 and Fed. R. Bankr. P. 9019, Approving Settlement and Release and Revised Bid Protections Contained in the New Purchase and Sale Agreement Between ASARCO LLC and Certain of its Subsidiaries, and Sterlite (USA), Inc., and for Related Relief (the "Sterlite 9019 Motion"), Docket No. 10526 (Mar. 11, 2009).

"new" deal included the likely prospect of Sterlite and its parent being released from their liabilities associated with the "old" deal.

The 9019 aspect highlighted a major problem with Sterlite's "new" Purchase and Sale Agreement:  it failed to allocate the consideration between what Sterlite was paying for the assets and what it was paying to be released from liability under the "old" Purchase and Sale Agreement.  This troubled the Asbestos Committee, which raised the non-allocation of consideration in its objection, and on this basis it found itself aligned with the Parent in challenging the Sterlite 9019 Motion.[112]  The estate, conceivably, might have been better off selling the assets for less consideration to a third-party while retaining its litigation claims against Sterlite and Sterlite's parent.[113] ASARCO could not lightly divest itself of estate assets—its post-petition breach of contract claims—without ensuring that sufficient and corresponding benefits flowed to the estate for the benefit of creditors in consequence of the divestiture.

The "new" Purchase and Sale Agreement also contained so-called bid protections on Sterlite that, in the Asbestos Committee's view, were unwarranted in light of Sterlite's past breach.[114]  Break-up fee and no-shop provisions may have made sense in the context of the "old" Purchase and Sale Agreement, but were questionable in the context of the "new" one.  Still, on April 22, 2009, the Court

---

[112]  Objection to the Sterlite 9019 Motion, Docket No. 10677 (Apr. 1, 2009).

[113]  ASARCO's breach of contract claims against Sterlite and Sterlite's parent were property of the estate.  11 U.S.C. § 541(a)(7) (property of the estate includes "[a]ny interest in property that the estate acquires after the commencement of the case.").

[114]  The objection Applicant prepared on the Asbestos Committee's behalf to the 9019 motion duly raised these concerns.  See footnote 112 *supra*.

granted in part and denied in part the Sterlite 9019 Motion. The partial denial stemmed from the Court's further limiting of the circumstances under which Sterlite and its parent would be entitled to a release from their contractual liabilities under the "old" Purchase and Sale Agreement.[115]

## G.   The Final Ascent.

But meanwhile, there had been a very big development, dateline Brownsville. April, not March, had come in like a lion. On April 1, 2009, Judge Hanen issued his long-awaited damages ruling in the Brownsville Litigation. And suddenly the Parent was staring at money damages totaling in the billions, exclusive of post-judgment interest, plus a mandate to return to ASARCO SPCC shares then worth $5 billion give or take. Applicant's Mr. Esserman candidly acknowledged the importance of this development as the "major game changer" and "eye opener" it was, which he thought would "spur the parent to take the actions they've started with [the Asbestos Committee]…. "[T]he parent has incredible incentive right now to put together something."[116]

Subsequent events were to bear out the truth of Mr. Esserman's latter observation. At the time, surprisingly, no one else seemed to focus on the huge incentive the Parent now had to put together a plan of its own worthy of creditor support. If the Parent were to retain ASARCO pursuant to a confirmed plan, it would effectively owe the staggering Brownsville judgment to itself. If it did not,

---

[115]   Order Approving Sterlite 9019 Motion, Docket No. 10935 (Apr. 22, 2009).

[116]   Hearing Transcript, 145:22-146:8 (Apr. 13, 2009).

subject to the vagaries of the appellate process, the judgment presented the Parent with a very large problem.

The prospect of a credible Parent-sponsored plan—one that could compete with the debtors' latest plan predicated on the new Purchase and Sale Agreement with Sterlite—was an appealing one.   In April 2009, for example, Mr. Jack Kinzie remarked:

> … I think that having competing plans is healthy, and I think what keeps the Grupo plan honest is a Sterlite plan.  Certainly having competition is a good thing.[117]

At the same hearing, the Court commented that it had "been asking and hoping that [the Parent would] make a deal with somebody for a long time here to get them moving on, you know.  We've got Mr. Deal Maker Charlie [gesturing to Mr. Esserman] over there."[118]

### 1.    *"Deal Maker" Sandy's "masterful tactical procedure."*

The Parent, in fact, immediately grasped the potential ramifications of the Brownsville damages ruling.  The recurring dialogue between the Parent's counsel and Applicant, along with the FCR had his counsel, had been ongoing and productive in the weeks prior to the damages ruling.  The Parent may have wanted to prepare for the contingency that materialized; in any event, its conversations with Applicant and the FCR took an even more earnest bent after the ruling.  As of April 12, 2009, in

---

[117]   Hearing Transcript, 49:14-17 (Apr. 13, 2009).

[118]   *Id.* at 146:18-22.

fact, the Parent, on the one hand, and the Asbestos Committee and FCR, on the other, had entered into an agreement in principle that proved to be—no pun intended—the definitive harbinger of a dynamic, competitive plan process would successfully conclude the case.

Mr. Esserman and the FCR recognized that this agreement with the Parent would be viewed by some participants in the reorganization case—rightly or wrongly—with tremendous skepticism. They therefore insisted that the Parent put up a very sizeable good faith deposit to show the Court, ASARCO, other creditors, and interested parties that the Parent had finally gotten serious. Agreeing to put its money where its mouth was, the Parent committed itself to deposit $1.3 billion in an escrow account to backstop its obligations under the agreement in principle.

In its agreement in principle with the Asbestos Committee and the FCR, the Parent agreed that its plan would allow aggregate asbestos claims against ASARCO in the amount of $1.0 billion, and would provide for funding of a § 524(g) trust with $500 million in cash, a promissory note by Reorganized ASARCO in the principal amount of $250 million, rights to insurance proceeds with respect to asbestos claims, and $27.5 million in cash for trust administration costs.[119] This was a far cry from

---

[119] At the time of the agreement in principle with the Parent, there was pending before the Court ASARCO's so-called "global environmental" 9019 motion. Docket No. 10534 (Mar. 12, 2009). It sought, among other things, approval of settlements that entailed transferring numerous debtor-owned but non-operating sites to various custodial trusts, which were to be funded with cash from the estate upon confirmation of a plan. This funding was to include $27.5 million for administrative costs of the custodial trusts. The Asbestos Committee had suggested that provision be made for comparable funding of the administrative costs of the § 524(g) asbestos trust, to which the Parent assented and Sterlite later assented with respect to the plan it was sponsoring.

ASARCO's prepetition offer to settle its aggregate asbestos liabilities for $17 million plus insurance and a small copper option.  The Asbestos Committee and FCR agreed to support the Parent's plan and not support the new "Sterlite plan."  They retained, however, a "fiduciary out" allowing them to shift their support to a competing plan that would yield a materially greater recovery to asbestos creditors and greater aggregate consideration to all creditors.[120]

      Mr. Esserman was the leading architect of that deal—a fact not lost on the Court, which later remarked:

> ... I mean, perhaps it was a cutthroat tactical decision to do it, just like somebody else who bought up the – Sandy Esserman—I used the term "bought" loosely—but which was also a masterful tactical procedure, because it basically changed the dynamics of everything...  [I]t's hard to overemphasize the significant achievement from a bankruptcy standpoint that the parent's plan was."[121]

At long last, a major constituency in the case had summoned the gumption to work out a deal with the Parent, bringing it onboard the plan process in a credible and constructive way.   Even though Applicant was behind the "masterful tactical procedure," its contribution was not instantly recognized.  The announcement that the Asbestos Committee would support the Parent's Plan momentarily caused ASARCO to consider defunding Applicant's source of funding for payment of its fees.

---

[120]  Agreement in Principle Regarding Summary Terms of Chapter 11 Plan for ASARCO LLC and Subsidiaries, Docket No. 10873 (Apr. 17, 2009), Exh. 1.

[121]  Hrg. Transcr., 23:16-24:3 (Nov. 16, 2009).

2.      ***Sterlite Ups the Ante***.

In the meantime, copper prices were trending favorably.  In May 2009, the price of copper rose above $2/lb., far above its $1.26/lb. trough in late December.[122] The ascent continued; in August, the price reached $3/lb., and it hovered near $3.20/lb. for the last quarter of the year, essentially erasing the decline that had begun just a year earlier.[123]  It did not take long for this progression to cast the proposed fire sale to Sterlite in a decidedly questionable light.

The changing landscapes—in the copper market at large and in ASARCO's reorganization case with the Parent's splashy entrée into the plan process—were not lost on Sterlite.  Although he had brokered a landmark deal with the Parent, Mr. Esserman and the rest of Applicant's team, in tandem with the FCR, remained committed to enhancing recoveries to asbestos creditors.  The agreement in principle with the Parent gave the Asbestos Committee and FCR fiduciary outs they would be entitled to exercise if an appropriate, better opportunity were presented to them. Hoping to promote a spirited auction process that would benefit all creditors, Mr. Esserman, with the FCR and his counsel, traveled to New York in May 2009 to meet with a delegation from Sterlite.

Much of the discussion with Sterlite's representatives focused on the possibility of Sterlite beefing up the "copper note."  Mr. Esserman pressed for Sterlite to increase the face principal amount above $600 million.  However, the face

---

[122]  *See* http://www.dailyfutures.com/metals/ (last viewed Feb. 5, 2010).

[123]  *Id.*

amount of the note was already subject to adjustment.  If the "Closing Accounts Amount" were less than an "Agreed Working Capital" number upon closing, the principal amount of the note floated below $600 million; if the reverse were true, it would float above that threshold.  Mr. Esserman urged Sterlite to eliminate downward adjustments while retaining upward ones so that the principal amount of the copper note would have a definite floor.

Another focus of these negotiations was the asbestos creditors' stake, under the Sterlite-sponsored plan, in the Brownville Litigation.  Asbestos creditors, through the proposed § 524(g) trust, were expected to have slightly more than a one-quarter interest in the Brownsville judgment.  While the amount of the judgment was, as noted, quite sizeable, an interest in the judgment was hardly tantamount to cash.  The Parent had vowed to appeal the judgment, which was also subject to collection uncertainties given that the Parent's assets were largely in Mexico.  Mr. Esserman, with the FCR's concurrence, recommended that Sterlite agree to a mechanism whereby asbestos creditors, if they chose to do so, could cash out their stake in the Brownsville judgment.

As a direct result of these negotiations, Sterlite eventually did improve its offer to a degree the Asbestos Committee and FCR could not ignore.  Sterlite agreed to increase the principal amount of the "copper note" from $600 million to *at least* $770 million—a floor subject only to upward adjustment as Mr. Esserman had

advocated.[124]  Notably, these enhancements inured to the benefit of creditors generally, not just asbestos creditors.  Sterlite did, however, agree to a further improvement specific to the asbestos constituency:  a "put" option in favor of the § 524(g) trust permitting the trust to sell Sterlite its interest in the Brownsville judgment for $160 million at any time during years 3 and 4 following the Effective Date.

Accordingly, on June 12, 2009, the Asbestos Committee and FCR exercised their fiduciary outs under the agreement in principle with the Parent and threw their support behind Sterlite's improved plan.  At confirmation, numerous witnesses credited Sterlite's enhancement of its bid directly to Mr. Esserman's efforts in concert with those of the FCR and his counsel.[125]  The "new" Sterlite-sponsored plan would allow aggregate asbestos claims in the amount of $1 billion and fund the § 524(g) trust with pro rata shares of cash distributed to unsecured creditors, the copper note, and litigation trust interests based upon a claim amount of $750 million, and included an additional $27.5 million to fund administrative costs of the trust plus asbestos insurance recoveries.[126]

---

[124]  Notice of Filing of Sterlite Plan Agreement in Principle Term Sheet with the Asbestos Representatives, Docket No. 11723 (June 14, 2009).  The $170 million increase in the principal amount translated into a substantial increase in the total consideration Sterlite was committing to pay for the assets, helping to push up the copper note's discounted present value to more than $300 million.

[125]  George M. Mack of Barclays, Hrg. Transcr., 142:20-143:22 (Aug. 11, 2009); ASARCO CEO Joseph F. Lapinsky, Hrg. Transcr., 240:18-241:20 (Aug. 10, 2009); Vedanta executive C.V. Krishnan, Hrg. Transcr., 42:21-43:14 (Aug. 11, 2009).  Mr. Esserman also acknowledges the invaluable assistance of the FCR and his counsel in these shared efforts.

[126]  See footnote 124 *supra*.

The "Sterlite Plan Agreement in Principle Term Sheet" memorializing all of this also helpfully dispatched a couple of tiresome sideshows.  The hearing on estimation of asbestos claims was adjourned pending confirmation.  With first the Parent, and now ASARCO, as a signatory to the new term sheet, agreeing that ASARCO's aggregate asbestos liabilities should be acknowledged with an allowed claim of $1 billion, both major plan proponents had finally conceded, in the homestretch of the reorganization case, the enormity of ASARCO's responsibility to its legions of asbestos victims, present and future.  ASARCO also agreed to extend the so-called "DIP Loan"—the mechanism through which the Subsidiary Debtors were paying their estates' professionals, including Applicant—through confirmation.[127]

Applicant and counsel for the FCR had insisted upon and obtained fiduciary outs with respect to the improved Sterlite Plan.  While the Asbestos Committee and FCR were obliged to continue to recommend that holders of asbestos claims vote in favor of the new Sterlite plan—even upon exercising their fiduciary outs—they reserved the right to recommend that asbestos claimants also vote in favor of whatever alternative plan gave rise to their exercise of the fiduciary outs.  This construct, conceived by Mr. Esserman with the assistance of the FCR and his counsel, permitted the asbestos constituency to make another run at the Parent, which it promptly proceeded to do.

---

[127]   See footnote 124 *supra*.

The continuing negotiations, like Applicant's conduct throughout the forthcoming confirmation hearing, demanded delicacy and skill cultivated over the course of long careers.  The Asbestos Committee had committed itself to support the Sterlite-sponsored plan.  It could not disengage from Sterlite to support, exclusively, an alternative plan.  There was a line it could not cross.  However, if the Asbestos Committee chose to exercise its new fiduciary out, it could permissibly support a worthy competing plan *in addition to* the Sterlite-sponsored plan.  And if that were to occur, the challenge would be to get close to the line without crossing it, to sit on a narrow fence without falling off, to deftly engage competing plan proponents to improve their proposals even after having committed to support their respective plans.

### 3.   *The Parent Raises*.

Renewed discussions with the Parent culminated before the end of June in an amended agreement in principle with the Parent.  With respect to the funding of the § 524(g) trust, the Parent agreed to upwardly adjust the principal amount of the note component of the trust's funding by $30 million, from $250 million to at least $280 million.[128]

The Parent-sponsored plan contemplated by the amended agreement in principle also promised, again at Mr. Esserman's insistence, to confer significant benefits on the estate generally, benefitting all creditors.  The Parent agreed, for

---

[128]   Notice of Filing of Confirmed Version of ASARCO Incorporated and Americas Mining Corporation's Seventh Amended Plan of Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code, as Modified on August 20, 2009, August 23, 2009, and August 27, 2009, Docket No. 12728, Ex. 18 (Aug. 30, 2009).

example, to release all its claims against the estate, including significant claims for reimbursement of more than $161.7 million for taxes paid on debtors' income and for a tax refund thought to be worth about another $60 million.  Additionally, the Parent agreed to include in its plan "customary exculpation provisions" for *all* parties involved in the reorganization case—a concession that stood to benefit ASARCO, *et al.*'s professionals most of all.[129]  These important concessions were agreed to and preserved only at Applicant's persistent urging.

The Asbestos Committee's constructive role in the plan process, as well as that of the FCR and his counsel, was acknowledged by both of ASARCO's independent directors in depositions taken in the month preceding the confirmation hearing.  Edward Caine recognized the Asbestos Committee's contributions with respect to both plans, testifying that

> there was a change in position of the asbestos committee relevant to the – the plans and the – the results of going back and forth with negotiations created a condition that was even more favorable to all of the plans or to the constituents. … [With r]egard to both [the Parent's and Sterlite's] plans, actually.[130]

Malcolm Lovett testified that he understood that the increase to the "copper note" came out of the negotiations between Sterlite, ASARCO, and "asbestos."[131]

---

[129]   *Id.*  With respect to the exculpation undertaking, the Parent equivocated on whether it would include, for example, Baker Botts and Barclays as exculpated parties, but Applicant persistently and successfully persuaded the Parent to agree to broad exculpation.

[130]   Deposition of Edward Caine, 55:19-25 – 56:1-6 (July 14, 2009).

[131]   Deposition of H. Malcolm Lovett, Jr., 19:3-23; 26:16-21 (Aug. 4, 2009).

George Mack, of Barclays, agreed, noting that the estate—not merely asbestos creditors—stood to benefit:

> Q.   Why did the note amount increase from 600 some odd million to 770?
>
> A.   The note amount increased as a result of negotiations between Sterlite and the asbestos claimants.
>
> Q.   And what about those negotiations caused the note amount to increase?
>
> A.   The asbestos claimants asked for more and Sterlite gave it to them.  Not to them, but to the estate.[132]

### 4.   *A bidding war at confirmation.*

With competing plans being championed by the Parent and ASARCO, the confirmation hearing began one day after the fourth anniversary of ASARCO's chapter 11 filing, on August 10, 2009.  Even during the confirmation hearing, the competitive plan process teed up by Applicant's timely engagement with the Parent continuously bore fruit.

The treatment of general unsecured claims under the plans being proposed immediately prior to the confirmation hearing is summarized in the table on the following page:


[THIS SPACE INTENTIONALLY LEFT BLANK]

---

[132]   Deposition of George M. Mack, 98:15-24 (July 29, 2009).

|  | **Debtors' Plan**[133] | **Parent's Plan**[134] |
|---|---|---|
| **General Unsecured Claims** | Holders of Class 3 General Unsecured Claims totaled $2.0264 billion.[135]   It was projected that these claimants would receive $1.539 billion in cash on the Effective Date, plus 73% of the nine-year, $770 million copper note. *ASARCO, et al.,* calculated the present value of the 73% stake in the copper note at $225.3 million.<br><br>In addition, General Unsecured Claims would share 73% of the Liquidation Trust and 73% of the SCC[136] Litigation Trust, to which they would have to look for any post-petition interest recovery. | Holders of Class 3 General Unsecured Claims could select from among three complicated "treatments", none of which purported to fully pay even the principal amounts of general unsecured claims.<br><br>"Treatment A" provided a pro rata share of ASARCO's existing cash on hand, $60 million from the tax refund, and a Parent contribution of $1.4625 billion.  Creditors would also receive a pro rata share of certain litigation trust interests, which included the potential litigation against Sterlite but excluded recovery from the Parent on account of the Brownsville Litigation.  Creditors were capped at full payment of the principal amount of their claims and could not recover post-petition interest.<br><br>"Treatment B" provided for a pro rata share of ASARCO's cash on hand, $60 million from the tax refund, a Parent contribution of $1.1 billion, and a note from the Parent mirroring the $770 million copper note under the Debtors' Plan.  Creditors would receive a pro rata share of the litigation trust interests as under Treatment A plus, to the extent consideration received by creditors electing Treatment B was insufficient to provide for payment-in-full of claims with post-petition interest, a pro rata share of SCC Litigation Trust interests.[137]<br><br>"Treatment C" was identical to Treatment B except that the Parent agreed to monetize the $770 million copper note at its present value of $307.8 million and distribute that cash to creditors on the Effective Date. |

---

[133]   Sixth Amended Joint Plan of Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code, As Modified, Docket No. 11898 (July 6, 2009).

[134]   Emergency Motion of ASARCO Incorporated and Americas Mining Corporation to (A) Supplement Joint Disclosure Statement and (B) Modify Solicitation Procedures, Docket No. 12100 (July 26, 2009).

[135]   Based on the Debtors' known and preliminary claims estimates as of August 3, 2009.

[136]   Interests in the SCC—Southern Copper Corporation—Litigation Trust were associated with future recovery on the Brownsville judgment.

[137]   Under the Parent's plan, superseded by amendments during the confirmation hearing, the Parent envisioned general unsecured creditors electing Treatments B or C could be partly compensated through interests in a trust representing future recoveries associated with the Brownsville Litigation, though overall recoveries would be capped an full payment of creditor claims.

These same plans, on the eve of confirmation, proposed treating asbestos

personal injury claims as follows:

| | Debtors' Plan | Parent's Plan |
|---|---|---|
| **Asbestos Personal Injury Claims** | Holders of Class 4 Unsecured Asbestos Personal Injury Claims were to be channeled to a § 524(g) asbestos trust projected to be funded with $569.6 million (on account of the $1 billion agreed claim).  The asbestos trust would also receive 27% of the $770 million copper note, to which ASARCO, *et al.*, ascribed a present value of $83.3 million.<br><br>The asbestos trust would also receive 27% of the Liquidation Trust and 27% of the SCC Litigation Trust, the latter backstopped by the put option giving the asbestos trust the right, but not the obligation, to sell its 27% of the SCC Litigation Trust to Sterlite for $160 million subject to temporal parameters (or, if the asbestos trust decided to sell only a portion of its SCC Litigation Trust Interests, for a corresponding percentage of $160 million).<br><br>The asbestos trust would also receive the Asbestos Insurance Recoveries, 100% of Reorganized Covington, and $27.5 million for its expenses. | Holders of Class 4 Unsecured Asbestos Personal Injury Claims were to be similarly channeled to a § 524(g) asbestos trust that would be funded $500 million in cash, plus a $280 million note secured by substantially all of ASARCO's assets and a pledge of 51% of the membership interests in Reorganized ASARCO—all on account of their $1 billion agreed claim:<br><br>In addition, the asbestos trust would receive the Asbestos Insurance Recoveries and $27.5 million for its expenses. |

Just as the confirmation hearing got underway, on day 1, ASARCO

announced changes to the Sterlite-sponsored plan—a "new deal" in counsel's

parlance.[138]  Sterlite proposed to purchase fifty percent (50%) (*i.e.*, half of 73%, or

36.5%) of general unsecured creditors' SCC Litigation Trust Interests—interests,

essentially, in the Brownsville judgment—for $487.3 million, and to subordinate its

distributions on account of those interests to payment in full of post-petition interest

---

[138]   Hrg. Transcr., 19:12-23 (Aug. 10, 2009).

to most general unsecured creditors.[139]  In exchange for 36.5% of the SCC Litigation Trust Interests, Sterlite upped the cash component of the purchase price from $1.1 billion to $1.5873 billion.  Because this change envisioned that most general unsecured creditors would be paid the full principal amounts of their claims in cash on the effective date, general unsecured creditors were no longer entitled to share in the $770 million copper note.  Thus, Sterlite reduced the face amount of the copper note to $207.9 million (i.e., 27% of $770 million), and the new copper note became payable solely to the § 524(g) trust.[140]  The reduced copper note had the same $83.3 million present value as the § 524(g) trust's 27% share of the prior $770 million note; thus, the changes announced had no impact on the consideration being paid to asbestos creditors.[141]

Not to be outdone, that very afternoon counsel for the Parent announced amendments to the Parent's plan,[142] which had provided for a cash contribution by the Parent of $1.4625 billion for general unsecured creditors electing "Treatment A."[143]  Under the Parent's revised plan, this amount was increased to $1.5225 billion, with the result that general unsecured creditors electing "Treatment A" were likely to

---

[139]  *Id.* at 20:6-10.

[140]  *Id.* at 21:3-7.

[141]  *Id.* at 22:8-18.

[142]  *Id.* at 137:17-21.

[143]  ASARCO Incorporated and Americas Mining Corporation's Modified Sixth Amended Plan of Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code, Docket No. 12254 at arts. 5-6 (Aug. 4, 2009).  The varying treatment options proposed by the Parent, which included Treatments B and C in addition to A, have since been mooted as noted below.

receive the full principal amount of their claims, or very nearly so.[144]  Similarly, the

Parent proposed to raise by $260 million each, to $1.410 billion and $1.720 billion,

respectively, its cash contributions for distribution to unsecured creditors electing

Treatments B and C.[145]

That evening—August 10, 2009—negotiations between Mr. Esserman and his

team from Applicant and counsel for the Parent ran very late.  By the next morning,

the Parent's counsel announced further modifications to the Parent's plan.

Henceforth, it would provide for unitary treatment of general unsecured claims

consistent with what had previously been "Treatment C," the option that would

provide the most cash to creditors at closing.[146]  The Parent's newly-modified plan

called for Parent to provide total consideration of $2.0 billion, comprised of a $1.720

billion cash contribution plus the $280 million secured asbestos note.  According to

counsel for the Parent, the Parent-sponsored plan now provided for a 108%

distribution to holders of most general unsecured claims.[147]

Day 3 of the confirmation hearing brought more welcome developments.

Baker Botts announced that Sterlite had agreed to increase the amount of its deposit

in connection with its sponsorship of the debtors' plan from $125 million to $225

million.[148]

---

[144]  Hrg. Transcr., 138:7-10, 12-16 (Aug. 10, 2009).

[145]  *Id.* at 138:18-21.

[146]  Hrg. Transcr., 182:14-25 & 183:1-2 (Aug. 11, 2009).

[147]  Hrg. Transcr., 186:6-17 (Aug. 11, 2009).

[148]  Hrg. Transcr., 13:5-14 (Aug. 12, 2009).

Even though its constituency had committed to support both competing plans going into the confirmation hearing, Applicant was hardly a spectator during the first week of the confirmation hearing. Its lawyers worked tirelessly, literally at all hours of the night, meeting with representatives of ASARCO, Sterlite, and the Parent to discuss continued modifications to the respective plans, all in an effort to steer the case to an even more successful conclusion from a creditor perspective. Applicant's efforts undeniably benefited asbestos creditors, but also facilitated material and significant benefit to the debtors' estates as a whole by consistently and deftly leveraging the respective plan proponents against each other. As a result, the total consideration that stood to be paid under both plans was steadily ratcheted up.

Mr. Esserman's efforts stood out. The ongoing discussions and negotiations he spearheaded throughout the first week of the confirmation hearings had much to do with the brisk pace of salutary plan amendments. His efforts and those of his colleagues (and the FCR and his counsel) contributed directly to the increased consideration being alternately pitched by the Parent and Sterlite. These efforts continued during the weekend; Mr. Esserman and his team participated in substantive discussions with counsel for Sterlite in an effort further the spirited one-upsmanship on the part of the plan proponents that had taken hold.

Indeed, when the confirmation hearing resumed on August 17, the Parent's counsel promptly announced that the Parent would be filing a plan that afternoon that would fund at close to $2.2029 billion in cash.[149] That, along with the

---

[149]   Hrg. Transcr., 85:21-22 (Aug. 17, 2009).

ASARCO's projected cash on hand, was thought to be sufficient to pay all administrative, priority, and secured claims and the principal amount of non-asbestos general unsecured claims *in full*, plus fund the amount of the § 524(g) trust's $500 million cash consideration and pay in full interest on general unsecured claims, interest on the asbestos settlement,[150] and any other claim entitled to post-petition interest under the plan.[151]  The only security remaining under the Parent's plan was the secured asbestos promissory note in the amount of $280 million, accruing interest at 6% and payable in one year without amortization.[152]  Additionally, the Parent committed to increase its good faith escrow deposit from $125 million to $1.6 billion upon entry of the Court's recommendation in favor of the Parent's Plan.[153]

The Parent's increased commitment came about as a direct result of several developments during the first week of confirmation, not the least of which was Mr. Esserman's judicious negotiations to press that all creditors, including asbestos and general unsecured creditors, received post-petition interest on account of their claims. It took extraordinary delicacy for Mr. Esserman to accomplish this, as his client, the Asbestos Committee, had committed to support both plans.  Mr. Esserman realized, however, that the confirmation was shaping up to be a photo-finish between the Parent and Sterlite.  Each was looking to tweak its plan advantageously, hoping to

---

[150]  The post-petition interest paid to the § 524(g) trust was calculated using a $780 million base claim (*i.e.*, the § 524(g) trust's $500 million cash consideration plus the $280 million secured asbestos note), rather than the $1 billion agreed-upon allowed claim for Class 4 asbestos creditors.

[151]  Hrg. Transcr., 85:22-25 & 86:1-5 (Aug. 17, 2009).

[152]  *Id.* at 86:7-11.

[153]  *Id.* at 86:19-22.

obtain an edge over the competing plan.  When Mr. Esserman proposed to the
Parent that it agree to pay asbestos creditors $135.5 million in additional cash as post-
petition interest, the Parent agreed.  In a similar vein, Mr. Esserman prevailed upon
the Parent to drop ASARCO's claim against the Subsidiary Debtors for
reimbursement of the DIP Loan, freeing up several million more dollars for asbestos
creditor recoveries and helping the Parent differentiate its plan from what Sterlite was
proposing.

 With the holder of ASARCO's equity now pitching what it termed a full-
payment plan, ASARCO followed suit, announcing on August 19 that Sterlite would
increase the cash offered under the "new" Purchase and Sale Agreement by an
amount sufficient to pay general unsecured creditors principal and interest in full.[154]
In essence, under its newest plan Sterlite would purchase 100% of the general
unsecured creditors' interests in the SCC Judgment for a purchase price equal to the
projected amount of those claims plus interest, thereby projecting payment-in-full of
all general unsecured claims.  ASARCO's counsel expressed the view that Sterlite's
plan, as revised, was for payment-in-full,[155] a useful characterization from the
standpoint of most creditors but technically a misnomer since the consideration to be
paid to asbestos creditors was less than full payment and remained unchanged.[156]

 Nor was that the end of it.  Counsel for the Parent announced additional
revisions to the Parent's plan on August 19 by committing to increase the $1.6 billion

---

[154] Hrg. Transcr., 13:13-16 (Aug. 19, 2009).

[155] *Id.* at 13:19-22.

[156] *Id.* at 13:16-17.

good faith escrow up to the full $2.2 billion contribution required under the Parent's plan.[157]

As before, Applicant had not been idly watching the volleys from the grandstand. Applicant continued its high level of engagement during week 2. Its late-night meetings with representatives of ASARCO, *et al.*, Sterlite, and the Parent, as well as other parties in interest, sustained the momentum in what was becoming a bidding war between Sterlite and the Parent. On August 21, Mr. Esserman announced "a material and positive enhancement to the treatment of asbestos claims under the Sterlite plan."[158] Asbestos would now receive $700 million cash at closing—previously, the § 524(g) trust was to receive an uncertain amount of cash at closing based on a waterfall, which ASARCO projected to be approximately $567 million.[159] In exchange for the increased cash, there would no longer be a copper note with a discounted present value of $83 million.[160] Asbestos creditors did, however, retain their right to "put" their interest in the litigation trust, in whole or in part, to Sterlite for $160 million between years two and four.[161]

The Parent, on the morning of closing arguments, had what amounted to the last word. To demonstrate that the Parent's plan could be funded seamlessly, counsel announced that Grupo México would pre-fund $500 million in cash into the existing

---

[157] Hrg. Transcr., 94:23-99:25 (Aug. 19, 2009).

[158] Hrg. Transcr., 13:2-4 (Aug. 21, 2009).

[159] *Id.* at 13:6-7.

[160] *Id.* at 13:10-12.

[161] *Id.* at 13:13-17.

escrow,[162] which would then contain $2.4 billion in stock and $500 million in cash.[163] As a result, the estate would have $500 million in cash plus shares of SCC stock valued at approximately $2.4 million to liquidate upon any default by Parent in its plan contributions.[164]

### 5.    *What If Applicant Had Not Been Involved in the Case?*

While a number of factors converged to make the chapter 11 of ASARCO, *et al.*, one of the most successful, major reorganizations in recent history, Applicant's efforts stand apart.  Applicant, with the FCR, brought the Parent to the bargaining table when every other estate fiduciary had resolutely committed itself to Sterlite. Applicant consistently held to its fiduciary duties and stood behind its deal with the Parent even when the other estate fiduciaries retaliated by cutting off funding of Applicant's professionals.

Despite its engagement of the Parent, Applicant (with the FCR and his counsel) was responsible for Sterlite's initial decision to increase the face amount of the copper note by $170 million and for the establishment of its $770 million principal amount as a "floor."

On August 20, 2009, near the end of the confirmation hearing, counsel for the Parent commented that

> [t]he Asbestos Committee and the [FCR] have been very helpful in focusing the Parent and its professionals on the importance of this major and fundamental change to the plan

---

162   Hrg. Transcr., 21:25 & 22:1-2 (Aug. 25, 2009).

163   *Id.* at 22:3-5.

164   *Id.* at 22:10-15.

and we appreciate the support and input that they've given us on that."[165]

Applicant's confirmation negotiations led directly to many of the material and significant increases that both the Parent and Sterlite made to the consideration offered under their respective plans during the confirmation hearings, ultimately providing the estate as a whole with a result far beyond the wildest expectations of the Court and the numerous parties in interest.

Asbestos creditors, too, fared far better in consequence of Applicant's efforts, given the bleak outlook prepetition and the laborious, near-vertical slog necessitated by the alter ego litigation. The well-funded § 524(g) trust is testimony to Applicant's creativity, tenacity, and deftness in pursuing adequate compensation for the legions of asbestos victims of ASARCO, *et al.*, against formidable adversaries and conditions that were often extraordinarily difficult and never easy.

## IV.   ARGUMENTS AND AUTHORITIES

### A.   In "Rare and Exceptional" Circumstances, Fee Enhancements are Appropriate.

Section 330(a) of the Bankruptcy Code governs payment of fees to estate professionals. Subpart 1 authorizes courts to award "[r]easonable compensation for actual, necessary services rendered …."[166] Subpart 3 speaks to the determination of what constitutes reasonable compensation, directing that courts consider "the nature,

---

[165]   Hrg. Transcr., 131:9-16 (Aug. 20, 2009) (discussing Parent's decision to reinstate the releases and exculpations in favor of Baker Botts, the independent directors, and Barclays).

[166]   11 U.S.C § 330(a)(1)(A) & (B).

the extent and the value" of services rendered.[167]   All relevant factors are to be taken

into account, including:

- time spent in their rendition;

- rates charges;

- their necessity to the administration of a case or their benefit at the time of their rendition;

- whether they were performed within a reasonable time commensurate with the complexity, importance, and nature of the matter addressed;

- with respect to professionals, whether the person is board certified or has otherwise demonstrated skill and experience in bankruptcy; and

- whether compensation is reasonable based on what comparably skilled, non-bankruptcy legal practitioners charge.[168]

The appropriate point of departure for determining what constitutes a

reasonable attorneys' fee is the lodestar (*i.e.*, the number of hours expended

multiplied by a reasonable hourly rate of compensation).  *Blum v. Stenson*, 465 U.S.

886, 888 (1984).  There is a "strong presumption" that the lodestar is reasonable.[169]

In "rare" and "exceptional" cases supported by "specific evidence" and detailed

findings of superior performance, however, results-based fee enhancements may be

appropriate.  *Blum*, 465 U.S. at 899; *see also Transam. Natural Gas Corp. v. Zapata P'ship,*

---

[167]   11 U.S.C. § 330(a)(3).

[168]   *Id.*

[169]   *Pennsylvania v. Del. Valley Citizens' Counsel for Clean Air ("Delaware I")*, 478 U.S. 546, 565 (1986).

*Ltd. (In re Fender)*, 12 F.3d 480, 487-88 (5th Cir. 1994); *Shipes v. Trinity Indus.*, 987 F.2d 311, 320-21 (5th Cir. 1993).

      *Blum* was a civil rights case, not a bankruptcy case. It involved application of a "fee-shifting statute" that empowered the court to award a reasonable attorney's fee to the prevailing party as part of costs.[170] Courts have generally regarded *Blum* and other fee-shifting cases as helpfully analogous to fee requests in bankruptcy,[171] but some caution that the analogy is imperfect.[172]

      The Fifth Circuit was skeptical of enhanced fee awards in *Fender* and *Shipes* because it was not persuaded that either case was rare or exceptional.[173] *Fender* involved a dispute over the construction of a settlement agreement between cotenants in minerals tract, one of whom was a chapter 11 debtor.[174] The bankruptcy court had awarded the debtor a fee enhancement of 1.7 times lodestar.[175] On appeal, the Fifth Circuit reversed the enhancement award and remanded, noting that nothing in the bankruptcy court's findings had shown the case to have been

---

[170] 42 U.S.C. § 1988.

[171] *See In re UNR Indus. Inc.*, 986 F.2d 207, 209-10 (7th Cir. 1993).

[172] The court in *In re Farah*, 141 B.R. 920, 928-29 (Bankr. W.D. Tex. 1992), noted that the 30%-of-lodestar "cap" on enhancement awards suggested in *Pennsylvania v. Delaware Valley Citizens' Council for Clear Air ("Delaware II")*, 483 U.S. 711, 730 (1987)—involving a fee-shifting provision in the Clean Air Act—was grounded in the concern that enhancing fees for risk of loss forces losing defendants to compensate plaintiff's lawyers for not prevailing against defendants in other cases. 141 B.R. at 928 (citing *Delaware II*, 483 U.S. at 725). The *Farah* court concluded that such a cap was inapplicable to enhancement awards in bankruptcy "because the rationale that supports that cap has no application in bankruptcy." *Id.* at 928-29. Applicant notes that the cap suggested in *Delaware II* was actually one-third of lodestar—not 30%. 483 U.S. at 730.

[173] Such a concern is unwarranted with respect to ASARCO, *et al.*'s reorganization. *See* Part IV.C. *infra*.

[174] 12 F.3d at 482.

[175] *Id.* at 487.

"rare and exceptional."[176]  *Shipes*, like *Blum*, was a civil rights case.[177]  In remanding,

the Fifth Circuit instructed to the district court to "take cognizance" that fee

enhancements are proper only in rare and exceptional cases supported by specific

evidence and detailed findings.[178]

     In assessing the propriety of a fee enhancement in bankruptcy, a number of

courts have identified bankruptcy-specific factors appropriate for consideration.  The

benefit to the estate conferred by counsel's efforts is one such factor.  *In re Vista*

*Foods USA, Inc.*, 234 B.R. 121, 134 (Bankr. W.D. Okla. 1999) (awarding an

enhancement and observing that "[t]here is no doubt that the estate significantly

benefited by the movant's performance.").

     Another closely-related factor uniquely applicable in bankruptcy is the effect

on creditors of counsel's efforts.  *Id.* The *Vista Foods* court noted that unsecured

creditors would be paid in full and that without counsel's services "the creditors

would have received substantially less, or nothing.").  *Id., see also, In re Gencor Indus.,*

*Inc.*, 286 B.R. 170, 179 (Bankr. M.D. Fla. 2002) ("In considering fee enhancements in

a bankruptcy case, courts should examine the way the attorney worked to maximize

the value of assets in the case and to increase distributions to all classes of

creditors.").

---

[176]  *Id.* at 488.

[177]  987 F.2d at 315.

[178]  *Id.* at 322, n.9.

That Applicant's efforts significantly benefited the estate generally and asbestos creditors specifically cannot be reasonably disputed.  Absent Applicant's efforts, in tandem with those of the FCR and his counsel, asbestos creditors could have wound up literally with nothing as contrasted with the substantial compensation for their claims that the § 524(g) trust can now provide.  Creditors generally would almost assuredly have fared less satisfactorily had Applicant not been successful in its engagement of the Parent and its subsequent efforts, with the FCR and his counsel, to press both the Parent and Sterlite to improve their respective plans.  ASARCO, et al.'s professionals benefited from Applicant's involvement as well; Applicant prevailed on the Parent to include them in the exculpation provision under the confirmed plan, which the Parent had demonstrated reluctance to do.

In *In re Mirant Corp.*, 354 B.R. 113 (Bankr. N.D. Tex. 2006), the bankruptcy court identified another bankruptcy-specific factor that it considered in evaluating proposed fee enhancements.  One was exceptional efficiency in the performance of the services provided.  *Id.* at 142-43.  The *Mirant* court also considered "the performance of the professional in a fiduciary context."  *Id.* at 143.  As the *Mirant* court explained:

> Although the professional may arguably not itself owe fiduciary responsibilities other that to its client, how the professional guides its fiduciary client must necessarily be a consideration in assessing whether a bonus has been earned.  Each of the Committees, Debtors and the Examiner is a statutory fiduciary.  In order for chapter 11 to work as contemplated by Congress, each statutory fiduciary must perform its duties in a fashion consistent with the best interests of the estates and its beneficiaries.  It is the obligation of a professional retained by a statutory fiduciary to ensure that its client understands and acts

> consistently with the client's fiduciary responsibilities, including a
> commitment to achieving a fair and equitable result, and, in deciding
> whether a professional has earned a fee enhancement, the court must
> assess its effectiveness in this respect.

*Id.* (internal citations omitted).  In such regard, the *Mirant* court weighed any

questionable aggressiveness of counsel and the costs and quality of the services in

determining whether to award enhancements.  *Id.* at 146.[179]

The steadiness of Applicant and the Asbestos Committee in the context of

this protracted and highly complex reorganization case is unassailable.  It is

noteworthy that the seminal event in kick-starting a serious plan process was the

agreement in principle that emerged from the Magner Mediation—ostensibly the

asbestos mediation.  By reaching a provisional understanding with environmental

creditors, Applicant, on behalf of the Committee, with the FCR and his counsel,

made it possible for ASARCO to focus its efforts on formulating a plan of

reorganization satisfactory to all of its major creditor constituencies.

Bankruptcy courts considering fee enhancements or "bonuses" have

consistently agreed that such awards are appropriately only in those "rare cases where

exceptional success has been achieved."  *In re THCR/LP Corp.*, No. 04-46898/JHW,

2008 WL 3194056, at *8 (Bankr. D.N.J. Aug. 1, 2008).  As the bankruptcy court

concisely observed, "[c]learly, a spectacular result is a necessary prerequisite to any

enhancement."  *Mirant*, 354 B.R. at 142.

---

[179]  In *Mirant*, the court found that although counsel for two official committees and counsel for the
debtors did a very good job of attending to the fiduciary duties they owed their clients, "the
incidents of over-reaching are sufficient that this factor must weigh against granting [the motion
for fee enhancements]."  *Mirant*, 354 B.R. at 146.

B.     **Fifth Circuit Jurisprudence Regarding Fee Enhancements in Bankruptcy.**

The Fifth Circuit has traditionally employed the lodestar method to determine a reasonable attorneys' fees under 11 U.S.C. § 330.  *In re Cahill*, 428 F.3d 536, 539 (5th Cir. 2005); *In re Fender*, 12 F.3d at 487.  A court may adjust the lodestar up or down based on its consideration of the Section 330 factors and those set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 713, 717-19 (5th Cir. 1974).[180]  Upward adjustment to the lodestar may be appropriate in rare and exceptional cases upon appropriate findings supported by the record.  *See, e.g., In re Lawler*, 807 F.2d 1207, 1213-14 (5th Cir. 1987); *Rose Pass Mines, Inc. v. Howard*, 615 F.2d 1088, 1090-91 (5th Cir. 1980).

Ordinarily, in applying the *Johnson* factors to determine whether an adjustment to the lodestar is appropriate, a court "must be careful not to double count a *Johnson* factor."  *Shipes*, 987 F.2d at 320.  That is, to the extent one or more *Johnson* factors may be fully reflected in the lodestar, an enhancement to lodestar cannot ordinarily be predicated on those factors.  However, consistent with the Supreme Court's pronouncement in *Blum*, an upward adjustment of the lodestar amount based on factors already included in determining the lodestar is permissible "in certain rare and

---

[180]   The *Johnson* factors are (1) time and labor required, (2) novelty and difficulty of the issues, (3) skill required to perform the legal services properly, (4) preclusion of other employment, (5) customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by client or circumstances, (8) amount involved and results obtained, (9) experience, reputation and ability of the attorneys, (10) undesirability of  the case, (11) nature and length of the professional relationship with the client, and (12) award in similar cases). 488 F.2d at 717-19.

exceptional cases supported by both specific evidence on the record and detailed findings by the lower courts."  *In re Fender*, 12 F.3d at 488.

### C.   This is a "Rare and Exceptional" Case in which an Enhancement to Applicant's Lodestar Fee is Appropriate.

Is the reorganization of ASARCO, *et al.*, sufficiently "rare" and "exceptional" as might warrant enhancement of select professionals' fees?  The effusive superlatives being used in all quarters to describe the case suggest rarity and exceptionality.  The judicial officers most involved agree that it is "one of the most successful bankruptcy proceedings in recent history."[181]  Colorado's attorney general actually used the word "exceptional" in epitomizing the case.[182]

It has been suggested that full satisfaction of creditors is a threshold requirement for finding a case to be rare and exceptional for purposes of a fee enhancement.[183]  In the ASARCO reorganization, there were plans vying for confirmation at the end that proposed to pay most creditors in full.[184]

It has also been suggested that a case's rareness and exceptionality may turn on the presence of three factors:  unforeseen obstacles, results in the end that far exceed reasonable expectations at the outset of the case, and consent by the party paying the fee to the enhancement request.[185]  Whether Reorganized ASARCO will,

---

[181]  *See* footnote 9, *supra.*

[182]  *See* footnote 10, *supra.*

[183]  *In re El Paso Refinery, L.P.*, 257 B.R. 809, 836 (Bankr. W.D. Tex. 2000) (citing *In re D.W.G.K. Rests.*, 106 B.R. 194, 197 (Bankr. S.D. Cal. 1989).

[184]  *See* footnote 8, *supra.*

[185]  *El Paso Refinery*, 257 B.R. at 839 (citing *In re First Am. Health Care of Ga., Inc.*, 212 B.R. 408, 416 (Bankr. S.D. Ga. 1997); *Gencor Indus.*, 286 B.R. at 179.

under the Parent's auspices, consent to Applicant's requested enhancement remains to be seen.  The confirmed plan did not merely pay general unsecured creditors in full and provide a substantial recovery to asbestos creditors; it allowed the Parent to retain its equity in ASARCO.  That the Parent succeeded in retaining its equity is due in large measure to Mr. Esserman's successful engagement of the Parent in the plan process in Spring 2009.

As to unforeseen obstacles, the Court is well-informed about the challenges Applicant successfully participated in surmounting, from the corporate governance crisis to the huge undertaking associated with the Arizona document review; from the timely engagement of the Parent in the plan process despite the possibility of being defunded to Applicant's deft stoking of the bidding war between the Parent and Sterlite leading up to and continuing throughout the confirmation hearing.

The results obtained in this case are unquestionably extraordinary when juxtaposed against what seemed likely pre-petition.  The Asbestos Committee's pre-petition precursor declined ASARCO's offer of $17 million and change, which would have been token compensation for ASARCO's asbestos victims.  Under the confirmed plan, almost $1 billion inures to the benefit of asbestos creditors.  The improvement, significantly attributable to Applicant's exertions, is literally logarithmic.  But that is only part of the picture.

Applicant's myriad efforts benefited the estate generally, especially its timely engagement with the Parent at a critical juncture leading to a vibrant competing plan process through confirmation.  Applicant, through its conversations with the Parent

early in the case and its bold agreement in principle on the heels of the Brownsville damages ruling, set the case on a trajectory that would lead to confirmation in just six months of a plan that paid most creditors in full and provided, for asbestos creditors, a substantial settlement of their aggregate claim.

The bleak outlook at the beginning of this case, contrasted against the results obtained with the confirmed plan, is reminiscent of the "rare and exceptional" result obtained by counsel for the equity committee in *In re THCR/LP Corp.*, No. 04-468989/JHW, 2008 WL 3194056, at *9 (Bankr. D.N.J. Aug. 1, 2008). When that case was filed, the debtors anticipated public non-insider shareholders would recover approximately $300,000 pursuant to a pre-negotiated plan. *Id.* at *10. Due to the efforts of counsel for the equity committee, those shareholders recovered a cash package worth approximately $40 million, plus one-year warrants to purchase stock in the reorganized company. *Id.* The *THCR/LP* court appropriately awarded an enhancement to the equity committee's counsel of thirty percent (30%) of lodestar.[186]

Additional achievements of Applicant in this case include Applicant's prevailing on the Parent to drop its substantial tax claims against the estate, freeing up additional funds for creditors. Applicant convinced Sterlite to increase its copper note at a critical juncture to the substantial benefit of all creditors. It was also as a result of Applicant's efforts with the Parent that the exculpated parties under the confirmed plan include ASARCO's counsel and numerous others, undoubtedly sparing the Court and others some post-confirmation distractions.

---

[186]   *In re THCR/LP Corp.*, 2008 WL 3194056, at *11.

In *Farah*, the court cited similarly successful efforts on the part of counsel for the debtors that resulted in the rare and exceptional results in that case. Debtors' counsel negotiated the "resolution of a highly publicized and bitter dispute" between one of the debtors and the company in which he had formerly served as CEO that resulted in, among other things, release of a $750,000 claim against the estate. *Farah*, 141 B.R. at 925. Counsel for the debtors also negotiated forgiveness of a $4 million obligation of the debtors to the RTC. *Id.* The Farah court doubled debtors' counsel's lodestar as an enhancement.[187]

Applicant's skillful bridging of the divide between ASARCO and the Parent culminated in competing plans, and the eventual confirmation of a plan that paid most creditors in full with interest, funded a substantial asbestos settlement, and allowed the Parent to retain its equity in ASARCO, and warrants enhancement of Applicant's fee. Applicant's efforts plainly maximized the value of assets in the case and increased distributions to all classes of creditors. In obtaining this extraordinary outcome for the benefit of ASARCO's estate and all of the creditors, Applicant overcame unforeseen obstacles and far exceeded expectations for reasonable outcomes at the start of the case. Applicant performed its duties in a manner consistent with the best interest of the estate and all of the creditors.

---

[187] *In re Farah*, 141 B.R. at 929; *see also In re Mirant Corp.*, 354 B.R. at 147-148 (enhancement of 10% of lodestar awarded to local counsel for equity committee and counsel for examiner); *In re El Paso Refinery*, 257 B.R. at 842-43 (enhancements of approximately 72% of lodestar awarded to general counsel for chapter 7 trustee); *In re Gencor Indus., Inc.*, 286 B.R. at 174 (27% of lodestar awarded to counsel for debtor).

## V. CONCLUSION

For the foregoing reasons, a fee enhancement of 25% of Applicant's lodestar, $19,317,274.78 through January 2010, is appropriate and Applicant respectfully prays for such an award.  Against Applicant's lodestar through January, such an enhancement would amount to $4,829,318.70.

**STUTZMAN, BROMBERG,
ESSERMAN & PLIFKA,
A Professional Corporation**


By: _ /s/ Jacob L. Newton _____
      Sander L. Esserman
      State Bar No. 06671500
      Steven A. Felsenthal
      State Bar No. 06889900
      David A. Klingler
      State Bar No. 11574300
      Jacob L. Newton
      State Bar No. 24046523

2323 Bryan Street, Suite 2200
Dallas, Texas  75201-2689
Telephone:  (214) 969-4900
Facsimile:  (214) 969-4999

**APPLICANT AND ATTORNEYS
FOR THE OFFICIAL COMMITTEE
OF ASBESTOS CLAIMANTS AND
THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS FOR
THE SUBSIDIARY DEBTORS**

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of February 2010, the foregoing Application of Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation, for an Order Granting Enhancement of Its Fees was served by ECF on all parties receiving ECF service and that a copy was served via ECF and/or United States First Class Mail, postage prepaid, on the parties identified below:

| VIA First Class Mail | VIA ECF |
|---|---|
| Charles R. Sterbach<br>Office of the United States Trustee<br>606 N. Carancahua, Suite 1107<br>Corpus Christi, Texas 78476 | John Tate<br>Debra Innocenti<br>Oppenheimer, Blend, Harrison & Tate<br>711 Navarro, Sixth Floor<br>San Antonio, TX  78205 |
| Subsidiary Debtors<br>5285 East Williams Circle, Suite 2000<br>Tucson, Arizona 85711 | Paul Singer<br>Derek Baker<br>Reed Smith LLP<br>435 Sixth Ave.<br>Pittsburgh, Pennsylvania 15219 |
| ASARCO, LLC<br>Attention: Doug McAllister<br>5285 East Williams Circle, Suite 2000<br>Tucson, Arizona 85711 | |
| Robert C. Pate<br>Law Offices of Robert C. Pate<br>Frost Bank Plaza<br>802 North Carancahua, Suite 1350<br>Corpus Christi, Texas 78470 | |
| Mark A. Roberts<br>Alvarez & Marsal North America, LLC<br>Fairfax Square Tower 1<br>8065 Leesburg Pike, Suite 310<br>Vienna, Virginia 22182 | Dion W. Hayes<br>McGuire Woods LLP<br>One James Center<br>901 East Cary Street<br>Richmond, VA 23219 |
| Alvarez & Marsal North America, LLC<br>600 Lexington Avenue<br>New York, New York 10022<br>Attention: General Counsel (re: ASARCO) | |

| **VIA First Class Mail** | **VIA ECF** |
|---|---|
| Americas Mining Corporation<br>ASARCO Incorporated<br>Campos Eliseos 400<br>Lomas de Chapultepec<br>Mexico, D.F. 11560<br>Attention: Jorge Lazalde | Charles A. Beckham, Jr.<br>Brooks Hamilton<br>Haynes & Boone, LLP<br>1 Houston Center<br>1221 McKinney, Suite 2100<br>Houston, TX 77010 |
| Robert J. Moore<br>Milbank, Tweed, Hadley & McCloy LLP<br>601 South Figueroa Street, 30th Floor<br>Los Angeles, CA 90017 | |

/s/ Jacob L. Newton
Jacob L. Newton