**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| In re: | § | Case No.  05-21207 |
| | § | |
| ASARCO LLC, et al., | § | Chapter 11 |
| | § | |
| Debtors. | § | Jointly Administered |

**COVER SHEET TO FINAL FEE APPLICATION OF BAKER BOTTS L.L.P.**

| | |
|---|---|
| Name of Applicant: | Baker Botts L.L.P. |
| Authorized to provide professional service to: | Chapter 11 Debtors |
| Date Order of Appointment signed: | August 12, 2005 |
| Date Rule 2016(b) statement filed: | August 10, 2005 |
| Application period for which compensation and reimbursement is sought: | August 9, 2005 through December 8, 2009 |
| Total professional service fees requested in this application, after voluntary reduction and before enhancement: | $113,338,522.48 |
| Total fee enhancement sought: | $22,667,704.50 |
| Total fees and expenses for preparation and defense of this application: | *See* Section X herein |
| Total professional hours requested in this application: | 319,860.85 |
| Total voluntary professional fee reductions: | $1,714,734.75 |
| Professional rates (2005-2009): | High:  $800.00; Low:  $190.00 |
| Paraprofessional / Staff rates (2005-2009): | High:  $380.00; Low: $50.00 |
| Blended hourly rate of all professionals based on lodestar calculation: | $354 |
| Blended hourly rate of lawyers only based on lodestar calculation: | $397 |
| Total reimbursable expenses sought in this application: | $6,065,598.58 |
| Total voluntary expense reductions: | $18,574.56 |
| Retainer amount: | $0.00 |
| Indicate whether this is an application for pre- or post-confirmation services: | Pre- and Post-confirmation Services |
| Prior applications, dates, amounts: | *See* Exhibit B |
| This is an interim/final application: | Final |

*/s/ James R. Prince*                                        February 8, 2010
James R. Prince

## Table of Contents

I.  SUMMARY ....................................................................................................................3

II.  JURISDICTION ...........................................................................................................7

III.  LEGAL STANDARD ...................................................................................................7

    A.  Compensation in Ordinary Bankruptcy Cases ........................................................7

    B.  Fee Enhancement Compensation ............................................................................9

    C.  Compensation for Preparation and Defense of Fee Application ...........................11

IV.  OBTAINING THE SCC JUDGMENT IN BROWNSVILLE .....................................11

V.  CREATING COMPETITION TO ACHIEVE A FULL-PAYMENT PLAN ............18

    A.  Identifying and Securing Sterlite as Plan Sponsor................................................18

    B.  Developing an Innovative Auction of the SCC Judgment.....................................21

    C.  Confirmation Hearing and Closing.......................................................................24

VI.  REDUCING LIABILITY EXPOSURE .......................................................................25

    A.  Resolution of Environmental Issues .....................................................................25

    B.  Resolution of Asbestos Issues..............................................................................34

    C.  Resolution of Toxic-Tort Issues...........................................................................38

    D.  The Mission Mine ................................................................................................39

VII.  MAXIMIZING ASSETS FOR THE ESTATES .........................................................41

    A.  Labor and Employee Benefits Issues....................................................................41

    B.  The South Mill .....................................................................................................42

    C.  Tax Issues.............................................................................................................45

VIII.  OVERCOMING THE PARENT'S CONDUCT ..........................................................47

IX.  RETENTION OF BAKER BOTTS AND PRIOR COMPENSATION.......................51

    A.  Retention ..............................................................................................................51

    B.  Prior Compensation .............................................................................................52

X.  COMPENSATION REQUESTED................................................................................53

XI.  CONCLUSION ...........................................................................................................55

## Description of Exhibits

**Exhibit A:** "<u>Retention Documents</u>" are the employment applications Baker Botts filed in these chapter 11 cases, related disclosures, and orders approving the employment applications. The orders approving Baker Botts' employment are also included in Exhibit A.

**Exhibit B:** "<u>Prior Compensation</u>" is a chart of all the fees and expenses awarded to Baker Botts under interim compensation orders.

**Exhibit C:** "<u>Professionals Summary</u>" identifies all of the Baker Botts professionals who worked on the chapter 11 cases, their billing rates, date of bar admission, and how many hours each professional billed to the case overall and to each project category by year during the Application Period (August 9, 2005 through December 8, 2009).

**Exhibit D:** "<u>Time and Billing Records</u>" includes (i) a chart that references the docket numbers of all the time and billing records of fees and expenses Baker Botts charged to the Debtors and filed with interim fee applications and (ii) the time and billing records of fees and expenses Baker Botts charged to the Debtors for November 1, 2009 through December 8, 2009 but which remain unpaid.

**Exhibit E:** "<u>Expense Summary</u>" is a chart summarizing all of the expenses Baker Botts charged to the Debtors during the Application Period.

**Exhibit F:** "<u>Summary of Services</u>" is a narrative summary of the various key projects Baker Botts completed for the Debtors organized by service category.

**Exhibit G:** "<u>Summary of Hours and Fees</u>" is a summary of the hours billed and fees charged to the various project categories.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| In re: | § | **Case No. 05-21207** |
| | § | |
| **ASARCO LLC, et al.,** | § | **Chapter 11** |
| | § | |
| **Debtors.** | § | **Jointly Administered** |

**FINAL FEE APPLICATION AND REQUEST FOR FEE ENHANCEMENT OF**
**BAKER BOTTS L.L.P., COUNSEL TO THE DEBTORS, FOR ALLOWANCE**
**AND PAYMENT OF COMPENSATION FOR SERVICES RENDERED**
**AND REIMBURSEMENT OF EXPENSES INCURRED FOR THE PERIOD**
**AUGUST 9, 2005 THROUGH DECEMBER 8, 2009**

**IN ACCORDANCE WITH THE ORDER SETTING DEADLINES AND PROCEDURES GOVERNING APPLICATIONS PURSUANT TO BANKRUPTCY §§ 330, 503(b)(3)(D) AND 503(b)(4) AND OTHER RELATED MATTERS, WRITTEN OBJECTIONS TO THIS FINAL FEE APPLICATION ARE DUE ON OR BEFORE MARCH 10, 2010. HEARINGS ON FINAL FEE APPLICATIONS AND FEE ENHANCEMENT APPLICATIONS ARE SET FOR JUNE 1 - 4, 2010 AT 9:00 A.M. (CENTRAL) AT THE UNITED STATES COURTHOUSE, 1133 N. SHORELINE BLVD. #208, CORPUS CHRISTI, TEXAS 78401. REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

TO THE HONORABLE RICHARD S. SCHMIDT, UNITED STATES BANKRUPTCY JUDGE:

Baker Botts L.L.P. ("Baker Botts") respectfully submits this final fee application and request for fee enhancement (the "Fee Application"). Baker Botts asks the Court to enter an order allowing $136,006,226.98 in fees and $6,065,598.58 in expenses incurred in Baker Botts' representation of ASARCO LLC ("ASARCO") and its affiliated debtors (the "Debtors") in these chapter 11 cases during the period of August 9, 2005 through December 8, 2009 (the "Application Period"). These amounts include (1) final approval of $112,018,548.73 in fees and $6,024,460.12[1] in expenses previously paid by ASARCO to Baker Botts pursuant to orders entered by this Court; (2) final approval of $1,319,973.75 in fees and $41,138.46 in expenses

---

[1] In preparing this Fee Application, Baker Botts identified a $4,452.09 discrepancy in the amount of expenses that have been approved by the Court and the payment amount received from ASARCO. Baker Botts will continue to investigate this discrepancy and supplement this Fee Application to the extent necessary.

incurred by Baker Botts for the period of November 1, 2009 through December 8, 2009, for which Baker Botts has not been paid[2]; and (3) a 20% enhancement of the $113,338,522.48 in fees calculated by the lodestar method that Baker Botts incurred during the Application Period, which is equal to an additional $22,667,704.50.  Baker Botts requests that the Court's order direct the Plan Administrator and/or ASARCO to pay to Baker Botts $23,987,678.25 in fees and $41,138.46 in expenses that remain unpaid, plus fees and expenses for the preparation and defense of this Fee Application in an amount to be determined by the Court.

The Court should award Baker Botts reasonable compensation for the actual and necessary services it performed in accordance with 11 U.S.C. § 330(a).  This award should include an enhancement of the lodestar calculation of Baker Botts' fees if the Court determines that the results obtained in these cases are rare and exceptional.  *See In re Fender*, 12 F.3d 480, 488 (5th Cir. 1994).

Baker Botts respectfully submits that the results obtained in these cases were so unexpected and so extraordinary that the Court should determine that an enhancement of 20% of the lodestar calculation is necessary to properly compensate for the value of the services that Baker Botts rendered in these cases.  The ASARCO bankruptcy case was one of the largest and most complex in United States history, and the results achieved were extraordinary, especially given the company's distressed financial state at the beginning of the case and the complex and contentious nature of the proceedings.  As Debtors' counsel, Baker Botts played a pivotal role in achieving these remarkable results.  Baker Botts' dedication, creativity, and efforts were primary factors leading to ASARCO's unprecedented reorganization.

---

[2] Baker Botts will send invoices of the fees and expenses that it incurred for the period of November 1, 2009 through December 8, 2009 to the Plan Administrator for processing and payment under the Administrative Order (defined below).

# I.   SUMMARY

1.      The Court has stated that the ASARCO bankruptcy case "is probably the most successful Chapter 11 of any magnitude in the history of the Code."  Tr. 11/23/09, at 41:5-6 (Schmidt, J.).  ASARCO entered bankruptcy on the brink of liquidation, but exited chapter 11 financially sound, with its creditors paid in full plus post-petition interest and allowed attorneys' fees.

2.      Baker Botts was one of the most significant contributors to this unexpected and extraordinary result.  Baker Botts used creative and innovative legal strategies to resolve the Debtors' complex legal matters, and advised the Debtors about how to navigate through the bankruptcy process to a successful reorganization.

3.      To be sure, the success in these cases is due to the diligent and effective efforts of other parties.  The District Court and its staff, the Bankruptcy Court and its staff, ASARCO's Board of Directors and management, and thousands of dedicated ASARCO employees played important roles.  Other parties and professionals in the cases made contributions to ASARCO's ultimate success, including the Debtors' co-counsel and financial advisors[3]; the Official Committee of Unsecured Creditors (the "ASARCO Committee") and its counsel and other advisors; the Official Committee of Asbestos Claimants (the "Asbestos Committee") and its counsel and other advisors; Robert Pate, the Future Claims Representative ("FCR"), and his counsel and other advisors; counsel for the U.S. Department of Justice, Environment and Natural Resources Division and the many state environmental agencies (collectively, the "DOJ"); and counsel for the United Steelworkers Union (the "USW").  Copper prices also played an

---

[3] Jordan, Hyden, Womble, Culbreth & Holzer, P.C. ("Jordan, Hyden") served as the Debtors' co-counsel in these cases and contributed significantly to their success.  Initially, Lehman Brothers Inc. and later Barclays Capital Inc. ("Barclays") served as the Debtors' financial advisors in these cases and also contributed significantly to their success.

important role, although not always in a positive manner.  At times, copper prices presented significant challenges.

4.      This Fee Application should not be read to diminish the efforts of others.  Nor should the discussion of a particular aspect of the cases be read as any indication that others involved should not receive credit at times for the results obtained.  Rather, the purpose of this Fee Application is to demonstrate that, by any measure, the legal services performed—and the remarkable results achieved—by Baker Botts were integral to the overall success of these cases.  The contrast between prepetition ASARCO and reorganized ASARCO is astounding, and Baker Botts was instrumental in this historic turnaround.

5.      In 1999, Grupo Mexico S.A.B. de C.V. ("Grupo Mexico") acquired ASARCO in a leveraged buyout that greatly increased the company's debt load.  During the next few years, copper prices plummeted to record lows that, coupled with ASARCO's new long-term debt, put the company into financial distress.  On top of that, ASARCO faced significant contingent liabilities for environmental, asbestos, and toxic-tort claims.

6.      ASARCO's financial situation worsened after Grupo Mexico effectuated an intercompany sale of ASARCO's most profitable asset—its controlling ownership interest in Southern Copper Corporation ("SCC")—in March 2003.[4]  Between that time and August 2005, ASARCO "survive[d] from hand to mouth."  *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 314 (S.D. Tex. 2008).  "It cannibalized assets, sold or abandoned other assets, fired employees, high-graded mines, monetized badly needed insurance policies, and cut costs.  It also maintained a pattern of delaying or refusing to pay creditors.  In layman's terms, it was constantly 'robbing Peter to pay Paul.'"  *Id.*

---

[4] At the time of the transfer, SCC was known as Southern Peru Copper Corporation.

7.     ASARCO's lack of cash also hurt the company's ability to maintain operations. "Years of under-funding had caused a deep drop in performance." *Id.* ASARCO's operational personnel "complained that the lost revenues due to lack of funding were nearly $100 million and that the company was losing valuable workers." *Id.*

8.     ASARCO was insolvent, beginning at least by March 2003. Ultimately, the straw that broke the camel's back was the strike of 1,500 ASARCO employees. ASARCO's labor contracts expired in 2004 and early 2005. Controlled by Grupo Mexico, a staunch opponent of unionized labor, ASARCO was unable or unwilling to negotiate new contracts with labor, and thus 1,500 union employees went on strike in July 2005.

9.     In August 2005, ASARCO sought chapter 11 protection and retained Baker Botts as Debtors' counsel. "[T]he prospects of reorganization were slim." Tr. 12/4/09, at 21:14-15 (Schmidt, J.). "[T]he company had essentially run out of cash and was saddled with massive environmental liability, financial debt, potential asbestos-related liability, falling copper prices, and a striking workforce." Dkt 12844 (Amended Report & Recommendation) at 3. Creditors were expected to receive cents on the dollar, if anything, because ASARCO's assets were severely depleted and the claims against it were extraordinarily high. Tr. 12/4/09, at 4-6 (Schmidt, J.) ("At the beginning of this case, it looked as though people who had unsecured claims . . . would get nothing."). Environmental and asbestos-related claims alone were upwards of $8 billion.

10.     Baker Botts faced significant hurdles from day one. Following ASARCO's bankruptcy filing, all of the company's prepetition directors and its chief executive officer resigned. ASARCO had little cash, no debtor-in-possession financing, and no financial advisor. It also was in the midst of a labor strike. Baker Botts acted quickly to assist ASARCO in

resolving its corporate governance issues, obtaining debtor-in-possession financing, retaining a financial advisor, and settling the strike. Each of these steps was critical to save ASARCO from liquidation and put it on the path toward reorganization.

11.     Baker Botts continued to work tirelessly for ASARCO over the next four years. The actions Baker Botts took to help ASARCO successfully reorganize are too numerous to catalog, but its greatest achievements can be grouped into three broad categories. Without these achievements, a full-payment plan likely would never have materialized.

12.     First, Baker Botts substantially increased the assets of ASARCO's estate. Among other things, it obtained a multi-billion-dollar judgment relating to ASARCO's transfer of its SCC shares. That judgment is the largest fraudulent transfer judgment in chapter 11 history. Baker Botts also litigated and reclaimed the South Mill, a lucrative component of ASARCO's mining operations. These results increased ASARCO's profitability and made the company far more attractive to potential buyers.

13.     Second, Baker Botts significantly reduced the claims faced by ASARCO. It used ground-breaking legal strategies to settle and resolve billions of dollars in environmental, asbestos, and toxic-tort claims—all on terms favorable to ASARCO. These results decreased ASARCO's liabilities and made the company even more desirable to potential buyers.

14.     Third, Baker Botts worked closely with ASARCO and Barclays to develop and implement an auction process that resulted in the selection of a plan sponsor that vigorously competed with Americas Mining Corporation ("AMC") and ASARCO Incorporated (together, the "Parent"). When that plan sponsor walked away from the parties' deal, Baker Botts worked closely with ASARCO and Barclays to renegotiate the parties' contract to maintain competition.

Baker Botts also increased the Parent's need to outbid other bidders for the company by developing an innovative auction process of the SCC judgment.

15.     In large part due to these efforts, creditors ultimately received what no one could have anticipated at the beginning of these cases: payment in full plus post-petition interest and allowed attorneys' fees.  At the same time, ASARCO left bankruptcy in the position to succeed for years to come.  With the help of Baker Botts, the company had reformed its corporate governance, improved its operations, and substantially reduced its liabilities.  ASARCO's bankruptcy is truly a rags-to-riches story, and Baker Botts is one of the primary authors.

16.     Below in Sections IV through VI is a narrative of some of the significant tasks that Baker Botts performed during these chapter 11 cases and the extraordinary results achieved. This narrative is not meant to and does not describe all the tasks Baker Botts performed during these chapter 11 cases.  Attached as **Exhibit D** is a chart that references all of the time and billing records Baker Botts filed in prior interim fee applications, which are incorporated by reference in this Fee Application.  In addition, attached as **Exhibit F** is a detailed narrative summary of the tasks Baker Botts performed for the Debtors, organized by task code.

## II.     JURISDICTION

17.     This Court has jurisdiction over this Fee Application under 28 U.S.C. §§ 157 and 1334.  Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the relief sought herein is 11 U.S.C. §§ 330 and 331 and Federal Rule of Bankruptcy Procedure 2016(a).

## III.     LEGAL STANDARD

### A.     <u>Compensation in Ordinary Bankruptcy Cases</u>

18.     Under 11 U.S.C. § 330(a), a professional employed by a debtor in possession may be awarded reasonable compensation for actual and necessary services performed by the

professional.   In ordinary bankruptcy cases in the Fifth Circuit, bankruptcy courts use the lodestar method to calculate reasonable fees under section 330 of the Bankruptcy Code, and that result is adjusted up or down based on factors set out in section 330(a)(3).   Section 330(a)(3) provides that in determining reasonable compensation, the court should consider the nature, the extent, and the value of the professional's services, taking into account all relevant factors, including:

- the time spent on such services;

- the rates charged for such services;

- whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under title 11;

- whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

- whether the professional has demonstrated skill and experience in the bankruptcy field; and

- whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in non-bankruptcy cases.

11 U.S.C. § 330(a).

19.     In *Johnson*, the Fifth Circuit set out twelve factors for a court to consider in determining whether attorney compensation is reasonable.  *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).  Half of those factors are contained in section 330(a) of the Bankruptcy Code and set forth above.  The additional *Johnson* factors not contained in section 330(a) are:

- the novelty and difficulty of the questions presented by the case, and the preclusion of other employment by the attorney;

- the customary fee for similar work in the community, whether the fee is fixed or contingent, and time pressure imposed by the client or the circumstances;

- the amount involved and the results obtained as a result of the attorney's services;

- the desirability of the case;

- the nature and length of the professional relationship with the client; and

- awards in similar cases.

This Fee Application and the accompanying exhibits address the factors set out in section 330(a)(3) of the Bankruptcy Code as well as the *Johnson* factors.

20.     Under the lodestar method, a court determines the reasonable number of hours expended and multiplies that number by the appropriate hourly billing rate.   Most fee arrangements between a chapter 11 debtor and its counsel are consistent with the lodestar method.  However, the Fifth Circuit, and bankruptcy courts in the Fifth Circuit, have held that courts are not necessarily limited by the fee arrangements of the parties, and that upward adjustment of fees are appropriate in bankruptcy cases in which the results obtained are rare and exceptional.  *See In re Fender*, 12 F.3d 480, 488 (5th Cir. 1994); *In re El Paso Refinery, L.P.*, 257 B.R. 809, 836 (Bankr. W.D. Tex. 2000); *In re Farah*, 141 B.R. 920, 924 (Bankr. W.D. Tex. 1992).

### B.     Fee Enhancement Compensation

21.     A fee enhancement is not a bonus.  Rather, it simply ensures that in rare cases with exceptional results, professionals receive reasonable compensation.  In extraordinary cases, the lodestar method alone is insufficient to reasonably compensate professionals for their work, as section 330 requires.

22.     Courts most often award fee enhancements when, as here, creditors receive at or near a full distribution and creditors had little or no prospect for recovery at the beginning of the case.  *See, e.g.*, *In re Buckridge*, 367 B.R. 191 (Bankr. C.D. Cal. 2007) (case began as a no-asset case but ended in a 100% distribution to creditors); *In re Nucentrix Broadband Networks, Inc.*, 314 B.R. 574 (Bankr. N.D. Tex. 2004) (creditors originally expected to receive 12% distribution

but ended with a 100% distribution to creditors and return to equity); *In re Se. Banking Corp.*, 314 B.R. 250 (Bankr. S.D. Fla. 2004) (creditors originally expected to receive no more than a 5% distribution but ended with a 100% distribution); *In re El Paso Refinery, L.P.*, 257 B.R. 809 (Bankr. W.D. Tex. 2000) (debtor expected to be administratively insolvent but ended with a 100% distribution to creditors); *In re Farah*, 141 B.R. 920 (Bankr. W.D. Tex. 1992) (creditors expected to receive 5% distribution but ended with 100% plus interest distribution); *In re Baldwin-United Corp.*, 79 B.R. 321 (Bankr. S.D. Ohio 1987) (debtor entered bankruptcy with nearly zero assets and billions of dollars in claims but ended with 60% distribution to creditors).

23.     The amount of an enhanced fee award is discretionary with the bankruptcy court. *See In re Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1257 (5th Cir. 1986).  Section 330 of the Bankruptcy Code provides that compensation awarded, including any fee enhancement, be "reasonable."   11 U.S.C. § 330(a)(1)(A); *see also Hensley v. Eckerhart*, 461 U.S. 424, 436-37 (1983); *In re Farah*, 141 B.R 920, 926 (Bankr. W.D. Tex. 1992).   Bankruptcy courts have declined to adopt a strict mathematical formula for determining what constitutes a reasonable and appropriate enhancement.  *See In re Farah*, 141 B.R. at 926 ("Unfortunately, there is no uniform standard by which to arrive at a fee enhancement figure.  Fee calculation is not an exact science.").

24.     Because "there is no one correct formula for a fee award" and a "court's calculation is anything but an arithmetical exercise," *id.*, courts have used a variety of approaches in calculating reasonable fee enhancements.  *See, e.g.*, *In re Nucentrix Broadband Networks, Inc.*, 314 B.R. 574 (Bankr. N.D. Tex. 2004) (awarding fee enhancement of 10% of fees billed at standard rate); *In re Levy*, 2006 WL 4102217 (Bankr. M.D. Fla. Nov. 13, 2006) (awarding 15.7% of total monies recovered by counsel for the estate); *In re Yankton College*, 101

B.R. 151, 166 (Bankr. D.S.D. 1989) (awarding 15% enhancement of fees); *In re Baldwin-United Corp.*, 79 B.R. 321 (Bankr. S.D. Ohio 1987) (awarding debtor's and committee counsel enhancement equal to 15% of total lodestar); *In re Wright Air Lines, Inc.*, 147 B.R. 20 (Bankr. N.D. Ohio 1992) (awarding enhancement equal to 25% of total lodestar fees).   Baker Botts requests a 20% fee enhancement.

### C.     Compensation for Preparation and Defense of Fee Application

25.     Section 330(a)(6) of the Bankruptcy Code provides that a bankruptcy court may award compensation "for the preparation of a fee application . . . based on the level and skill reasonably required to prepare the application."   The majority of courts interpreting this statute hold that the cost of defense of a fee application is also compensable.   *See, e.g.*, *Smith v. Edwards & Hale, Ltd.* (*In re Smith*), 317 F.3d 918, 928 (9th Cir. 2002), *abrogated on other grounds by Lamie v. U.S. Tr.*, 540 U.S. 526, 531-39 (2004); *In re Buckridge*, 367 B.R. 191, 207 n.26 (Bankr. C.D. Cal. 2007); *Hennigan, Bennett & Dorman LLP v. Goldin Assocs. L.L.C.* (*In re Worldwide Direct Inc.*), 334 B.R. 108, 111-12 (D. Del. 2005); *In re Atwell*, 148 B.R. 483 (Bankr. W.D. Ky. 1993); *In re Hunter Constr. Co.*, 126 B.R. 1005, 1013 (Bankr. E.D. Wis. 1991).

## IV.     OBTAINING THE SCC JUDGMENT IN BROWNSVILLE

26.     The creativity, tenacity, and superior legal talent that Baker Botts brought to bear in the ASARCO bankruptcy is perhaps best illustrated by the firm's prosecution of an action to recover from AMC the crown jewel of ASARCO—its controlling ownership interest in SCC. When AMC directed ASARCO to transfer the SCC shares to AMC in March 2003, dividends on the shares accounted for 100% of ASARCO's operating income.   The transfer occurred while ASARCO was in financial distress and a desperate cash crunch, and added insurmountable momentum to ASARCO's downward spiral into bankruptcy.   By the time the SCC lawsuit went to trial in May 2008, the stock and dividends Baker Botts fought to recover from AMC were

worth more than $10 billion.  With creditors seeking meaningful repayment and the Parent clinging to its ill-gotten gains, the stakes of this lawsuit were enormous.

27.     This landmark case posed legal issues of first impression.  Baker Botts worked diligently and with utmost competence, facing complex legal issues with respect to the law of fraudulent transfers, fiduciary duties, and conspiracy, including the following:

- whether ASARCO had standing to assert a fraudulent transfer claim based on a reverse veil-piercing theory;

- whether a corporation must be a sham and exist only as a vehicle to perpetuate fraud for the corporate veil to be pierced;

- how to determine the value of the SCC shares and consideration received by ASARCO, including appropriate discount rates and the propriety of applying a control premium;

- whether certain parties and their affiliates owed fiduciary duties to ASARCO and its creditors and at what point those duties were breached;

- whether a parent company and its wholly owned subsidiary, or the parent and the directors of its wholly owned subsidiary who also sit on the parent's board, can constitute two or more persons as required to support a conspiracy claim;

- whether a claim of conspiracy to breach a fiduciary duty is separately cognizable from a claim of aiding and abetting a breach of fiduciary duty;

- whether conspiracy to breach a fiduciary duty is actionable only if all members of the conspiracy independently owe a fiduciary duty to the plaintiff;

- whether AMC had any affirmative defenses that might have precluded relief, such as recoupment, laches, good faith, causation, ratification, *res judicata*, and ripeness;

- whether a consent decree entered in 2003 barred ASARCO from challenging the SCC transaction;

- the damages appropriate under federal and state law; and

- how to address a litany of choice-of-law issues related to the underlying claims and damages.

The legal issues that Baker Botts faced, researched, and briefed are too numerous to catalog.

28.     Baker Botts also spent thousands of hours investigating the facts behind the SCC transaction and developing viable factual theories to support the case consistent with applicable law.  Baker Botts lawyers spent months reviewing documents stored in warehouses in Arizona with an eye toward issues relating to the SCC transaction.  They searched through millions of pages of documents on ASARCO's computer systems to identify documents relating to the transaction, and obtained and reviewed hundreds of thousands of pages of documents from AMC and over a dozen third parties.

29.     The SCC lawsuit was not a garden-variety lawsuit.  To prevail on behalf of ASARCO and its creditors, Baker Botts had to uncover, understand, and piece together the complex facts leading up to and following the SCC transaction, from Grupo Mexico's leveraged buyout of ASARCO in 1999, to ASARCO's bankruptcy filing in mid-2005.  Baker Botts had to analyze and explain not only the SCC transaction itself, but also the transfer of the SCC shares from ASARCO to Southern Peru Holdings Corporation in 1999; the sale of ASARCO's non-core assets in 1999 and 2000; the restructuring of Grupo Mexico in 2000; the escalation of ASARCO's financial problems in 2001 and 2002; the negotiations concerning restructuring or repayment of ASARCO's revolving credit facility in 2002 and 2003; and the merger of SCC with Grupo Mexico's subsidiary Minera Mexico in 2004.

30.     Baker Botts' investigation of these complicated transactions and dealings was hampered by the fact that most of the potential witnesses with first-hand knowledge about key events in the case were no longer employed by ASARCO or were adverse to the company's interest in recovering the SCC shares for the benefit of its creditors.  Notwithstanding these challenges, Baker Botts trial lawyers skillfully separated the wheat from the chaff and pieced

together a compelling case of fraudulent transfer, aiding and abetting breach of fiduciary duties, and conspiracy that demanded redress.

31.     Baker Botts' experience with high-stakes litigation prepared the firm to seize opportunities to develop and advance ASARCO's case.  For example, at the outset of the case Baker Botts sought a preliminary injunction and presented this Court with key documents showing that the SCC transaction had closed over the warnings and protests of ASARCO's disinterested directors, its financial advisors, its attorneys, and its management.  Very shortly after the filing of the complaint, Baker Botts sought and obtained an order preventing AMC from transferring or encumbering 54.2% of SCC's shares.  This legal strategy ensured that ASARCO could recover its interest in SCC if it later prevailed in the litigation.

32.     Baker Botts encountered opposition from AMC from inception of the case through trial.  Among other things, Baker Botts defeated AMC's motion to dismiss, AMC's efforts to resist discovery, AMC's attempts to delay both the depositions of key witnesses and the trial, and AMC's motion for summary judgment on every claim asserted by ASARCO.

33.     At trial, Baker Botts lawyers had the wisdom and experience to understand that the success of ASARCO's actual fraudulent transfer claim depended heavily on the District Court's appreciation of the breach of fiduciary duties committed by ASARCO's inside directors. Baker Botts did not rely solely on the badges of fraud listed in the relevant statutes as circumstantial evidence of AMC's intent to hinder, delay, and defraud ASARCO's creditors, but instead also emphasized that the SCC transaction was rife with non-statutory badges of fraud. Baker Botts proved that AMC:

- conceived and carried out the transaction because it wanted to take ASARCO's crown jewel away from creditors and for itself;

- paid only those creditors it had to pay to close the transaction and hindered, delayed, or defrauded all others;

- refused to auction the SCC shares to the highest bidder inside or outside of bankruptcy;

- obstructed ASARCO's independent directors, ASARCO's financial advisors, and the DOJ from receiving accurate information;

- closed the transaction over the objections of every group identified solely with ASARCO and ASARCO's creditors;

- required ASARCO to pay certain bonds at par plus interest, even though it knew ASARCO was in a liquidity crisis and unable to pay its other creditors;

- broke its promise not to pay those bonds without the consent of ASARCO's independent directors; and

- established bank accounts for the sole purpose of avoiding garnishment.

*ASARCO*, 396 B.R. at 374–86.

34.     These additional facts provided the circumstantial evidence the District Court needed to find that AMC had the requisite intent for ASARCO to prevail on its actual fraudulent transfer claim. *Id.* at 374.  The District Court found that the "circumstantial evidence that [Baker Botts] introduced at trial illustrate[d] that AMC/Grupo was aware that the [SCC] transaction . . . would hinder and delay some of ASARCO's other creditors from collecting overdue payments from ASARCO." *Id.* at 386.

35.     Baker Botts also proved that AMC aided and abetted and conspired with ASARCO's inside directors to breach fiduciary duties owed to ASARCO and its creditors and to commit the fraudulent transfer.  *See id.* at 411.  This was no small feat.  To prove ASARCO's aiding and abetting claim, Baker Botts established, among other things, that AMC and ASARCO's inside directors:

- initiated the SCC transaction only after discovering ASARCO's high actual and contingent liabilities;

- structured the financial aspects of the transaction to benefit AMC and Grupo Mexico, leaving ASARCO unable to pay its numerous other overdue obligations;

- did not negotiate the terms of the transaction with anyone representing ASARCO's interests;

- forced the closing of the transaction at a time when ASARCO was insolvent; and

- did not pay a fair price for the SCC shares.

*Id.* at 407–14.

36.    The Baker Botts trial team responded quickly and effectively to the District Court's requests and AMC's defenses.  Baker Botts lawyers at trial in Brownsville and at home in Dallas and Houston researched, drafted, and filed numerous briefs upon the District Court's request and in response to briefing filed by AMC.  These briefs helped crystallize the issues before the District Court.  When AMC's lawyers revealed that they would not call to the stand three key witnesses they had stipulated an intent to call, Baker Botts lawyers responded forcefully.  After finding that ASARCO's lawyers had relied on the representation of AMC's lawyers, the District Court acted on its own to call Grupo Mexico Chairman German Larrea as a witness.

37.    In sum, Baker Botts' strategic decisions and its handling of the trial and pre-trial matters made a substantial difference in the trial's outcome.  The trial would have unfolded differently in the hands of less able counsel, and the results may have been less beneficial to ASARCO and its creditors.

38.    Baker Botts' involvement with the SCC lawsuit did not end with the trial, however.  Baker Botts worked assiduously over the next two weeks to prepare over 300 pages of comprehensive findings of fact and conclusions of law tied to the trial record.  After the District Court found that AMC closed the SCC transaction with the actual intent to hinder or delay

ASARCO's creditors, and conspired with and aided and abetted the ASARCO directors to breach fiduciary duties owed to ASARCO and its creditors, numerous post-trial issues quickly surfaced, requiring extensive post-trial litigation.  Baker Botts handled a multitude of issues regarding expert witnesses, trial exhibits, subpoenas, hearings, and briefs on damages and in response to a slew of AMC post-trial arguments.

39.     After all the post-trial disputes and court-ordered mediation, on April 1, 2009, the District Court issued its opinion on damages.  The District Court ordered AMC to return to ASARCO stock worth more than $6 billion, plus cash of $1.35 billion in dividends and prejudgment interest (net of the consideration paid by AMC), and required AMC to place in escrow shares sufficient to secure the judgment on appeal.  The judgment obtained by Baker Botts ranks as one of the largest awards of any kind in history.

40.     As a result of Baker Botts' relentless efforts before, during, and after the trial, ASARCO's creditors and the bankruptcy estate received perhaps the greatest benefit of the entire bankruptcy proceeding in at least two respects.  First, the return of billions of dollars of value to the estate ensured that the creditors would receive a far more meaningful recovery than originally anticipated.  The Court found that, given that ASARCO's enterprise value was between $950 million and $1.25 billion at the time of the confirmation hearing, the Parent was paying "in excess of $1 billion . . . for the release [of the SCC Judgment]."  Report at 76.

41.     Second, the judgment gave the Parent and Grupo a "dog in the race."  With the judgment in hand, Baker Botts, working with ASARCO and Barclays, led the effort to develop and implement an innovative auction process that, coupled with negotiations with Sterlite (USA), Inc. ("Sterlite"), created a competitive environment where the highest and best bidder would ultimately obtain the company.  It is the SCC judgment and this competition that motivated the

Parent to fund a full-payment plan, resulting in one of the most unprecedented turnarounds in bankruptcy history.

## V.   CREATING COMPETITION TO ACHIEVE A FULL-PAYMENT PLAN

### A.   Identifying and Securing Sterlite as Plan Sponsor

42.     While the SCC Litigation was underway in Brownsville, Baker Botts worked closely with ASARCO and Barclays to develop and administer a plan sponsor selection process that contributed significantly to the confirmation of a full-payment plan.  In early 2008, the Debtors and major creditor constituents agreed that the sale of substantially all of ASARCO's assets pursuant to a plan of reorganization would maximize value to the Debtors' estates.  Baker Botts, in consultation with the Debtors' financial advisors, devoted significant resources to develop and create bid procedures for a sale auction.

43.     The Parent contested the sale auction, but after the Court approved the bid procedures, the Parent, along with three other potential plan sponsors, including Sterlite, submitted qualified bids in April 2008.  Three of the bids were voluminous, non-uniform purchase and sale agreements and one, the Parent's bid, was a proposed chapter 11 reorganization plan and plan support agreement.  Baker Botts reviewed and analyzed the submitted bids and numerous subsequent modifications expeditiously, which required a thorough examination of a complex array of legal issues.  During the two-day plan sponsor selection meeting held in late May 2008, Baker Botts coordinated with approximately 130 professionals who participated in the auction.  Armed with Baker Botts' analysis, ASARCO determined on May 30, 2008 that Sterlite had submitted the best bid proposal, offering $2.6 billion in cash for the purchase of substantially all of ASARCO's assets.  Sterlite backed its bid with a $50 million letter of credit, on which ASARCO could draw if Sterlite failed to close the transaction.

44.     The selection of Sterlite as the winning plan sponsor was one of the most contentious hearings in these chapter 11 cases.  In the days leading up to the two-day hearing in mid-June 2008, Baker Botts assisted the Debtors in producing tens of thousands of pages of documents in response to discovery.  Baker Botts also prepared for, took, and defended seven depositions in this shortened time frame.  At the hearing, the Court considered over 100 exhibits and the testimony of six witnesses before ruling in ASARCO's favor.

45.     Baker Botts then worked quickly to draft a plan of reorganization.  In July 2008, the Debtors filed a plan centered on Sterlite's winning bid.  The Parent sought and obtained a modification of exclusivity and filed its own competing plan in August 2008.  The Parent promised to provide approximately $2.7 billion for distribution to creditors under its plan.  The Debtors and the Parent moved forward with solicitation on their plans and preparations for a confirmation hearing that was scheduled to commence in November 2008.

46.     However, on October 14, 2008, Sterlite, citing the global financial crisis, informed the Debtors and the Court that it could not and would not close the purchase and sale agreement absent a material reduction in the purchase price.  Solicitation of votes on the Debtors' plan was suspended, and the Parent responded shortly thereafter by withdrawing consideration of its plan.

47.     In the aftermath of Sterlite's announcement and the Parent's withdrawal of its plan, the Debtors and their creditors faced challenges presented by the precipitous decline in the global economy and in copper prices.  In January 2009, Jorge Lazalde, one of the Parent's corporate representatives, stated that ASARCO was not worth more than $200 million and that

the Parent was now "not willing to pay everyone in full. . . . [Creditors] decided not to engage with Grupo and now they are paying the consequences.  Now they will get cents on the dollar."[5]

48.     In this challenging environment, Baker Botts wasted no time getting to work on a strategy to develop a new plan of reorganization.  Following the entry of the liability opinion in the SCC Litigation, the District Court had ordered the parties to mediate in an effort to achieve a settlement that could be part of a plan of reorganization.  After Sterlite's announcement, this Court ordered Sterlite and key creditors constituents to attend the mediation that the District Court ordered.  In late October 2008, Baker Botts took an active role in that mediation.  The mediation, however, resulted in no consensus on how to achieve a successful emergence from bankruptcy for the Debtors.

49.     In late 2008 and early 2009, the Debtors, affected by the sharp economic downturn, suffered monthly operating losses for the first time since the early stages of bankruptcy.  The Debtors asked Baker Botts and Barclays to develop alternative plan structures for the Board's consideration while continuing to negotiate with the Parent and Sterlite.  Baker Botts lawyers, drawing on their experience, skill, and creativity, analyzed numerous potential scenarios for the Board's consideration.  One possible course would have been to pursue Sterlite aggressively for its breach of contract, making that cause of action and the SCC Judgment the centerpieces of a new plan of reorganization.  Baker Botts analyzed, and the Board considered, several alternative possibilities.  Between the time Sterlite announced it would not close on the original PSA and the beginning of March 2009, Baker Botts advised the Board at least 23 times on potential alternative plan proposals and the status of negotiations with Sterlite.

---

[5] Jorge Lazalde, quoted in the *Arizona Daily Star* (Jan. 28, 2009), available at http://www.azstarnet.com/allheadlines/277743.

50.     Ultimately, after four months of vigorous negotiations with Sterlite and a full vetting of the advantages and disadvantages of a Sterlite-sponsored stalking-horse plan and other possible plan structures, the Board determined that a modified transaction and settlement with Sterlite would yield the highest and best value for the bankruptcy estate.  On March 6, 2009, the Debtors entered into a new purchase and sale agreement with Sterlite ("New PSA").  The New PSA was subject to higher and better bids.

51.     On March 11, 2009, Baker Botts filed a motion for approval of the New PSA under Bankruptcy Rule 9019.  The Parent, along with several other parties in interest, objected. Following a contentious two-day hearing in mid-April, the Court approved the New PSA.  The District Court later denied the Parent's appeal of that order.

52.     Baker Botts worked closely with ASARCO and Barclays to identify Sterlite as a plan sponsor and negotiate the New PSA with Sterlite following the global financial crisis of 2008.  That success, along with the SCC Judgment and the innovative auction process designed to maximize the value of the judgment, provided the foundation for the competitive bidding process that eventually led to confirmation of a full-payment plan.  The Court noted that the continuation of the plan sponsor selection process following the termination of the original PSA "resulted in tangible benefit to the estate by promoting plan competition that resulted in the filing and prosecution o[f] the Parent's Plan."  Report, at 19-20.

**B.      Developing an Innovative Auction of the SCC Judgment**

53.     On April 1, 2009, the District Court entered its multi-billion-dollar damages opinion in the SCC Litigation.  Counsel for the Parent acknowledged that the District Court's "determinations first of liability, then of damages" constituted a "game changer."  Tr. 10/19/09, at 207:1-3 (Moore, R.).  Securing Sterlite as a plan sponsor and obtaining the judgment against

the Parent in the SCC Litigation provided incentive for the Parent to once again offer a competing plan of reorganization.

54.     Counsel for the Parent admitted that although "[t]he mere existence" of the SCC Judgment may have compelled the Parent to propose a full-payment plan, "a number of other factors" also put pressure on the Parent to finally propose a confirmable plan that would pay creditors in full with interest.  Tr. 11/16/09, at 4-15 (Beckham, C.).  The innovative concept of auctioning the SCC Judgment, which was the creative brainchild of Baker Botts, further motivated the Parent to participate in the plan process.  Baker Botts worked closely with ASARCO and Barclays to develop and implement that process.

55.     In its Amended Report and Recommendation, this Court observed that the "[i]nitiation of the auction process brought tangible benefit to the Debtor's estate and was perhaps the final impetus needed to encourage the Parent to file its plan which pays creditors in full."  Report, at 30.  Further, during a hearing on November 16, 2009, the Court explained: "I have no idea why the parent ultimately decided to do a full payment plan, but I suspect that the bidding process . . . played a major part of that, because the worst possibility for the [P]arent was to lose both the judgment and the debtor."  Tr. 11/16/09, at 23:12-16 (Schmidt, J.).

56.     ASARCO's overarching goal throughout the bankruptcy was to maximize the value of the estate's assets for the benefit of all creditors and stakeholders.  To that end, Baker Botts and ASARCO considered various strategic alternatives for leveraging the value of the SCC Judgment to benefit the estate.  Equipped with Baker Botts' advice on creative strategies, ASARCO determined that the best alternative was to conduct a sale of all or a portion of the SCC Judgment through a competitive auction process.  ASARCO concluded that a sale of all or part of the SCC Judgment would accelerate creditors' cash recoveries.  Additionally, the auction

process was designed to establish a market-based value for the SCC Judgment. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 436 (1999) ("[T]he best way to determine value is exposure to a market.").

57.     Baker Botts worked with Barclays and the Debtors to develop and implement the innovative auction plan that Baker Botts had devised.  The unusual nature of the asset being auctioned required the development of a novel due diligence process.  That the Parent was uniquely situated and incentivized to overbid either directly at the auction or indirectly through a competing plan was a concern to potential bidders.  The monumental size of the asset and the risks associated with the Parent's appeal made it difficult for potential bidders to value the judgment.  The "aggressive and creative" auction process (as Robert Moore, counsel for the Parent, called it, Tr. 8/25/09, at 132:3) permitted potential buyers to bid on portions of the judgment and enabled Sterlite to participate, fostering a "bidding war" between Sterlite and the Parent.

58.     Under the terms of the Debtors' proposed plan of reorganization, if sold as a whole, the SCC Judgment would be assigned to the purchaser, and the proceeds of the sale distributed to creditors in accordance with the Debtors' Plan.  If only a portion of the SCC Judgment were sold, the Debtors' Plan provided for a transfer of the SCC Judgment to a litigation trust, interests in which would be distributed to creditors and any purchasers in connection with confirmation.  This trust would hold title to and defend the SCC Judgment on appeal, and distribute proceeds received in respect of the SCC Judgment to such holders.

59.     As counsel for the Parent acknowledged at a hearing before Judge Hanen:

> [t]he bidding process did precisely what it, I think, should have done, what Judge Schmidt wanted it to accomplish, what the debtor wanted it to accomplish, and that was eventually force the parent, through that process, to bid high enough to pay all creditors in full,

including interest, in cash on exit from bankruptcy.   The process
succeeded from that point of view.

Tr. 10/19/09, at 201:16-22.

### C.   Confirmation Hearing and Closing

60.     The confirmation hearing on the two competing plans began on August 10, 2009.

Baker Botts' success in obtaining the SCC Judgment and conceiving the auction process for the

judgment, together with ASARCO keeping Sterlite engaged as plan sponsor, resulted in two

confirmable full-payment plans of reorganization being submitted to the Court by the end of the

two-week evidentiary hearing.

61.     Throughout the confirmation process, Baker Botts vigilantly represented the

Debtors in and outside the courtroom.   At the direction of the Board, Baker Botts continued to

negotiate with Sterlite to improve the Debtors' plan, and four amendments to the plan were filed

during the course of the confirmation hearing.   The Debtors' improvement to their plan pressured

the Parent to improve its plan, resulting in six plan amendments from the Parent during the

confirmation hearing.[6]   In fact, the first plan that the Parent filed in 2009 proposed only a 75%

distribution to creditors, with no interest.   Even this proposal was substantially better than the

many plan proposals the Parent had previously submitted, under which the Parent proposed to

pay creditors only cents on the dollar and/or reinstate various claims.   These proposals were

made before the competitive plan sponsor environment that Baker Botts steadfastly fought for on

behalf of the Debtors.

62.     As Montana Resources aptly noted in a brief filed with the Court, the Parent

chose to wait until only the last week to pay creditors in full with interest, after parties in the case

---

[6] Between May 15, 2009 and November 13, 2009 when the District Court entered the confirmation order, the Debtors and the
Parent filed a combined total of 23 plans, and each time the respective plan proponents argued that their respective amendments
improved treatment to creditors.

had "suffered needless expense imposed by the Parent's maddening habit of amending its Plan in small increments." Dkt 12613, at 2-3. Though the Debtors' Plan was not confirmed, Baker Botts' diligence in fighting for competition before and during the auction process through confirmation was an integral and necessary component to the District Court's confirmation of a full-payment plan in these chapter 11 cases.

63.     After confirmation, Baker Botts assisted ASARCO and the Parent in closing the multi-billion dollar transaction contemplated under the Parent's Plan. According to the Plan Administrator's Funds Flow Memorandum, ASARCO delivered cash in excess of $1.432 billion and the Parent delivered its $2.205 billion contribution to the Plan Administrator. *See* Dkt 13394. Baker Botts also assisted ASARCO in obtaining, over Sterlite's objection, a court order authorizing the company to draw on the $50 million letter of credit Sterlite deposited to secure its obligations under the original purchase and sale agreement. On the effective date of the Parent's Plan, the Court granted the Plan Administrator's request to return $75.6 million to Reorganized ASARCO.

## VI.    REDUCING LIABILITY EXPOSURE

### A.    <u>Resolution of Environmental Issues</u>

64.     At the outset of the bankruptcy cases, the Debtors faced the unenviable task of resolving hundreds of proofs of claim asserting billions of dollars in environmental liabilities associated with numerous sites spread across North America. Through a combination of creativity, diplomacy, and hard work, Baker Botts, in consultation with a diverse group of constituents, devised and implemented an unprecedented procedure for estimation of over $6 billion of these asserted liabilities. The resulting innovative case management order permitted the claims to be resolved in a timely and cost-effective manner while protecting the claimants' due process rights and providing each participant a full and fair opportunity to present its case.

65.     Baker Botts successfully negotiated separate settlements of the claims relating to all but three of the sites subject to the estimation procedure without the need for an estimation hearing. Ultimately, Baker Botts helped the Debtors achieve a landmark global environmental settlement that resolved the remaining environmental claims through either allowance of claims at agreed-upon amounts or the transfer of certain owned, non-operating sites into environmental custodial trusts.  Baker Botts obtained approval of both the stand-alone settlements and the global settlements and thereby eliminated almost $5 billion in environmental claims.

66.     Without the liquidation of environmental claims, no plan sponsor could have determined what would be required to confirm a plan of reorganization, and absent this extraordinary result, the amount of plan consideration needed to pay creditors in full would have been significantly higher.  Baker Botts' innovation and hard work in resolving the Debtors' environmental claims were essential to the Debtors' successful reorganization.

67.     Environmental legal issues in any case can be complex and require sophisticated legal analysis.  That complexity was compounded in these cases.  As the Court has stated: "[T]his case is perhaps the largest and most complex in bankruptcy history with respect to claims for environmental liability."   Report, at 20.   The federal government has made similar statements.  *See* Response of the United States and Certain State Agencies to Debtors' Fourth Motion to Extend Exclusivity Period, ¶ 2 (Sept. 21, 2006) (Dkt 3081) (noting that "[i]n the United States' view, there has never been a bankruptcy case presenting as many complex environmental issues as presented by this one").

68.     Without question, Baker Botts advised the Debtors on some of the most complex, sophisticated, and challenging issues in chapter 11 history.  The United States filed several proofs of claim asserting environmental liabilities in amounts ranging from $3.6 to $4 billion.

Sixteen states filed claims asserting amounts ranging in the aggregate from $3.8 to $4 billion. Forty-eight separate federal and state agencies were involved in prosecuting these claims. These governmental claims included costs incurred or to be incurred in cleaning up or otherwise responding to contamination at sites (referred to as "response costs") and damages for harm to natural resources caused by the release of hazardous substances (referred to as "natural resource damages").   Moreover, Native American tribes filed independent claims for natural resource damages totaling approximately $800 million.   Finally, contribution claims totaling almost $2 billion were filed by non-governmental entities (sometimes referred to as "potentially responsible parties" or "PRPs") that were co-liable with one or more of the Debtors for the environmental liabilities.   Disregarding claims that were obviously duplicative, the total amount of environmental claims filed against the Debtors was approximately $6.5 billion, with a significant number of additional claims filed in undetermined amounts.

69.     What made these issues especially complex and sophisticated was the fact that almost 100 sites were involved, located in 17 different states and 6 regions of the EPA.   What made these issues even more challenging was the fact that many of the largest, oldest, and most complex Superfund sites in the country were involved, including the largest (Coeur d'Alene) and the second largest (Tri-States).   The complex environmental and bankruptcy issues included the following:

- how to calculate past and future response costs, oversight costs, and natural resource damages under applicable state and federal law;

- how to obtain approval of settlements of environmental liabilities under the standards established under bankruptcy law and environmental laws (including CERCLA and applicable state laws);

- whether environmental liabilities (including obligations under injunctive orders) are dischargeable claims;

- which environmental claims are entitled to administrative priority status;

- whether environmentally contaminated property may be abandoned by the Debtors;

- whether actions by governmental units are subject to the automatic stay or are excepted from the automatic stay as an exercise of the police and regulatory power;

- whether contingent contribution claims of potentially responsible parties should be disallowed under section 502(e)(1)(B) of the Bankruptcy Code;

- what method should be used to estimate environmental claims;

- for what purpose(s) should environmental claims be estimated;

- how to develop a schedule for estimation of environmental claims that satisfies due process requirements and permits claims to be resolved in a timely and cost-effective manner;

- what is the *res judicata* effect of estimation proceedings in Bankruptcy Court;

- how to develop environmental custodial trusts and negotiate settlement and trust agreements addressing such trusts;

- whether environmental liabilities are joint and several or may be limited to the Debtors' proportionate share;

- what factors should be used to allocate the Debtors' proportionate share of environmental liabilities;

- whether claimants seeking to file proofs of claim after the bar date satisfy the excusable neglect standard;

- whether the reference of the motion to approve the global environmental settlements should be withdrawn on either mandatory or permissive grounds;

- what discount rate and what base date should be used to reduce claims for future response costs to present value;

- how to address choice of law issues;

- whether unsecured creditors are entitled to prepetition and/or post-petition interest and, if so, what interest rate should be used;

- whether certain unpatented mining claims are property of ASARCO's estate;

- how to satisfy compliance obligations of the Debtors as debtors in possession;

- whether environmentally contaminated property should be sold, retained, or transferred to an environmental custodial trust; and

- whether a sale of environmentally contaminated property should be structured as a liability transfer.

70.     While the environmental claims presented many common issues, each site posed unique challenges.  A particular site might involve claims for past costs, future clean-up, natural resource damages, penalties, or some combination thereof.  The claims might arise under CERCLA, other federal statutes, or state statutes.  In some instances, ASARCO was the only liable party, while other sites involved a number of PRPs.  Some sites were subject to a consent decree, consent judgment, or other court order issued by a federal district judge.  Some sites were owned by ASARCO or one of the other Debtors, while others were never owned by any of the Debtors.  Of the owned sites, some had ongoing operations, while others did not.  Each of these variables had important consequences in assessing whether the Debtors had any liability and, if so, in determining the amount and priority of that liability.

71.     ASARCO's environmental claims were by far the estates' largest unliquidated liabilities.  Baker Botts analyzed the hundreds of environmentally related proofs of claim filed by federal agencies, states, Native American tribes, and PRPs, and organized them on a site-by-site basis.  Absent the liquidation of these environmental liabilities, no plan proponent could have secured new capital or exit financing, determined the size and treatment of an unsecured creditor class, or prepared a disclosure statement that contained meaningful information regarding what creditors could expect to receive under a plan.  As the Court noted, "it was clear to all that these claims had to be determined, estimated or settled before confirmation."   Report and Recommendation on Motion to Withdraw the Reference, at 2 (Apr. 24, 2009) (Dkt 10992).

72.     Because resolution of the environmental claims outside of bankruptcy would have taken many years and perhaps decades, the Debtors sought estimation of the claims under section 502(c) of the Bankruptcy Code.  However, only a handful of bankruptcy courts had actually

estimated environmental claims prior to the ASARCO case, and none had undertaken estimation of environmental liabilities on such a large scale. Both the number and amounts of the claims and the plethora of difficult issues posed a daunting challenge.

73.     On January 30, 2007, the Debtors filed a motion to estimate for all purposes the environmental liabilities at 75 unowned sites, which would address $6 billion of the potential environmental liabilities. After considering the various methods that have been used in other cases to estimate contingent and unliquidated claims, Baker Botts recommended that the Court use probabilistic estimation methods (and specifically, ASTM International's E2137-06 – Standard Guide for Estimating Monetary Costs and Liabilities for Environmental Matters), an unprecedented prospect but one which was ideally suited to the Debtors' situation. As to sites with more than one PRP, Baker Botts further recommended that the total claim for each Debtor's liability at each site be estimated in an amount equal to the Debtor's apportionate share.

74.     An estimation of claims of this magnitude and complexity—relating to such a large number of diverse sites—had never been attempted. After filing the estimation motion, Baker Botts worked extensively with federal and state agencies, PRPs, other creditor constituents, and the Parent on a case management order (the "CMO") establishing agreed-upon procedures for estimation of ASARCO's environmental claims at 21 sites. These claims accounted for approximately $6.0 billion of the $6.5 billion in environmental claims asserted in determined amounts along with significant environmental claims asserted in undetermined amounts. The CMO divided the sites into five groups and provided robust discovery, mediation, pre-trial procedures, and estimation hearings for each group. A separate order was negotiated and entered to address trial procedures. A significant amount of the Court's calendar during the summer of 2007 was reserved for the estimation hearings.

75.     The efforts of Baker Botts' environmental team had to be precisely coordinated given the tight pre-trial schedule.  The estimation proceedings as to the five groups of sites were staggered so that simultaneously discovery was being conducted as to some sites, mediation was ongoing as to others, with an estimation hearing being held as to another site.  Baker Botts submitted briefs and provided oral argument regarding, among other complex issues, the interaction of environmental and bankruptcy law, whether joint and several liability should be imposed upon the Debtors, and whether obligations under injunctive orders are dischargeable claims.

76.     An early success from the environmental estimation proceedings occurred with a comprehensive settlement with the United States, the State of Colorado, and the Debtors' former joint venture partner of claims relating to the California Gulch Superfund Site and the Black Cloud Mine.  The parties participated in a mediation in June 2007 that ultimately led to three separate but interdependent settlement agreements resolving the complex and interrelated environmental liabilities relating to the Cal Gulch site.  Baker Botts filed a motion seeking approval of the settlement on July 18, 2007, and approval was granted on August 28, 2007, following an evidentiary hearing and over the Parent's vigorous objection.

77.     The settlement of environmental liabilities relating to the Cal Gulch site set a precedent in these bankruptcy cases for both reasonable settlements reached through a fair, mediated process and for prosecuting a contested motion under Bankruptcy Rule 9019.  Baker Botts used this template for settlement in connection with the other sites included in the estimation proceedings, and settled all but three of them on a stand-alone basis, thereby resolving $3 billion in environmental claims for approximately $532.1 million in allowed unsecured claims or cash.  The Court conducted estimation hearings as to the remaining sites covered by the CMO

(the Omaha, Nebraska site and portions of the Coeur d'Alene, Idaho and the Tacoma, Washington sites) in respect to approximately $3 billion of environmental liabilities, with Baker Botts vigorously representing ASARCO in all but the Omaha hearing.

78.     On March 14, 2008, Baker Botts filed a second motion for a case management order regarding environmental claims of PRPs, in aid of the estimation motion.  The motion sought, among other things, to implement a procedure for handling the PRPs' environmental claims and to disallow the PRPs' claims for future environmental costs barred by the contribution protection provided in the settlements or section 502(e)(1)(B) of the Bankruptcy Code.  On May 9, 2008, the Court entered a second case management order relating to the PRPs' environmental claims (the "PRP CMO").  The asserted liabilities at the sites included in the PRP CMO accounted for approximately $117 million in environmental claims asserted in determined amounts, along with significant environmental claims asserted in undetermined amounts.  The claims of 46 PRPs were subject to the PRP CMO.  Baker Botts had responsibility for 37 of them, with co-counsel addressing the other nine.  Six PRP claims remained pending on the Effective Date, and Baker Botts had reached agreements in principle with all but one of those PRPs to settle or withdraw their claims.  In addition, four other PRP environmental claims at the Hylebos Waterway, the East Helena, and the Blackhawk Mill/Chino Mines sites were allowed or estimated.

79.     Over several months, Baker Botts negotiated a resolution of the remaining environmental claims.  The negotiations began as part of the mediation before the Honorable Elizabeth W. Magner.  Though negotiations were extensive and often contentious, the parties negotiated a global settlement of claims at the Coeur d'Alene, Tacoma, and Omaha sites, as well as the environmental claims relating to the sites that were not part of the estimation proceedings.

80.     On June 5, 2009, after several days of hearings and consideration of approximately 1,200 exhibits and the testimony of 47 witnesses, the Court approved the global environmental settlement pursuant to Bankruptcy Rule 9019 over the strenuous objections of the Parent and other parties.[7]   The global environmental settlement included an unprecedented $261.3 million custodial trust settlement, whereby certain owned but non-operating properties were to be transferred to environmental custodial trusts, together with sufficient cash to pay for remediation and restoration costs and the trusts' administrative costs.   Baker Botts negotiated with more than 20 parties, including numerous federal and state agencies and private parties, to document the five settlement agreements.   Issues ranged from how to describe the sites to how to define the scope of the release.   Baker Botts ensured that all of the relevant liabilities were addressed and negotiated the transfer of the ongoing obligations under previous settlement agreements and consent decrees to the environmental custodial trustees.

81.     Baker Botts also negotiated for ASARCO to receive credit against the settlement amount for any capital expenditure response cost that ASARCO incurred in the period between the drafting of the settlement agreement and the effective date of the environmental custodial trusts.   There were also issues related to possible future use of the properties being transferred to the environmental custodial trusts, as well as the possibility that the governments might try to assert allegations of liability for ASARCO's pre-settlement conduct in the future.   Baker Botts successfully negotiated solutions to these issues and drafted language to incorporate them, including an agreement from the governments that they would not oppose a plan of

---

[7] The global environmental settlement included five agreements: (a) the Amended Settlement Agreement Regarding the Miscellaneous Federal and State Environmental Sites; (b) the Amended Consent Decree and Settlement Agreement Establishing a Custodial Trust for Certain Owned Sites in Alabama, Arizona, Arkansas, Colorado, Illinois, Indiana, New Mexico, Ohio, Oklahoma, Utah, and Washington; (c) the Consent Decree and Settlement Agreement Regarding the Montana Site; (d) the Consent Decree and Settlement Agreement Establishing a Custodial Trust for the Owned Smelter Site on El Paso, Texas and the Owned Zinc Smelter Site in Amarillo, Texas; and (e) the Amended Settlement Agreement and Consent Decree Regarding Residual Environmental Claims for the Coeur d'Alene, Idaho, Omaha, Nebraska, and Tacoma, Washington Environmental Sites.

reorganization that prohibited the governments from pursing any claims based on environmental laws for the Debtor's conduct that occurred prior to February 1, 2009.  These intricate settlement agreements took almost a year to negotiate, and the end result was a set of agreements that protect ASARCO's interests and resolve the environmental issues addressed by the settlements.

### B. Resolution of Asbestos Issues

82.     Baker Botts has extensive experience in developing restructuring solutions for companies struggling with mass-tort liabilities.  Baker Botts successfully developed the first-ever prepackaged bankruptcy plan dealing with mass-tort asbestos claims, representing DynCorp in the Fuller-Austin Insulation Company bankruptcy case.  Baker Botts also developed and resolved the largest ever mass-tort prepackaged plan, representing Halliburton Company in the Dresser and Kellogg Brown & Root bankruptcy cases.  Baker Botts also has had extensive experience defending asbestos-related lawsuits in the state-court tort system since the 1980s. The firm's prior experience and creative strategy of conflict resolution, as opposed to indiscriminate litigation, led to the successful settlement of the Debtors' significant contingent liability for present and unknown future asbestos claims.

83.     One of the significant factors contributing to the Debtors' need to reorganize was their exposure to asbestos liability.  Before their bankruptcy filings, the Debtors were involved in vexatious litigation by countless claimants across the nation.  After the Debtors filed their bankruptcy petitions, Baker Botts lawyers used their prior asbestos and bankruptcy experience to develop creative strategies for addressing ASARCO's alleged asbestos liabilities.  Among these strategies was the development of an unprecedented asbestos bar-date process to obtain detailed claims information without expensive and prolonged discovery.  The process facilitated direct communications among the experts and consultants for the major constituencies and provided the

factual basis from which substantive negotiations could proceed.  This process is likely to become the template for future mass-tort cases.

84.    Approximately 102,000 claimants filed asbestos claims or submitted electronic claims data against ASARCO or one or more of the subsidiary Debtors.  Though ASARCO maintained that it never manufactured or sold asbestos or asbestos-containing products, experts for the Asbestos Committee and the FCR (together, the "Asbestos Fiduciaries") reported that ASARCO's derivative liability was between $1.8 and $2.1 billion.  This estimate did not include asbestos premises liability, alleged direct asbestos claims against ASARCO, costs of defense, or liability for prepetition judgments and settlements for which the Asbestos Fiduciaries claimed ASARCO was liable.

85.    Resolution of the Debtors' asbestos liability was critical for emergence from bankruptcy.  Without this resolution and a section 524(g) channeling injunction, the Debtors would have faced the risk of litigating countless prepetition asbestos claims (along with unknown future claims) in courts across the nation.  Proving feasibility as to either plan of reorganization would have been a significant challenge for both plan proponents.  The task of resolving the asbestos claims and future demands was not an easy one.

86.    The bulk of the asbestos liability resided with the non-operating subsidiaries.  Because these subsidiary debtors had no significant assets, claimants asserted liability against ASARCO on alter ego and veil piercing theories, and ASARCO initiated an adversary proceeding challenging these theories of liability.  After ASARCO became a debtor, it sought to estimate any derivative liability and negotiated an estimation process with the Asbestos Fiduciaries that the Court adopted.

87.     Representing ASARCO with respect to its asbestos liability required Baker Botts to analyze over sixty years of corporate history.  Moreover, because of the nature of bankruptcy, Baker Botts had to prosecute the adversary proceeding in an extremely compressed time frame.

88.     Baker Botts reviewed and analyzed approximately 20,000 largely unindexed boxes spread throughout the United States and parts of Canada.  Complicating matters was the fact that the Asbestos Fiduciaries, who were prosecuting the estimation, did not hold the privilege for the subsidiary debtors' documents.  Baker Botts developed and negotiated privilege and discovery protocols for the prosecution of the case.   The firm also coordinated the production of materials from numerous third parties, including the Debtors' accountants and litigation counsel.   Again, Baker Botts developed and negotiated the necessary protocols to protect the Debtors' privileges while allowing the estimation process to continue.   After the parties' review of the thousands of boxes and collection from third parties, more than three million pages of materials were copied and produced.

89.     Besides addressing ASARCO's liability, if any, for indirect asbestos claims, the task of ascertaining any potential damages was equally daunting.  Baker Botts oversaw the collection of claims and settlement data and facilitated discovery of the parties' expert econometricians.   Four econometricians issued preliminary reports, and three of them were deposed after issuing supplemental and rebuttal reports.  Despite constant resistance from the Asbestos Fiduciaries, Baker Botts recommended that ASARCO push for estimation as quickly as possible.  As the parties proceeded towards the estimation hearing, ASARCO asked the Court to order the parties to mediation.  The Court directed ASARCO, the Asbestos Fiduciaries, and other creditor constituents to mediation before Judge Elizabeth Magner.

90.     The mediation resulted in an agreement in principle that became the foundation of the first plan of reorganization the Debtors filed.  Under the proposed agreement, the Debtors would have paid $750 million to an asbestos trust on behalf of holders of asbestos claims and demands.  If general unsecured claims were paid in full with post-petition interest, the asbestos trust would have received a supplemental distribution of $102 million.  The Parent vehemently opposed this settlement even though it ultimately agreed to settle the asbestos claims and demands for a higher allowed amount of $1 billion.

91.     After Sterlite announced that it would not close the transaction underpinning that plan of reorganization, the asbestos estimation recommenced and Baker Botts sought to expand the scope of the estimation proceeding to include direct claims against ASARCO.  The purpose of the expansion of the scope was to estimate ASARCO's total liability for asbestos exposure for purposes of proposing a plan of reorganization.

92.     Veil-piercing expert discovery and fact-witness depositions were taken as the parties prepared for an estimation hearing.  With the estimation hearing looming, the parties were able to resolve ASARCO's and the other Debtors' asbestos liabilities under both the plan sponsored by the Debtors and the plan sponsored by the Parent.  Indeed, the resolution of asbestos claims and demands incorporated into the Parent's Plan was based on the several months of litigation and negotiation between Baker Botts and key creditor constituents.  The initial agreement in principle between the Parent and Asbestos Fiduciaries in April 2009 required the Parent to fund a section 524(g) trust with $750 million, consisting of cash and a promissory note (and $27.5 million for administration fees).  *See* Dkt 10873.

93.     Asbestos claims and demands (direct and indirect, premises, and products liability) were settled for a present value of $912.30 million under the Parent's Plan, almost $1.2

billion less than the Asbestos Fiduciaries' experts' estimate of the subsidiary debtors' asbestos liability alone. The Parent greatly benefited from Baker Botts' four years of work on the estimation proceeding, creativity in collecting claims data, and vigorous negotiations with the Asbestos Fiduciaries. Baker Botts lawyers who had worked with asbestos plaintiffs' counsel for years in other asbestos and asbestos-related bankruptcy cases had developed mutual respect and trust with those counsel, which in turn helped create an atmosphere for successful settlement negotiations.

### C.    Resolution of Toxic-Tort Issues

94.    In addition to its staggering environmental and asbestos liability exposure, ASARCO was burdened by 1,380 toxic-tort claims in the aggregate amount of $1.47 billion, not including claims filed in an undetermined amount. Through its aggressive efforts, Baker Botts settled $1.383 billion in toxic-tort claims (94% of the total amount) for $34.97 million.

95.    ASARCO or its predecessors-in-interest had conducted operations in certain areas resulting in alleged lead, arsenic, and zinc contamination to property and exposure to people living in those areas. The personal-injury claimants consisted primarily of parents making claims on behalf of or in the name of their allegedly exposed children. Some adults also sued for their own alleged personal-injury damages in federal and state courts, claiming exposure to and contamination by a host of hazardous substances.

96.    Dealing with these personal-injury claims presented a unique challenge because the claimants could have sought to obtain jury trials and take advantage of statutory provisions related to personal-injury claims in bankruptcy. Because of the volume of these claims, ASARCO could have been forced to litigate with individual claimants in hundreds of trials. This could have resulted in virtually limitless costs, and the chapter 11 cases could have been significantly delayed pending liquidation of these claims.

97.     Baker Botts advised ASARCO that the most effective way to liquidate these claims was to seek approval of an estimation proceeding.  Nevertheless, resolving the toxic-tort claims through estimation would still present a monumental task.  The personal-injury claims, particularly those of the children, could not be precisely measured by scientific calculation.  Valuing mental anguish, loss of earning capacity of children, and physical impairment of a child with mental, emotional, and developmental difficulties is a perilous process that could vary from jury to jury or judge to judge.

98.     The volume of these toxic-tort claims was daunting, but Baker Botts shrewdly negotiated with plaintiffs' counsel, as well as creditor constituents and certain insurance companies, and discussed various methods for resolution.  Baker Botts persuaded toxic-tort plaintiffs' counsel that resolving claims at the bargaining table rather than in the tort system or through proceedings in a federal district court was in everyone's best interest.

99.     The Court-approved mediation sessions took place over four days.  During the negotiation process, the participating plaintiffs' attorneys and Baker Botts negotiated settlement matrices whereby values were assigned to categories of harms allegedly suffered by the claimants.  The matrices were complex, taking into account levels of lead in a claimant's blood and geographic location of the claimant.  Baker Botts' work on the Debtors' toxic-tort claims was a remarkably successful and efficient resolution of complex personal-injury claims that otherwise would have taken years, if not decades, to resolve in the tort system at a significantly greater cost to the Debtors and their estates.

### D.     The Mission Mine

100.     Central to ASARCO's ability to emerge from chapter 11 as a viable mining company was the company's ability to continue mining copper at its Mission Mine.  The Mission Mine is, in part, located on lands leased to ASARCO by the U.S. Department of the Interior (the

"DOI") for the benefit of certain allottees of the Tohono O'odham Nation on the San Xavier Indian Reservation. The DOI alleged that the leases incorporated certain federal regulations that impose obligations on ASARCO to reclaim the mined land. For three decades before ASARCO's bankruptcy filing, the company had tried to reach agreement with the DOI and Tohono O'odham Nation concerning the reclamation required of ASARCO on the leased lands. Under ASARCO's theory of reclamation, the company's obligations would cost $15 million, whereas early estimates of the DOI's and Tohono O'odham Nation's reclamation plan put the cost in excess of $1 billion. ASARCO needed a legal strategy to bring the DOI and Tohono O'odham Nation quickly to the negotiating table to resolve ASARCO's reclamation obligations, and Baker Botts fulfilled that need.

101.    Absent resolution with the DOI and the Tohono O'odham Nation, ASARCO was faced with two unappealing options with respect to the Mission Mine lease. First, ASARCO could reject the lease and lose one-third of its reserves, which represented 552 million pounds of copper. Rejection would have had a significantly negative impact on ASARCO's overall production and would have increased the company's unit cost. Second, ASARCO could have assumed the Mission Mine lease but would have done so without resolution of the reclamation issues.

102.    Baker Botts thoroughly researched the complex legal issues associated with the Mission Mine. Among other things, Baker Botts researched ASARCO's obligations under the leases, issues related to dischargeability of these obligations, and the potential liability of ASARCO under CERCLA and federal mining regulations applicable to Native American lands. This research equipped Baker Botts with the knowledge needed to negotiate a settlement with the DOI and the Tohono O'odham Nation.

103.    For more than three years, Baker Botts and representatives from the DOI and the Tohono O'odham Nation engaged in numerous negotiations and meetings, which stopped and restarted at various points.  Because of the longevity of the dispute between ASARCO and the Tohono O'odham Nation, the discussions often involved impassioned exchanges rooted in cultural misunderstandings.  The negotiation process would have challenged even the most seasoned lawyer.

104.    Ultimately, Baker Botts achieved what ASARCO had not in over three decades before the bankruptcy:  a resolution of ASARCO's reclamation obligations under the Mission Mine leases.  Under the settlement that Baker Botts negotiated, ASARCO deposited $33 million into an escrow account to fund its reclamation obligations.  The settlement also resolved all issues related to royalties being paid to the allottees.  The settlement allowed ASARCO to assume the leases and continue to mine at the Mission Mine, resulting in an invaluable benefit to the company and the bankruptcy estates.

## VII.    MAXIMIZING ASSETS FOR THE ESTATES

### A.    Labor and Employee Benefits Issues

105.    Essential to ASARCO's successful reorganization was the resolution of numerous complex and contentious labor and employee benefits issues rivaling those in the largest of chapter 11 cases.  The expedient resolution of these issues was needed to enable ASARCO to improve dramatically its productivity, without which the continued viability of the company was in doubt.  ASARCO's stable workforce and improved labor relations contributed greatly to the company's success in generating over $1.4 billion in distributable cash, which cash provided a substantial portion of the funding for each of the two confirmable plans of reorganization presented to the Court for confirmation.

106.    At the time of ASARCO's bankruptcy filing, the company was experiencing a labor strike involving nearly 1,500 hourly employees at its copper-mining and smelting facilities that was negatively affecting ASARCO's production and impairing ASARCO's ability to generate cash necessary to satisfy its ongoing obligations.  Creditor constituents demanded that ASARCO settle the strike, and the Court held an in-chambers meeting with Mr. Ruiz, ASARCO's then-sole director, to facilitate a resolution of the work stoppage.

107.    With the assistance of Baker Botts and the ASARCO Committee, and with the urging by the Court, the company ultimately secured an interim agreement with the USW on November 7, 2005.  ASARCO's employees returned to work in December 2005, and soon thereafter, ASARCO's pre-strike production capacity was restored.

108.    In 2006 and 2007, Baker Botts worked closely with ASARCO's new President and Chief Executive Officer, Joseph Lapinsky, as he negotiated with the labor representatives on the terms of a definitive collective bargaining agreement.  ASARCO, again with the assistance of Baker Botts, also addressed settlement of the retiree medical class action suit filed in the United States District Court for the District of Arizona.  Eventually, the parties reached consensus on a collective bargaining agreement and a settlement of the retiree litigation.  The Court approved the agreement and the District Court affirmed that ruling over the Parent's strong objection. Later, during the 2009 confirmation hearing, the Parent recognized the agreement as a starting place for negotiations with the USW.

**B.**     **The South Mill**

109.    The injunction that Baker Botts obtained on behalf of ASARCO prohibiting the dismantling of a profitable mill ultimately earned the estates millions of dollars.  The Mission South Mill (the "South Mill") is one of two mills at the Mission Mine in Sahuarita, Pima County, Arizona.  The South Mill is a wholly functional, fully engineered mill in excellent condition for

its intended use.  ASARCO had spent $40 million in capital improvements to the mill in 1990-91 to expand its milling capacity to 20,000 tons of ore per day.  The South Mill was an income-producing asset that ASARCO operated successfully from 1991 to 2001 in a copper price environment of $0.74 to $1.36 (from 1992 to 2001).  It was taken out of production when copper prices dropped to $0.65/lb as of December 31, 2001.

110.    Strapped for cash, on July 19, 2005—just three weeks before the bankruptcy filing—ASARCO closed the sale of the South Mill and related equipment, parts, supplies, and inventory to Mineral Park, Inc. ("Mineral Park").  The total sale price for the assets per the sale agreement was $6 million:  $3.9 million for the South Mill and $2.1 million for the parts and supplies.

111.    The decision to sell the South Mill to Mineral Park was directed by the Parent. Before agreeing to sell the South Mill to Mineral Park, ASARCO conducted no analysis of what the South Mill was worth to ASARCO's ongoing business or how the South Mill could positively impact ASARCO's cash flow if brought back into production.

112.    In September 2006, Mineral Park started dismantling the South Mill, the first step in moving the mill to Mineral Park's copper mine in Kingman, Arizona.  ASARCO needed to take immediate action to protect the mill.  Baker Botts quickly investigated the facts, developed a trial strategy, and filed a lawsuit to avoid the sale of the South Mill as a fraudulent transfer.

113.    After obtaining a temporary restraining order, and during the month leading up to the preliminary injunction hearing, Baker Botts conducted 13 depositions in multiple states, exchanged voluminous written discovery, and prepared extensive trial briefing on numerous issues, the most significant of which concerned complex valuation questions.  After a hotly contested, three-day evidentiary hearing, Baker Botts and its co-counsel, Jordan, Hyden,

obtained an injunction prohibiting Mineral Park from further dismantling and moving the mill. That result, standing alone, saved the ASARCO estate some $40 to $50 million because it would have cost that much for ASARCO to dismantle, move, and re-assemble the South Mill back on ASARCO's property if successful on the merits of the underlying fraudulent transfer litigation.

114. According to evidence admitted at the injunction hearing, one of the best and most immediate ways for ASARCO to increase production to take advantage of increasing copper prices was to restart the South Mill at Mission Mine. The value of the South Mill on the date it was sold in July 2005 was at least $20 million and up to $70 million on a discounted cash flow basis, based on 2005-level copper prices.

115. Winning the injunction hearing was critical to the successful resolution of the litigation. The key issue in the case was whether Mineral Park had paid reasonably equivalent value for the mill. Answering this question required the Court to value the mill at the time of sale. Baker Botts developed and presented a convincing case for valuing the mill as an operating asset at the time of the sale, even though ASARCO had not operated the mill since 2001. ASARCO also had no operating mine plans in July 2005 that contemplated restarting the mill. ASARCO and Mineral Park each presented competing expert opinions of value. Each expert, in turn, used vastly different valuation approaches. In issuing the injunction, the Court accepted ASARCO's income valuation approach and determined that ASARCO had a reasonable likelihood of prevailing on the merits.

116. Notwithstanding the injunction ruling, Mineral Park was unwilling to concede defeat and settle the case. Mineral Park instead moved the District Court for permission to appeal immediately. Although interlocutory review of a preliminary injunction, particularly in a case set for trial just three months later, appeared at the time to have a low chance of success,

that was not the case here. At a telephonic scheduling conference to set a hearing on Mineral Park's motion for permission to appeal, the District Court granted immediate appellate review. In so ruling, the District Court expressed grave concerns regarding the Court's use of ASARCO's valuation methodology.

117.    Baker Botts immediately deployed its appellate specialists to work closely with the trial team to prepare appellate briefing. Baker Botts developed creative arguments and distilled the voluminous evidentiary record to the salient points necessary to win the appeal. Baker Botts' efforts were successful. The District Court reversed course, finding no error in the Court's ruling. At this point, the case was positioned for settlement. Shortly before trial, Baker Botts and Barclays worked together to negotiate a settlement of the South Mill litigation, which the Court approved in February 2007. As a consequence, ASARCO avoided spending $40 to $50 million to rebuild the South Mill, and ASARCO was able to retain an income-generating asset that increased revenues and profits for the company. The Parent, which had directed the sale of the South Mill, now benefits from the efforts of Baker Botts to avoid the sale and return the asset to the estate. As a result, the Parent will enjoy millions of dollars of incremental cash flow as a result of the South Mill operating at Mission Mine.

### C.    Tax Issues

118.    Baker Botts also played a critical role in the effort to realize certain tax benefits for the estate. After the bankruptcy filing, Baker Botts commenced an adversary proceeding against the Parent and other related entities seeking a declaration that ASARCO was the owner of a tax refund of approximately $60 million, which arose from the overpayment of federal income taxes made in the late 1980s by ASARCO's predecessor (the "Tax Refund"). As a result of objections filed by the Parent, the Internal Revenue Service had withheld the Tax Refund from ASARCO. Baker Botts also objected to the Parent's request for an administrative expense of

approximately $500 million (which the Parent, after the filing of the objection, later reduced to $161.7 million) for taxes attributable to ASARCO's post-petition income. These matters were consolidated into a single adversary proceeding (the "Tax Adversary").

119.   The Tax Adversary involved complicated facts and required a comprehensive understanding of a broad range of complex laws. The case implicated several aspects of the Bankruptcy Code, including provisions related to priority, claim classification, and subordination. The case also presented an array of state contract-law issues. Finally, it involved complicated federal income tax laws related to ownership of tax refunds and liability for tax obligations arising from assets and operations of a disregarded limited liability company, which also implicated issues related to the reorganization and intercompany transaction provisions of the Internal Revenue Code and Treasury Regulations promulgated thereunder. After a litany of motions, briefs, hearings, and the relentless study of the applicable laws, Baker Botts prosecuted its action before the Bankruptcy Court in July and August 2009.

120.   Through the Tax Adversary, Baker Botts protected a material estate asset and defended against the largest administrative claim asserted against the estate. Ultimately, the Parent agreed to withdraw its claim to ownership of the Tax Refund and request for administrative expense upon the District Court's confirmation of the Parent's plan of reorganization. Baker Botts' efforts in the Tax Adversary thus increased substantially the assets of the bankruptcy estate.

121.   In addition, ASARCO generated over $1.4 billion in cash during the bankruptcy, which the Parent used to pay ASARCO's creditors as part of its plan. All or substantially all of the amounts paid in settlement of environmental claims, asbestos claims, and toxic-tort claims will be deductible to the benefit of the Parent. *See Coltec Indus., Inc. v. United States*, 62 Fed.

Cl. 716, 744 (Fed. Cl. 2004); *Kerr-McGee Corp. v. United States*, 77 Fed. Cl. 309, 317 (2007); Treas. Reg. § 1.162-21(b)(2). These deductions will result in large net operating losses for the taxable year 2009. *See* Adv. No. 07-02011, Tr. 8/04/09, at 31:23–32:6, 32:13–33:9, 34:17–36:3 (testimony of Parent's tax expert). The Parent's financial expert testified: "As part of the Parent's Plan, certain amounts which have not been previously claimed as deductions, such as asbestos payments, will be paid out by ASARCO, thereby creating estimated net operating losses . . . of $1.5 billion for regular Federal tax purposes and $700 million for Adjusted Minimum Tax . . . purposes." Poulin Proffer, Ex. C-4 at 3.

122. The Parent will benefit in two ways from these net operating losses, which stem at least in part from Baker Botts' efforts. First, the Parent will be able to carry back and apply the losses against the taxable income generated by the affiliated group of corporations consisting of the Parent and its subsidiaries (the "AMC Consolidated Group") in prior years. *See* Adv. No. 07-02011, Tr. 8/04/09, at 32:3–12 (testimony of Parent's tax expert). This will substantially reduce the AMC Consolidated Group's federal income tax liability for those years and thereby produce a tax refund expected to exceed $100 million dollars. *See id.* at 36:4–40:1, 43:17–44:2. Second, the Parent will be able to carry forward excess net operating losses to reduce the taxable income of the AMC Consolidated Group, dollar-for-dollar, in future years, which will substantially reduce the AMC Consolidated Group's income tax liability in future years. *See id.* at 44:3–7. Baker Botts' work has helped provide the Parent with hundreds of millions of dollars in tax benefits that the Parent will recognize immediately, as well as substantial tax benefits that the Parent will enjoy for years to come.

## VIII.   OVERCOMING THE PARENT'S CONDUCT

123. Another significant factor that increased dramatically the complexity of these cases was the obstreperous conduct of the Parent. Throughout the course of the case, the Parent

had every opportunity to pay creditors in full, but declined to do so. It was not until the last possible moment when it had no other option, and was on the precipice of losing not only ASARCO but also the SCC shares worth billions of dollars plus $1.35 billion in cash, that the Parent finally presented a true full-payment plan that recognized reasonable settlements with creditors, was free of loopholes, and was backed by an acceptable forfeitable deposit.

124.     Rather than working collaboratively with creditor constituents in the case to resolve differences and to pay claims in full at reasonable settlement values, the Parent instead showed apparent indifference to creditors, apparent preference of its own interests over the interests of creditors, and an apparent desire to derail the Debtors' reorganization efforts at virtually every turn. That the Parent wore multiple hats—owner, industry competitor, bidder, and defendant in the largest fraudulent transfer lawsuit ever prosecuted to judgment[8]— apparently motivated the Parent to oppose the Debtors' efforts to settle claims globally and to maximize the value of the estate's assets, including the SCC Judgment, through competitive bidding.

125.     The Parent's litigation and delay tactics during the chapter 11 cases were extensive and unrestrained:

| Type of Action | Occurrences |
|---|---|
| **Objections in Case (including objections to 65 creditor proofs of claim)** | **107** |
| **Discovery Motions** | **15** |
| **Filings to Regain Company Control** | **5** |

---

[8]  The SCC Litigation was by far the largest claim against the Parent, but not the only claim. The estate had ten other lawsuits against the Parent and other insiders to recover transfers of assets and to collect inter-company debts, a lawsuit against the former officers and directors of ASARCO (many of whom are current officers and directors of AMC or Grupo Mexico), and a lawsuit against AMC to determine title to a tax refund of approximately $60 million held by the IRS.

| Type of Action | Occurrences |
|---|---|
| Harassment Filings (Mandamus, Examiner, Withdraw of Reference) | 4 |
| Appeals | 13 |

126.   The Parent appeared bent on attempting to derail entry into the 2007 collective bargaining agreement.  The Parent opposed and appealed virtually every material environmental settlement.   The Parent opposed efforts to reach a global compromise of asbestos and environmental claims.  The Parent opposed exposing ASARCO's operating assets and the SCC Judgment to a competitive auction environment.

127.   The Parent also sought (on five separate occasions) to regain control of the Board and its decision-making authority apparently so that the Parent could carry out its own agenda.[9] In September 2006, the Parent requested access to ASARCO's confidential information and to place the Parent's professionals in the Company's offices.  The request was denied.  In denying the motion, this Court observed that (a) the Parent's potential conflicts presented special "considerations about unfettered information going to them;" (b) "any significant . . . participation by [the Parent] in the everyday operations of this business . . . would be ill-perceived by participants that work in this company" and could negatively impact morale; (c) the Parent "is being accused of some significant, very serious things;" and (d) the Parent "is a competitor" of ASARCO.  Tr. 9/27/06, at 164-66 (Schmidt, J.).

128.   In January 2007, the day after ASARCO moved for approval of its collective bargaining agreement with labor, the Parent moved to expand the Board to five members, three of whom would be appointed by the Parent.  This too was denied.

---

[9] In response to motions to appoint an independent person to control ASARCO due to conflicts of interest of Grupo Mexico and other insiders, early in the bankruptcy case ASARCO's direct parent at the time, New Asarco, entered into a consensual corporate governance stipulation in which it relinquished its control over ASARCO.

129.   Then, in March 2007, the Parent (a) moved to compel ASARCO to provide it certain confidential information and to restrict ASARCO from providing the same information to other potential plan sponsors as part of the plan sponsor selection process; or, in the alternative, (b) sought a second time to increase the size of its Board.  The Court denied any change in governance and the Parent's request to restrict information to the Parent only.

130.   On August 13, 2007, the Parent filed a motion seeking authority to veto any settlement over $10 million.  The Court denied the Parent's motion, and Judge Head affirmed that decision on appeal.

131.   In early 2008, the Parent filed a motion seeking to appoint an examiner to examine, among other things, "the facts and circumstances surrounding the various settlements reached among the Debtors, asbestos claimants and the Department of Justice."  Determining that the appointment of an examiner was mandatory due to the amount of aggregate claims in the chapter 11 cases, the Court appointed an examiner but assigned no duties to him, which the Parent challenged by writ of mandamus to the District Court.  Thereafter, the Parent, ASARCO, and other parties in interest agreed to the entry of an order directing the examiner to attend the plan sponsor selection meeting and to report as to the fairness of the process.  Following the plan sponsor selection meeting, the examiner reported that the process was fair to all participants, including the Parent.

132.   In recommending to Judge Head that the District Court deny one of the Parent's attempts—as late as April 2009—to derail the environmental global settlement and stifle competitive bidding, the Court observed that the Parent's actions were just another delay tactic designed to "knock out" competitive bidders for the Debtors' assets:

> The Parent's last minute attempt to remove this case to District Court cannot be viewed as anything more than forum shopping and

delay tactics . . . .   Delay favors no one except the Parent.  The Court has recently approved a bid procedure process based on a new plan of reorganization involving purchase by Sterlite.  The bid procedure process and plan confirmation contains negotiated deadlines for confirmation of the plan.  The Parent has indicated that it intends to file a competing plan.  The Court's experience in this case suggests that the parties' feet must be held to the fire to move the case along.  ***If the Parent can delay the process and cause the Sterlite deal to fall apart, the Parent will arguably be the only contender for the Debtor.   The Parent's motion to withdraw the reference is simply another delay tactic aimed at knocking out competitive bidders.***

Report and Recommendation on Motion to Withdraw the Reference dated April 24, 2009, Dkt 10992 at 10 (emphasis added).

## IX.    RETENTION OF BAKER BOTTS AND PRIOR COMPENSATION

### A.    <u>Retention</u>

133.    On August 10, 2005, Baker Botts filed *ASARCO LLC's Application for an Order Pursuant to 11 U.S.C. § 327(a) Seeking Authorization for the Employment and Retention of Baker Botts L.L.P. as Debtor's Counsel*.  The Court entered an order approving this application on August 12, 2005.

134.    On February 20, 2006, Baker Botts filed the *Joint Application for an Order Pursuant to 11 U.S.C. § 327(a) and Local Rule 2014(b) Authorizing the Nunc Pro Tunc Employment and Retention of Baker Botts L.L.P. as Subsidiary Debtors' Counsel*.  The Court entered an order approving this application on March 20, 2006.

135.    On January 31, 2007, Baker Botts filed the *Joint Application for an Order Pursuant to 11 U.S.C. §§ 327(a) and 328 Expanding the Retention of Baker Botts L.L.P. as Counsel to the Recently Filed Subsidiary Debtors*.  The Court entered an order approving this application on February 23, 2007.

136.   **Exhibit A** is a chart with docket references to the foregoing employment applications, related attorney disclosures, and orders approving these applications.  Behind this chart is a copy of each of the three orders approving Baker Botts' retention in these chapter 11 cases.

B.   **Prior Compensation**

137.   On December 15, 2005, the Court entered the *Administrative Order Granting* [sic] *[Doc #855] Pursuant to Sections 105(a) and 331 of the Bankruptcy Code Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* (the "Administrative Order").  Under the Administrative Order, each Court-appointed professional could submit a monthly statement to ASARCO, and, absent objection by specified parties (in a manner set forth in the Administrative Order), ASARCO would pay 80% of fees and 100% of out-of-pocket expenses requested.  Approximately every four months, each professional would file with the Court on or before the 45th day following the last day of the compensation period, an interim application of the compensation and reimbursement of expenses requested for the prior four months.  Upon Court approval of the interim application, ASARCO would be authorized to pay the 20% of fees held back from the monthly statements.

138.   Under the Administrative Order, Baker Botts submitted monthly interim statements of professional fees and expenses to ASARCO, the United States Trustee, and the ASARCO Committee.  Baker Botts submitted thirteen quarterly interim fee applications.  The Court approved every one.  A table containing the amounts requested and paid under the Administrative Order is attached as **Exhibit B**.

139.     Baker Botts filed its time and billing records with each interim fee application. **Exhibit D** is a chart with specific docket references to these filings.[10]   The time and billing records of services performed, and expenses incurred, by Baker Botts timekeepers from November 1, 2009 through December 8, 2009 are also included in **Exhibit B**.   This Fee Application incorporates by reference all previously filed interim fee applications and time and billing records referenced on **Exhibit D**.

140.     Baker Botts has no agreement of any kind, express or implied, to divide with any other person or entity any portion of the compensation sought or to be received by it in these cases.   The fees that Baker Botts charged are the same as (or lower than) they would have been in a non-bankruptcy matter of similar size and complexity.

## X.     COMPENSATION REQUESTED

141.     Baker Botts requests final approval and allowance of the following amounts for services rendered and expenses incurred during the Application Period:

| | |
|---|---|
| ➢     Fees previously awarded under interim fee applications ........... | $112,018,548.73 |
| ➢     Fees from November 1, 2009 through December 8, 2009 ............. | $1,319,973.75 |
| ➢     Twenty percent enhancement of lodestar fees ............................ | $22,667,704.50 |
| ➢     Expenses previously awarded under interim fee applications ....... | $6,024,460.12 |
| ➢     Expenses from November 1, 2009 through December 8, 2009 .......... | $41,138.46 |
| ➢     **Total** ..................................................................................... | **$142,071,825.56** |

Baker Botts also requests compensation for fees and expenses incurred in the preparation of this Fee Application and any fees and expenses incurred as a result of defending this Fee Application. Baker Botts will supplement this Fee Application with invoices of time and billing records in connection with the preparation and defense of this Fee Application.

---

[10] All of Baker Botts' time and billing records during the Application Period are compiled in CD-ROM format.  Requests for a copy of the CD should be made to Kristen Wilkirson at kristen.wilkirson@bakerbotts.com.

142.     The fees that Baker Botts charged in the ASARCO case are relatively low when compared to peer firms representing debtors in complex chapter 11 cases.  In 2009, for example, Baker Botts' average billing rate for all professionals (including paraprofessionals) was approximately $400.02 in the ASARCO case.   That amount is significantly lower than the average billing rates in large bankruptcy cases pending in 2009 as reflected in the chart below[11]:

| Case Name | Law Firm | Average Hourly Rate in 2009 |
|---|---|---|
| Lyondell Chemical | Cadwalader | $551.80 |
| Nortel | Cleary Gottlieb | $551.72 |
| Lehman Brothers | Weil Gotshal | $528.90 |
| ASARCO | Baker Botts | $400.02 |

Baker Botts' $400.02 average billing rate for professionals in 2009 is well below the average billing rate in comparable cases as demonstrated in the above chart.  Simply adjusting Baker Botts' average billing rate to $500, which is still lower than any of the hourly rates charged in these other cases, ASARCO's estate would have been required to pay approximately $7 million more in 2009 alone for the 69,958.65 hours its professionals worked in that year.

143.     Although this Court approved non-local rates being charged in these cases, it is important to note that Baker Botts did not charge truly "national rates" in these cases.  For illustration, below is a chart of rates charged by partners at law firms serving as debtor's counsel in various chapter 11 cases pending in 2009 in the Southern District of New York and Delaware, which reflects a sampling of accurate national rates for 2009.

---

[11] The information contained in this chart and the chart below is taken from the fee applications filed by the respective professionals in 2009.  *In re Hayes Lemmerz Int'l, Inc.*, No. 09-11655 (Bankr. D. Del.) (Dkt 1073; fee period: 05/11/09 through 12/21/09); *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y.) (Dkt 4825; 6205; fee period 2/1/09 through 9/30/09); *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y.) (Dkt 2008, 3208; fee period: 1/6/09 through 8/31/09); *In re Nortel Networks Inc.*, No. 09-10138 (Bankr. D. Del.) (Dkt 1943; 2356; fee period: 1/14/09 through 11/30/09); *In re Stock Bldg. Supply Holdings*, LLC, No. 09-11554 (Bankr. D. Del.) (Dkt 320; fee period: 05/06/09 through 06/15/09); *In re T H Agric. & Nutrition, L.L.C.*, No. 08-14692 (Bankr. S.D.N.Y.) (Dkt 556; fee period: 1/12/09 through 11/30/09).  The *Stock Building Supply Holdings* and *T H Agriculture & Nutrition, L.L.C.* cases were prepackaged bankruptcy cases.

| Case Name | Law Firm | Range of 2009 Partner Billing Rates |
|---|---|---|
| Stock Building Supply | Shearman & Sterling | $900-$995 |
| Hayes Lemmerz | Skadden Arps | $825-$1,050 |
| Nortel | Cleary Gottlieb | $725-$980 |
| Lyondell | Cadwalader | $700-$1,050 |
| Lehman Brothers | Weil Gotshal | $700[12]-$1,005 |
| ASARCO | Baker Botts | $465-$800 |

## XI.   CONCLUSION

144.   The ASARCO bankruptcy case was one of the most complicated and yet most successful reorganizations in United States history.  The case was certainly the largest and most complicated chapter 11 case from an environmental standpoint.  With the addition of over 100,000 personal injury asbestos and toxic-tort claims, it also was one of the largest mass-tort bankruptcies in recent history, if ever, to pay all claims in full with post-petition interest and allowed attorneys' fees.  The SCC transaction, planned and carried out by AMC in 2003, further complicated matters.  Baker Botts trial lawyers successfully prepared and tried the largest fraudulent transfer case in United States history in less than 18 months.

145.   While massive environmental and mass-tort claims and the SCC litigation contributed significantly to the complexity of the ASARCO bankruptcy cases, they were not the only factors making the cases unique.  Additional factors and disputes that made these cases extraordinarily complex include (1) the Debtors' lack of liquidity, combined with a striking workforce at filing; (2) the need to repair strained, and severely damaged, employee and vendor

---

[12]In its First Interim Fee Application, Weil Gotshal listed $500 as David S. Dederick's hourly billing rate.  *See In re Lehman Brothers Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y.) (Dkt 3343).  In its Third Interim Fee Application, Weil Gotshal listed $650 as Francis Teitgen's hourly billing rate.  *See* (Dkt 6205).  Mr. Dederick and Mr. Teitgen are partners in Weil Gotshal's overseas offices according to Weil Gotshal's website and have only billed 25.8 hours cumulatively in the *Lehman Brothers* case according to all of Weil Gotshal's publicly filed fee applications.  *See* Dkt 3343 (p. 4); Dkt 4825 (p. 3); Dkt 6205 (p. 2).  Mr. Dederick and Mr. Teitgen's hourly billing rates are not representative of the rates charged by Weil Gotshal's U.S. partners in the *Lehman Brothers* case.

relations; (3) the rehabilitation of operating assets that had suffered years of neglect and lack of necessary upkeep and repair under the Parent's control; (4) the collapse of credit and commodity markets in 2008; and (5) the need to maximize the value of ASARCO's assets through a competitive auction (and plan) process, not just once but twice.  While any one of these controversies would make these cases complicated, the confluence of all of these intricate legal and factual disputes in the same bankruptcy case, and the extraordinary results achieved—payment in full in cash plus post-petition interest and allowed attorneys' fees—makes these cases rare and exceptional by virtually any definition.

146.    Baker Botts was one of the main contributors to ASARCO's successful reorganization.   Throughout these cases, Baker Botts lawyers and paralegals conducted themselves with the utmost professionalism, addressing an array of challenging legal issues with sophistication, creativity, and skill.  The outcomes achieved by Baker Botts for ASARCO and its creditors were exceptional.  Most significantly, Baker Botts created literally billions of dollars of value that did not exist when ASARCO filed bankruptcy by winning the largest fraudulent transfer judgment in United States history and obtaining favorable settlements in other fraudulent transfer lawsuits (e.g., South Mill, Montana Resources, and Rosemont/Augusta Resources).

147.    Baker Botts submits that equity requires that such extraordinary results in the face of numerous substantial obstacles be rewarded.  Baker Botts' request for a 20% fee enhancement is reasonable, appropriate, and necessary to properly compensate the firm for the exceptional results achieved.

Accordingly, Baker Botts respectfully requests that the Court enter an order:

1.    granting the Fee Application in all respects;

2.      approving on a final basis and allowing as an administrative expense entitled to priority under the applicable provisions of the United States Bankruptcy Code the $112,018,548.73 in fees and $6,024,460.12 previously paid by ASARCO to Baker Botts pursuant to orders entered by the Court;

3.      approving on a final basis and allowing as an administrative expense entitled to priority under the applicable provisions of the United States Bankruptcy Code fees in the amount of $1,319,973.75 and expenses in the amount of $41,138.46 for November 2009 and December 1-8, 2009, which were not previously approved pursuant to an interim fee application;

4.      approving on a final basis and allowing as an administrative expense entitled to priority under the applicable provisions of the United States Bankruptcy Code a fee enhancement in the amount of $22,667,704.50, which is equal to 20% of the $113,338,522.48 in total fees paid or earned, and approved for the period August 9, 2005 through December 8, 2009;

5.      approving on a final basis and allowing as an administrative expense entitled to priority under the applicable provisions of the United States Bankruptcy Code the reasonable fees and expenses incurred by Baker Botts in preparation and defense of the Fee Application (in an amount to be submitted at a later date);

6.      approving on a final basis the reasonable fees and expenses incurred by Baker Botts in defense of any appeal of the order granting the Fee Application (in an amount to be determined at a later date, if necessary);

7.      authorizing and directing the Plan Administrator, in accordance with the *Amended Order Approving Plan Administrator's Amended Funds Flow Memorandum*

*Pursuant to Section 10.4 of the Parent's Plan and Paragraph 105 of Confirmation Order* (Dkt 13441), to pay Baker Botts the amount of fees and expenses (including fee enhancement) approved in the order granting the Fee Application for which Baker Botts has not already received payment, promptly upon the order granting the Fee Application becoming a Final Order; and

8.   authorizing and directing the Plan Administrator to pay interest at the federal judgment rate on any fees and expenses (including fee enhancement) approved in the order granting the Fee Application but which remain unpaid, which interest shall accrue beginning on the date of entry of the order.

Respectfully Submitted this 8th day of February 2010.


**BAKER BOTTS L.L.P.**

| | |
|---|---|
| */s/ James R. Prince*<br>Jack L. Kinzie, State Bar No. 11492130<br>Kemp Sawers, State Bar No. 00788358<br>James R. Prince, State Bar No. 00784791<br>Marty Green, State Bar. No. 08351500<br>Eric Söderlund, State Bar No. 24037525<br>Omar J. Alaniz, State Bar No. 24040402<br>Thomas E. O'Brien, State Bar No. 24046543<br>2001 Ross Avenue<br>Dallas, Texas 75201-2980<br>Telephone: 214.953.6500<br>Facsimile: 214.661.6503<br>Email: *jack.kinzie@bakerbotts.com*<br>       *kemp.sawers@bakerbotts.com*<br>       *jim.prince@bakerbotts.com*<br>       *marty.green@bakerbotts.com*<br>       *eric.soderlund@bakerbotts.com*<br>       *omar.alaniz@bakerbotts.com*<br>       *tom.obrien@bakerbotts.com* | G. Irvin Terrell, State Bar No. 19794500<br><br>One Shell Plaza<br>Houston, Texas 77002<br>Telephone: 713.229.1234<br>Facsimile:  713.229.1522<br>Email:  *irv.terrell@bakerbotts.com* |

## STATEMENT OF CERTIFYING PROFESSIONAL

The undersigned hereby certifies that he has read the foregoing Final Fee Application of Baker Botts L.L.P., Counsel to Debtors, for Allowance and Payment of Compensation for Services Rendered and Reimbursement of Expenses Incurred for the Period August 9, 2005 through December 8, 2009 and to the best of his knowledge, information and belief, formed after reasonable inquiry, the compensation and expense reimbursement sought is (a) in conformity with the Southern District of Texas, United States Bankruptcy Court Local Rule 2016, effective January 1, 2008, and (b) are billed at rates, in accordance with practices, no less favorable than those customarily employed by Baker Botts in similar matters and generally accepted by Baker Botts' clients.


                                    */s/ James R. Prince*
                                    James R. Prince