IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No.  05-21207 |
| | § | |
| ASARCO LLC, *et al.,* | § | Chapter 11 |
| | § | |
| Debtors. | § | (Jointly Administered) |

_____

**FOURTEENTH AND FINAL APPLICATION OF JORDAN, HYDEN, WOMBLE, CULBRETH & HOLZER, P. C.  FOR APPROVAL OF ATTORNEY'S FEES AND EXPENSES INCURRED  AS BANKRUPTCY COUNSEL FOR ASARCO, L.L.C. AND REQUEST FOR AWARD OF ENHANCED FEE**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU.  IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE.  IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY.  YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 20 DAYS OF THE DATE THIS WAS SERVED ON YOU.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED.  IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU.  IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING.  UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**FAILURE TO OBJECT TO THE FEE APPLICATION AND/OR ENTRY OF A ORDER APPROVING FEES WILL BE A FIRST AND FINAL JUDICIAL DETERMINATION OF ALL ISSUES WHICH WOULD PREVENT, LIMIT OR REPRESENT A BASIS FOR REDUCTION OF THE RIGHT TO PAYMENT OF THE REQUESTED FEES OR THE NECESSITY, QUALITY AND VALUE OF THE WORK PERFORMED REASONABLENESS OF THE FEES CHARGED.**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

NOW COMES the law firm of Jordan, Hyden, Womble, Culbreth & Holzer, P.C. (herein "**Applicant**" or "**Jordan Hyden**") as former bankruptcy attorneys to Asarco, L.L.C.,[1] as Debtor and Debtor-In-Possession in the above-entitled jointly administered bankruptcy proceeding

_____

[1] Applicant was also bankruptcy counsel to Asarco's Asbestos Subsidiaries, and is seeking approval of its lodestar fees and expenses incurred in representation of the Asbestos Subsidiaries by separate application; however, for purposes of any potential enhanced fees, Applicant requests that its efforts on behalf of the Asbestos Subsidiaries be considered in the Court's review and consideration of this application.

(hereinafter "**Asarco,**" or "**Debtor**"), and files this its Fourteenth and Final Application of Jordan, Hyden, Womble, Culbreth & Holzer, P.C. for Approval of Attorney's Fees and Expenses Incurred as Bankruptcy Counsel for Debtor and Request For Enhanced Fee (herein the "**Application**") and would show the Court as follows:

1.      Asarco filed its Voluntary Petition under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq., on August 9, 2005, which was several months after the Asbestos Subsidiaries filed their Chapter 11 proceedings in this Court.

2.      Applicant was bankruptcy co-counsel for Debtor and makes this Application for Approval and Allowance of Compensation pursuant to § 331 of the Bankruptcy Code for professional services rendered and reimbursement of out-of-pocket expenses incurred by Applicant in representation of the Debtor in this jointly administered bankruptcy case for the period of November 21, 2009 through December 9, 2009 (hereinafter the "**Application Period**").

3.      Applicant further seeks a fee enhancement of 20% of all lodestar fees awarded as counsel for Asarco and as counsel for the Asbestos Subsidiaries.  Based on total lodestar fees requested of $7,009,305.05, the enhancement sought is an additional $1,401,861.00.

4.      The Order Granting Debtor's Application for Approval of Retention of Applicant was entered on August 12, 2005 (Doc. #55).

5.      On June 10, 2004, Applicant received a retainer of $75,000.00 from Asarco on behalf of the Asbestos Subsidiaries.  No retainer was paid by Asarco on its own behalf.

6.      On January 21, 2010, Applicant submitted its final bill to Asarco in accordance with the Interim Compensation Order and absent objection will draw from the retainer 80% of fees and 100% of expenses on February 10.

7.      Applicant agreed to represent the Debtor at hourly rates for its attorneys, paralegals, and law clerks, and on the same basis and factors as are normally considered in determining fees.  The rates charged were the normal rates charged by Applicant for the class of

persons named and were subject to periodic adjustment to reflect economic, experience and other factors.

8.     This Court has core jurisdiction to determine the reasonableness of the fees, the amount of the expenses and the appropriateness of the charges in respect to all of the professional fees, all the expenses, and also to the Applicant's request for a fee enhancement.

9.     Prior to the representation of Asarco in this Chapter 11 proceeding, Applicant had not represented Asarco other than during the few days prior to the bankruptcy filing in preparation for the filing. Applicant had represented Asarco's Asbestos Subsidiaries as described above and as set forth in Applicant's retention affidavit [Doc #19, Exh. 1 thereto].

10.     This Application is the Fourteenth and Final Application filed by Applicant for its fees and expenses incurred in its representation of the Debtor Asarco, LLC. All previously approved fees and expenses have been paid.  This Final Application incorporates herein all of the statements made in each of the prior Interim Applications and all the attachments to each of the prior Interim Applications.   Applicant's prior interim applications for fees and expenses approved by the Court are listed below, along with lodestar amounts for this application, and a total amount of all the lodestar applications made on behalf of the Asbestosis Subsidiaries:

| Application | Appl Period | Order Date | Doc # | Fees | Expenses |
|---|---|---|---|---|---|
| First Interim | 8/5/05-11/19/05 | 12/15/05 | 1228 | $274,857.00 | $7,474.51 |
| Second Interim | 11/20/05-3/19/06 | 5/12/06 | 2177 | $281,739.00 | $9,236.95 |
| Third Interim | 3/20/06-7/19/06 | 9/1/06 | 2893 | $246,300.50 | $10,431.85 |
| Fourth Interim | 7/20/06-11/19/06 | 12/22/06 | 3481 | $492,290.00 | $17,126.85 |
| Fifth Interim | 11/20/06-4/19/07 | 5/21/07 | 4776 | $464,382.60 | $26,239.58 |
| Sixth Interim | 4/20/07-8/19/07 | 9/25/07 | 5938 | $450,831.50 | $23,853.65 |
| Seventh Interim | 8/20/07-12/19/07 | 1/29/08 | 6767 | $485,818.50 | $47,761.44 |
| Eighth Interim | 12/20/07-4/19/08 | 5/23/08 | 7873 | $580,224.50 | $36,403.42 |

| | | | | |
|---|---|---|---|---|
| Ninth Interim | 4/20/08-8/19/08 | 9/23/08 | 9283 | $646,780.50 | $23,566.12 |
| Tenth Interim | 8/20/08-11/21/08 | 12/31/08 | 10215 | $552,919.50 | $19,646.49 |
| Eleventh Interim | 11/22/08-3/19/09 | 4/24/09 | 10986 | $462,099.50 | $10,968.58 |
| Twelfth Interim | 3/20/09-7/19/09 | 9/4/09 | 12795 | $884,056.50 | $39,014.85 |
| Thirteenth Interim | 7/20/09-11/18/09 | 12/11/09 | 13464 | $632,241.45 | $41,216.55 |
| THIS APPLICATION Fourteenth Interim | | | | $75,405.00 | $3,757.05 |
| ASARCO TOTALS | | | | $6,529,946.05 | $316,697.89 |
| ASBESTOS SUBSIDIARIES TOTALS | | | | $479,359.00 | $40,402.17 |
| GRAND TOTALS | | | | $7,009,305.05 | $357,100.06 |

11.     During this final Application Period, the Applicant represented the Debtor in its Chapter 11 proceeding now pending and incurred the following attorney fees and expenses, as more particularly set forth in the Fee and Expense Summary attached hereto as Exhibit "A" and the itemized monthly invoices attached as Exhibit "B".  Applicant incurred these fees and out-of-pocket expenses in performing necessary services for and on behalf of Debtor in this proceeding.

| | | |
|---|---|---|
| Bankruptcy Fees | $ | 75,405.00 |
| Bankruptcy Expenses | $ | 3,757.05 |
| **Total Bankruptcy Fees and Expenses** | **$** | **79,162.05** |

12.     During the final Application Period, the Applicant provided 173.50 hours of professional services on behalf of the Debtor.  The time spent and hourly rate of each attorney and paralegal during the Application Period is disclosed as follows:

**JORDAN, HYDEN, WOMBLE,**
**CULBRETH & HOLZER, P.C.**                        Hourly Rate                    Actual Hours
Shelby A. Jordan - Shareholder                $525.00                  89.80
Harlin C. Womble, Jr. - Shareholder          $475.00                  0.10

| | | |
|---|---|---|
| Nathaniel Peter Holzer – Shareholder | $425.00 | 57.30 |
| Ernest C. Garcia- Of Counsel | $400.00 | 0.50 |
| Susan M. Womble-Associate | $220.00 | 2.00 |
| Barbara Smith – Sr. Paralegal | $165.00 | 9.50 |
| Shaun D. Jones – Sr. Paralegal | $155.00 | 7.00 |
| Ron Richardson-Paralegal | $95.00 | 1.00 |
| Linda Salyers-Paralegal | $75.00 | <u>6.30</u> |
| **TOTAL:** | | **173.50** |

## FACTS RELEVANT TO THE AWARD OF ATTORNEY'S FEES

13.     All of the Applicant's billed time during this final period was assigned to the U.S.

Trustee's task codes as follows:

| CATEGORIES | ATTORNEY TIME | PARALEGAL TIME |
|---|---|---|
| B110 Case Administration | 14.40 | 11.30 |
| B120 Asset Analysis and Recovery | | |
| B130 Asset Disposition | | |
| B140 Relief from Stay/Adequate Protection | | |
| B150 Meetings of & Communications with Creditors | | |
| B160 Fee/Employment Applications | 6.80 | 0.10 |
| B170 Fee/Employment Objections | | |
| B180 Avoidance Action Analysis | | |
| B185 Assumption/Rejection of Executory Contracts | | |
| B190 Other Contested Matters | .50 | .60 |
| B195 Non-Working Travel | | |
| B210 Business Operations | | |
| B220 Employee Benefits/Pensions | | |
| B230 Financing/Cash Collections | | |
| B240 Tax Issues | | |
| B250 Real Estate | | |
| B260 Board of Directors Matters | | |
| B310 Claims Administration and Objections | 16.90 | 7.0 |
| B320 Plan and Disclosure Statement | 111.10 | 4.80 |
| L110 Fact Investigation/Development | | |
| **TOTALS:** | **147.70** | **23.80** |

14.     With respect to the Interim Fee Applications, and the hourly rate fees that are the subject of this Final Application, various factors have been suggested by the Courts in considering the value of compensation rendered in awarding compensation in a bankruptcy case

as enumerated by the Court in *In re First Colonial Corporation*, 544 F.2d 1291 (Sixth Circuit 1977) and *In re Wildman*, 15 BCD 1189 (Bankr. N.D. Ill. 1987).  These factors are relevant to this Application, and are set out in this section and discussed separately below with respect to the overall results obtained in Applicant's representation of the Debtor and this estate.

        A.    <u>Time and Labor Required</u>.  Applicant has utilized its attorney time and paralegal or law clerk time in this Chapter 11 proceeding to the exclusion of other potential clients.  The problems presented by this case have required almost a continuous immediate attention, forcing priority use of time by both attorneys and staff, very often outside of normal working hours and also on weekends.   Because of the amount of time required to dispose of the issues that have arisen in this bankruptcy case, Applicant has had to refuse some potential new clients since inception of this case in order to work on this matter.

        B.    <u>Novelty and Difficulty of the Questions</u>.  Applicant, as co-counsel, worked continuously with the Baker Botts firm in all dealings in this case, including handling numerous matters related to the Debtor's case, as well as the bankruptcy cases filed by Asarco's Asbestos Subsidiaries.  Matters handled successfully during the overall course of the representation included all aspects of the cases, including dealings with environmental claims and objections, corporate governance, labor issues, asbestos and future claims, litigation by and against the Debtor's parent and affiliates, litigation against fraudulent transfer parties including recovery of the South Mill;  plan drafting, interim fee applications, auction process and motions including auction of the judgment against the Debtor's parent and affiliates; issues related to termination of the Sterlite PSA and LC draw, appeals and stays pending appeal, court status conferences, confirmation of the various competing plans, closing and post closing matters including the Sterlite bids, the parent's supplemental confirmation order, administrative claim and fee claim issues

including enhancement, Halcyon motion for substantial contribution, flow of funds matters and two related hearings, management bonus motion, and various transition matters.  This is of course not a comprehensive list of matters handled during this four-plus year engagement; for greater detail please refer to the prior interim applications.

C.   <u>Skills Requisite to Perform the Service Properly</u>.  This case required staffing of  attorneys with substantial experience in all aspects of bankruptcy proceedings, in order to successfully develop, evaluate, litigate, or otherwise deal with the many complex issues of this case.

D.   <u>Customary Fees</u>. The rates charged by Applicant were the normal charges for the work performed in similar matters for similar clients for this law firm, without consideration of size and degree of responsibility, difficulty, complexity and results achieved.  The charges by Applicant are believed to be at a rate less than that being charged in the State of Texas by attorneys of the same or similar expertise representing debtors and creditors in insolvency cases.  As an example, other Texas attorneys involved in these cases have rates in excess of $700.00 per hour. National firms in this practice area have higher hourly rates than that.  The blended rate for hours actually expended by all timekeepers at Jordan Hyden during this Application Period is $434.61.  the blended rate for hours actually expended by attorneys during this Application Period is $482.20.

E.   <u>Whether Fee is Fixed or Contingent</u>. As in all bankruptcy proceedings, fees of the Applicant are subject to the review, approval and/or discretion of the Court in determining the value of services to the estate as well as subject to the availability of funds in the estate and are accordingly, in that sense, contingent.  These fees are not intended to be contingent, and the results obtained to date, it is believed, justify both the award of these fees and an enhancement.

F.   Time Limitations. The circumstances under which Applicant was employed as counsel for the Debtor caused the firm to experience time limitations and demands early on in the Chapter 11 proceeding and related litigation.  The Debtor has requested and has received a priority handling of its case by the Applicant.

G.   Amount Involved and Results Obtained.  The Parent's full payment plan resulted in the payment of $3.6 billion dollars to the Plan Administrator for payment in full plus interest to all creditors.

H.   The Undesirability of the Case.  At the outset this case did not appear to be a candidate for a successful reorganization.

I.   The Nature and Length of Professional Relationship with the Client. The Applicant had no relationship with the Debtor, the Creditors' Committees, Asarco, or any creditor except as disclosed above and in the retention affidavits on file with the Court.

J.   Awards in Similar Cases. The lodestar compensation sought is consistent with the reasonable compensation awarded in other cases of this size and nature.  The request for a fee enhancement, discussed further below, is also consistent with reasonable compensation awarded in other cases with such extraordinary outcomes.

K.   Fees and Expenses.  The Applicant has incurred substantial necessary out-of-pocket fees and expenses in connection with this case.

L.   Mileage.  When applicable, Applicant's rate for automobile mileage is the mileage rate charged and normally approved in the Southern District of Texas.

M.   Travel Time.  When applicable, the hourly time charged reflects only one-half of the time actually spent in travel, in accordance with this firms practice.

N.   Itemized Entries.  Attached hereto as Exhibit "A" is a Fee and Expense Summary of Applicant's charges to the Debtor broken down by the professional who rendered the service.  Attached hereto as Exhibit "B" is a chronological record reflecting

time spent by attorneys and description of the services performed on behalf of the Debtor. Exhibits "A" and "B" are incorporated herein for all purposes as if set forth fully at length.

15.     The request for approval and allowance of lodestar fees and expenses is submitted under the standards set forth in ***In re First Colonial***.  This fee application is filed and submitted in accordance with the requirements of this Court and the Bankruptcy Code, and it is not intended as a waiver in any respect of the attorney client privilege between counsel and the debtor-in-possession.   Such privileges, and all privileges related thereto, are specifically reserved.

## REQUEST FOR FEE ENHANCMENT

16.     The final application of co counsel Baker Botts, LLP, for award of enhanced fee, which was filed today (doc#13915), sets forth the legal basis for fee enhancements and explains why the extraordinary results obtained in this case qualifies Baker Botts for a fee enhancement.[2]

---

[2]     *See, e.g., In re Buckridge*, 367 B.R. 191 (Bankr. C.D. Cal. 2007) (case began as a no-asset case but ended in a 100% distribution to creditors); *In re Nucentrix Broadband Networks, Inc.*, 314 B.R. 574 (Bankr. N.D. Tex. 2004) (creditors originally expected to receive 12% distribution but ended with a 100% distribution to creditors and return to equity); *In re Se. Banking Corp.*, 314 B.R. 250 (Bankr. S.D. Fla. 2004) (creditors originally expected to receive no more than a 5% distribution but ended with a 100% distribution); *In re El Paso Refinery*, L.P., 257 B.R. 809 (Bankr. W.D. Tex. 2000) (debtor expected to be administratively insolvent but ended with a 100% distribution to creditors); *In re Farah*, 141 B.R. 920 (Bankr. W.D. Tex. 1992) (creditors expected to receive 5% distribution but ended with 100% plus interest distribution); *In re Baldwin-United Corp.*, 79 B.R. 321 (Bankr. S.D. Ohio 1987) (debtor entered bankruptcy with nearly zero assets and billions of dollars in claims but ended with 60% distribution to creditors).

The amount of an enhanced fee award is discretionary with the bankruptcy court.  *See In re Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1257 (5th Cir. 1986).  Section 330 of the Bankruptcy Code provides that compensation awarded, including any fee enhancement, be "reasonable."  11 U.S.C. § 330(a)(1)(A); *see also Hensley v. Eckerhart*, 461 U.S. 424, 436-37 (1983); *In re Farah*, 141 B.R 920, 926 (Bankr. W.D. Tex. 1992).  Bankruptcy courts have declined to adopt a strict mathematical formula for determining what constitutes a reasonable and appropriate enhancement.  *See In re Farah*, 141 B.R. at 926.  ("Unfortunately, there is no uniform standard by which to arrive at a fee enhancement figure.  Fee calculation is not an exact science.").

This Final Application incorporates the relevant factual and legal portions of that Baker Botts Application by reference and so they are not repeated herein.

### A.    Service as Co-Counsel to the Debtors

17.    Jordan Hyden worked closely with Baker Botts on virtually all the strategy, briefing, and, in particular, coordination of court proceedings and court appearances that resulted in the Parent's full-payment plan, while at the same time scrupulously avoiding any duplication of efforts.  Although Baker Botts took the lead in formulating the grounds for most all strategic decisions (with a few exceptions such as the OLS environmental litigation and matters related solely to the Asbestos Subsidiaries), Jordan Hyden participated regularly in the analysis, planning, and recommendations that resulted in the major strategic reorganization decisions, and the implementation of the Debtor's decisions that were based on those recommendations. Likewise, although Baker Botts normally took the lead in drafting pleadings, Jordan Hyden regularly edited and commented on most all significant pleadings, including the Plans, the various sales and auction processes, and the environmental and asbestos pleadings.  Jordan Hyden often prepared or contributed to the many demonstratives used at trial, and often presented the arguments and examined witnesses.

### B.    Nature of the Irregular Work Schedule

18.    The most significant obstacle to the confirmation of a plan to pay creditors in full was the refusal of the equity owners and affiliates (collectively the "Parent") to collaboratively work with creditor constituents in the case to resolve differences and to pay claims in full at reasonable settlement values.  The Parent showed apparent indifference to the value of the Debtor enterprise, exhibited a clear preference for its own interests over the interests of creditors, and exhibited an apparent desire to derail the Debtors' reorganization efforts at virtually every turn.  The Parent wore multiple hats—owner, industry competitor, claims and settlement objector, bidder, and defendant in the largest fraudulent transfer lawsuit ever prosecuted to

judgment.[3]  The Parent had inside information about the Debtor at the time of filing of this case, and had other strategic advantages by having taken, for the benefit of its competitive position in the industry, important assets, opportunities, and important personnel (*i.e.*, the entire tax department) and used those strategic advantages to impede the Debtors attempts at reorganization.

19.    The Parent opposed the Debtors' efforts to settle creditor claims both individually and globally, including the attempts at mediation and settlement of asbestos claims, the environmental settlements, and the union resolution.  The Parent opposed the Debtor's efforts to maximize the value of the estate's assets, including the Debtors attempt to monetize the SCC Judgment through competitive bidding.

20.    Significantly, the extraordinary results achieved in this case thru the efforts of Applicant and its co counsel involved numerous occasions where implementation of the required responsive work required far more than an eight hour day or a five day week for the lawyers and staff.[4]  Jordan Hyden absorbed the additional costs, inconvenience, and expenses of scheduling the lengthy days in order to achieve the results culminating in a payment in full plan being presented on almost the last day of the confirmation hearings. The Parent filed many of its pleadings that were designed to impede the reorganization on an "emergency" basis and thereby obtained hearings on a greatly accelerated basis.  Many times hearings were set on two days or less notice, requiring responsive reactions that often could only be accomplished by long and late hours for the lawyers and support staff.

---

[3]    Although the SCC Litigation was by far the largest claim against the Parent, it was not the only insider claim.  The estate had ten other lawsuits against the Parent and other insiders to recover transfers of assets and to collect inter-company debts, a lawsuit against the former officers and directors of ASARCO (many of whom are current officers and directors of AMC or Grupo Mexico), and a lawsuit against AMC to determine title to a tax refund of approximately $60 million held by the IRS.

[4] Applicant does not mean to imply that Debtors' co counsel were alone responsible for the extraordinarily successful outcome in this case.  Many other persons had important roles, worked long hours, and played a part in achieving these results.

### C.     The Extraordinary Results

21.     The final application of Baker Botts set out the extraordinary events in this case that forced the Parent to the negotiating table and ultimately forced the Parent to propose a 100% payment in full (including interest) Plan that it had given lip service at times but in fact had generally opposed over the four prior years of this reorganization case.  Jordan Hyden agrees entirely with the allegations of fact and the conclusions set out in Baker Botts application and those details will not be repeated herein.   It is clear that Baker Botts had the leading role in the success in these cases, but the success was also due in part to the efforts of the Court, the Board of Directors, management, the employees, the creditor constituents, other professionals and advisors, and a mostly favorable copper market.

22.     Included in the extraordinary events overcome by the Debtor's counsels' strategic planning and strategic implementation (that forced the Parent to do that which it refused to do for four (4) years of this case) include the following:

(i)         World Copper Market

23.     This element had two critical time periods requiring unique responses.   First, at the filing of this Chapter 11 case the Debtor was almost out of cash and was experiencing a labor strike that appeared to doom any possible reorganization.  The Parent, at filing, appointed and continued to appoint the directors and implement its own strategy of refusing to settle the labor strike and take advantage of what appeared to be an increasing copper price and market.  The Debtors management, creditors' committees, and other parties in interest all desired the strike settled, and the union indicated a willingness to work toward resolution.  It was the Parent-controlled board and management that did not want to settle the strike and it was Debtor's counsel that ultimately arranged management's direct meeting with the court in the presence of all major constituents to present its labor position to the Court for consideration.   As a result of that conference, and the comments of the Court, management (which at the time consisted of

one Parent-appointed director), agreed to participate in efforts to settle the strike and with the direction of Debtor's counsel and the direct participation of the committees and labor, the strike was settled within time to allow the Debtor's financial survival.   That financial survival permitted the Debtor and the process to move forward to what ultimately resulted in exiting bankruptcy with more than $1 billion in cash on hand.   In fact, by October 2008 the Debtor was poised to exit bankruptcy with a very substantial plan designed to sell the Debtor's business (or confirm a Parent's litigation-based plan it was then proposing) – neither of which, however, Plan could have then been considered a payment in full plan.

24.    The copper market in late fall of 2008, however, created the second entrenchment to "survival" mode for Debtor's counsel to strategically deal with – the world financial crisis and the total collapse of copper prices caused the Plan proposed by the Debtor to be withdrawn (as a result of the breach of the purchase contract by Sterlite) and the Parent's subsequent abandonment of its Plan.  The Parent not only refused to go forward with its Plan to reacquire the Debtor because of the market crash, it  actually published a press release scolding the Debtor's business and suggesting that because of the current market conditions creditors would get only pennies the dollar.

(ii)    The Parent as a Judgment-Debtor

25.    This second critical period, however, had several events produced by Debtor's counsel's efforts that assured the Debtor's survival and caused the ability of the Debtor to "force" a competing plan environment in which the Parent was "forced" to participate or else risk billions of dollars in losses and lost opportunities.

a.    In August, 2008, after a summer trial that lasted one month before Hon. Judge Hanen, the District Court entered its judgment on liability (reserving the damages to a further judgment).  This ultimate Judgment against the Parent caused the complete reversal of the prediction by the Parent that creditors would get pennies on the dollar.

But for this Judgment obtained by Baker Botts with the assistance of Applicant, and its use in the confirmation process, it is likely that the reorganization results would have been far less favorable to creditors, and nowhere near payment in full.

b.    It was also during this period, the Debtor determined that it must keep the sale of the business in play in lieu of litigation against Sterlite, and through the planning and efforts of its bankruptcy counsel was able to re-negotiate a new contract with Sterlite to continue the leverage of a possible loss of the business by the Parent, an ingredient absolutely necessary to compelling the Parent to respond as the results of this case illustrate.

c.    Third, the Debtor implemented a process to auction the Judgment over the objection of the Parent, the results of which were expected to generate sufficient cash to fund a high payout plan, or, as eventually occurred, force the Parent to a reasonable "bid."

Thus, the Judgment, keeping Sterlite in play, and the strategic use of the Judgment accomplished two intended results.  First, it exposed the Parent to as much as $9 billion in potential liability and thereby hedged the Debtor's business enterprise value against the collapsed copper price. Secondly, the Debtor's counsels' recommendation and implementation of an auction of all or part of the Judgment removed from the Parent its ability to continue to argue that all that could ever be collected from the Judgment, even if affirmed on appeal years later, was the amount necessary to pay creditors in full.  A successful auction sale of the Judgment would not only insulate the Debtor from loss of all value of the Judgment in the unlikely event the Parent obtained reversal on its appeal, but removed the Parent's argument that it had only limited risk because the bankruptcy capped the maximum they had to pay.   If the Judgment were sold, there would be no bankruptcy cap and a reversal on appeal would not eliminate the value of the Judgment to the estate.

(iii)    The Efforts to Impede the Reorganization

26.    It seems clear now that the Parent received full value for it ultimate decision to fund a payment in full plan, as even though the Parent may claim that it paid as much as $2.65 billion to re-acquire the Debtor, in fact it received in exchange an enterprise whose value appears to be at least $2.65 billion.   The copper market has rebounded and the value of the Debtor's enterprise likely materially exceeds the purchase price.

27.    It also seems clear that the Parent used virtually every legal position, maneuver, and argument, no matter how tenuous, to defeat the Debtor's attempts at reorganization without the Parent paying creditors.   In this respect, the Judgment accomplished another important, although indirect, ingredient to the reorganization.   Although this Court can use its actual observations of the Parent's conduct during this reorganization process to evaluate these claims of obstruction and impeding the Debtor's reorganization efforts, the District Court's opinion set out in detail the bad acts, breach of fiduciary duties, and wrongful conduct of the Parent pre-petition that actually caused the financial destruction of the enterprise forcing the Debtor into bankruptcy in the first place, and can glean from the record the not-surprising fact that similar obstructionist tactics were engaged in by Parent during the pendency of the case.

28.    Thus, Debtor's counsel used creative, unique responses, strategies, and legal work designed and implemented to:

a.    deal with the financial stress of the Parent's financial destruction of the Debtors pre-petition initiating a case with a high risk of failure;

b.    deal with the financial and practical stress of the copper market and later the world financial collapse;

c.    respond to, and most often successfully defeat, the  obstructionist conduct, threats of suit, and litigation strategy of the Parent requiring continuous litigation of virtually every aspect of this case;

d.      respond to the conduct and breach of contract of Sterlite brought about by extraordinary market conditions and the strategic handling of the re-negotiations so as to keep the Parent on notice of its potential loss of the Debtor's enterprise;

e.      successfully recover the largest fraudulent transfer judgment in American jurisprudence, and the strategic handling of the judgment so as to unequivocally require the Parent to participate to the full extent of all creditors' claims or risk not only loss of the enterprise to Sterlite's purchase but loss of the Judgment to a successful auction bidder;

f.      successfully deal with the largest environmental bankruptcy in America (notwithstanding the fact that it was not only the environmental claims that were of significance in this case) and ultimately reach a global settlement approved by the Court of what were initially filed as $9+ billion of environmental claims;

g.      successfully deal with one of the largest asbestos bankruptcy cases ever and ultimately reach a global settlement and preserved the § 524 injunction approved by the Court of what were initially filed as $6+ billion of asbestos claims;

h.      successfully work with, as opposed to continued litigation against, the interests of environmental, asbestos (current and future claims), and the unsecured creditors' committee to take advantage of these constituents expertise, professional judgment, and find common ground in multiple high-stakes mediations, including the mediation of the Plan format; and

i.      successfully emerge from a contentious Chapter 11 case paying 100% of all creditor claims by delivering an asset to the Parent valued more than

the Parent's ultimate decision to advance sufficient funds to pay 100% of all claims plus interest and potential attorneys fees claims.

**D.     The Efforts of Debtor's Counsel, and Despite the Parent's Obstructionist Conduct, Actually Improved the Financial Outcome for the Parent:**

29.     As argued above, it seems clear that the Parent received full value in exchange for it ultimate decision to fund a payment in full plan, although it appears to have been a decision brought about only by the threat of losing the enterprise and potential loss to auction of a part or all of the Judgment.  In exchange for the Parent's $2.65 billion price to re-acquire the Debtor, the Parent's balance sheet should now also have at least a $2.65 billion asset.  The Parent did not lose any money in it re-purchase (just as it was not out any funds in the original leverage buyout of ASARCO) by exchanging cash for an asset of equivalent or greater value.  In addition, the Parent's balance sheet went from a $9 billion debt due on the Judgment, to an addition of the $2.65+ valuable asset to replace the cash purchase price.

30.     Importantly, within 30 days of closing on the effective date of the Parent's Plan, the parent-nominated Plan Administrator sought and obtained authority to return to the Parent in excess of $70 million of its purchase price, as, according to the Plan Administrator, it did not need those funds  to pay or sufficiently reserve payment to all creditors.

31.     In fact, the return of Asarco as a valuable company and the post confirmation "rebate" of $70 million are not the only windfalls the Parent has received as a direct beneficiary of the Debtor's counsels' attention to strategic implementation of every aspect of this reorganization.  For example, the Parent as owner of the post-confirmation Debtor received $50 million from the Sterlite letter of credit – an amount exclusively the result of the negotiations, and re-negotiations by Debtors' counsel of the Sterlite purchase, which was opposed by the Parent.  Aside from the likely ability to use the multi-million dollar loss carry forward, or the profits to be earned from the recovery of the South Mill that the Parent practically gave away

pre-petition (adding significantly to cash flows and the efficiencies of operations of the reorganized Asarco), the Parent now operates an enterprise under a labor contract that it now seeks to keep in place (after literally years of objecting to the contract terms).

## CONCLUSION

32.     Creditors are now the beneficiaries of a full payment plan from a reorganization that can only be characterized as amazing.  The joint representation of both Asarco and its Asbestos Subsidiaries created numerous challenging situations that Jordan Hyden successfully negotiated for the full 4¾ years these cases were pending, and that successful engagement and the outcome is an independent basis for awarding Jordan Hyden a fee enhancement. Likewise, many other parties and professionals in the cases contributed to ASARCO's ultimate success, including the financial advisors,[5] the Official Committee of Unsecured Creditors and its counsel and other advisors, the Official Committee of Asbestos Claimants and its counsel and other advisors, Robert Pate, the Future Claims Representative and his counsel and other advisors, counsel for the U.S. Department of Justice and the many state environmental agencies, and counsel for the United Steelworkers Union.  This Fee Application should not be read in any way to diminish the efforts of all these constituencies and others, nor should the discussion of a particular aspect of the cases herein be read as any indication that others involved should not receive some credit for the results obtained.  Rather, the purpose of this Fee Application is simply to establish that, by any measure, it is clear that integral to the overall success of these cases were the legal services performed, and the remarkable results obtained, by the extraordinary efforts and intricate design of Applicant and its co counsel Baker Botts.

33.     Accordingly, Jordan Hyden respectfully requests, upon final hearing of this application, that the Court enter an order approving the firm's request for payment of a fee

---

[5] Initially, Lehman Brothers Inc. and later Barclays Capital Inc. served as the Debtors' financial advisors in these cases and also contributed significantly to their success.

enhancement equal to twenty percent (20%) of the firm's Court-approved lodestar fees earned in its representation of both Asarco and the Asbestos Subsidiaries from case commencement through the effective date, totaling an additional $1,401,861.00.

## FEES FOR FEE APPLICATIONS

33.     Applicant also seek approval of its fees incurred in preparation and prosecution of this fee application through trial, and, also if necessary, through any appeals and subsequent proceedings.[6]  Applicant will supplement its fees request and provide itemized time records for such additional time and expenses at the final hearing on this application.

## PRAYER

34.     For the foregoing reasons, the Applicant requests that the Fourteenth and Final Application of Jordan, Hyden, Womble, Culbreth & Holzer, P.C. for Approval of Attorney's Fees and Expenses Incurred as Bankruptcy Counsel for Debtor and Request For Enhanced Fee be approved and ordered paid; that all prior interim applications be approved on a final basis; that its request for an enhanced fee be approved and ordered paid; that all its fees for prosecuting this fee application be paid; and that the Applicant have such other and further relief to which it may show itself to be justly entitled both at law and equity.

Respectfully submitted,


/s/ Shelby A. Jordan
Shelby A. Jordan
State Bar No. 11016700; Adm. No. 2195
Harlin C. Womble

---

[6]     Section 330(a)(6) of the Bankruptcy Code provides that a bankruptcy court may award compensation "for the preparation of a fee application . . . based on the level and skill reasonably required to prepare the application." The majority of courts interpreting this statute hold that the cost of defense of a fee application is also compensable. *See, e.g., Smith v. Edwards & Hale, Ltd.* (*In re Smith*), 317 F.3d 918, 928 (9th Cir. 2002), *abrogated on other grounds by Lamie v. U.S. Tr.*, 540 U.S. 526, 531-39 (2004); *In re Buckridge*, 367 B.R. 191, 207 n.26 (Bankr. C.D. Cal. 2007); *Hennigan, Bennett & Dorman LLP v. Goldin Assocs. L.L.C.* (*In re Worldwide Direct Inc.*), 334 B.R. 108, 111-12 (D. Del. 2005); *In re Atwell*, 148 B.R. 483 (Bankr. W.D. Ky. 1993); *In re Hunter Constr. Co.*, 126 B.R. 1005, 1013 (Bankr. E.D. Wis. 1991).

State Bar No. 21880300; Adm. No. 8959
Nathaniel Peter Holzer
State Bar No. 00793971; Adm. No. 21503
***Jordan, Hyden, Womble, Culbreth & Holzer, P.C.***
500 North Shoreline Blvd., Suite 900
Corpus Christi, Texas 78471
Telephone: (361) 884-5678
Telecopier: (361) 888-5555

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument will be served electronically on all parties registered with the Court's electronic noticing system.


*/s/ Nathaniel Peter Holzer*_____
Nathaniel Peter Holzer