


ENTERED
09/28/2010

**IN THE UNITED STATES BANKRUPTCY COURT
OF THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 05-21207** |
| | § | |
| **ASARCO LLC, *et al*.,** | § | **Chapter 11** |
| | § | |
| **Debtors.** | § | **Jointly Administered** |
| | § | |

**MEMORANDUM OPINION AND ORDER ON APPLICATION OF MAJORITY BONDHOLDERS UNDER 11 U.S.C. SECTIONS 503(B)(3)(D) AND (B)(4) FOR PAYMENT OF FEES AND REIMBURSEMENT OF EXPENSES FOR SUBSTANTIAL CONTRIBUTION**

[Related to Docket No. 13897]

On this day came on for consideration the Application of Majority Bondholders under 11 U.S.C. Sections 503(b)(3)(D) and (b)(4) for Payment of Fees and Reimbursement of Expenses for Substantial Contribution (the "Application", Docket No. 13897). The Court, having heard the evidence and arguments of counsel, makes the following findings of fact and conclusions of law.

**INTRODUCTION**

Harbinger Capital Partners Master Fund I, Ltd. ("Master Fund"), Harbinger Capital Partners Special Situations Fund, L.P. ("Special Fund"), and Citigroup Global Markets, Inc. ("Citi", and collectively with Special Fund and Master Fund, the "Movants") seek as much as $16.7 million in the form of a substantial contribution claim (the "Substantial Contribution Claim") under section 503(b)(3)(D) of title 11 of the United States Code (the "Bankruptcy Code") from the reorganized Debtors (the "Reorganized Debtors").

The Substantial Contribution Claim is based on the Movants' assertion that the plan of reorganization filed by Master Fund (the "Harbinger Plan") was the cause of a bidding war

between Sterlite (USA), Inc. ("Sterlite"), the purchaser under the Debtors' 2009 proposed plan of reorganization (the "Debtors' Plan"), on the one hand, and ASARCO Incorporated ("ASARCO Inc.") and Americas Mining Corporation ("AMC" and with ASARCO Inc., the "Parent"), on the other hand, which resulted in the Parent submitting the now confirmed and effective Seventh Amended Plan of Reorganization of Asarco Incorporated and Americas Mining Corporation Dated August 17, 2009 (as modified on August 20, 2009, August 23, 2009, and August 27, 2009, the "Parent's Plan"). The Movants further assert that the objections they raised to an earlier iteration of the Parent's Plan caused the Parent to amend the Parent's Plan, to the benefit of all creditors. Finally, the Movants also assert that virtually every action they undertook from the beginning of these bankruptcy cases to the date on which the Parent's Plan was confirmed constituted a substantial contribution to these bankruptcy cases.

For the reasons stated below, the Court finds that none of the Movants established the elements required by the Fifth Circuit's ruling in *Hall Fin. Group, Inc. v. DP Partners, L.P. (In re DP Partners, L.P).*, 106 F.3d 667, 73 (5th Cir. 1997) *cert. denied*, 522 U.S. 815 (1997) ("*DP Partners*"), to demonstrate that they made a substantial contribution in the Debtors' bankruptcy cases under section 503(b)(3)(D) of the Bankruptcy Code. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure and Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Rules"), as made applicable in this contested matter by Rule 9014.

**DISCUSSION**

Movants contend that the Parent's and the Plan Administrator's objection to the Application constitutes a breach of the Bondholder Settlement. The Movants also suggest that the Plan Administrator (1) is the successor to the Debtors, and (2) agreed to support a substantial contribution claim for the Debtors of up to $6 million.

First, the Plan Administrator was not a party to the Bondholder Settlement and in fact the Plan Administrator did not exist until the Effective Date. Accordingly, the Plan Administrator could not breach the Bondholder Settlement.

Second, Section 12.3 of the Parent's Plan explicitly provides that the Plan Administrator is not a successor of the Debtors. That section provides:

> (a) Except as otherwise expressly provided in the Parent's Plan, none of the ASARCO Protected Parties shall be deemed a successor or successor-in-interest to any of the Debtors or to any Entity for which the Debtors may be held legally responsible, by reason of any theory of law or equity, and none shall be responsible for any successor or transferee liability of any kind or character….
>
> (b) Except as otherwise expressly provided in the Parent's Plan, none of the ASARCO Protected Parties shall have any obligations to perform, pay, indemnify creditors for, or otherwise have any responsibilities for any liabilities or obligations of the Debtors or Reorganized ASARCO, whether arising before, on, or after the Confirmation Date.

Subsection (k) of the definition of "ASARCO Protected Parties" in the Parent's Plan includes the Plan Administrator. The Plan Administrator was created for the sole purpose of administering the Parent's Plan and it is neither a successor to the Debtors nor is it obligated to support the Application under the Bondholder Settlement.

Section 2.13 of the Plan Administration Agreement—the agreement approved as part of the Parent's Plan and which governs the Plan Administrator—states that other than obligations of

the Plan Administrator enumerated in the Plan Administration Agreement, under the Parent's Plan or in the Confirmation Order, the Plan Administrator "has no duties or obligations of any kind or nature…". Neither the Plan nor the Confirmation Order requires the Plan Administrator to honor the Debtors' agreements regarding support of any substantial contribution claims or any other claim in these bankruptcy cases that has not become an allowed claim. As such, the Plan Administrator is not bound by the Bondholder Settlement and did not breach that agreement by objecting to the Application. Moreover, the United States Trustee objected to the Bondholder's Substantial Contribution claim and this Court has an independent responsibility to evaluate the Substantial Contribution Claim.

The Movants filed the Application under sections 503(b)(3)(D) and (b)(4) of the Bankruptcy Code on February 8, 2010. The Application, as initially filed, sought $6 million for the reimbursement of attorneys' fees and other fees and expenses incurred in connection with prosecuting the Harbinger Plan and objecting to the Parent's Plan as a substantial contribution to these bankruptcy cases. At trial, the Movants withdrew their request for payment of $6 million and sought payment of an amount to be determined by the Court, presumably not to exceed the $16.7 million they assert they incurred for all of Movants' activities "in connection" with the entirety of the more than four-year duration of these bankruptcy cases.

The Movants became involved in these bankruptcy cases after acquiring unsecured bonds issued by certain of the Debtors (the "Bonds"). The Movants acquired the Bonds in the market at various times.

The Movants hired numerous professionals to assist them in these bankruptcy cases. Specifically, they hired Kramer Levin Naftalis & Frankel LLP ("Kramer Levin") as bankruptcy counsel, Seyfarth Shaw LLP ("Seyfarth") as labor counsel, Latham & Watkins LLP ("L&W") as

environmental counsel, Jefferies & Company, Inc. ("Jefferies"), an investment bank, as financial advisor, Winstead PC ("Winstead") as local counsel, and Entrix Inc. ("Entrix") as an environmental consultant.

The Movants incurred the following fees and expenses in relation to these bankruptcy cases:

- Kramer Levin billed the Movants $7,513,843.23 for the period from April 2006 to November 2009.
- L&W billed the Movants $5,271,516.04 for the period from March 2007 to July 2009. (*Id.*). Only $5,140.15 of the fees billed by L&W was billed after September 2008.
- Seyfarth billed the Movants $612,009.54 for the period from September 2006 to June 2008.
- Jefferies billed the Movants $1,708,793.21 for the period from February 2007 to August 2008.
- Winstead billed the Movants $1,663,405.20 for the period from July 2007 to November 2009.
- The fees of Entrix were not invoiced to the Movants directly, but were included as expenses in the bills of L&W. Entrix's fees totaled approximately $82,628.00 in these bankruptcy cases.

Over the course of these bankruptcy cases, the Movants held various amounts of Bonds. On February 7, 2007, the Movants, on a combined basis, held approximately $287 million in principal amount of Bonds. As of July 16, 2007, the holdings of the Movants had increased to in excess of $298 million in principal amount of Bonds. However, by July 8, 2009, the Movants had reduced their holdings from $298 million in principal amount to $257 million in principal amount, and at least one of the Movants, Special Fund, no longer held any Bonds.

In addition to being holders of Bonds, certain of the Movants actively sought to acquire the operating assets of the Debtors. The services of Seyfarth, L&W, Jefferies, and Entrix were

sought and delivered in a time period during which the Movants' intentions were to pursue ownership of the operating assets of the Debtors through the Debtors' failed 2008 auction process.

Beginning in April 2007, the Debtors sought to market the assets of the Debtors. By early 2008, the Debtors determined that they would seek to accomplish the sale of their operating assets through the selection of a plan sponsor to whom the operating assets of the Debtors would be sold.

In order to select the highest and best offer from potential bidders, the Debtors filed a motion in February 2008 seeking to establish bidding procedures. The Court granted the motion, and an auction commenced in April 2008. At least four interested parties—the Movants, the Parent, Sterlite, and GlenCore—and possibly others, undertook due diligence and other actions to partake in the process by which the Debtors' would be selecting a successful bidder. The Parent, the Movants (through an acquisition vehicle), Sterlite, and GlenCore each submitted bids in the auction process. Final bids in the 2008 auction process were submitted at a selection meeting held on May 22 and 23, 2008.

The Movants, GlenCore, Sterlite, and the Parent (through a plan structure) each presented and negotiated final bids for the operating assets of the Debtors during the May 22 and 23 selection meeting. The Debtors' board selected Sterlite as the winning bidder at the conclusion of the 2008 auction process. None of the Movants was selected as the winning bidder. Under bid procedures approved by the Court, the failure to be selected did not entitle any of the unsuccessful bidders to a break-up fee or any reimbursement of expenses for their actions in the 2008 auction process. In short, each of these entities was merely an unsuccessful bidder at an

auction (which ultimately did not produce a successful transaction for the operating assets of the Debtors).

On June 2, 2008, the Debtors filed their motion for Final Approval of Bid Protections in Connection with a Sale of Substantially all the Assets of ASARCO LLC to Sterlite (USA), Inc. On July 1, 2008, this Court entered an order approving that motion. The Parent appealed that order on July 2, 2008. On the same date that appeal was filed, the Court modified the exclusive period in which only the Debtors could file a plan of reorganization in order to permit the Parent to file a plan of reorganization. The Parent filed a plan of reorganization for the Debtors on August 26, 2008. The Parent's appeal of the order approving the final bid protections for Sterlite was dismissed by the District Court for the Southern District of Texas (the "District Court") on September 26, 2008. As of the date of that appeal's dismissal and well before the filing of the Harbinger Plan, the Movants had expended more than $14 million—or almost 84% of the $16.7 million they incurred in these bankruptcy cases and currently seeking as a substantial contribution claim—on account of the various professionals they had retained in these bankruptcy cases, including their ill-fated quest to obtain the assets of the Debtors through the failed 2008 auction process.

In October 2008, Sterlite breached the purchase and sale agreement under which it had agreed to acquire the Debtors' operating assets. Shortly thereafter, on October 20, 2008, the solicitation process in regard to the Debtors' and the Parent's 2008 plans was suspended, and the Parent's then-pending plan was subsequently withdrawn.

Beginning sometime around January 2009, the price of copper began to rise from the low it had reached in late 2008. The Movants acknowledged this increase in copper prices at the time of the August 2009 confirmation hearing and also acknowledged that copper prices were likely

to increase over the next 10 years, increasing the value of the Debtors' operating assets. While the spot price of copper fluctuated daily, the price of copper increased by more than 88% in the months leading up to the confirmation hearing, with the price per pound increasing from $1.49 to $2.81 between January 2009 and August 2009. The gradual increase in the price of copper during 2009 ultimately improved the going concern value of the Debtor.

In March 2009, the Debtors and Sterlite agreed to a new transaction pursuant to which the Debtors would convey their operating assets to Sterlite for less than half the consideration Sterlite had agreed to pay for these assets under the repudiated 2008 purchase and sale agreement. As part of that transaction, Sterlite negotiated an offer and compromise that provided a release of all of the Debtors' claims against it on account of Sterlite's 2008 breach of the original purchase and sale agreement only if the Debtors no longer supported the Sterlite plan, or if a plan with Sterlite as a proponent was confirmed—was approved by this Court.

On April 12, 2009, the Official Committee of Asbestos Claimants (the "Asbestos Committee"), Robert C. Pate as the Future Claims Representative (the "FCR", and with the Asbestos Committee, the "Asbestos Fiduciaries"), and the Parent entered into an agreement in principle which, among other things, provided that the Asbestos Fiduciaries would oppose the sale of the Debtors' operating assets to Sterlite, oppose confirmation of the Debtors' Plan, and that the FCR would not support, and the Asbestos Committee would not recommend that its constituents vote in favor of, a section 524(g) injunction under the terms of the Debtors' Plan unless the treatment for asbestos claimants under a future Debtors' Plan was materially better than the treatment provided in the Parent's Plan and greater value was to be delivered to all creditors.

The Movants assert that the agreement between the Asbestos Fiduciaries and the Parent threatened the recovery of all creditors, causing Master Fund to consider an alternative to the Debtors' Plan and the transaction proposed by the Parent. Thus, the Movants began to formulate an alternative to the Parent's and Debtors' Plans that would not require a section 524(g) channeling injunction, but would instead include a channeling injunction, loosely based on a pre-section 524(g) case, that ostensibly would have the same effect as a section 524(g) channeling injunction. The Movants claim this injunction would have provided all of the benefits of a 524(g) channeling injunction, without the necessity of meeting the stringent voting or funding requirements necessary for a section 524(g) channeling injunction.

On April 14, 2009, the District Court entered a substantial judgment against the Parent in favor of the Debtors. *ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150, 164 (S.D. Tex. 2009) (the "SCC Judgment"). The Parent appealed the SCC Judgment to the Fifth Circuit Court of Appeals shortly after it was entered by the District Court. The appeal of the SCC Judgment was not ruled upon prior to the filing of the Harbinger Plan or the Parent's Plan becoming effective and was released when the Parent's Plan became effective.

On May 15, 2009, the Parent filed the Parent's Plan (its third amended plan), which included a 524(g) channeling injunction. On May 21, 2009, by motion, Master Fund requested that the Court permit it to file a plan of reorganization for the Debtors. That motion was granted at a hearing held on May 26, 2009. On May 27, 2009, Master Fund filed the Harbinger Plan. At its core, the Harbinger Plan was a vehicle by which Master Fund could acquire all of the Debtors' operating assets for a cash payment of $500 million. The Harbinger Plan also required that the asbestos claims asserted against the Debtors be capped at $500 million.

The Movants contend that the Harbinger Plan was an "open architecture" plan that could be used by any party that wished to purchase the Debtors' operating assets. However, no other party ever sought to use the Harbinger Plan's architecture to purchase the Debtors' operating assets.

On June 2, 2009, the Parent filed the fourth amended Parent's Plan. On June 15, 2009, the Debtors filed the sixth amended Debtors' Plan. The Debtors' Plan of June 15, 2009, included a 524(g) channeling injunction, as the Asbestos Fiduciaries had by then agreed to support the Debtors' Plan in addition to supporting the Parent's Plan.

On August 3, 2009, the Debtors, Citi, Master Fund and the indenture trustees for the Bonds (the "Indenture Trustees") entered into, and filed on the docket, an agreement in principle regarding the treatment of the claims under the Bonds in the Debtors' Plan (the "Bondholders Settlement"). That agreement provided for, among other things, the allowed amounts of principal, interest and make-whole obligations for bondholders and the Debtors' commitment to pay the reasonable fees of the Indenture Trustees under the Debtors' Plan if confirmed. That agreement also provided for the Debtors to support a substantial contribution claim for Master Fund and Citi limited to "fees and expenses reasonably incurred in connection with the Harbinger Plan, up to a maximum of $6 million."

The $6 million substantial contribution claim cap does not bear any relation to actual fees incurred, but was simply a number negotiated between Citi and Master Fund and the Debtors as part of the larger Bondholder Settlement. The Court approved the Bondholder Settlement in September 2009, after the conclusion of the confirmation hearing on the Debtors' and Parent's Plans.

Also on August 3, 2009, Master Fund filed a motion to abate the Harbinger Plan. Even prior to that time, it had become clear that the Harbinger Plan was not likely to be confirmed because it lacked the support of any major creditor constituency, failed to obtain an accepting vote from a single impaired class of creditors, was not able to obtain the necessary support of, and indeed was bitterly opposed by, the fiduciaries who represented the asbestos claimants—who would be required to support the Harbinger Plan if it were to obtain a valid channeling injunction authorized by the Bankruptcy Code—and was met with numerous and significant additional objections. On August 4, 2009, the Court granted Master Fund's uncontested motion to abate the Harbinger Plan.

In early August 2009, counsel to the Parent, the Indenture Trustees, and Master Fund had numerous discussions in an attempt to reach settlement regarding the treatment of the Bonds under the Parent's Plan. Pursuant to these discussions, the Parent, Master Fund, and the Indenture Trustees ultimately negotiated similar treatment for the claims under the Bonds as the Debtors provided in the Bondholder Settlement. [1]

The confirmation hearings on the amended Parent's Plan and the amended Debtors' Plan began on August 11, 2009. Both the Parent and the Debtors amended their plans of reorganization numerous times during the course of the confirmation hearing.

This Court entered its Report and Recommendation for Entry of Findings of Facts and Conclusions of Law on Plan Confirmation favoring the Parent's Plan on August 31, 2009 (as amended on September 10, 2009, the "Court's Recommendation"). On November 13, 2009, the District Court entered its Memorandum Opinion, Order of Confirmation, and Injunction (the "First Confirmation Order") adopting the Court's Recommendation and overruling the objection

[1] Whether the Parent entered into or breached an agreement with Movants for a substantial contribution claim is not before the court and accordingly, this Court makes no such finding. Even if such an agreement exists, Movants must nevertheless prove their substantial contribution claim to this Court..

of Citi and Master Fund to the Parent's Plan. The District Court supplemented the First Confirmation Order by its order dated December 3, 2009 (the "Supplemental Confirmation Order," together with the First Confirmation Order, the "Confirmation Order"). In its Confirmation Order, the District Court appointed Mark A. Roberts as the Plan Administrator of the Plan. Neither the Parent's Plan nor the Confirmation Order provided for the payment of a substantial contribution claim to the Movants or required any party, including the Parent and the Plan Administrator, to support or agree to any substantial contribution claim of the Movants.

## SUBSTANTIAL CONTRIBUTION STANDARDS

Section 503(b)(3)(D) of the Bankruptcy Code states, in relevant part, "there shall be allowed administrative expenses, including . . . the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by . . . a creditor . . . in making a substantial contribution in a case under chapter 9 or 11 of this title . . ." 11 U.S.C. § 503(b)(3)(D). Pursuant to section 503(b)(4), the Court can, in turn, authorize an administrative expense for "reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph . . . (D) . . . of paragraph (3) of this subsection, based on the time, nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant." 11 U.S.C. § 503(b)(4).

The phrase "substantial contribution" is not defined in the Bankruptcy Code. The Fifth Circuit, however, has concluded that the term "substantial contribution" in section 503(b)(3)(D) means a contribution that is "considerable in amount, value or worth." *DP Partners, L.P.* 106 F.3d at 673. The Fifth Circuit, in *DP Partners,* also held that a direct benefit must be provided to

the debtor's estate in order to be eligible for payment for a substantial contribution. *Id.*; *In re Buttes Gas & Oil Co.*, 112 B.R. 191, 194 (Bankr. S.D. Tex. 1989). Failing to show a direct, significant and demonstrable benefit to the estate caused by the actions of the applicant is, therefore, fatal to a substantial contribution claim. *See In re Eldercare Home Health & Hospice,* No. 04-71101, 2007 Bankr. LEXIS 879, at *7 (Bankr. S.D. Tex. Feb. 14, 2007); *In re Fortune Natural Res. Corp.,* 366 B.R. 549, 554 (Bankr. E.D. La. 2007); *see also DP Partners*, 106 F.3d at 673. Movants bear the burden to demonstrate, by a preponderance of the evidence, that they caused a substantial contribution if they wish to recover the fees and expenses associated with their making such a contribution. *In re Eldercare Home Health & Hospice*, 2007 Bankr. LEXIS 879, at *1.

Substantial contribution claims may only be granted in "unusual or rare circumstances." *Id.*; *In re Am. Plumbing & Mech., Inc.*, 327 B.R. 273, 279 (Bankr. W.D. Tex. 2005). Narrowly construing the allowance of substantial contribution claims to rare and unusual circumstances is "consistent with the general doctrine that priority statutes, such as section 503(b), should be strictly construed to preserve the estate for the benefit of creditors." *Id.* (citing *In re Federated Dep't Stores, Inc.*, 270 F.3d 994, 1000 (6th Cir. 2001)); *In re Commercial Fin. Servs., Inc.*, 246 F.3d 1291, 1293 (10th Cir. 2001)). In short, section 503(b)(3)(D) of the Bankruptcy Code "should not become a vehicle for reimbursing every creditor who elects to hire an attorney." *Id.* Activities of a creditor or their counsel that are ordinary, expected, routine, or duplicative do not constitute a substantial contribution to a debtor's estate. *In re Eldercare Home Health & Hospice*, 2007 Bankr. LEXIS 879, at *6; *In re Buttes Gas & Oil Co.*, 112 B.R. at 195; *In re General Homes Corp. FGMC, Inc.*, 143 B.R. 99, 103 (Bankr. S.D. Tex. 1992); *In re American Plumbing and Mech., Inc.*, 327 B.R. at 283.

To meet this high threshold, a movant must establish that "[its] services have some causal relationship to the contribution." *In re Fortune Natural Res. Corp.*, 366 B.R. 549, 554 (Bankr. E.D. La. 2007) (emphasis added); *see DP Partners*, 106 F.3d at 673. Mere conclusory statements regarding the causation or provision of a substantial contribution are insufficient to establish that a substantial contribution has been made. *In re United States Lines, Inc.*, 103 B.R. 427, 430 (Bankr. S.D.N.Y. 1989). Moreover, a substantial contribution claim cannot be successful when the asserted contribution would have occurred without the claimant's involvement. *See In re Alert Holdings*, 157 B.R. 753, 759 (Bankr. S.D.N.Y. 1993) (denying the substantial contribution application when "even without the benefit of the LPOC's objection, most of the changes to the disclosure statement would have been made anyway"); *In re New Power Co.*, 311 B.R. 118, 124 (Bankr. N.D. Ga. 2004) (denying the substantial-contribution application because "the Court must conclude that the Examiner would have been appointed . . . absent [the applicant's alleged contribution]").

Neither unsuccessful bidders in bankruptcy auctions (especially unsuccessful auctions) nor unsuccessful competing plan proponents are eligible to receive a substantial contribution claim merely for putting forth a bid or a competing plan. *See In re Eldercare Home Health & Hospice*, 2007 Bankr. LEXIS 879 at *6-*7 ("the Bankruptcy Code contemplates competing plans and contains no provision for an administrative claim to the losing party when more than one plan is proposed"); *In re Dana Corp.*, 390 B.R. 100, 110 (Bankr. S.D.N.Y. 2008); *In re Kidron, Inc.*, 278 B.R. 626, 630-31 (Bankr. M.D. Fla. 2002) (holding that "expenses incurred by a creditor with respect merely to participating as a bidder in the [auction for] a debtor's assets in a chapter 11 case are not 'incurred by a creditor in making a substantial contribution' to a chapter 11 case"); *In re Granite Partners*, 213 B.R. at 450-55; *In re Public Service Co. of New*

*Hampshire*, 160 B.R. 404, 452 (Bankr. D.N.H. 1993) (bidder at bankruptcy auction cannot establish substantial contribution claim solely based on auction participation). None of the fees or expenses associated with the 2008 auction process amount to a substantial contribution.

In *DP Partners*, the substantial contribution claimant filed a competing plan setting off a bidding war which ultimately provided $3 million more to creditors. While the Debtor and the Parent filed a number of competing plans ultimately resulting in the Parent's full payment Plan, the Harbinger Plan had little or no impact on that process. The Harbinger Plan at best provided only potential benefit and, as such, is distinguishable from the plan proponent in *DP Partners*.

Additionally, the Movants failed to establish that the actions they undertook directly caused the benefit they claim the Debtors' bankruptcy cases received. Demonstration of a direct causal connection between the actions of the claimant and the benefit received by the bankruptcy estate is required in order to prove a substantial contribution. *DP Partners*, 106 F.3d at 673; *In re Buttes Gas & Oil Co.*, 112 B.R. at 194. The Movants assert that several of their actions caused the Debtors and/or the Parent to amend their respective plans of reorganization in these cases. However, the Movants' evidence on causal connection is wholly speculative. Such speculative evidence is nothing more than a conclusory and self-serving statement of what the Movants believe occurred. Mere conclusory statements and speculation regarding an alleged substantial contribution to a bankruptcy case are insufficient to establish a substantial contribution claim. *In re United States Lines, Inc.*, 103 B.R. 427, 430 (Bankr. S.D.N.Y. 1989).

As they admit, there is no direct evidence that the Movants caused any of the amendments to the Parent's or the Debtors' Plans—the alleged benefit they claim these bankruptcy cases received. Instead, the Movants rely solely on the temporal proximity of actions taken by the Movants and certain amendments to the Parent's Plan or the Debtors' Plan.

The temporal evidence the Movants adduced at Trial was: (1) the Parent amended the Parent's Plan shortly after Master Fund filed the Harbinger Plan; (2) the Parent amended the Parent's Plan after Harbinger objected to the Parent's Plan; (3) the Asbestos Fiduciaries forged an agreement with the Debtors after the filing of the Harbinger Plan; and (4) the Debtors amended the Debtors' Plan after Master Fund filed the Harbinger Plan. While it is correct that certain events chronologically occurred after other events, there was no evidence adduced at Trial that established a direct causal relationship between any action by the Movants and the actions described above.

To the contrary, the Parent's decision to submit a full-payment plan was driven by several factors independent of the Movants' actions, including, but not limited to, (1) the SCC Judgment; (2) the rise in copper prices during the 2009 plan negotiation and confirmation process, (3) the Parent's long-held desire to maintain its ownership of ASARCO LLC and bring the U.S. assets and operations back into the fold of its global mining business, (4) the Parent's strong desire to bring an end to the costly, time-consuming, and distracting litigation involving environmental and asbestos claims, and (5) the amended competing plans filed by the Debtor. The evidence adduced at trial did not establish, by the preponderance of the evidence, that the Movants made a substantial contribution in these bankruptcy cases.

Likewise, there has been no proof offered, beyond the temporal link, to show that the Asbestos Fiduciaries joined forces with the Debtors regarding their plan treatment because of the actions of the Movants. To the contrary, there is ample evidence that the Asbestos Fiduciaries were under pressure from the Debtors to forge an agreement with the Debtors and Sterlite at the time the Harbinger Plan was filed.

Additionally, a creditor cannot recover on account of a substantial contribution when the asserted contribution would have occurred even without the claimant's involvement. *See In re New Power Co.*, 311 B.R. 118, 124 (Bankr. N.D. Ga. 2004) (denying the substantial contribution application because "the Court must conclude that the Examiner would have been appointed . . . absent [the applicant's alleged contribution]"); *In re Alert Holdings*, 157 B.R. 753, 759 (Bankr. S.D.N.Y. 1993) (denying the substantial-contribution application when "even without the benefit of the LPOC's objection, most of the changes to the disclosure statement would have been made anyway"). As discussed above, many factors propelled and enabled the Parent eventually to submit a full payment plan to meet its goal of retaining the Debtors. The Parent's decision to submit a full-payment plan was not driven by Master Fund's filing of the Harbinger Plan, the Movants' participation in the failed 2008 auction process, or the Movants' objections to the Parent's Plan, but instead was driven by the independent factors discussed above which occurred regardless of the existence or actions of the Movants. Therefore, the Movants failed to establish that they caused a substantial contribution in these bankruptcy cases by a preponderance of the evidence.

In sum, the Movants were large and expectedly active creditors in these bankruptcy cases and nothing more. However, merely being an active creditor in a bankruptcy case does not entitle that creditor to a claim for making a substantial contribution. *In re Mirant*, 354 B.R. at 136. The Movants ask this Court simply to ignore the actions of other parties in interest in these cases and recognize the status of their actions as not only "rare" or "unusual", but as the primary forces that caused the Parent and Debtor to undertake any action. This Court acknowledges that these cases were successful for all creditors, but the actions of the Movants were not the primary

cause of this success, nor did they create a “rare” or “unusual” circumstance that would constitute a substantial contribution.

Because the Movants failed to show that they made a substantial contribution to these bankruptcy cases pursuant to section 503(b)(3)(D) of the Bankruptcy Code, they cannot recover for any expenses that they incurred. Similarly, the Movants are not entitled to recover legal fees or expenses under section 503(b)(4) of the Bankruptcy Code absent a finding of a substantial contribution having been made. *See In re Oxford Homes, Inc.*, 204 B.R. 264, 267 (Bankr. D. Me. 1997) (“A finding under § 503(b)(3)(D) that [the] creditor…made a substantial contribution to [the Debtors’] reorganization is a prerequisite to administrative allowance of … counsel’s fees under § 503(b)(4)”).

**CONCLUSION**

Based on the Findings of Fact and Conclusions of Law detailed above, this Court concludes that the Movants’ Application should be denied in its entirety.

It is therefore ORDERED that the Application of Majority Bondholders under 11 U.S.C. Sections 503(b)(3)(D) and (b)(4) for Payment of Fees and Reimbursement of Expenses for Substantial Contribution (Docket No. 13897) is hereby DENIED.

SIGNED 09/28/2010.

Richard S. Schmidt
United States Bankruptcy Judge