# IN THE UNITED STATES BANKRUPTCY COURT
## OF THE SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

ENTERED
12/02/2010

| | | |
|---|---|---|
| In re: | § | **Case No. 05-21207** |
| | § | |
| **ASARCO LLC, et al.,** | § | **Chapter 11** |
| | § | |
| Debtors. | § | **Jointly Administered** |
| | § | |

## MEMORANDUM OPINION AND ORDER ON FEE APPLICATION AND FEE ENHANCEMENT MOTION OF BARCLAYS CAPITAL INC.

On this day came on for consideration the following:

1.      Third Interim and Final Fee Application Request of Barclays Capital Inc. ("BarCap") as Purchaser of Rights to Compensation of Lehman Brothers Inc. ("Lehman") for Services Rendered and Reimbursement of Expenses as Financial Advisor and Investment Banker to the Debtors for the Period August 30, 2005 to December 9, 2009 (docket #13835) (the "Final Fee Application")[1];

2.      Preliminary Application of Barclays Capital Inc. for Allowance of Award of Discretionary Fee (docket #13389);

3.      Amended Preliminary Application of Barclays Capital Inc. for Allowance of Award of Discretionary Fee (docket #13408); and

4.      Barclays Capital Inc.'s Motion for Allowance of a Fee Enhancement. (docket 13850) (the "Fee Enhancement Motion.")

5.      BarCap seeks approval not only of its Final Fee Application which includes the fees of Lehman, but also seeks an additional "discretionary fee" of $9,202,500, which is

---

[1]      ASARCO withdrew its objection to the Final Fee Application. Thereafter, the Plan Administrator attempted to resurrect the objection. To the extent any live pleading exists that constitutes an objection to the Final Fee Application, it is hereby overruled. Accordingly, these Findings of Fact and Conclusions of Law apply only to the second, third, and fourth items before the Court.

comprised of (a) $1,202,500 for "unanticipated services" performed by Lehman; (b) $2 million

for the overall success of the reorganization cases; and (c) $6 million for the "successful SCC

Judgment auction."

The Court, having heard the evidence and arguments of counsel, finds that the Final Fee

Application should be approved and that BarCap should receive an additional $975,000 pursuant

to 11 U.S.C. §328(a) for unanticipated services of Lehman. In support thereof, the Court finds as

follows:

## I.  BARCLAYS REQUEST FOR FEES FOR UNANTICIPATED SERVICES PERFORMED BY LEHMAN

On April 11, 2005, five of ASARCO LLC's wholly owned direct or indirect subsidiaries

(the "Subsidiary Debtors")[2] filed their voluntary petitions in this Court (the "Subsidiary Cases").

On August 9, 2005, ASARCO LLC filed its voluntary petition for relief under chapter 11 of title

11 of the United States Code (the "Bankruptcy Code") in this Court. Additional ASARCO LLC

subsidiaries subsequently filed voluntary petitions in this Court.[3]  The cases of ASARCO LLC

and all of the debtor subsidiaries (together with ASARCO LLC, the "Debtor") are collectively

referred to as the "Reorganization Cases."

---

[2]      The Subsidiary Debtors consist of the following five entities: Lac d'Amiante du Québec Ltée (f/k/a Lake Asbestos of Quebec, Ltd.); Lake Asbestos of Quebec, Ltd.; LAQ Canada, Ltd.; CAPCO Pipe Company, Inc. (f/k/a/ Cement Asbestos Products Company); and Cement Asbestos Products Company.

[3]      Encycle, Inc. and Encycle/Texas, Inc. filed on August 26, 2005. ASARCO Consulting, Inc. filed on September 1, 2005. The following entities filed on October 13, 2005: ALC, Inc.; American Smelting and Refining Company; AR Mexican Explorations Inc.; Asarco Master, Inc.; Asarco Oil and Gas Company, Inc.; Bridgeview Management Company, Inc.; Covington Land Company; Government Gulch Mining Company, Limited; and the filings of December 12, 2006 included the following entities: Southern Peru Holdings, LLC; AR Sacaton, LLC, a Delaware limited liability company; and ASARCO Exploration Company, Inc. Finally, the most recent filings included Alta Mining and Development Company, Blackhawk Mining and Development Company, Limited, Green Hill Cleveland Mining Company, Tulipan Company, Inc., Peru Mining Exploration and Development Company and Wyoming Mining and Milling Company. All of these subsidiary debtors (except for Encycle/Texas, Inc., which has been converted to a chapter 7 bankruptcy), collectively with ASARCO and the Subsidiary Debtors, will be referred to as the "Debtor."

On September 19, 2005, ASARCO LLC filed an application to retain Lehman Brothers Inc. ("Lehman") as its exclusive financial advisor and investment banker *nunc pro tunc* to August 30, 2005.   Under the terms that ASARCO LLC and Lehman negotiated and memorialized in an engagement letter (the "Lehman Engagement Letter"), Lehman was to perform the following services:

    a.    Advise and assist the Company[4] in formulating a plan of reorganization and/or analyzing any proposed plan, including assisting in the plan negotiation and confirmation process of a Restructuring Transaction under Chapter 11 of the Bankruptcy Code;

    b.    In connection therewith, provide financial advice and assistance to the Company in structuring any new securities to be issued in a Restructuring Transaction;

    c.    Participate in negotiations among the Company and its creditors, unions, suppliers, lessors and other interested parties relating to the Chapter 11 Case;

    d.    Participate in hearings before the bankruptcy court with respect to the matters upon which Lehman Brothers has provided advice, including, as relevant, coordinating with the Company's counsel with respect to testimony in connection therewith;

    e.    Provide expert witness testimony concerning any of the subjects encompassed by the other financial advisory services;

    f.    Upon request, review and analyze any proposals the Company receives from third parties in connection with a Transaction, including, without limitation, any proposals for debtor-in-possession ("DIP") financing and/or exit financing;

    g.    Assist the Company in connection with the Company's liquidity analysis;

    h.    Review and analyze the Company's business, operations, properties, financial condition and prospects and financial projections (including business plans provided by the Company);

    i.    Evaluate the Company's debt capacity in light of its projected cash flows and assist in the determination of an appropriate capital structure for the Company;

---

[4]    Both the Lehman Engagement Letter and the BarCap Engagement Letter refer to the "Company," which means ASARCO LLC.

j.      Analyze various restructuring scenarios and the potential impact of these scenarios on the recoveries of those stakeholders impacted by any Transaction;

k.      Provide strategic advice with regard to restructuring or refinancing the Company's financial obligations;

l.      Assist in the drafting, preparation and distribution of selected information and other related documentation describing the Company and the terms of a potential transaction;

m.      Assist the Company in identifying, contacting and evaluating potential purchasers for any Sale Transaction; and

n.      Provide such other advisory services as are customarily provided in connection with the analysis and negotiation of a Restructuring Transaction or a Sale Transaction, as requested.

- - Lehman Retention Order, at 7-8, ¶ 3.

For these services, ASARCO LLC agreed to compensate Lehman as follows: (1) a monthly cash fee (the "Advisory Fee") of $100,000 for two years, then $75,000 per month beginning in August 2007; (2) a $4 million transaction fee; and (3) 100% of all Advisory Fees for twenty-four months and 50% of all Advisory Fees paid thereafter would be creditable against any transaction fee.   On October 13, 2005, this Court entered the Agreed Order Granting ASARCO's Application pursuant to 11 U.S.C. § 327(a) for the Employment and Retention of Lehman Brothers Inc. as Financial Advisor and Investment Banker to the Debtor.

ASARCO LLC twice moved – once on August 4, 2007 (Lehman Expansion Application) and again on January 23, 2008 (Amended Lehman Expansion Application) – to expand the scope of Lehman's retention and engagement.   Lehman claimed it was expending more time and effort on the case than anticipated and had, over the course of two years, performed work allegedly outside the scope of the original court-approved retention agreement.

In an order entered on May 28, 2008, the Court approved in part the motion to expand Lehman's retention, only so as to include (1) $800,000 for valuation services related to the

proceedings against Americas Mining Corporation and Montana Resources, and (2) $100,000 each for valuation services related to each of the proceedings involving Sacaton and Rosemont in connection with certain fraudulent transfer proceedings. The Court did not approve Lehman's request to retroactively increase its monthly compensation for the period from April 2007 through September 2008. The Court found that Lehman was bound by the terms of its original engagement but could, under §328(a), apply for additional compensation after the conclusion of its employment if it could prove that its original terms and conditions were "improvident in light of developments not capable of being anticipated at the time of fixing of such terms and conditions." 11 U.S.C. §328(a).

Ultimately, the services performed by Lehman made the compensation originally agreed to by Lehman improvident. Further, the conditions that led to the additional responsibilities were not capable of being anticipated at the time of the original employment agreement, as further set forth below:

### A. Lehman's Initial Engagement Envisioned a Quick Sale of the Debtors' Assets

Lehman made its initial presentation regarding the services it would provide as the Company's financial advisor and investment banker in mid-August 2005. In the early stages of this case, the Debtors' restructuring process was expected to take the form of a quick sale, because the Company was unlikely to survive for long on its own in its then-current operational state. The Debtors expected the bankruptcy to take about one month.

Prior to negotiating the terms of the August 2005 Engagement Letter, Lehman gathered and studied all available information regarding the Debtors. Because ASARCO LLC was (and is) a non-public subsidiary of a foreign company, such information was necessarily limited. However, Lehman reviewed all pertinent industry reports, public filings, and other public

materials concerning the Company, all of which indicated that the Company's expectation of a quick liquidation was reasonable.

Lehman did not have access to confidential information concerning the Company. Thus, Lehman was unaware—and indeed had no way of knowing—that the Company had serious deficiencies in its internal management capabilities and reporting systems. Further, no one could have anticipated that the chief executive officer would be removed by the Parent within one month of Lehman's retention, or that the Board would be replaced twice within the first months of the case.

### B. Lehman Performed Significant Crisis Management and Other Services to Resuscitate the Debtor That Were Not Contemplated in the August 2005 Engagement Letter

Once Lehman began working with the Debtors and gained access to their operations, as well as to confidential information, Lehman discovered that the Debtors faced several impending crises. The Debtors lacked effective executive-level leadership. They faced a severe liquidity crisis, internal reporting and controls were practically non-existent, and there was essentially no internal communication. The Company was in the practice of informally reporting information to the Parent, which long had made all operating and financial decisions for the Company. This system not only masked the lack of any real internal management function, but it also left existing management unaccustomed to making high-level decisions without guidance from the Parent.

As a result of these issues, in December 2005, the Debtors faced the risk of administrative insolvency. Because a quick sale under these conditions would not maximize the value of the Debtors' estate, Lehman, at the Debtors' request, dedicated significant time to stabilizing the Debtors through crisis management and other services that were outside the scope of the August 2005 Engagement Letter.

In general, in an attempt to fill the void in human resources and experience at the Company, and to educate remaining management, Lehman assembled basic information about the Debtors, their operations, their cash balances and other information necessary to make strategic decisions. The Debtors also requested that Lehman provide services in five key areas: (a) creation of a new program of salary, incentive and key employment retention plans designed to retain salaried employees; (b) assistance in the recruitment of new independent directors; (c) recruitment of a new chief executive officer and new chief financial officer; (d) corporate planning and budgeting efforts, and institution of internal controls and reporting systems; and (e) institution of a hedging program to protect the Debtors' liquidity position.

### 1. Lehman Assisted the Debtors to Resolve the Liquidity Crisis

One of the most serious problems facing the Debtors early in the cases was their liquidity crisis. Lehman's professionals quickly identified the dire need for liquidity and immediately undertook to solve that problem, a service beyond the scope of a traditional investment banker. The Board requested that Lehman develop potential liquidity-generating financing alternatives, including access to the capital markets. This additional work required Lehman to expend significant time and effort to assess the market, develop securities or financing structures that could be attractive to investors, and communicate with potential investors. This work was outside the scope of the traditional tasks performed by an investment banker and financial advisor. Nevertheless, Lehman dedicated significant commitments of resources during that early period.

Ultimately, the Debtors could only obtain such liquidity via a debtor-in-possession financing facility (a "DIP"). Despite the Debtors' severe liquidity crisis, the Parent resisted pursuing such financing. Nonetheless, in order to ensure the Debtors' survival, Lehman began negotiating the terms of a DIP facility. The ongoing union strike, which contributed to the

Debtors' significant cash drain, hampered Lehman's efforts to obtain a DIP. Despite these challenges, by the end of October 2005, Lehman successfully negotiated the terms of a DIP, which closed in November 2005.

The union strike constituted another significant challenge early in the Chapter 11 Cases. When Lehman was engaged, no end to the strike was in sight. Thus, it was impossible to predict when the Debtors' employees would return to their jobs and allow the Debtors to resume normal operations. Lehman worked with the Debtors to resolve the operational crises caused by the ongoing strike. Lehman's efforts in the early phase of its engagement to resolve the Debtors' liquidity, management and other issues and to end the strike, which had crippled its operations and drained its cash flow, allowed the Debtors to avoid a quick liquidation.

### 2. To Resolve Corporate Governance Disputes, Lehman Recruited Independent Board Members

In September 2005, the Parent appointed Carlos Ruiz Sacristan and Javier Perez Rocha as new board members. However, shortly after Messrs. Ruiz and Rocha were appointed to the Board, Mr. Rocha resigned, leaving the Debtors with a one-member board and a still-vacant CEO position.

Early in the cases, the Debtors' creditors and the Parent disagreed regarding the extent of the Parent's control of the Debtors. To resolve this conflict, the parties agreed that a three-person Board would be appointed, with two of the directors being independent. Lehman assisted in the recruitment process for the two independent board members, including speaking to a large number of people about their qualifications and interest in serving on the Board. Ultimately, after a number of candidates were considered, the parties agreed to the appointment of Edward Caine and Malcolm Lovett, who joined Mr. Ruiz, the Parent's representative, on the Board.

On December 15, 2005, the newly reconstituted Board convened and began to consider the Debtors' situation. The Board agreed with Lehman's assessment that the Debtors were in critical condition in a number of respects. At that time, the Debtors' internal controls and management reporting were inaccurate and inadequate, both in terms of the quality and the usefulness of the data generated. The state of the Debtors' financial and accounting department was under-managed, unorganized, undisciplined and marginally functional. The only good news for the Debtors was that the union strike recently ended.

The new Board asked Lehman, and Lehman agreed, to keep its professionals on-site at the Debtors' Tucson offices, beginning in early 2006, to advise management on a daily basis regarding a variety of day-to-day management and operation tasks that a debtor's management typically performs. For example, at the request of the Board, Lehman structured and prepared numerous reports analyzing budget and cash flow projections and certain metal purchase agreements. Lehman professionals performed such services on nearly a daily basis for approximately six months. Lehman professionals also attended nearly every meeting of the Debtors' Board.

### 3. Lehman Developed a Retention Plan

Due to the financial and governance turmoil, the change in leadership, and non-competitive compensation for employees, the Debtors experienced a steady loss of salaried employees in 2005 and 2006, threatening operations and requiring Lehman to fill an even deeper void. Evidence throughout these Chapter 11 Cases shows that although some management upheaval is to be expected in a chapter 11 case, it would be difficult to forecast that a company with the size, complexity and history of ASARCO would lack depth of management to the extent of company. As the Court recognized: "There's no question that the engagement in this case

took place at a time when nobody would have thought we would have been here today like we are today."

The Debtors were losing personnel at an alarming rate at a critical time in the Debtors' operational restructuring.   With copper prices on the rise, demand for knowledgeable, experienced employees began to increase.  In fact, a number of nearby mines were luring away the Debtors' workforce.  Employee retention became such a serious issue for the Debtors that in 2005, and continuing through the first part of 2006, the Board asked Lehman professionals to develop an employee retention plan, an area well outside the typical work of an investment banker and specifically excluded from the scope of work under the August 2005 Engagement Letter.

The Board also asked Lehman to develop, and Lehman did develop, a revised salary structure, an incentive compensation program (where none had existed previously), and a comprehensive key employee retention plan. Lehman professionals were required to devote significant time to developing and implementing fair and effective compensation and incentive programs.

### 4. Lehman Filled the Debtors' Management and Governance Vacuum and Provided Crisis Management and Operation Services

To Lehman's surprise, at the end of September 2005, Daniel Tellechea, the Debtors' chief executive officer, was either fired or forced to resign by the Parent.  The absence of a chief executive officer after Mr. Tellechea's departure was one of the most salient personnel shortages that plagued the Company in the pre- and post-petition periods.  Doug McAllister, who was the general counsel of the Debtors, stepped in to act as CEO.  Unfortunately, Mr. McAllister had no significant prior executive, operational, or financial experience, and he was not a suitable

permanent replacement for Mr. Tellechea. Moreover, the management team under Mr. McAllister was materially understaffed.

Due to the absence of a chief financial officer ("CFO"), among other management positions, Lehman also was significantly involved in the preparation and development of weekly cash plans until the Debtor later hired a CFO. After the new CFO joined ASARCO, at the Debtors' request, Lehman also assisted the CFO, among others, in (a) creating reports for constituents, management and the Board; (b) managing communications with relevant financial advisors and creditors, including establishing an on-line data room; and (c) obtaining and analyzing financial information, as well as numerous other tasks in support of management, the Board and counsel. In addition, Lehman contributed to the development of the Debtors' business plans early in the cases, which continued during the development of the plan sponsor selection process.

### 5. Lehman Led the Searches for a New CEO and Crisis Manager

In late 2005, it became clear that the complicated nature of the Company's business and the challenges it faced called for a CEO with substantial business management experience. Lehman, with the support of the Board, assisted in the search process for this new CEO. As part of this process, Lehman professionals contacted Joseph Lapinsky, who previously worked with Gilbert Sanborn of Lehman. Lehman professionals had numerous conversations with Mr. Lapinsky during this time and ultimately Mr. Lapinsky agreed to join the Debtors in the beginning of July 2006. Hiring Mr. Lapinsky proved to be an enormous benefit to the Debtors, because he played a crucial role in stabilizing the Company as soon as he assumed his duties as CEO in the summer of 2006.

In the early part of 2006, Lehman professionals also worked with the Company to retain a management consulting firm. This effort resulted in the retention of Alvarez & Marsal. At the

time of Alvarez & Marsal's engagement, Lehman was devoting significant time and effort communicating with the Board regarding the Debtors, their operations, and financing.

### 6. Lehman Designed and Implemented a Copper Hedging Program

In 2006, Lehman advised the Debtors that a hedging program would provide protection from the volatility of copper prices. After conversations with the Official Committee of Unsecured Creditors (the "Creditors' Committee") and its financial advisor, the parties agreed to institute a hedging program. Lehman managed and executed that program over the next year and one-half as copper prices continued to fluctuate, protecting the Company when copper prices fell. The hedging program Lehman implemented was unique for a chapter 11 debtor outside of the ordinary course of the debtor's business.

Given the number of constituencies in these cases, reaching a consensus with the Debtors' stakeholders concerning the hedging program was a difficult task. The Department of Justice (the "DOJ"), the Asbestos Committee, the Creditors' Committee, and the Parent all needed to reach a consensus. Lehman spent many hours with the DOJ, the Asbestos Committee and the Creditors' Committee explaining the mechanics and potential benefits of a hedging program.

### C. <u>BarCap May Recover a Fee Enhancement Under 11 U.S.C. §328</u>

The Bankruptcy Code limits compensation of professionals under § 328 as follows:

> The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, *if such terms and conditions prove to have been improvident in light of developments not*

> *capable of being anticipated at the time of the fixing of such terms and conditions.*

- - 11 U.S.C. § 328(a) (emphasis added).

Thus the basis for a catch-up, bonus, or enhancement under § 328(a) is the "improvident in light of developments not capable of being anticipated" standard. To obtain a § 328(a) adjustment, BarCap must prove that the "intervening circumstances must have been incapable of anticipation, not merely unanticipated." *In re Barron*, 325 F.3d 690, 693 (5th Cir. 2003) (re-affirming the "incapable of anticipation" standard); *see also Gibbs & Bruns LLP v. Coho Energy, Inc. (In re Coho Energy, Inc.)*, 395 F.3d 198, 205 (5th Cir. 2004) (classifying the "improvidence exception" as a "high standard"); *In re Barron*, 225 F.3d 583, 585 (5th Cir. 2000) (rejecting bankruptcy court's reliance on "developments unforeseen when [the retention] was originally approved" and requiring a showing that the developments justifying an increase were "not capable of being anticipated").

Courts within the Circuit have applied this heightened "improvidence" standard to attempts to boost professional fees beyond the agreed-to amount. *See In re Nucentrix Broadband Networks, Inc.*, 314 B.R. 574, 581 (Bankr. N.D. Tex. 2004)(denying a bonus based on the court's conclusion that it "must live with the conditions of that section . . . [and the Court] cannot wink at the language of Section 328, nor the mandate of the Fifth Circuit and the United States Supreme Court to follow the language of the statute"); *In re El Paso Refinery*, 257 B.R. 809, 834 n.49 (Bankr. W.D. Tex. 2000)("[T]he bar the statute [§ 328] erects prevents not only later reductions but also later increases absent the requisite showing of improvidence and inability to anticipate.").

However, as detailed above, the history of this case was extraordinary. No one foresaw the length or complexity of the case. At a result, Lehman's contracted fees were well below market rate and thus were improvident.

The reasonable compensation for Lehman was the rate negotiated by the Debtor and Lehman later in the case of $150,000 per month. Lehman is entitled to the difference between its original rate ($75,000) and the reasonable rate later negotiated by it ($150,000) from the date of its request for additional compensation (August 2007) until the end of the employment (September 2008) - -thirteen months at $75,000 per month which equals $975,000.

## II. BARCAP'S REQUEST FOR A SUCCESS FEE

On September 15, 2008, Lehman's parent company, Lehman Brothers Holdings Inc., filed in the United States Bankruptcy Court for the Southern District of New York a voluntary petition for relief under chapter 11 of the Bankruptcy Code, and Lehman commenced a proceeding under the Securities Investor Protection Act (the "SIPA Proceeding"). The next day, Lehman and Lehman Brothers Holdings Inc. entered into an Asset Purchase Agreement (the "Asset Purchase Agreement") with Barclays Capital, Inc. ("BarCap") in which BarCap purchased Lehman's investment banking and financial advisory businesses. The sale transaction closed on September 22, 2008.

Pursuant to the Asset Purchase Agreement Among Lehman Brothers Holdings Inc. ("LBHI," and together with Lehman Brothers, the "Seller"), Lehman Brothers, Inc., LB 745 LLC and Barclays Capital Inc., dated as of September 16, 2008 (the "Bar Cap Purchase Agreement"), Bar Cap purchased all the assets used in connection with the Seller's Business (the "Purchased Assets"), other than certain excluded liabilities set forth in the Bar Cap Purchase Agreement. "Business" is defined in the Bar Cap Purchase Agreement as the "U.S. and Canadian investment

banking and capital markets businesses of Seller including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's [Lehman Brothers Inc.'s] business as a futures commission merchant."

The Purchased Assets include "Purchased Contracts," which are governed by Section 2.5 of the Bar Cap Purchase Agreement.  Section 2.5 provided a sixty-day period for Bar Cap to designate as "Purchased Contracts" the financial services agreements it desired.  In order to preserve the non-public information in the executory contracts, the bankruptcy court in the chapter 11 case of Lehman Brothers Holdings Inc. and the Securities Investor Protection Act ("SIPA") case of Lehman Brothers entered orders providing that, upon Bar Cap's designation, the financial advisory agreements would be "Purchased Contracts" without further action by either Lehman Brothers or Bar Cap, so long as the contracts were related to the Business, and were, in fact, executory. The orders also provided for notice of the assignment to be sent to the counterparty of each assumed contract.

On October 30, 2008, the Court approved the indemnity provisions in the Bar Cap Engagement Letter so that Bar Cap could commence services to the Debtors.  On November 26, 2008, the Court approved, on a final basis, the Bar Cap Engagement Letter.

After Bar Cap's purchase of the investment banking and financial advisory businesses of Lehman Brothers, Bar Cap informed the Debtors that it was not prepared to go forward under the then-current terms. As a result, the Debtors and Bar Cap undertook to renegotiate the terms of the engagement.  On or about October 15, 2008, Bar Cap designated the August 2005 Engagement Letter, the April 2007 Engagement Letter, which had not been approved by the Court, and the 2008 Supplemental Engagement Letter (collectively, the "Assigned Contracts") to be assigned to it via a letter to Mr. Lapinsky, CEO of the Debtors (the "Cure Notice"). The Cure

Notice advised the Debtors of the asset sale to Bar Cap, the assignment of the Assigned Contracts, and that no cure amounts were payable. The Cure Notice provided that Bar Cap had received an assignment of Lehman Brothers' rights and assumed the obligations under the Assigned Contracts and that Bar Cap intended to obtain formal approval of Bar Cap's retention from the bankruptcy court presiding over the Debtors' chapter 11 case.

Bar Cap and the Debtors were within their rights to negotiate new terms for the Assigned Contracts. By taking an assignment of the Assigned Contracts, Bar Cap preserved the right to seek compensation for services already performed by Lehman Brothers. By negotiating new terms of the Assigned Contracts, Bar Cap and the Debtors reached an acceptable agreement for terms under which Bar Cap would perform services for the Debtors after its retention.

The Fifth Circuit has held that an executory contract can be assumed as amended by the parties, so long as the amendment is consensual. "Nothing in the [Bankruptcy] Code suggests that the debtor may not modify its contracts when all parties to the contract consent." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). In *Richmond Leasing*, the debtor assumed a lease that it consensually renegotiated with the landlord. Creditors objected to the assumption contending that the debtor could not assume an amended lease. The Fifth Circuit first observed that the counterparty is typically the one objecting to the assumption, not the debtor's creditors who are "strangers to the transaction." *Id.* The Fifth Circuit then held that "to the extent that the amended lease represents a true renegotiation of the obligations of RCL [the debtor] . . . and GECC [the counter party], it falls entirely outside of § 365's concern." *Id.* The Fifth Circuit also held that the standard to assume the renegotiated lease was the business judgment standard. *Id.* Here, the Parent argued both that Bar Cap took an assignment of the Assigned Contracts and was bound to their terms and that Bar Cap did not take an

assignment, and therefore Bar Cap is not entitled to Lehman Brothers' rights thereunder. The Court finds that Bar Cap received an assignment of the Assigned Contracts, which were assumed and assigned as modified by the Bar Cap Engagement Letter.

Similarly, relying on *Richmond Leasing*, the Sixth Circuit held that § 365 did not require the debtor to assume a lease with all of its benefits and burdens intact, when the debtor and the lessor consensually negotiated to amend the lease. *City of Covington v. Covington Landing Ltd. P'ship*, 71 F.3d 1221, 1227 (6th Cir. 1995). Based upon the single day gap between the October 15, 2008, Cure Notice and the parties' entry into the Bar Cap Engagement Letter on October 16, 2008, it appears that the Debtors' willingness to renegotiate the terms of the engagement were required in order to induce Bar Cap to take an assignment of the Assigned Contracts. The Court rejects the Parent's allegation that Bar Cap was bound to the terms of the April 2007, Engagement Letter simply by virtue of taking an assignment of the Assigned Contracts. Bar Cap had the sole discretion to select the contracts to assume. There is no evidence that Bar Cap would have designated the engagement as an Assigned Contract if it had not expected to reach acceptable terms with the Debtors as to future compensation.

The Court approved the BarCap Engagement Letter on November 26, 2008. For all of its services, ASARCO LLC agreed to pay BarCap a monthly cash fee of $225,000 (the "Retainer Fee"), and a transaction fee of $5 million (the "Transaction Fee") which would be triggered by either the sale of substantially all ASARCO LLC's assets or a restructuring – regardless of the usefulness, value, or application of BarCap's services.

Unlike the Lehman Engagement Letter, the BarCap Engagement Letter provided no mechanism for any crediting of the Retainer Fee against the Transaction Fee. Also unlike the

Lehman Engagement Letter, the BarCap Engagement Letter gave BarCap the right to seek a "discretionary fee based upon the successful outcome of the case" (the "Discretionary Fee"):

> Bar Cap and the Company hereby agree that Bar Cap shall be entitled to apply to the court for final approval of an additional discretionary fee based upon the successful outcome of the Chapter 11 case. This fee shall be based upon a variety of factors including but not limited to quality of service, creativity of advice, and comparable market rates, all of which should be evaluated by the most objective standard available. The discretionary fee herein replaces, and shall be in lieu of, the discretionary fee set forth in the engagement letters between Lehman Brothers and the Company . . . .

- - *Id.* 11 at 6, ¶ 6(f).

In addition, the BarCap Engagement Letter gave BarCap the right to seek a discretionary fee above any fees awarded to Lehman:

> For the avoidance of doubt, more than one fee may be payable to Bar Cap under subparagraphs 6(b), (c), (d), (e) and (f) hereof in connection with any single transaction or series of transactions, it being understood and agreed that in the event that a Sale Transaction Fee has been earned under subparagraph 6(c) in connection with a Sale of All Assets and a Restructuring Transaction Fee has been earned under subparagraph 6(d), only one fee shall apply. Furthermore, because Bar Cap purchased Lehman Brothers' accounts receivable, it is not necessary to apportion between Bar Cap and Lehman Brothers any one or more fees payable pursuant to subparagraphs 6(b), (c), (d), (e) and (f) hereof. Any such fees shall be paid only to Bar Cap, without regard to whether a portion of the services that resulted in the fees were performed by Lehman Brothers or during the Tail Period of Lehman Brothers' engagement.

- - BarCap Engagement Letter at ¶ 6(f).

The Bar Cap Engagement Letter provides a nonexclusive list of three factors to consider in determining the amount of a Discretionary Fee in the event that the Chapter 11 Cases are successful: i) the quality of service; ii) the creativity of advice; and iii) comparable market rates. In seeking its Discretionary Fee, BarCap contends that "the successful outcome of these Chapter 11 Cases . . . resulted in no small measure from the quality of BarCap's service, the creativity of its advice, and the perennial dependability of its employees." BarCap also:

- Characterizes its service as "directly and primarily responsible for ASARCO avoiding liquidation, and instead, surviving to benefit from the dramatic rise in copper prices" ;

- Maintains that its "highly sophisticated and time-intensive development and implementation of multiple asset auctions successfully brought substantial competitive pressure to these cases and provided the final impetus to the Parent to propose a full payment plan" ;

- Attributes the full payment of creditors and ASARCO LLC's avoidance of liquidation to "the significant contributions of BarCap";

- Claims to have played a "crucial role" and provided ASARCO LLC with "indispensable support" and "essential assistance"; and

- Contends that its "creativity and expertise in resolving the Debtors' many challenges were primary drivers in achieving a full payment plan."

This Court finds, however, that the Parent's full-payment plan was attributable to a coalescence of factors, including:

- A well-timed and substantial rise in copper prices in 2009;

- The SCC Judgment;

- The Parent's desire to retain ownership and control of ASARCO LLC and move to a full-payment plan;

- The Parent's strong desire to bring an end to the costly, time-consuming and distracting litigation involving the environmental claims and asbestos claims;

- This Court and how this Court conducted the case; and

- Other participants, constituents, professionals, and attorneys.

There is no dispute that these Chapter 11 Cases were a remarkable success. Moreover, Bar Cap's advice, commitment, and undertaking of a variety of tasks, including those that are typically not performed by investment bankers, provided benefits to the estate. Indeed, both this Court and the District Court recognized the benefits conferred upon the estate by BarCap. The contract rate plus the additional fees awarded herein provide BarCap with reasonable compensation for the services performed at a market rate. Therefore, taking into consideration the nonexclusive factors set out in the BarCap engagement letter, the Court finds that no additional compensation is warranted.

## III. BARCAP'S REQUEST FOR A FEE FOR A SUCCESSFUL SCC JUDGMENT AUCTION

On June 4, 2009, ASARCO LLC moved to expand the scope of BarCap's retention and employment as financial advisor and investment banker to ASARCO LLC in connection with the auction and potential sale of the SCC Judgment. (BarCap Expanded Retention Motion) The Motion included BarCap's proposed supplemental engagement letter (the "Proposed Supplemental BarCap Engagement Letter") relating solely to services to be performed in connection with the SCC Judgment auction process. BarCap recommended a two-step, stalking horse auction process as the best approach to auctioning the SCC Judgment. For these services, the Proposed Supplemental BarCap Engagement Letter provided for a $1 million initial retainer fee. It also proposed payment of either a Successful Sale Fee or a Successful Bid Fee (but, under no circumstance the payment of both):

> (b) Successful Sale Fee: If, during the term of the engagement or for a period of 12 months following the effective date of its termination by the Company (other than for cause), a definitive agreement to effect a sale of the SCC Judgment is entered into by the Company and the sale is consummated by the Company, Barclays Capital would be paid a fee equal to the lesser of (i) $6 million and (ii)

the Successful Bid Fee (as defined below) that would have been payable pursuant to section 5(c) of the Engagement Letter (the "Successful Sale Fee").

(c)  Successful Bid Fee: If, during the term of the engagement, one or more Bona Fide Offers (as defined in the Engagement Letter) are submitted to the Company prior to the effective date of the Company's Chapter 11 plan, but the Company does not enter into a definitive sale agreement with respect to any of such Bona Fide Offers, Barclays Capital shall be paid a fee equal to two percent of the aggregate amount of cash consideration proposed in each of the Bona Fide Offers (the "Successful Bid Fee").  In no event shall the Successful Bid Fee exceed $6,000,000.

- - Proposed Supplemental BarCap Engagement Letter, exhibit to BarCap Expanded Retention Motion.

This Court never approved ASARCO LLC's retention of BarCap in connection with the sale of the SCC Judgment on these terms.  Based on the record of this case, the Court finds: (i) the proposal of the SCC Judgment auction process was covered by the terms of the BarCap Engagement Letter and BarCap did not need any further compensation to explore an Auction of this asset[5]; and (ii) the SCC Judgment auction process did not yield a bid or sale that would qualify for a success fee under the proposed Supplemental BarCap Engagement Letter.

BarCap and ASARCO LLC devised a process that BarCap claimed would result in the sale of the SCC Judgment.  First, BarCap would send an introductory letter and teaser to entities it believed might have an interest in the SCC Judgment.  Second, BarCap would send an information memorandum to certain parties that expressed an interest in learning more about the SCC Judgment.  Those parties would be invited to join a virtual data room containing pleadings, deposition and hearing transcripts, exhibits, and other information about the SCC Judgment. Third, BarCap would send an indication-of-interest letter, which would invite potential bidders to submit, by July 16, 2009, "a preliminary, non-binding written indication of interest for a partial

---

[5]      The Court rejects BarCap's claim that the SCC litigation was not an asset because there was no judgment at the time of BarCap's engagement.  BarCap's own retained expert, John T. Young, agreed that the litigation was an economic – not an accounting – asset.  Malcolm Lovett, a former director of ASARCO LLC, likewise testified that the SCC litigation claims were assets of the estate.

or full purchase of the SCC Judgment," a so-called "Indicative Offer."   Fourth, BarCap would invite a subset of these "Initial Bidders" to conduct additional diligence and submit a binding bid.

According to BarCap, there would be additional steps to occur after the "binding" bids were submitted.  ASARCO LLC, in conjunction with its advisors, was to analyze any offers and then determine whether to enter into a stalking-horse purchase agreement.   The next step would be the filing of a motion with the bankruptcy court seeking (i) approval of any bid protections, including any expense reimbursement to a qualified stalking-horse bidder under legally acceptable bidding procedures, and (ii) approving "topping fee" provisions, if any.   However, these additional steps never happened, and the Court never approved this piecemeal process. The multi-step bid process – which was to lead to the designation of a stalking-horse bidder, the approval of bid and bidder protection procedures, the scheduling of an auction, and finally the setting of a hearing on notice to obtain approval of a sale to the highest bidder after the conclusion of the auction process – was not accomplished in the limited timeframe available in the midst of a comprehensive two-week confirmation trial.

Ultimately, the auction process generated nothing more than non-binding, fractional interest bids like those submitted by Elliot Management and the Baupost Group on the one hand and DK Acquisition Partners L.P. and Halcyon Master Fund L.P on the other hand.  None of these bids were ever accepted by ASARCO LLC or the Court.  Professor Kenneth Klee testified that in valuing the SCC Judgment, he could not rely on the sale process as it was "incomplete." He further opined that "the market bids to date have undervalued the SCC Judgment by at least 15 to 25 percent."  In the end, ASARCO LLC abandoned the auction process in the early stages of the confirmation hearing because no meaningful bids were received. While it is possible that

the threat of an auction may have played an important part in the Parent's decision to propose its full payment plan, the auction was not successfully completed and thus does not support a $6 million enhancement.

## CONCLUSION

During its more than four years of intensive service Lehman and then BarCap played a critical role in achieving the successful reorganization of the Debtors. They provided indispensable support to the Debtors and their counsel throughout the Chapter 11 Cases, including the provision, at the Board's request, of crisis management and other services that were outside the scope of traditional investment banking services. Their creativity and expertise assisted the Debtors in resolving many challenges.

As described above, the Court finds that the impact of the original contract between the Debtors and Lehman was incapable of anticipation at the time of the contract and resulted in compensation below market rate. BarCap is entitled to the amount necessary to bring Lehman's compensation up to a market level, $975,000. However, BarCap did not show by a preponderance of the evidence that they are entitled to any additional fee enhancement.

Accordingly, the Court finds that pursuant to either 11 U.S.C. §328 or subparagraph 6(f) of the BarCap Engagement Letter, BarCap is entitled to a discretionary fee in the amount of $975,000. The Court approves the award and directs the payment of the Discretionary fee of $975,000 to BarCap.

It is so **ORDERED.**

Dated: 12/2/10

Richard S. Schmidt
United States Bankruptcy Judge