**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

**ENTERED**
**07/20/2011**

| | | |
|---|---|---|
| In re: | § | **Case No. 05-21207** |
| | § | |
| **ASARCO LLC, *et al.*,** | § | **Chapter 11** |
| | § | |
| Debtors. | § | **Jointly Administered** |

**MEMORANDUM OPINION ON
FINAL FEE APPLICATION of BAKER BOTTS L.L.P.**

### I.   INTRODUCTION

1.      On this day came on for consideration the final fee application of Baker Botts L.L.P. filed on February 8, 2010, and supplemented on June 2 and July 7, 2010 (the "Fee Application").[1] Baker Botts L.L.P. ("Baker Botts" or the "Firm") represented ASARCO LLC ("ASARCO" or the "Company") and its affiliated debtors (the "Debtors") in these chapter 11 cases during the period of August 9, 2005, through December 8, 2009 (the "Application Period"). The Court, having heard the evidence and arguments of counsel, makes the following findings of fact and conclusions of law.

2.      Baker Botts asks the Court to finally approve and allow $135,870,714.58 in fees and $6,046,135.06 in expenses for services performed and expenses incurred by the Firm during the Application Period.    The $135,870,714.58 in requested fees is comprised of (1) $113,074,527.74 in fees approved by this Court on an interim basis under section 331 of the Bankruptcy Code and paid to Baker Botts; (2) *plus* $263,994.74 in additional, unpaid fees incurred by Baker Botts for the period of November 1, 2009, through December 8, 2009; (3) *plus* $22,645,119.10 in additional, unpaid fees to compensate Baker Botts for the difference between

---

[1] *Final Fee Application and Request for Fee Enhancement of Baker Botts L.L.P.*, Dkt. No. 13915 ("*Final Fee Application*"); *Mot. for Leave to Supplement Final Fee Application and Request for Enhancement of Baker Botts L.L.P.*, Dkt. No. 14838; *Second Supplement to Final Fee Application and Brief in Support* ("*Second Supplement*").

the hourly rates it charged during the Application Period and the proper hourly rates (20% higher than the rates Baker Botts charged) based on application of section 330 of the Bankruptcy Code and the lodestar analysis; (4) *minus* $112,927.00 in fees charged by Baker Botts to the estates, for which Baker Botts has agreed voluntarily to credit the estates. The $6,046,135.06 in requested expenses is comprised of (1) $6,065,598.58 in expenses approved by this Court on an interim basis under section 331 of the Bankruptcy Code and paid to Baker Botts; (2) *minus* $19,463.52 in expenses charged by Baker Botts to the estates, for which Baker Botts has agreed voluntarily to credit the estates.

      3.      Baker Botts also asks the Court to finally approve and allow $8,004,920.50 in fees and $457,443.83 in expenses incurred by the Firm in preparing and defending the Fee Application through July 13, 2010. These amounts are comprised of (1) $5,042,001.50 in fees and $199,900.60 in expenses incurred by Baker Botts through July 6, 2010, defending the fees and expenses approved by this Court on an interim basis under section 331 of the Bankruptcy Code and the fees and expenses incurred by Baker Botts from November 1, 2009, through December 8, 2009; (2) $2,684,243.50 in fees and $252,883.23 in expenses incurred by Baker Botts through July 6 defending its request for a 20% increase; (3) $42,845.50 in fees incurred by Baker Botts through July 6 for non-working travel time; and (4) $235,830.00 in fees and $4,660.00 in expenses that Baker Botts estimated it would incur from July 7 through closing argument on the Fee Application on July 13. In addition, Baker Botts asks the Court to include in its final order resolving the Fee Application a provision authorizing the Firm to submit supplemental applications for additional defense fees and expenses incurred after July 13, 2010, upon resolution of any appeals or in connection with any subsequent proceedings in the event of a remand.

4.      During the course of these cases, ASARCO, the Debtor in Possession, would from time to time raise questions or concerns regarding Baker Botts' invoices with the responsible attorneys.  In each instance, Baker Botts addressed the concerns to the reasonable satisfaction of ASARCO. No party in these cases posed an objection to the interim allowance of Baker Botts' fees and expenses, and ASARCO paid the fees and expenses approved on an interim basis to Baker Botts.   Nevertheless, Reorganized ASARCO LLC ("Reorganized ASARCO") has now objected to the final approval and allowance of (1) the fees charged by Baker Botts to the estates during the Application Period, (2) any additional compensation over and above the fees charged by Baker Botts to the estates during the Application Period, and (3) the fees and expenses requested by Baker Botts for the preparation and defense of the Fee Application.[2]  Reorganized ASARCO originally objected to the final approval and allowance of the expenses charged by Baker Botts to the estates during the Application Period, but withdrew that objection on June 1, 2010.[3]

5.      During the course of these cases, the United States Trustee (the "U.S. Trustee") also would from time to time raise questions or concerns regarding Baker Botts' invoices with the responsible attorneys.  In each instance, Baker Botts addressed the concerns to the reasonable satisfaction of the U.S. Trustee.  The U.S. Trustee did not object to the final approval and allowance of either the fees and expenses charged by Baker Botts to the estates during the Application Period, or the fees and expenses requested by Baker Botts for the preparation and

---

[2] *Reorganized ASARCO LLC's Response and Objection to Baker Botts L.L.P.'s Final Fee Application*, Dkt. No. 14118 ("*Original Objection to Final Fee Application*"); *Reorganized ASARCO LLC's Response and Objection to Preliminary and Final Requests for Fee Enhancement of Baker Botts L.L.P.*, Dkt. No. 14119 ("*Objection to Fee Enhancement*"); *Reorganized ASARCO LLC's First Amended Response and Objection to Baker Botts L.L.P.'s Final Fee Application*, Dkt. No. 14713 ("*Amended Objection to Final Fee Application*").
[3] *Original Objection to Final Fee Application*; *Amended Objection to Final Fee Application*; Hr'g Tr. 143:20–24, June 1, 2010 (H. Novosad).

defense of the Fee Application.[4]  However, the U.S. Trustee has objected to the final approval

and allowance of the 20% increase requested by Baker Botts.[5]  The U.S. Trustee contends that if

the Court deems any increase proper, the increase should be limited to 5% of the amount of fees

charged by Baker Botts to the estates during the Application Period.[6]  No other party has

objected to the Fee Application.

6.     Baker Botts provided adequate notice of the Fee Application and complied with

the due process and service requirements of the Bankruptcy Code, the Federal Rules of

Bankruptcy Procedure, the Parent's plan, and the order confirming the Parent's plan.  The Court

has considered all objections, briefs, arguments, testimony, and documentary evidence related to

the Fee Application.  The Court held a final hearing on the Fee Application on May 27 and 28,

June 1 and 2, June 18, and July 13, 2010.  Baker Botts, Reorganized ASARCO, the U.S. Trustee,

and all other interested parties had a full and complete opportunity to be heard by the Court at the

final hearing.

7.     As detailed below, based upon the record before the Court, the Court finds and

concludes that:

- $6,046,135.06 in expenses incurred by Baker Botts during the Application Period were actual, necessary expenses;

- The services summarized in the Fee Application and performed by Baker Botts during the Application Period were substantial and provided a tangible and material benefit to the estates;

- The fees sought by Baker Botts for the services it performed during the Application Period reflect the actual and reasonable billable time expended by Baker Botts during the Application Period in connection with

---

[4] *Original Objection to Final Fee Application*; *Amended Objection to Final Fee Application*; Hr'g Tr. 143:20–24, June 1, 2010 (H. Novosad).
[5] *Corrected Limited Objection of the United States Trustee to the Final Fee Application and Request for Fee Enhancement of Baker Botts L.L.P., Counsel to Debtors*, Dkt. No. 14137.
[6] *Corrected Limited Objection of the United States Trustee to the Final Fee Application and Request for Fee Enhancement of Baker Botts L.L.P., Counsel to Debtors*, Dkt. No. 14137.

these cases and do not reflect (1) any unnecessary duplication of services, or (2) services that were not (a) reasonably likely to benefit the estates or (b) necessary to the administration of the cases;

- $457,443.83 in expenses incurred by Baker Botts in preparing and defending the Fee Application through July 13, 2010, were actual, necessary expenses;

- The fees sought by Baker Botts for preparing and defending the Fee Application through July 13, 2010, reflect the actual time expended by Baker Botts for preparing and defending the Fee Application. However, the Court finds that the reasonable compensation for the actual, necessary services performed by Baker Botts in preparing and defending the Fee Application through July 13, 2010, is $5,000,000 based on the level and skill reasonably required to prepare and defend the Fee Application.

- In addition to the $113,225,595.48 in fees sought by Baker Botts in its original interim application, it is entitled to an enhancement of $4,161,708.96 for the extraordinary efforts and results in litigating and obtaining a multi-billion dollar judgment against ASARCO's parent company in the SCC Litigation

8.       The Court finally approves and allows $117,613,158.44 in fees and $6,046,135.06 in expenses for services performed and expenses incurred by Baker Botts during the Application Period.  The $117,613,158.44 fee award is comprised of (1) $113,074,527.74 in fees approved by this Court on an interim basis under section 331 of the Bankruptcy Code and paid to Baker Botts; (2) *plus* $263,994.74 in additional, unpaid fees incurred by Baker Botts for the period of November 1, 2009, through December 8, 2009; (3) *plus* 4,161,708.96 as an enhancement because there are rare and extraordinary circumstances in these cases and Baker Botts' services were instrumental in producing the exceptional results that were unanticipated at case commencement; (4) *minus* $112,927.00 in fees charged by Baker Botts to the estates, for which Baker Botts has agreed voluntarily to credit the estates.  The $6,046,135.06 expense award is comprised of (1) $6,065,598.58 in expenses approved by this Court on an interim basis under section 331 of the Bankruptcy Code and paid to Baker Botts; (2) *minus* $19,463.52 in expenses

charged by Baker Botts to the estates, for which Baker Botts has agreed voluntarily to credit the estates.

9.     The Court finally approves and allows $5,000,000.00 in fees and $457,443.83 in expenses incurred by Baker Botts in preparing and defending the Fee Application through July 13, 2010.  In addition, the Court will include in its final order resolving the Fee Application a provision authorizing Baker Botts to submit supplemental applications for additional defense fees and expenses incurred after July 13, 2010, upon resolution of any appeals or in connection with any subsequent proceedings in the event of a remand.

## II. Background

### A. Summary

10.     Throughout these bankruptcy cases, Baker Botts lawyers conducted themselves with the utmost professionalism and commitment, addressing an array of challenging legal issues with sophistication, creativity, and skill.  Few firms in the country have the breadth and depth of experience in different disciplines necessary to handle these cases with the skill demonstrated by Baker Botts.  Baker Botts performed at an exemplary level in a wide spectrum of legal specialties.

11.     The results obtained in these cases are nothing short of extraordinary.  This Court has said that the ASARCO bankruptcy case "is probably the most successful Chapter 11 of any magnitude in the history of the Code." Baker Botts contributed significantly to the success of these cases.  Baker Botts performed in an extraordinary fashion in numerous areas, but perhaps most notably in trying and obtaining a multi-billion-dollar judgment against ASARCO's parent company, Americas Mining Corporation ("AMC," and together with ASARCO Incorporated, a Delaware corporation controlled by AMC, the "Parent"). Creditors ultimately received payment in full of all claims, plus post-petition interest and allowed attorneys' fees.   Such an

extraordinary result would have seemed far fetched at the outset of these cases.

12.     When ASARCO filed its bankruptcy case on August 9, 2005, "the prospects of reorganization were slim." "[T]he [C]ompany had essentially run out of cash and was saddled with massive environmental liability, financial debt, potential asbestos-related liability, falling copper prices, and a striking workforce."[7] Creditors were expected to receive cents on the dollar, if anything, because ASARCO's assets were severely depleted and the claims against it were extraordinarily high. Environmental, asbestos, and toxic-tort claims alone were more than $10 billion. The history of this case is well documented in this Court's Recommendation to the District Court on plan confirmation.

13.     Baker Botts faced significant hurdles from the outset of these cases. Following ASARCO's bankruptcy filing, all of the Company's prepetition directors and its chief executive officer were forced to resign. ASARCO had little cash, no debtor-in-possession financing, and no financial advisor. It also was in the midst of a labor strike. There was a significant possibility that these chapter 11 cases would be converted to chapter 7 cases and the Debtors would be forced to liquidate, placing professionals like Baker Botts at substantial risk of non-payment.

14.     Baker Botts acted quickly to assist ASARCO in resolving its corporate governance issues, obtaining debtor-in-possession financing, retaining a financial advisor, and settling the strike. Each of these steps was critical to save ASARCO from liquidation and put it on the path toward reorganization.

15.     Over the next four years, the Debtors and Baker Botts "continuously moved this case toward the confirmation of a plan that resulted in the best possible recovery for creditors—

---

[7] *Amended and Supplemental Report and Recommendation for Entry of Findings of Fact and Conclusions of Law on Plan Confirmation*, Dkt. No. 12844 ("*Amended Report and Recommendation*"), at 3.

full payment."[8] Baker Botts' outstanding achievements are described below.

16.     First, Baker Botts obtained a multi-billion-dollar judgment against AMC relating to the sale of ASARCO's controlling ownership interest in Southern Copper Corporation ("SCC").  The judgment obtained by Baker Botts against AMC is likely the largest fraudulent transfer judgment in chapter 11 history.

17.     Second, Baker Botts conceived, recommended, and commenced an innovative auction of the multi-billion-dollar judgment against AMC that, under the Debtors' unique plan structure, exposed the Parent to the possibility that it could both lose the Company and have to pay the judgment in full.

18.     Third, Baker Botts worked closely with ASARCO and Barclays Capital Inc. ("Barclays") to develop and implement a process to auction the Debtors' assets that resulted in the selection of a plan sponsor that vigorously competed with the Parent.  When, as a result of the worldwide financial crisis in September and October of 2008, that plan sponsor repudiated the parties' deal, Baker Botts worked closely with ASARCO and Barclays to renegotiate the parties' contract to maintain this critical competition for the Debtors' assets.

19.     Fourth, in addition to obtaining a multi-billion-dollar judgment against AMC, Baker Botts litigated and reclaimed the Mission South Mill (the "South Mill"), a valuable and important component of ASARCO's mining operations, and prosecuted a complicated tax adversary proceeding, the result of which led to creditors receiving the benefit of an approximately $60 million tax refund.  These results increased ASARCO's profitability and made the Company far more attractive to potential buyers and ultimately more valuable to the Parent.

20.     Fifth, Baker Botts significantly reduced the claims faced by the Debtors.  The

---

[8] *Amended Report and Recommendation*, at 4.

United States Department of Justice, Environment and Natural Resources Division (the "DOJ"),
has described the ASARCO case in a press release as "the largest environmental bankruptcy in
U.S. history." Baker Botts, through estimation and settlement resolved billions of dollars in
environmental, asbestos, and toxic-tort claims, along with the claims related to the Mission
Mine—all on terms favorable to the Debtors. These results liquidated the Debtors' liabilities in a
substantially diminished amount and made ASARCO even more desirable to potential buyers.[9]

21.     Finally, Baker Botts played a significant role in repairing the severed relationship
ASARCO had with its workforce when it assisted the Company in settling the 2005 strike,
negotiating a new collective bargaining agreement with the unions, and resolving a number of
problems that had arisen in connection with employee benefit and pension plans.

22.     During the course of these cases, ASARCO was transformed from a broke and
broken company to a reorganized ASARCO, cleansed of its historical liabilities and well-
positioned to compete effectively in the world of commerce. Under the guidance of Baker Botts,
the Company reformed its corporate governance, dramatically improved its operations, and
substantially reduced its liabilities.

23.     Baker Botts' expert, retired bankruptcy lawyer Paul Wickes, explained that he is
"not aware of a case in which the ultimate result was so much better than what would have been
expected at commencement." The Court agrees. ASARCO's bankruptcy is truly a rags-to-riches
story.

## B. Synopsis of Services Performed by Baker Botts During the Application Period

24.     Although the Court will not attempt to describe all the tasks Baker Botts

---

[9] The Debtors entered bankruptcy with over $10 billion of asserted historical debts. They exited bankruptcy under a confirmed full-payment plan of reorganization with no historical debts other than a one-year $280 million note to a section 524(g) asbestos trust, $200 million of which Reorganized ASARCO prepaid in the first quarter of 2010. Baker Botts Exhibit 71, Grupo Mexico First Quarter 2010 Results, at 5.

performed during these cases, the Court nonetheless finds it appropriate to highlight some of the significant services that Baker Botts performed during these cases and the extraordinary results achieved in this case.

25.     The Baker Botts Fee Application contains a detailed narrative summary of the tasks Baker Botts performed for the Debtors, organized by task code.   These tasks were further described by Baker Botts' witnesses.   The Court finds that the witnesses that Baker Botts presented at trial were credible, and the Court gives significant weight to their testimony.

26.     In the first four months of these bankruptcy cases ASARCO fought its way through a free-fall and precipitous bankruptcy filing, a perilous financial situation, a labor strike, and the perception that the Company was being managed for the benefit of Grupo Mexico rather than in the best interests of the estates. With the advice and assistance of Baker Botts, ASARCO avoided liquidation, and instead laid the ground work for a successful reorganization.

27.     Baker Botts successfully negotiated and documented the debtor-in-possession financing notwithstanding the labor strike and the fact that the Company had experienced severe financial distress for several years.

28.     On October 15, 2005, after negotiations among the Debtors, lenders, and creditor constituents, the Debtors moved for and obtained court approval, on an interim basis, of a debtor-in-possession facility for up to $20 million provided by CIT.[10]   The Court finds that Baker Botts' work in negotiating the debtor-in-possession financing provided a tangible benefit to the estate.

29.     With the Court's guidance and the concurrence of Mr. Ruiz—who at that time was ASARCO's only director— Baker Botts negotiated an interim agreement with the USW,

---

[10] *Interim Order Authorizing Post-Petition Financing, Granting Senior Liens and Priority Administrative Expense Status, and Modifying the Automatic Stay*, Dkt. No. 648.   This Court approved the financing on a final basis on December 15, 2005.   *Final Order Authorizing Post-Petition Financing, Granting Senior Liens and Priority Administrative Expense Status, and Modifying the Automatic Stay*, Dkt. No. 1224.

which put ASARCO's employees back to work.

30.     On December 9, 2005, Baker Botts obtained a Court order mandating the appointment of two independent directors. Ultimately Edward R. Caine and H. Malcolm Lovett, Jr. were appointed to serve as independent directors.

31.     In sum, Baker Botts played an important role in the Debtors' resolution of the major obstacles facing them during the first four months of these cases. Baker Botts assisted ASARCO in retaining a financial advisor, obtaining debtor-in-possession financing, settling the strike, and resolving the Company's corporate governance issues.

### 1. Obtaining a $6 Billion Judgment Against AMC

32.     The pivotal event in these cases was Baker Botts' successful prosecution of an action to recover ASARCO's crown jewel—its controlling ownership interest in SCC. When AMC directed ASARCO to transfer the SCC shares to AMC in March 2003, ASARCO was in financial distress and the transfer added insurmountable momentum to ASARCO's spiral into bankruptcy. By the time the SCC lawsuit (the "SCC Litigation") went to trial in May 2008, the stock and dividends Baker Botts fought to recover from AMC were worth more than $10 billion.

33.     Through its creativity, tenacity, and legal talent, Baker Botts was able quickly and efficiently to prosecute the SCC Litigation, prevail at trial, and obtain and secure a judgment ordering AMC to return to ASARCO stock, dividends, and interest valued in excess of $6 billion at the time of the judgment. The Court finds that the results obtained by Baker Botts in the SCC Litigation are rare and extraordinary and unquestionably provided a tangible and material benefit to the estates. The Court further finds that the extraordinary results achieved by Baker Botts were due to Baker Botts' performance and not to inferior performance by opposing counsel, unanticipated defense concessions, unexpectedly favorable rulings, a sympathetic fact-finder, or

simple luck. The Baker Botts trial team won the SCC Litigation by deciphering millions of pages of documents and using those documents to tell a compelling story primarily out of the mouths of adverse witnesses at depositions and in the courtroom. The SCC Litigation is described in detail in the District Court's opinions.[11]

34.     On April 1, 2009, the District Court issued its opinion on damages.[12] The opinion was later amended on April 14, 2009, to correct a clerical error. The District Court ordered AMC to return to ASARCO stock worth approximately $5.48 billion at that time. The District Court also ordered AMC to pay ASARCO money damages of approximately $1.38 billion. The monetary award was comprised of dividends AMC received on the SCC shares of $1.94 billion and prejudgment interest on those dividends of $329 million, less the $747 million that AMC paid for the SCC shares, together with interest on that payment of $164 million.

35.     The District Court issued its Final Judgment on April 15, 2009, implementing its liability and damages opinions (the "SCC Judgment"). The SCC Judgment obtained by Baker Botts most likely is the largest fraudulent transfer verdict in United States history. Mr. Wickes testified that, based on his experience, "the results obtained in the SCC case are nothing short of remarkable." Reorganized ASARCO's Senior Associate General Counsel Ruth Kern, who testified at the final hearing on the Fee Application on behalf of Reorganized ASARCO, admitted that a $6 billion judgment is a rare result. Reorganized ASARCO's expert witness, Mr. Meckler, similarly testified that the SCC Litigation was "rare" and "extraordinary."[13] The Court agrees. The results achieved by Baker Botts in the SCC Litigation are, without question, rare

---

[11] See generally *ASARCO LLC v. Americas Mining Corp.*, 382 B.R. 49 (S.D. Tex. 2007); *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278 (S.D. Tex. 2008); *ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150 (S.D. Tex. 2009); *ASARCO LLC v. Americas Mining Corp.*, No. 1:07-CV-00018, 2009 WL 2168778 (S.D. Tex. July 20, 2009).
[12] *Amended Report and Recommendation*, ¶ 50.
[13] Reorganized ASARCO's expert on fee enhancement, Judge Monroe, does not contest this. Judge Monroe testified that he was not offering an opinion as to whether the result of the SCC Litigation, or Baker Botts' work on these cases as a whole, were rare and exceptional.

and extraordinary measured by any possible standard.

36.     The Court finds that, as a result of Baker Botts' efforts before, during, and after the trial in the SCC Litigation, ASARCO's creditors and the bankruptcy estates received perhaps the greatest benefit of these bankruptcy cases in at least two respects.  First, the prospect of the return of billions of dollars of value to the estates promised a far more meaningful recovery for creditors than originally anticipated.  In fact, this Court found that, given that ASARCO's enterprise value was between $950 million and $1.25 billion at the time of the confirmation hearing in August 2009, the Parent ultimately paid "in excess of $1 billion . . . for the release [of the SCC Judgment]."[14]  The Court reaffirms and reiterates that finding.

37.     The Court finds that the initiation of the SCC Litigation, the pursuit of the SCC Judgment, and the SCC Judgment itself brought tangible and material benefit to the estates.

### 2. Recovering the South Mill at ASARCO's Mission Mine

38.     Baker Botts also was instrumental in obtaining the return of what became one of ASARCO's important operating assets: the South Mill.

39.     The South Mill is one of two mills at ASARCO's Mission Mine in Sahuarita, Pima County, Arizona.  The other mill is the Mission North Mill.  The South Mill is a wholly functional, fully engineered mill in excellent condition for its intended use.  ASARCO had spent $40 million in capital improvements to the mill in 1990 and 1991 to expand its milling capacity to 20,000 tons of ore per day.   ASARCO operated the South Mill successfully from 1991 to 2001 in a copper price environment of $0.74 to $1.36 per pound (from 1992 to 2001), but took it out of production when copper prices dropped to $0.65 per pound as of December 31, 2001.

40.     Strapped for cash, on July 19, 2005—just three weeks before the bankruptcy

---

[14] *Amended Report and Recommendation,* ¶ 193; *see also* Hr'g Tr. 188:20–189:14, June 1, 2010 (J. Lazalde) (admitting that ASARCO was worth around $1 billion in July 2009 and that the Parent paid in excess of $2.4 billion for the Company).

filing—ASARCO closed the sale of the South Mill and related equipment, parts, and supplies to Mineral Park. The total sales price was $6 million.

41.     The decision to sell the South Mill to Mineral Park was directed by the Parent. Before agreeing to sell the South Mill to Mineral Park, ASARCO conducted no analysis of what the South Mill was worth to ASARCO's ongoing business or how the South Mill could increase ASARCO's cash flow if brought back into production.

42.     In September 2006, Mineral Park started dismantling the South Mill. Baker Botts quickly investigated the matter and filed a lawsuit on September 21, 2006, to avoid the sale of the South Mill as a fraudulent transfer and to enjoin further dismantling of the mill.[15]

43.     Baker Botts sought and obtained from this Court a temporary restraining order and, after a hearing, a preliminary injunction.

44.     The key issue in the case was whether Mineral Park had paid reasonably equivalent value for the South Mill at the time of sale. That question turned on whether the income approach could be used to value an asset that was not in operation—a matter of first impression.

45.     Baker Botts' successfully defended the injunction in an appeal to the District Court.[16] Shortly thereafter, a settlement was reached and ASARCO retained the South Mill.

46.     As a consequence of Baker Botts' efforts, ASARCO avoided spending $40 to $50 million to rebuild the South Mill, and ASARCO was able to retain an income-generating asset that increased revenues and profits for ASARCO. The restarting of the South Mill also lowered the cost per pound of production at the Mission Mine, the Hayden Smelter, and the Amarillo refinery, thereby increasing ASARCO's profitability.

---

[15] *See ASARCO's Complaint*, Adv. No. 06-02069, Dkt. No. 1.
[16] *Order Affirming Bankruptcy Court Order Granting Preliminary Injunction Dated February 5, 2007*, Case No. 2:06-cv-524, Dkt. No. 21.

### 3. Recovering Millions of Dollars of Tax Attributes

47.    These cases involved some of the most complex and contentious tax issues of any

bankruptcy case in this Court's experience.  Despite this, Baker Botts effectively prosecuted a

complicated tax adversary proceeding against the Parent, the result of which led to creditors

receiving the benefit of an approximately $60 million tax refund.

### 4. Reducing the Liabilities of the Estates

48.    The Court finds that Baker Botts' approach to these cases as a structured, court-

supervised negotiation, rather than a platform for protracted litigation of the countless issues that

can arise in any bankruptcy case, contributed substantially to the successful results obtained. As

Debtors' counsel, Baker Botts was generally successful in developing a consensus among the

key creditor constituents to support the Debtors' business or legal strategy.  Baker Botts kept

constituents informed of the Debtors' intended course of conduct, solicited creditor input,

carefully considered their views, and then explained and provided, as appropriate, the analytical

underpinning of the Debtors' decisions.  There were many more hours spent at the negotiating

table than in court.

49.    Examples of consensus among the Debtors and their creditor constituents abound,

including the agreements reached regarding the debtor-in-possession financing, the approval of

the collective bargaining agreement, the plan sponsor selection process, and, finally, the

confirmation hearing itself at which there was overwhelming creditor support for the Debtors'

plan.  However, the best examples of successful negotiations among the Debtors and the creditor

constituents are the court-approved settlements of the Debtors' environmental, asbestos, toxic-

tort, and Mission Mine liabilities.  The Debtors' exposure to these claims was substantial and

would have taken decades and hundreds of millions of dollars in professional fees to resolve in

the tort system or in the context of an administrative proceeding (as was the case for the Mission

Mine liabilities).  Baker Botts developed and deployed innovative legal strategies that enabled the Debtors to settle over $10 billion of environmental, asbestos, toxic-tort, and Mission Mine claims in less than five years and on a cost-effective basis.  The Court finds that Baker Botts' efforts with respect to ASARCO's most significant liabilities, and the results achieved by the Firm, provided tangible benefit to the estate.  Baker Botts' work decreased ASARCO's liabilities and made the Company more desirable to potential buyers and ultimately more valuable to the Parent.

### 5. Resolving the Environmental Liabilities

50.    At the outset of these cases, ASARCO faced billions of dollars of environmental liabilities at approximately 100 sites in seventeen different states and six regions of the Environmental Protection Agency (the "EPA") involving many of the largest, oldest, and most complex Superfund sites in the country, including the two largest—Coeur d'Alene and Tri-States.  Because resolution of the environmental claims outside of bankruptcy would have taken many years and perhaps decades, Baker Botts recommended that the Debtors seek to estimate them under section 502(c) of the Bankruptcy Code.  However, only a handful of bankruptcy courts had actually estimated environmental claims prior to these cases, and none had undertaken estimation of environmental liabilities on such a large scale.  The number and amounts of the claims, the large number of diverse sites, and the plethora of difficult issues posed a daunting challenge.

51.    Baker Botts' accomplishments in the environmental aspect of the bankruptcy were outstanding.  ASARCO faced staggering claims for billions of dollars of alleged environmental harm substantiated by credible experts, many of whom had spent decades or their entire careers studying the disputed sites.  For each site, Baker Botts faced a shifting array of

interests and demands from various governments, potentially responsible parties ("PRPs"), and constituencies. To resolve these claims in a timely manner—thereby allowing the Company to promptly reorganize—Baker Botts negotiated a creative case management order (the "CMO") that provided for the estimation of approximately $6 billion of claims at twenty-one sites, involved dozens of parties, and required those estimation proceedings to be conducted and concluded in an expedited time frame. Baker Botts then executed the tasks contemplated by the CMO by assigning teams of highly proficient bankruptcy and environmental lawyers to each of the sites and requiring these teams, as well the other parties to the estimation proceedings, to meet the demanding schedule for discovery, third-party mediation, and actual estimation hearings, all as contemplated by the CMO. Baker Botts settled or tried all claims at the sites covered by the CMO within the timeframe allowed. Ultimately, Baker Botts managed to craft a "global environmental settlement" that resolved billions of dollars of environmental liabilities. And the Firm did it in a demanding, compressed time frame.

52.     The Court finds that the global environmental settlement was of substantial material benefit to the estates, and that Baker Botts' superior performance in obtaining the settlement and gaining the Court's approval of the same provided a tangible benefit to the estates.

### 6. Implementing the Global Environmental Settlement

53.     Another excellent feature of Baker Botts' work was addressing the difficulties inherent in the large numbers of property transactions that underpinned the settlement agreements and trusts that were necessary for the global environmental settlement.

54.     Baker Botts established custodial trusts that resolved ASARCO's liabilities at the properties to be transferred to the trusts. Baker Botts again faced numerous legal and logistical

challenges in the transfer of these properties. Included in these challenges was incorporating twenty-seven designated properties, located in fourteen states, each with different legal obligations and liabilities to be addressed.

55.     There were several months of negotiations with the federal and state agencies aimed at releasing ASARCO from these liabilities and establishing the terms and funding for custodial trusts. Ultimately, the Baker Botts team reached a deal with the governments to release ASARCO of the liabilities at these certain properties in exchange for funding a trust that would take ownership of the properties.

### 7. Resolving the Asbestos Liabilities

56.     Another significant factor contributing to the Debtors' need to reorganize was their exposure to asbestos liability. Before their bankruptcy filings, approximately 195,600 asbestos claims had been filed against ASARCO or its subsidiaries. While about half of these claims had been settled, the Company was still facing 20,000 claimants with unfunded settlements and about 67,000 pending claims.

57.     Resolution of the Debtors' asbestos liability was a critical path to their exit from bankruptcy. Without this resolution and a section 524(g) channeling injunction, the Debtors faced the prospect of litigating thousands of prepetition asbestos claims and an unknown number of future claims in jury trials across the nation, and proving feasibility of any plan of reorganization would have been a significant challenge for any plan proponent.

58.     The task of resolving the asbestos claims and future demands was not an easy one, but, drawing on its previous experience with asbestos and bankruptcy matters, Baker Botts developed creative strategies for addressing these claims and demands and successfully assisted the Company in resolving its alleged asbestos liability in a timely and cost-effective manner.

Among the creative strategies that Baker Botts developed was an innovative asbestos bar date process to obtain detailed claims information without expensive and prolonged discovery. The process facilitated direct communications among the experts and consultants for the major constituencies and provided the factual basis from which substantive negotiations could proceed.

59.    In large part due to the efforts of Baker Botts, the Debtors were able to settle all asbestos claims and demands for a present value of $912.3 million under the Parent's plan— almost $1.2 billion less than the asbestos claimants' experts' estimate of the Subsidiary Debtors' asbestos liability alone. The Court finds that the services that Baker Botts performed with respect to the Debtors' alleged asbestos liabilities were excellent, allowed the Debtors to emerge from bankruptcy free from all asbestos liabilities in a timely and cost-effective manner, and provided a tangible and material benefit to the estates.

### 8. Resolving the Toxic-Tort Liabilities

60.    In addition to its staggering environmental and asbestos liability exposure, ASARCO was burdened by 1,380 toxic-tort claims in the aggregate amount of $1.47 billion, excluding claims filed in an undetermined amount. Further complicating matters was the problem that individuals asserting such claims suffered from serious diseases and health impairments (*e.g.*, children exposed to lead and arsenic). Despite these obstacles, Baker Botts encouraged claimants to settle rather than to litigate. With the assistance of Baker Botts, ASARCO successfully settled substantially all of the toxic-tort claims for approximately $35 million—an outcome that, at the beginning of these cases, seemed impossible. By the commencement of the confirmation hearing, all but two of the remaining claims were either settled or disallowed. The Court finds that Baker Botts demonstrated excellent wisdom and skill in negotiating these settlements, without which the Company undoubtedly would have incurred

significant costs and expended valuable resources in litigation with no assurance of success.

61.     The Court finds that Baker Botts' work on the Debtors' toxic-tort claims was a successful and efficient resolution of complex personal injury claims that otherwise would have taken years, if not decades, to resolve in the tort system at a significantly greater cost to the Debtors and their estates.  Baker Botts' services with respect to toxic-tort claims provided tangible and material benefit to the estates.

### 9. Resolving the Mission Mine Liabilities

62.     Central to ASARCO's ability to emerge from chapter 11 as a viable mining company was the Company's ability to continue mining copper at its Mission Mine.  After hard-fought negotiations complicated by distrust for the Company and Grupo Mexico, Baker Botts successfully resolved the claims relating to the Mission Mine for only $30 million in contrast to the estimates of the claimants of between $69 million and $1 billion, and ASARCO was permitted to continue mining copper at its Mission Mine.

63.     The Court finds that the Mission Mine Settlement provided tangible and material benefit to the estates.

### 10. Resolving Labor and Employee Benefit Issues

64.     From the beginning of these cases until their conclusion, ASARCO has had a troubled relationship with its workforce and labor unions.  Baker Botts played a significant role in repairing this severed relationship when it assisted the Company in negotiating a new collective bargaining agreement with the unions and resolving problems that had arisen in connection with employee benefit plans and pensions.  In 2006, Baker Botts worked closely with ASARCO's new President and Chief Executive Officer, Joseph Lapinsky, as he negotiated with the labor representatives on the terms of a definitive collective bargaining agreement.  ASARCO, again with the assistance of Baker Botts, also addressed settlement of the retiree medical class

action suit filed in the United States District Court for the District of Arizona. The collective bargaining agreement that Baker Botts helped to bring about "was critical to a successful reorganization and assisted in the Debtor[s] being in position to generate $1.4 billion in cash that ma[de] both the Debtor's Plan and the Parent's Plan possible."[17]

65.    In addition to the labor strike, ASARCO, under the control of the Parent, had also allowed many of the employee benefit plans to languish to the point that many of them no longer complied with applicable law and ran the substantial risk of being terminated. Baker Botts' efforts were crucial to getting these issues resolved and the plans back into compliance because ASARCO otherwise lacked the resources, personnel, or expertise to do so independently.

66.    ASARCO also had to address issues regarding the adequate funding of its pension plans during the course of these cases, which Baker Botts expended significant time and energy in addressing on ASARCO's behalf.

67.    The Court finds that Baker Botts' efforts with respect to labor, employee benefits, and pension matters contributed to the stable workforce that enabled ASARCO to generate approximately $1.4 billion in cash, which ultimately was distributed to creditors under the Parent's plan. The Court finds that Baker Botts' superior performance with respect to labor and employee benefits and pension issues provided tangible and material benefit to the estates.

**11. Creating Competition for the Assets of the Estates**

68.    Throughout these cases, Baker Botts encouraged ASARCO to adopt a strategy of creating a competitive environment for the control of the Company's assets to maximize the value of the estates and the return to creditors. Competition was necessary to encourage the Parent to put forth a full-payment plan. The benefits of competition accrued to the estates by providing more and better creditor options, maximizing the value of the Debtors' estates, and

---

[17] *Amended Report and Recommendation,* ¶ 15.

presenting for confirmation two confirmable full-payment plans.

69.     The Court finds that Baker Botts' efforts to create competition for the assets of the estates were outstanding and provided tangible and material benefit to the estates.

**12. Securing Sterlite as the Plan Sponsor**

70.     Baker Botts worked closely and effectively with ASARCO and Lehman Brothers to develop and implement an auction process that resulted in the selection of a plan sponsor that vigorously competed with the Parent. By securing Sterlite as a plan sponsor and later encouraging ASARCO to both evaluate alternatives to a Sterlite-sponsored plan and to keep Sterlite engaged in the auction process, Baker Botts provided a tangible and material benefit to the estates.

71.     On March 6, 2009, the Debtors entered into a new purchase and sale agreement with Sterlite. Pursuant to the terms of the New Sterlite PSA, Sterlite would obtain a release from ASARCO's breach of contract claim against it only if Sterlite successfully purchased the Company. Because the Parent's plan was ultimately confirmed, ASARCO delivered to the Parent at closing a $50 million deposit and the breach of contract claim against Sterlite—a claim Reorganized ASARCO is now pursuing.

72.     The renegotiated contract with Sterlite and the threat of the litigation against it if it did not win the Company kept Sterlite competing with the Parent, contributed to the competitive bidding process at confirmation and ultimately to two full-payment plans.

**13. Maintaining Competition During Plan Confirmation**

73.     This Court previously noted the effect of competition on the Parent when it explained that, "[t]hroughout this case, the Parent has proposed and withdrawn many plans. On numerous occasions, attorneys for the Parent suggested that the Parent would propose a full

payment plan. However, the history of this case demonstrates that all of the Parent's plans were proposed in reaction to other plans, tactically designed to regain control of the Debtor during this case or as an effort to limit liability in the SCC Litigation."[18]

74.     Baker Botts analyzed the numerous changes to the Parent's plan and evolving deal terms, conducted necessary discovery at an accelerated pace before and during confirmation. Baker Botts identified and forced the Parent to close loopholes and walk-away rights and to solidify its funding and escrow agreement as part of a competitive bidding process.

75.     Throughout the confirmation hearing, Baker Botts continued to negotiate with Sterlite to improve the Debtors' plan, and four amendments to the plan were filed during the course of the confirmation hearing. The Debtors' improvement to their plan pressured the Parent to improve its plan, resulting in six plan amendments from the Parent after the commencement of the confirmation hearing.

76.     The Debtors' plan on which the creditors voted provided for a distribution to creditors of $1.1 billion cash, a $770 million nine-year, non-interest-bearing note, and litigation trust interests in the SCC Judgment. The Parent's plan on which creditors voted proposed a $1.4625 billion cash distribution plus an additional $280 million note to the asbestos trust. Baker Botts encouraged Sterlite to increase the cash consideration and to monetize the non-cash consideration under the Debtors' plan such as the SCC Litigation trust interests. By the end of confirmation, Sterlite had contractually agreed to buy the interests in the SCC Litigation Trust that would otherwise have been distributed to creditors under the Debtors' plan for a total of $1.1515 billion. In response to this competitive pressure, the Parent increased its cash consideration and improved the terms of its plan by way of six amendments. However, creditors

---

[18] *Amended Report and Recommendation*, at 5.

voted overwhelmingly in favor of the Debtors' plan.[19]

77.     By the conclusion of the confirmation hearing, the Debtors' plan provided for $2.272 billion cash in aggregate consideration (subject to additional contributions if necessary for claims to be paid in full), and the Parent's plan proposed $2.4801 billion cash in aggregate consideration (subject to the return of cash in excess of the amount necessary for claims to be paid in full).

78.     This Court entered its report and recommendation in favor of the Parent's plan on August 31, 2009.  Sterlite offered to improve its offer under the New Sterlite PSA, thereby improving the Debtors' plan.  Because Sterlite's presence in these cases had always incentivized the Parent, Barclays recommended that the Debtors keep Sterlite as an available alternative. Sterlite agreed to waive its right to terminate the New Sterlite PSA (Sterlite had a termination right if this Court failed to recommend the Debtors' plan for confirmation), and to allow the Debtors to prepare for a closing with the Parent, but only if the Debtors objected to the report and recommendation.

79.     The Court finds that it was reasonable for the Debtors and its advisors to believe that copper price volatility could impede financing under the Parent's plan.  It also was reasonable for them to believe that the Parent might have devised a strategy before closing if it became necessary or desirable for the Parent to avoid or delay a closing.  After careful consideration and deliberation, the Board decided to object to the report and recommendation on certain limited discrete issues, provided Sterlite would stipulate that the Company and its advisors could and would prepare for a prompt closing of the Parent's plan if and when confirmed.

---

[19] *Amended Report and Recommendation*, at 7.

80.     The District Court entered its confirmation order in favor of the Parent's plan on November 13, 2009. The Debtors, aided by Baker Botts, worked diligently and professionally to prepare for a prompt closing of the Parent's plan. Copper prices held, the Parent obtained its financing, the plan closed on December 9, 2009, and the creditors were paid in full.

81.     The Court finds that Baker Botts' efforts before and during confirmation not only benefitted the Debtors and their creditors but the Parent and Grupo Mexico as well. Not only did Grupo Mexico retain its indirect ownership of ASARCO, but it received a company cleansed of its liabilities and well positioned to compete in the world of commerce. At closing, ASARCO received the benefit of the $50 million Sterlite deposit, a breach of contract claim against Sterlite that it is pursuing, and a refund from the Plan Administrator of approximately $70 million. Grupo Mexico has advertised the benefits it has received from the ASARCO bankruptcy and reorganization. Baker Botts Exhibits 70 and 71 are Grupo Mexico's Fourth Quarter Results 2009 and First Quarter Results 2010 that are published on its website (http://www.gmexico.com/financial/en-fi00.asp). Extracts from those reports follow:

- The restructuring of Asarco was successfully concluded in December, consolidating once again as a subsidiary of [Grupo Mexico] completely free of any environmental and asbestos related contingencies and liabilities. With the integration of Asarco, [Grupo Mexico] positions itself as the number one company in copper reserves worldwide . . . and reaffirms its position as one of the main producers of mined and refined copper.

- Asarco contributed US$1.357 billion from its own cash and made payment to its creditors for an aggregate cash consideration of US$3.562 billion.

- Tax Benefits of US$1.024 billion. [Grupo Mexico's] investment in the reorganization of Asarco generated a fiscal benefit of US$1.024 billion to be realized in the following quarters. Taking this benefit into account, the net transaction cost was US$1,181 million. At the average copper price of US$3.25 per pound estimated by analysts for 2010, Asarco will generate an EBITDA of approximately US$550 million in 2010, implying for the transaction a very attractive valuation of 2.1 times EBITDA.

- Consolidated sales for 1Q10 were US$1.933 billion compared to US$851 million for 1Q09, an increase of 127% mainly due to greater production by the Mining Division through the recovery of Asarco and higher metal prices.

82.     Grupo Mexico's overall net cash position has significantly improved following the ASARCO acquisition, allowing Grupo Mexico to prepay its debt and reward its stockholders with at least two cash dividends. During the first quarter of 2010, "prepayments were made on the AMC loan and the ASARCO note for a total of US$500 million." Additionally, "[o]n January 29, 2010, the Board of Directors approved a dividend payment of $0.14 pesos per outstanding share," which equates to a total dividend of $83,594,131.[20] "On April 23, 2010, the Board of Directors approved a dividend payment in cash of $0.17 pesos per outstanding share," which equates to a total dividend of $108,599,660.[21] The Court finds that Grupo Mexico benefitted from the superior performance of Baker Botts in representing ASARCO in these cases.

### III.  DISCUSSION

**A. Section 330 of the Bankruptcy Code**

83.     Section 330 of the Bankruptcy Code governs the award of fees and expenses for professionals retained under section 327 of the Bankruptcy Code. Section 330 of the Bankruptcy Code "authorizes compensation for services and reimbursement of expenses of officers of the estate," and "prescribes the standards on which the amount of compensation is to be determined."[22] Section 330 provides that a bankruptcy court, in its discretion, determines "the amount of reasonable compensation" for professionals retained under section 327 of the

---

[20] This amount was calculated as of January 29, 2010, at which time there were 7,785,000,000 shares outstanding and the conversion factor was 0.0766989.
[21] This amount was calculated as of April 23, 2010, at which time there were 7,785,000,000 shares outstanding and the conversion factor was 0.082058.
[22] H.R. Rep. No. 95-595, at 329 (1977); *see also Chamberlain v. Kula (In re Kula)*, 213 B.R. 729, 736 (B.A.P. 8th Cir. 1997) ("Section 330 applies to all bankruptcy cases, including Chapter 11 cases.").

Bankruptcy Code.[23]

84.     Section 330 provides considerable guidance to bankruptcy courts in determining reasonable compensation. It provides:

> (3) In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and
>
> (E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.[24]

This list is non-exclusive.[25]

---

[23] 11 U.S.C. § 330(a)(3); *see In re Farah*, 141 B.R. 920, 923 (Bankr. W.D. Tex. 1992) ("Determining what constitutes reasonable compensation is soundly within the discretion of the bankruptcy court, primarily because the bankruptcy judge is in the best position to determine the reasonableness of a proposed fee.").

[24] 11 U.S.C. § 330(a)(3). Section 330(a)(3) was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act in 2005. The amendment to section 330(a)(3) is effective for all title 11 cases filed after October 17, 2005. The ASARCO bankruptcy case was filed prior to that date. The amendment to section 330(a)(3) added an additional statutory factor for courts to consider in determining reasonable compensation: with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field. 11 U.S.C. § 330(a)(3). Even if the amendment to section 330(a)(3) governed these cases, the Court concludes that Baker Botts has demonstrated skill and experience in the bankruptcy field. Baker Botts' proffers and the Court's first-hand experience presiding over these cases support this conclusion.

[25] *See Staiano v. Cain (In re Lan Assocs. XI, L.P.)*, 192 F.3d 109, 123 (3d Cir. 1999) ("[T]he factors set forth in § 330(a) are not exhaustive and . . . bankruptcy courts may consider relevant factors beyond those listed in the statute.").

**1. Application of the Statutory Factors Listed in Section 330 of the Bankruptcy Code**

**a. Time Spent on Services**

85.    Courts may determine the reasonable amount of time a professional should spend on a given project.[26]  In making such determination, the Court may take into account the complexity of the legal issues for which the services were performed.[27]  A fee applicant should also demonstrate good faith "billing judgment."[28]

86.    The Court finds that Baker Botts spent a total of 319,860.85 hours of professional time during the Application Period.

87.    Baker Botts firm policy requires timekeepers to record their hours contemporaneously with the work they perform, or as soon thereafter as reasonably possible, recognizing the vagaries and demands of the practice.  Baker Botts lawyers are to accurately describe the work performed, and record all of their time but "not a minute more."  The Court has no reason to doubt that any attorney who worked on these cases performed as efficiently and as diligently as he or she reasonably could under the circumstances.

88.    In terms of complexity and novel issues, few if any chapter 11 cases in United States history rival these cases.

89.    The amount of time that Baker Botts spent securing the SCC Judgment; developing the innovative auction of the SCC Judgment; addressing the Debtors' environmental, asbestos, and toxic-tort liability; addressing the Debtors' cash-flow deficiencies in the early stages of these cases; participating in the resolution of disputes between ASARCO and the labor unions and work on the Debtors' employee benefits issues; addressing ASARCO's corporate governance issues; identifying and securing Sterlite as the plan sponsor; seeking confirmation of

---

[26] *In re Wildman*, 72 B.R. 700, 713 (Bankr. N.D. Ill. 1987).
[27] *See Frazin v. Haynes & Boone LLP (In re Frazin)*, 413 B.R. 378, 424 (Bankr. N.D. Tex. 2009).
[28] *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

the Debtors' plans of reorganization and responding to other plan sponsors' plans of reorganizations; maintaining competition among the plan sponsors in these cases; and performing other services that counsel for debtors-in-possession routinely perform in chapter 11 cases was reasonable and fully compensable.

90.     The Court concludes that Baker Botts exercised good faith billing judgment during these cases, Baker Botts staffed these cases properly under the circumstances, the work was performed efficiently and consistent with high standards, and the time Baker Botts spent on the services it performed for the Debtors during the Application Period was reasonable and fully compensable.

### b. Rates Charged for Services

91.     Courts take a number of different factors into account when reviewing the rates charged by a fee applicant, including (1) the customary compensation charged by comparably skilled professionals;[29] (2) the novelty and complexity of the issues, the special skill and experience of counsel, the quality of the representation, the results obtained, and the superior performance of counsel;[30] (3) the lack of objection to the rate charged;[31] (4) the type of services performed;[32] (5) the bankruptcy court's own experience with the rates charged by other fee applicants;[33] and (6) whether the applicant charges more for bankruptcy services than for non-bankruptcy services.[34]   In addition, courts will analyze what the prevailing market rate is for

---

[29] *See, e.g., Pal Family Credit Co. v. County of Albany (In re Pal Family Credit Co., Inc.)*, 425 B.R. 1, 9 (N.D.N.Y. 2010); *see also In re Berg*, 05-39380, 2008 WL 2857959, at *5 (Bankr. E.D. Pa. July 21, 2008) (taking into account the experience and skill of the professionals in the case, the market cost for a professional with such experience and skill, and the applicant's normal billing rate).

[30] *In re Tan, Lie Hung & Mountain States Inv., LLC*, 413 B.R. 851, 862 n.23 (Bankr. D. Or. 2009).

[31] *In re Moss*, 320 B.R. 143, 157 (Bankr. E.D. Mich. 2005).

[32] *In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d 833, 849 (3rd Cir. 1994).

[33] *In re Allegheny Int'l, Inc.*, 139 B.R. 336, 339 (Bankr. W.D. Penn. 1992).

[34] *In re Fleming Cos., Inc.*, 304 B.R. 85, 92–93 (Bankr. D. Del. 2003).

similar work in connection with a lodestar analysis.[35]

92.     The Court concludes that consideration of the novelty and complexity of these cases, the results obtained, and the rates charged by comparably skilled attorneys in other large chapter 11 cases is more appropriate when determining the prevailing market rate under the lodestar analysis.

93.     The Court finds that no other firm could have achieved the results in these cases at the rates charged by Baker Botts. Baker Botts presented unrebutted evidence to support this finding. Baker Botts' expert, Paul Wickes, testified that Baker Botts was one of a select few law firms that could have achieved the results obtained in these cases. Mr. Wickes further testified that none of the other firms capable of achieving the results obtained in these cases would have been "prepared to take [these cases] for a blended hourly rate of anything close to the $354 per hour that Baker Botts has charged and would have instead insisted on a blended hourly rate more in the range of that charged by [the Parent's counsel] Milbank." Mr. Wickes even admitted that his former firm, Linklaters, would not have been able to handle these cases. Mr. Kinzie testified that while there might be a handful of firms that could have represented ASARCO successfully, it is unlikely any of those firms could have done so for less than $200 million. The Court agrees.

### c. Baker Botts' Hourly Rates

94.     For the period 2005 through 2009, Baker Botts billed ASARCO at the standard rates that Baker Botts had in place for each of those years. The rates that Baker Botts charged to ASARCO are the same or lower than they would have been in a non-bankruptcy matter of similar size and complexity.

95.     The standard rates that Baker Botts charged during these cases are generally lower than those charged by Baker Botts' competitors. Baker Botts sets its standard rates at the lower

---

[35] See, e.g., In re Atwell, 148 B.R. 483, 489 (Bankr. W.D. Ky. 1993).