# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

**ENTERED**
**07/20/2011**

| | | |
|---|---|---|
| In re:  ASARCO LLC, *et al.*, | § | **Case No.  05-21207** |
| | § | **Chapter 11** |
| | § | |
| Debtors. | § | **(Jointly Administered)** |

---

## MEMORANDUM OPINION ON FINAL FEE APPLICATION OF
## JORDAN, HYDEN, WOMBLE, CULBRETH & HOLZER, P.C.

On this day came on for consideration the Final Fee Application of Jordan, Hyden, Womble, Culbreth & Holzer, P.C. (herein "**Applicant**" or "**Jordan Hyden**") as former bankruptcy attorneys to ASARCO LLC and its Asbestos Subsidiaries as Debtors and Debtors-In-Possession in the above-entitled jointly administered bankruptcy proceeding (hereinafter "**Asarco**," or "**Debtor**"). The Court, having heard the evidence and arguments of counsel, makes the following findings of fact and conclusions of law. These findings concern

> a. [Doc # 13871] Fifteenth and Final Application for Approval of Attorney's Fees and Expenses Incurred as Debtors' Counsel in Asbestos Subsidiary Cases; and
>
> b. [Doc # 13917] Fourteenth And Final Application Of Jordan, Hyden, Womble, Culbreth & Holzer, P. C.  For Approval Of Attorney's Fees And Expenses Incurred As Bankruptcy Counsel For ASARCO LLC And Request For Award Of Enhanced Fee.
>
> c. [Doc # 15156]  Motion to Clarify Fourteenth and Final Application of Jordan, Hyden, Womble, Culbreth & Holzer, PC For Approval of Attorney's Fees and Expenses Incurred as Bankruptcy Counsel For ASARCO LLC and Request for Award of Enhanced Fee

Notwithstanding that no objections were made to any of the Final Fee Applications of Jordan, Hyden, except with respect to the increased or enhanced fee, the Court recognizes its duty to review the Final Fee Applications pursuant to  11 U.S.C. § 330 and the standards discussed herein.

1.      Asarco filed its Voluntary Petition under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq., on August 9, 2005, which was several months after the Asbestos Subsidiaries filed their Chapter 11 proceedings in this Court.

2.      Jordan Hyden was sole bankruptcy counsel to the Asbestos Subsidiaries and was co-bankruptcy counsel for Debtor Asarco, and seeks final allowance of compensation for professional services rendered and reimbursement of out-of-pocket expenses incurred by Jordan Hyden in representation of the Subsidiary Debtors and Asarco the Debtor for the period of April 11, 2005 through December 9, 2009 (hereinafter the "**Application Period**").

3.      Jordan Hyden further seeks a fee enhancement of twenty percent (20%) of all lodestar fees awarded as counsel for Asarco and as counsel for the Asbestos Subsidiaries.  Based on total lodestar fees requested of $7,009,305.05, the enhancement sought is an additional $1,401,861.00.

4.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

## I. BACKGROUND

**A.      Qualifications of Jordan Hyden's Attorneys**

1.      Jordan Hyden's lead counsel Shelby A. Jordan is a highly qualified and well recognized bankruptcy attorney, having begun representation of Debtors in Chapter X and Chapter XI cases in 1974, and since then representing well over one hundred successfully

reorganized Chapter 11 Debtors.  He obtained Board Certification in Business Bankruptcy Law by the State Bar of Texas in 1988, the first year certification was offered, and was certified by the American Bankruptcy Institute in Business Bankruptcy in 1992, also from the first year such certification was offered.  He is professionally rated "AV" by Martindale Hubble since 1979 and his practice has primarily involved business litigation and business reorganizations.  He is a frequent speaker on bankruptcy and business litigation topics and has written numerous articles and papers accompanying those talks, or published articles in legal periodicals and publications.

2.      He represented a number of large Chapter 11 Debtors in this Court including American Rice, TransAmerican Energy, TransTexas Gas, Pacific Lumber Company, as well as counseled or represented a wide range of lenders, asset acquirers, creditors, labor unions, committees, officers and directors, and debtor-affiliates in virtually every aspect of complex Chapter 11 cases.

**B.      Overview of the Case and Summary Of Jordan Hyden's Work For Asarco And Its Subsidiaries**

3.      In June, 2004, Jordan Hyden was originally retained by two of the Asbestos Subsidiaries of ASARCO LLC ("Asarco") to represent their interest as counsel for a contemplated pre-pack bankruptcy.  Jordan Hyden subsequently was retained by all the Asbestos Subsidiaries in their Chapter 11 cases filed in April of 2005 and finally retained on behalf of Asarco in August, 2005.

4.      The Asbestos Subsidiaries were for the most part non-operating companies, with limited assets and overwhelming asbestos litigation and liability.  In addition to the asbestos litigation, insurance coverage litigation was pending by certain of the Asbestos Subsidiaries in Nueces County District Court, to determine insurance coverage for asbestos claims and defense of asbestos claims.  Asbestos litigation was also pending in the State of New York based on

allegations of alter ego, piercing the corporate veil, and similar arguments and allegations involving not only Asarco, but its up-stream owners including Americas Mining Corporation and Grupo Mexico (collectively herein the "Parent").

5.      These Asbestos Subsidiaries' Chapter 11 cases were commenced shortly after Jordan Hyden joined in the on-going discussions and negotiations headed and directed by Baker Botts, to begin to understand and deal with not only these Asbestos Subsidiary issues but also the potential impact upon Asarco.   Soon after the filing of the Asbestos Subsidiary cases, events began to accelerate that impacted adversely the parent of the Asbestos Subsidiary, Asarco, including mounting debt, diminishing cash flow, and ultimately a labor strike bringing operations to a crawl.

6.      On August 9, 2005, Asarco filed its Chapter 11 case and the Bankruptcy Court appointed Baker Botts and Jordan Hyden as co-counsel to Asarco.   The failing financial and management condition of Asarco worsened from the filing date and at times early-on appeared to be almost irreversible.  Not only was the labor union on strike, and senior management quitting, but also the equity interests owners of Asarco were competing for Asarco's own market share of copper sales worldwide,  competing for Asarco's equipment and access to its equipment, and for Asarco's key employees.  From the beginning of the bankruptcy case, Asarco found itself in a day-to-day struggle for its survival financially and operationally and in difficult circumstances with Asarco's owners.

7.      From the beginning of its representation of these Debtors, Mr. Jordan was involved in the overall planning and strategy with Baker Botts, and actively became involved in the representation at not only the top strategy level, but also in the day-to-day, often emergency, work that these exceptionally large Chapter 11 cases required.  As with any organized approach

to multiple billion dollar problems, a single coordinator and leader is required and Jack Kinzie of Baker Botts served in that role for advice to the client on planning and strategy and for implementing those strategies. Jordan Hyden has been involved as counsel and co-counsel for debtors in other large Chapter 11 cases involving many complex issues, often involving more complex financing structures, bond holders, and various levels of stockholders or other interest owners. However, these Chapter 11 cases were not only larger in size, but involved many unique issues in numerous respects, including foreign ownership and the unique perspective that foreign business practices brought to these cases.

8.      Beginning in 2006, after the change of corporate governance, Asarco's Parent took an active role in these Chapter 11 cases. That participation almost always took the form of criticism and objections to the Debtors' business judgment, to its lawyers' case handling, and the Debtors' approach to a successful reorganization

9.      Even in face of what began and continued to be wholly uncooperative ownership of Asarco, Debtors' counsel accomplished:  (i) settlement of the labor strike, (ii) return of millions of dollars in valuable operational assets, (iii)  settlement of the multi-billion-dollar environmental claims,  (iv) settlement of multi-billions-dollar asbestos and toxic tort claims,  (v) prosecution of core and non-core litigation including the multi-billion dollar judgment against the Asarco Parents, and ultimately,  (vi)  the confirmation of the Parent's Plan of Reorganization that:

    a.      paid all allowed claims 100%, together with both pre-petition and post-petition interest and, where authorized by law, all costs and attorneys' fees;

    b.      paid in full all costs and expenses of administration;

      c.     created and fully funded several going-forward environmental trusts to protect the public interest in those on-going environmental sites remaining at Confirmation;

      d.     refunded back to the Parent within days of the "Effective Date" of their Plan over $70,000,000.00 from their purchase price deposit;  and

      e.     returned to the Parent, in exchange for funding the 100% plan, the Debtor's ongoing enterprise with cash in excess of $1.4 billion, (and whose enterprise value was most likely equal to, or in excess of, the required plan funding purchase price) and a totally reorganized enterprise with a financially and operationally viable business.

## C.    The Retention of Jordan Hyden on Behalf of the Debtors

10.    The Court entered its Order granting the Asbestos Subsidiaries' application for approval of retention of Jordan Hyden on April 13, 2005.

11.    The Court entered its Order granting Asarco's application for approval of retention of Jordan Hyden on August 12, 2005.

12.    From the inception of these bankruptcy cases until the effective date, Jordan Hyden was sole bankruptcy counsel to the Asbestos Subsidiaries and co-counsel with Baker Botts to Asarco.

13.    Jordan Hyden sent separate invoices to the Asbestos Subsidiaries and to Asarco, and filed separate interim fee applications.

14.    By its two final fee applications Jordan Hyden requests final approval of fees of $7,009,305.05 for its representation of the Debtors, and a fee enhancement of twenty percent (20%) of that amount.

15.    Jordan Hyden also requests final approval of expenses incurred on behalf of both Debtors totaling $357,100.06.

**D.    The Jordan Hyden Loadstar Fees – Billing for Hours Spent and Out-of-Pocket Expenses**

16.    Jordan Hyden's hourly rates for its attorneys, paralegals, and law clerks were subject to periodic adjustment to reflect economic, experience and other factors, in accordance with its court-approved fee agreements with the Debtors.  At each occasion, those rates were below the national rates charged by national firms in representations such as this national-scope case.

17.    The cumulative blended rate for the attorneys of Jordan Hyden for the entire engagement was less than $400 per hour, and is below the national rates charged by national firms in representations such as this national-scope case.

18.    Jordan Hyden filed thirteen interim fee applications that were all approved and one final fee application for Asarco as follows:

| Application | Appl. Period | Order Date | Doc # | Fees | Expenses |
|---|---|---|---|---|---|
| First Interim | 8/5/05-11/19/05 | 12/15/05 | 1228 | $274,857.00 | $7,474.51 |
| Second Interim | 11/20/05-3/19/06 | 5/12/06 | 2177 | $281,739.00 | $9,236.95 |
| Third Interim | 3/20/06-7/19/06 | 9/1/06 | 2893 | $246,300.50 | $10,431.85 |
| Fourth Interim | 7/20/06-11/19/06 | 12/22/06 | 3481 | $492,290.00 | $17,126.85 |
| Fifth Interim | 11/20/06-4/19/07 | 5/21/07 | 4776 | $464,382.60 | $26,239.58 |
| Sixth Interim | 4/20/07-8/19/07 | 9/25/07 | 5938 | $450,831.50 | $23,853.65 |
| Seventh Interim | 8/20/07-12/19/07 | 1/29/08 | 6767 | $485,818.50 | $47,761.44 |
| Eighth Interim | 12/20/07-4/19/08 | 5/23/08 | 7873 | $580,224.50 | $36,403.42 |
| Ninth Interim | 4/20/08-8/19/08 | 9/23/08 | 9283 | $646,780.50 | $23,566.12 |
| Tenth Interim | 8/20/08-11/21/08 | 12/31/08 | 10215 | $552,919.50 | $19,646.49 |
| Eleventh Interim | 11/22/08-3/19/09 | 4/24/09 | 10986 | $462,099.50 | $10,968.58 |
| Twelfth Interim | 3/20/09-7/19/09 | 9/4/09 | 12795 | $884,056.50 | $39,014.85 |
| Thirteenth Interim | 7/20/09-11/18/09 | 12/11/09 | 13464 | $632,241.45 | $41,216.55 |
| Fourteenth FINAL | 11/19/09-12/9/09 | | | $75,405.00 | $3,757.05 |
| TOTALS | | | | $6,529,946.05 | $316,697.89 |

19.    Jordan Hyden filed fourteen interim fee applications that were all approved and one final fee application for the Asbestos Subsidiaries as follows:

| Application | Period | Order Date | Doc # | Fees | Expenses |
|---|---|---|---|---|---|
| First Interim | 4/11/05-7/19/05 | 9/9/05 | 303 | $122,256.00 | $28,211.89 |
| Second Interim | 7/20/05-11/19/05 | 12/15/05 | 1229 | $20,375.00 | $1,192.08 |
| Third Interim | 11/20/05-3/19/06 | 5/11/06 | 2162 | $5,056.50 | $83.58 |
| Fourth Interim | 3/20/06-7/19/06 | 9/1/06 | 2892 | $10,244.50 | $61.26 |
| Fifth Interim | 7/20/06-11/19/06 | 9/22/06 | 3482 | $27,227.50 | $512.54 |
| Sixth Interim | 11/20/06-4/19/07 | 5/24/07 | 4800 | $45,780.00 | $359.85 |
| Seventh Interim | 4/20/07-8/19/07 | 9/25/07 | 5938 | $18,962.50 | $676.50 |
| Eighth Interim | 8/20/07-12/19/07 | 1/29/08 | 6771 | $8,881.00 | $26.17 |
| Ninth Interim | 12/20/07-4/19/08 | 5/23/08 | 7875 | $50,810.00 | $14.45 |
| Tenth Interim | 4/20/08-8/19/08 | 9/26/08 | 9371 | $21,787.00 | $28.93 |
| Eleventh Interim | 8/20/08-11/21/08 | 12/31/08 | 10216 | $53,604.50 | $473.10 |
| Twelfth Interim | 11/22/08-3/19/09 | 4/24/09 | 10984 | $20,655.50 | $462.13 |
| Thirteenth Interim | 3/20/09-7/19/09 | 9/1/09 | 12756 | $49,024.00 | $8,269.29 |
| Fourteenth Interim | 7/20/09-11/18/09 | 12/11/09 | 13463 | $23,850.00 | $30.40 |
| Fifteenth FINAL | 11/19/09-12/9/09 | | | 845.00 | 0.00 |
| TOTALS | | | | $479,359.00 | $40,402.17 |

20.     Debtors retained Jordan Hyden in these Chapter 11 cases to provide legal work and counseling on all issues of bankruptcy and related litigation, including the following professional services:

(a)     Assistance to the Debtors in the counseling and professional advice regarding continued operation of their businesses and management of their property and duties and responsibilities as Debtors;

(b)     Assistance to the Debtors in preparing all schedules and statements required pursuant to Title 11 of the United States Code;

(c)     Assistance to the Debtors in preparing on behalf of the Debtors all necessary applications, notices, answers, adversaries, orders, reports and other legal papers regarding the Debtors' obligations and operations under Chapter 11;

(d)     Assistance to the Debtors in the negotiation of a Plan satisfactory to parties in interest, and to prepare a Disclosure Statement which will be submitted to parties in interest; and

(e)     Assistance to the Debtors in performing all other legal services for Debtors as may be necessary and appropriate to advise, instruct, assist or otherwise perform the duties of Debtors and Debtors in possession in a Chapter 11 case.

21.     All of Jordan Hyden's professional services provided to the Debtors fell within the scope of work that the Debtors retained Jordan Hyden to provide.   As to all such work and the Fees associated with such work or the expenses incurred for such work there has been no objection by any party to the allowance (other than several minor questions during the case interposed by the Debtors' staff or the United States Trustee, all of which were resolved to the satisfaction of the parties and, if such was requested, was previously deducted from the bill).

22.     Jordan Hyden, as co-counsel with Baker Botts, handed numerous matters related to Asarco's case, as well as the in reorganization cases of the Asbestos Subsidiaries.   Matters handled successfully during the overall course of the representation were testified to by Mr. Jordan at the hearing on the Application.   Summarizing, matters handled successfully during the overall course of the representation included all aspects of the cases, including dealings with environmental claims and objections, corporate governance, labor issues, asbestos and future claims treatment, litigation by and against the Debtor's Parent and affiliates, litigation against fraudulent transfer parties including recovery of the South Mill; plan drafting, interim fee applications, auction process and motions including auction of the judgment against the Debtor's Parent and affiliates; issues related to termination of the Sterlite PSA and LC draw, appeals and stays pending appeal, court status conferences, mediations and confirmation of the various

competing plans, closing and post closing matters including the Sterlite bids, the Parent's supplemental confirmation order, administrative claim and fee claim issues including enhancement, Halcyon motion for substantial contribution, flow of funds matters and two related hearings, management bonus motion, and various transition matters. This is of course not a comprehensive list of matters handled during this four-plus year engagement; greater detail can be found in the prior interim applications and the exhibits thereto and the docket sheet of these cases, all of which are part of the record in this matter, along with Jordan Hyden Trial Exhibits 2 – 16 and 18 – 31, and all the exhibits and testimony of lawyers from Baker Botts and others as was incorporated into the evidence on these motions by agreement of the Court and all the parties.

23.     All of Jordan Hyden's professional's services provided tangible, material benefits to the Debtors' estates, and were provided at rates below the rates charged by national firms handling the same or similar issues, litigation, and bankruptcy cases. The issues addressed in these reorganization cases were often novel and new to the law or the rules of procedure. The amount of work demanded by this case precluded the taking of any other significant Chapter 11 reorganization or any other significant client retention, and required significant staff overtime for which Jordan Hyden has not sought reimbursement in its Fee Applications.

24.     The fees sought in the Fee Applications satisfy the reasonableness standards set forth in 11 U.S.C. § 330(a) for compensation of professional persons. The relief requested in the Fee Applications is reasonable considering the nature, the extent, and the value of the services performed by Jordan Hyden, taking into account all relevant factors, including (a) the time spent on such services; (b) the rates charged for such services; (c) whether the services were necessary to the administration of, or beneficial at the time at which such service was rendered toward

completion of, the case; (d) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task to be addressed; (e) whether the professional persons seeking compensation were board certified or otherwise had demonstrated skill and experience in the bankruptcy field; and (f) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in non-bankruptcy cases. *See* 11 U.S.C. 330(a)(3)(A-F).

25.     The Fee Applications satisfy the additional factors for determining reasonableness of professionals' compensation enunciated in *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).

26.     In addition to the fees addressed in the two Fee Applications, from the Effective Date of the Plan thru the date of the hearing, Jordan Hyden incurred fees and expenses totaling $15,035.74, in prosecution of its hourly rate fees, as shown in Jordan Hyden Trial Exhibits 32 – 38. Jordan Hyden has incurred but does not seek payment of any separate, additional fees in prosecution of an enhancement to its fees, and does not seek enhancement of the $15,035.74 in post Effective Date fees. Thus, the total fees and expenses for which approval is sought are as follows:

| | |
|---|---|
| Hourly Fees | $7,009,305.05 |
| Enhancement | $1,401,861.00 |
| Expenses | $357,100.06 |
| Post Effective Date fees | $15,035.74 |
| TOTAL | $8,783,301.70 |

**E.      Description of Services Performed**

27.      Jordan Hyden's initial dealings with this case began through introductions by Baker Botts. After these initial discussions, originally aimed at a possible pre-packaged Chapter 11, it did not appear to suggest that reorganization, other than for pennies on the dollar to unsecured creditors, was likely. By August, 2005, a quick review of the current events disclosed the dire financial and operational condition of the Asarco group of entities, having  (i) had its most profitable and most valuable asset [the Southern Copper Corporation ("SCC")] wrongfully spun off to the Parent, and  (ii) many of its operations restricted by loss of equipment or physical plants needed to operate;  (iii) lost many key personnel; and (iv) greatly reduced cash. Even though the Parent had previously cannibalized the Debtor's assets, raised cash by selling off valuable assets at fire sale prices, fired key employees, and ran up millions of dollars in unpaid attorneys fees for the defense of asbestos cases, when Jordan Hyden's participation began, the Parent appeared intent on protecting its right to deal with or re-acquire (at liquidation value) the Debtor's assets.

28.      The initial representation by Jordan Hyden involved the non-operating Asbestos Subsidiaries. Many of the pre-filing facts were not known to Jordan Hyden initially, and became known only in the first several months of representation of Asarco while trying to understand the Parent's conduct and attitude toward this reorganization.[1]

**F.      The Emergency Circumstances of the Asarco Financial Condition**

29.      On August 9, 2005, Asarco faced an almost impossible reorganization. Asarco had more than 94 major environmental sites spread over in 21 states, 190,000+ asbestos claims (including hundreds of millions in settlement and defense costs), a general labor strike of its

---

[1]      Many of the details of these pre-filing events are detailed in Judge Hanen's opinions in the fraudulent transfer litigation. *See, e.g.* 396 B.R. 314 – 405.

1,500 unionized workers represented by the United Steel Workers, no DIP financing, and less than $10 million cash from the beginning the Parent's motion practice was almost entirely scheduled on an emergency basis. This emergency motion practice became the Parent's norm. The emergency nature of this motion practice caused substantial need for detailed coordination between Jordan Hyden and Baker Botts. On each occasion, timely responses were filed, timely hearings were scheduled and attended, and briefs were prepared and timely filed. This practice required many late night preparation sessions for Jordan Hyden lawyers and staff resulting in unreimbursed overtime and employee costs to Jordan Hyden.

30.     In November a creditor motion was filed to name a new Chief Executive Officer and threats accelerated for the appointment of a CRO or other governance changes. After several hearings and continued negotiations, the Debtors' counsel brokered a compromise arrangement that allowed for the appointment of two independent directors, and the retention of Mr. Ruiz, for a three-member functioning board. In fact, negotiations included the suggestion of a lawyer for the Parent, and of Malcolm Lovett as one of the independent board members. After more than a month of litigation and intense negotiations, the Court entered an agreed Corporate Governance Stipulation [Dkt. 1223]. Mr. Lovett and Mr. Ed Caine were appointed independent board members and the then-serving vice president and general counsel, Mr. McAllister, was appointed the CEO. This resolution avoided the potential risk of a Chapter 11 Trustee and should have ended the continued distraction of the governance litigation. Just as important, and at the recommendation of Debtors' counsel, various amendments were made to the Debtors' LLC Agreement that proved vital to the continuity of the independent board later when the Parent attempted on multiple occasions to re-take control of the Debtor's governance.

**G.     The Efficient and Strategic Operations of the DIP Reorganization Process:**

31.     The Chapter 11 Cases, once operations and DIP financing were stabilized, took several parallel paths all required to reach the goal of a confirmed Chapter 11 plan:

- The ongoing administrative tasks of accounting, claims handling, and the multiple core and non-core proceeding needed, including avoidance actions for the recovery of assets (in addition to the SCC Litigation).

- The resolution of the $9+ billion of Environmental Claims and Toxic Tort Claims.

- The resolution of the $2+ billion of Asbestos Claims.

- The resolution of the $7-$9 billion Fraudulent Transfer claims against the Parent for the return of the SCC assets.

- The resolution of the union issues, including the possibility of a new Collective Bargaining Agreement.

- The resolution of the Plan negotiation and confirmation process with a maximum return to creditors and the estate.

Even though these independent tasks required independent staffing of highly qualified and specialized lawyers, legal staff, and experts, none of these parallel paths could be done independent of the other.

- Jordan Hyden worked closely with Jack Kinzie of Baker Botts, and his team of partners and associates in working on the plan selection process, the Chapter 11 administrative issues, the asset recovery actions, and the union issues.

- Jordan Hyden worked closely with Tony Davis in implementing the procedures, and in the litigation and negotiations and eventual settlements of the environmental claims.  Jordan Hyden also acted independently of Baker Botts as trial counsel in the trial of the Omaha Lead Site estimation hearing and all

subsequent hearings involving the OLS including the Rule 9019 settlement hearing.

- Jordan Hyden worked closely with Catharina Haynes in dealing with and resolving numerous toxic tort claims.

- Jordan Hyden worked closely with the core and non-core Baker Botts lawyers (i.e., James Prince regarding return of the South Mill) in obtaining judgments or settlements for the maximizing of return of assets, or the protection of assets, for the benefit of the estate.

- Jordan Hyden also worked closely with all of the plan confirmation team through the end of the confirmation hearings.

## H.   The Success of Each Parallel Path

32.    The challenge, aside from dealing at every step with the Parent's interposed objections to almost all attempts to move the case forward, was to direct the somewhat independent tasks to the single goal of confirmation of a 100% plan.  Debtors' counsel, primarily Jack Kinzie, implemented a plan, program, and a strategy that brought each of the billion-dollar elements to a single, successful, resolution in a unique and remarkable manner, far exceeding the creditors' expectations.

### (i)    Environmental

33.    In brief, environmental required the development of a wholly new procedure – "banding"- to rationalize the core-proceeding "estimation" process dealing with the many multi-million dollar environmental sites involving multiple levels of governmental entities, and the incredible document intensive and fact intensive inquiries, as well as education of the Court on procedural matters having little or no rules or case precedent.   Debtors' counsel, lead by Tony

Davis with Baker Botts, initiated and ultimately set in place a procedure for pre-trial, discovery, mediation and trial schedule for the estimation of the environmental claims that would have resulted in Court orders or settlements in months instead of years even if all such claims had to be estimated to a final judgment. This incredible process required Debtors' counsel to prepare for multiple-tracked sites teams of environmental and bankruptcy lawyers toward mediation, trial or settlement of each site, yet coordinated such that overlapping legal issues, overlapping facts and experts, could be efficiently implemented. Jordan Hyden was directly and frequently involved in handling all aspects of the environmental claims including acting independent of Baker Botts as trial counsel for the Debtors' objection to the EPA Omaha Lead site $404 million claim (one of the three largest environmental sites and claims) and participating in many of the environmental planning and hearings resulting in the process ultimately approved by the Court through Rule 9019 settlements.    Ultimately the Debtors were successful in negotiating an overall settlement covering all of the significant environmental claims with both the EPA and the 21 states, an accomplishment without precedence.  The total settled claims approximated $1.6 billion, down from the in excess of $6 billion in filed claims initially in the case, and done so within one year of initiating the estimation process.   Additionally the Debtors' counsel resolved the PRP claims through litigation and settlements ultimately approved by the Court.

(ii)    <b>Asbestos Alter Ego Claims</b>

34.    As a result of Jordan Hyden's recommendation and the decision by the Asbestos Subsidiary board to allow the Asbestos Committee and FCR to prosecute all claims of its alter ego, piercing the veil or other actions designed to require responsibility of Asarco on these claims, Jordan Hyden did not participate in the liquidation of these claims.  The defense of that litigation and its coordination was primarily the responsibility of Baker Botts.  Jordan Hyden did,

however, assist as co-counsel to the Debtors in the ultimate plan treatment of the asbestos and FCR claims and the negotiations leading up to the plan confirmation.

### (iii)   Administrative and Bankruptcy Code Actions

35.     Jordan Hyden assisted in many of the core avoidance actions brought by Asarco (generally supervised by James Prince and Judith Ross) for the recovery of assets or opportunities lost during the Parent's pre petition asset fire-sales.   Jordan Hyden contributed the "quick response" abilities to coordinate with the Baker Botts lawyer teams assigned to the various actions, and was sole bankruptcy counsel for the pursuit of such claims by the Asbestos Subsidiaries, primarily involving recovery of insurance coverage assets.

### (iv)   The SCC Fraudulent Transfer Suit

36.     Although Jordan Hyden was not an active trial participant in this remarkable trial and remarkable result, Jordan Hyden assisted the process in several ways.     Jordan Hyden furnished to the entire Baker Botts Chapter 11 teams twice-daily summaries of the trial and its progress.     The details of the facts actually being developed during this trial had important application to the many pending and filed motions by not only creditors but more particularly by the Parent in objecting to claims for relief, or important to the analysis of related avoidance actions ongoing.   These reports were finished and circulated during the noon hour of each trial day, and within 30 minutes of the conclusion of each trial day, and kept the entire Chapter 11 teams of lawyers and staff up to date on the SCC Litigation.   Additionally, Jordan Hyden further assisted in the physical planning of a trial in Brownsville, Texas including locating of the trial team's offices next to the Federal Courthouse, furnishing staff and transportation for witnesses and documents, service of subpoenas during the trial, and other behind-the-scene work to allow the trial team to dedicate its work to the merits of the trial.

### (v)     The Plan Confirmation Process

37.     The Plan confirmation process was directed by Jack Kinzie.   Mr. Jordan frequently discussed and assisted in the overall planning of the strategy implemented to accomplish the 100% plan that ultimately this planning forced to occur.

### (a).     The Request for Mediation

38.     Initially it was clear that claims liquidation would drive the terms of any plan. Debtors' counsel not only set in process the manner and method (and the true threat of a final resolution) of liquidation of these multi-billion dollars of claims, but soon thereafter, sought and obtained from the Court an order for a mediation of environmental and asbestos claims before a sitting Bankruptcy Judge, Hon. Elizabeth Magner.   This decision proved particularly important in the Plan process.   This request even required the approval of the Fifth Circuit Court of Appeals.   The request for this mediation was intended not only to deal with both asbestos and the environmental claims, but also (as the mediation progressed) the plan itself.   Debtors' counsel seized the opportunity to move negotiations on the liquidation of these claims to negotiations of a plan itself.   Interestingly, the Parent was invited to attend the mediation but determined, as progress was clearly being made on an overall resolution of these two groups of claims and the plan treatment, not to attend much of the remaining mediation process.

### (b).     The Asbestos Post-Mediation Events and the Debtors' Response

39.     The mediation, over the following several months, lead to the foundation for the agreements to resolve both asbestos and environmental which permitted the Debtors to move forward on their plan confirmation process.     This is not to say that there were not further problems to be resolved by Debtors' counsel, including issues concerning the the § 524(g) asbestos

trust.   In the Plan confirmation process, the Debtors needed the § 524(g) trust remedy, obtained by the consent of 75% of the vote of the asbestos creditors.   To thwart that process, the Parent reached an agreement with asbestos to resolve their claims in an amount well above the initial mediated amount, provided the asbestos claims holders did not agree to a § 524(g) trust in favor of any proposed plan other than the Parent's plan.   This had the initial appearance of destroying the competition between Sterlite's Plan [that was conditioned on a § 524(g) trust] and the Parent's plan that likewise included the trust condition.   However, Debtors' counsel, after considerable negotiations and difficult sessions, including the decision to re-initiate the asbestos estimation proceedings, the Asbestos Committee and the FCR informed the Parent that they were exercising their fiduciary out under the agreement they negotiated with the Parent.   This was accomplished by Debtors' counsel successfully negotiating increases by Sterlite under its plan, and ultimately the increased amount of the asbestos claims settlement was paid by the Parent under the obligations of its plan, which in fact were resolved for an amount more than $1 billion less than the asbestos claimants expert had estimated the claims.

**(c).   Dual-Track of the SCC Litigation and the First Attempt at**

**Plan Confirmation**

40.   The SCC litigation outcome and the Plan Process outcome constitute the most significant, rare, and extraordinary outcomes in this case, without which the ultimate outcome would be at best problematic.   The Plan negotiation and confirmation process must be viewed as the plan process straddled the most dramatic development in this Chapter 11 case – the SCC Judgment.   Prior to the damages judgment in the SCC litigation the Debtors had designed and implemented the auction process to select a bidder to undertake the initial plan proposal.   After significant planning and notice by the Debtors and their financial advisors (all over the objections of the Parent), and multiple objections by the Parent, a multi-day plan selection

process conference was held in the Baker Botts Dallas offices attended by well over 100 representatives of the bidders (including the Parent) and the Debtors. Two days of negotiations resulted in Sterlite being selected as the high bidder. Negotiations, including constant communication and consulting with the DOJ, the FCR, the union, and the two official committees, resulted in the Debtors' business judgment to select Sterlite's proposal. The Parent attended, but refused to match the Sterlite bid and commenced thereafter their objections to most every aspect of the plan process.

41.     The Debtors' counsel moved promptly to incorporate the Sterlite signed and enforceable proposal into the terms of a plan. The Parent was permitted to file its own competing plan to re-take ownership of the Debtors' assets. The Parent's plan, not close to a 100% payment plan, did not receive any significant creditor support. Both plans moved to a confirmation hearing in November, 2008.

## I.     Withdrawal of the Initial Plans and the Aftermath

42.     Remarkably, and only days after Judge Hanen issued his first opinion on liability of the Parent for the fraudulent transfer, the price of copper crashed. Sterlite then announced its intention to not perform under its agreement. So also, the Parent immediately withdrew its plan and refused to seek any plan confirmation. The plan confirmation process was brought to a halt. Just as was the case in the initial period of this reorganization before the labor strike and corporate governance problems were solved, the financial risks now caused by the crash of copper prices and the pull-out of Sterlite left the potential for a complete disaster were this case converted to Chapter 7.   In such an event, the asbestos liability alone would have deterred any potential bidders leaving a one-bidder auction (i.e., the Parent) buying at liquidation values for pennies on the dollar. Likewise, the administrative priority of the environmental claims would

have swamped the Chapter 11 professional fees.

**J.    The New Sterlite Plan and the Judgment Auction**

43.    Negotiations were re-commenced with Sterlite and ultimately reached an agreement that Sterlite would only obtain a release if it successfully purchased the Company (because the Parent's plan was ultimately confirmed, Asarco delivered to the Parent at closing a $50 million deposit and the breach of contract claim against Sterlite—a claim Asarco is now pursuing). This new PSA, although for less overall value, was subject to higher and better bids.

44.    The Debtors' counsel devised a unique idea, procedure and process – to offer the SCC Judgment to sale to the highest bidder, either for the whole judgment or for any significant part thereof. Three dramatic results came from this strategy –

•    First, the SCC Judgment could be immediately monetized in some amount at or around the confirmation process timeline insulating the estate to the threat by the Parent of the risks of loss on appeal; and

•    Second, the Parent was now at risk that if the SCC Judgment were in fact sold, its "cap" theory and argument was gone.   Any purchaser of the SCC Judgment would not have any cap applicable to its purchased amount.

•    Third, the Parent was faced instead with the potential for multiple losses-it could lose control of Asarco, and also still have to pay the judgment in full.

45.    Debtors' counsel had now created an environment of true negotiations through maximizing and transferring the risk of loss to both Sterlite and the Parent.  The only way the Parent could avoid loss of both assets (the business and the SCC Judgment) was to outbid Sterlite before the auction was put in place and concluded. The only way Sterlite could avoid liability for a big judgment was to outbid the Parent.

46.     The Parent proposed for the first time in the 4+ year history of this case, a true 100% Plan to reacquire the company and avoid loss of the SCC Judgment.

47.     As the evidence in this case clearly shows, the entire administrative cost of this reorganization was paid many times over by the dramatic increase in value of the Debtors' estate at confirmation when compared to the insolvent enterprise delivered by the Parent on the Petition Date.

48.     In fact, this spectacular increase in value was created by, and resulted from; the strategic planning and implementation of that planning by the Debtors' co-counsel, including Jordan Hyden, as well others.

## II. DISCUSSION

### A.     Section 330 Factors.

1.     Section 330 provides a non-inclusive list of factors that must be considered by the Court in reaching its allowed fee determination.  Because the statute makes clear this list is non-inclusive, Courts have listed other, and sometimes overlapping, criteria.  These factors must also include a determination of the "relevant market" in which these fees are determined and the fees billed compared.  [*See infra; see, also* § 330(3)(A)].

### B.     Factors That Also May Be Considered Under Lodestar

#### (i)     The *Johnson* Factors

2.     The Supreme Court has also instructed the lower courts to consider factors such as those discussed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), to determine the lodestar, notwithstanding the fact that some of the factors overlap with § 330 of the Code.  These *Johnson* factors are:

(1)     the time and labor required;  [*See, also* § 330(3)(A)]

(2)     the novelty and difficulty of the questions;

(3)     the skill requisite to perform the legal service properly;  [*See, also* § 330(3)(E)]

(4)     the preclusion of other employment by the attorney due to acceptance of the case;

(5)     the customary fee;  [*See, also* § 330(3)(B)]

(6)     whether the fee is fixed or contingent;

(7)     time limitations imposed by the client or the circumstances;

(8)     the amount involved and the results obtained;

(9)     the experience, reputation, and ability of the attorneys;  [*See, also* § 330(3)(E)]

(10)    the "undesirability" of the case;

(11)    the nature and length of the professional relationship with the client; and

(12)    awards in similar cases.  [See, also § 330(3)(B), (E)]

*Blanchard v. Bergeron*, 489 U.S. 87, 94, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). The Supreme Court in *Blanchard* (involving a "fee shifting" statue) noted that no one factor is a substitute for the lodestar figure.  The Fifth Circuit also requires the lodestar guidelines outlined be used for calculating fee awards in bankruptcy cases. *See, also, In re First Colonial Corp. of America*, 544 F.2d 1291, 1299 (5th.Cir.1977); *Lawler v. Teofan (Matter of Lawler)*, 807 F.2d 1207, 1211 (5th Cir.1987).   Distinct from "fee shifting" statutes, the dynamics that might justify the sharing of fees among beneficiaries of a common fund, as is the situation in bankruptcy (as well as probate

and class actions) were not mentioned in *First Colonial* when applying the Johnson Factors to bankruptcy fees[2] *See, also, In re El Paso Refinery* at 819.

       **(ii)**     **The Priority of Factors Considered**

    3.      Additionally, the Fifth Circuit has instructed that the bankruptcy courts pay special attention to the following *Johnson* factors when determining the lodestar:

        (1)     the time and labor involved;

        (2)     the customary fee;

        (3)     the amount involved and the results obtained; and

        (4)     the experience and reputation of counsel;

*Copper Liquor, Inc. v. Adolph Coors Co.,* 624 F.2d 575, 583 (5th Cir.1980) (*citing Johnson,* 488 F.2d 714).   Without much creativity, these determinations seem almost completely subsumed in the § 330(a)(3) criteria.

    4.      The *Copper Liquor III* court further reasoned that these four "special" factors could be considered in a three-tiered framework similar to, but not quite the same as, that described in *First Colonial*:

        (1)     Ascertain the nature and extent of the services supplied by the attorney;

        (2)     Value the services according to the customary fee and quality of the legal work;

---

[2]    *First Colonial* also stated that bankruptcy courts should keep in mind two additional considerations in applying the *Johnson* factors: first, economy is the most important principle in awarding fees to the trustee's attorneys; and, second, the court should be wary of any duplicative fees or non-legal services. *See First Colonial 544 F.2d at 1299.*   The Bankruptcy Act of 1978 legislatively overruled any "notions of economy of the estate in fixing fees." H.R.Rep. No. 95-595, 95th Cong., 1st Sess., 330 (1977), U.S.Code Cong. & Admin.News pp. 5963, 6286. Such notions were considered to be "outdated" and had "no place in a bankruptcy code." *Id.* The 1978 version of section 330(a) provided that "the cost of comparable services other than in a case under this title" forms the basis of attorney compensation. 11 U.S.C. § 330(a)(1).

(3)     Adjust the compensation awarded on the basis of other *Johnson* factors

that may be of significance in the particular case.  [This "adjustment" may be only on the

basis of a below-or-above the relevant market rate charged (or sought to be approved) by

the professional, or after the lodestar is awarded, as an "enhancement" on the lodestar].

*Id.* (citing *Copper Liquor, Inc. v. Adolph Coors Co.,* 624 F.2d 575 (5th Cir.1980) [Emphasis

added.] ( *Copper Liquor II*) (relying on *First Colonial,* 544 F.2d at 1299-1300)).

> "The 'lodestar' is equal to the number of hours reasonably expended multiplied
> by the prevailing hourly rate in the community for similar work. The lodestar is
> then adjusted to reflect other factors such as the contingent nature of the suit and
> the quality of the representation."

*Id.* at 1093 (citing *Copeland v. Marshall,* 641 F.2d 880, 891-94 (D.C.Cir.1980) (en banc)).

### (iii)     The Lodestar Adjustment Standards

5.     In the first effort to "establish an objective basis for determining the amount of

compensation that is reasonable for an attorney's services," the Fifth Circuit, in *First Colonial* set

forth a three-step process that bankruptcy courts were to follow in determining reasonable

attorneys' fees and emphasized that the court must give an explanation of the findings and

reasons why the award was granted, including a description of how all of the twelve *Johnson*

factors affected the court's decision. *First Colonial.* at 1299-1300;   *See, also In re El Paso*

*Refinery* at 820.[3]

---

[3]     After the *First Colonial* decision, Congress enacted the Bankruptcy Act of 1978. This
Act provided bankruptcy courts with some guidelines as to how "reasonable compensation" should be
determined. *See* 11 U.S.C. § 330(a)(1). Bankruptcy courts were instructed to base reasonable
compensation on
> "the nature, the extent, and the value of such services, the time spent on such services,
> and the cost of comparable services other than in a case under this title." *Id.*

### (iv)    The "Relevant Community" and "Prevailing Market Rates:"

6.      In reviewing the reasonableness of an attorney's rate, the court must be guided by the "prevailing market rates in the relevant community." *Blum,* 465 U.S. at 895 & n. 11, 104 S.Ct. 1541; *Hensley,* 461 U.S. at 433, 103 S.Ct. 1933; *Guam Soc'y of Obstetricians & Gynecologists v. Ada,* 100 F.3d 691, 696 (9th Cir.1996).

7.      Thus, once the number of "reasonable" hours is determined, the second prong of the lodestar analysis requires the court to "determine a reasonable hourly rate considering the experience, skill, and reputation of the attorney requesting fees." *Chalmers v. City of L.A.,* 796 F.2d 1205, 1210 (9th Cir.1986), *amended* 808 F.2d 1373 (9th Cir. 1987).[4]

8.      This determination *"is not made by reference to rates actually charged the prevailing party." Id.* [Emphasis added.]   Rather, the court must independently look to the prevailing market rate in the community for similar services of lawyers of reasonably "comparable skill, experience, and reputation." *Id.* at 1210-11; *see Schwarz v. Sec'y of Health & Human Servs.,* 73 F.3d 895, 908 (9th Cir.1995).   It is this rate that is compared to the billed or requested rate.   For instance, the Asarco Chapter 11 is not reviewed by looking to the Corpus Christi Division of the Southern District of Texas ordinary legal fees.   The fact is there are no law firms of the size and experience capable of handling the Asarco chapter 11 located in Corpus Christi, and only a few individual lawyers capable of representing Asarco as a Debtor in such a

---

[4]      In bankruptcy cases, the hourly rate must compare favorably to the rate that would be charged by "comparably skilled" attorneys for similar services rendered in a non-bankruptcy context. 11 U.S.C. § 330(a)(3)(F); *see Cedic Dev. Co.,* 219 F.3d at 1117 (upholding a bankruptcy court's fee enhancement where the rates actually charged "were bargain rates"); *Yermakov,* 718 F.2d at 1471 (stating that "the hourly rate must be based on the rate that would be charged for comparable services in a non-bankruptcy case").   Reasonable hourly rates, for purpose of calculating lodestar award to attorney fee applicant in bankruptcy case, are prevailing rates for similar services by lawyers of reasonably comparable skill, experience and reputation in relevant market. *In re Masterwear Corp.,* 233 B.R. 266 (Bankr. S.D. N.Y. 1999). Lodestar must be determined in light of prevailing market rate in community for similar services of lawyers of reasonably comparable skill, experience and reputation. 11 U.S.C.A. § 330(a)(1). *In re Buckridge,* 367 B.R. 191 (Bankr. C.D. Cal. 2007).

large and complex bankruptcy case, such as the Jordan Hyden lawyers.   Thus, the market relevant to the Asarco bankruptcy is the national market made up of law firms of the experienced senior lawyers, supported by a size and staff capable of dealing with an extremely complex and involved Chapter 11 case.   The Court should adjust any such rate based upon differences in overhead. That market is the proper market to which this Court will determine the lodestar rates, and then compare those rates requested in the pending final fee applications.   There was ample evidence of the national rate inasmuch as most all lawyers were from large cities in Texas, New York, Illinois, California, and others, and from large firms doing national work in the large national cases such as Asarco.   In fact, the only law firm located in Corpus Christi representing either the debtors, or the committees, or the Parent, was Jordan Hyden, a local firm frequently appearing in national cases representing debtors.

**C.    Enhancement**

9.    The Applicant seeks an enhancement based upon a percentage of the total hours billed in this case. For the reasons set out in this Court's Memorandum Opinion on the Final Fee Application of Baker Botts, such an enhancement is not appropriate. However, the Applicant assisted Baker Botts in the trial of the SCC litigation. Based upon the extraordinary results obtained in that litigation and for the reasons articulated in the Memorandum Opinion on the Final Fee Application of Baker Botts, an enhancement based upon a percentage of the hours billed in the SCC Litigation is appropriate. Because Baker Botts was more directly involved with the SCC Litigation the Court finds that a 10% enhancement is appropriate for the Jordan Hyden Application. Multiplying the total hours spent on the SCC litigation, the 10% increase results in an enhancement of $125,831.00.

**D.     Preparation and Defense of Final Fee Application**

10.     For the reasons set out in this Court's Memorandum Opinion on Final Fee Application of Baker Botts L.L.P., reasonable fees and expenses incurred in the defense of Applicant's fee application may be awarded. Jordan Hyden included in its final application $15,035.74 in additional fees in preparation of its fee application. Such fees are reasonable and should be approved.

11.     Similarly, the court will include in its final order resolving this fee application a provision authorizing Jordan Hyden to submit supplemental application for additional defense fees upon resolution of any appeals or subsequent remand.

## III. CONCLUSION

1.     The Court finds and concludes that:

a.     $357,100.06 expenses incurred by Jordan Hyden during the Application Period were actual, necessary expenses.

b.     The services summarized in the Fee Application and performed by Jordan Hyden during the Application Period were substantial and provided a tangible and material benefit to the estates.

c.     The fees sought by Jordan Hyden for the services it performed during the Application Period reflect the actual and reasonable billable time expended by Jordan Hyden during the Application Period in connection with these cases and do not reflect (1) any unnecessary duplication of services, or (2) services that were not (a) reasonable likely to benefit the estates or (b) necessary to the administration of the cases.

d.     The reasonable compensation for the actual, necessary services performed by Jordan Hyden during the application Period is $7,036,066.64.

e.    The fees sought by Jordan Hyden for preparing and defending the Fee Application reflect the actual time expended by Jordan Hyden for preparing and defending the Fee Application. The court finds that the reasonable compensation for the actual, necessary services performed by Jordan Hyden in preparing and defending the Fee Application is $15,035.74.

2.    The Court finally approves and allows $7,161,897.64 in fees and $357,100.06 in expenses for services performed and expenses incurred by Jordan Hyden during the Application Period. The $7,161,897.64 fee award is comprised of (a) $7,009,305.05 in fess approved by this Court; (2) plus $125,831.00 as an enhancement because there are rare and extraordinary circumstances in these cases and Jordan Hyden's services in the SCC litigation were instrumental in producing the exceptional results that were unanticipated at case commencement.

3.    The Court finally approves and allows $15,035.74 in fees incurred by Jordan Hyden in preparing and defending the Fee Application.

4.    In the event of an appeal SBEP may file a supplemental fee application.

5.    The Court orders Jordan Hyden to prepare and submit an order consistent with these findings within ten (10) days from the date of entry of this Memorandum Opinion.

Dated: ___JUL 2 0 2011___

RICHARD S. SCHMIDT
United States Bankruptcy Judge