IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

ENTERED
07/20/2011

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| ASARCO, LLC et al. | § | Case No.  05-21207 |
| | § | |
| Debtors. | § | Chapter 11 |
| | § | (Jointly Administered) |

## MEMORANDUM OPINION WITH RESPECT TO:

**(1) FINAL APPLICATION OF OPPENHEIMER, BLEND, HARRISON & TATE, INC. FOR AN ORDER GRANTING FULL AND FINAL ALLOWANCE OF PAYMENT FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES, AS ATTORNEYS FOR THE FUTURE CLAIMS REPRESENTATIVE IN CONNECTION WITH THE SUBSIDIARY DEBTORS, ASARCO, LLC, AND THE ADDITIONAL DEBTORS FOR THE PERIOD FROM APRIL 11, 2005, THROUGH DECEMBER 9, 2009;**

**(2) FINAL APPLICATION OF ROBERT C. PATE FOR AN ORDER GRANTING FINAL APPROVAL AND ALLOWANCE OF FEES AND REIMBURSEMENT OF EXPENSES INCURRED AS THE FUTURE CLAIMS REPRESENTATIVE FOR THE SUBSIDIARY DEBTORS, ASARCO, LLC, AND THE ADDITIONAL DEBTORS FOR THE PERIOD FROM APRIL 11, 2005, THROUGH DECEMBER  9, 2009;**

**(3) JOINT APPLICATION OF ROBERT C. PATE, FUTURE CLAIMS REPRESENTATIVE AND OPPENHEIMER, BLEND, HARRISON & TATE, INC., AS COUNSEL TO THE FUTURE CLAIMS REPRESENTATIVE FOR ORDER AWARDING AN ENHANCEMENT OF TWENTY-FIVE PERCENT (25%) OF THEIR FEES; AND**

**(4) ALL SUPPLEMENTS THERETO**

On this day came on for consideration the (1) *Final Fee Application of Oppenheimer, Blend, Harrison & Tate, Inc. for an Order Granting Full and Final Allowance of Payment for Compensation and Reimbursement of Expenses, as Attorneys for the FCR in Connection with the Subsidiary Debtors, Asarco LLC, and the Additional Debtors* [Docket No. 13883] (the "OBHT Final Fee Application") for the period from April 11, 2005 through December 9, 2009 (the

"Application Period"), in the above-styled, jointly-administered Chapter 11 reorganization cases (the "Chapter 11 Cases"); (2) the *Application of Robert C. Pate, Future Claims Representative for an Order Granting Final Approval and Allowance of Fees and Reimbursement of Expenses Incurred as the Future Claims Representative for the Subsidiary Debtors, ASARCO, LLC, and the Additional Debtors* [Docket No. 13877] (the "FCR Final Fee Application"); (3) the *Joint Application of Robert C. Pate, Future Claims Representative and Oppenheimer, Blend, Harrison & Tate, Inc., as Counsel to the Future Claims Representative for Order Awarding an Enhancement of Twenty-Five Percent (25%) of Their Fees* [Docket No. 13886] (the "Enhancement Application"); and all supplements thereto filed by both the FCR and OBHT (collectively with the FCR Final Fee Application, the OBHT Final Fee Application and the Enhancement Application, the "Applications"). The court, having heard the evidence and arguments of counsel, makes the following Findings of Fact and Conclusions of Law.

## I.   Introduction

1.     Robert C. Pate, the legal representative of future asbestos-related claimants ("Judge Pate" or the "FCR"), and his counsel, Oppenheimer, Blend, Harrison & Tate, Inc. ("OBHT") performed superior services in these Chapter 11 Cases that produced exceptional results. Commencing in the Summer of 2005, with the realistic prospect that their constituents would not recover anything on their claims, the FCR and OBHT, together with the committee appointed to represent current asbestos claimants and its counsel, successfully prosecuted a complex alter ego lawsuit on behalf of the Subsidiary Debtors[1] against its parent, ASARCO LLC ("ASARCO"), which resulted in a $1 billion allowed claim and a cash recovery on such claim of more than $940 million for the Subsidiary Debtors' estates—estates that had no operations, no

---

[1] The "Subsidiary Debtors" or "Asbestos Subsidiaries" consist of the following five entities: Lac d'Amiante du Québec Ltée (f/k/a Lake Asbestos of Quebec, Ltd.); Lake Asbestos of Quebec, Ltd.; LAQ Canada, Ltd.; CAPCO Pipe Company, Inc. (f/k/a Cement Asbestos Products Company); and Cement Asbestos Products Company.

cash flow, and no meaningful assets other than contingent insurance proceeds. The FCR and OBHT were handicapped at every turn, not the least by their complete lack of institutional knowledge of the decades-long relationship of these affiliated entities. Essentially, they were handed the keys to a warehouse graveyard of tens of thousands of dusty, disorganized boxes and challenged to make a case.

2.      The FCR and OBHT along with counsel for the Asbestos Committee became the only fiduciary constituents who also negotiated a plan-sponsor agreement with ASARCO's parent companies, ASARCO Incorporated ("ASARCO Inc.") and Americas Mining Corporation ("AMC," together with ASARCO Inc., the "Parent"). This agreement helped produce a bidding war at the very point in these Chapter 11 Cases when the flagging economy and deal-fatigued parties threatened to undermine all the progress the Debtors had theretofore made. The end result was a confirmed plan that paid all allowed claims of all creditors in full with interest.

3.      On February 8, 2010, the FCR and OBHT filed applications for final allowance and approval of their fees and expenses and an upward adjustment of their standard hourly rates. On March 10, 2010, Reorganized ASARCO LLC ("Reorganized ASARCO") (now controlled by the Parent), filed objections to the FCR's and OBHT's final fee and enhancement applications. Reorganized ASARCO and the Parent also asserted objections (collectively, the "Objections") against the final fee and enhancement applications of other Court-appointed professionals as well as the FCR and OBHT (collectively, the "Applications"), and the Court received testimony, documentary evidence and argument concerning the Applications and Objections in hearings conducted in traunches on non-consecutive days in June 2010 (the "Fee Hearings"). The evidence introduced in each of the various Fee Hearings was cumulative. The hearing on the FCR's and OBHT's Applications were held June 15 through 17, 2010. Because the Court must

consider the entire course of these cases to dispose of the Applications, the Court took judicial notice and incorporated the entire record of these cases (and their spawn of adversary proceedings) since their commencement.

4.     The Applications and Objections are subject to the Court's core jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2). This memorandum opinion comprises the Court's findings of fact and conclusions of law and order respecting the Applications and Objections.

## II.   Retention of FCR and His Counsel

### A.     Terms of Appointment and Employment.

5.     On March 23, 2005, the Asbestos Subsidiaries and Robert C. Pate executed a pre-petition engagement letter retaining Judge Pate as the FCR in conjunction with an anticipated prepackaged chapter 11 that the Asbestos Subsidiaries were considering (the "Pre-Petition Engagement Letter"). Judge Pate engaged OBHT to serve as his counsel in performing these services.

6.     At the time that Judge Pate and OBHT were engaged, and throughout the duration of these Chapter 11 Cases, the Asbestos Subsidiaries were non-operating entities whose assets consisted primarily of insurance coverage for asbestos claims. Other than contingent insurance proceeds, the Asbestos Subsidiaries had no other assets and no operations or cash flow to pay professionals. Accordingly, in order to retain the services of the Asbestos Fiduciary, ASARCO (not yet in Chapter 11) unconditionally guaranteed payment of their fees and expenses and provided the Asbestos Fiduciary with retainers of $50,000.00 each to secure their engagements.

7.     On April 11, 2005, the Asbestos Subsidiaries filed voluntary petitions in this Court (the "Subsidiary Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Thereafter, the Asbestos Subsidiaries filed a motion to appoint Judge Pate

4

as the FCR in the Subsidiary Cases, which was granted by this Court on April 19, 2005.   The

FCR then filed an application to employ OBHT as his counsel (the "Application to Employ

OBHT in the Subsidiary Cases"), which was also approved by the Court "on the terms and

conditions as set forth in the Application."  In neither application did the FCR or OBHT agree to

cap its compensation according to the standard hour rates charged for services performed.  In the

Application to employ the FCR, paragraph 21(c), Judge Pate indicated his acceptance of the

engagement was conditioned on being compensated "consistent with treatment afforded other

professionals in these cases pursuant to applicable provisions of the Bankruptcy Code…"  OBHT

did not agree to cap its compensation according to the standard hour rates charged by its

attorneys.  In the Application to Employ OBHT in the Subsidiary Cases, OBHT indicated that its

acceptance of the engagement was conditioned on its being compensated "at the normal hourly

rates for its attorneys, paralegals, and law clerks, and on the basis of other factors normally

considered by the Bankruptcy Code in determining fees."  Application to Employ OBHT in

Subsidiary Cases at ¶ 8.    The Bankruptcy Code provides for payment of reasonable

compensation to Court-approved professionals as adjusted upward or downward at the discretion

of the Bankruptcy Court pursuant to the directives of the statute.  11 U.S.C. § 330(a)(3).

     8.     On August 9, 2005, ASARCO filed its voluntary petition for relief under chapter

11 of the Bankruptcy Code (the "ASARCO Case").    Subsequently, additional ASARCO

Subsidiaries (the "Additional Debtors") filed voluntary petitions in this Court (the "Additional

Debtors Cases," together with the ASARCO Case, the "ASARCO Cases").

     9.     From the FCR's initial appointment in the Subsidiary Cases on April 19, 2005,

through August 15, 2008, the FCR and OBHT served as case professionals only in the

Subsidiary Cases.    In order to facilitate the Debtors' Second Amended Joint Plan of

Reorganization and on the Debtors' motions, the Court appointed Judge Pate as the FCR in the ASARCO Case and the Additional Debtors Cases, on August 15, 2008, and August 26, 2008, respectively. On September 2, 2008, the FCR filed an application to retain OBHT as his counsel (the "Application to Employ OBHT in the ASARCO Cases") As in the Subsidiary Cases in its Application to Employ both the FCR and OBHT in the Asarco cases, neither the FCR nor OBHT agreed to limit compensation to the standard hourly rates charged for services performed. In the ASARCO application to employ the FCR, paragraph 26(c), Judge Pate indicated his acceptance of the engagement was conditioned on being compensated "consistent with treatment afforded other professionals in these cases pursuant to applicable provisions of the Bankruptcy Code..." OBHT stated that its acceptance of the engagement was conditioned on its being compensated "at the normal hourly rates for its attorneys, paralegals, and law clerks, and on the basis of other factors normally considered by the Bankruptcy Code in determining fees." Application to Employ OBHT in the ASARCO Cases at ¶ 8. On September 16, 2008, the Court entered an order approving OBHT's employment "on the terms and conditions as set forth and stated in the Application."

### B.   The FCR and His Counsel Were Employed to Fulfill Broad Roles.

10.     Judge Pate was appointed to represent the interests of all persons who might subsequently assert "demands" as that term is defined in Section 524(g) of the Bankruptcy Code (the "Future Claimants"). The primary role of a representative of future claimants in asbestos bankruptcy cases is that of a plan negotiator. *See* S. Elizabeth Gibson, Judicial Management of Mass Tort Bankruptcy Cases (Federal Judicial Center, 2005) at p. 68. These Chapter 11 Cases were no different. From the time of their pre-petition engagement by the Asbestos Subsidiaries, it was contemplated that the FCR and OBHT would become involved in the assessment of the

collective Debtors' assets and liabilities in order to maximize any potential recovery for the

Future Claimants from a common fund to be shared by all creditors pursuant to a "pot" plan. As

described in his Pre-Petition Engagement Letter, it was necessary for the FCR to familiarize

himself with all aspects of all Debtors, including "the insurance, business affairs, assets and

liabilities of Asarco and its affiliates." Accordingly, the orders employing OBHT authorized and

ordered OBHT to provide a broad range of services to assist the FCR:

> (a)    to give the Future Claims Representative legal
> advice with respect to his duties and obligations in this case;
> (b)    to prepare on behalf of the Future Claims
> Representative necessary applications, notices, answers,
> adversaries, orders, reports and other legal papers;
> (c)    to advise the Future Claims Representative
> concerning the administration of the case;
> (d)    to assist the Future Claims Representative in his
> investigation of the acts, conduct, assets, liabilities, and financial
> condition of the Debtors' business, and any other matter relevant to
> the formulation of a Plan;
> (e)    to participate with the Future Claims Representative
> in the negotiation and formulation of a Plan;
> (f)    to provide advice and assistance regarding the tax,
> trust, litigation, and other non-bankruptcy law aspects that may be
> required in the performance of the duties of the Future Claims
> Representative; and
> (g)    to perform such other legal services for the Future
> Claims Representative as may be requested and which may be
> necessary and appropriate in this Chapter 11 Case.

11.    An Official Committee of Unsecured Creditors was also appointed in the

Subsidiary Cases (the "Subsidiary Committee").    Contemporaneously with Judge Pate's

appointment as FCR in the ASARCO Case and Additional Debtors Cases, the members of the

Subsidiary Committee were appointed to represent current asbestos victims in the ASARCO

Case and Additional Debtors Cases (the "Asbestos Committee") and retained Stutzman,

Bromberg, Esserman and Plifka, PC ("SBEP") as their counsel, SBEP together with the FCR and

OBHT are herein sometimes collectively referred to as the "Asbestos Fiduciaries." The FCR and OBHT coordinated work on mutually beneficial or necessary projects with SBEP throughout these Chapter 11 Cases in order to avoid unnecessary duplication of services.

## III. The FCR and OBHT Performed Superior Services that Caused a Rare and Exceptional Outcome for their Constituents, for the Asbestos Subsidiaries' Estates, and for All Creditors in these Chapter 11 Cases

12.     When the FCR and OBHT were retained in the Subsidiary Cases, they undertook their fiduciary obligations to the Future Claimants for estates that had no operations or cash flow, whose primary assets were contingent insurance proceeds, but were exposed to asbestos claims, which combined with future asbestos claims totaled to more than a $1 billion dollars of liability. Shortly after the retention orders were entered, instead of a "pre-packaged Chapter 11" being prepared, the FCR was sued in an adversary proceeding filed by ASARCO seeking a declaration that ASARCO had no liability to the Subsidiary Debtors' or their asbestos victims. ASARCO had steadfastly denied any derivative liability to the Asbestos Subsidiaries victims for decades. That the FCR and OBHT were able to successfully prosecute the derivative asbestos claims and obtain an allowed claim of $1 billion against ASARCO's Chapter 11 estate with substantially full payment at the conclusion of these Chapter 11 Cases is an extraordinarily rare and exceptional outcome resulting directly from the superior performances by the FCR, OBHT, and the other Asbestos Fiduciaries. The Asbestos Fiduciaries, individually and as a group were the sole producing cause of this outcome, without which the Subsidiary Debtors would have had no means to provide any remuneration to the more than 100,000 asbestos victims that had filed claims in the Subsidiary Cases as well as the FCR's constituencies, the future demand holders.

13.     The details and history of the ASARCO bankruptcy are chronicled in the Court's Recommendation to the District Court on Plan Confirmation and in this Court's Memorandum

Opinion approving the Fee Application of Baker Botts. The Asbestos Fiduciaries played a role in the overall successful outcome of these Chapter 11 Cases. The Debtors were not only able to pay in full and with interest their billion-dollar asbestos liabilities, but, also, their multi-billion-dollar environmental liabilities, and enormous indebtedness to toxic tort claimants, bondholders or other unsecured creditors. These results are even more exceptional in light of that fact that for the early part of their reorganization, the Debtors were teetering on the brink of liquidation.

### A.    The Asbestos Fiduciaries Successfully Prosecuted the Exceedingly Challenging and Complex Derivative Asbestos Claims

14.    One principal cause of the filing of these Chapter 11 Cases was ASARCO's asbestos liability. More than 100,000 claimants filed asbestos-related claims or submitted electronic claims data against ASARCO or one or more of the Subsidiary Debtors. In a number of these claims against the Asbestos Subsidiary Debtors, and in prepetition lawsuits, ASARCO was alleged to be derivatively liable for claims against the Subsidiary Debtors, an allegation ASARCO denied. ASARCO sought to rid itself of its "asbestos crisis" in bankruptcy by relegating all liability to the Subsidiary Debtor level, where the companies were essentially empty shells.

15.    ASARCO asserted that its asbestos liability was zero.

16.    On June 15, 2005, before filing bankruptcy itself, ASARCO filed a complaint in the Subsidiary Cases initiating Adversary Proceeding No. 05-02048 (the "Adversary") against the Asbestos Subsidiaries and the FCR, seeking a declaration that it was not liable for the asbestos-related liabilities of the Asbestos Subsidiaries under any alter ego theories[2]. The Adversary complaint recited ASARCO's decade-old position: that it had "never mined, milled, manufactured or sold asbestos or asbestos-containing products." At the time the Adversary was

---

[2] The derivative asbestos-related liability of ASARCO in its various procedural postures will be collectively referred to as the "Derivative Asbestos Liabilities."

filed, the FCR and OBHT had initially been retained believing their efforts were to negotiate a pre-packaged bankruptcy proceeding. The FCR found himself in the unanticipated position of sued as defendant in an adversary proceeding regarding allegations for which he had no historical knowledge or records.

17.     Future Claimants would not be able to obtain any meaningful recovery in these Chapter 11 Cases, without a determination that ASARCO was directly or derivatively liable for their asbestos or asbestos-related injuries. Successful derivative liability cases are rare and exceptional in themselves. ASARCO's counsel, Baker Botts, recognized that the derivative nature of ASARCO's asbestos liability presented an opportunity to zero out its asbestos claims and, accordingly, brought to bear the full force of its considerable resources.

18.     The FCR was at an extreme disadvantage in the Adversary. ASARCO named itself as Plaintiff and the Subsidiary Debtors and the FCR, as Defendants. Although nominally included as defendants, the Subsidiary Debtors were wholly-owned and financially-dependant subsidiaries of ASARCO and their interests in the Adversary were aligned with ASARCO. Moreover, once ASARCO filed for bankruptcy protection, it shared legal counsel with the Asbestos Subsidiaries. OBHT was in the position of representing the sole independent defendant in the Adversary, the FCR, who had no historical knowledge of the 40-year corporate relationship between ASARCO and its Asbestos Subsidiaries, no historical knowledge of the Debtors' protracted asbestos litigation, and no access to the records or witnesses necessary to recreate this history.

19.     OBHT in coordination with SBEP had to fight for and were granted a realignment of the parties to reflect the true nature of the controversy. Pursuant to a stipulation approved by this Court on April 25, 2006, the Subsidiary Committee and the FCR were granted standing to

prosecute the derivative asbestos claims on behalf of the Subsidiary Debtors' estates and were authorized to take the lead role in prosecuting the Adversary Proceeding and all claims, defenses, and counterclaims against ASARCO related to the derivative asbestos claims. Thereafter, on May 9, 2006, the Subsidiary Committee and the FCR, on behalf of the Asbestos Subsidiary Debtors, filed an Amended Complaint seeking a judgment declaring that ASARCO was liable for the Asbestos Subsidiaries' asbestos-related liabilities under Alter Ego Theories.

20.     After the Asbestos Fiduciaries succeeded in realigning and reconstituting the Adversary, ASARCO and Baker Botts then shifted the procedural path for resolving the Derivative Asbestos Claims, seeking to estimate the claims in an abbreviated hearing pursuant to Section 502(c) of the Bankruptcy Code.   The Asbestos Fiduciaries opposed the estimation, and the Court addressed these issues in a number of hearings, urging the parties to reach a resolution. Efforts to reach a resolution took weeks of protracted negotiations, but by June 2006, the parties were able to reach a compromise regarding some aspects of the procedure for resolution of the Derivative Asbestos Claims and entered into a written agreement memorializing the compromise.   The Debtors and Asbestos Fiduciaries abated the Adversary and agreed to a schedule for resolving the Derivative Asbestos Claims as a contested matter.  The time for the FCR and OBHT to prepare its case had been compressed to less than 9 months, and OBHT attorneys began to work around the clock to prepare.

21.     Discovery related to the Derivative Asbestos Claims was extensive, and the Bankruptcy Court held numerous status conferences and discovery hearings in connection therewith.   ASARCO alleged that, due to the enormous volume of documents, traditional document production was not possible and would be unduly burdensome.  At various times it

was alleged that as many as 40,000 boxes[3] of documents were stored at two warehouse locations: One in Phoenix, Arizona and the other at ASARCO's abandoned mine complex in Sacaton, Arizona.

22.     Beginning on July 17, 2006 and continuing for more than eight weeks, OBHT and SBEP sent teams of lawyers to Arizona to conduct a review of ASARCO's stored warehouse documents during the oppressive summer heat of Phoenix, Arizona and in difficult working conditions.

23.     The records of ASARCO's inter-company accounts were vital to proving the Alter Ego Theories alleged by the Asbestos Fiduciaries.  OBHT and SBEP spent considerable efforts to reconstruct the financial relationship between ASARCO and its Asbestos Subsidiaries. Despite its involvement in alter ego litigation for the preceding 15 years, ASARCO claimed that it lacked meaningful accounting records reflecting its inter-company accounts for periods after the mid 1990s, when its Asbestos Subsidiaries had ceased operations.  In an effort to locate this important information, OBHT and SBEP sought further document production from ASARCO's current and former auditors Arthur Anderson, LLP; PriceWaterhouse Coopers, LLP and Keegan Linscott Kenon, PC and its banking records from Credit Suisse Securities (USA), LLC; and  JP Morgan Chase Bank.

24.     As a result of its time consuming review of warehouse records, the Asbestos Fiduciaries identified approximately 3,200,000 million pages of possibly relevant documents. The next stage of the process was difficult:  to meticulously review and analyze each of the 3,200,000 million pages culled from the Debtors' Phoenix "document dump" and other

---

[3] While no one has an accurate count of the actual number of boxes stored in Arizona, based upon the relation of total boxes selected for copying to the number of boxes culled from production, Raymond W. Battaglia of OBHT testified he estimated that the likely number of boxes was in excess of 25,000.

discovery efforts. From those 3,200,000 million pages of potentially-relevant documents and the expenditure of thousands of hours of work, the Asbestos Fiduciaries successfully reconstructed the concealed history of ASARCO's asbestos enterprise. This reconstruction essentially was the sole avenue of obtaining any factual information to support the Alter Ego Theories, as there were few, if any; known witnesses available to testify or even guide OBHT through the voluminous production. Despite these obstacles, the Asbestos Fiduciaries were able to produce compelling evidence of ASARCO's misuse of the Asbestos Subsidiaries[4].

25.     During their review of ASARCO's document production, the Asbestos Fiduciaries discovered what they considered a "smoking gun" letter prepared by the law firm of Rogers & Wells (the "Rogers & Wells Opinion"). Concerned in the mid 1970s by what appeared to be a wave of asbestos litigation, ASARCO had engaged Rogers & Wells, a prominent New York law firm, to analyze the relationship between ASARCO and its Asbestos Subsidiaries. The Rogers & Wells Opinion detailed the relationship between parent and subsidiaries, justifying ASARCO's concerns.

26.     Discovery of the Rogers & Wells Opinion, combined with suspicions raised due to the assertions of privilege by ASARCO's counsel, led directly to a battle with ASARCO over attorney client privilege issues and subsequent additional discovery from two prominent law firms which had historically represented ASARCO and its' Asbestos Subsidiaries – Covington & Burling, LLP ("Covington") and Porzio Bromberg & Newman, PC. ("Porzio"). The Defendant ASARCO asserted that it held the privilege over attorney client records of the Asbestos Subsidiaries, the plaintiffs in the lawsuit complaining of ASARCO's undue control. The efforts

---

[4] *Trial Brief Filed by Robert C. Pate, Future Claims Representative and the Official Committee of Unsecured Creditors for the Subsidiary Debtors on Behalf of the Estates of Lac D'Amiante du Quebec Ltee and CAPCO Pipe Company, Inc. – Brief on Asarco's Liability for Alter Ego Claims*, PATE-OBHT Exhibit 164 ("Alter Ego Liability Brief") at pp. 205 – 227.

to obtain these withheld documents took months. The Asbestos Fiduciaries, however, were successful in their efforts and were able to inspect allegedly privileged materials of ASARCO and the Asbestos Subsidiaries possessed by ASARCO and Porzio and Covington.

27.     At the same time OBHT was forced to engage in the excavation and reconstruction of the Debtors' corporate histories, OBHT was also experiencing similar frustration with the Debtors' asbestos claims database. In the typical asbestos case, in order to evaluate the Debtor's asbestos claims and demands, each party's expert expects to receive from the debtor an electronic database that provides a comprehensive history of the debtor's asbestos claims history, including the claims' resolutions by judgment or settlement. The database is commonly maintained by the debtor's law firm in order to track the lawsuits that it is retained to defend, and the database has the veracity of a business record relied upon by a business in the performance of its normal operations. ASARCO's historic claims database that was ultimately provided to the various asbestos claims estimation experts was not compiled in the course of ASARCO's (or its law firms') business but was instead produced specifically for the estimation proceeding, cobbled together from multiple sources.

28.     The asbestos damages experts retained by the various parties produced remarkably different liability estimations. The Asbestos Fiduciaries' asbestos damages expert, Dr. Mark Peterson, estimated ASARCO's current and future asbestos liability to be between $1.3 billion and $2.1 billion. However, the asbestos damages experts retained by the Debtors and the ASARCO Committee (Dr. Francine Rabinovitz and Dr. Charles Bates, respectively) produced significantly lower estimates. Dr. Rabinovitz estimated ASARCO's asbestos liability only to be between $280 million and $457 million; and Dr. Bates estimated ASARCO's liability only to be between $80 million and $160 million.

14

29.     On August 30, 2007, ASARCO filed an emergency motion to mediate the contested matter without suspending its November 2007 trial date.

30.     The Court ordered the parties to mediation on October 29 through 31, 2007, with Bankruptcy Judge Elizabeth W. Magner of the United States Bankruptcy Court for the Eastern District of Louisiana serving as mediator.  The mediation as ordered by the Court occurred at the Bankruptcy Court in New Orleans, Louisiana and was attended by counsel and representatives for the Debtors, the Parent, and the largest creditor constituents in the Chapter 11 Cases. The mediation continued through January 2009, and the parties were able to reach agreement on not only a settlement of the Derivative Asbestos Claims but also a global resolution of the Chapter 11 Case through a consensual plan of reorganization.

31.     On account of the apparent settlement, the prosecution of the Derivative Asbestos Claims was abated, and the FCR and OBHT then focused their efforts in assisting the Debtors to obtain approval of bid procedures for selecting a Chapter 11 plan sponsor and, after implementation of those procedures, approval of the selection of Sterlite as the winning bidder, on October 13, 2008. Sterlite subsequently breached the agreement and a new agreement was negotiated with Sterlite.

32.     On April 12, 2009, after extensive negotiations with the Parent, the Asbestos Committee and the FCR executed an agreement in principle with the Parent (the "Parent AIP") that presented and alternatively resolved the treatment of Asbestos Personal Injury Claims and Demands in a Parent-sponsored plan of reorganization. Pursuant to the Parent AIP, both the FCR and the Asbestos Committee agreed to oppose the Sterlite 9019 Motion and sale of the Debtors' operating assets to Sterlite and confirmation of the Debtors' Plan, and the Asbestos Committee would not recommend that their constituents deliver sufficient votes nor would the FCR consent

to support a section 524(g) channeling injunction under the Debtor's Plan. In return, the Parent agreed to deposit $1.3 billion in cash or cash equivalent into an escrow account, to propose a revised Parent sponsored plan of reorganization providing for treatment of all claims in the bankruptcy and the retention of the Parent's equity ownership in ASARCO, and to allow Asbestos Personal Injury Claims in the aggregate amount of $1.0 Billion, and channel asbestos claims to a Section 524(g) Trust, funded with a contribution of cash and Note totaling $750 million, all asbestos insurance proceeds, and a $27.5 million administrative claim to fund the trust's administration costs. This settlement agreement marked the first time in the ASARCO bankruptcy case that a major creditor group had reached an agreement with the Parent as to treatment of their claims and the presentation of a viable alternative cause of action.

33.     On April 27, 2009, the Court entered a Supplement to the Second Amended Case Management Order setting a trial of the Contested Matter on June 22, 2009 (the "Asbestos CMO").

34.     The FCR and OBHT began emergency and extensive preparation for a trial of the Contested Matter, pulling all available OBHT attorneys and staff into the enterprise and undertaking an exhaustive review and analysis of the gathered evidence. Work product that had lain dormant for an extended time had to be revived, reorganized and detailed work assignments determined. Despite these emergency conditions thrust upon them, two trial briefs were prepared in record time, one setting out in 280 pages the facts and law overwhelmingly supporting ASARCO's derivative liability and another setting out the projection of $1.3 to $2.1 billion in damages that ASARCO faced. OBHT along with counsel for the Asbestos Committee, prepared and filed expert reports, designated approximately 3,200 exhibits and deposition designations, conducted depositions of expert witnesses, and prepared for the presentation of their case. On

May 13, 2009, four years after ASARCO first sought to determine its asbestos liability and only a month before trial, ASARCO petitioned this Court to expand the scope of the Contested Matter to include a determination of direct asbestos claims against ASARCO.

35.    Faced with a superior Parent-sponsored Plan produced through the efforts of the Asbestos Fiduciaries, the Debtors and Sterlite initiated proposals for the improved treatment of asbestos in the New Sterlite Plan. These talks proved successful, and on June 12, 2009, the Asbestos Fiduciaries informed the Parent that they were exercising their "fiduciary out" under the Parent AIP as a consequence of entering into an agreement in principle with Sterlite (the "Sterlite Counter AIP") with the Debtors and Sterlite. The Sterlite AIP provided that asbestos claimants and Demand holders would agree to reduce their "asserted claims" to a $1.0 billion allowed claim, and the asbestos claims would be channeled to a Section 524(g) Trust funded with (A) (i) a pro rata share of all cash distributed to unsecured creditors; (ii) a pro rata share of the Purchaser Promissory Note; (iii) a pro rata share of litigation trust interests (all based upon a $750 Million claim amount (with a $160 million "put" option exercisable by the proposed asbestos trust between years 2 and 4, post-confirmation); (B) rights to all insurance proceeds from all policies with respect to Asbestos Claims; and (C) $27.5 million to cover costs of administrating the Trust. Other agreements were also reached, including extension of the DIP Loan through the Effective Date. Shortly thereafter, the Debtors, the Asbestos Committee and the FCR entered into an agreed order abating all deadlines governing the Derivative Asbestos Contested Matter, which was entered by the Court on June 17, 2009.

36.    The competitive process spawned by the Asbestos Fiduciaries continued to produce enhanced treatment for the asbestos claimants. The Asbestos Fiduciaries subsequently entered into an enhanced Parent AIP (the "First Enhanced Parent AIP"), which memorialized the

exercise of their fiduciary out and wherein the Parent agreed to increase the overall consideration to be paid under its Plan and other enhancements to unsecured claims; and the Asbestos Committee agreed to recommend, without stating a preference, that asbestos claimants vote to accept both the Parent's Plan and the Debtors' Plan and that asbestos claimants vote to reject all other plans. The FCR also agreed to support confirmation of both the Parent's Plan and the Debtors' Plan over all plans. In return, the Parent agreed to increase the amount of the one-year, six percent Asbestos Trust promissory note to $280 million and cause AMC to guaranty it and secure it by a first lien on all of Reorganized ASARCO's assets and a pledge from the Parent of 51 percent of the equity in Reorganized ASARCO.

37.     On August 17, 2009, on the sixth day of the ten-day Confirmation Hearing, the Parent proposed yet again a further enhanced plan that paid all creditors in full with interest.

38.     By the close of the Confirmation Hearing, not only had all other creditors benefited from their extraordinary efforts, but the Asbestos Fiduciaries had reached agreements with both plan proponents to settle the Derivative Asbestos Claims for an allowed claim of $1 billion to be funded into a § 524(g) Asbestos Trust with cash and assets valued at approximately $940 million. These monumental settlements represented a 350% premium over the Debtors' asbestos damages valuation; 1,250% over the ASARCO Committee's asbestos damages valuation; and 5,588% over the first $17 million pre-petition settlement offer–and represented substantial payments for asbestos claims for which ASARCO had repeatedly and historically denied it had any liability whatsoever.  Truly, this is a rare and exceptional result produced by the superior performance by the Asbestos Fiduciaries individually and as a group.

**B.     The FCR Also Played an Expanded Role in these Chapter 11 Cases**

39.     In addition to his work maximizing recovery for the Asbestos Personal Injury Claimants, the FCR in many ways served as one of the principle fiduciaries for the overall Chapter 11 Cases.  From the very beginning of the case, the FCR's views concerning a broad array of case issues were sought and requested by the Debtors' counsel, and he was expected to participate in matters concerning the Debtors' overall rehabilitation under the Bankruptcy Code and was asked repeatedly by the Debtors' counsel to comment on key decisions and overall strategy.  His work was necessary and often requested by the other parties in interest.  They had good reason to do so: the key to the recovery for any of the creditors of these Chapter 11 Cases estates was the Debtors' ability to operate as a going concern and emerge from Chapter 11 with a channeling injunction pursuant to Section 524(g) of the Bankruptcy Code.  The latter, in particular, required the FCR's consent.

40.     The FCR and OBHT provided critical assistance in appointing independent management to ASARCO's board that were not beholden to the Parent or were not otherwise conflicted.  ASARCO's new and independent management "stabilized ASARCO's operations, increased production and efficiency, cut costs, strengthened the Company's financial department, hired executives to assist with developing and implementing a business strategy, established credibility with the Company's employees, vendors, and creditors, and eventually stewarded the Company into profitability."

41.     At the request of the Debtors, the FCR and OBHT reviewed and provided comments on numerous drafts of plan sponsor agreements.  The FCR and OBHT attended the plan sponsor selection meeting held at the offices of Debtors' counsel, met with the Debtors, their financial advisors, the Parent and potential bidders.   Together with the Asbestos

Committee's counsel, OBHT attorneys drafted the Asbestos Trust Agreement and Asbestos Trust Distribution Procedures.

42.     The FCR and OBHT participated in the estimation of the Debtors' environmental liabilities, toxic tort liabilities and the more significant claims in the bankruptcy estates.  OBHT attorneys traveled to the mediations of the different sites, consulted with both the Debtors' and the plaintiffs' or government's attorneys, and made recommendations to the Debtors on settlement strategy.   The presence of case fiduciaries, including OBHT attorneys, at the mediations often assisted the Debtors in acclimating claimants' counsel with the general mechanics of settling claims in bankruptcy proceedings and in the particular context of these Chapter 11 Cases.  The FCR and OBHT also monitored and participated in the more significant claims objections, offering their suggestion to Debtors' counsel on the reasonableness of settlement offers and other procedural and substantive matters before the Bankruptcy Court and, when solicited, overall strategy.

## IV.    The FCR's and OBHT's Compensation During the Chapter 11 Cases

### A.    Sources of Compensation for the Asbestos Fiduciaries

43.     For the first three years of these Chapter 11 Cases, the FCR and OBHT were appointed to represent the Future Claimants in the Subsidiary Cases filed on April 11, 2005.  At that time and throughout the Chapter 11 Cases, the Subsidiary Debtors were essentially empty shells.  The Asbestos Fiduciaries who provided services in the Subsidiary Cases were completely dependent on the proceeds from various cash settlements with the Debtors' asbestos insurers for their fees and expenses.   As a result, the Debtors and the Asbestos Fiduciaries executed stipulations wherein they agreed to escrow these insurance proceeds in a designated account for the purpose of paying the Asbestos Fiduciaries' fees and expenses.

44.     By the time the asbestos insurance escrow proved insufficient, ASARCO had improved financially and was able to provide debtor-in-possession financing to the Asbestos Subsidiaries in order to pay the fees and expenses of the Asbestos Subsidiaries' professionals.

45.     The fees and expenses of the Asbestos Fiduciaries for services provided in the ASARCO Cases were paid directly by ASARCO.

**B.     Interim Compensation Procedures**

46.     The Debtors requested and this Court entered certain orders pursuant to Section 331 of the Bankruptcy Code governing the interim compensation of professionals in both the Subsidiary Cases and the ASARCO Cases (the "Interim Compensation Orders

47.     The Interim Compensation Orders provided a streamlined procedure for the periodic payment of fees and costs of all court-appointed professionals (the "Professionals") prior to actual allowance by the Court but after amply opportunity for certain parties, including the Debtors, the U.S. Trustee, the appointed creditors committees and their respective counsel (the "Reviewing Parties") to review the Professional's fee and expense statements. The Interim Compensation Orders further gave all parties in interest, creditors, and the Court an opportunity to review and object to the fee and expense statements of all Professionals as filed with the Court every four (4) months.

48.     Specifically, pursuant to the Interim Compensation Orders, all Professionals were required to submit to the Reviewing Parties on a monthly basis detailed statements of services rendered and expenses incurred for the prior month (the "Monthly Statements"). Absent a timely objection (for the Subsidiary Cases, 15 days, and for the ASARCO Cases, 20 days), the respective Debtor entity would remit payments for 100% of the incurred expenses and a portion of the fees. For the Subsidiary Cases, 100% of fees were remitted with a requirement that the

professional segregate 20% in an IOLTA Trust account, and in the ASARCO Cases, ASARCO remitted 80% of fees with ASARCO itself holding back the remaining 20%.

49.     In the event that any of the Reviewing Parties had an objection to a professional's Monthly Statement, the Reviewing Party was required to serve such objection in written form on the relevant Professional as well as a notice of the objection on the other Reviewing Parties.  If the objecting Reviewing Party and Professional were unable to reach an agreement on the correct payment to be made, the Professional had the choice of foregoing payment of the disputed amount until the next interim fee application or filing the objection and a corresponding request for payment with the Court for resolution.

50.     In addition to the service and exchange of Monthly Statements, professionals were also required by the Interim Compensation Orders to file with the Court every four (4) months and to serve on all parties entitled to notice an application for interim Court approval and allowance, pursuant to Section 331 of the Bankruptcy Code, for compensation and reimbursement of expenses for the prior four (4) months (the "Interim Compensation Applications").  Upon the Court's entry of an order approving the Interim Compensation Application, ASARCO was authorized to pay the unpaid 20% of fees to the ASARCO Case professionals, and professionals in the Asbestos Subsidiary Cases were authorized to draw down on the 20% set-aside in their IOLTA Trust accounts.

### C.     OBHT's Preparation and Submission of Monthly Statements and Interim Compensation Applications

51.     OBHT submitted Monthly Statements for both the Subsidiary Cases and the ASARCO Cases to the relevant Reviewing Parties set out in the respective Interim Compensation Orders.   OBHT also filed, submitted, and served Interim Compensation Applications for both the Subsidiary Cases and the ASARCO Cases pursuant to the requirements

of the Interim Compensation Orders, Section 331 of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the applicable general orders and local rules of the United States Bankruptcy Court of the Southern District of Texas (the "Local Rules") and the U.S. Trustee's Office *Guidelines for Reviewing Applications for Compensation & Reimbursement of Expenses filed under 11 U.S.C. § 330* (the "U.S. Trustee Guidelines"). The Interim Compensation Applications contained sufficient detail and information and to otherwise comply with the Bankruptcy Code, Bankruptcy Rules, Fifth Circuit law, and the Guidelines.

52.     John H. Tate, II, a shareholder of OBHT and the OBHT attorney responsible for billing matters in these Chapter 11 Cases, testified that OBHT's Monthly Statements reflected the billing attorneys' actual expenses and hours worked.  He further testified that OBHT's billing practices throughout the Chapter 11 Cases were thorough, careful and complete and complied with the requirements of the Bankruptcy Code, the Bankruptcy Rules, Fifth Circuit law and the Guidelines.  In fact, OBHT put in place a review process wherein Mr. Tate or attorneys under his supervision and direction would review the pro forma invoices generated by OBHT's accounting department and make appropriate corrections for inadvertent billing errors and completeness and to otherwise insure compliance with the Guidelines.  Mr. Tate and OBHT attorneys also made certain redactions of privileged or confidential information, such as strategy, when that information could compromise or hinder the FCR's prosecution of the Derivative Asbestos Liability Claims or other privileged or confidential matters that affected the interests of the Future Claimants.

53.     Mr. Tate also testified that OBHT made certain accommodations to the Debtors' estates that departed from their customary billing practices.  When recording time entries for non-working travel, OBHT timekeepers discounted their non-working travel time by one-half

unless they were actually working on case-related matters during such travel. OBHT attorneys did not seek reimbursement for first class seating or any other luxurious accommodations. Unless unavoidable due to particular circumstances, all commercial air travel was at all times charged at or below a refundable economy fare.

54.     OBHT also allocated the services it performed to the Subsidiary Cases, the ASARCO Case or the Additional Debtors Cases, according to who was the beneficiary of such services. Many times OBHT services benefited the Future Claimants in the Chapter 11 Cases as a whole, and the allocation of OBHT time was a highly subjective determination. Accordingly, Mr. Tate testified that he allotted OBHT time entries to the respective Debtor to the best of his ability.

55.     OBHT also complied with the U.S. Trustee Guidelines. In its Interim and Final Fee Applications, OBHT categorized the time spent by OBHT attorneys and paraprofessionals by the categories suggested in the U.S. Trustee Guidelines and drafted overall narratives summarizing the services that OBHT provided. The Interim Fee Applications sorted the hours of services provided by attorney and paraprofessional, listed the respective hourly rates of the attorneys and paraprofessionals, and calculated a blended rate. The Interim Fee Applications also set out the factors normally considered by the courts in reviewing fee applications and provided argument and support for how OBHT met these factors and considerations.

### D.     OBHT's Reliance on Absence of Objections to Monthly Statements and Interim Compensation Applications

56.     Mr. Tate testified that from time to time, OBHT was contacted by the U.S. Trustee's Office requesting additional information or supporting documents for an expense item in OBHT's Monthly Statements. OBHT provided the requested information or documentation to the satisfaction of the U.S. Trustee's Office, and OBHT never received from the U.S. Trustee,

ASARCO, any of the Reviewing Parties, or any other creditor or party in these Chapter 11 Cases any comment or objection as to the failure of any time entry therein to comply with the guidelines as to any of its Monthly Statements or any of Interim Compensation Applications. The Court entered orders approving all of OBHT's Interim Compensation Applications and 100% of fees and expenses (except for certain 20% "stub period" fees in OBHT's Final Fee Application) were paid during the course of the Chapter 11 Cases.

57.   Mr. Tate testified that the absence of comments or objections to OBHT's Monthly Statements and Interim Compensation Applications and the Court's entry of orders approving OBHT's Interim Compensation Applications caused him to believe and to rely upon the fact that the information and detail provided in the OBHT Monthly Statements and Interim Compensation Applications (i) were sufficient to enable the reviewing parties, ASARCO, all parties entitled to notice, and the Court to make an independent assessment as to the reasonableness and necessity of OBHT's services and incurred expenses and (ii) were in technical compliance with the Bankruptcy Code, Bankruptcy Rules, Fifth Circuit law, and the Guidelines.  The first time that Reorganized ASARCO and the Parent filed any objection to OBHT's requested fees and expenses was when Reorganized ASARCO and the Parent filed the objections that were the subject of June 15-17, 2010, hearings.

**E.    OBHT's Final and Supplemental Fee Applications**

58.   On February 8, 2010, OBHT filed its Final Fee Application. The Final Fee Application requested final allowance and approval of the time and expenses (i) approved on an interim basis in the Interim Compensation Orders and (ii) incurred during the period from December 1, 2009 to December 9, 2010 (the "Stub Period"), wherein OBHT performed services and incurred expenses after its last Interim Compensation Application and prior to closing of the

Parent's Plan. In its Final Fee Application, requested compensation for 34,640.30 hours of professional time which, according to the respective standard hourly rates for its attorneys, total $10,187,728.50 and out-of-pocket expenses totaling $647,076.67. Contemporaneously with the Final Fee Application, the FCR and OBHT filed a Joint Enhancement Application, wherein OBHT requested an upward adjustment of twenty-five percent (25%) to its average lodestar rate to reflect the true market value of its services. In this regard, OBHT requested that the Court approve and allow on a final basis $12,734,660.63 in fees and $647,076.67 in expenses.

59.    OBHT filed two supplemental applications, requesting fees and expenses incurred during the post-confirmation period preparing and defending its Final Fee Application and Joint Enhancement Application against the objections of Reorganized ASARCO and the Parent.   On June 11, 2010, OBHT filed its first supplement (the "First OBHT Supplemental Application"), and on June 29, 2010, OBHT filed its second supplement (the "Second OBHT Supplemental Application," together with the First OBHT Supplemental Application, the "OBHT Supplemental Applications"). The First OBHT Supplemental Application requested the Court to approve and allow on a final basis an additional $182,103.25 in fees and $5,943.85 in expenses for preparing and defending its and the FCR's Final Fee Applications and $141,771.50 in fees and $5,943.85 in expenses for preparing and defending the Joint Enhancement Application. The Second OBHT Supplemental Application requested the Court to approve and allow on a final basis an additional $121,319.75 in fees and $17,680.33 in expenses for preparing and defending its and the FCR's Final Fee Applications and $87,614.75 in fees and $22,313.60 in expenses for preparing and defending the Joint Enhancement.   The fees requested in the OBHT Supplemental Applications were calculated in accordance with OBHT's standard hourly rates at the time the services were rendered.

60.     The Second OBHT Supplemental Application also estimates that OBHT will expend an additional 140 hours, more or less, at its attorneys' standard billing rates in preparing proposed findings of fact and conclusions of law and preparing and presenting final arguments. OBHT further expects to incur an additional $50,000.00 in fees and $5,000 in expenses, more or less, to be equally divided between the Final Fee Application and Joint Enhancement Application. OBHT estimated that, in the event of an appeal to the District Court, it would incur approximately an additional $50,000.00 in fees and $5,000.00 in expenses, more or less, to be equally divided between the Final Fee Application and Joint Enhancement Application.

61.     In sum, OBHT requested final approval of the following:

**OBHT Fees and Expenses**

| Period | Fees | | Expenses | |
|---|---|---|---|---|
| Pre-Plan Effective Rate (Pre Dec. 9, 2009) | $ | 10,187,728.50 | $ | 647,076.67 |
| 25% Upward Adjustment of Pre-Confirmation Fees | $ | 2,546,932.13 | $ | 0.00 |
| Post-Confirmation (Post Dec. 9, 2009) | | | | |
|    Services Related to Final Fee Application | $ | 302,423.00 | $ | 23,624.18 |
|    Services Related to Enhancement Application | $ | 229,386.25 | $ | 28,257.45 |
| Estimated Post-June 28, 2010 | | | | |
|    Services Related to Final Fee Application | $ | 25,000.00 | $ | 2,500.00 |
|    Services Related to Enhancement Application | $ | 25,000.00 | $ | 2,500.00 |
| Estimated District Court Appeal | | | | |
|    Services Related to Final Fee Application | $ | 25,000.00 | $ | 2,500.00 |
|    Services Related to Enhancement Application | $ | 25,000.00 | $ | 2,500.00 |
| **TOTAL** | **$** | **13,366,469.88** | **$** | **708,958.30** |

## F.     The FCR's Final and Supplemental Fee Applications

62.     The Future Claims Representative filed fourteen interim fee applications in the subsidiary cases and four interim fee applications in the ASARCO Cases and, in each instance, informed this Court that the rates being charged for his services was a normal rate without consideration of size and degree of responsibility, difficulty and complexity.  On February 8, 2010, the FCR filed his Final Fee Application. His Final Fee Application requested final

allowance and approval of the time and expenses (i) approved on an interim basis in the Interim

Compensation Orders and (ii) incurred during the Stub Period, wherein the FCR performed

services and incurred expenses after his last Interim Compensation Application and prior to

closing of the Parent's Plan. In his Final Fee Application, the FCR requested compensation for

4,251.95 hours of professional time which, according to his standard hourly rate for the

respective years, total $1,442,277.50 and out-of-pocket expenses totaling $73,680.39. Pursuant

to the Joint Enhancement Application, the FCR requested an upward adjustment of twenty-five

percent (25%) to his standard rates to reflect the prevailing market rates or the true market value

of his services. In this regard, the FCR requested that the Court approve and allow on a final

basis $1,802,846.88 in fees and $73,680.39 in expenses.

63.     The FCR also filed two supplemental applications, requesting fees and expenses

incurred during the post-confirmation period preparing and defending his Final Fee Application

and the Joint Enhancement Application against the objections of Reorganized ASARCO and the

Parent.   On June 11, 2010, the FCR filed his first supplement (the "First FCR Supplemental

Application"), and on June 29, 2010, the FCR filed his second supplement (the "Second FCR

Supplemental Application," together with the First FCR Supplemental Application, the "FCR

Supplemental Applications"). The First FCR Supplemental Application requested the Court to

approve and allow on a final basis an additional $73,912.50 in fees and $3,712.61 in expenses for

preparing and defending his Final Fee Application and the Joint Enhancement Application. The

Second FCR Supplemental Application requested the Court to approve and allow on a final basis

an additional $7,377.72 in fees and $1,212.72 in expenses for preparing and defending his Final

Fee Applications and $26,178.90 in fees and $5,163.90 in expenses for preparing and defending

the Joint Enhancement.     The fees requested in the FCR Supplemental Applications were

calculated in accordance with Judge Pate's standard hourly rate at the time the services were rendered.

64.     In sum, the FCR requested final approval of the following:

**FCR Fees and Expenses**

| Period | Fees | | Expenses | |
|---|---|---|---|---|
| Pre-Plan Effective Rate (Pre Dec. 9, 2009) | $ | 1,442,277.50 | $ | 73,680.39 |
| 25% Upward Adjustment of Pre-Confirmation Fees | $ | 360,569.38 | | |
| Post-Confirmation (Post Dec. 9, 2009) | | | | |
| Services Related to Final Fee Application | $ | 81,290.22 | $ | 4,925.33 |
| Services Related to Enhancement Application | $ | 26,178.90 | $ | 5,163.90 |
| **TOTAL** | $ | **1,910,316.00** | $ | **83,769.62** |

## V.     Reorganized ASARCO's Objection to the FCR's and OBHT's Final Fee Application

65.     On March 10, 2010, Reorganized ASARCO filed its Objections to the FCR's and OBHT's Final Fee Applications.

66.     On June 15, 2010, the opening day of the Hearings on the FCR's and OBHT's Applications, Reorganized ASARCO withdrew its Objections to the FCR's Final Fee Application by a last minute announcement through counsel in open court—leaving only Reorganized ASARCO's Objections to OBHT's Final Fee Enhancement and Reorganized ASARCO's and the Parent's Objections to any upward adjustment of the FCR's or OBHT's standard hourly rates.

67.     For the reasons set forth herein, the Court finds and concludes that none of Reorganized ASARCO's Objections to OBHT's Final Fee Application form a legitimate basis for disallowing any of OBHT's fees and expenses, particularly when properly viewed in the context of the almost five years covered, the non-existence of any prior comments or objections, the complexity of the Chapter 11 Cases, the work performed, and the exceptional outcome.

## VI.    OBHT's Fee Applications and Underlying Monthly Statements Contain the Necessary Information for the Court to Determine the Underlying Services were Reasonable and Necessary

68.     The Fifth Circuit has repeatedly held that fee applications and the underlying invoices do not need to "reach an ideal level of completeness"; rather they must contain "the necessary information," such as "the amount of time devoted to the case by each of the involved persons." *Lawler v. Teofan (In re Lawler)*, 807 F.2d 1207, 1212 (5th Cir. 1987); *see also Continental Illinois Nat'l Bank & Trust Co. of Chicago v. Charles N. Wooten, Ltd. (In re Evangeline Refining Co.)*, 890 F.2d 1312, 1326 (5th Cir. 1989).   This "necessary information" can be contained in both the fee applications as well as the record of the court. *Evangeline Refining Co.*, 890 F.2d at 1326 ("an application must be sufficiently detailed and accurate that, in conjunction with any proceeding in connection therewith and the record in the case, a court can make an independent evaluation as to what level of fees are actual, necessary and reasonable"). The Fifth Circuit has denied as "wasteful" objections to fee applications requiring "an elaborate breakdown of [attorneys'] activities when the information was readily available in the time records submitted to the bankruptcy courts." *Lawler*, 807 F.2d at 1212 (5th Cir. 1987)(where objectors contended that the applicants should have "specif[ied] the amount of time devoted to each phase of the bankruptcy proceedings and the time spent preparing the fee application").

69.     In large, long, complex cases, the Court should look at totality of circumstances and not nitpick fee entries.  *In re Amdura Corp.,* 139 B.R. 963, 972 (Bankr. D. Colo. 1992)("As the Court has already observed, there were many services provided in this case in a relatively short time period. The client required attention to multiple tasks, most of which also involved serious time pressures. Many hours were billed by the professionals. It is reasonable under any circumstances to expect that, out of the totality of hours billed, there may be some percentage of