

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

**ENTERED**
**07/20/2011**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 05-21207** |
| | § | |
| **ASARCO LLC, et. al.** | § | **Chapter 11** |
| | § | |
| **Debtors** | § | **(Jointly Administered)** |

**MEMORANDUM OPINION ON FINAL APPLICATION OF STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, A PROFESSIONAL CORPORATION, FOR APPROVAL OF ATTORNEYS' FEES AND EXPENSES INCURRED AS COUNSEL FOR THE OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS FOR THE PERIOD FROM APRIL 11, 2005 THROUGH <u>JANUARY 31, 2010, AS AMENDED AND SUPPLEMENTED</u>**

On this day came on for consideration, the Final Application of Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation ("SBEP"), For Approval of Attorneys' Fees and Expenses Incurred as Counsel for the Official Committee of Asbestos Claimants for the Period from April 11, 2005 through January 31, 2010 (the "Final Fee Application"), as amended and supplemented. The Court, having heard the evidence and arguments of counsel makes the following findings of fact and conclusions of law.

    1.      On February 8, 2010, Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation ("Applicant") filed its Final Fee Application, initially seeking final approval of the sum of $19,317,274.78 for professional services rendered for the period from April 11, 2005 through January 31, 2010 ("the Final Compensation Period") and $905,433.76 for reimbursement of expenses incurred in connection with the rendition of such services, for a total of $20,222,708.54.

2.      SBEP's Final Fee Request, as supplemented, seeks final approval of the sum of $25,810,911.35.  Of this amount, $19,978,976.79 was incurred by SBEP before the Effective Date of the Parent's Plan (the "Pre-Effective Date Fees and Expenses"); $4,829,318.70 represents the 25% upward adjustment requested by SBEP in the SBEP Final Fee Requests; $912,615.86 has been incurred by SBEP after the Effective Date of the Parent's Plan in connection with defending and prosecuting the SBEP Final Fee Requests (the "Post-Effective Date Fees and Expenses")[1]; and $90,000.00 estimated for fees and expenses that SBEP incurred for work performed between the June 15-17 hearing and the closing arguments held on July 13, 2010.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the Final Fee Application pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

4.      On April 11, 2005, the Subsidiary Debtors filed petitions for relief under Chapter 11 of the Bankruptcy Code and their cases were initially jointly administered under case no. 05-20521 in the United States Bankruptcy Court for the Southern District of Texas ("Bankruptcy Court" or "Court").

---

[1]  SBEP has at the Court's request divided its Post-Effective Date Fees and Expenses, $912,615.86, to the extent possible, between those fees associated with the SBEP Final Fee Application and those fees associated with the SBEP Enhancement Application.  Exhibits A and B to the Esserman Affidavit are invoices that contain the daily time entries of SBEP starting on December 10, 2009, and running through June 18, 2010, separated between time spent in connection with the SBEP Final Fee Application (Exhibit A) and the SBEP Fee Enhancement Application (Exhibit B).  For the Post-Effective Date Fees and Expenses, SBEP has allocated $430,626.43 to work performed on the SBEP Final Fee Application (see Exhibit A to Esserman Affidavit) and $481,989.43 for work performed on the SBEP Enhancement Application (see Exhibit B to Esserman Affidavit).

5. On April 27, 2005, the United States Trustee appointed the Official Committee of Unsecured Creditors in the Subsidiary Debtors' bankruptcy cases. *See* Dkt. No. 45 in Case No. 05-20521.

6. By order signed June 3, 2005, the Bankruptcy Court authorized the Subsidiary Committee to retain Applicant as its counsel nunc pro tunc to April 11, 2005.

7. On August 9, 2005, ASARCO, LLC, the direct or indirect parent company for each of the Subsidiary Debtors, filed its own chapter 11 petition for relief, and the Bankruptcy Court ordered on August 12, 2005, that the Subsidiary Debtors' and ASARCO's bankruptcy cases be jointly administered under case no. 05-21207. After that date, several of ASARCO's other wholly owned direct or indirect subsidiaries filed similar petitions for relief in this Court (the "Additional Subsidiary Debtors" and together with ASARCO and the Subsidiary Debtors, the "Debtors"). The Additional Subsidiary Debtors' cases were also jointly administered under case no. 05-21207.

8. On July 18, 2008, the Debtors filed their Expedited Motion for Order Directing the United States Trustee to Appoint an Official Committee of Asbestos Claimants [Dkt No. 8423] (the "Committee Expansion Motion"), requesting that this Court direct the United States Trustee to appoint an Official Committee of Asbestos Claimants to represent the holders of asbestos-related claims against ASARCO and the Subsidiary Debtors.

9. On August 15, 2008, the Court entered its Order Granting Debtors' Expedited Motion for Order Directing the United States Trustee to Appoint an Official Committee of Asbestos Claimants [Dkt No. 8735] (the "Committee Expansion Order").

10. Shortly thereafter, ASARCO determined that it was in the best interests of the jointly administered Debtors' estates for the Official Committee of Asbestos Claimants to represent the holders of asbestos-related claims against all of the Debtors—not only ASARCO and the Subsidiary Debtors, but the Additional Subsidiary Debtors as well. Accordingly, on August 21, 2008, the

Debtors filed their Expedited Supplemental Motion for Order Directing the United States Trustee to Appoint an Official Committee of Asbestos Claimants [Dkt. No. 8809] (the "Supplemental Committee Expansion Motion"), requesting that this Court vacate the August 15, 2008, Committee Expansion Order and direct the United States Trustee to appoint an Official Committee of Asbestos Claimants to represent the specific class of creditors with asbestos-related claims against any of the Debtors, including ASARCO, the Subsidiary Debtors, and the Additional Subsidiary Debtors.

11.     On August 26, 2008, the Court entered its Order Granting Debtors' Expedited Supplemental Motion for Order Directing the United States Trustee to Appoint an Official Committee of Asbestos Claimants [Dkt. No. 8859] (the "Supplemental Committee Expansion Order").

12.     Also on August 26, 2008, the United States Trustee for the Southern District of Texas, Corpus Christi Division, appointed the Official Committee of Asbestos Claimants. *Id.*

13.     By order signed on September 16, 2008, the Bankruptcy Court authorized the Asbestos Committee to employ Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation, as its counsel. Because the Application to Employ was made within 30 days of the commencement of Applicant's services to the Asbestos Committee, the Application to Employ is deemed to have been filed contemporaneously with the commencement of Applicant's services to the Asbestos Committee on August 15, 2008. *See* Bankruptcy Local Rule 2014(b)(1).

14.     Confirmation hearings on two competing plans of reorganization were held before the United States Bankruptcy Court for the Southern District of Texas beginning on or about August 10, 2009. After several days of hearings and substantial post-hearing briefing, the Bankruptcy Court recommended the confirmation of Asarco Incorporated and Americas Mining Corporation's (collectively, the "Parent") Seventh Amended Plan of Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code, as Modified on August 20, 2009, August

23, 2009, and August 27, 2009 (the "Parent's Plan").  On November 13, 2009, the United States

District Court for the Southern District of Texas adopted the Bankruptcy Court's recommendation

and entered its Memorandum Opinion, Order of Confirmation, and Injunction (the "Confirmation

Order") confirming the Parent's Plan [Docket No. 70 in case no. 2:09-CV-00177].

      15.     On December 9, 2009, the Parent's Plan went effective and the ASARCO Asbestos

Personal Injury Settlement Trust was created and funded with nearly $1 billion in assets, including

more than $650 million in cash plus a $280 million secured note from Reorganized ASARCO.

## THE INTERIM APPLICATIONS

      16.     Pursuant to the Subsidiary Administrative Order[2] and the ASARCO Administrative

Order,[3] Applicant submitted monthly invoices to ASARCO, the Subsidiary Debtors, the United

States Trustee, the Future Claims Representative, and the Official Committee of Unsecured

Creditors (as applicable) throughout the course of this bankruptcy case.  Applicant also filed

fourteen interim applications for approval of compensation and reimbursement of expenses as

further detailed in the Final Fee Application.  No objections were filed to any of these interim

applications and in each case the Court entered an order approving the interim application.

      17.     In addition to the interim fee applications filed with this Court, Applicant served

monthly invoices beginning on December 1, 2009, for services rendered to the Asbestos Committee

on the appropriate notice parties as well as the Plan Administrator for the Parent's Plan (defined

below).

---

[2]  As used herein, "Subsidiary Administrative Order" refers to the Interim Administrative Order
under 11 USC §§ 105 and 331 Establishing Procedures for Interim Compensation and
Reimbursement of Expenses for Professionals (Dkt. No. 21 in Case No. 05-20521).

[3]  As used herein, the term "ASARCO Administrative Order" refers to the Administrative Order
Granting [DOC #855] pursuant to Sections 105(a) and 331 of the Bankruptcy Code Establishing
Procedures for Interim Compensation and Reimbursement of Expenses of Professionals
Representing ASARCO, LLC (Dkt. No. 1225, in Case No. 05-21207).

18.     Prior to the filing of the Subsidiary Debtors' bankruptcy cases, Applicant represented an ad hoc committee of asbestos claimants (the "Ad Hoc Committee") that consisted of certain of the law firms that represent the claimants who are now represented on the Asbestos Committee. Pursuant to an agreement entered into between the Ad Hoc Committee and ASARCO, ASARCO agreed to reimburse the Ad Hoc Committee for its fees, costs, and expenses (including the fees and expenses of its attorneys). To fulfill this pre-petition agreement, ASARCO provided Applicant with a $50,000.00 retainer to be held by Applicant against the pre-petition fees and expenses incurred until Applicant's final invoice in connection with this matter is paid in full by ASARCO or until it is otherwise drawn down in connection with a proposed chapter 11 case or otherwise. Applicant thereafter provided legal services to the Ad Hoc Committee and sent certain invoices to ASARCO, which invoices were paid on a regular basis by ASARCO until the filing of the Subsidiary Debtors' bankruptcy cases.

19.     As of the April 11, 2005 petition date for the Subsidiary Debtors, Applicant had applied the entire retainer for services rendered pre-petition. After drawing down the entire amount of the retainer to pay for pre-petition services, there remained a $10,235.97 balance due from ASARCO for additional pre-petition services. Subsequent to the petition date, ASARCO paid off this pre-petition balance.

## ALLOCATION OF FEES AND EXPENSES

A.     *Fees and Expenses Allocated to the Subsidiary Debtors*

20.     Pursuant to the terms of the Bankruptcy Court's April 13, 2005, Subsidiary Administrative Order, Applicant submitted monthly statements for work completed on behalf of the Subsidiary Committee and allocated to the Subsidiary Debtors to the Subsidiary Debtors, the United States Trustee, the FCR and to ASARCO in the amount of $16,108,946.05 for the period from April 11, 2005 through January 31, 2010 (the "Subsidiary Debtor Fee Statements").

- 6 -

21.     In accordance with the Subsidiary Administrative Order, once payment was received for each monthly Subsidiary Debtor Fee Statement, Applicant placed 20% of the amount received on account of professional fees into its trust account; the remaining 80% of fees and 100% of expenses billed for each Subsidiary Debtor Fee Statement was placed into Applicant's operating account. The 20% hold back on fees remained in Applicant's trust account until such amounts were awarded to Applicant pursuant to the orders approving each of Applicant's interim fee applications discussed above. *Id.*

B.     *Fees and Expenses Allocated to ASARCO*

22.     Pursuant to the Bankruptcy Court's December 15, 2005, ASARCO Administrative Order, Applicant submitted monthly statements (the "ASARCO Fee Statements") to ASARCO, the United States Trustee, and the Official Committee of Unsecured Creditors in the amount of $4,090,987.99 for the period from August 15, 2008 through and including, January 31, 2010.  Final Fee Application at 25.  Upon submission of each ASARCO Fee Statement and the expiration of the applicable objection deadline, ASARCO would pay to Applicant 80% of the professional fees billed and 100% of the expenses billed for each ASARCO Fee Statement; the remaining 20% of professional fees billed for each ASARCO Fee Statement was held back by ASARCO until such fees were awarded to Applicant pursuant to an order granting the applicable interim fee application.

C.     *Fees and Expenses allocated to the Additional Subsidiary Debtors*

23.     During the Final Compensation Period, Applicant also completed work on behalf of the Asbestos Committee related to the Additional Subsidiary Debtors.  Applicant has incurred $22,774.50 in professional fees for work allocated to the Additional Subsidiary Debtors. *Id.* Applicant has received the sum of $18,224.10 on account of its monthly statements relating to the Additional Subsidiary Debtors.  *Id.*  Thus, $4,550.40 in fees for work relating to the Additional Subsidiary Debtors remains outstanding.

D.    *Payments Received*

24.    Since the filing of the SBEP Final Fee Requests on February 8, 2010, SBEP has received payment in the amount of $112,208.28 for work allocated to the Subsidiary Debtors for the pre-effective date period December 1-9, 2009, $20,838.35 of which is being held by SBEP in trust pending final approval by this Court.  SBEP has also received partial payment in the amount of $91,343.01 for work allocated to ASARCO for the pre-effective date period December 1-9, 2009, with a remaining balance of $20,831.60 due for this period.  SBEP is likewise owed an additional $4,550.40 for pre-effective date work allocated to the Additional Subsidiary Debtors.  Accordingly, with regard to the Pre-Effective Date Fees and Expenses only, Reorganized ASARCO owes SBEP a total of $25,382.00, plus the $20,838.35 currently held in SBEP's trust account pending final approval by this Court.

25.    Other than the payments described above and made in accordance with the Subsidiary Administrative Order and the ASARCO Administrative Order, Applicant has not received payment of any compensation or reimbursement of expenses in these chapter 11 cases.  No fees and expenses incurred after the Effective Date have been paid.  There is no agreement or understanding between Applicant and any other person for the sharing of compensation received for services rendered during the Debtors' chapter 11 cases.

E.    *Detail of Fees and Expenses*

26.    A summary containing Applicant's services to the Subsidiary Committee and the Asbestos Committee, its customary billing rate, its time expended, and the total value of time incurred by it, identified by project task categories, is attached to the Final Fee Application as Exhibit E.  Exhibit E also includes a breakdown of Applicant's services allocated to the Subsidiary Debtors.

27.     In addition, attached to the Final Fee Application as Exhibit E-2, Exhibit E-4, and Exhibit E-6 are Applicant's monthly invoices that have not been the subject of an interim fee application. These invoices reflect the time recorded for services rendered on a daily basis during the period covered by each invoice and descriptions of the services provided to the Asbestos Committee and the Subsidiary Committee and allocated to the Subsidiary Debtors, ASARCO and the Additional Subsidiary Debtors, respectively.

28.     With respect to the time and labor expended by Applicant in this case, as set forth in Exhibit E, during the Final Compensation Period, a brief narrative description of the services rendered for or on behalf of the Subsidiary Committee and the Asbestos Committee and the time expended, organized by project task categories, is set forth in Applicant's applications, including the SBEP Supplement and Esserman Affidavit.

29.     Exhibit F to the Final Fee Application contains a breakdown of expenses incurred by Applicant during the Final Compensation Period, broken down into categories of charges, including, inter alia, telephone charges, special or hand delivery charges, photocopying charges, and long-distance travel charges. Exhibit F also includes an attachment reflecting the monthly breakdown of Applicant's travel expenses for those months that have not been the subject of a previous interim fee application.

30.     The SBEP Supplement contains a breakdown of time and expenses to support the approval of the sum of $353,862.00 for professional services rendered from February 1, 2010, through May 31, 2010, plus an additional $8,721.50 for expenses incurred in connection with the rendition of such additional services, for a total of $362,583.50

31.     The invoices attached to the Esserman Affidavit as Exhibits A and B show a breakdown of the time and expenses to support approval of the sum of $293,761.51 for professional services rendered from June 1, 2010, through June 18, 2010, plus an additional $12,539.10 for

expenses incurred in connection with the rendition of such additional services, for a total of $306,300.61.

32.     SBEP estimated that it would incur an additional $90,000 in fees and expenses through closing arguments in connection with drafting the findings of fact and conclusions of law filed on July 9, 2010, in preparing for and attending the closing arguments held on July 13, 2010, and for other work performed after the June 15-17 hearing on the SBEP Final Fee Requests.

33.     The SBEP Final Fee Application, SBEP Supplement and Esserman Affidavit provide sufficient information to enable the Court to determine the necessity and benefit of the services provided and to assess whether the services were performed within a reasonable time corresponding to the nature and complexity of the tasks.

## FACTS RELEVANT TO AWARD OF FEES

34.     Various factors in considering the value of services rendered in awarding compensation in a bankruptcy case are enumerated in *American Benefit Life Ins. Co. v. Baddock (In re First Colonial Corp.)*, 544 F.2d 1291 (5th Cir. 1977), as set forth below.

A.     *Time and Labor Required*

35.     Applicant spent 47,447.25 hours of professional time during the period from April 11, 2005 through January 31, 2010.  The professionals, the hours spent, and the hourly rate charged by each professional covered by the Final Fee Application are set forth on Exhibit E attached thereto.  SBEP incurred an additional 893.45 hours of professional time during the period from February 1, 2010 through May 31, 2010.  During this time period, SBEP also incurred an additional $8,721.50 in expenses.  SBEP's invoices for February 2010, March 2010, April 2010, and May 2010, are attached to the Supplement as Exhibit B.  In addition, SBEP incurred the hours and expenses set forth in the Esserman Affidavit in the amount of $293,761.51 for professional services from June 1, 2010 through June 18, 2010, plus $12,539.10 in expenses during that period.

B.    *Novelty and Difficulty of the Questions*

36.    This case involved a number of complex issues that had to be overcome before the

Debtors could successfully reorganize.  Particularly challenging for Applicant were the issues related

to ASARCO's Complaint for Declaratory Judgment filed on or about June 15, 2005, as adversary

case no. 05-2048 (the "Alter Ego Adversary").  The Alter Ego Adversary, which was ultimately

stayed by the parties and prosecuted as a contested matter (the "Alter Ego Estimation Proceeding"),

sought a determination of ASARCO's derivative liability for the asbestos liabilities of the Subsidiary

Debtors.  *See* Adversary Case No. 05-2048.  Through the prosecution of the Alter Ego Estimation

Proceeding, Applicant, acting on behalf of the Subsidiary Committee, also sought to prosecute a

number of additional claims and causes of action to recover funds for the Subsidiary Debtors'

bankruptcy estates in the amount of several billion dollars.  As the Alter Ego Estimation Proceeding

progressed, ASARCO eventually sought to expand the scope of the Alter Ego Estimation

Proceeding to include the estimation of both ASARCO's direct and indirect asbestos liabilities. *See*

Dkt. No. 8 in Adversary Case No. 05-2048. After extensive preparation for the trial on ASARCO's

asbestos liabilities and extensive negotiations between the parties, the Alter Ego Estimation

Proceeding was ultimately settled by the parties after four years of litigation.

37.    In addition to the issues surrounding the Debtors' asbestos liabilities, Applicant was

also required to navigate its way through the various issues surrounding the reorganization of an

operating copper mining business confronted with multi-billion environmental claims, characterized

as "the largest environmental bankruptcy in U.S. history."[4] In order to effectively represent and

protect the interests of the Debtors' asbestos creditors, Applicant had to review and analyze the

---

[4]    *Environmental News Service* newswire, *ASARCO Parent Pays $1.79 Billion in Record Environmental Bankruptcy Settlement,* http://www.ens-newswire.com/ens/dec2009/2009-12-10-092.asp (last viewed Feb. 5, 2010).

effect of these environmental claims and the various settlements reached by governmental entities with the Debtors on the potential recovery for asbestos claimants.

38.     ASARCO's voyage through bankruptcy was not simple by any means.  Ultimately, owned by a Mexican corporation, ASARCO faced substantial hurdles along its path towards reorganization, including labor strikes, a corporate governance crisis, vast market swings in the price of copper, and a monumental fraudulent transfer claim against its indirect parent company.  *See ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278 (S.D. Tex. 2008).  In addition to navigating its way through these issues, Applicant also analyzed the numerous issues raised by the potential sale of all of ASARCO's operating assets to an Indian company and its subsidiary, Sterlite (USA), Inc. ("Sterlite"), and the effect that such sale would have on the recovery for asbestos claimants. Applicant's role in the case also required it to address numerous issues regarding Sterlite's breach of the sale contract, as well as the numerous competing plans of reorganization that were proposed by various parties throughout the course of the Debtors' case.

C.     *Skills Requisite to Perform the Services Properly*

39.     The complex nature of this case made it necessary for the Subsidiary Committee and the Asbestos Committee to retain counsel with the highest level of expertise and experience in not only chapter 11 reorganizations in general, but also with specific and substantial experience and skill in bankruptcy cases involving asbestos-related claims and causes of action.  Applicant's expertise in bankruptcy and especially in asbestos-related bankruptcies allowed it to play a significant role in the successful reorganization of Debtors with seemingly insurmountable asbestos and environmental liabilities.

D.     *Preclusion of Other Employment*

40.     Applicant was not necessarily precluded from other employment during the case, although the time commitment was significant.

- 12 -

E.    *Customary Fees*

41.    The rates charged by Applicant are the normal rates for the law firm, without consideration of size and degree of responsibility, difficulty, complexity, and results achieved.

F.    *Whether Fee is Fixed or Contingent*

42.    As in all bankruptcy cases, fees of the Applicant are subject to the review, approval and/or discretion of the Court in determining the value of services to the estate as well as being subject to the availability of funds in the estate and, accordingly, are, in that sense, contingent. Due to the circumstances of this case, Applicant also faced a substantial risk of non-payment of its fees and expenses. Other than causes of action, the Subsidiary Debtors had few assets when they filed for bankruptcy and Applicant had to rely on the Subsidiary Debtors' ability to recover insurance proceeds to pay Applicant's fees and expenses during the bankruptcy process—proceeds that otherwise would have been earmarked for the payment of asbestos-related claims asserted by Applicant's constituency. At various times, it was not always clear whether there would be enough funds in the Subsidiary Debtors' estates to pay Applicant's fees and expenses. *Id.* Although part of this uncertainty was resolved by the intercompany DIP financing between ASARCO and the Subsidiary Debtors, ASARCO later refused to extend the term of the intercompany DIP facility after its expiration, thus cutting-off funding for Applicant's fees and expenses. Hence, over the course of this case, Applicant had, at various times, substantial risk of nonpayment of its fees and expenses.

G.    *Time Limitations by the Client or Other Circumstances*

43.    The circumstances under which Applicant was employed as counsel for the Subsidiary Committee and the Asbestos Committee caused Applicant to experience time limitations and demands at various junctures of this chapter 11 proceeding, particularly with respect to the Alter

Ego Estimation Proceeding and the extensive discovery conducted in connection therewith, as well as the hearing on confirmation of the Debtors' and the Parent's plans of reorganization.

H.    *Amount Involved and Results Obtained*

44.    Although the Debtors' bankruptcy cases began with very few assets on hand and a future that looked bleak for both asbestos and other creditors, these cases came to a successful conclusion. At the time that it filed for chapter 11 protection, ASARCO had barely $10,000,000.00 in cash and was faced with over $2 billion in asbestos claims and several billion dollars in environmental claims asserted by various state and federal governmental agencies. ASARCO also had hundreds of millions of bond debt and general unsecured debt. Despite these massive liabilities, ASARCO successfully reorganized and due in large part to Applicant's efforts, the ASARCO Asbestos Personal Injury Settlement Trust was funded on the Effective Date with nearly $1 billion in assets, including more than $650 million in cash, plus a $280 million secured note from Reorganized ASARCO. Under the confirmed plan, all of ASARCO's unsecured creditors, except the asbestos claimants, were paid in full with interest, and equity interests were maintained.

I.    *The Experience, Reputation and Ability of the Attorneys*

45.    Applicant has acted as counsel for various debtors, creditors' committees, and unsecured and/or secured creditors in numerous other reorganization cases. Applicant also has experience in general corporate, real estate, and litigation matters and, as a result of its prior and current representations, has developed considerable expertise in matters which were important in this case.

J.    *The Undesirability of the Case*

46.    The case is not considered particularly undesirable. However, any chapter 11 case is generally undesirable due to the contingent nature of payment resulting from the need for Court

approval of all fees and expenses and the potential for uncertainty of the availability of funds to pay the approved fees and expenses.

K.     *The Nature and Length of the Professional Relationship of the Client*

47.     Prior to the appointment of the Subsidiary Committee and the Asbestos Committee, Applicant represented in connection with these Debtors an Ad Hoc Committee that consisted of representatives of the law firms that represent certain claimants who are now represented on the Asbestos Committee.  Applicant also represented some of the law firms who were members of the Ad Hoc Committee in other matters and continued to do so and may have performed additional work for those firms in additional other matters.

L.     *Awards in Similar Cases*

48.     The compensation sought is consistent with the reasonable compensation awarded in other cases of this size and scope.

M.     *Expenses*

49.     Applicant's expenses in this matter have not been objected to.  For this reason, the Court approves the expenses sought.  In addition, however, the Court finds as follows.  Applicant has incurred out-of-pocket expenses in connection with this case, primarily relating to travel costs incurred to attend depositions, mediations, and hearings held in this case.  Applicant incurred a considerable amount of expenses related to the substantial document review and analysis conducted by Applicant at Debtors' facilities in Phoenix and Sacaton, Arizona.  Applicant also incurred a substantial amount of expenses in connection with the trial of the Southern Peru Cooper Corporation ("SPCC") fraudulent transfer litigation that was prosecuted before Judge Hanen in the United States District Court for the Southern District of Texas, Brownsville Division.  In addition,

Applicant incurred expenses in connection with the discovery related to the Sterlite 9019 Motion,[5] the depositions related thereto, and preparations for the hearing on the motion, as well as the preparations for the Alter Ego Estimation Proceeding and the confirmation hearings. The Court finds that these expenses are actual, necessary, out-of-pocket expenses that are not properly included in overhead, that arise exclusively from and are traceable to representation of the Subsidiary Committee and the Asbestos Committee, which are incurred for the benefit of the estate and are, therefore, reimbursable by the estate. No allowable disbursement is treated as a "profit center" involving a markup over actual cost.

N.    *Itemized Entries*

50.    Itemized time records reflecting time spent by staff and a description of the services performed and expenditures made on behalf of the Subsidiary Committee and the Asbestos Committee are attached to the Final Fee Application as Exhibit E. Because the majority of Applicant's fees and expenses were the subject of interim fee applications, Exhibit E only contains the time records for those periods that have not been covered by one of the fourteen interim fee applications previously filed by Applicant. Final Fee Application at 23. Applicant's time records associated with its interim fee applications can be found as exhibits to each of the interim fee applications described in the Final Fee Application. In addition, itemized time records are attached to the SBEP Supplement and the Esserman Affidavit.

O.    *Charges for Preparation of Fee Application.*

51.    The Final Fee Application includes 1,188.50 hours for preparation of Applicant's various interim fee applications, the Final Fee Application, Applicant's monthly Fee Statements required to be served pursuant to the Subsidiary Administrative Order and the ASARCO

---

[5] As used herein, the term "Sterlite 9019 Motion" refers to the Debtors' Motion for Order, Pursuant to § 363, 105 and Fed. R. Bankr. P. 9019 Approving Settlement and Release and Revised Bid Protections Contained in the New Purchase and Sale Agreement Between ASARCO LLC and Certain of its Subsidiaries, and Sterlite (USA), Inc., and for Related Relief.

Administrative Order and attending to other fee related matters. The Final Fee Application also includes 542.75 hours for work relating to Fee Applications and monthly Fee Statements served by other estate professionals. Because the Final Fee Application only seeks compensation and reimbursement of fees and expenses incurred through and including January 31, 2010, Applicant has supplemented the application to request allowance of additional time related to the preparation of the Final Fee Application and the preparation of the Final Fee Applications of the Subsidiary Committee's and the Asbestos Committee's professionals.

## CONCLUSIONS OF LAW

1. The professional services summarized by the Final Fee Application, the SBEP Supplement and the Esserman Affidavit and rendered by Applicant to the Subsidiary Committee and the Asbestos Committee were substantial, necessary and beneficial to the Subsidiary Committee's and the Asbestos Committee's constituents, as well as the Debtors' estates.

2. The amounts sought by Applicant consist only of the reasonable, actual and necessary billable time expended by its professionals and the actual and necessary expenses incurred by Applicant during the Final Compensation Period.

3. The Final Fee Application, the SBEP Supplement and the Esserman Affidavit, and the description of services set forth therein of work performed are in compliance with the requirements of Local Bankruptcy Rule 2016 and the applicable guidelines and requirements of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and the Executive Office for the United States Trustee.

4. The time spent and the rates charged for services rendered by Applicant in Debtors' reorganization case are set forth on Applicant's Final Fee Application, as supplemented.

5. Applicant kept accurate records of all time it spent working on Debtors' reorganization case and the related expenses Applicant incurred.

6.      The SBEP Final Fee Application, as supplemented, provides a detailed breakdown of the time spent in rendering the described services and the rates charged for those services. The SBEP Final Fee Application, as supplemented, also provides information to enable the Court to determine the necessity and benefit of the services provided and that the services were performed within a reasonable time corresponding to the nature and complexity of the tasks.

7.      The services rendered by Applicant were necessary to the administration of Debtors' reorganization case and were beneficial to Debtors' estates at the times of their rendition.

8.      The services rendered by Applicant were performed within a reasonable time commensurate with the complexity, importance, and nature of the matters they addressed.

9.      While Applicant has demonstrated skill and expertise in bankruptcy in its representation of the Asbestos Committee in Debtors' reorganization case, the Court notes particularly Mr. Esserman's considerable experience and national reputation in complex chapter 11 cases generally and mass tort driven reorganizations specifically and Mr. Felsenthal's long and distinguished service on the bench of the United States Bankruptcy Court for the Northern District of Texas and expertise in the intricacies of mass tort bankruptcies and related settlements.

10.     The SBEP Final Fee Requests ask the Court, in the context of its analysis under 11 U.S.C. § 330, to determine reasonable compensation for SBEP and to use rates other than the hourly rates actually charged by SBEP during these cases. The Final Fee Requests submitted to the Court on February 8, 2010, support this legal theory.

11.     Section 330(a) of the Bankruptcy Code governs payment of fees to estate professionals such as Applicant. Subsection (a)(1) authorizes courts to award "[r]easonable compensation for actual, necessary services rendered ...."[6] Subsection (a)(3) instructs courts how to determine the amount of reasonable compensation. Courts are directed to consider "the nature, the

---

[6] 11 U.S.C § 330(a)(1).

- 18 -

extent and the value" of services rendered.[7]  All relevant factors are to be taken into account, including:

- time spent in their rendition;
- rates charged for such services;
- their necessity to the administration of a case or their benefit at the time of their rendition;
- whether they were performed within a reasonable time commensurate with the complexity, importance, and nature of the matter addressed;
- with respect to professionals, whether the person is board certified or has otherwise demonstrated skill and experience in bankruptcy; and
- whether compensation is reasonable based on what comparably skilled, non-bankruptcy legal practitioners charge.[8]

Each of these factors is specifically discussed in the SBEP Final Fee Requests.

12.     Thus, upon consideration of all relevant factors, it falls to the Court to determine the so-called lodestar—hours multiplied by prevailing market rate(s)—and whether that lodestar reflects reasonable compensation for Applicant as an estate professional.  "Determining what constitutes reasonable compensation is soundly within the discretion of the bankruptcy court, primarily because the bankruptcy judge is in the best position to determine the reasonableness of the proposed fee." *In re Farah*, 141 B.R. 920, 923 (Bankr. W.D. Tex. 1992).

13.     The Fifth Circuit has traditionally employed the lodestar method to determine a reasonable attorneys' fees under 11 U.S.C.§ 330.  *In re Cahill*, 428 F.3d 536, 539 (5th Cir. 2005); *In re Fender*, 12 F.3d at 487.

14.     "The 'lodestar' method of calculating fees builds on the *Johnson* factors…"  *In re King*, 350 B.R. 327, 332 (Bankr. S.D. Tex. 2006); *In re Unger & Assocs.*, 277 B.R. 694, 697 (Bankr. E.D. Tex. 2001) (citing *In re First Colonial Corp. of Am.*, 544 F.2d 1291, 1299 (5th Cir. 1977)).  "The

---

[7] 11 U.S.C. § 330(a)(3).

[8] *Id.*

'lodestar' is equal to the number of hours reasonably expended multiplied by the prevailing hourly rate in the community for similar work." *In re Lawler*, 807 F.2d 1207, 1211 (5th Cir. 1987) (citing *Copper Liquor, Inc. v. Adolph Coors Co.*, 684 F.2d 1087, 1093 (5th Cir. 1982)).

15.     In determining the prevailing market rate to be used in setting the lodestar, a court may adjust a fee applicant's standard hourly rates up or down based on its consideration of the Section 330 factors and those set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 713, 717-19 (5th Cir. 1974).[9]

16.     SBEP requested that the Court award an enhancement of its fees. In determining reasonable compensation, "a court is guided by the 'prevailing market rates in the relevant community.'" *In re Buckridge*, 367 B.R. 191, 205 n. 24 (Bankr. C.D. Cal. 2007) (internal citation omitted).  As the Fifth Circuit articulated that task, the court must "select an appropriate hourly rate based on prevailing community standards for attorneys of similar experience in similar cases." *Shipes v. Trinity Indus.*, 987 F.2d 311, 319 (5th Cir. 1993).

17.     Prevailing market rates may be established by, among other things, affidavits "reciting precise fees that counsel with similar qualifications have received in comparable cases," by recent fee awards by court in other cases." *Spell v. McDaniel,* 824 F.2d, 1380, 1402 (4th Cir. 1987).

18.     A national community is arguably the appropriate and relevant "community" in this case.  The environmental claims in the case were national in scope; ASARCO's was the largest environmental bankruptcy case ever filed.   Debtors' asbestos-related activities, too, were national in scope.  But, regardless of what "community" or "market" the Court uses in determining reasonable compensation under 11 U.S.C. 330, "the compensation requested by professionals in the same

---

[9] The *Johnson* factors are (1) time and labor required, (2) novelty and difficulty of the issues, (3) skill required to perform the legal services properly, (4) preclusion of other employment, (5) customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by client or circumstances, (8) amount involved and results obtained, (9) experience, reputation and ability of the attorneys, (10) undesirability of the case, (11) nature and length of the professional relationship with the client, and (12) award in similar cases). 488 F.2d at 717-19.

proceeding is relevant to the reasonableness of the fees of all the professionals before the Court." *In re Liberal Market, Inc.*, 24 B.R. at 659.

19.     Applying this standard, the Court finds that the rates charged by SBEP are reasonable and are the appropriate hourly rate to apply to the lodestar.

20.     Pursuant to 11 U.S.C. § 330 and based on the factors enumerated above, the Court determines that the reasonable value of the services rendered to the Subsidiary Committee and the Asbestos Committee up through January 31, 2010, by Applicant is $19,317,274.78. The out-of-pocket expenses of $905,433.76 in the Final Fee Application are reasonable, actual and necessary.

21.     Thus, the Court allows and approves $905,433.76 in expenses and $19,317,274.78 in fees charged to the estate by SBEP during the case.

22.     Under the Parent's Plan, SBEP continues in its role as counsel to the Official Committee of Asbestos Claimants (the "Asbestos Committee") for the purpose of prosecuting the SBEP Final Fee Requests.[10]  In addition, case law supports the award of fees and expenses to bankruptcy professionals incurred in defending against objections to their final fee requests.  *In re Smith*, 317 F.3d 918, 929 (9th Cir. 2002) (overruled on other grounds) (affirming fees awarded to law firms in litigating challenges to fee awards); *In re Dimas*, 357 B.R. 563, 592 (Bankr. N.D. Cal. 2006) ("Applicant's time devoted to Rakitin's objections to its fees is also compensable."); *In re Ahead Commc'ns Sys.*, No. 02-30574, 2006 WL 2711752, at *8 (Bankr. D. Conn. Sept. 21, 2006).

23.     The Court finds that the fees and expenses set forth in the SBEP Supplement are reasonable and compensable for actual and necessary services and approves the sum of $353,862.00 for professional services rendered from February 1, 2010, through May 31, 2010, plus an additional $8,721.50 for actual and necessary expenses incurred in connection with the rendition of such additional services, for a total of $362,583.50.  The amounts sought by Applicant consist only of the

---

[10] *See* Parent's Plan, § 15.5.

actual and reasonable billable time expended by its professionals and the actual and necessary expenses incurred by Applicant during the applicable period.

24.     The Court allows and approves an additional $362,583.50 for fees and expenses from February 1, 2010, through May 31, 2010.

25.     As reflected on the invoices attached to the Affidavit of Sander L. Esserman, as Exhibits A and B,[11] SBEP has incurred additional fees and expenses since filing the SBEP Supplement, particularly in connection with deposing the expert witnesses designated by Reorganized ASARCO and the Parent and preparing for and attending the trial of the SBEP Final Fee Requests. The Court finds such amounts reasonable and compensable and allows and approves the sum of $293,761.51 for actual and necessary professional services rendered from June 1, 2010, through June 18, 2010, plus an additional $12,539.10 for reasonable, actual and necessary expenses incurred in connection with the rendition of such additional services, for a total of $306,300.61.

26.     SBEP incurred additional fees and expenses in connection with drafting the findings of fact and conclusions of law that were filed on July 9, 2010, in preparing for and attending the closing arguments held on July 13, 2010, and for other work performed after the June 15-17 hearing on the SBEP Final Fee Requests. The Court finds such sum reasonable and compensable and allows and approves the payment of an additional $90,000 for actual and necessary services and expenses incurred from June 19, 2010, through and including closing arguments.

27.     A summary of Applicant's out-of-pocket expenses incurred in connection with these cases is attached to the Final Fee Application as Exhibit F, and as set forth in the Supplement and

---

[11] Attached to the Affidavit of Sander L. Esserman as Exhibits A and B are invoices that contain the daily time entries of SBEP starting on December 10, 2009, and running through June 18, 2010, separated between time spent in connection with the SBEP Final Fee Application (Exhibit A) and the SBEP Fee Enhancement Application (Exhibit B).

Esserman Affidavit. The Court finds these expenses reasonable, actual and necessary and allows and approves payment in full of all of these expenses.

28.     SBEP also seeks an enhancement based upon a percentage of the total hours billed in this case. For the reasons set out in this court's Memorandum Opinion on the Final Fee Application of Baker Botts, such an enhancement is not appropriate. However, SBEP and the other asbestos fiduciaries did achieve extraordinary results in the alter ego litigation, reaching a settlement which ultimately paid the asbestos claimants nearly one billion dollars. While the alter ego lawsuit was not tried to a conclusion, the settlement was achieved as a direct result of the exceptional legal work of the asbestos professionals. The result was also a "win-win" solution for both the asbestos claimants and the Parent in that it provided the claimants a sum which was arguably at the high end of reasonable settlement figures while at the same time provided the Parent with both a consenting class of creditors and a Section 524(g) injunction. The Court believes that an enhancement based upon a 10% increase in the fees charged for the alter ego litigation, or $451,131.00, is appropriate.

29.     All objections to the SBEP Final Fee Requests should be overruled.

30.     Any Findings of Fact that in whole or in part are actually conclusions of law are intended to be, and shall be deemed to be, Conclusions of Law. Any Conclusions of Law that in whole or in part are actually findings of fact are intended to be, and shall be deemed to be, Findings of Fact.

31.     In the event of an Appeal SBEP may file a supplemental fee application.

32.     Counsel for SBEP shall submit a proposed order in conformance with the Court's Findings of Fact and Conclusions of Law within ten (10) days from the date below.

Dated:   JUL 2 0 2011

RICHARD S. SCHMIDT
UNITED STATES BANKRUPTCY JUDGE

- 23 -